## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

Google Inc.,

        *Plaintiff,*

        *v.*

Jim Hood, Attorney General of the State of
Mississippi, in his official capacity,

        *Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)
)

SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**

**DEC 19 2014**

ARTHUR JOHNSTON
BY_____DEPUTY

No. 3:14cv981 HTW-LRA

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1.      This is an action for declaratory and injunctive relief brought by Google Inc.

("Google") against Mississippi Attorney General Jim Hood, in his official capacity (the

"Attorney General" or "Attorney General Hood").

2.      Google is an Internet service provider that maintains and operates one of the

world's most popular Internet search engines, providing free, fast, and convenient access to the

trillions of individual web pages publicly-available on the Internet.  Google also maintains and

operates YouTube, a leading online forum for uploading, searching for, viewing, and sharing

videos.

3.      The Attorney General has engaged in a sustained campaign of threats against

Google, designed to compel Google to restrict the information created by others that Google

makes available through its search engine, YouTube video-sharing site, and related advertising.

As part of that campaign, the Attorney General has threatened to proceed against Google civilly

or criminally under Mississippi's Consumer Protection Act ("MCPA"), and he has issued a

retaliatory and burdensome Administrative Subpoena and Subpoena Duces Tecum ("Subpoena")

to Google, demanding Google produce an enormous volume of documents on a wide range of

topics related to the actions Google takes and does not take to restrict the content created by third parties that may be accessed through Google's services.

4.      The Attorney General's threats of criminal prosecution or civil litigation and his punitive Subpoena violate settled federal law. Section 230 of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C § 230, explicitly grants Internet service providers like Google broad immunity from a state enforcement action for doing precisely what the Attorney General has threatened to prosecute or sue Google for doing—making available content created by third parties. The Attorney General's threats and Subpoena also violate the First Amendment's bars on government censorship and interference in a publisher's editorial judgment, including Google's selection and ordering of third-party content on the Internet. Portions of the Subpoena and threatened litigation are also preempted by other federal laws, such as the Copyright Act and the Food, Drug, and Cosmetic Act ("FDCA"). And the Subpoena also constitutes an unreasonable search and seizure, in violation of the Fourth Amendment.

5.      Google brings this action to enjoin the criminal prosecution or civil litigation the Attorney General has threatened, to enjoin enforcement of an unlawful and burdensome Subpoena issued to Google, and to declare Google's rights under federal statutory and constitutional law.

## JURISDICTION AND VENUE

6.      This case arises under the United States Constitution and the laws of the United States, and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3). Google seeks remedies under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 1988.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b).

8.      Assignment of this case to the Northern Division of this Court is appropriate under the Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi, because a substantial part of the events giving rise to this action occurred in Hinds County.

## PARTIES

9.      Plaintiff Google Inc. is a Delaware corporation, with its principal place of business in Mountain View, California.

10.      Defendant Jim Hood is the Attorney General of Mississippi and is sued in his official capacity.  He is the chief law enforcement officer of the State of Mississippi.  Pursuant to the Constitution and laws of the State of Mississippi, the Attorney General is "the chief legal officer and advisor for the state, both civil and criminal, and is charged with managing all litigation on behalf of the state."

## FACTS

### The Services at Issue

11.      Founded in 1998, Google's mission is "to organize the world's information and make it universally accessible and useful."  Today, Google employs over 50,000 people around the world.  The Attorney General's threats and the Subpoena focus on three Google services: Google's search engine ("Google Search" or "Search"), including Autocomplete; YouTube; and advertising.

12.      Google Search is a free service used by over one billion users around the world.  Search is built upon a constantly-updated index reflecting information from the trillions of web pages publicly available on the Internet.  Google receives billions of search queries per day from users around the globe, who conduct millions of searches each minute.  When a user types a query into Google, Google's algorithms identify the web pages captured in Google's index that

are most relevant to the user's query.  Google then ranks and displays relevant search results.  If the user clicks on a result, the user is re-directed from Google.com to the third-party web page corresponding to the link.

13.     Search includes an Autocomplete feature that uses algorithms to statistically predict a user's query before the user finishes typing that query.  Users can click on any prediction, or they can complete typing their query without selecting a prediction displayed in Autocomplete.  Autocomplete predictions are automatically generated based on an algorithm that uses numerous objective factors, including how often other users have included a term in their queries.  The purpose of Autocomplete is to provide users with a quicker and more user-friendly search experience.

14.     YouTube is a free video-sharing website owned by Google, where users can upload, search for, view, and share videos.  Nearly 300 new hours of video are uploaded to YouTube by users every minute.  Each month, more than one billion unique users visit YouTube, collectively watching millions of hours of videos.

15.     Google's AdWords program allows advertisers to bid on certain keyword search terms.  When those keyword terms are entered by a user, the ads for the winning bidders will appear on the user's results pages.  Advertisements are clearly labeled as such and are distinct from the search results generated by the user's query.  Google earns revenue when a user clicks on an ad that appears in response to the user's search query.  Google also serves AdWords ads on third-party websites through a program called AdSense.

16.     On YouTube, a user who posts a video has the option of displaying advertising against the user-posted content.  Advertisements are often displayed in the form of banner ads running horizontally across videos or static images linking to an advertiser site.  In some cases,

revenue generated from those ads is shared between the uploader of the video and Google. Videos with such advertising are known as "monetized" videos. In other cases, YouTube shares the ad revenue with the owner of copyrighted audio or video contained in the uploaded video.

### Google's Approach to Third-Party Content

17.     Section 230 of the CDA provides Internet service providers like Google with broad immunity from state regulation based upon third-party content available on Google's services or the manner in which Google moderates that content. That immunity affords Internet service providers the space to innovate without facing potentially ruinous liability if third parties misuse their service to disseminate inappropriate content. And Section 230 immunity also permits an Internet service provider to make judgments about what third-party content is or is not appropriate for its service, without fear that by excluding some content, the service provider will have exposed itself to liability for not excluding other content.

18.     Consistent with Section 230, Google has adopted different content policies for its various services, reflecting the different nature and purposes of those services. Google expects to spend upwards of $100 million on enforcing its content policies in 2014 alone, and it is the industry leader in efforts to fight illegal activities online.

19.     Search—designed to inform users of the publicly-available websites on the Internet that are most relevant to the user's query—has the least restrictive content policies. Google removes, restricts, demotes, or flags search results under very limited circumstances, such as links to web pages it has identified as a source of child pornography; content found by a court of competent jurisdiction to be unlawful; malware; and sensitive personally-identifying information (e.g., credit cards and social security numbers).

20.     Autocomplete is a tool designed to speed the entry of queries by users.  To avoid predictions that may be upsetting to users, Google voluntarily excludes a limited set of predictions from Autocomplete, including certain predictions relating to pornography, suicide, violence, hate speech, slavery and sex trafficking, murder, and terrorism, among others.

21.     YouTube, unlike Search, hosts third-party videos on Google servers. Accordingly, Google voluntarily follows more restrictive content policies for YouTube than for Search.  YouTube's Community Guidelines prohibit, among other things, videos containing sexually explicit content, images of animal abuse, shock videos, hate speech, spam, and predatory behavior.  Users must affirmatively agree to the Community Guidelines before they upload any content to YouTube.

22.     With nearly 300 hours of content uploaded to YouTube every minute by third-party users, it is inevitable that some small percentage of the uploaded videos will contain content that violates YouTube's Community Guidelines.  YouTube has voluntarily committed significant monetary and human resources to the detection and removal of such videos.  In 2014, YouTube expects to spend over $25 million on such efforts, with over 200 people employed around the globe for this purpose.  In 2014 alone, YouTube has removed or blocked over 180 million videos for Community Guidelines violations.

23.     Google has more restrictive content policies for advertisements than it does for Search, YouTube, or Autocomplete.  These policies include express prohibitions against various types of ads, including those that promote dangerous products or services (e.g., recreational drugs and associated paraphernalia), dishonest behavior (e.g., hacking software, fake documents, academic cheating services), and offensive or inappropriate content.  Google further restricts certain other categories of ads that may be inappropriate in some contexts and for some users,

6

such as adult-oriented content.  Google also expressly requires that advertisers comply with all applicable laws and regulations in the jurisdictions where advertiser ads are showing.

24.     Google has sophisticated systems to analyze the tens-of-millions of new ads created by advertisers every day.  In 2014, Google has already disapproved over 428 million advertisements, prevented any ads from linking to over one million websites, suspended or terminated over 900,000 AdWords advertiser accounts, and terminated over 200,000 websites from AdSense.

### Copyright

25.     In the Digital Millennium Copyright Act ("DMCA"), Congress created a safe harbor from copyright infringement liability for information location tools like those offered by Google.  17 U.S.C. § 512.  That safe harbor protects information location tools from copyright liability so long as they remove copyrighted content upon receiving an appropriate takedown request from the copyright holder.

26.     In Search, Google receives and honors a substantial number of DMCA takedown requests.  In 2013, for example, Google removed 222 million web pages from the Search index.  Most requests are addressed within six hours.  The DMCA safe harbor requires removal only of the specific infringing content, not the entire web page or website on which that infringing content appears.

27.     YouTube's Community Guidelines prohibit uploading copyrighted content without the copyright holder's consent.  YouTube honors DMCA takedown notices.  YouTube also takes proactive steps to identify videos that infringe copyrights.  YouTube employs a sophisticated "Content ID" program, which analyzes and compares every uploaded video to millions of fingerprints corresponding to copyrighted works.  YouTube then affords the

copyright owner the option to block the infringing video or permit it to run.  If the copyright owner permits the video to run, the copyright owner may choose to monetize the video, in which case the copyright owner, rather than the uploader, receives a share of the resulting ad revenue. The Content ID program has generated more than $1 billion in ad revenue for rights holders.

28.     AdWords and AdSense also use sophisticated systems to detect and exclude potential advertisers and publishers who disseminate infringing content.

29.     Autocomplete blocks and filters certain query predictions that are sometimes used to seek content that may infringe copyrights.

### Prescription Drugs

30.     There was a time when pharmacies in Canada were permitted to run AdWords advertisements in the United States.  During the last decade, lawmakers at the state and federal level engaged in an extensive public debate concerning whether to permit the purchase of prescription drugs from foreign pharmacies in order to cut the cost of prescription drugs in the United States.  For example, in 2003, the U.S. Senate voted overwhelmingly to allow pharmacists to import prescription drugs from Canada.  In most circumstances, however, the FDCA prohibits foreign pharmacies from exporting prescription drugs into the United States. *See* 21 U.S.C. §§ 331, 384.

31.     Since March 2010, Google has prohibited AdWords advertisements in the U.S. from all foreign pharmacies and all U.S. pharmacies lacking accreditation from the National Association of Boards of Pharmacy.  In 2011, Google entered into a non-prosecution agreement with the U.S. Department of Justice related to its pre-2010 practices regarding foreign pharmacies.  So far in 2014, Google has blocked over 7 million ads for violation of Google's robust healthcare and medicines policies.  The vast majority of these ads were never seen by

users.  Google has also removed or blocked over 200,000 videos in 2014 for violating

YouTube's policies concerning the unauthorized sale of pharmaceuticals.  Rather than censoring

search results relating to pharmaceuticals, Google displays important information to users about

the hazards of some Internet pharmacies, including running no-cost ads linking to a pharmacy

checker tool that helps users investigate the legitimacy of online pharmacies.  And Google

promotes content from DrugFree.org for search queries related to drugs and addiction, providing

answers to questions parents might have in these areas.

### The Attorney General's Threats and Actions Against Google

32.     Notwithstanding Google's extensive voluntary efforts to address the misuse by

third parties of its various services, the Attorney General has repeatedly (and without basis in law

or fact) accused Google of violating Mississippi law.  Ignoring both the distinctions among

Google's various services, as well as the immunities and protections of federal statutory and

constitutional law, he has demanded that Google block or remove from its services various

content he disfavors.  When Google did not give in to his demands, he first threatened, then

issued, a burdensome Subpoena explicitly focused on immunized conduct.

33.     The Attorney General launched his campaign against Google at a meeting in the

fall of 2012 of the Intellectual Property Committee of the National Association of Attorneys

General ("NAAG")—of which the Attorney General was then co-chairman.  The meeting was

called to discuss efforts to address the online sale of stolen intellectual property and unauthorized

prescription drugs.  Although other search engines and Internet companies were invited to send

representatives to this meeting, Google was the only company that attended.

34.     Following that meeting, on February 13, 2013, the Attorney General wrote to

Google asking that it address, in writing, "[h]ow auto complete [sic] features can be altered to

reduce or eliminate directing consumers to counterfeit product sites," and "[w]hat role search engines have played in curbing the sale of counterfeit pharmaceuticals, medical devices, and other products posing significant consumer health and safety threats." The letter did not provide a deadline for responding.

35.     Google contacted the Attorney General's staff shortly after receiving the February 13, 2013 letter and explained that the company was preparing a written response. Google continued to have ongoing discussions with the Attorney General's office following receipt of the February 13th letter.

36.     On April 1, 2013, the Attorney General wrote to Google's General Counsel, complaining that "no substantive response has been forthcoming," and characterizing Google as "deliberatively evasive" and "unwilling[] to make meaningful reforms." In the letter, the Attorney General asserted that Google's "failure to stop illegal sites from selling stolen intellectual property" and to curb "the prevalence of illegal drugs" was "threaten[ing] the lives and livelihoods of millions of American families and companies." He characterized Google as "promot[ing] and profit[ing] from" the "sale of illegal off shore pharmaceuticals"—even though Google has barred such advertising for years. The Attorney General closed his April 1st letter by stating that if Google did not take voluntary action, "we will take legal action to change behavior . . . ."

37.     After various conversations with the Attorney General's staff, on April 19, 2013, Google provided a detailed, seven-page response to the Attorney General's February 13th letter. Google explained that it "has dedicated tens of millions of dollars in engineering and other resources to address the[] issues [raised in the February 13th letter] and leads the industry in helping to combat copyright infringement and the sale of counterfeit goods online." Google

explained that in providing search results, however, it neither "make[s] claims about the content

of the pages nor . . . [has] a relationship with the owners of [those] pages," and that removing

links to a website from its search results "does not remove it from the web." Noting that it had

"seen many demands for removal of sites which threaten to stifle legitimate commerce and

speech," Google wrote:

> Google is committed to free expression and only removes content
> from our search results in a narrow set of circumstances. Google
> cannot adjudicate the legality of content on the web and cannot
> determine whether a particular piece of content is authorized or
> not. Because content owners large and small use the Web in so
> many different ways, determining a particular copyright holder's
> preference—including determining whether a third-party uploader
> has permission to upload—is difficult at best.

38.     On May 20, 2013, Google responded to the Attorney General's April 1st letter.

Google further detailed its "specific efforts to help combat illegal pharmacies online" and

explained that "[t]his is an area that Google takes quite seriously and one in which we are

leading the industry in the fight against counterfeit and illegal pharmaceuticals." Specifically,

Google discussed innovations and developments in its advertising, cooperation with law

enforcement, cross-industry collaboration, and Autocomplete policies, all intended to combat

illegal pharmacies online.

39.     Essentially ignoring the information Google provided, the Attorney General

escalated his threats against Google. In a letter dated May 21, 2013, addressed to Google's Chief

Executive Officer, Larry Page, the Attorney General falsely accused Google of "aiding and

abetting" and even "encourag[ing] . . . illegal activity." The Attorney General invited Mr. Page

and Google's General Counsel to attend a NAAG meeting scheduled for June 18, 2013. The

Attorney General stated his expectation that Google would explain at the meeting, among other

things, why Google would not agree to censor search results by "remov[ing] websites . . . that

purport to sell prescription drugs without a prescription or provide pirated content." Of course, Google removes from its search results links to content that a copyright holder has identified as infringing. What Google declines to do is go beyond what the DMCA, the CDA, and the First Amendment require and remove links to pages from the same site that have *not* been identified by a copyright holder as containing infringing content. And while Google is in no position to judge whether a particular website's offering of prescription drugs is lawful or unlawful, it will remove any site from search results if a court finds that the site's conduct is unlawful.

40.    The Attorney General also threatened that if Google provided answers that the Attorney General found to be "not . . . adequate . . . or unresponsive," he would "call on all of [his] fellow attorneys general to issue civil investigative demands to Google to produce documents and answer questions about Google's dangerous conduct." The Attorney General also made clear that he expected Google to announce that the activity he complained about "ha[d] ceased" and to provide him with a "24-hour link" through which his "de-indexing requests"—that is, the Attorney General's unilateral requests to remove links to specific websites from search results—were "granted or addressed within hours."

41.    By letter dated June 10, 2013, Google declined the Attorney General's invitation for Google to attend the NAAG meeting scheduled for June 18, 2013. Google's response explained that the company "has a well-documented history of cooperation with law enforcement in general and state Attorneys General in particular," and it detailed the steps Google had taken to cooperate with the Attorney General's investigation. It further pointed out that Google was not itself engaged in the activity of which the Attorney General disapproved—importing prescription drugs or selling pirated content. Rather, Google "organize[s] and make[s] accessible information provided by others—an activity that the courts have held is entitled to broad

immunity under settled and controlling federal law." In closing, Google reiterated that it "remains open to working cooperatively with you and your staff to find consensus around appropriate voluntary actions in some of the areas mentioned in your letter."

42. The Attorney General responded by letter on June 10, 2013, announcing that "[t]he State of Mississippi . . . is investigating and evaluating Google's conduct related to its search algorithm, auto-complete feature, advertising policies, and any other related functions." The letter stated that the "purpose of this investigation is to determine whether there exist any violations of Mississippi law," and put Google on notice that "[o]ne of the many potential outcomes of the ongoing investigation could be civil or criminal litigation arising under state law."

43. At the June 18, 2013 NAAG meeting, the Attorney General inaccurately alleged, among other things, that Google had not been responsive to his inquiries regarding autocomplete; that Google had "manipulated" its algorithm to allow for links to pirating sites to be included in search results; and that Google had failed to honor DMCA takedown notices. (In fact, Google blocked certain algorithmically generated Autocomplete predictions after the Attorney General called them to Google's attention, it has adjusted its search algorithms to make it *less likely* that links to so-called pirated sites appear in search results, and it promptly honors 99% of the DMCA takedown notices it receives.)

44. The Attorney General also stated that if Google did not "make some of these changes that we've been suggesting since November," that is, agree to remove from search results and other services content the Attorney General deemed undesirable, without a court adjudication of unlawfulness or even a DMCA takedown notice, then he would "call on my colleagues to issue civil investigative demands or subpoenas." The Attorney General also

encouraged the Mississippi "public employees retirement system" (amongst others) to divest itself of Google shares and Google's advertisers to "pull their ads with them."

45.     The Attorney General made these statements despite acknowledging in writing—little more than a month later—that Section 230 of the CDA would bar any case he might bring against Google.  On July 23, 2013, Attorney General Hood and 46 other state attorneys general sent a letter to Senators Rockefeller and Thune and Representatives Upton and Waxman, of the Senate and House commerce committees, urging them to amend the CDA.  In this letter, Attorney General Hood and his fellow attorneys general expressly acknowledged that "[f]ederal courts have broadly interpreted the immunity provided by the CDA," which "prevents State and local law enforcement agencies from prosecuting" and "investigating" Internet companies for third-party content accessible on their sites.

46.     On June 26, 2013, Google responded by letter to the comments Attorney General Hood made at the June 18th NAAG meeting.  In addition to, again, exhaustively documenting its extensive, voluntary policy enforcement efforts, Google set forth its position that the investigation, criminal prosecution, and civil litigation that the Attorney General was threatening were barred by legal doctrines that "appropriately limit the obligations under law that are imposed on Internet service providers like Google."  Google observed that "[t]he starting premise of [the Attorney General's] inquiry appears to be that Google has an obligation to determine whether websites included in Google search results, or videos displayed on YouTube, promote violations of the law," and explained that such an obligation was barred under the First Amendment and the CDA.  Google reiterated that its "efforts . . . to create a safe environment for users and to crack down on bad actors like rogue pharmacies" were voluntary and went "well beyond Google's legal obligations."  Google explained: "Because decisions to allow, restrict, or

remove content from Google's search results often require difficult judgment calls and the application of complex federal and state law and regulations, Google believes that courts and the lawmakers are in the best position to decide which pages are and are not illegal."

47.     On July 31, 2013, the Attorney General again publicly attacked Google.  This time, in a speech he gave at the Neshoba County Fair in Philadelphia, Mississippi, the Attorney General accused Google of "taking advantage of our country and the pain of our people . . . [with the sale of] counterfeit items and counterfeit drugs over the Internet that harm our consumers." (Google, of course, does not sell counterfeit drugs; nor does it permit sites that do so to advertise.)  After acknowledging Google's immunity under the CDA from state criminal prosecution and civil suit, the Attorney General asserted that corporations like Google "only respond to bad publicity" so "you [have] to take it to that level" to "change the way they're operating"—first through meetings and then through use of civil investigative demands, "to make them produce documentation."

48.     On October 7, 2013, the Attorney General, along with the attorneys general of Nebraska, Hawaii, and Virginia, wrote a letter to Google, accusing YouTube of disseminating "illegal and possibly dangerous content," and "partner[ing] with the posters of such harmful content and reciev[ing] revenue from resulting content-specific advertising."  Asserting their "obligation as state Attorneys General to address the wide dissemination and monetization of dangerous and illegal content," the attorneys general demanded a meeting with Google.

49.     On November 19, 2013, Attorney General Hood sent an email to Google's General Counsel, attaching a "draft" letter response to Google's June 26th letter.  The draft response, which was largely written by lawyers for the movie industry, began by stating that "overwhelming evidence shows that Google facilitates and profits from numerous illegal online

activities ranging from piracy to illegal drug sales and human trafficking." (No such evidence was cited; contrary to the letter's implication, Google in fact prohibits "pirate" sites, illegal drug sellers, and human traffickers from advertising on Google, and enforces those prohibitions vigorously.) The draft letter explained that Google's alleged inaction in response to these issues "raises serious questions as to whether Google has engaged in unlawful conduct itself." It continued: "There is every reason to believe further investigation will reveal that Google's illegal conduct reaches far beyond the illegal pharmaceutical sales that it has already admitted to facilitating." The draft letter summed up these menacing prefatory comments as follows: "To maintain its status as a legitimate business and avoid further liability, Google must finally take the actions it can to cease promoting and profiting from unlawful conduct."

50. In the cover email attaching the draft letter, Attorney General Hood suggested that "it would be wise" for Google's General Counsel to attend an upcoming NAAG meeting "with authority to reach an initial agreement to fix some of the problems we have pointed out over the past two years." The Attorney General further requested that Google's CEO review the response.

51. On November 26, 2013, Attorney General Hood sent Google and its counsel a final version of that same response letter, which the Attorney General released publicly on November 27, 2013.

52. Google responded promptly on November 27, 2013, proposing a meeting "to discuss the extensive measures Google has already taken to address many of your concerns" and to "hear[] about instances in which our services are being misused in violation of our policies" so that Google could "further improve and refine our enforcement efforts." Google reiterated that it had taken "a number of steps to address the specific concerns you raise[d] regarding

Autocomplete, YouTube, ads, and content monetization." Google enclosed several documents that further detailed these voluntary steps, including earlier letters it provided to the Attorney General, letters to two other state attorneys general in response to monetization inquiries, a report titled *How Google Fights Piracy*, a "Best Practices and Guidelines for Ad Networks to Address Piracy and Counterfeiting" announcement Google helped formulate for the White House, and two Google blog posts regarding removals from Search.

53.     On December 10, 2013, Attorney General Hood and twenty-three other state attorneys general sent a letter to Google's General Counsel, informing Google that "much more must be done" to address concerns about "troubling and harmful problems posed by several of Google's products" including:  "(1) Google's monetization of dangerous and illegal content; (2) the prevalence of content constituting intellectual property violations and ease with which such content is shared and trafficked over Google's systems; (3) the promotion of illegal and prescription-free drugs; and (4) the facilitation of payments to and by purveyors of all of the aforementioned content through Google's payment services."  The letter proposed a meeting with Google in January 2014, an invitation Google accepted.

54.     On January 21, 2014, Google voluntarily met with Attorney General Hood and representatives from 20 other states, in Denver, Colorado.  Google's General Counsel and eight other Google legal and technical personnel attended.

55.     According to recent press reports, lawyers for the movie industry had met with the Attorney General just a few days earlier, to prepare him for his meeting with Google and get "him focused on the key issues and the asks."

56.     The vast majority of the January 21, 2014 meeting was spent discussing piracy and copyright issues.  The Attorney General acknowledged during the meeting that Google has

more rights under U.S. laws than in foreign countries where it is required, by law, to censor certain content.  The Attorney General inquired about the way Google's products and enforcement efforts worked and again pressed Google to do more on enforcement.  Attorney General Hood informed Google that the attorneys general would provide Google with a list of questions to answer ahead of the next NAAG meeting, scheduled for February 2014.

57.    On January 23, 2014, Google sent a letter to Attorney General Hood, thanking him and the other attorneys general for the meeting in Denver, and expressing an interest in "continuing this dialogue and making progress to address the various issues raised in the course of the discussion."  The letter provided points of contact at Google who could respond to follow-up questions.  Google also expressed an interest in meeting again in February 2014.  The letter further reiterated Google's "commit[ment] to continuously refining our enforcement efforts" and "improv[ing] our products and services."

58.    On February 7, 2014, Attorney General Hood, along with four other state attorneys general, sent Google a letter with the following list of questions:  (a) "Will Google agree to substantially increase both automated and human scrutiny of content uploaded to its services?  If so, how?"  (b) "Will Google agree to substantially increase the demotion and delisting in its search results of sites whose contents and services violate Google's own content policies?  If so, how?"  (c) "Will Google agree to address its problem monetizing dangerous and/or illegal content through advertising sales and direct revenue-sharing agreements with producers of content which violates Google's own policies?  If so, how?"  (d) "Additionally, what can Google do to encourage a culture worthy of its 'Don't be evil' motto by ensuring that preventing the spread of dangerous and/or illegal content is a priority during the product development process?  What specific additional steps will Google take to accomplish this?"  (e)

"What are Google's specific proposals for [] a mechanism" by which attorneys general "can communicate compliance issues to Google with the expectation of swift responses?"  The letter also requested that Google come to the winter NAAG meeting on February 24, 2014, in Washington, D.C., "to discuss your responses to this letter and discuss additional steps."

59.    On February 21, 2014, Google responded with a detailed, nine-page letter answering the Attorney General's inquiries.  It also enclosed a 58-page portion of the slide presentation Google had prepared for the Denver meeting.  Google noted that the presentation provided "additional background information on the massive scale of the issues Google faces and the breadth of our compliance efforts."  For each specific question raised in the Attorney General's February 7th letter, Google detailed its current enforcement efforts, including the amount of resources dedicated to these efforts, and additional enforcement steps it was planning or considering taking.  Google also detailed more recent and immediate steps it had voluntarily taken since the Denver meeting, such as having "added hundreds of terms . . . for which we will not return ads on YouTube and AdWords," in response to the "specific concerns about human trafficking" raised at the meeting.

60.    With respect to the Attorney General's inquiries about censoring search results by delisting websites that may contain illegal or dangerous content, Google again informed the Attorney General that the request went beyond the scope of the law.  Google explained that "removing an entire site would have a chilling effect on free speech by entirely removing lawful pages that no one has identified as infringing."  "Given the First Amendment and free-expression issues at play" and the fact that the "vast majority of search queries . . . link to legal content," it is Google's "firm belief that Google should not be the arbiter of what is and is not legal on the web--that is for the courts and government to decide."

61.     Google explained that it was also concerned that "[w]hole-site removal also sends the wrong message internationally by favoring overinclusive private censorship over the rule of law":

> If Google embraces such an approach to address domestic law violations (e.g., copyright), it will embolden other countries to seek similar whole-site removal remedies for violations of their laws (e.g., insults to the king, dissident political speech). This would jeopardize free speech principles and the free flow of information online globally and in contexts far removed from copyright.

Google further noted that whole-site removal was "rejected by Congress in 2012 as part of the controversial Stop Online Piracy Act (SOPA)," and that the "DMCA already provides copyright owners with an effective statutory framework for removing any infringing page on a site . . . ."

62.     While recognizing that "it is still important to address content that may pose a risk to user safety," Google maintained that it both complied with the law and engaged in additional efforts to protect users.  Google noted that it would be willing to consider additional steps in cooperation with attorneys general and regulators.  Google further "committed to finding new ways to collaborate directly with law enforcement," including the implementation of a "Trusted Flagger program for YouTube" to accelerate the ability of the attorneys general to report potentially illegal videos for review against YouTube's community standards.

63.     As requested, on February 24, 2014, Google personnel attended the winter NAAG meeting in Washington, D.C.  Before the meeting, Attorney General Hood announced in an open session to fellow attorneys general that he would be meeting with Google and invited them all (including attorneys general not involved in prior discussions with Google) to attend.  The offices of 24 attorneys general, including many attorneys general themselves, participated in the Google meeting.

64.     The Attorney General appears to have closely coordinated this meeting with corporate lobbyists representing clients with interests adverse to Google.  Four days before the meeting, the Attorney General received an email from a lobbyist regarding a "pre meeting on Google," asking whether or not he "want[ed] the Digital Citizens [Alliance], and industry folks to be at or around [his] pre meeting on m[ ]onday morning," February 24, 2014.  The Digital Citizens Alliance ("DCA") is an anti-Google group used and funded by lobbyists to further the agenda of their business clients; it has published three reports expressly targeting Google since June of 2013.  The DCA's staff and board of directors consist of numerous individuals who work on behalf of Google competitors seeking to impose additional obligations on Google, irrespective of the law.

65.     When Google personnel walked into the February 24th meeting, they were presented with a copy of the non-prosecution agreement Google had reached with the Department of Justice three years earlier, regarding decisions made ten years ago in relation to advertisements for Canadian pharmacies.  They were also provided a draft report prepared by the DCA, titled "Digital Weeds: How Google Continues to Allow Bad Actors to Flourish on YouTube."

66.     From the outset of the meeting, the Attorney General made clear that he had no intention of addressing the content of Google's February 21, 2014 letter, which responded to the inquiries made by the Attorney General on February 7, 2014.  Previously, the Attorney General represented to Google that such was the purpose of the meeting.

67.     Instead, at the February 24, 2014 meeting, the Attorney General again demanded that Google exclude from Search entire websites that in the Attorney General's opinion facilitate illegal activity.  The Attorney General in particular demanded that Google respond to certain

DMCA takedown notices by excluding not only the content specifically identified as infringing (all that the law requires), but also the entire website containing that content, even when other content and pages on the site have not been identified as infringing.  Google declined to do so.

68.     The Attorney General then made a speech at a public session of the NAAG meeting on February 25, 2014, expressing disappointment in the extent and effectiveness of Google's enforcement efforts.  While acknowledging Google's commitment of resources— "huge amounts . . . and a thousand people"—to such enforcement efforts, the Attorney General asserted that Google's efforts were not working well enough and argued that Google "should delist [that is, exclude from Search] some of these sites that they know are bad sites."   The CDA, DMCA, and First Amendment do not support the position taken by the Attorney General.

69.     On May 13, 2014, Google provided training on its "Trusted Flagger" bulk flagging tool for YouTube to five representatives from Attorney General Hood's office.  The "Trusted Flagger" tool permits designated YouTube users to identify videos they believe violate YouTube's Community Guidelines.  YouTube reviews such requests promptly, and removes videos adjudged to violate the Guidelines.  Since providing that training, representatives from the Attorney General's office have flagged only seven videos, and Google responded by voluntarily taking down six of those videos for violation of its Community Guidelines, with an average response time of 13 minutes.  The seventh video was from Scandinavia, discussed sexuality and parts of the human anatomy, violated no state or federal laws, and did not violate YouTube's Community Guidelines.  To the best of Google's knowledge, the Attorney General has not filed any legal action against any of the actual creators of the specific underlying content to which he objected.

70.     On July 24, 2014, Bloomberg Businessweek reported that the Attorney General was claiming that Google "hasn't done enough to satisfy an investigation by multiple states into whether it adequately screens illegal drug advertisements and illicit online videos . . . ." The Attorney General explained that he planned to issue a civil investigative demand for "'documents and emails about how they screen or don't screen videos and ads' and 'how they place ads beside videos . . . .'" He indicated that he "believe[d] other state attorneys will join him in the civil investigative demand."

71.     Google next heard from the Attorney General on August 29, 2014, in a letter offering "suggested improvements" to Google's proposed "Trusted Flagger" program. The Attorney General had three requests. First, he asked YouTube to "temporarily remov[e]" any video flagged for review by a trusted flagger, instead of leaving it up until the flag had been verified. However, as Google has noted, false-positive removals—even temporary ones—create a negative user experience, and raise serious First Amendment concerns if they occur because of the action of a government official. Moreover, despite the Attorney General's concerns about the Trusted Flagger program, his Office has made no attempts to flag any videos since May 2014, and the handful of videos flagged by his Office were reviewed by Google 13 minutes after flagging, on average.

72.     Second, the Attorney General sought notice as to whether or not a flagged video had been removed, along with the date and time of removal. In response, Google voluntarily added this feature into the bulk flagging tool. However, the Attorney General has not made use of this tool since requesting this change several months ago.

73.     Third, the Attorney General demanded that Google "dedicat[e] . . . resources [to] the development of content analysis software and/or additional personnel to review the content"

of YouTube, as part of "a more comprehensive content evaluation process."  However, Google

has already voluntarily devoted tens of millions of dollars to monitoring YouTube, using both

software and personnel—a fact that the Attorney General has consistently ignored in reciting his

demands.  Indeed, Google's own efforts have led to the identification and removal or blocking of

over 180 million videos in 2014 alone, and dedicated enforcement resources and teams continue

to grow.

### The Attorney General's Issuance of a Subpoena

74.     On October 27, 2014, the Attorney General followed through on his persistent

threats and served on Google a 79-page Subpoena, comprising 141 document requests and 62

interrogatories.  The Subpoena alleges that Google "may have violated one or more of the

provisions of Section 75-24-1, *et seq.*, Mississippi Code of 1972, as amended, commonly

referred to as the Mississippi Consumer Protection Act ["MCPA"], as follows:  Miss. Code Ann.

§§ 75-24-5(1)."  It asserts that, "[s]pecifically, the Attorney General has reasonable grounds to

believe that Google Inc. has used trade practices that are unfair, deceptive, and misleading."  The

Subpoena expressly reserves the Attorney General's right to apply to the chancery court "for an

order compelling compliance in accordance with Miss. Code Ann. § 75-24-17."  By agreement,

the Subpoena's return date was extended from November 26, 2014 to January 5, 2015.

75.     The Subpoena demands the production of an extraordinarily broad array of

information—everything from "all documents reflecting analyses or evaluations of how users

interact with Google search results pages" (Document Request No. 125) to a "searchable

database" of *every* YouTube video that has been "accepted for monetization" (i.e., on which

advertisements have run) (Document Request No. 10).  To respond to the Subpoena in full,

Google would have to produce an enormous volume of data at great burden, expense, and disruption to its business operations and consumer services.

76.     The Subpoena frequently inquires about Google's actions with regard to "dangerous" content or conduct.  However, these terms are defined very broadly to mean "content, conduct *or information* that in itself *is dangerous* or has indicia that *it could, in any way*, either directly, *indirectly or tangentially*, aid, abet, assist, facilitate, encourage or promote activity that *could lead* to physical harm or injury . . . ." (emphasis added).  As defined, these terms used throughout the Subpoena necessarily encompass perfectly lawful content or conduct, such as videos of people playing football.

77.     In addition to this improper focus on lawful content, the Subpoena unmistakably focuses on immunized conduct.  The Subpoena frequently uses the terms "aid," "abet," "assist," "facilitate," "encourage," and "promote"—and those terms are defined as "the doing of any act . . . that could possibly directly, indirectly or tangentially further or advance a course of action by any actor or actors, *regardless of whether or not the act or acts would be protected or immunized under the [CDA] . . . .*" (emphasis added).

78.     Following service of the Subpoena, Google asked that the Subpoena be withdrawn or at least limited to activity *not* immunized by Section 230 of the CDA.  The Attorney General declined.  Google thereafter voluntarily provided the Attorney General's office with documentation showing that each identifiable item of content about which the Attorney General expressed concern in his meetings and communications with Google, and in the Subpoena itself, was created by third parties, not Google, and thus Google's activity in making accessible that content to Internet users fell squarely within the immunity created by Section 230 of the CDA.  But the Attorney General still has not withdrawn the Subpoena.

79.     The Subpoena includes a section titled "Stolen Intellectual Property" that contains thirteen document requests and two interrogatories seeking information premised upon direct or contributory copyright infringement, a topic on which federal law entirely preempts state enforcement authority.  For example, the Subpoena demands the production of "documents . . . concerning the use of Google Services . . . to commit, promote, or facilitate copyright infringement."  Document Request No. 119; *see also* Document Request No. 120 (demanding "all documents concerning how Google Search, including search algorithms, . . . promote . . . sites that offer infringing or allegedly infringing content").  More generally, the Subpoena defines "Illegal Content or Conduct/Unlawful Content" as including "content or conduct that violates . . . state or federal laws governing intellectual property" and then incorporates this definition into demands throughout the Subpoena.  Again, the Attorney General rejected requests to narrow the Subpoena to exclude this content.

80.     The Subpoena also demands information related to importation of prescription drugs, another subject on which federal law preempts state enforcement authority.  For example, the Subpoena demands information concerning the allegation that "Google . . . was on notice that most Canadian online pharmacy advertisers . . . geo-targeted their advertisements to consumers in the United States and imported into the United States . . . controlled prescription drugs, in violation of Title 21, United States Code, Section 331(a) and (d)."  Document Request No. 2; *see also* Document Request No. 3 (requesting documents related to benefits Google allegedly received by aiding Canadian pharmacies).  The Attorney General also declined to narrow his Subpoena to exclude this conduct.

81.     Little in the Subpoena seems to relate to valid subjects of regulation by the Attorney General—it is instead, consistent with the Attorney General's prior public statements,

designed only to impose burdensome obligation on Google in order to coerce Google to agree to the changes to its business practices that the Attorney General seeks, irrespective of the law.

### Injury to Google Resulting From the Attorney General's Inquiry

82.     As a result of the course of conduct upon which the Attorney General has engaged, as described in paragraphs 32-81, including but not limited to the Attorney General's continued, concrete threats of imminent civil or criminal action; his following through on prior threats to call on other state attorneys general to initiate investigations, criminal prosecutions, and/or civil litigation; his issuance of informal inquiries under threat of civil or criminal action; and his issuance of the Subpoena under threat of an enforcement proceeding (the "Attorney General's Inquiry")—all in violation of federal constitutional and statutory laws invoked herein—Google has suffered, now suffers, and will continue to suffer, under credible and imminent threats of criminal prosecution, civil litigation, and proceedings to enforce the Subpoena.

83.     The Attorney General's Inquiry impairs Google's interests and rights secured by federal constitutional and statutory law.  Acting under the laws, customs, and usages of the State of Mississippi, the Attorney General has subjected Google, and is causing Google to be subjected, to the deprivation of rights, privileges, and immunities secured by Section 230 of the CDA, the Copyright Act (including the DMCA), the FDCA, and the First and Fourth Amendments of the U.S. Constitution, made enforceable against the Attorney General by the Due Process Clause of Section 1 of the Fourteenth Amendment to the U.S. Constitution, all within the meaning and contemplation of 42 U.S.C. § 1983.

84.     Absent immediate relief from the Court, the Attorney General will continue to deprive Google of such rights, privileges, and immunities.

## CAUSES OF ACTION

## COUNT I

### Violation of the Communications Decency Act, 47 U.S.C. § 230
### and 42 U.S.C. § 1983

85.     Google repeats and realleges paragraphs 1 through 84 above as if set forth fully

herein.

86.     Section 230 of the CDA broadly immunizes providers of interactive computer

services from litigation and liability arising from making accessible to Internet users third-party

content.  In particular, Section 230 bars the Attorney General from commencing any legal

proceeding that seeks to hold Google liable either (a) for content created by third parties or (b)

on account of measures Google has elected to undertake voluntarily and in good faith to restrict

or block access to material it considers objectionable.  These immunities extend not only to civil

liability, but also to state law criminal liability.

87.     Subject to only a few narrow exceptions, Section 230 immunity exists whenever

(i) the party claiming immunity is a "provider . . . of an interactive computer service," (ii) the

allegedly unlawful content was "provided by another information content provider," and (iii)

another party seeks to "treat[]" the party claiming immunity as the "publisher or speaker" of that

information.  47 U.S.C. § 230(c)(1).

88.     Google is a "provider" of an "interactive computer service" within the meaning of

47 U.S.C. §§ 230(c)(1) and 230(f)(2).

89.     Google did not create or develop any of the content accessible via Google that is

the subject of the Attorney General's Inquiry; all of the content constitutes "information"

provided by "another information content provider."

90.     The Attorney General's Inquiry against Google constitutes "treat[ment]" of Google as the "publisher or speaker" of third-party content, in violation of 47 U.S.C. § 230(c)(1).

91.     Section 230 provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). This provision prohibits not merely the imposition of liability, but also the *bringing* of any cause of action, demonstrating that Section 230 is not merely a defense to liability, but also an immunity from being haled into court at all on charges based on third-party content.

92.     In sum, the Attorney General's Inquiry violates, and any further steps the Attorney General takes to fulfill his threats of a criminal prosecution, civil litigation, and/or enforcement proceeding against Google under Mississippi law for making accessible third-party content to Internet users would further violate, Google's federal statutory right to be free from liability based on third-party content, as well as from the burdens of having to defend itself against suits or other legal proceedings seeking to impose such liability.

## COUNT II

### Violation of the Rights of Google and Its Users
### Under the First Amendment and the Fourteenth Amendment
### of the United States Constitution and 42 U.S.C. § 1983

93.     Google repeats and realleges paragraphs 1 through 92 above as if set forth fully herein.

94.     The First Amendment of the U.S. Constitution, made applicable to the states by the Fourteenth Amendment, protects Google's selection, ordering, and display of third-party web content. The Attorney General's Inquiry seeks to regulate and displace, through coercion, Google's editorial judgment in order to favor certain speech or speakers over others. The Attorney General's Inquiry constitutes a content-based speech restriction that is not narrowly tailored to advance any compelling governmental interest. The First Amendment bars the

Attorney General from seeking or threatening to impose criminal or civil liability or investigative burdens for disfavored speech, which is precisely the conduct that comprises the Attorney General's Inquiry.

95.     The Attorney General's Inquiry also constitutes retaliatory conduct motivated at least in part by a purpose to retaliate for constitutionally protected speech, and, in particular, to punish Google for failing to comply with his censorship demands, in violation of the First Amendment.

96.     The Attorney General's Inquiry includes demands that Google pre-screen all third-party content it makes available and block third-party content that merely *may* involve illegal activity, even at the cost of burdening lawful, protected speech. These demands violate the First Amendment rights of Google and its users because they seek to restrict the flow of protected speech to the public.

97.     The effect of the Attorney General's Inquiry is to chill the operation of Google's search engine, Autocomplete feature, YouTube video-sharing site, and advertising, thereby threatening to silence vast amounts of protected speech. The First Amendment forbids silencing or chilling substantial amounts of protected speech in the course of proscribing unprotected speech.

98.     The Attorney General's Inquiry against Google constitutes the exercise of prosecutorial and/or civil regulatory authority under color of state law.

99.     The Attorney General's Inquiry is not the least restrictive means of accomplishing any compelling governmental purpose and it is not narrowly tailored to accomplish any compelling governmental purpose.

100.    In sum, the Attorney General's Inquiry has violated, is violating, and any further steps the Attorney General takes to fulfill his threats of a criminal prosecution, civil litigation, and/or enforcement proceeding against Google for making accessible third-party content to Internet users would further violate, the rights of Google and its users under the First and Fourteenth Amendments, to be free from content-based regulation of speech, retaliation for protected speech, and unconstitutional limits on the public's access to information.

## COUNT III

### Violation of the Rights of Google
### Under the Fourth Amendment and the Fourteenth Amendment
### of the United States Constitution and 42 U.S.C. § 1983

101.    Google repeats and realleges paragraphs 1 through 100 above as if set forth fully herein.

102.    The Attorney General's issuance of the Subpoena contravenes, and any effort to enforce the Subpoena would further contravene, the rights provided to Google by the Fourth Amendment of the U.S. Constitution, made applicable to the states by the Fourteenth Amendment, to be secure in its papers and effects against unreasonable searches and seizures.

103.    The Subpoena is an unreasonable search and seizure, because it is vastly overbroad and demands information about lawful conduct that is immunized from state regulation under federal statutory and constitutional law, including Section 230 of the CDA, the First and Fourteenth Amendments, the Copyright Act, including the DMCA, and the FDCA.

## COUNT IV

### Preemption Under the Copyright Act, 17 U.S.C. §§ 301, 512,
### and the Food, Drug, and Cosmetic Act, 21 U.S.C. § 337,
### and 42 U.S.C § 1983

104.    Google repeats and realleges paragraphs 1 through 103 above as if set forth fully herein.

31

105.    The Attorney General's Inquiry, insofar as it pertains to possible copyright infringement or the importation of prescription drugs, is preempted by the Copyright Act, including the DMCA, and by the FDCA.

## COUNT V

### Declaration of the Parties' Respective Rights Under 28 U.S.C. § 2201

106.    Google repeats and realleges paragraphs 1 through 105 above as if set forth fully herein.

107.    Google is entitled to a declaration (i) that Section 230 of the CDA and the First and Fourteenth Amendment of the U.S. Constitution preclude civil or criminal charges under the MCPA against Google for content created by third-parties; (ii) that any charge the Attorney General makes against Google under the MCPA for copyright infringement or importation of prescription drugs is preempted by the Copyright Act, including the DMCA, and/or the FDCA; and (iii) that enforcement of the Subpoena, as presently drafted, against Google is impermissible under Section 230 of the CDA, the First, Fourth, and Fourteenth Amendments of the U.S. Constitution, and the Copyright Act, including the DMCA, and/or the FDCA.

## PRAYER FOR RELIEF

A.    Declare (i) that Section 230 of the CDA and the First and Fourteenth Amendment of the U.S. Constitution preclude civil or criminal charges or liability under the MCPA against Google for content created by third parties; (ii) that any charge the Attorney General makes against Google under the MCPA for copyright infringement or importation of prescription drugs is preempted by the Copyright Act, including the DMCA, and/or the FDCA; and (iii) that enforcement of the Subpoena, as presently drafted, against Google is impermissible under Section 230 of the CDA, the First, Fourth, and Fourteenth Amendments of the U.S. Constitution, and the Copyright Act, including the DMCA, and/or the FDCA;

B.      Issue a temporary restraining order enjoining the Attorney General, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the Subpoena and/or instituting criminal prosecution and/or civil litigation against Google for making accessible third-party content to Internet users;

C.      Preliminarily and permanently enjoin the Attorney General, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the Subpoena and/or instituting criminal prosecution and/or civil litigation against Google for making accessible third-party content to Internet users;

D.      Award Google its reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

E.      Grant Google such other and further relief as the Court deems just and proper.

Dated:  December 19, 2014

*Fred Krutz*

OF COUNSEL:
Jamie S. Gorelick
Patrick J. Carome
Paul N. Lekas
Blake C. Roberts
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
jamie.gorelick@wilmerhale.com
patrick.carome@wilmerhale.com
paul.lekas@wilmerhale.com
blake.roberts@wilmerhale.com

Peter G. Neiman
Violetta G. Watson
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8000
Facsimile: (212) 230-8888
peter.neiman@wilmerhale.com
violetta.watson@wilmerhale.com

Fred Krutz, MSB No. 4270
Daniel J. Mulholland, MSB No. 3643
FORMAN PERRY WATKINS
   KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone: (601) 960-8600
Facsimile: (601) 960-8613
fred@fpwk.com
mulhollanddj@fpwk.com

*Attorneys for Plaintiff Google Inc.*