**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**



|  |  |
|---|---|
| Google Inc., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| | ) No. 3:14cv981 HTW-LRA |
| | ) |
| | ) **MEMORANDUM OF LAW IN** |
| *v.* | ) **SUPPORT OF PLAINTIFF GOOGLE** |
| | ) **INC.'S MOTION FOR TEMPORARY** |
| | ) **RESTRAINING ORDER AND** |
| Jim Hood, Attorney General of the State | ) **PRELIMINARY INJUNCTION** |
| of Mississippi, in his official capacity, | ) |
| | ) [ORAL ARGUMENT REQUESTED] |
| *Defendant.* | ) |
| | ) |

## TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................................... ii

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................5

        A.      Google's Services ....................................................................................5

        B.      How Google Enforces Its Content Policies ............................................6

        C.      Google's Approach to Copyright and Prescription Drugs.......................7

        D.      The Attorney General's Threats and Demands.......................................9

        E.      The Subpoena........................................................................................13

III.    GOVERNING STANDARD................................................................................14

IV.     ARGUMENT .....................................................................................................14

        A.      Google Will Succeed on the Merits of Its Claims ................................15

                1.      The Communications Decency Act Immunizes the Conduct Under
                        Scrutiny .....................................................................................15

                2.      Google's Activities Are Protected By the First and Fourteenth
                        Amendments of the United State Constitution ...........................22

                3.      Defendant's Subpoena Violates the Fourth and Fourteenth
                        Amendments of the United State Constitution ...........................28

                4.      Individual Federal Laws Preempt Several Aspects of the Subpoena ........29

        B.      Google Faces A Substantial Threat Of Irreparable Injury ....................33

        C.      The Attorney General Will Suffer No Harm From Complying With a
                Temporary Restraining Order and Preliminary Injunction....................34

        D.      Issuance of a Temporary Restraining Order and Preliminary Injunction
                Furthers the Public Interest ..................................................................34

V.      CONCLUSION...................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Income Life Insurance Co. v. Google Inc.*,
   No. 2:11-CV-4126-SLB, 2014 WL 4452679 (N.D. Ala. Sept. 8, 2014) ..........................18, 20

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012)...........................................................................17

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)..............................................................................................................24

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) ..............................................................................................4

*Ben Ezra, Weinstein, & Co. v. America Online, Inc.*,
   206 F.3d 980 (10th Cir. 2000) .................................................................................16, 18, 19

*Blumenthal v. Drudge*,
   992 F. Supp. 44 (D.D.C. 1998) ...........................................................................................21

*Buckman Co. v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001).............................................................................................................32

*Canal Authority of Florida v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ...............................................................................................14

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) .............................................................................................16

*Cohen v. Coahoma County, Mississippi*,
   805 F. Supp. 398 (N.D. Miss. 1992).....................................................................................33

*Colson v. Grohman*,
   174 F.3d 498 (5th Cir. 1999) ...............................................................................................24

*Dart v. Craigslist, Inc.*,
   665 F. Supp. 2d 961 (N.D. Ill. 2009) ...................................................................................17

*Doe v. Bates*,
   No. 5:05-CV-91-DF-CMC, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006)..........................19

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) .............................................................................................2, 16

*Donovan v. Lone Steer, Inc.*,
    464 U.S. 408 (1984)................................................................................................28

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................................33

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) (en banc) ................................................................21

*Gavra v. Google Inc.*,
    No. 5:12-CV-06547-PSG, 2013 WL 3788241 (N.D. Cal. July 17, 2013).........................20, 21

*Getachew v. Google, Inc.*,
    491 F. App'x 923 (10th Cir. 2012) ........................................................................21

*GlobeRanger Corp. v. Software AG*,
    691 F.3d 702 (5th Cir. 2012) ..............................................................................3, 30

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................................20

*Green v. America Online (AOL)*,
    318 F.3d 465 (3d Cir. 2003)..............................................................................16, 18

*Harrell v. St. John*,
    792 F. Supp. 2d 933 (S.D. Miss. 2011)..................................................................31

*Hartman v. Moore*,
    547 U.S. 250 (2006)................................................................................................24

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
    804 F.2d 1390 (5th Cir. 1986) ...............................................................................33

*Incubus Investments, L.L.C. v. City of Garland*,
    No. CIV.A. 303CV2039-K, 2003 WL 23095680 (N.D. Tex. Dec. 17, 2003).........................35

*Izen v. Catalina*,
    398 F.3d 363 (5th Cir. 2005) ..........................................................................24, 25

*Jian Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433, 436, 438 (S.D.N.Y. 2014)................................................2, 22, 23

*Jones v. Dirty World Entertainment Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) .................................................................................16

*Jurin v. Google, Inc.*,
    695 F. Supp. 2d 1117 (E.D. Cal. 2010)..............................................................20, 21

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) ......................................................................35

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012) (*en banc*) ...................................................24

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007).....................................................20, 22

*Leathers v. Medlock*,
    499 U.S. 439 (1991)..................................................................................22

*Little v. City of North Miami*,
    805 F.2d 962 (11th Cir. 1986) ..................................................................25

*Lofton v. McNeil Consumer & Specialty Pharmaceuticals*,
    672 F.3d 372 (5th Cir. 2012) ...............................................................32, 33

*Major League Baseball v. Butterworth*,
    181 F. Supp. 2d 1316 (N.D. Fla. 2001), *aff'd*, 331 F.3d 1177 (11th Cir. 2003)......................15

*Major League Baseball v. Crist*,
    331 F.3d 1177 (11th Cir. 2003) ......................................................3, 29, 34

*MANual Enterprises, Inc. v. Day*,
    370 U.S. 478 (1962)..................................................................................27

*Marcus v. Search Warrants*,
    367 U.S. 717 (1961)..................................................................................29

*Miami Herald Publishing Co. v. Tornillo*,
    418 U.S. 241 (1974)..............................................................................22, 23

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)...............................................................................3, 34

*Morris v. PLIVA, Inc.*,
    713 F.3d 774 (5th Cir. 2013) ....................................................................32

*Nasser v. WhitePages, Inc.*,
    Civil Action No. 5:12CV-097, 2013 WL 6147677 (W.D. Va. Nov. 22, 2013)......................21

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ....................................................................19

*O'Kroley v. Fastcase, Inc.*,
    No. 3-13-0780, 2014 WL 2881526 (M.D. Tenn. June 25, 2014)..........................20

*Obado v. Magedson,*
   No. CIV. 13-2382 (JAP), 2014 WL 3778261 (D.N.J. July 31, 2014) ......................................20

*Oklahoma Press Publishing Co. v. Walling,*
   327 U.S. 186 (1946)......................................................................................................................28

*Opulent Life Church v. City of Holly Springs, Mississippi,*
   697 F.3d 279 (5th Cir. 2012) ................................................................................................33, 34

*Parker v. Google, Inc.,*
   422 F. Supp. 2d 492 (E.D. Pa. 2006), *aff'd,* 242 F. App'x 833 (3d Cir. 2007) ......................20

*Pendleton v. St. Louis County,*
   178 F.3d 1007 (8th Cir. 1999) ....................................................................................................25

*People v. Williams,*
   920 N.E.2d 446 (Ill. 2009) ..........................................................................................................30

*Perfect 10, Inc. v. CCBILL LLC,*
   488 F.3d 1102 (9th Cir. 2007) ....................................................................................................18

*Reno v. ACLU,*
   521 U.S. 844 (1997)......................................................................................................................17

*Richemont International S.A. v. Tony Chen,*
   No. 12-CV-6689-WHP, Dkt. No. 51 (S.D.N.Y. Mar. 1, 2013) ................................................23

*Riley v. Cordis Corp.,*
   625 F. Supp. 2d 769 (D. Minn. 2009) ........................................................................................32

*Rosetta Stone Ltd. v. Google, Inc.,*
   732 F. Supp. 2d 628 (E.D. Va. 2010), *aff'd,* 676 F.3d 144 (4th Cir. 2012)............................20

*Schouest v. Medtronic, Inc.,*
   13 F. Supp. 3d 692, 700 (S.D. Tex. 2014) ................................................................................32

*Search King, Inc. v. Google Technology, Inc.,*
   No. CIV-02-1457-M, 2003 WL 21464568 (W.D. Okla. May 27, 2003)................................22

*See v. City of Seattle,*
   387 U.S. 541 (1967)......................................................................................................................28

*Smith v. People of California,*
   361 U.S. 147 (1959)......................................................................................................................26

*Sprint Communications Inc. v. Jacobs,*
   134. S. Ct. 584 (2013)..................................................................................................................15

*State v. Perry*,
  697 N.E.2d 624 (Ohio 1998)...................................................................................30

*Stayart v. Google, Inc.*,
  783 F. Supp. 2d 1055 (E.D. Wis. 2011), *aff'd*, 710 F.3d 719 (7th Cir. 2013) ...................21

*Texas Medical Providers Performing Abortion Services v. Lakey*,
  667 F.3d 570 (5th Cir. 2012) ...................................................................................14

*Universal Communications Systems, Inc. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007)................................................................................16, 17, 20

*Watkins v. City of Arlington*,
  No. 4:14-CV-381-O, 2014 WL 3408040 (N.D. Tex. July 14, 2014)...........................35

*White v. Baker*,
  696 F. Supp. 2d 1289 (N.D. Ga. 2010) ...................................................................34

*Wicks v. Mississippi State Employment Services*,
  41 F.3d 991 (5th Cir. 1995) ...................................................................................19

*Wilson v. Thompson*,
  593 F.2d 1375 (5th Cir. 1979) ...............................................................................25

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ...........................................................................16, 17

*Zieper v. Metzinger*,
  392 F. Supp. 2d 516 (S.D.N.Y. 2005), *aff'd on other grounds*, 474 F.3d 60 (2d Cir. 2007) ..22

*Zieper v. Metzinger*,
  474 F.3d 60 (2nd Cir. 2007).............................................................................2, 23

*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978)...............................................................................................29

**Constitutional Provisions, Statutes, and Legislative Materials**

17 U.S.C. § 301(c) .................................................................................................30

17 U.S.C. § 501(b) .................................................................................................30

17 U.S.C. § 506 ......................................................................................................30

17 U.S.C. § 512 ........................................................................................................7

17 U.S.C. § 512(c)(1).............................................................................................31

17 U.S.C. § 512(d).................................................................................................31

17 U.S.C. § 512(m) ........................................................................................... 31

18 U.S.C. § 2319 .............................................................................................. 30

21 U.S.C. §§ 301-399f ...................................................................................... 31

21 U.S.C. § 331 ........................................................................................... 31, 33

21 U.S.C. § 337 ............................................................................................. 3, 32

21 U.S.C. § 337(b)(1) ....................................................................................... 32

21 U.S.C. § 384 ........................................................................................... 31, 33

47 U.S.C. § 230 .................................................................................... 1, 2, 6, 15

47 U.S.C. § 230(a)(1) .................................................................................... 1, 16

47 U.S.C. § 230(a)(3) ........................................................................................ 16

47 U.S.C. § 230(b) ............................................................................................ 16

47 U.S.C. § 230(b)(2) ............................................................................... 1, 16, 34

47 U.S.C. § 230(c)(1) ................................................................................... 16, 19

47 U.S.C. § 230(c)(2) ........................................................................................ 16

47 U.S.C. § 230(e)(1) ........................................................................................ 17

47 U.S.C. § 230(e)(3) ................................................................................... 16, 17

141 Cong. Rec. H8460-01 (Aug. 4, 1995) ........................................................ 17

Miss. Code Ann. § 75-24-7 ............................................................................... 27

Miss. Code Ann. § 97-23-3 ............................................................................... 27

U.S. CONST. amend. I ................................................................................. passim

U.S. CONST. amend. IV ............................................................................... passim

**Other Authorities**

Nick Wingfield & Eric Lipton, *Google's Detractors Take Their Fight to the States*,
   N.Y. Times, Dec. 16, 2014 ........................................................................... 10

*Rhode Island Attorney General Turns Attorney General Lobbyist*, N.Y. Times, Oct. 28, 2014, *available at* http://www.nytimes.com/interactive/2014/10/28/us/5-Rhode-Island-Attorney-General-Turned-Attorney-General-Lobbyist.html ..................................................................13

*Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda*, The Huffington Post, Dec, 18, 2014, *available at* http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html .........................11

*Project Goliath: Inside Hollywood's Secret War Against Google*, The Verge, Dec. 12, 2014, *available at* http://www.theverge.com/2014/12/12/7382287/project-goliath ..........................11

## I.      INTRODUCTION

Congress broadly immunized interactive computer service providers from state regulation for displaying information created by others.  *See* 47 U.S.C. § 230.  Congress determined that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance," and granted this immunity in order to "preserve the vibrant and competitive free market that presently exists for the Internet . . . , unfettered by . . . State regulation."  *Id.* at § 230(a)(1), (b)(2).

For the last eighteen months, the Mississippi Attorney General has threatened to prosecute, sue, or investigate Google unless it agrees to block from its search engine, YouTube video-sharing site, and advertising systems, third-party content (*i.e.*, websites, videos, or ads not created by Google) that the Attorney General deems objectionable.  When Google did not agree to his demands, the Attorney General retaliated, issuing an enormously burdensome subpoena and asserting that he now has "reasonable grounds to believe" that Google has engaged in "deceptive" or "unfair" trade practice under the Mississippi Consumer Protection Act (MCPA), which allows for both civil and criminal sanctions.  The Attorney General did so despite having publicly acknowledged in a letter to Congressional leaders that "federal law prevents State and local law enforcement agencies from prosecuting" Internet platforms.[1]  The Attorney General took these actions following a sustained lobbying effort from the Motion Picture Association of America.

---

[1] Forty-six other state attorneys general joined the Attorney General in this acknowledgement of the limits federal law imposes on the ability of individual states to regulate the inherently national Internet.  *See* Declaration of Peter Neiman in Support of Plaintiff Google's Motion for Temporary Restraining Order and Preliminary Injunction ("Neiman Decl.") Ex. 12 at 1.

The Attorney General's efforts to force Google to severely limit third-party information accessible through Google's services violates federal law in several ways.

*First*, Section 230 of the Communications Decency Act ("CDA") precludes state regulation of Google based upon the third-party content available on its services or the manner in which Google moderates that content.[2] "Congress provided broad immunity under the CDA to Web-based service providers for all claims stemming from their publication of information created by third parties." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

*Second*, the First Amendment protects Google's organization and display of third-party information (*e.g.*, search results), prohibits retaliation for how it organizes and displays such content, and bars state action that limits public access to constitutionally-protected speech. As multiple courts have found, the state can no more tell a search engine what results to publish than it can tell a newspaper what editorials to run. *See, e.g., Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 436, 438 (S.D.N.Y. 2014). Nor can the state "encourag[e] the suppression of speech in a manner which can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Zieper v. Metzinger*, 474 F.3d 60, 65-66 (2d Cir. 2007) (internal quotation marks omitted).

---

[2] While generally immunizing Internet platforms from state regulation based on their transmission or display of third-party content, Section 230 does not turn the Internet into a law-free zone. Rather, it permits state regulation of the creators of content disseminated through the Internet. Thus, states remain free to prosecute the operators of unlawful Internet gambling or payday loan sites, for example. The statute also permits some federal regulation of interactive computer services related to third-party content, including through enforcement of federal criminal law. For instance, Google entered into a Non-Prosecution Agreement ("NPA") with the Justice Department in 2011 for its decision in 2004 to permit advertisements from Canadian pharmacies targeting U.S. customers, in potential violation of federal law. It agreed to a number of remedial actions, including a forfeiture of $500 million.

*Third*, the subpoena violates the Fourth Amendment by demanding information about conduct that is plainly lawful. "[I]nvestigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that" the Supreme Court has held violate the Fourth Amendment and "do[] not pass muster under *any* standard." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187-88 (11th Cir. 2003) (citations omitted).

*Fourth*, much of the Attorney General's subpoena is preempted by the Copyright Act or the Food, Drug and Cosmetics Act ("FDCA"). Many of the Attorney General's inquiries concern copyright infringement—but copyright is exclusively a matter of federal law, which the Attorney General may not enforce and with which Google fully complies. *See GlobeRanger Corp. v. Software AG*, 691 F.3d 702, 705-06 (5th Cir. 2012). Similarly, the Subpoena seeks information about Google's practices *ten years ago* with regard to advertisements relating to the importation of prescription drugs. But the FDCA regulates importation of prescription drugs and preempts enforcement actions not brought "by and in the name of the United States." 21 U.S.C. § 337.

Google seeks to enjoin the Attorney General's ongoing violation of its rights under well-established federal law. This Court has clear authority to do so. *See, e.g., Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-84 (1992) (enjoining state attorneys general from bringing suit under consumer protection law for conduct protected by federal law); *Crist*, 331 F.3d at 1186-88 (affirming injunction against enforcement of state attorney general's subpoena where federal law preempted state theory of liability).

To be clear, Google agrees that much of the third-party content about which the Attorney General complains is objectionable. And with great care, Google voluntarily strives to exclude content that violates either federal law or Google's own policies, by blocking or removing

- 3 -

hundreds of millions of videos, web pages, advertisements, and links in the last year alone. These extensive efforts comply with and go well beyond Google's legal obligations.

But if a state Attorney General can punish, irrespective of well-established federal law, any search engine or video-sharing platform whenever he finds third-party content he deems objectionable, search engines and video-sharing platforms cannot operate in their current form. They would instead have to pre-screen the trillions of websites and millions of videos on the Internet, blocking anything they had not yet reviewed from being publicly accessible so as to avoid the ire of even a single state or local regulator. This would "severely restrict the information available on the Internet," *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003), precisely the opposite of the "unfettered" Internet the CDA and the First Amendment protect. The Attorney General may prefer a pre-filtered Internet—but the Constitution and Congress have denied him the authority to mandate it.

Google is likely to succeed on the merits and preliminary relief is warranted. The Attorney General's threat of prosecution or civil enforcement litigation is causing ongoing injury: it forces Google to choose between being charged improperly or changing its services to screen out content per the Attorney General's demands, irrespective of what the law actually requires. The subpoena is causing ongoing injury as well, because it denies Google the broad immunity granted in the CDA, subjects Google to an unreasonable search in violation of the Fourth Amendment, and punishes Google for constitutionally protected speech.

To prevent these irreparable harms from continuing while this case is pending, this Court should temporarily restrain and preliminarily enjoin the Attorney General from (a) enforcing the pending subpoena (returnable January 5, 2015) or (b) bringing a civil or criminal charge (as

threatened) against Google under Mississippi law for making accessible to Internet users third-party content.

## II. STATEMENT OF FACTS

### A.    Google's Services

Google Search is the most popular search engine in the world.  Built upon a constantly updated index reflecting information from trillions of web pages, Google's search engine processes approximately 3.5 billion queries per day.  Declaration of Brian Downing in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction, ("Downing Decl.") ¶¶ 4-5.  Google provides Search for free to over a billion users around the world.  *Id.*  It displays advertisements alongside search results through a separate service called "AdWords."  Declaration of Sheily Chhabria in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction ("Chhabria Decl.") ¶ 4.  Over 40 million ads are created by AdWords users every day. *Id.* ¶ 5.  These ads appear on Search, YouTube, and on third-party websites through a service called "AdSense." *Id.*

Search includes an Autocomplete feature that uses algorithms to statistically predict a user's query as the user types it in the search field, permitting the user to complete the search by selecting a prediction.  Downing Decl. ¶ 16.  Like similar services on other search engines, Autocomplete seeks to anticipate the query being entered, giving users a shortcut for conducting search queries more quickly.  *Id.*

YouTube is a web-based platform that lets users upload, view, and share videos instantly. Declaration of Victoria Grand in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction ("Grand Decl.") ¶ 2.  Users upload nearly 300 hours of video onto YouTube every minute. *Id.*  YouTube is also a free service where ads are displayed for many videos. *Id.* ¶ 14.  In some cases, YouTube shares ad revenue with the

uploader of the video against which the ad runs. *Id.* ¶¶ 14-15.  In others, YouTube shares the ad revenue with the owner of copyrighted audio or video contained in the uploaded video. *Id.* ¶ 18.

### B.    How Google Enforces Its Content Policies

The Internet lets people around the world instantly publish content in many formats on many platforms.  The scale and diversity of information online is unprecedented and has contributed to an explosion of art, culture, and commerce in the United States and around the world.  Inevitably, some tiny fraction of Internet content relates to offensive or unlawful activity.

Section 230 of the CDA provides Internet service providers like Google with broad immunity from state regulation for their display of such content created and developed by others. That immunity affords Internet service providers the space to innovate without facing frequent and burdensome litigation and potentially ruinous liability, whenever any third parties misuse their services to disseminate inappropriate content.  And it permits an Internet service provider to make judgments about what third-party content is or is not appropriate for its service, without fear that by excluding some content, the service provider will have exposed itself to liability for not excluding other content.

Consistent with Section 230, Google has adopted different content policies for its various services, reflecting the different purposes of those services.  Google expects to spend upwards of $100 million on enforcing its content policies in 2014 alone, and it is the industry leader in efforts to fight illegal activities online.  Chhabria Decl. ¶ 3.

Search is Google's least restrictive service because it merely assists users in locating third-party web pages that are publicly available.  Downing Decl. ¶ 11.  Google restricts search results under very limited circumstances, such as web pages it has identified as a source of child pornography; content found by a court to be unlawful; spam; malware; sensitive personally

identifying information (*e.g.*, credit card and social security numbers); and shocking images that Google can identify automatically. *Id.* ¶¶ 13-14; *see also id.*, Ex. 4.

YouTube, unlike Search, hosts third-party videos on Google servers; it is more restrictive than Search and is subject to Community Guidelines, which prohibit certain types of content on the site. Grand Decl. ¶ 3; *see also id.* Ex. 1. YouTube enforces these Guidelines both through crowdsourcing (leveraging its billions of users to flag content that violates the Community Guidelines), *id.* ¶¶ 5-7 and Ex. 2, and through sophisticated automated systems that attempt to identify offending content. *Id.* ¶¶ 9-10 & Ex. 4. In 2014 alone, YouTube has removed or blocked over 180 million videos for violating the Community Guidelines. *Id.* ¶ 12.

Google's advertising services are even more restrictive because they are used to promote third-party products, services, and websites. In 2014, Google has disapproved over 428 million advertisements, prevented ads from linking to over one million websites, suspended or terminated over 900,000 AdWords advertiser accounts, and terminated over 200,000 websites from AdSense, all based on violations of Google policies. Chhabria Decl. ¶¶ 14, 26.

## C.   Google's Approach to Copyright and Prescription Drugs

Google's policies exclude advertising from websites offering the unauthorized downloads of copyrighted works and prohibit the uploading of infringing content to YouTube. Chabbria Decl. Ex. 3 at 5-6, Ex. 18 at 3; Downing Decl. Ex. 5; Grand Decl. Ex. 1 at 1-2, *id.* ¶¶ 5-7, 9-13. With regard to Search, the Digital Millennium Copyright Act ("DMCA") creates a safe harbor from copyright infringement liability for information location tools like Google that remove infringing content upon receiving an appropriate takedown request from the copyright holder. 17 U.S.C. § 512. Based on takedown notices, Google removed 222 million web pages from the Search index in 2013 alone. Downing Decl. Ex. 5 at 13. Google has reasonably made the judgment that going further—removing entire sites from search results (as opposed to removing

only content identified as infringing), without a judicial finding of illegality—is not appropriate unless mandated by law. Congress came to the same conclusion. Declaration of Peter G. Neiman in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction ("Neiman Decl.") Ex. 23 at 4. But Google has taken other significant steps to hinder the efforts of third parties to promote websites that include material appearing to infringe copyrights. *See* Downing Decl. ¶ 14, Ex. 4 at 1-3; *id.* ¶ 15, Ex. 5; Chhabria Decl. ¶ 21, Ex. 14 at 1; Neiman Decl. Ex. 23 at 4-5.

Google has also focused on combating pharmacies that illegally sell drugs without prescriptions. Although some rogue pharmacy sites advertised with Google many years ago, leading to a 2011 non-prosecution agreement with the U.S. Department of Justice, *see* p. 5, n.1 *supra*, no other Internet company does more to address this issue today. Chhabria Decl. ¶ 16, Ex. 9; *id.* ¶ 17, Ex. 10; *id.* ¶ 18, Ex. 11. In 2014, Google has already blocked more than 7.1 million ads that violate its pharmacy and related content policies, the vast majority of which were never seen. *Id.* ¶ 19. Google has also removed or blocked over 200,000 videos in 2014 for violating YouTube's policies concerning the unauthorized sale of pharmaceuticals. Grand Decl. ¶ 12. Rather than censoring Search results relating to pharmaceuticals, Google displays important information to users about the hazards of some Internet pharmacies, including running no-cost ads linking to a pharmacy checker tool helping users investigate the legitimacy of online pharmacies. And Google promotes content from DrugFree.org for search queries related to drugs and addiction, providing answers to questions parents might have in these areas.[3]

---

[3] *See also* Chhabria Decl. ¶ 18, Ex. 11. ¶ 20, Ex. 12(A)-(Q).

**D.     The Attorney General's Threats and Demands**

Notwithstanding Google's extensive and largely voluntary efforts to address illegal and offensive third-party content, the Attorney General believes Google "hasn't done enough." Neiman Decl. Ex. 28 at 1. Over the last eighteen months, he has made increasingly strident allegations of illicit conduct by Google and threats of civil and criminal action against it. *See id.* Exs. 1, 2, 5, 6, 8-10, 13-15, 17, 19, 20, 22, & 25-30. He has done so despite acknowledging on more than one occasion that any legal action against Google is barred by the "immunity provided by" the CDA as "broadly interpreted" by the courts of the United States. *Id.* Ex. 12 at 1. *See also, e.g., id.* Ex. 12 at 1-2; *id.* Ex. 13 at 2:16-20, 4:3-5.

In several letters to Google, the Attorney General has falsely accused it of, among other things, "aiding and abetting" and even "encourag[ing] . . . illegal activity." *Id.* Ex. 5 at 3. He has characterized Google as an "accessory before the fact" in criminal conduct, *id.* Ex. 2 at 1, asserted it has "no corporate conscience for the safety of its customers," *id.* Ex. 17 at 1, and claimed that Google "facilitates and profits from numerous illegal online activities," *id.* Ex. 17 at 2. *See also id.* Ex. 15 at 3 (page 1 of the draft letter). He has threatened to "take legal action to change [Google's] behavior," *id.* Ex. 2 at 3, outlining "[p]ossible [c]auses of [a]ction" against Google in a presentation to the National Association of Attorneys General ("NAAG"), *id.* Ex. 10 at 53-57, sending numerous requests for information, *see, e.g., id.* Exs. 1, 5, & 22, and a broad litigation hold notice, *id.* Ex. 8. The Attorney General has demanded in several meetings that Google pre-screen or block third-party content and search results that merely may involve illegal activity, even at the cost of burdening lawful, protected speech. *See, e.g., id.* Ex. 2 at 2; *id.* Ex. 22 at 2; *id.* Ex. 27 at 5:13-6:24, 7:16-8:14. He has even sought a "24-hour link through which attorneys general[]" can request that links to particular websites be removed from search results

"within hours," presumably without judicial review or an opportunity for operators of the target websites to be heard. *Id.* Ex. 5 at 3.

The Attorney General has criticized Google in public appearances, even publicizing a letter to Google under his signature, but largely written by lawyers for the movie industry, that inaccurately claimed "overwhelming evidence shows that Google facilitates and profits from numerous illegal online activities . . . ." *Id.* Ex. 17 at 2. *See also* Nick Wingfield & Eric Lipton, *Google's Detractors Take Their Fight to the States*, N.Y. Times, Dec. 16, 2014. He has repeated these allegations and threats at public meetings of the NAAG, *see, e.g.*, Neiman Decl. Ex. 9 at 9:6-19, 24:8-23; *id.* Ex. 27 at 3-9, at one point falsely accusing Google of intentionally "manipulat[ing]" its algorithm to include and promote sites with allegedly infringing content in search results, and calling upon other attorneys general to "issue civil investigative demands" if Google did not change its policies in the ways he was proposing, *id.* Ex. 9 at 8:12-16. *See also id.* Ex. 9 at 24:14-23.

The Attorney General has cited no evidence at all of misconduct by Google to back up these inflammatory allegations. He has instead identified a handful of web pages among the trillions reflected in Google's index, and a smattering of videos amongst the millions of hours watched every month on YouTube, and asserted that some of the content of those websites and videos (all created by third parties) is unlawful. *See, e.g., id.* Ex. 10 at 4-11, 14-20, 23-26, 30-34, 38-40, 45-52; *id.* Ex. 20; *id.* Ex. 25 at 1-9; *id.* Ex. 26. He has noted that advertising occasionally appears alongside the videos about which he complains. *See, e.g., id.* Ex. 5 at 3; *id.* Ex. 6 at 1; *id.* Ex. 9 at 9:14-19; *id.* Ex. 14 at 1; *id.* Ex. 17 at 7, 9, & 11; *id.* Ex. 19 at 1; *id.* Ex. 22 at 2. And he has criticized some of Autocomplete's algorithmically-generated predictions. *See, e.g., id.*

Ex. 2 at 2; *id.* Ex. 5 at 2; *id.* Ex. 8 at 2; *id.* Ex. 9 at 5:17-6:3, 6:11-13, 11:22-25, 16:19-17:6, 23:4-13; *id.* Ex. 13 at 3:9-17; *id.* Ex. 17 at 5-6, 10.

Whatever that says about the actions of those who created and developed the content about which the Attorney General complains, it in no way implies that Google has violated the law. Given the vast quantity of third-party content available on the Internet, it is no surprise that some small percentage of the information found via Search or posted on YouTube is inappropriate or unlawful. Statutes such as the CDA and DMCA accept the inevitability of problematic content online as the cost of a free and open Internet, and squarely immunize Google and other interactive service providers from liability arising from such third-party content.

The Attorney General has been particularly focused on websites containing allegedly infringing content protected by copyright. He has demanded that Google promote in its search results sites that have been endorsed by Hollywood, display an icon alongside such favored sites in its results, and de-index sites "substantially dedicated to intellectual property infringement." *Id.* Ex. 17 at 5. While these changes might suit the business interests of certain copyright holders,[4] the Attorney General has never explained the source of *his* authority to pursue alleged

---

[4] According to recent press reports, the Motion Picture Association of America (MPAA) launched a "multi-pronged" campaign against Google, including encouraging state attorneys general to investigate Google and retaining Jenner & Block to provide legal support. *Project Goliath: Inside Hollywood's Secret War Against Google*, The Verge, Dec. 12, 2014, *available at* http://www.theverge.com/2014/12/12/7382287/project-goliath (hereinafter "The Verge, Project Goliath"). *See also Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda*, The Huffington Post, Dec. 18, 2014, *available at* http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html (hereinafter "HuffPo, Hollywood Worked With AG"). Jenner & Block drafted a letter the Attorney General sent to Google in November 2013. *See* Neiman Decl. Ex. 15; *id.* Ex. 16. In advance of a meeting with Google in January 2014, Jenner & Block Partner Thomas J. Perrelli prepped the Attorney General and "got him focused on the key issues and the asks." HuffPo, Hollywood Worked With AG. Press reports further indicate the MPAA knew of the Subpoena before it was served on Google and planned to leverage it to obtain concessions from Google. *See* HuffPo, Hollywood Worked With Attorney General; The Verge, Project Goliath.

copyright infringement, an area regulated exclusively by federal law, or to demand a remedy—whole site removal—Congress explicitly rejected. Nor, more generally, has he explained how his demands can be reconciled with the "unfettered" Internet the CDA mandates.

Nevertheless, Google has worked to address the Attorney General's concerns. *See, e.g.,* Neiman Decl. Exs. 3, 4, 7, 11, 18, 21, & 23. In response to his questions, Google provided over one-hundred pages of written answers detailing its policies and practices for voluntarily combating abuse across its services, and voluntary shared nearly 100,000 pages of supporting documents. YouTube engineers even created a custom reporting tool and trained the Attorney General's office on how to use it so that they could report for expedited review and possible removal videos they deemed objectionable. *See* Grand Decl. ¶ 21. To date, over half a year later, the Attorney General has used this tool to report only seven videos.[5] *See id.* Nor, to the best of Google's knowledge, has the Attorney General filed any legal action against any of the actual creators of the specific underlying content to which he has objected. Google has also explained the applicability of CDA immunity and the DMCA safe-harbor provisions to services like Google, as well as the constitutional concerns raised by his demands. *See, e.g.,* Neiman Decl. Ex. 3 at 1, 3-4, 6; *id.* Ex. 7; *id.* Ex. 11 at 2-5, 8, 10-13; *id.* Ex. 18; *id.* Ex. 23 at 3-4, 7.

Ignoring both the law and the evidence Google has presented, the Attorney General has continued to target Google by, amongst other things:  (1) making and fulfilling threats to serve Google with a retaliatory civil investigative demand, *see id.* Ex. 9 at 8:8-16, 24:18-23; *id.* Ex. 30, (2) threatening to encourage and actively encouraging other state attorneys general do likewise,

---

[5] That represents less than 0.000004% of the YouTube videos on which Google independently took action for policy violations in 2014.

*see id.* Ex. 5 at 3; *id.* Ex. 9 at 8:8-16, 24:14-23,[6] and (3) threatening to prosecute Google, and

encouraging other state attorneys general to do so.  *See id.* Ex. 10 at 53-57; *id.* Ex. 30 at 1-2.

### E.    The Subpoena

On October 27, 2014, the Attorney General followed through on his long-stated threat to

serve Google with a punitive and burdensome subpoena (the "Subpoena")—79 pages

propounding 141 document requests and 62 interrogatories. *See* Neiman Decl. Ex. 30.[7]  The

Subpoena asserts that the Attorney General has "reasonable grounds to believe" that Google has

violated the MCPA.  *Id.* at 1.  But it takes a sweeping view of what third-party content

potentially gives rise to liability for Google.  Specifically, the Subpoena demands extensive

information about "Illegal Content," which the Subpoena defines as not just content that violates

Mississippi law, but also "*any* information that . . . has *indicia* that it *could*, either directly,

indirectly or *tangentially*, promote, facilitate, encourage, aid or abet activity that *could be* in

violation of any criminal or civil law of the United States or that of any state or territory." *Id.* at

7 ¶ 9 (emphases added).  The Subpoena further demands information about all "Dangerous

Content," which includes not only information that actually causes harm, but also "information

that . . . has *indicia* that it *could*, in *any way*, either directly, indirectly or *tangentially*, aid, abet,

assist, facilitate, encourage or promote activity that *could lead* to physical harm or injury." *Id.* at

4 ¶ 3 (emphases added).

---

[6] In October 2013, Patrick Lynch, a lobbyist representing Google's competitors, emailed state
attorneys general to urge them to press Google.  He wrote that "the voice and authority of
Attorneys General, either individually or collectively, are key to changing Google shift behavior
[sic]—to put them under real pressure via CIDs [civil investigative demands] and depositions."
*See Rhode Island Attorney General Turns Attorney General Lobbyist*, N.Y. Times, Oct. 28,
2014, *available at* http://www.nytimes.com/interactive/2014/10/28/us/5-Rhode-Island-Attorney-
General-Turned-Attorney-General-Lobbyist.html (pages 62, 63 of PDF).

[7] The Subpoena is long enough to require a table of contents.

The Subpoena makes crystal clear that it demands information about activities immunized by the CDA.  The Subpoena's first definition states that "aiding and abetting"—a term incorporated into most other requests—includes any conduct "regardless of whether or not the act or acts would be protected or immunized under the [CDA]." *Id.* at 4 ¶ 1.

The Subpoena demands the production of an extraordinarily broad array of information. In order to respond to the Subpoena in full, Google would have to produce millions of documents, at great expense and disruption to its business.[8]

### III.  GOVERNING STANDARD

An applicant for a preliminary injunction or temporary restraining order must show: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of an irreparable injury without preliminary relief; (3) threatened injury that outweighs potential harm to the preliminarily-enjoined party; and (4) that granting preliminary relief will not disserve the public interest. *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012).  Where the party seeking the injunction "will be more severely prejudiced by a denial of the injunction than defendant would be by its grant," a lower probability of success suffices. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576-77 (5th Cir. 1974).

### IV.  ARGUMENT

The Attorney General's course of conduct violates federal law and burdens the constitutional rights of Google and millions of Americans (including Mississippians) who use Google services to help access publicly available content on the Internet.  Google seeks a temporary restraining order and preliminary injunction to enjoin the Attorney General from

---

[8] The Attorney General has declined requests to narrow the subpoena to exclude conduct immunized by the CDA or pre-empted by other federal law. *See* Neiman Decl. ¶¶ 32 & 34.

taking retaliatory action to enforce the Subpoena and pursuing the threatened enforcement action against Google until Google's statutory and constitutional claims can be fully briefed and heard. Google would be irreparably injured in the absence of preliminary injunctive relief, while the Attorney General's legitimate interests would not be measurably prejudiced by the resulting delay. The public interest in a free and open Internet overwhelmingly weighs in favor of relief.

### A.     Google Will Succeed on the Merits of Its Claims

The Subpoena and threatened civil or criminal charges violate multiple constitutional and statutory provisions, each of which offers an independent basis to issue the requested order and injunction. Google need only have a substantial likelihood of success on *one* of its claims. As discussed below, the Subpoena and threatened enforcement action should be enjoined under the CDA, the First Amendment, and the Fourth Amendment, and are in large part preempted by the Copyright Act and by the Food, Drug, and Cosmetic Act.[9]

### 1.     The Communications Decency Act Immunizes the Conduct Under Scrutiny

Section 230 of the CDA grants interactive computer services broad immunity from state regulation with respect to their role in making accessible content created and developed by others. Because Google did not create or develop the third-party content on which the Attorney General focuses, the CDA precludes the Attorney General's inquiry.

---

[9] There is no basis for the Court to abstain from exercising jurisdiction here. *Sprint Comm'ns Inc. v. Jacobs*, 134. S. Ct. 584, 588 (2013) ("In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter."). Here, there is not even a state proceeding pending. *Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316, 1321 n.2 (N.D. Fla. 2001) (Attorney General's CID not a state proceeding for abstention purposes), *aff'd*, 331 F.3d 1177 (11th Cir. 2003).

a.    The CDA Provides "Broad Immunity"

In 1996, Congress created CDA immunity to preserve the "extraordinary advance in the availability of educational and informational resources" brought by the Internet and interactive computer services. 47 U.S.C. § 230(a)(1); *see also id.* § 230(b) (articulating the "policy of the United States"). Congress sought to ensure that the Internet remained a "forum" for free-ranging intellectual inquiry and diverse political and cultural discourse, and a "vibrant and competitive free market . . . unfettered by Federal or State regulation." *Id.* § 230(a)(3), (b)(2). CDA immunity was—and is—essential to the Internet's status as an open, democratized forum for the world.

The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). It declares that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). And to promote voluntary efforts to address inappropriate content, the CDA protects interactive computer services that, like Google, filter out some third-party content from a claim that doing so creates a duty to filter out other types of content. *Id.* § 230(c)(1)-(2).

Courts throughout the country, including the Fifth Circuit, have held that "Congress provided broad immunity under the CDA to Web-based service providers for all claims stemming from their publication of information created by third parties . . . ." *MySpace*, 528 F.3d at 418; *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra, Weinstein, & Co. v. Am. Online, Inc.*, 206 F.3d 980, 984-86 (10th Cir. 2000); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir.

1997).  Congress deliberately chose "not to deter harmful online speech" by "imposing tort

liability on companies that serve as intermediaries," *Lycos*, 478 F.3d at 418, because the risk of

such liability posed a "threat . . . to freedom of speech in the new and burgeoning Internet

medium," *Zeran*, 129 F.3d at 330.

Given the expansion of the Internet since 1996, that threat is even greater today.  When

the CDA was passed, "commercial online services had almost 12 million individual subscribers,"

*Reno v. ACLU*, 521 U.S. 844, 850-51 (1997), which led to a "staggering" quantity of information

being shared online, *Zeran*, 129 F.3d at 331.  As one Member of Congress noted, companies

would have to deal with content "far larger than our daily newspaper . . . thousands of pages of

information a day."   141 Cong. Rec. H8460-01, H8471 (Aug. 4, 1995).  As a result:

> The specter of tort liability in an area of such prolific speech would
> have an obvious chilling effect.  It would be impossible for service
> providers to screen each of their millions of postings for possible
> problems.    Faced  with  potential  liability  for  each  message
> republished  by  their  services,  interactive  computer  service
> providers might choose to severely restrict the number and type of
> messages posted.  *Congress considered the weight of the speech
> interests implicated and chose to immunize service providers to
> avoid any such restrictive effect.*

*Zeran*, 129 F.3d at 331 (emphasis added).  With the exponential growth in Internet users and

content, *see supra* 6-8, these considerations have only grown more compelling.

The CDA's "broad immunity" includes protection from enforcement actions under state

law.  *Compare* 47 U.S.C. § 230(e)(3) (barring action under "any State or local law") *with id.* §

230(e)(1) (permitting enforcement of "Federal" criminal statutes); *see, e.g.*, *Backpage.com, LLC

v. McKenna*, 881 F. Supp. 2d 1262, 1275 (W.D. Wash. 2012) (immunity applies to state law

criminal action); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967-68 (N.D. Ill. 2009) (state law

nuisance action).  Indeed, in a 2013 letter to congressional leaders, the Attorney General, along

with 46 other state attorneys general, conceded that "[f]ederal courts have broadly interpreted the

- 17 -

immunity provided by the CDA" and acknowledged that "the [CDA] prevents State and local

law enforcement agencies from prosecuting [Internet platforms]."  Neiman Decl. Ex. 12 at 1.

*See also id.* Ex. 10 at 54.

Numerous courts have held that CDA immunity bars actions under state consumer

protection laws like the MCPA.  *See, e.g., Perfect 10, Inc. v. CCBILL LLC*, 488 F.3d 1102, 1119,

1121 (9th Cir. 2007); *Green*, 318 F.3d at 473; *see also Am. Income Life Ins. Co. v. Google Inc.*,

No. 2:11-CV-4126-SLB, 2014 WL 4452679, at *15 (N.D. Ala. Sept. 8, 2014) (holding CDA

immunized Google from claim under Alabama consumer law).

This broad immunity against state enforcement actions protects Internet service providers

from facing possibly conflicting demands from multiple state regulators as to content that "may

be viewed across the Internet, and thus in more than one state at a time."  *Perfect 10*, 488 F.3d at

1118.  Requiring providers to conform with such conflicting demands would be "contrary to

Congress's expressed goal of insulating the development of the Internet from the various state-

law regimes."  *Id.*

The CDA also bars subpoenas pertaining to immunized conduct.  The immunity

Congress provided would be hollow if state officials could coerce Internet service providers by

making endless burdensome demands for information about immunized conduct.[10]  Courts have

recognized that requiring service providers to respond to discovery demands can itself "deny an

interactive service provider the immunity authorized by the [CDA]."  *Ben Ezra*, 206 F.3d at 986

---

[10] A subpoena limited to seeking the facts necessary to determine whether immunity exists would
be a different matter.  Google has already voluntarily provided the Attorney General with
information sufficient to establish that Google did not create or develop any of the content to
which the Attorney General has objected.  *See* Neiman Decl. ¶ 33; *id.* Ex. 3; *id.* Ex. 4; *id.* Ex. 7;
*id.* Ex. 11; *id.* Ex. 18; *id.* Ex. 21; *id.* Ex. 23.  The Attorney General, however, has declined to
withdraw or narrow the Subpoena.  *See* Neiman Decl. ¶¶ 32, 34.

(internal quotation marks omitted); *see also Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) ("[I]mmunity means more than just immunity from liability; it means immunity from the burdens of defending a suit, including the burdens of pretrial discovery"). As the Fourth Circuit explained:

> Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. As we have often explained in the qualified immunity context, 'immunity is an immunity from suit rather than a mere defense to liability' and 'it is effectively lost if a case is erroneously permitted to go to trial.' We thus aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009) (citations omitted). *See also Doe v. Bates*, No. 5:05-CV-91-DF-CMC, 2006 WL 3813758, at *10 (E.D. Tex. Dec. 27, 2006) (holding that delay in ruling on CDA immunity would "defeat one of the fundamental purposes of the immunity, namely to insulate service providers . . . from the burdens of litigation, including . . . discovery"). Enforcement of the Subpoena—which, as discussed below, is aimed almost entirely at immunized conduct—would strip away the very protections Congress provided to interactive computer services like Google.

### b.       The CDA Immunizes Google's Conduct

CDA immunity generally exists when (1) the defendant claiming immunity is "a provider . . . of an interactive computer service," (2) the allegedly unlawful content was "provided by another information content provider," and (3) the plaintiff's claims seek to "treat[]" the defendant as the "publisher or speaker" of that information. 47 U.S.C. § 230(c)(1). *See also Ben Ezra*, 206 F.3d at 984-85. All three elements are met here.

*First*, as federal courts have repeatedly held, Google—as the provider of a search engine service, the operator of online advertising platforms, and content host on YouTube—is a

provider of an "interactive computer service" under the CDA. *See, e.g., Am. Income Life Ins. Co.*, 2014 WL 4452679, at *8; *O'Kroley v. Fastcase, Inc.*, No. 3-13-0780, 2014 WL 2881526, at *2 (M.D. Tenn. June 25, 2014); *Rosetta Stone Ltd. v. Google, Inc.*, 732 F. Supp. 2d 628, 632 (E.D. Va. 2010), *aff'd*, 676 F.3d 144 (4th Cir. 2012); *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1122-23 (E.D. Cal. 2010); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 630-31 (D. Del. 2007); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 500-01 (E.D. Pa. 2006), *aff'd*, 242 F. App'x 833 (3d Cir. 2007); *Gavra v. Google Inc.*, No. 5:12-CV-06547-PSG, 2013 WL 3788241, at *1 (N.D. Cal. July 17, 2013).

*Second*, all of the third-party content that is targeted by the Attorney General's Subpoena and threatened enforcement actions against Google was created and developed by "another information content provider." Google simply does not create or develop the third-party content that the Attorney General deems objectionable. *See Am. Income Life Ins. Co.*, 2014 WL 4452679, at *8 (dismissing complaint where the plaintiff "fail[ed] to allege that defendant Google created the [web page] content" at issue); *Obado v. Magedson*, No. CIV. 13-2382 (JAP), 2014 WL 3778261, at *6 (D.N.J. July 31, 2014) ("suggested search terms auto-generated by a search engine do not remove that search engine from the CDA's broad protection"); *see also* Grand Decl. ¶ 20; Downing Decl. ¶ 19; Chhabria Decl. ¶ 28; Neiman Decl. Ex. 10; *id.* Ex. 20; *id.* Ex. 25; *id.* Ex. 26. That is true even if Google provided neutral tools that were used to create the objectionable content. *See Gavra*, 2013 WL 3788241, at *2 (YouTube "[m]erely provid[ed] third parties with neutral tools to create web content"); *Goddard*, 640 F. Supp. 2d at 1198 ("Google's Keyword Tool is a neutral tool. It does nothing more than provide options that advertisers may adopt or reject at their discretion."). And that would be true even if Google was on notice of objectionable content. *Lycos*, 478 F.3d at 420.

*Third*, the Attorney General's theory—that it is an unfair trade practice for Google to make this third-party content accessible—treats Google as the publisher or speaker of the third-party content. *See, e.g.*, Neiman Decl. Ex. 2 at 2; *id.* Ex. 5 at 3; *id.* Ex. 10 at 53-60; *id.* Ex. 30 at 2. The Attorney General seeks to penalize Google for failing to screen out all disfavored third-party content. *See, e.g.*, *id.* Ex. 2 at 2; *id.* Ex. 5 at 2-3; *id.* Ex. 8 at 2; *id.* Ex. 9 at 12, 13:19-14:8; *id.* Ex. 10 at 53-60; *id.* Ex. 17 at 3-8; *id.* Ex. 22 at 2; *id.* Ex. 27 at 5:18-6:24. But the CDA immunizes "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc). Federal courts have consistently rejected actions that seek to impose liability on Google for third-party content. *See, e.g.*, *Getachew v. Google, Inc.*, 491 F. App'x 923, 925-26 (10th Cir. 2012) (Search); *Gavra*, 2013 WL 3788241, at *2 (YouTube); *Stayart v. Google, Inc.*, 783 F. Supp. 2d 1055, 1056-58 (E.D. Wis. 2011) (Autocomplete), *aff'd*, 710 F.3d 719 (7th Cir. 2013); *Jurin*, 695 F. Supp. 2d at 1122-23 (Ads). Nor does the fact that YouTube sometimes shares advertising revenue with third-party content providers change the analysis. *See Nasser v. WhitePages, Inc.*, Civil Action No. 5:12CV-097, 2013 WL 6147677, at *4 (W.D. Va. Nov. 22, 2013) ("Neither is immunity lost when the interactive service provider pays a third party for the content at issue, and essentially becomes a 'distributor' of the content." (footnote omitted)); *Blumenthal v. Drudge*, 992 F. Supp. 44, 49-53 (D.D.C. 1998) (AOL's immunity extended to statements by Drudge, despite AOL paying Drudge a monthly fee to disseminate his content, having the right to edit that content, and promoting that content to users).

2.      **Google's Activities Are Protected By the First and Fourteenth Amendments of the United State Constitution**

The First Amendment stands as a bulwark against government efforts to control the availability of information. The Attorney General's actions violate the First Amendment in three distinct ways: (1) by regulating Google's speech based on its content; (2) by retaliating against Google for its protected speech; and (3) by seeking to place unconstitutional limits on the public's access to information.

a.      **The Attorney General Is Regulating Google's Protected Speech Based on Its Content**

Every court to consider the issue has concluded that search results lie at the core of the First Amendment's free speech protections. *See Jian Zhang*, 10 F. Supp. 3d at 436. Search results are a form of editorial judgment—"opinions of the significance of particular web sites as they correspond to a search query." *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457-M, 2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003); *see also Jian Zhang* 10 F. Supp. 3d at 437-41 (search engine rankings are protected speech); *Langdon*, 474 F. Supp. 2d at 630 (same). In the same way that a newspaper publisher's selection of what third-party speech to print is protected by the First Amendment, *see Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974), so too does the First Amendment protect Google's selection and ordering of third-party web content in its search results. And just as the First Amendment protects a cable television provider's supply of a system for delivering third-party "news, information, and entertainment," *see Leathers v. Medlock*, 499 U.S. 439, 444 (1991), so too is YouTube's provision of a platform for viewing third-party "news, information, and entertainment" protected by the First Amendment. *See also Zieper v. Metzinger*, 392 F. Supp. 2d 516, 530-32 (S.D.N.Y. 2005) (First Amendment protects a website hosting third-party video content), *aff'd on other grounds*, 474 F.3d 60 (2d Cir. 2007).

The Attorney General has made clear that he disagrees with how Google exercises editorial judgment in the composition of its search results and YouTube content, and wishes to force Google to adopt editorial judgments that he would prefer. For content he disfavors, he asks that Google censor from search results links to websites that are readily available on the Internet, regardless of whether any court has found them unlawful, and has even gone so far as to demand that certain search terms themselves be banned.[11] *See, e.g.*, Neiman Decl. Ex. 2 at 2; *id.* Ex. 5 at 2-3; *id.* Ex. 9 at 12, 13:19-14:8; *id.* Ex. 10 at 58-60; *id.* Ex. 17 at 3-8; *id.* Ex. 22 at 2; *id.* Ex. 27 at 5:18-6:24. The Attorney General has also demanded that links to disfavored content be demoted in search rankings and marked with a warning to users. *See, e.g.*, *id.* Ex. 9 at 12; *id.* Ex. 17 at 5; *id.* Ex. 22 at 2. Conversely, he has asked Google to promote favored content (*e.g.*, Hollywood-approved websites) by raising its standing in search results and indicating its favored status with an icon. *See, e.g*, *id.* Ex. 9 at 12, 23:4-13; *id.* Ex. 17 at 5. Such demands by a government official to displace a private party's editorial judgment in order to favor certain speech or speakers over others strike at the heart of the First Amendment. *See Tornillo*, 418 U.S. at 254-58; *Jian Zhang*, 10 F. Supp. 3d at 437-41.

There is no doubt that threats of civil and criminal liability for disfavored speech are sufficient to sustain a claim for injunctive and declaratory relief. "[T]he First Amendment prohibits government officials from encouraging the suppression of speech in a manner which can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Zieper*, 474 F.3d at 65-66

---

[11] Google will remove links to a website from its search results upon receipt of a valid court order, an option that others have used. *See, e.g.*, *Richemont Int'l S.A. v. Tony Chen*, No. 12-CV-6689-WHP, Dkt. No. 51 (S.D.N.Y. Mar. 1, 2013) (order to disable and transfer Defendants' newly-detected domains).

(internal quotation marks omitted).  *See also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-69

(1963) ("the threat of invoking legal sanctions and other means of coercion, persuasion, and

intimidation" can violate the First Amendment); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917

(9th Cir. 2012) (*en banc*) (valid First Amendment claim where defendant allegedly issued

"broad" subpoenas and took other threatening steps).

Here, the Attorney General has repeatedly threatened Google with prosecution if it does

not accede to his content-based demands for altering its constitutionally-protected judgments as

to the selection and organization of third-party content (*e.g.*, search results).  The Attorney

General has already acted on these threats, issuing his enormously burdensome subpoena after

Google did not "make some of these changes that [he has] been suggesting."  Neiman Decl. Ex.

9 at 8:10-11.  The Attorney General's efforts to regulate the content of Google's speech through

threats and investigative burdens violates the First Amendment and must be enjoined.

### b.    The First Amendment Forbids Retaliation For Protected Speech

"Official reprisal for protected speech offends the Constitution" because it "threatens to

inhibit exercise of the protected right."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal

quotation marks omitted).  "Any form of official retaliation for exercising one's freedom of

speech, including prosecution, threatened prosecution, bad faith investigation, and legal

harassment, constitutes an infringement of that freedom."  *Izen v. Catalina*, 398 F.3d 363, 367

n.5 (5th Cir. 2005)[12]; *see also Lacey*, 693 F.3d at 917 (retaliation claim based on investigation

---

[12] Plaintiffs alleging retaliation who are public employees or public officials in the hurly-burly of
the political arena must show an injury amounting to an adverse employment action. *See, e.g.*,
*Colson v. Grohman*, 174 F.3d 498, 514 (5th Cir. 1999) (dismissing retaliation claim where
"allegedly retaliatory crusade amounted to no more than the sort of steady stream of false
accusations and vehement criticism that any politician must expect to endure").  Google need not

and arrest); *Pendleton v. St. Louis Cnty.*, 178 F.3d 1007, 1011 (8th Cir. 1999) (retaliation claim premised in part on "fabricated" investigation); *Little v. City of N. Miami*, 805 F.2d 962, 968 (11th Cir. 1986) (retaliation claim based on "subjecting [plaintiff] to official investigation"). To enjoin retaliatory conduct, a plaintiff must show (1) that the speech retaliated against was constitutionally protected, and (2) that the retaliatory conduct "was motivated at least in part by a purpose to retaliate for" that speech; if these burdens are met, the defendant must show it would have taken the same action "even had the impermissible purpose not been considered." *See Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979). In assessing the final factor, a court should consider if "the State prosecution [or action] was undertaken with no hope of a valid conviction [or success]." *Id.* at 1387 n.22.

The Attorney General's conduct falls squarely within this prohibition. *First*, as discussed above, the Google practices at issue are clearly protected by the First Amendment and federal law. *Second*, there is no doubt that the Attorney General has been "motivated in part" by retaliation—he has overtly expressed his intent to use every available means to punish Google for failing to comply with his demands. For example, at the June 18, 2013, NAAG meeting the Attorney General explained that he "told [Google] if you don't . . . work with us to make some of these changes that we've been suggesting since November, then I'm going to call on my colleagues to issue civil investigative demands or subpoenas." Neiman Decl. Ex. 9 at 8:8-13.

The Attorney General did that and more. He called upon other attorneys general to "issue civil investigative demands" at the June 18, 2013 NAAG meeting, *id.* Ex. 9 at 24:19; called for divestment in Google, including by Mississippi's "public employees retirement system," *id.* Ex.

satisfy this standard, *see Izen*, 398 F.3d at 367 n.5, though the retaliatory conduct described above is sufficiently punitive under any standard.

9 at 25:3-10; encouraged his fellow attorneys general to blacklist Google through calls for divestment, *id.*; sent messages to Google's advertisers encouraging them to "pull their ads," *id.* Ex. 9 at 25:16-17; and repeatedly threatened prosecution and civil litigation, *see, e.g., id.* Ex. 9; *id.* Ex. 10 at 53-57; *id.* Ex. 30 at 1-2. The Attorney General's subpoena is the latest step in this sustained campaign being urged so aggressively by Hollywood.[13]

The Attorney General cannot show that he would have taken these actions absent a retaliatory motive. He has admitted a retaliatory purpose. And any civil or criminal action under the MCPA "has no hope of a valid conviction" or successful verdict—Google's conduct is clearly immunized by the CDA and protected by the First Amendment. The Attorney General's retaliatory Subpoena and enforcement threats should be enjoined.

### c.    The Attorney General Would Limit Access To Constitutionally Protected Content

State enforcement actions targeting unprotected speech can violate the First Amendment by limiting the "public's access to constitutionally protected matter." *Smith v. People of California*, 361 U.S. 147, 153 (1959). A state may not penalize a bookseller for unknowingly offering obscene material because he would then "tend to restrict the books he sells to those he has inspected," and the limits on his ability to inspect content would "tend to restrict the public's access to [content] which the State could not constitutionally suppress directly." *Id.* at 153-54. Similarly, a state may not sanction a magazine for unknowingly publishing unlawful advertisements because "publishers cannot practicably be expected to investigate each of their

---

[13] There is evidence that the Attorney General coordinated this campaign with the Digital Citizens Alliance (the "DCA"), an anti-Google group used by lobbyists to further the agendas of their business clients. *See* Neiman Decl. Ex. 24 (lobbyist inquiring as to whether the DCA and "industry folks" should attend a February 24, 2014, meeting in advance of the Attorney General's meeting with Google that same day); *id.* Ex. 25 (draft DCA report provided to Google by the Attorney General at the February 24, 2014, meeting).

advertisers," and the risk of sanction could lead a publisher to reject advertisements that "could conceivably be deemed objectionable by the [government]," which would deprive the public of access to protected speech, and the potential advertisers an "avenue of access to the public." *MANual Enters., Inc. v. Day*, 370 U.S. 478, 493 (1962).

Federal and state laws echo this constitutional principle. As discussed above, the CDA immunizes Internet platforms from state regulation over third-party content in order to avoid chilling the free flow of information to the public. And the DMCA requires removal only of infringing content specifically, not the entire page or site on which it appears. Similarly, the MCPA itself immunizes from liability "a newspaper, periodical, printing shop, directory or radio or television station [for] the publication or dissemination of an advertisement, when [it] did not have knowledge of the false, misleading or deceptive character of the advertisement and did not have a direct financial interest in the sale or distribution of the advertised product or service." Miss. Code Ann. § 75-24-7. *See also* Miss. Code Ann. § 97-23-3 (immunizing publishers from criminal liability where they lacked knowledge of the false or deceptive character of the advertisement).

This First Amendment principle applies even more strongly to Internet platforms like Google, which provide the public an "avenue of access" to not just a store's worth of books or a magazine's worth of advertisements, but links to trillions of web pages, billions of advertisements, and millions upon millions of hours of video. The Attorney General's efforts to coerce Google to pre-screen all speech, if successful, would inevitably restrict the flow of protected speech to the public.

That unconstitutional restriction would result even if the Attorney General were targeting only unprotected speech. However, the Subpoena makes clear that his intended reach is much

broader.  It demands information regarding any display of "Dangerous Content" or "Illegal Content," categories it defines with extraordinary breadth.  "Dangerous Content," for example, as defined in the Subpoena would include YouTube videos of high school football games, cheerleading competitions, and countless other activities that "could lead to physical harm or injury."  Neiman Decl. Ex. 30 at 4 ¶ 3.  Similarly, "Illegal Content" would encompass search results listing sales of fishing equipment or radar detectors permitted in some states but not others, and YouTube videos discussing upcoming civil protests because such videos may "indirectly or tangentially[] promote[] . . . [or] encourage[] . . . activity that could be in violation of [the] . . . law of . . . [a] state . . . ."  *Id.* at 7 ¶ 9.  Additionally, the Attorney General's demand that Google Search block entire websites because of a *portion* of their hosted content would, if met, necessarily limit access to protected speech.  The Attorney General may be willing to padlock the library door rather than pull the objectionable books from the shelves, but the First Amendment denies him that option.  On this record, there can be no doubt that his efforts to coerce Google unconstitutionally endanger the public's access to protected speech.

### 3. Defendant's Subpoena Violates the Fourth and Fourteenth Amendments of the United State Constitution

An administrative subpoena for records is a search subject to Fourth Amendment reasonableness limitations and must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."  *See v. City of Seattle*, 387 U.S. 541, 544 (1967); *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (Fourth Amendment requirements allow subpoena recipient "to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court."); *Oklahoma Press Publ'g Co. v. Walling*, 327

U.S. 186, 208 (1946) ("The gist of the protection is in the requirement . . . that the disclosure sought shall not be unreasonable.").

These requirements must be applied with "scrupulous exactitude" where "the materials sought to be seized *may* be protected by the First Amendment." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (internal quotation marks omitted) (emphasis added).  Otherwise, as the Supreme Court has long cautioned, the "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961).  Here, where the Attorney General's subpoena overtly demands detailed information about the protected speech of both Google and many individual Internet users, *see supra* §§ II.B & IV.A.2, exacting Fourth Amendment scrutiny is warranted.

The Subpoena fails Fourth Amendment standards.  It is vastly overbroad.  It seeks information pertaining to conduct protected by both the CDA and the First Amendment.  A subpoena probing such lawful conduct is unreasonable *per se*.  *See Crist*, 331 F.3d at 1187 ("[I]nvestigations premised solely upon *legal* activity are the very type of 'fishing expeditions' that" the Supreme Court has held violate the Fourth Amendment and "do[] not pass muster under any standard") (citations omitted).  The Attorney General has cast his net unreasonably wide as well, for the Subpoena contains no overall time limits and requires the production of millions of documents having nothing to do with Google's current practices and is thus unlikely to lead to relevant information.

### 4.     Individual Federal Laws Preempt Several Aspects of the Subpoena

#### a.     The Federal Copyright Act, including the DMCA, Preempts Much of the Subpoena

The Court should also enjoin the Subpoena and threatened prosecution insofar as it pertains to alleged MCPA violations that would be preempted by the federal Copyright Act,

including the DMCA. The Copyright Act "completely preempts the substantive field" such that "it converts an ordinary state common-law complaint into one stating a federal claim[.]" *GlobeRanger Corp.*, 691 F.3d at 705-06.[14]

Much of the Attorney General's investigation is preempted because it rests upon alleged violations of federal copyright law. *See People v. Williams*, 920 N.E.2d 446 (Ill. 2009) (affirming appellate court's reversal of conviction because Copyright Act pre-empted state antipiracy law); *State v. Perry*, 697 N.E.2d 624 (Ohio 1998) (holding that Copyright Act pre-empted prosecution of state charges of unauthorized use of computer software ). The Subpoena includes a substantial section titled "Stolen Intellectual Property"—thirteen document requests and two interrogatories seeking information premised upon direct or contributory copyright infringement. Neiman Decl. Ex. 30 at 71-76. For example, the Attorney General demands the production of "documents . . . concerning the use of Google Services . . . to commit, promote, or facilitate copyright infringement." *Id.* at 72, Document Request No. 119; *see also id.* at 72, Document Request No. 120 (demanding "all documents concerning how Google Search, including search algorithms, . . . promote . . . sites that offer infringing or allegedly infringing content[.]"). More generally, the Subpoena defines "Illegal Content or Conduct/Unlawful Content" as including "content or conduct that violates . . . state or federal laws governing intellectual property," and then incorporates this definition into demands throughout the Subpoena. *Id.* at 7-8, ¶ 9. The Attorney General lacks the authority to enforce the Copyright Act through criminal or civil actions. *See* 17 U.S.C. §§ 501(b), 506; 18 U.S.C. § 2319. And he cannot demand evidence of copyright infringement throughout the Subpoena and then evade

---

[14] Copyright preemption does not reach pre-1972 sound recordings. 17 U.S.C. § 301(c).

copyright preemption by labeling his investigation as arising under the MCPA. *See Harrell v. St. John*, 792 F. Supp. 2d 933, 942 (S.D. Miss. 2011).

The Subpoena also contains numerous requests for information and documents relating to alleged intellectual property concerns for which Google is immunized under the safe harbor provisions of the DMCA. *See, e.g.*, Neiman Decl. Ex. 30 at 72, Interrogatory No. 60 ("Describe why infringing sites identified in Google's Transparency Report, including 'Specified Domains' that have received hundreds of thousands or millions of takedown notices, still regularly appear on the top of search results."). The DMCA governs the liability of a service provider for copyright infringement by "linking users to an online location containing infringing material . . . using information location tools." 17 U.S.C. § 512(d). The DMCA provides a safe harbor for online service providers, like Google, that remove or disable access to allegedly infringing material upon receiving a qualifying request. *Id.* § 512(c)(1).[15] Permitting states to investigate and prosecute conduct within the federal safe harbor would defy congressional intent and turn copyright preemption on its head. This Court should enjoin the Subpoena and threatened prosecution as preempted insofar as they relate to alleged copyright infringement.

> **b.     The Federal Food, Drug, and Cosmetic Act Preempts Much of Defendant's Investigation**

The Attorney General has also demanded information to support claims that are preempted by the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-399f. The FDCA governs the importation and introduction of prescription drugs into interstate commerce. *See* 21 U.S.C. §§ 331, 384. States may enforce the FDCA in a limited set of circumstances, none of

---

[15] The DMCA makes clear that the safe harbor does not depend "on a service provider monitoring its services or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m).

which apply here. *See* 21 U.S.C. § 337(b)(1) (allowing states to bring actions under the FDCA for violations of the misbranded food provisions of the Act). All other proceedings to enforce the FDCA must be brought "by and in the name of the United States." 21 U.S.C. § 337. This reservation of enforcement authority preempts state actions based upon alleged FDCA violations. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001); *Morris v. PLIVA, Inc.*, 713 F.3d 774, 777 (5th Cir. 2013).

State actions premised on violations of federal law deprive the federal agency of the ability to use its enforcement authority to achieve a "delicate balance of statutory objectives." *Buckman Co.*, 531 U.S. at 348. *See also Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 376 (5th Cir. 2012) (same). Claims based upon traditional tort law principles may not be preempted, but one that "exist[s] solely by virtue" of the regulatory scheme will not proceed. *Lofton*, 672 F.3d at 379. Thus, to avoid preemption, a claim must be based upon conduct "that would give rise to liability under state law even if the FDCA had never been enacted." *Riley v. Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009); *Schouest v. Medtronic, Inc.*, 13 F. Supp. 3d 692, 700 (S.D. Tex. 2014).

Here, the Attorney General demands information that could only support claims resting upon an alleged violation of the FDCA. For example, the Attorney General is concerned with the allegation that "Google . . . 'was on notice that most Canadian online pharmacy advertisers . . . geo-targeted their advertisements to consumers in the United States and *imported into the United States* . . . controlled prescription drugs, *in violation of Title 21, United States Code, Section 331(a) and (d)'* . . . ." Neiman Decl. Ex. 30, at 14, Document Request No. 2 (emphasis added); *see also id.*, Document Request No. 3 (requesting documents related to benefits Google allegedly received by aiding Canadian pharmacies). Both of these requests necessarily implicate

two FDCA provisions, 21 U.S.C. §§ 331, 384, which govern the importation and introduction of

drugs into interstate commerce and are enforced solely by the federal government.  The

Subpoena and threatened prosecution should be enjoined insofar as they are preempted by the

FDCA.

### B.    Google Faces A Substantial Threat Of Irreparable Injury

To demonstrate irreparable injury, a party "need show only a significant threat of injury

from the impending action, that the injury is imminent, and that money damages would not fully

repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.

1986).  A "violation of constitutional rights constitutes irreparable harm[.]" *Cohen v. Coahoma

Cnty., Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992).  Specifically, "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012)

(internal quotation marks omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Attorney General has already violated Google's First Amendment rights by seeking

to regulate, through coercion, the content of its protected speech (*e.g.*, the creation and ranking of

search results) and by retaliating for its failure to change its practices.  Google is imminently

threatened with further injury that will occur if it is forced to choose between (1) conforming its

constitutionally-protected practices to the Attorney General's preferences; and (2) standing on its

rights, and risking a Subpoena enforcement action and prosecution under the MCPA.  The

Attorney General also threatens Google's Fourth Amendment rights through an unreasonable,

retaliatory, and burdensome Subpoena.

The Attorney General also causes irreparable injury by violating Google's immunity

under the CDA, similarly forcing Google either to forego immunized conduct or risk prosecution

by the Attorney General.  Courts have enjoined subpoenas from and prosecution by attorneys

general in precisely this circumstance, including where only statutory rights were at issue. *See Morales*, 504 U.S. at 381 (upholding injunction against attorneys general when threatened enforcement of preempted state laws forced airlines to choose whether to continually violate the state laws and risk huge liability or violate them once and "suffer the injury of obeying the law" while a test case was pending); *Crist*, 331 F.3d at 1186-89 (enjoining enforcement of attorney general civil investigative demand where league's conduct was immunized by federal law and demand thus violated the Fourth Amendment).

### C.   The Attorney General Will Suffer No Harm From Complying With a Temporary Restraining Order and Preliminary Injunction

The injuries facing Google outweigh any harm to the Attorney General from preliminary relief. Google's substantial injuries are described above. In contrast, preliminary relief would only briefly delay this aspect of the Attorney General's course of dealings with Google over the last eighteen months in order to allow Google's claims to be heard. In light of Google's existing practices (which meet or exceed industry standards), its long-running discussions with the Attorney General, and the Subpoena's admittedly punitive purpose, that delay is inconsequential. Importantly, preliminary relief will not prevent the Attorney General from prosecuting actual third-party wrongdoers who created the websites and videos to which he objects.

### D.   Issuance of a Temporary Restraining Order and Preliminary Injunction Furthers the Public Interest

In this action, Google seeks to vindicate its own constitutional rights, the First Amendment rights of millions of Internet users to easily publish and access information online, and federal policy favoring an open and accessible Internet. *See* 47 U.S.C. § 230(b)(2). These goals undoubtedly serve the public interest. *See Opulent Life Church*, 697 F.3d at 298 ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (alteration in the original); *White v. Baker*, 696 F. Supp. 2d 1289, 1313 (N.D. Ga. 2010)

("because a constitutional right is at issue, the entry of an injunction would not be adverse to the public interest but would in fact advance it").[16] The failure to issue preliminary relief would harm these interests, while granting preliminary relief will not materially hinder any discernable public interest.

## V. CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court grant its motion for a temporary restraining order and preliminary injunction.

---

[16] Finally, this Court should exercise its discretion not to require Google to post a bond. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). The Attorney General "will not suffer any significant . . . damages if the injunction is granted and later dissolved." *Watkins v. City of Arlington*, No. 4:14-CV-381-O, 2014 WL 3408040, at *14 (N.D. Tex. July 14, 2014). And a bond is unwarranted for an action to vindicate constitutional rights. *See Incubus Invs., L.L.C. v. City of Garland*, No. CIV.A. 303CV2039-K, 2003 WL 23095680, at *4 (N.D. Tex. Dec. 17, 2003) ("[T]o require a bond [for a constitutional challenge] would have a negative impact on [the plaintiff's] constitutional rights, as well as the constitutional rights of the members of the public.").

DATED this 19th day of December, 2014.

Respectfully submitted,

Fred Krutz, MSB No. 4270
Daniel J. Mulholland, MSB No. 3643
FORMAN PERRY WATKINS
   KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone:  (601) 960-8600
Facsimile:  (601) 960-8613
fred@fpwk.com
mulhollanddj@fpwk.com

*Attorneys for Plaintiff Google Inc.*

OF COUNSEL:
Jamie S. Gorelick
Patrick J. Carome
Paul N. Lekas
Blake C. Roberts
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
jamie.gorelick@wilmerhale.com
patrick.carome@wilmerhale.com
paul.lekas@wilmerhale.com
blake.roberts@wilmerhale.com

Peter G. Neiman
Violetta G. Watson
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone:  (212) 230-8000
Facsimile:  (212) 230-8888
peter.neiman@wilmerhale.com
violetta.watson@wilmerhale.com