## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| Google Inc., <br>      *Plaintiff,* <br><br><br>     v. <br><br><br> Jim Hood, Attorney General of the State <br> of Mississippi, in his official capacity, <br>      *Defendant.* | ) <br> ) <br> ) <br> ) <br> ) <br> )   No. _____ 3:14cv981HTW-LRA <br> ) <br> )   **Declaration of Sheily Chhabria in** <br> )   **Support of Plaintiff Google Inc.'s** <br> )   **Motion for Temporary Restraining** <br> )   **Order and Preliminary Injunction** <br> ) <br> ) |

I, Sheily Chhabria, hereby declare as follows:

1.  I have been an employee of Google Inc. ("Google") since August 2006. I am currently the Head of User Advocacy & Governance for Product Quality Operations (PQO), a position I have held since April 2014. Prior to that, I was Head of Strategic Operations & Governance for PQO from July 2012 - April 2014, Head of Governance for PQO from October 2011 - July 2012, Chief of Staff and Head of Program Management for PQO from January 2011 - October 2011, and Manager of Business Analytics for PQO from April 2009 - January 2011. This declaration is based on my personal knowledge, review of relevant Google business records, and conversations with other Google personnel, and I am competent to so testify if called upon as a witness.

2.  Google designs policies for its products with twin goals in mind: to protect user safety while also protecting free expression on the internet and user choice. Google believes that

- 1 -

these goals allow it to further innovation and promote discourse while fostering user trust in its products, brands and businesses.  While specific terms of a policy may vary based on its function, Google's policies are designed to advance the above goals.

3.      In 2014 alone, Google anticipates spending well over $100 million to enforce its policies to make the web safer while ensuring open access to legal content.  Google also has over 1000 employees working on this effort.

4.      Google displays advertisements alongside search results through a program called "AdWords."  Google also serves ads on third-party websites through a program called "AdSense."

**AdWords**

5.      Several billions of AdWords ads are created each year by millions of advertisers, with over 40 million AdWords ads created every day.  Using AdWords, advertisers create both the ad content and hyperlinks in the ads which direct users to a third-party webpage chosen by the advertiser, typically the advertiser's own website.  Google earns revenue from these ads only when a user clicks on an advertisement.

6.      Publicly-available webpages describe how AdWords places advertisements alongside search results, based on the user's query.  True and accurate copies of those webpages, as they appeared as of December 10, 2014, at https://support.google.com/adwords/answer/2497976?hl=en and https://support.google.com/adwords/answer/1704371 are attached hereto as Exhibits 1 and 2, respectively.

- 2 -

7.    Google has strict content prohibitions and restrictions on advertisers and advertisements, as well as restrictions on advertiser practices.  These prohibitions and restrictions are explained in Google's AdWords policies, which are accessible on a publicly available webpage.  A true and accurate copy of Google's AdWords policies, as they appeared as of December 10, 2014, at https://support.google.com/adwordspolicy/answer/6008942?hl=en&rd=1, is attached hereto as Exhibit 3.

8.    The categories of advertisements prohibited under Google's AdWords policies are listed at pages 1-3 of Exhibit 3.  The categories of advertisements that are restricted, but not outright prohibited, are listed at pages 4-7 of Exhibit 3.  Advertiser prohibited practices are discussed at pages 3-4 of Exhibit 3.  Google's AdWords policies also provide circumstances for the termination of an advertiser's account and of the advertiser's ability to advertise with Google in the future.  Exhibit 3 at 8-9.

9.    Google's efforts to enforce its AdWords policies are also discussed on publicly available webpages.  True and accurate copies of these webpages, as they appeared as of December 10, 2014, at http://adwords.blogspot.com/2014/01/busting-bad-advertising-practices-2013.html and http://adwords.blogspot.com/2013/01/ads-security-2012-retrospective.html, are attached hereto as Exhibits 4 and 5, respectively.

10.   Google has committed significant monetary and human resources to the removal of inappropriate and illegal advertisements.

11.     Google has designed systems to enforce its AdWords policies.  A summary of Google's detection and enforcement systems is accessible on a publicly available webpage.  *See* Exhibit 3.

12.     Google also has automated systems that analyze the tens of millions of new ads created by advertisers every day.  True and accurate copies of publicly available webpages describing Google's automated review systems, as they appeared as of December 10, 2014, at http://googleblog.blogspot.com/2012/04/inside-view-on-ads-review.html and http://adwords.blogspot.com/2013/04/a-healthy-advertising-ecosystem.html, are attached hereto as Exhibits 6 and 7, respectively; *see also* Exhibit 4.

13.     Google also relies on its users and on other advertisers to report improper advertisements.  The process for users and other advertisers to report improper advertisements is accessible through a publicly available webpage.  A true and accurate copy of that webpage, as it appeared as of December 10, 2014, at https://support.google.com/adwordspolicy/answer/6086450?rd=1, is attached hereto as Exhibit 8.

14.     In 2014, Google has already disapproved over 428 million advertisements (most of which never generated a single impression), it has prevented ads from linking to over one million websites, and it has suspended or terminated over 900,000 advertiser accounts for violations of Google's AdWords policies.  The vast majority of these actions were taken as a result of Google's proactive systems rather than as a result of outside complaints.

15.     A specific restricted category of advertisements is those promoting healthcare-rated content, including prescription medication and online pharmacies.  Exhibit 3 at 7.

- 4 -

16.     In 2011, Google entered into a non-prosecution agreement ("NPA") with the U.S. Department of Justice regarding AdWords search advertisements for Canadian-based pharmacies. A true and accurate copy of the NPA is attached hereto as Exhibit 9.

17.     Today, Google takes proactive steps to affirmatively block potentially unlawful advertisements for prescription medication and online pharmacies. The steps Google takes are explained in its healthcare and medicines policy, which is accessible at a publicly available webpage. A true and accurate copy of Google's healthcare and medicines policy, as it appeared on December 10, 2014, at https://support.google.com/adwordspolicy/answer/176031?hl=en, is attached hereto as Exhibit 10.

18.     In 2010, Google became the first search engine to require pharmacy advertisers to obtain Verified Internet Pharmacy Practice Sites (VIPPS) accreditation by the National Association of Boards of Pharmacy (NABP). A true and accurate copy of a publicly available webpage discussing Google's decision to require VIPPS accreditation for pharmacy advertisers, as it appeared as of December 10, 2014, at https://www.nabp.net/news/nabp-commends-google-s-vipps-accreditation-requirement-for-intern et-pharmacy-advertisers, is attached hereto as Exhibit 11. Only domestic pharmacies that have been accredited by the NABP are permitted to link their U.S. advertisements to pharmacy sites. *See* Exhibit 11 at 1.

19.     In 2014 alone, Google disapproved over seven million rogue pharmacy ads (that is, advertisers lacking appropriate accreditation to run pharmacy ads) and it disabled over 30,000 advertiser websites for violating Google's healthcare and medicines policies. Most of these ads

were removed before they generated any ad impressions.  In 2013, Google disapproved over 4.5 million rogue pharmacy ads for violating Google's healthcare and medicines policies.

20.     I understand that Google has also worked closely with law enforcement to investigate and prosecute rogue pharmacies around the world.  For example, true and accurate copies of letters from Google to the FDA referring the FDA to potential rogue pharmacies are attached hereto as Exhibits 12(A)-(Q) (exclusive of voluminous attachments).  Also, a true and accurate copy of a news article, as it appeared as of December 10, 2014, at www.safemedsonline.org/2013/07/interpol-with-aid-from-csip-blocks-over-1677-fake-pharmacy -websites/, reporting on Interpol's Operation Pangea, in which Google participated, is attached hereto as Exhibit 13.

21.     Another aspect of online advertising in which Google has taken additional proactive steps is combatting piracy.  Google's piracy policies are accessible on a publicly available webpage.  A true and accurate copy of that webpage, as it appeared as of December 10, 2014, at http://googlepublicpolicy.blogspot.com/2014/10/continued-progress-on-fighting-piracy.html, is attached hereto as Exhibit 14.  Google recently implemented steps to promote advertisements and links for users to access legal copies of copyrighted works in connection with search queries that suggest users are trying to locate pirated material.  *See* Exhibit 14 at 1-2.

22.     Google has also taken steps to help non-profit organizations use AdWords to promote their missions and initiatives on Google Search results pages through its Google Ad Grants program.  A description of the Ad Grants program is accessible on a publicly available

webpage.  A true and accurate copy of that webpage, as it appeared as of December 10, 2014, at

www.google.com/grants/, is attached hereto as Exhibit 15.

**AdSense**

23.     Google's AdSense program is a way for third-party websites – for example, the

*New York Times* – to host advertisements generated through Google's AdWords program.  The

third-party websites are called "publishers."  A description of the AdSense program is accessible

on a publicly available webpage.  A true and accurate copy of that webpage, as it appeared as of

December 10, 2014, at http://www.google.com/adsense/start/how-it-works.html, is attached

hereto as Exhibit 16.

24.     Each publisher must comply with AdSense's Terms of Service, which is

accessible on a publicly available webpage.  A true and accurate copy of the AdSense Terms of

Service, as they appeared as of December 10, 2014, at

https://www.google.com/adsense/localized-terms, is attached as Exhibit 17.

25.     Google's mechanisms to ensure compliance with the AdSense content policies

and the sanctions for violations of those policies are also explained on a publicly available

webpage.  A true and accurate copy of that webpage, as it appeared as of December 10, 2014, at

https://support.google.com/adsense/answer/1348688?hl=en, is attached hereto as Exhibit 18.

26.     In the last year alone, Google has blacklisted over 200,000 AdSense webpages for

policy violations, and it has terminated over 200,000 AdSense accounts.

**Attorney General Jim Hood and the Subpoena Served on October 27, 2014**

27.     I have reviewed the Administrative Subpoena and Subpoena Duces Tecum

("Subpoena") served on Google on October 27, 2014.  The Subpoena covers a broad range of

content related to Google's products, including AdSense and AdWords. The scale of these advertising services is immense, and responding to the Subpoena, with its 141 document requests and 62 interrogatories would be incredibly burdensome, in terms of time and resources.

28.     The Subpoena identifies various content found through AdWords that it deems to be problematic. None of it is content that Google itself created or developed. Rather, it is all third-party content.

29.     I have reviewed certain letters, press statements, and transcripts of speeches from the Mississippi Attorney General Jim Hood, made over the last 18 months, in which he has repeatedly threatened to bring legal action against Google if it does not restrict certain content. In each case, the content at issue was created and developed by third parties, not Google. The Attorney General's threats continue to burden Google's speech and threaten to chill it to this day by attaching potentially significant consequences to Google's expression of its editorial judgment and its display of facially lawful advertisements.

30.     While Google has worked with the Attorney General where appropriate, it has declined his request that Google effectively delegate to him the tasks of deciding what advertisements are made available, and how Google should craft, enforce, and apply its AdWords policies and AdSense Terms of Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 16, 2014, in Mountain View, California.

Sheily Chhabria

- 8 -