Google Inc.
1101 New York Avenue, N.W.
Second Floor
Washington, DC 20005



Main 202 346.1100
Fax 202 346.1101
www.google.com

April 19, 2013

Attorney General Jim Hood
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205

Attorney General Kenneth T. Cuccinelli
Office of the Attorney General of Virginia
900 East Main Street
Richmond, Virginia

Attorney General David M. Louie
Office of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813

Dear Attorneys General Hood, Cuccinelli, and Louie:

We appreciated the opportunity to participate in the National Association of Attorneys General Intellectual Property Committee Stakeholder Discussion that was held on November 28th. As a follow-up to that discussion, please find our responses to the questions outlined in your February 13th letter.

Google remains committed to developing effective policies and technology tools to combat infringing activities. Google has dedicated tens of millions of dollars in engineering and other resources to address these issues and leads the industry in helping to combat copyright infringement and the sale of counterfeit goods online. Our successes include:

- **DMCA Takedowns on Google Search** -- The industry-leading tools that we have built have dramatically streamlined the DMCA takedown process for rights holders. Today, Google is processing more notices and faster than any other search engine.

- **Combating the Sale and Promotion of Counterfeits in Online Advertising** -- We've dedicated considerable human and engineering resources across the company to develop and implement measures to root out counterfeit from our ad networks. Our engineering teams have developed highly sophisticated automated systems based on

1

Neiman Decl.
Ex. 3

advanced risk models that rely on thousands of data signals to detect fraudulent activity by advertisers, including counterfeit. Our automated systems are highly effective. We shut down approximately 82,000 AdWords accounts for attempting advertise counterfeit goods in 2012. Nearly 99% of AdWords accounts terminated on counterfeit grounds are detected by these systems. Due to continuous enhancements to these systems, counterfeiters are increasingly unable to circumvent our detection methods. Rights holders have also provided feedback that these systems are working well.

- **Illegal Pharmaceuticals** -- Google is committed to stopping the problems of online pharmacy advertising at the source. We have taken a lead role in a cross-industry effort to collaborate with government. As part of this effort, Google was a founding member of the Center for Safe Internet Pharmacies (http://www.safemedsonline.org/who-we-are/) which was formed in 2011. The Center provides consumers with important information about purchasing prescription drugs safely online.

    In addition, Google provides criminal referrals to law enforcement in the US regarding rogue pharmacies that have attempted to abuse our systems. We have made thousands of referrals to the FDA in the last few years, and we participate in concerted action with law enforcement agencies worldwide (*e.g.*, Operation Pangea).

- **Removal of Ads from Sites that Engage in Copyright Infringement** -- Google has always taken steps to prevent the appearance of AdSense ads -- that is, ads served by Google -- on sites that engage in copyright infringement. Over the past two years, we have intensified those efforts. For example, in addition to responding to notices received from rights holders, in 2012 we proactively took action against more than 46,000 sites that were showing AdSense ads against potentially infringing content.

- **Content ID** -- No other online video site has done more to fight piracy or paid more in royalties to the content industry than YouTube. As a result of our state-of-the-art Content ID system, as every video is uploaded, it is analyzed and compared to our database of millions of fingerprints corresponding to copyrighted works. When copyrighted music or video is detected in a video, we apply the business rules chosen by the relevant copyright owner. The choice of most copyright owners has been to allow the video to be posted and monetized with advertising -- a choice that has yielded substantial royalty payments from YouTube to those companies. Please note that Content ID does not require sending a takedown notice as there is nothing to take down since we have blocked the video from being posted in the first place.

    Additionally, we terminate the accounts of users who abuse our service and we take steps to block third-party "downloader" sites that violate our terms of service.

With this background in mind, we now turn to answering your specific questions.

***Specific details of how the takedown process works.***

2

We have takedown policies for our various products, but for the purposes of this question, we will focus on organic search and ads.

<u>Organic search</u>: The web is made up of over 30 trillion pages and grows every day. Google navigates the web by crawling the pages to build an index of the web. Google uses algorithms to deliver the most relevant results to users entering search queries. Google's search index simply reflects existing content on the web and the sites linked to in Google's search results are created and controlled by those sites' webmasters. Removing a page from Google's index does not remove it from the web and people will still be able to see that page by going to it directly or via another search engine.

Google is committed to free expression and only removes content from our search results in a narrow set of circumstances. Google cannot adjudicate the legality of content on the web and cannot determine whether a particular piece of content is authorized or not. Because content owners large and small use the Web in so many different ways, determining a particular copyright holder's preference --including determining whether a third-party uploader has permission to upload -- is difficult at best.

Rights holders have several ways to address problematic sites in organic search results.  First, Google complies with the [Digital Millennium Copyright Act](#) and removes webpages upon notice from a rights holder of infringing copyrights. Google leads the industry in its DMCA removals and has invested vast resources to support the number of removals undertaken. The manner in which we deal with removals is transparent, public, and detailed in our Transparency Report which you can view [here](#). Additionally, rights holders can submit court orders obtained against the unlawful sites to Google. Google offers an online [form](#) for submission of court orders adjudicating content to be unlawful. The court orders simply need to identify webpages that contain illegal content and Google will remove the pages voluntarily from our search results.

<u>Advertising</u>: Google's advertising solutions helps businesses around the world grow online, from small businesses to Fortune 500 companies. Google's online advertising platforms allow businesses to connect with users searching for information. There are over a million advertisers in our AdWords network.

Rights holders can take advantage of the online removals processes that Google has set up for any problematic advertisements. Google has a robust counterfeit complaint and removal process. We have a simple and accessible complaint [form](#) for reporting ads that may promote counterfeit goods. This form can be submitted by consumers, as well as trademark owners. In response to a valid complaint, Google will take action in 24 hours. In most instances, we terminate the account and disable the domain so the advertiser and site are banned from AdWords. Additionally, it is our policy to respond to notices of alleged infringement that comply with the DMCA. For AdWords, if we receive a notice or otherwise have reason to believe that an advertiser's site is infringing, we may remove the offender's advertising in compliance with the DMCA. More information about our DMCA process is available at
http://adwords.google.com/support/aw/bin/request.py?hl=en&contact_type=adwords_dmca&rd=1.

***A detailed explanation of the use of DMCA notices or other factors to alter search results,***

3

*including statistics demonstrating how rankings have been altered as a result of removal notices.*

Google's goal is to provide a great experience for our users. Toward that goal, we have developed over 200 signals to ensure our search algorithms deliver the best possible results. A recent signal takes into account the number of valid copyright removal notices we receive for any given site. Sites with high numbers of removal notices may appear lower in our results. This ranking change should help users find legitimate, quality sources of content more easily.

At the same time, we want to point out that Google cannot determine whether a particular webpage does or does not violate copyright law. While our 200 plus signals influence the ranking of some search results, consistent with the DMCA, we do not remove any pages from search results unless we receive a valid copyright removal notice from the rights owner. Responding to billions of queries each day, Google's algorithms work to provide results that are relevant to user queries. We are not in a position to determine whether any one among the more than 30 trillion web pages available on the Internet is "legal" or "illegal" or, more precisely, "infringing" or "noninfringing." That is a determination that a copyright owner or court is best positioned to make. Copyright owners also have the power to "line edit" search results by sending us DMCA takedown notices.

We believe that the interests of our users and copyright owners are aligned. Our users want access to the best material available and that should be the material provided by copyright owners. Our job is to connect the two.

***How auto complete features can be altered to reduce or eliminate directing consumers to counterfeit product sites, as well as illegal and harmful sites, such as the search "buy oxycodone online without a prescription" mentioned at the meeting.***

The predictions that appear in auto complete are an algorithmic reflection of query terms that are popular with our users and on the internet. Google does not manually select these terms or determine what queries are considered related to each other. Instead, we use algorithms to detect patterns based on data sources including user search queries. While Google's auto complete functionality displays predictions of search terms that the user might find useful, a user is always able to type in any term in which he is interested, regardless of whether it shows up as a prediction in Autocomplete. For more information on our auto complete feature and policies, we encourage you to visit:
http://www.google.com/support/websearch/bin/answer.py?hl=en&answer=106230

Google does apply a narrow set of filters in cases of potentially shocking or offensive entries (*e.g.*, hate speech) and in cases where there is a high correlation between particular terms and infringing copyright. We are not aware of a high correlation between particular terms and sites associated with counterfeiting or pharmaceuticals in search results.  In fact, queries for terms such as "counterfeit" or "fake" generally lead to sites on how to detect counterfeits. In any event, Google is unable to implement broad filters without censoring legitimate search queries. For instance, it would be vastly overbroad to remove generic terms such as "prescription" or "online"

4

or fake" or "knockoff" or "mp3" or "download."

***How licensing services have helped or can help reduce infringing activities.***

While online piracy remains a challenge to overcome, viable marketplace alternatives are making progress and are driving legitimate consumption. Just a few years ago, iTunes did not exist and it wasn't clear if anyone could compete with "free." Now, digital music sales have grown 1000% over the last six years and there are more music purchases than ever before. Meanwhile, services like YouTube are creating entirely new revenue streams, and Amazon is selling more eBooks than paperbacks. Consumers will play by the rules if they are offered high quality content that is convenient to purchase and consume, and  competitively priced.

Google fully supports licensed services and strives to connect consumers to them. Our launch of Google Play offers music fans a compelling new alternative for enjoying their music. In conjunction with copyright owners, we are in the process of creating licensing models to accommodate new, exciting authorized services under the Google Play brand. All signs point to a turning of the tide, with legitimate services going mainstream, digital music revenues for copyright owners trending upward, and companies like Google making substantial efforts to combat piracy. Copyright owners can also do more to help prevent piracy, such as adopting day-and-date for online releases of most popular movie studios and TV networks (Game of Thrones, in-theater movies). Why give pirates the ability to make your works available first when you can beat them to the market?

The availability of lawful works does dramatically reduce piracy. Please note the opening of this February 26, 2013 article by Forbes magazine[1]:

> It seems that people just aren't pirating music the way they used to. In many cases, because they don't have to. That's according to the NPD Group, which just released their "Annual Music Study 2012."  The report shows that the number of music files being illegally downloaded was 26% less in 2012 than in 2011. What's more, 40% of the people surveyed in the study who said that they'd illegally downloaded in 2011 did *not* do so in 2012.
>
> So what's responsible for this massive reduction in piracy? According to the survey, it's not stepped-up enforcement, it's the availability of free music via streaming services like Spotify, which is a fully-licensed music service that pays sizable royalties to copyright owners. Nearly half of the people who had stopped or sharply reduced their music downloading cited those services as the reason for stopping.

***Whether "whole site" removal can be used in cases of repeat offenders.***

Whole site removal is ineffective and can easily result in censorship of lawful material. Blogging sites contain millions of pages from hundreds of thousands of users as do social networking

---

[1] The article is available in full here: http://www.forbes.com/sites/alexknapp/2013/02/26/study-finds-that-streaming-and-spyware-are-killing-music-piracy/

5

sites, e-commerce sites, and cloud computing services. All can inadvertently contain material that is infringing. It is rare indeed for a site to consist wholly of infringing material. But for such "rogue" websites dedicated to copyright infringement or counterfeiting sites, Google believes that a "follow the money" approach, which chokes off revenue, is most effective. Since such sites are dedicated to making money, taking away sources of money is the most effective approach.

We employ a range of procedures and financial resources to prevent our advertising products form being used to monetize material that infringe copyright. For example, our AdSense program enables website publishers to display ads alongside their content. Our policies prohibit the use of this program for infringing sites, and we use automated and manual review to weed out abuse.

***Legal issues posed by altering or eliminating direct access by consumers to counterfeit product sites and illegal and harmful sites, as well as "whole site" removal.***

Google is a provider of information not a mediator or censor. As discussed above, Google's search index simply reflects existing content on the web, and the sites linked to in Google's search results are created and controlled by those sites' webmasters. Google brings different web pages that relate to search requests, but Google does not make claims about the content of the pages nor does Google have a relationship with the owners of these pages. Removing a page from Google's index does not remove it from the web, and people will still be able to see that page by going to it directly or via another search engine.

Google is not in the position to play the role of arbiter through content review, adjudications of illegality, and censorship. That role is properly left to the courts. In our experience, we have seen many demands for removal of sites which threaten to stifle legitimate commerce and speech. For example, we have seen rights holders seek removal of resellers of unauthorized sellers of genuine goods – either used goods or new goods at prices below those at retail outlets. We have seen competitors targeting each others' sites for removal under the claim of counterfeit. Rights holders have also sought the removal of "gripe sites" containing consumer complaints, critical product reviews, or criticism.

Whole site removal was evaluated and rejected on the federal level due to the precedent it would set. As discussed above, whole site removal is ineffective and can easily result in censorship of lawful material.

***What role search engines have played in curbing the sale of counterfeit pharmaceuticals, medical devices, and other products posing significant consumer health and safety threats.***

Google has been an industry leader in the fight against counterfeits and illegal pharmaceuticals. Google has zero tolerance on counterfeit in search ads. We've dedicated considerable human and engineering resources across the company to develop and implement measures to root out counterfeit from AdWords. These measures are applicable across all counterfeit goods, including ones posing health and safety concerns.

As discussed above, our engineering teams have developed highly sophisticated automated systems to detect fraudulent activity by advertisers, including counterfeit. Our automated systems are highly effective. Nearly 99% of AdWords accounts terminated on counterfeit grounds are detected by these systems. Due to continuous enhancements to these systems, counterfeiters are increasingly unable to circumvent our detection methods.  We're now seeing a decrease in counterfeiters infiltrating AdWords. For example, we shut down approximately 82,000 accounts on counterfeit grounds in 2012, down from 150,000 in 2011.  More information about our efforts can be found here: http://adwords.blogspot.com/2013/01/ads-security-2012-retrospective.html.  In addition to our proactive efforts, Google also works with rights holders who submit notices of any ads violating our policies to ensure that those ads are removed and associated accounts are disabled.

Specifically with respect to pharmaceuticals, since March 2010, the AdWords program has only permitted online pharmacies based in the United States to run ads appearing in the United States. Google is the first online search provider to require these U.S. online pharmacies to be accredited by the National Association Boards of Pharmacy VIPPS program.

Google continues to improve upon its existing automated screening programs and has developed new tools to enhance its ability to enforce and monitor advertisers' compliance with these policies. Google monitors thousands of prescription drug terms for compliance with Google's advertising policies (see http://support.google.com/adwordspolicy/answer/2430794).

On a quarterly basis, Google provides criminal referrals to law enforcement in the US regarding any rogue pharmacies that have attempted to abuse our systems.  We have made thousands of referrals to the FDA in the last few years. We also participate in concerted action with law enforcement agencies around the world.

Google has also taken a lead role in a cross-industry effort to collaborate with government bodies to attempt to stop the problems of online pharmacy advertising at the source. Those efforts led to the creation in 2011 of the Center for Safe Internet Pharmacies (http://www.safemedsonline.org/who-we-are/) that provides consumers with important information about purchasing prescription drugs safely online (http://www.safemedsonline.org/protecting-consumers/check-your-pharmacy/).

We trust this information is sufficient to address your questions and look forward to working with you on these important issues.

Sincerely,

*John C Burchett* (signature)

John Burchett
*Director*
*Public Policy, U.S. States and Local, Latin America and Canada*

7