WILMERHALE

June 26, 2013

Jamie S. Gorelick

+1 202 663 6500 (t)
+1 202 663 6363 (f)
jamie.gorelick@wilmerhale.com

Hon. Jim Hood
Attorney General
State of Mississippi
P.O. Box 220
Jackson, Mississippi 39205

Dear General Hood:

We write in response to your remarks at the June 18, 2013 meeting of the National Association of Attorneys General in Boston and to continue our ongoing dialogue on these important issues.

You have raised questions about (a) whether Google should remove from its search results web pages allegedly promoting rogue internet pharmacies or offering pirated movies and songs; (b) whether Google should modify its autocomplete feature to exclude algorithmically generated query predictions that may lead to search results linking to offending web pages; and (c) whether Google should pre-filter the 100 new hours of videos uploaded by users onto YouTube every minute in order to identify whether any of those videos potentially promote illegal or otherwise objectionable activity in violation of YouTube's policies.

As previously indicated, Google is interested in working with you on ways it can continue making the internet safer for its users. Google has voluntarily and in good faith made considerable strides in addressing the kinds of issues raised at your meeting. Google has described many of these efforts publicly in blog posts on the subject,[1] has detailed many of these efforts in prior communications with your office over the last several months, and was the only search engine to attend your November 2012 meeting, all in the spirit of having an "open, honest and transparent conversation" with you about ways to best address these very important issues.

---

[1] http://googleblog.blogspot.com/2007/11/free-expression-and-controversial.html;
http://googleblog.blogspot.com/2010/04/controversial-content-and-free.html;
http://googlepublicpolicy.blogspot.com/2010/12/making-copyright-work-better-online.html;
http://googlepublicpolicy.blogspot.com/2011/09/making-copyright-work-better-online.html;
http://googleblog.blogspot.com/2012/03/making-our-ads-better-for-everyone.html;
http://googleblog.blogspot.com/2012/04/inside-view-on-ads-review.html;
http://googleblog.blogspot.com/2012/05/transparency-for-copyright-removals-in.html;
http://googleblog.blogspot.com/2012/05/fight-against-scam-adsby-numbers.html;
http://googleblog.blogspot.com/2012/06/ads-integrity-alliance-working-together.html;
http://adwords.blogspot.com/2012/09/taking-extra-precautions-to-keep-ads.html;
http://adwords.blogspot.com/2013/01/ads-security-2012-retrospective.html;
http://googlepublicpolicy.blogspot.com/2013/02/safer-internet-day-how-we-help-you-stay.html;
http://googlepublicpolicy.blogspot.com/2011/03/keeping-counterfeits-out-of-ads.html;
http://googlepublicpolicy.blogspot.com/2013/05/protecting-seniors-from-identity-theft.html;
http://googlepublicpolicy.blogspot.com/2013/06/combating-rogue-online-pharmacies.html;
http://googlepublicpolicy.blogspot.com/2013/06/transparency-report-making-web-safer.html.

Neiman Decl.
Ex. 11

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 2

In order to ensure that we are responding comprehensively to your inquiries and public comments, we set forth below additional information responsive to some of your recent questions, as well as the applicable legal framework pertaining to these issues.

**1. Search**

Google maintains and constantly updates an index of essentially all accessible webpages on the worldwide web. The index contains over 100 million gigabytes of information, and reflects the contents and various relevant attributes of more than 30 trillion individual webpages. When a user types a search query into Google, Google's algorithms factor in hundreds of signals to identify the webpages most relevant to the user's query, and then Google ranks and displays the results, all in about one eighth of a second. For each page listed, Google generates automated text excerpts from the page, permitting users to easily evaluate whether their query matches one of the search listings displayed on the page. Clicking on a search listing takes the user to the web page listed. Google handles more than a million searches per minute, and offers this service to its users free of charge. Google sells advertising space alongside its search results through a program called AdWords.

Search is the least restrictive of all Google's services, because search results reflect the content of the web. Google does not remove content from search results except in narrow circumstances. For example, in some countries lacking the robust protections for speech provided in the United States under the First Amendment, Google locally removes content that violates local censorship rules, such as Nazi-related content from its German service (google.de); allegedly defamatory content from its United Kingdom service (google.co.uk); or insults to religion from its India service (google.co.in). Google does remove child pornography, which is illegal virtually everywhere in the world. Pursuant to the process prescribed by Congress in the Digital Millennium Copyright Act ("DMCA"), Google also removes webpages listed in its search results upon receipt of sworn takedown notices from copyright holders. And whenever content on the web has been found by a court of competent jurisdiction to be unlawful and the party responsible for the content is ordered to remove it, Google voluntarily removes those pages from its search results, irrespective of the safe harbor made available to companies like Google under the Communications Decency Act ("CDA"). We also remove, demote or flag for users pages that violate our webmaster guidelines, such as those containing spam or malware, technical decisions that can be made automatically without evaluating the legality of content on particular web pages.

Other than these narrow exceptions, Google does not attempt to exclude web pages from its search results, or make difficult determinations regarding the legality of third-party content. Google believes that this approach honors "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment." *Harte-Hanks Commc'ns., Inc. v.*

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 3

*Connaughton*, 491 U.S. 657, 686 (1989). It is consistent with the company's strongly held beliefs that more speech is almost always the appropriate response to speech we find distasteful, and that censorship is a last resort, and never a preferred option for Google or its billions of users worldwide.

Google understands that rogue pharmacies are a serious matter of public concern; it has indeed made substantial commitments to address the issue in its Non-Prosecution Agreement ("NPA") with the federal government, and has worked tirelessly to combat the issue more generally outside of those commitments, taking a number of voluntary steps—described in more detail below—to address the problem. Google does not permit rogue pharmacies to advertise in the United States; it has rejected more than three million ads from rogue pharmacies in the last few years; and it provides assistance and input to organizations like the Center for Safe Internet Pharmacies, which runs ads on Google promoting its public service campaigns in response to pharma-related search queries. Those ads urge caution and link directly to the LegitScript pharmacy verification tool, which enables users to ascertain whether the pharmacies they encounter online are legitimate.

Google's commitment to a safer internet is manifest. But asking Google to identify and remove from search results any page that Google unilaterally suspects may be unlawful would go well beyond what federal law and sound public policy require, and conflicts with core First Amendment principles. It would also be inconsistent with how the other major search engines operate – none remove pages from their search results based on unilateral suspicion. And it would be inconsistent with Google's NPA with the federal government. The NPA drew a sharp distinction between Google's sale of advertising through its AdWords program, and Google's provision, for free, of search results reflecting the full diversity of information available on the internet, which is not the subject of the NPA. Because decisions to allow, restrict, or remove content from Google's search results often require difficult judgment calls and the application of complex federal and state law and regulations, Google believes that courts and the lawmakers are in the best position to decide which pages are and are not illegal. As has always been the case, Google will remove from its search results any web pages found by a competent court to be illegal, whether it be a rogue online pharmacy or any other type of operator engaging in conduct online that is deemed unlawful.

2.     **Autocomplete**

Autocomplete is analogous to automatic spell checkers commonly used in email and texting programs. The goal of autocomplete is to anticipate the search query being entered by a user before the user finishes typing that query, providing a useful shortcut for entering queries into Google's free search services more quickly. This is one of the ways Google makes searching faster.

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 4

Autocomplete is generated algorithmically by comparing what the user is typing with other information, primarily prior search queries from users. Applying multiple factors, autocomplete algorithmically predicts prior user queries likely to match the user's intended query. The algorithm ranks this list, and displays the top results immediately under the search box. A user can click on any autocomplete prediction, which changes dynamically as a user enters more text, at any time and run that search. Users can also complete a search without selecting an entry displayed in autocomplete at all. In other words, a user is always able to type any term or phrase into search, whether or not it shows up as a prediction in autocomplete. Google does not manually select autocomplete predictions, but it does occasionally tweak its autocomplete systems to prevent entries that might be shocking or offensive to its users from appearing.

Google has taken very seriously your complaints about autocomplete listing entries that include phrases potentially relating to rogue pharmacies. In line with the practices of other search engines, Google's autocomplete feature simplifies and quickens billions of searches for content online. In certain cases, we have been able to identify phrases that are highly likely to result in the display of sites to pages containing problematic or objectionable content. In those cases, Google is already doing some things to address the issue—*e.g.*, phrases like "without a prescription" are no longer included as autocomplete predictions when a user types in a search such as "buy vicodin online."[2] Of course, given the richness of languages around the world, it will always be possible to find some phrases that may suggest such content. Google continues working to strike the right balance between preserving important automated features like autocomplete, which users find helpful, and determining when to block potentially objectionable terms and phrases that may have entirely legitimate uses depending on context.

3.      YouTube

YouTube is a platform that hosts videos posted by users, which YouTube makes available to its users free of charge. More than 100 hours of new video is uploaded to YouTube by users every minute; more than one billion unique users visit YouTube each month to watch more than six billion hours of video per month—an average of almost one hour per month for every human on earth. In other words, YouTube is massive, and with this much video and this many users, attempting to monitor the content of each one of those videos is a herculean task.

As indicated in Google's prior letters to you, YouTube nonetheless makes substantial efforts to exclude inappropriate videos from its site. YouTube has strict community guidelines[3] governing the type of content that can be uploaded to the site. Those guidelines bar, among other things,

---

[2] In contrast, a user who typed "buy vicodin w" into Yahoo! on June 24, 2013 would see the prediction "buy vicodin without script."
[3] *See* http://www.youtube.com/t/community_guidelines.

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 5

uploading any video that violates "applicable local, national, and international laws and regulations," and any video intended to incite "violence or other dangerous illegal activity." YouTube's review teams respond immediately and around the clock when videos are flagged by users for removal, including for pharma-related violations. YouTube itself removes any content found to violate its own policies.

Given the staggering number of videos on YouTube, and the significant technical challenges associated with trying to automate any meaningful evaluation of the lawfulness of specific content contained in the vast and diverse corpus of videos available on the site, it is not feasible for YouTube alone to identify and exclude all videos that might relate to unlawful activities.[4] This is why YouTube provides copyright owners with a number of sophisticated tools to block and remove infringing content from the site. And this is why YouTube relies on its community of users—now in the billions—to flag other objectionable content that they might encounter on the site. Even law enforcement officials use these very tools to report to YouTube any specific videos on the site containing unlawful content, and YouTube takes action on those reported videos, around the clock.

YouTube also works hard on behalf of its advertisers to keep ads from running on potentially objectionable videos, including pharma-related content, and YouTube disables any such advertising when it learns of it. YouTube has also created and implemented automated solutions to attempt to both remove spam videos placed by potential rogue pharmacies and disable ads from running against videos containing metadata suggesting they might contain objectionable pharma-related content.

Earlier this month, YouTube learned through news reports about a number of videos allegedly promoting rogue pharmacies and counterfeit drugs on YouTube. Based on those reports, YouTube immediately removed any video it located that violated YouTube's community guidelines (about 2,000 so far), and will continue to respond similarly to any future credible reports it receives, irrespective of their source (*e.g.*, users, law enforcement, or regulators). YouTube takes its commitment to removing bad videos when it learns of them very seriously, irrespective of whether the notifications come from users, law enforcement, or anyone else.

4.    **Advertising**

Google has long worked on tackling the difficult problem of identifying and removing rogue pharmacies from its advertising networks, and today, Google is better than ever at doing just that.

---

[4] Much speech which relates to unlawful activity is nonetheless entitled to First Amendment protection. *See Brandenburg v. Ohio*, 395 U.S. 444 (1969) ("the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action").

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 6

Here's how: (a) requiring since March 2010 that any advertiser marketing pharmaceuticals be certified under the National Association of Boards of Pharmacy's stringent VIPPS program (only 33 companies hold that certification); (b) constantly improving screening systems to identify and block pharmaceutical ads from uncertified sites; (c) hiring an independent third party, LegitScript, to conduct weekly sweeps to identify any improper pharma ads that have evaded Google's filters and checks; and (d) regularly referring rogue online pharma sites to criminal authorities.[5] Google has also voluntarily, and without prompting, restricted advertising related to health supplements, weight loss drugs, and anabolic steroids.[6]

Google is also a founding member and ongoing supporter of the Center for Safe Internet Pharmacies ("CSIP"), a cross-industry non-profit organization founded in December 2010 following extensive discussions with the White House on the important subject of combating illegal pharmacies online. CSIP and its member companies are dedicated to promoting information sharing about suspected rogue pharmacies, providing consumer education about buying prescription drugs online, and coordinating collaboration with law enforcement pursuing suspected rogue online pharmacies. Since its inception, CSIP has, among other things:

- created an information-sharing tool for its members to help them identify bad actors attempting to abuse member company platforms, thus permitting member companies to tap into a shared resource to assist in identifying suspected rogue pharmacies;

- actively participated in public service campaigns about the potential dangers associated with purchasing pharmaceuticals online;[7] and

- offered consumers a pharmacy checker tool to assist internet users in confirming that their online pharmacies are indeed legitimate.[8]

These important efforts have been acknowledged and praised by the U.S. Intellectual Property Enforcement Coordinator ("IPEC") and others. For example, John Horton, president of LegitScript, the industry's leading verification service for online pharmacies and a close Google partner in initiatives to help keep rogue pharmacies out of Google's ad networks, has seen the positive results of these efforts first-hand. As Mr. Horton has explained:

---

[5] Google has made referrals or reports to the Food and Drug Administration on November 1, 2010, November 10, 2011, November 22, 2011, February 21, 2012, May 18, 2012, May 22, 2012, August 21, 2012, August 22, 2012, November 20, 2012, November 30, 2012, February 22, 2013 and May 20, 2013.
[6] See https://support.google.com/adwordspolicy/answer/2423645.
[7] See http://www.safemedsonline.org/protecting-consumers/psa-video-contest/
[8] See http://www.safemedsonline.org/protecting-consumers/check-your-pharmacy/.

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 7

> The Center for Safe Internet Pharmacies (CSIP) was created to focus its members on a simple goal: making it harder for bad actors to harm consumers. An industry-wide issue requires industry-wide solutions. When CSIP members show industry leadership by refusing to permit their paid services to be used by rogue Internet pharmacy operators, rogue Internet pharmacies are weakened and can't profit at the expense of patient safety.

All of these measures are paying off. LegitScript, which regularly works with regulators (such as the FDA) and other companies like Google to combat the problem of rogue pharmacies, reports that illegal drug and pharmacy ads on major search engines like Google and Bing have been virtually eliminated. "Google and Microsoft are now industry leaders in safety and security on pharmaceutical ads. They have come a long way. Specifically, Google and Microsoft have implemented unprecedentedly comprehensive pharma-related advertising policies. There is zero tolerance for illegal, unsafe or deceptive medical or pharmaceutical advertisements. Other companies, including some of the payment networks, are attacking this issue more aggressively as well."[9]

And the measures described above cover only Google's pharma-specific actions. The company has long been focused on addressing other types of abuse using its advertising systems, and has built an industry-leading system of filters and other tools designed to block and remove a wide range of advertisements that promote conduct that is illegal or otherwise violates Google's comprehensive ad policies.[10]

In 2012 alone, Google rejected more than 200 *million* ads, and suspended the accounts of more than 800,000 would-be advertisers for violations of Google's policies, including those relating to rogue pharmacies and counterfeits.[11] Google's automated filtering systems for ads have also proven highly effective at combating counterfeits. Nearly 99% of AdWords accounts terminated on counterfeit grounds are detected proactively by Google's systems (rather than based on customer or manufacturer complaints). Due to continuous enhancements to these systems, counterfeiters are, for example, increasingly unable to circumvent Google's detection methods.

\*\*\*\*\*

Of course, no system handling billions of users and trillions of instances of content on the web or created by users is perfect. It will always be possible to type in a specific search query, identify

---

[9] *See* http://www.safemedsonline.org/2013/05/companies-join-forces-to-protect-consumers-from-the-prevalent-threat-of-illegal-online-pharmacies/
[10] *See* http://services.google.com/fh/files/misc/info-final.pdf
[11] You have suggested that Google may be in breach of the NPA. Please let us know of any advertising which you believe violates Google's obligations under the NPA, so that Google can take immediate action.

a specific search result, or find a hosted video that potentially relates to some form of illegal or unpleasant activity on the web. Only a draconian system of prior review and restraint could effectively block all such content, and any such approach would fundamentally undermine the ability of all Americans to access information on the web by imperiling internet platforms for free expression.

With the steadily growing success of Google's ever expanding tools and filters, abuse of its platforms has become increasingly more difficult. But Google continues to be open to feedback about yet further and additional steps it can take to address the abuse of its systems by rogue actors. In that spirit, Google continues to incorporate suggestions for filters and algorithmic changes to its autocomplete system, for example. Likewise, it continues to expand its algorithmic and manual review of YouTube videos (similar to what LegitScript does for search ads) to remove videos promoting rogue pharmacy websites.

## 5. Relevant Legal Doctrines

Google's efforts described above to create a safe environment for users and to crack down on bad actors like rogue pharmacies go well beyond Google's legal obligations. A constellation of legal doctrines—designed to promote free expression, the broad dissemination of knowledge, and the growth of the Internet largely unfettered by regulation—appropriately limit the obligations under law that are imposed on internet service providers like Google. These well-established doctrines—including the exacting *mens rea* required for aiding and abetting liability, the strong First Amendment protections afforded to disseminators of third-party information, and the statutory immunity granted to such dissemination by the Communications Decency Act of 1996—preclude requiring companies like Google to be censors of what is available on the internet.

These doctrines place the burden of ensuring that content complies with the law squarely on the creator of the content—*i.e.*, those who operate unlawful websites or post unlawful YouTube videos. Where regulation of internet service providers is warranted, Congress has placed primary authority in the hands of the federal government so that inherently national businesses face one rather than fifty sets of rules. That is a particularly sensible allocation of responsibility with regard to pharmaceuticals, which are pervasively and actively regulated by the federal Food and Drug Administration.

      *a.*    *No aiding-and-abetting theory applies to Google's conduct under Mississippi law.*

Your recent comments and inquiries suggest that you believe Google might be subject to aiding-and-abetting liability under Mississippi law for crimes committed by third parties whose

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 9

websites are identified in response to user searches (including those predicted by autocomplete), or whose videos run on YouTube. No court has ever found aiding and abetting liability in remotely analogous circumstances. To the contrary, the settled law is that aiding-and-abetting liability does not extend to legitimate businesses who provide lawful services (such as Google's search and YouTube services), even when it is foreseeable that some small portion of users may abuse those services to promote illegal ventures.

Aiding-and-abetting liability requires much more than failing to prevent a foreseeable misuse. It requires that the defendant "deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime"—that is, that the defendant "voluntarily participated in its commission with the intent to violate the law." *Milano v. State*, 790 So.2d 179, 185 (Miss. 2001).

The Supreme Court has long recognized a "broad latitude of immunity" from aiding-and-abetting (or conspiracy) liability for sellers of lawful goods who deal at arm's length with customers, even when they actually know the customer will use the good to break the law, so long as the seller acts for ordinary commercial reasons, rather than with an intent to assist in law-breaking. *Direct Sales Co. v. United States*, 319 U.S. 703, 712 n. 8 (1943); *see also United States v. Falcone*, 311 U.S. 205 (1940) (arms-length sale of sugar to known distiller during prohibition not a crime).[12]

This broad latitude of immunity covers information providers: As one court explained, "[h]olding [a provider of information] responsible for whatever conduct the [provider] could anticipate a [recipient] *might* engage in after [receiving the information] is simply beyond the scope of either conspiracy or aiding and abetting."[13]

Google interacts with *trillions* of webpages, *billions* of searches per day, and *millions* of people who upload videos and other content to the web; only a very small fraction of users abuse Google's platforms to further improper conduct. There is simply no basis under law to treat Google as an aider and abettor under these circumstances.

---

[12] Although these cases interpret federal law, they are fully applicable to Mississippi's aiding and abetting law, which tracks the federal standard so closely that in *Milano* the Mississippi Supreme Court directed trial courts to use the pattern jury instruction of the United States Court of Appeals for the Fifth Circuit defining aiding and abetting liability. *Milano*, 790 So.2d at 185.

[13] *Conant v. Walters*, 309 F.3d 629, 635-36 (9th Cir. 2002); *see also United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 178 (6th Cir. 1992).

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 10

    b.    *The First Amendment bars requiring Google to investigate the lawfulness of all websites included in search results or videos displayed on YouTube.*

The starting premise of your inquiry appears to be that Google has an obligation to determine whether websites included in Google search results, or videos displayed on YouTube, promote violations of the law. But the courts have recognized that the First Amendment does not permit imposing such an obligation. Indeed, the Supreme Court found that even the publisher of a magazine with a small number of advertisers (when compared to Google) "cannot practicably be expected to investigate each of their advertisers." *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 493 (1962). As Justice Harlan explained, any other rule would require the publisher to "refrain from accepting advertisements from those whose own materials could conceivably be deemed objectionable," which would "deprive such materials, which might otherwise be entitled to constitutional protection, of a legitimate and recognized avenue of access to the public." *Id.*; *see also Smith v. California*, 361 U.S. 147 (1960) (First Amendment precludes holding bookseller strictly liable for selling obscene book).

Sanctioning Google for the conduct of a website included in Google's search results, or the maker of a video posted on YouTube, would directly implicate these First Amendment concerns. The publisher in *Manual Enterprises* had only a handful of advertisers in a single line of business. 370 U.S. at 481. Google's search crawlers have scanned *trillions* of web pages (Google crawls over twenty billion pages each day), and over six billion hours of video are watched on YouTube every month. Google is not in a position to make determinations about the legality of such an enormous body of information; those are determinations best left to the courts and lawmakers.

More fundamentally, even the notion that information—which is what users are seeking when using Google services—could itself be unlawful conflicts with core First Amendment principles, as the Supreme Court's decision in *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011) illustrates. The Court was quite clear that constitutionally protected speech cannot be restricted out of a paternalistic desire to protect the audience from making harmful decisions. *Id.* at 2671. ("[I]nformation is not in itself harmful.... [P]eople will perceive their own best interests if only they are well enough informed, and ... the best means to that end is to open the channels of communication rather than to close them").

    c.    *Section 230 of the Communications Decency Act provides Google with broad immunity for displaying third-party content.*

Federal statutory law also expressly precludes requiring Google to verify the lawfulness of third-party information accessible through Google's search and YouTube platforms. These laws make clear that it is the "policy of the United States" to "promote the continued development of the

**WILMERHALE**

Hon. Jim Hood
June 26, 2013
Page 11

Internet" and to "preserve the vibrant and competitive free market that presently exists for the internet ... unfettered by Federal or State regulation." 47 U.S.C. §230(b)(1-2). To implement that policy, these laws explicitly immunize providers of interactive computer services like Google from state-law liability for organizing and displaying content provided by third parties. Specifically, Section 230 of the Communications Decency Act of 1996 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section. 47 U.S.C. §230(e)(3).[14]

It has been settled law for more than fifteen years that Section 230 "plainly immunizes computer service providers ... from liability for information that originates with third parties." *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Thus, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Id.* at 330.[15] Courts have "construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).[16]

"[S]o long as the third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." *Carefano*, 339 F.3d at 1123-24. That is because the alternative—"[m]aking interactive computer services and their users liable for the speech of third parties"—"would severely restrict the information available on the Internet." *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003)

---

[14] Section 230 has a carve-out for intellectual property law, *see* 47 U.S.C. § 230(e)(2), which is instead covered by 17 U.S.C. § 512, which creates a safe harbor from copyright infringement liability for "information location tools" so long as they remove infringing items when provided notice.

[15] *Zeran* was the first case interpreting Section 230. "The *Zeran* court's views have been broadly accepted, in both federal and state courts." *Barrett v. Rosenthal*, 51 Cal. Rptr. 3d 55, 64 (Cal. 2006); *see also MySpace*, 528 F.3d at 42; *Blumenthal v. Drudge*, 992 F. Supp. 44, 51 (D.D.C.1998); *Ben Ezra, Weinstein, and Co., Inc. v. America Online, Inc.* 206 F.3d 980, 986 (10th Cir. 2000); *Morrison v. American Online, Inc.*, 153 F. Supp. 2d 930, 933-934 (N.D. Ind. 2001); *PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069, 1071 (D.S.D. 2001); *Green v. America Online*, 318 F.3d 465, 470- 71 (3rd Cir.2003); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003); *Doe One v. Oliver*, 755 A.2d 1000, 1003-04 (Conn. 2000); *Doe v. America Online, Inc.*, 783 So.2d 1010, 1013-17 (Fla.2001); *Schneider v. Amazon.com, Inc.*, 31 P.3d 37, 40-42 (Wash. 2001); *Barrett v. Fonorow*, 799 N.E.2d 916, 923-25 (Ill. 2003); *Donato v. Moldow*, 865 A.2d 711, 720-27 (N.J. App. Div. 2005); *Austin v. CrystalTech Web Hosting*, 125 P.3d 389, 392-94 (Ariz. Ct. App. 2005).

[16] Section 230 explicitly carves out *federal* criminal prosecutions, but Section 230 immunity applies fully in *state* criminal proceedings. *See, e.g., Backpage.com LLC v. Cooper*, 2013 WL 1558785 (M.D. Tenn. 2013) (Section 230 pre-empts state law criminalizing display of certain advertising); *Backpage.com LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) ("If Congress did not want the CDA to apply to state criminal actions, it would have said so").

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 12

Section 230 immunity applies where (1) the defendant claiming immunity is "a provider . . . of an interactive computer service," (2) the legal action at issue seeks to "treat[]" the defendant as the "publisher or speaker" of that information, and (3) the allegedly unlawful information was "provided by another information content provider." 47 U.S.C. § 230(c)(1); *Ben Ezra, Weinstein & Co.,* 206 F.2d at 980.

All three elements are met here.

*First*, there is "no doubt that Google qualifies as an 'interactive computer service'" and is therefore "eligible for immunity under § 230." *Parker v. Google, Inc.*, 422 F. Supp.2d 492, 501 (E.D. Pa. 2006); *see also Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del. 2007); *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009).

*Second*, any contemplated legal action here depends on treating Google as the "publisher" or "speaker" of the information in question. That is because any claim that "can be boiled down to deciding whether to exclude material that third parties seek to post online" is a claim that depends on treating the service provider as a publisher, and thus falls within the scope of Section 230 immunity. *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc); *Green*, 318 F.3d at 471 (any claim that a service provider "promulgat[ed] harmful content" and "fail[ed] to address certain harmful content" pertains to "decisions relating to the monitoring, screening and deletion of content from its network—actions quintessentially related to a publisher's role"). The assertion that Google must legally not display algorithmically generated results linking to certain third-party webpages or videos not created by Google is a claim that Google must proactively exclude from its services materials that third parties seek to make available online. This would be the equivalent of treating Google as if it were the publisher or speaker of third-party information – precisely what Section 230 forbids.

The same is true for the assertion that Google should not permit autocomplete to display certain search query predictions. Autocomplete entries simply reflect what an algorithm predicts is the likely search query the customer is entering, based primarily on analyses of prior queries entered by other customers (i.e., Google users). The autocomplete function is an "aggregation of user-generated data," and efforts to preclude Google from displaying such results therefore treat Google as if it were the publisher or speaker of the third party content, in violation of Section 230. *See Levitt v. YELP! Inc.*, No. C-10-1321 EMC, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) (YELP's publication of aggregated customer ratings covered by Section 230 immunity); *Gentry v. eBay, Inc.*, 99 Cal. App.4th 816, 834 (2002) (eBay's publication of ratings reflecting its aggregation of ratings supplied by users covered by Section 230 immunity).

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 13

Google does not manually create the entries displayed in autocomplete; those entries are a reflection of popular search terms on the internet.

*Third*, and finally, all of the information in question here was unquestionably supplied by another information content provider. Google did not create the web pages about which you complain; it did not shoot or upload the YouTube videos you deem objectionable; and it did not craft the various user search query predictions you find objectionable in autocomplete. It follows that Section 230 immunity plainly applies to the conduct under scrutiny here.

**Conclusion**

We would be happy to discuss all this in person with you and your staff, at your convenience.

Best regards,

*[signature]*

Jamie S. Gorelick
Peter G. Neiman


cc:     The Honorable David M. Louie
        The Honorable Kenneth T. Cuccinelli