Google Inc.
1600 Amphitheatre Parkway
Mountain View CA 94043



Main Phone 650 253-0000
Main Fax 650 253-0001
www.google.com

November 27, 2013

**By E-mail and First Class Mail**

**Hon. Jim Hood**
**Attorney General**
**State of Mississippi**
**P.O. Box 220**
**Jackson, MS 39205**

Dear General Hood:

I write in response to your letter from yesterday.  As we discussed last week, Google wishes to continue our substantive engagement with you and other Attorneys General on the important issues raised in your letter.  Over the last several months, we have been working with your staff to schedule an in-person meeting at a mutually acceptable time.  We had proposed meeting dates in November and December, and we continue to be open to meeting in January if you would prefer. As I noted during our conversation, I am not able to commit to meeting during the week of December 2nd.

We hope that we can find a mutually agreeable time to meet in the near future.  We would appreciate the opportunity to discuss the extensive measures Google has already taken to address many of your concerns.  We welcome hearing about instances in which our services are being misused in violation of our policies, as that feedback helps us to further improve and refine our enforcement efforts, even as we continue to improve the quality of our services, protect intellectual property rights, and promote user safety.

Contrary to the assertions in your most recent letter, Google has already taken a number of steps to address the specific concerns you raise regarding Autocomplete, YouTube, ads, and content monetization.  I enclose copies of our earlier letters to you providing extensive details about many of those measures.  I also enclose a copy of our letter to the Attorneys General of Nebraska and Oklahoma in response to their inquiries relating to monetization, a 26-page report we released this September titled "How Google Fights Piracy," which outlines Google's efforts in this important area, and the White House's announcement of Best Practices and Guidelines for Ad Networks to Address Piracy and Counterfeiting, which Google helped formulate.  Finally, I enclose copies of two of our earlier blog posts regarding removals from search.

We look forward to hearing back from you regarding proposed meeting dates, and I hope that you and yours have a Happy Thanksgiving.

Best regards,

Kent Walker
Senior Vice President & General Counsel

cc:    The Honorable Jon Bruning
        The Honorable David Louie
        The Honorable Eric Holder

Neiman Decl.
Ex. 18

ENCLOSURES

Letters from Google
to Attorney General Hood
from April, May, and June, 2013

Google Inc.
1101 New York Avenue, N.W.
Second Floor
Washington, DC 20005

Main 202 346.1100
Fax 202 346.1101
www.google.com



April 19, 2013

Attorney General Jim Hood
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205

Attorney General Kenneth T. Cuccinelli
Office of the Attorney General of Virginia
900 East Main Street
Richmond, Virginia

Attorney General David M. Louie
Office of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813


Dear Attorneys General Hood, Cuccinelli, and Louie:

We appreciated the opportunity to participate in the National Association of Attorneys General Intellectual Property Committee Stakeholder Discussion that was held on November 28th. As a follow-up to that discussion, please find our responses to the questions outlined in your February 13th letter.

Google remains committed to developing effective policies and technology tools to combat infringing activities. Google has dedicated tens of millions of dollars in engineering and other resources to address these issues and leads the industry in helping to combat copyright infringement and the sale of counterfeit goods online. Our successes include:

- **DMCA Takedowns on Google Search** -- The industry-leading tools that we have built have dramatically streamlined the DMCA takedown process for rights holders. Today, Google is processing more notices and faster than any other search engine.

- **Combating the Sale and Promotion of Counterfeits in Online Advertising** -- We've dedicated considerable human and engineering resources across the company to develop and implement measures to root out counterfeit from our ad networks. Our engineering teams have developed highly sophisticated automated systems based on

1

advanced risk models that rely on thousands of data signals to detect fraudulent activity by advertisers, including counterfeit. Our automated systems are highly effective. We shut down approximately 82,000 AdWords accounts for attempting advertise counterfeit goods in 2012. Nearly 99% of AdWords accounts terminated on counterfeit grounds are detected by these systems. Due to continuous enhancements to these systems, counterfeiters are increasingly unable to circumvent our detection methods. Rights holders have also provided feedback that these systems are working well.

- **Illegal Pharmaceuticals** -- Google is committed to stopping the problems of online pharmacy advertising at the source. We have taken a lead role in a cross-industry effort to collaborate with government. As part of this effort, Google was a founding member of the Center for Safe Internet Pharmacies (http://www.safemedsonline.org/who-we-are/) which was formed in 2011. The Center provides consumers with important information about purchasing prescription drugs safely online.

  In addition, Google provides criminal referrals to law enforcement in the US regarding rogue pharmacies that have attempted to abuse our systems. We have made thousands of referrals to the FDA in the last few years, and we participate in concerted action with law enforcement agencies worldwide (*e.g.*, Operation Pangea).

- **Removal of Ads from Sites that Engage in Copyright Infringement** -- Google has always taken steps to prevent the appearance of AdSense ads -- that is, ads served by Google -- on sites that engage in copyright infringement. Over the past two years, we have intensified those efforts. For example, in addition to responding to notices received from rights holders, in 2012 we proactively took action against more than 46,000 sites that were showing AdSense ads against potentially infringing content.

- **Content ID** -- No other online video site has done more to fight piracy or paid more in royalties to the content industry than YouTube. As a result of our state-of-the-art Content ID system, as every video is uploaded, it is analyzed and compared to our database of millions of fingerprints corresponding to copyrighted works. When copyrighted music or video is detected in a video, we apply the business rules chosen by the relevant copyright owner. The choice of most copyright owners has been to allow the video to be posted and monetized with advertising -- a choice that has yielded substantial royalty payments from YouTube to those companies. Please note that Content ID does not require sending a takedown notice as there is nothing to take down since we have blocked the video from being posted in the first place.

  Additionally, we terminate the accounts of users who abuse our service and we take steps to block third-party "downloader" sites that violate our terms of service.

With this background in mind, we now turn to answering your specific questions.

***Specific details of how the takedown process works.***

2

We have takedown policies for our various products, but for the purposes of this question, we will focus on organic search and ads.

Organic search: The web is made up of over 30 trillion pages and grows every day. Google navigates the web by crawling the pages to build an index of the web. Google uses algorithms to deliver the most relevant results to users entering search queries. Google's search index simply reflects existing content on the web and the sites linked to in Google's search results are created and controlled by those sites' webmasters. Removing a page from Google's index does not remove it from the web and people will still be able to see that page by going to it directly or via another search engine.

Google is committed to free expression and only removes content from our search results in a narrow set of circumstances. Google cannot adjudicate the legality of content on the web and cannot determine whether a particular piece of content is authorized or not. Because content owners large and small use the Web in so many different ways, determining a particular copyright holder's preference --including determining whether a third-party uploader has permission to upload -- is difficult at best.

Rights holders have several ways to address problematic sites in organic search results.  First, Google complies with the Digital Millennium Copyright Act and removes webpages upon notice from a rights holder of infringing copyrights. Google leads the industry in its DMCA removals and has invested vast resources to support the number of removals undertaken. The manner in which we deal with removals is transparent, public, and detailed in our Transparency Report which you can view here. Additionally, rights holders can submit court orders obtained against the unlawful sites to Google. Google offers an online form for submission of court orders adjudicating content to be unlawful. The court orders simply need to identify webpages that contain illegal content and Google will remove the pages voluntarily from our search results.

Advertising: Google's advertising solutions helps businesses around the world grow online, from small businesses to Fortune 500 companies. Google's online advertising platforms allow businesses to connect with users searching for information. There are over a million advertisers in our AdWords network.

Rights holders can take advantage of the online removals processes that Google has set up for any problematic advertisements. Google has a robust counterfeit complaint and removal process. We have a simple and accessible complaint form for reporting ads that may promote counterfeit goods. This form can be submitted by consumers, as well as trademark owners. In response to a valid complaint, Google will take action in 24 hours. In most instances, we terminate the account and disable the domain so the advertiser and site are banned from AdWords. Additionally, it is our policy to respond to notices of alleged infringement that comply with the DMCA. For AdWords, if we receive a notice or otherwise have reason to believe that an advertiser's site is infringing, we may remove the offender's advertising in compliance with the DMCA. More information about our DMCA process is available at http://adwords.google.com/support/aw/bin/request.py?hl=en&contact_type=adwords_dmca&rd=1.

***A detailed explanation of the use of DMCA notices or other factors to alter search results,***

3

**including statistics demonstrating how rankings have been altered as a result of removal notices.**

Google's goal is to provide a great experience for our users. Toward that goal, we have developed over 200 signals to ensure our search algorithms deliver the best possible results. A recent signal takes into account the number of valid copyright removal notices we receive for any given site. Sites with high numbers of removal notices may appear lower in our results. This ranking change should help users find legitimate, quality sources of content more easily.

At the same time, we want to point out that Google cannot determine whether a particular webpage does or does not violate copyright law. While our 200 plus signals influence the ranking of some search results, consistent with the DMCA, we do not remove any pages from search results unless we receive a valid copyright removal notice from the rights owner. Responding to billions of queries each day, Google's algorithms work to provide results that are relevant to user queries. We are not in a position to determine whether any one among the more than 30 trillion web pages available on the Internet is "legal" or "illegal" or, more precisely, "infringing" or "noninfringing." That is a determination that a copyright owner or court is best positioned to make. Copyright owners also have the power to "line edit" search results by sending us DMCA takedown notices.

We believe that the interests of our users and copyright owners are aligned. Our users want access to the best material available and that should be the material provided by copyright owners. Our job is to connect the two.

**How auto complete features can be altered to reduce or eliminate directing consumers to counterfeit product sites, as well as illegal and harmful sites, such as the search "buy oxycodone online without a prescription" mentioned at the meeting.**

The predictions that appear in auto complete are an algorithmic reflection of query terms that are popular with our users and on the internet. Google does not manually select these terms or determine what queries are considered related to each other. Instead, we use algorithms to detect patterns based on data sources including user search queries. While Google's auto complete functionality displays predictions of search terms that the user might find useful, a user is always able to type in any term in which he is interested, regardless of whether it shows up as a prediction in Autocomplete. For more information on our auto complete feature and policies, we encourage you to visit:
http://www.google.com/support/websearch/bin/answer.py?hl=en&answer=106230

Google does apply a narrow set of filters in cases of potentially shocking or offensive entries (*e.g.*, hate speech) and in cases where there is a high correlation between particular terms and infringing copyright. We are not aware of a high correlation between particular terms and sites associated with counterfeiting or pharmaceuticals in search results.  In fact, queries for terms such as "counterfeit" or "fake" generally lead to sites on how to detect counterfeits. In any event, Google is unable to implement broad filters without censoring legitimate search queries. For instance, it would be vastly overbroad to remove generic terms such as "prescription" or "online"

4

or fake" or "knockoff" or "mp3" or "download."

***How licensing services have helped or can help reduce infringing activities.***

While online piracy remains a challenge to overcome, viable marketplace alternatives are making progress and are driving legitimate consumption. Just a few years ago, iTunes did not exist and it wasn't clear if anyone could compete with "free." Now, digital music sales have grown 1000% over the last six years and there are more music purchases than ever before. Meanwhile, services like YouTube are creating entirely new revenue streams, and Amazon is selling more eBooks than paperbacks. Consumers will play by the rules if they are offered high quality content that is convenient to purchase and consume, and  competitively priced.

Google fully supports licensed services and strives to connect consumers to them. Our launch of Google Play offers music fans a compelling new alternative for enjoying their music. In conjunction with copyright owners, we are in the process of creating licensing models to accommodate new, exciting authorized services under the Google Play brand. All signs point to a turning of the tide, with legitimate services going mainstream, digital music revenues for copyright owners trending upward, and companies like Google making substantial efforts to combat piracy. Copyright owners can also do more to help prevent piracy, such as adopting day-and-date for online releases of most popular movie studios and TV networks (Game of Thrones, in-theater movies). Why give pirates the ability to make your works available first when you can beat them to the market?

The availability of lawful works does dramatically reduce piracy. Please note the opening of this February 26, 2013 article by Forbes magazine[1]:

> It seems that people just aren't pirating music the way they used to. In many cases, because they don't have to. That's according to the NPD Group, which just released their "Annual Music Study 2012."  The report shows that the number of music files being illegally downloaded was 26% less in 2012 than in 2011. What's more, 40% of the people surveyed in the study who said that they'd illegally downloaded in 2011 did *not* do so in 2012.

> So what's responsible for this massive reduction in piracy? According to the survey, it's not stepped-up enforcement, it's the availability of free music via streaming services like Spotify, which is a fully-licensed music service that pays sizable royalties to copyright owners. Nearly half of the people who had stopped or sharply reduced their music downloading cited those services as the reason for stopping.

***Whether "whole site" removal can be used in cases of repeat offenders.***

Whole site removal is ineffective and can easily result in censorship of lawful material. Blogging sites contain millions of pages from hundreds of thousands of users as do social networking

---

[1] The article is available in full here:
http://www.forbes.com/sites/alexknapp/2013/02/26/study-finds-that-streaming-and-spyware-are-killing-music-piracy/

5

sites, e-commerce sites, and cloud computing services. All can inadvertently contain material that is infringing. It is rare indeed for a site to consist wholly of infringing material. But for such "rogue" websites dedicated to copyright infringement or counterfeiting sites, Google believes that a "follow the money" approach, which chokes off revenue, is most effective. Since such sites are dedicated to making money, taking away sources of money is the most effective approach.

We employ a range of procedures and financial resources to prevent our advertising products form being used to monetize material that infringe copyright. For example, our AdSense program enables website publishers to display ads alongside their content. Our policies prohibit the use of this program for infringing sites, and we use automated and manual review to weed out abuse.

***Legal issues posed by altering or eliminating direct access by consumers to counterfeit product sites and illegal and harmful sites, as well as "whole site" removal.***

Google is a provider of information not a mediator or censor. As discussed above, Google's search index simply reflects existing content on the web, and the sites linked to in Google's search results are created and controlled by those sites' webmasters. Google brings different web pages that relate to search requests, but Google does not make claims about the content of the pages nor does Google have a relationship with the owners of these pages. Removing a page from Google's index does not remove it from the web, and people will still be able to see that page by going to it directly or via another search engine.

Google is not in the position to play the role of arbiter through content review, adjudications of illegality, and censorship. That role is properly left to the courts. In our experience, we have seen many demands for removal of sites which threaten to stifle legitimate commerce and speech. For example, we have seen rights holders seek removal of resellers of unauthorized sellers of genuine goods – either used goods or new goods at prices below those at retail outlets. We have seen competitors targeting each others' sites for removal under the claim of counterfeit. Rights holders have also sought the removal of "gripe sites" containing consumer complaints, critical product reviews, or criticism.

Whole site removal was evaluated and rejected on the federal level due to the precedent it would set. As discussed above, whole site removal is ineffective and can easily result in censorship of lawful material.

***What role search engines have played in curbing the sale of counterfeit pharmaceuticals, medical devices, and other products posing significant consumer health and safety threats.***

Google has been an industry leader in the fight against counterfeits and illegal pharmaceuticals. Google has zero tolerance on counterfeit in search ads. We've dedicated considerable human and engineering resources across the company to develop and implement measures to root out counterfeit from AdWords. These measures are applicable across all counterfeit goods, including ones posing health and safety concerns.

6

As discussed above, our engineering teams have developed highly sophisticated automated systems to detect fraudulent activity by advertisers, including counterfeit. Our automated systems are highly effective. Nearly 99% of AdWords accounts terminated on counterfeit grounds are detected by these systems. Due to continuous enhancements to these systems, counterfeiters are increasingly unable to circumvent our detection methods.  We're now seeing a decrease in counterfeiters infiltrating AdWords. For example, we shut down approximately 82,000 accounts on counterfeit grounds in 2012, down from 150,000 in 2011.  More information about our efforts can be found here: http://adwords.blogspot.com/2013/01/ads-security-2012-retrospective.html.  In addition to our proactive efforts, Google also works with rights holders who submit notices of any ads violating our policies to ensure that those ads are removed and associated accounts are disabled.

Specifically with respect to pharmaceuticals, since March 2010, the AdWords program has only permitted online pharmacies based in the United States to run ads appearing in the United States. Google is the first online search provider to require these U.S. online pharmacies to be accredited by the National Association Boards of Pharmacy VIPPS program.

Google continues to improve upon its existing automated screening programs and has developed new tools to enhance its ability to enforce and monitor advertisers' compliance with these policies. Google monitors thousands of prescription drug terms for compliance with Google's advertising policies (see http://support.google.com/adwordspolicy/answer/2430794).

On a quarterly basis, Google provides criminal referrals to law enforcement in the US regarding any rogue pharmacies that have attempted to abuse our systems.  We have made thousands of referrals to the FDA in the last few years. We also participate in concerted action with law enforcement agencies around the world.

Google has also taken a lead role in a cross-industry effort to collaborate with government bodies to attempt to stop the problems of online pharmacy advertising at the source. Those efforts led to the creation in 2011 of the Center for Safe Internet Pharmacies (http://www.safemedsonline.org/who-we-are/) that provides consumers with important information about purchasing prescription drugs safely online (http://www.safemedsonline.org/protecting-consumers/check-your-pharmacy/).

We trust this information is sufficient to address your questions and look forward to working with you on these important issues.

Sincerely,

*John C Burchett* [signature]

John Burchett
*Director*
*Public Policy, U.S. States and Local, Latin America and Canada*

7

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043



Main 650 253.0000
Fax 650 253.0001
www.google.com

May 20, 2013

The Honorable Jim Hood
Attorney General of Mississippi
Post Office Box 220
Jackson, Mississippi 39205-0220

**Re:  April 1, 2013 Letter to Google**

Dear Attorney General Hood:

I write in response to your letter of April 1, 2013 regarding illegal websites selling counterfeit and/or otherwise unlawful products.

Many of the specific issues raised in your letter have been addressed in our April 19th response to the the follow-up questions from the National Association of Attorneys General Intellectual Property Committee Stakeholder Discussion, a copy of which I include herewith for ease of reference.

As a further follow-up, please find a brief summary of Google's specific efforts to help combat illegal pharmacies online. This is an area that Google takes quite seriously and one in which we are leading the industry in the fight against counterfeit and illegal pharmaceuticals.

**Advertising**

Google changed its policy regarding online pharmacies in March 2010, allowing online pharmacies based in the United States to run pharmacy ads domestically only if those advertisers have been accredited under the National Association Boards of Pharmacy ("NABP") VIPPS program (http://www.nabp.net/programs/accreditation/vipps).  Google was the first online search provider to require the stringent VIPPS certification for pharmacy advertisers, and only about 30 online pharmacies nationwide are currently VIPPS certified.

Since 2010, Google has improved and continues to improve its existing automated screening programs and to develop new tools to enhance its ability to enforce and monitor advertisers' compliance with these policies, monitoring thousands of prescription drugs terms (see https://support.google.com/adwordspolicy/answer/2430794#), and rejecting millions of pharma ads each year.  Google's efforts extend beyond just prescription drug ads.  In 2012, Google voluntarily banned ads for dangerous or deceptive herbal and dietary supplements, as well as unsafe "designer drugs" (see https://support.google.com/adwordspolicy/answer/2423645#).

In order to further enhance Google's enforcement of these policies, Google has also contracted with LegitScript, an independent company with knowledge of online pharmacies, to conduct

weekly "sweeps" of ads on Google (i.e., running searches of various terms associated with prescription drugs and supplements to see which ads appear) so that Google can immediately remove any ads identified by LegitScript that have managed to evade Google's policy enforcement systems.

As a result of all of these efforts, the number of illegal ads in this space on search engines like Google has declined by more than 900% percent since 2010 (see http://www.safemedsonline.org/2013/05/companies-join-forces-to-protect-consumers-from-the-prevalent-threat-of-illegal-online-pharmacies/).

## Cooperation with Law Enforcement

Upon identifying any advertiser potentially operating a rogue online pharmacy, Google alerts appropriate law enforcement officials, resulting in thousands of criminal referrals by Google over the course of the last few years.  Google also regularly cooperates with law enforcement investigations relating to illegal pharmaceuticals online, assisting investigators both formally and informally in ascertaining the data available to Google and how to lawfully obtain the same for use in connection with their investigations.

## Cross-Industry Collaboration

In 2010, Google commenced discussions with the White House Intellectual Property Enforcement Coordinator's (IPEC) office to discuss mechanisms for improving cross-industry collaboration as part of efforts to thwart rogue online pharmacies.  At these meetings, Google, GoDaddy, and IPEC made the case for creating a formal organization among industry stakeholders with a nexus to the pharmaceutical supply chain to better facilitate information sharing so that members of the organization could capitalize on a broader universe of information and take quicker action against rogue online pharmacies.

On December 14, 2010, IPEC announced the formation of a 501(c)(3) organization, the Center for Safe Internet Pharmacies (CSIP), that would be dedicated to promoting information sharing, education, and more efficient law enforcement of rogue online pharmacies.  Since its inception, CSIP has, among other things:

1. created an information-sharing tool for its members so as to assist in identifying bad actors attempting to abuse member company platforms;
2. actively participated public service campaigns about the potential dangers associated with purchasing pharmaceuticals online (see http://www.safemedsonline.org/protecting-consumers/psa-video-contest/); and
3. Offered consumers a pharmacy checker tool to assist internet users in confirming that their online pharmacies are indeed legitimate (see http://www.safemedsonline.org/protecting-consumers/check-your-pharmacy/).

**Autocomplete**

With regard to objectionable phrases in Autocomplete, please note that Autocomplete predictions are algorithmically determined based on a number of factors (including popularity of search terms) without any human intervention. In other words, Autocomplete is a feature that algorithmically predicts and displays queries as users type, based on what other Google users have searched for historically, and is nothing more than a shortcut for typing common queries into Google's search engine.  Removing entries from Autocomplete does nothing to preclude users from typing in objectionable queries. More information on Google's autocomplete feature can be found at:
http://www.google.com/support/websearch/bin/answer.py?hl=en&answer=106230

Google remains committed to free expression and only removes content from its search results (i.e., the organic results displayed based on user search queries) in a narrow set of circumstances.  Google cannot adjudicate the legality of content on the web.  To the extent any website appearing in Google's search results has been adjudged by a court of competent jurisdiction as illegal based on its sale of pharmaceuticals, Google voluntarily removes such websites from its search results.   The court order simply need identify the specific web pages containing the illegal content so as to permit Google to identify and remove those pages from its search results.

*****

We look forward to continuing to work with you and the National Association of Attorneys General Intellectual Property Committee, which you co-chair, to resolve any outstanding issues.

Best regards,

Adam L. Barea
Director, Legal
Google Inc.

WILMERHALE

June 26, 2013

Jamie S. Gorelick

+1 202 663 6500 (t)
+1 202 663 6363 (f)
jamie.gorelick@wilmerhale.com

Hon. Jim Hood
Attorney General
State of Mississippi
P.O. Box 220
Jackson, Mississippi 39205

Dear General Hood:

We write in response to your remarks at the June 18, 2013 meeting of the National Association
of Attorneys General in Boston and to continue our ongoing dialogue on these important issues.

You have raised questions about (a) whether Google should remove from its search results web
pages allegedly promoting rogue internet pharmacies or offering pirated movies and songs; (b)
whether Google should modify its autocomplete feature to exclude algorithmically generated
query predictions that may lead to search results linking to offending web pages; and (c) whether
Google should pre-filter the 100 new hours of videos uploaded by users onto YouTube every
minute in order to identify whether any of those videos potentially promote illegal or otherwise
objectionable activity in violation of YouTube's policies.

As previously indicated, Google is interested in working with you on ways it can continue
making the internet safer for its users.  Google has voluntarily and in good faith made
considerable strides in addressing the kinds of issues raised at your meeting.  Google has
described many of these efforts publicly in blog posts on the subject,[1] has detailed many of these
efforts in prior communications with your office over the last several months, and was the only
search engine to attend your November 2012 meeting, all in the spirit of having an "open, honest
and transparent conversation" with you about ways to best address these very important issues.

---

[1] http://googleblog.blogspot.com/2007/11/free-expression-and-controversial.html;
http://googleblog.blogspot.com/2010/04/controversial-content-and-free.html;
http://googlepublicpolicy.blogspot.com/2010/12/making-copyright-work-better-online.html;
http://googlepublicpolicy.blogspot.com/2011/09/making-copyright-work-better-online.html;
http://googleblog.blogspot.com/2012/03/making-our-ads-better-for-everyone.html;
http://googleblog.blogspot.com/2012/04/inside-view-on-ads-review.html;
http://googleblog.blogspot.com/2012/05/transparency-for-copyright-removals-in.html;
http://googleblog.blogspot.com/2012/05/fight-against-scam-adsby-numbers.html;
http://googleblog.blogspot.com/2012/06/ads-integrity-alliance-working-together.html;
http://adwords.blogspot.com/2012/09/taking-extra-precautions-to-keep-ads.html;
http://adwords.blogspot.com/2013/01/ads-security-2012-retrospective.html;
http://googlepublicpolicy.blogspot.com/2013/02/safer-internet-day-how-we-help-you-stay.html;
http://googlepublicpolicy.blogspot.com/2011/03/keeping-counterfeits-out-of-ads.html;
http://googlepublicpolicy.blogspot.com/2013/05/protecting-seniors-from-identity-theft.html;
http://googlepublicpolicy.blogspot.com/2013/06/combating-rogue-online-pharmacies.html;
http://googlepublicpolicy.blogspot.com/2013/06/transparency-report-making-web-safer.html.

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing    Berlin    Boston    Brussels    Frankfurt    London    Los Angeles    New York    Oxford    Palo Alto    Waltham    Washington

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 2

In order to ensure that we are responding comprehensively to your inquiries and public comments, we set forth below additional information responsive to some of your recent questions, as well as the applicable legal framework pertaining to these issues.

**1.    Search**

Google maintains and constantly updates an index of essentially all accessible webpages on the worldwide web.  The index contains over 100 million gigabytes of information, and reflects the contents and various relevant attributes of more than 30 trillion individual webpages.  When a user types a search query into Google, Google's algorithms factor in hundreds of signals to identify the webpages most relevant to the user's query, and then Google ranks and displays the results, all in about one eighth of a second.  For each page listed, Google generates automated text excerpts from the page, permitting users to easily evaluate whether their query matches one of the search listings displayed on the page.  Clicking on a search listing takes the user to the web page listed.  Google handles more than a million searches per minute, and offers this service to its users free of charge.  Google sells advertising space alongside its search results through a program called AdWords.

Search is the least restrictive of all Google's services, because search results reflect the content of the web.  Google does not remove content from search results except in narrow circumstances.  For example, in some countries lacking the robust protections for speech provided in the United States under the First Amendment, Google locally removes content that violates local censorship rules, such as Nazi-related content from its German service (google.de); allegedly defamatory content from its United Kingdom service (google.co.uk); or insults to religion from its India service (google.co.in).  Google does remove child pornography, which is illegal virtually everywhere in the world.  Pursuant to the process prescribed by Congress in the Digital Millennium Copyright Act ("DMCA"), Google also removes webpages listed in its search results upon receipt of sworn takedown notices from copyright holders.  And whenever content on the web has been found by a court of competent jurisdiction to be unlawful and the party responsible for the content is ordered to remove it, Google voluntarily removes those pages from its search results, irrespective of the safe harbor made available to companies like Google under the Communications Decency Act ("CDA").  We also remove, demote or flag for users pages that violate our webmaster guidelines, such as those containing spam or malware, technical decisions that can be made automatically without evaluating the legality of content on particular web pages.

Other than these narrow exceptions, Google does not attempt to exclude web pages from its search results, or make difficult determinations regarding the legality of third-party content. Google believes that this approach honors "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment."  *Harte-Hanks Commc'ns., Inc. v.*

WilmerHale

Hon. Jim Hood
June 26, 2013
Page 3

*Connaughton*, 491 U.S. 657, 686 (1989).  It is consistent with the company's strongly held beliefs that more speech is almost always the appropriate response to speech we find distasteful, and that censorship is a last resort, and never a preferred option for Google or its billions of users worldwide.

Google understands that rogue pharmacies are a serious matter of public concern; it has indeed made substantial commitments to address the issue in its Non-Prosecution Agreement ("NPA") with the federal government, and has worked tirelessly to combat the issue more generally outside of those commitments, taking a number of voluntary steps—described in more detail below—to address the problem.  Google does not permit rogue pharmacies to advertise in the United States; it has rejected more than three million ads from rogue pharmacies in the last few years; and it provides assistance and input to organizations like the Center for Safe Internet Pharmacies, which runs ads on Google promoting its public service campaigns in response to pharma-related search queries.  Those ads urge caution and link directly to the LegitScript pharmacy verification tool, which enables users to ascertain whether the pharmacies they encounter online are legitimate.

Google's commitment to a safer internet is manifest.  But asking Google to identify and remove from search results any page that Google unilaterally suspects may be unlawful would go well beyond what federal law and sound public policy require, and conflicts with core First Amendment principles.  It would also be inconsistent with how the other major search engines operate – none remove pages from their search results based on unilateral suspicion.  And it would be inconsistent with Google's NPA with the federal government.  The NPA drew a sharp distinction between Google's sale of advertising through its AdWords program, and Google's provision, for free, of search results reflecting the full diversity of information available on the internet, which is not the subject of the NPA.  Because decisions to allow, restrict, or remove content from Google's search results often require difficult judgment calls and the application of complex federal and state law and regulations, Google believes that courts and the lawmakers are in the best position to decide which pages are and are not illegal.  As has always been the case, Google will remove from its search results any web pages found by a competent court to be illegal, whether it be a rogue online pharmacy or any other type of operator engaging in conduct online that is deemed unlawful.

## 2.    Autocomplete

Autocomplete is analogous to automatic spell checkers commonly used in email and texting programs.  The goal of autocomplete is to anticipate the search query being entered by a user before the user finishes typing that query, providing a useful shortcut for entering queries into Google's free search services more quickly.  This is one of the ways Google makes searching faster.

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 4

Autocomplete is generated algorithmically by comparing what the user is typing with other information, primarily prior search queries from users. Applying multiple factors, autocomplete algorithmically predicts prior user queries likely to match the user's intended query. The algorithm ranks this list, and displays the top results immediately under the search box. A user can click on any autocomplete prediction, which changes dynamically as a user enters more text, at any time and run that search. Users can also complete a search without selecting an entry displayed in autocomplete at all. In other words, a user is always able to type any term or phrase into search, whether or not it shows up as a prediction in autocomplete. Google does not manually select autocomplete predictions, but it does occasionally tweak its autocomplete systems to prevent entries that might be shocking or offensive to its users from appearing.

Google has taken very seriously your complaints about autocomplete listing entries that include phrases potentially relating to rogue pharmacies. In line with the practices of other search engines, Google's autocomplete feature simplifies and quickens billions of searches for content online. In certain cases, we have been able to identify phrases that are highly likely to result in the display of sites to pages containing problematic or objectionable content. In those cases, Google is already doing some things to address the issue—*e.g.*, phrases like "without a prescription" are no longer included as autocomplete predictions when a user types in a search such as "buy vicodin online."[2] Of course, given the richness of languages around the world, it will always be possible to find some phrases that may suggest such content. Google continues working to strike the right balance between preserving important automated features like autocomplete, which users find helpful, and determining when to block potentially objectionable terms and phrases that may have entirely legitimate uses depending on context.

3.    **YouTube**

YouTube is a platform that hosts videos posted by users, which YouTube makes available to its users free of charge. More than 100 hours of new video is uploaded to YouTube by users every minute; more than one billion unique users visit YouTube each month to watch more than six billion hours of video per month—an average of almost one hour per month for every human on earth. In other words, YouTube is massive, and with this much video and this many users, attempting to monitor the content of each one of those videos is a herculean task.

As indicated in Google's prior letters to you, YouTube nonetheless makes substantial efforts to exclude inappropriate videos from its site. YouTube has strict community guidelines[3] governing the type of content that can be uploaded to the site. Those guidelines bar, among other things,

---

[2] In contrast, a user who typed "buy vicodin w" into Yahoo! on June 24, 2013 would see the prediction "buy vicodin without script."

[3] *See* http://www.youtube.com/t/community_guidelines.

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 5

uploading any video that violates "applicable local, national, and international laws and regulations," and any video intended to incite "violence or other dangerous illegal activity." YouTube's review teams respond immediately and around the clock when videos are flagged by users for removal, including for pharma-related violations.  YouTube itself removes any content found to violate its own policies.

Given the staggering number of videos on YouTube, and the significant technical challenges associated with trying to automate any meaningful evaluation of the lawfulness of specific content contained in the vast and diverse corpus of videos available on the site, it is not feasible for YouTube alone to identify and exclude all videos that might relate to unlawful activities.[4] This is why YouTube provides copyright owners with a number of sophisticated tools to block and remove infringing content from the site.  And this is why YouTube relies on its community of users—now in the billions—to flag other objectionable content that they might encounter on the site.  Even law enforcement officials use these very tools to report to YouTube any specific videos on the site containing unlawful content, and YouTube takes action on those reported videos, around the clock.

YouTube also works hard on behalf of its advertisers to keep ads from running on potentially objectionable videos, including pharma-related content, and YouTube disables any such advertising when it learns of it.  YouTube has also created and implemented automated solutions to attempt to both remove spam videos placed by potential rogue pharmacies and disable ads from running against videos containing metadata suggesting they might contain objectionable pharma-related content.

Earlier this month, YouTube learned through news reports about a number of videos allegedly promoting rogue pharmacies and counterfeit drugs on YouTube.  Based on those reports, YouTube immediately removed any video it located that violated YouTube's community guidelines (about 2,000 so far), and will continue to respond similarly to any future credible reports it receives, irrespective of their source (*e.g.*, users, law enforcement, or regulators). YouTube takes its commitment to removing bad videos when it learns of them very seriously, irrespective of whether the notifications come from users, law enforcement, or anyone else.

## 4.    Advertising

Google has long worked on tackling the difficult problem of identifying and removing rogue pharmacies from its advertising networks, and today, Google is better than ever at doing just that.

---

[4] Much speech which relates to unlawful activity is nonetheless entitled to First Amendment protection.  *See Brandenburg v. Ohio*, 395 U.S. 444 (1969) ("the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action").

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 6

Here's how: (a) requiring since March 2010 that any advertiser marketing pharmaceuticals be certified under the National Association of Boards of Pharmacy's stringent VIPPS program (only 33 companies hold that certification); (b) constantly improving screening systems to identify and block pharmaceutical ads from uncertified sites; (c) hiring an independent third party, LegitScript, to conduct weekly sweeps to identify any improper pharma ads that have evaded Google's filters and checks; and (d) regularly referring rogue online pharma sites to criminal authorities.[5]   Google has also voluntarily, and without prompting, restricted advertising related to health supplements, weight loss drugs, and anabolic steroids.[6]

Google is also a founding member and ongoing supporter of the Center for Safe Internet Pharmacies ("CSIP"), a cross-industry non-profit organization founded in December 2010 following extensive discussions with the White House on the important subject of combating illegal pharmacies online.  CSIP and its member companies are dedicated to promoting information sharing about suspected rogue pharmacies, providing consumer education about buying prescription drugs online, and coordinating collaboration with law enforcement pursuing suspected rogue online pharmacies.  Since its inception, CSIP has, among other things:

- created an information-sharing tool for its members to help them identify bad actors attempting to abuse member company platforms, thus permitting member companies to tap into a shared resource to assist in identifying suspected rogue pharmacies;

- actively participated in public service campaigns about the potential dangers associated with purchasing pharmaceuticals online;[7] and

- offered consumers a pharmacy checker tool to assist internet users in confirming that their online pharmacies are indeed legitimate.[8]

These important efforts have been acknowledged and praised by the U.S. Intellectual Property Enforcement Coordinator ("IPEC") and others.  For example, John Horton, president of LegitScript, the industry's leading verification service for online pharmacies and a close Google partner in initiatives to help keep rogue pharmacies out of Google's ad networks, has seen the positive results of these efforts first-hand.  As Mr. Horton has explained:

---

[5] Google has made referrals or reports to the Food and Drug Administration on November 1, 2010, November 10, 2011, November 22, 2011, February 21, 2012, May 18, 2012, May 22, 2012, August 21, 2012, August 22, 2012, November 20, 2012, November 30, 2012, February 22, 2013 and May 20, 2013.

[6] *See* https://support.google.com/adwordspolicy/answer/2423645.

[7] *See* http://www.safemedsonline.org/protecting-consumers/psa-video-contest/

[8] *See* http://www.safemedsonline.org/protecting-consumers/check-your-pharmacy/.

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 7

The Center for Safe Internet Pharmacies (CSIP) was created to focus its members on a simple goal: making it harder for bad actors to harm consumers. An industry-wide issue requires industry-wide solutions. When CSIP members show industry leadership by refusing to permit their paid services to be used by rogue Internet pharmacy operators, rogue Internet pharmacies are weakened and can't profit at the expense of patient safety.

All of these measures are paying off. LegitScript, which regularly works with regulators (such as the FDA) and other companies like Google to combat the problem of rogue pharmacies, reports that illegal drug and pharmacy ads on major search engines like Google and Bing have been virtually eliminated. "Google and Microsoft are now industry leaders in safety and security on pharmaceutical ads. They have come a long way. Specifically, Google and Microsoft have implemented unprecedentedly comprehensive pharma-related advertising policies. There is zero tolerance for illegal, unsafe or deceptive medical or pharmaceutical advertisements. Other companies, including some of the payment networks, are attacking this issue more aggressively as well."[9]

And the measures described above cover only Google's pharma-specific actions. The company has long been focused on addressing other types of abuse using its advertising systems, and has built an industry-leading system of filters and other tools designed to block and remove a wide range of advertisements that promote conduct that is illegal or otherwise violates Google's comprehensive ad policies.[10]

In 2012 alone, Google rejected more than 200 *million* ads, and suspended the accounts of more than 800,000 would-be advertisers for violations of Google's policies, including those relating to rogue pharmacies and counterfeits.[11] Google's automated filtering systems for ads have also proven highly effective at combating counterfeits. Nearly 99% of AdWords accounts terminated on counterfeit grounds are detected proactively by Google's systems (rather than based on customer or manufacturer complaints). Due to continuous enhancements to these systems, counterfeiters are, for example, increasingly unable to circumvent Google's detection methods.

*****

Of course, no system handling billions of users and trillions of instances of content on the web or created by users is perfect. It will always be possible to type in a specific search query, identify

---

[9] *See* http://www.safemedsonline.org/2013/05/companies-join-forces-to-protect-consumers-from-the-prevalent-threat-of-illegal-online-pharmacies/

[10] *See* http://services.google.com/fh/files/misc/info-final.pdf

[11] You have suggested that Google may be in breach of the NPA. Please let us know of any advertising which you believe violates Google's obligations under the NPA, so that Google can take immediate action.

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 8

a specific search result, or find a hosted video that potentially relates to some form of illegal or
unpleasant activity on the web.  Only a draconian system of prior review and restraint could
effectively block all such content, and any such approach would fundamentally undermine the
ability of all Americans to access information on the web by imperiling internet platforms for
free expression.

With the steadily growing success of Google's ever expanding tools and filters, abuse of its
platforms has become increasingly more difficult.  But Google continues to be open to feedback
about yet further and additional steps it can take to address the abuse of its systems by rogue
actors.  In that spirit, Google continues to incorporate suggestions for filters and algorithmic
changes to its autocomplete system, for example.  Likewise, it continues to expand its
algorithmic and manual review of YouTube videos (similar to what LegitScript does for search
ads) to remove videos promoting rogue pharmacy websites.

**5.      Relevant Legal Doctrines**

Google's efforts described above to create a safe environment for users and to crack down on
bad actors like rogue pharmacies go well beyond Google's legal obligations.  A constellation of
legal doctrines—designed to promote free expression, the broad dissemination of knowledge,
and the growth of the Internet largely unfettered by regulation—appropriately limit the
obligations under law that are imposed on internet service providers like Google.  These well-
established doctrines—including the exacting *mens rea* required for aiding and abetting liability,
the strong First Amendment protections afforded to disseminators of third-party information, and
the statutory immunity granted to such dissemination by the Communications Decency Act of
1996—preclude requiring companies like Google to be censors of what is available on the
internet.

These doctrines place the burden of ensuring that content complies with the law squarely on the
creator of the content—*i.e.*, those who operate unlawful websites or post unlawful YouTube
videos.  Where regulation of internet service providers is warranted, Congress has placed
primary authority in the hands of the federal government so that inherently national businesses
face one rather than fifty sets of rules.  That is a particularly sensible allocation of responsibility
with regard to pharmaceuticals, which are pervasively and actively regulated by the federal Food
and Drug Administration.

> *a.      No aiding-and-abetting theory applies to Google's conduct under Mississippi
> law.*

Your recent comments and inquiries suggest that you believe Google might be subject to aiding-
and-abetting liability under Mississippi law for crimes committed by third parties whose

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 9

websites are identified in response to user searches (including those predicted by autocomplete), or whose videos run on YouTube. No court has ever found aiding and abetting liability in remotely analogous circumstances. To the contrary, the settled law is that aiding-and-abetting liability does not extend to legitimate businesses who provide lawful services (such as Google's search and YouTube services), even when it is foreseeable that some small portion of users may abuse those services to promote illegal ventures.

Aiding-and-abetting liability requires much more than failing to prevent a foreseeable misuse. It requires that the defendant "deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime"—that is, that the defendant "voluntarily participated in its commission with the intent to violate the law." *Milano v. State*, 790 So.2d 179, 185 (Miss. 2001).

The Supreme Court has long recognized a "broad latitude of immunity" from aiding-and-abetting (or conspiracy) liability for sellers of lawful goods who deal at arm's length with customers, even when they actually know the customer will use the good to break the law, so long as the seller acts for ordinary commercial reasons, rather than with an intent to assist in law-breaking. *Direct Sales Co. v. United States*, 319 U.S. 703, 712 n. 8 (1943); *see also United States v. Falcone*, 311 U.S. 205 (1940) (arms-length sale of sugar to known distiller during prohibition not a crime).[12]

This broad latitude of immunity covers information providers: As one court explained, "[h]olding [a provider of information] responsible for whatever conduct the [provider] could anticipate a [recipient] *might* engage in after [receiving the information] is simply beyond the scope of either conspiracy or aiding and abetting."[13]

Google interacts with *trillions* of webpages, *billions* of searches per day, and *millions* of people who upload videos and other content to the web; only a very small fraction of users abuse Google's platforms to further improper conduct. There is simply no basis under law to treat Google as an aider and abettor under these circumstances.

---

[12] Although these cases interpret federal law, they are fully applicable to Mississippi's aiding and abetting law, which tracks the federal standard so closely that in *Milano* the Mississippi Supreme Court directed trial courts to use the pattern jury instruction of the United States Court of Appeals for the Fifth Circuit defining aiding and abetting liability. *Milano*, 790 So.2d at 185.

[13] *Conant v. Walters*, 309 F.3d 629, 635-36 (9th Cir. 2002); *see also United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 178 (6th Cir. 1992).

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 10

> b.   *The First Amendment bars requiring Google to investigate the lawfulness of all websites included in search results or videos displayed on YouTube.*

The starting premise of your inquiry appears to be that Google has an obligation to determine whether websites included in Google search results, or videos displayed on YouTube, promote violations of the law. But the courts have recognized that the First Amendment does not permit imposing such an obligation. Indeed, the Supreme Court found that even the publisher of a magazine with a small number of advertisers (when compared to Google) "cannot practicably be expected to investigate each of their advertisers." *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 493 (1962). As Justice Harlan explained, any other rule would require the publisher to "refrain from accepting advertisements from those whose own materials could conceivably be deemed objectionable," which would "deprive such materials, which might otherwise be entitled to constitutional protection, of a legitimate and recognized avenue of access to the public." *Id.*; *see also Smith v. California*, 361 U.S. 147 (1960) (First Amendment precludes holding bookseller strictly liable for selling obscene book).

Sanctioning Google for the conduct of a website included in Google's search results, or the maker of a video posted on YouTube, would directly implicate these First Amendment concerns. The publisher in *Manual Enterprises* had only a handful of advertisers in a single line of business. 370 U.S. at 481. Google's search crawlers have scanned *trillions* of web pages (Google crawls over twenty billion pages each day), and over six billion hours of video are watched on YouTube every month. Google is not in a position to make determinations about the legality of such an enormous body of information; those are determinations best left to the courts and lawmakers.

More fundamentally, even the notion that information—which is what users are seeking when using Google services—could itself be unlawful conflicts with core First Amendment principles, as the Supreme Court's decision in *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011) illustrates. The Court was quite clear that constitutionally protected speech cannot be restricted out of a paternalistic desire to protect the audience from making harmful decisions. *Id.* at 2671. ("[I]nformation is not in itself harmful…. [P]eople will perceive their own best interests if only they are well enough informed, and … the best means to that end is to open the channels of communication rather than to close them").

> c.   *Section 230 of the Communications Decency Act provides Google with broad immunity for displaying third-party content.*

Federal statutory law also expressly precludes requiring Google to verify the lawfulness of third-party information accessible through Google's search and YouTube platforms. These laws make clear that it is the "policy of the United States" to "promote the continued development of the

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 11

Internet" and to "preserve the vibrant and competitive free market that presently exists for the internet ... unfettered by Federal or State regulation." 47 U.S.C. §230(b)(1-2). To implement that policy, these laws explicitly immunize providers of interactive computer services like Google from state-law liability for organizing and displaying content provided by third parties. Specifically, Section 230 of the Communications Decency Act of 1996 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section. 47 U.S.C. §230(e)(3).[14]

It has been settled law for more than fifteen years that Section 230 "plainly immunizes computer service providers ... from liability for information that originates with third parties." *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Thus, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Id.* at 330.[15] Courts have "construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).[16]

"[S]o long as the third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." *Carefano*, 339 F.3d at 1123-24. That is because the alternative—"[m]aking interactive computer services and their users liable for the speech of third parties"—"would severely restrict the information available on the Internet." *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003)

---

[14] Section 230 has a carve-out for intellectual property law, *see* 47 U.S.C. § 230(e)(2), which is instead covered by 17 U.S.C. § 512, which creates a safe harbor from copyright infringement liability for "information location tools" so long as they remove infringing items when provided notice.

[15] *Zeran* was the first case interpreting Section 230. "The *Zeran* court's views have been broadly accepted, in both federal and state courts." *Barrett v. Rosenthal*, 51 Cal. Rptr. 3d 55, 64 (Cal. 2006); *see also MySpace*, 528 F.3d at 42; *Blumenthal v. Drudge*, 992 F. Supp. 44, 51 (D.D.C.1998); *Ben Ezra, Weinstein, and Co., Inc. v. America Online, Inc.* 206 F.3d 980, 986 (10th Cir. 2000); *Morrison v. American Online, Inc.*, 153 F. Supp. 2d 930, 933-934 (N.D. Ind. 2001); *PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069, 1071 (D.S.D. 2001); *Green v. America Online*, 318 F.3d 465, 470- 71 (3rd Cir.2003); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003); *Doe One v. Oliver*, 755 A.2d 1000, 1003-04 (Conn. 2000); *Doe v. America Online, Inc.*, 783 So.2d 1010, 1013-17 (Fla.2001); *Schneider v. Amazon.com, Inc.*, 31 P.3d 37, 40-42 (Wash. 2001); *Barrett v. Fonorow*, 799 N.E.2d 916, 923-25 (Ill. 2003); *Donato v. Moldow*, 865 A.2d 711, 720-27 (N.J. App. Div. 2005); *Austin v. CrystalTech Web Hosting*, 125 P.3d 389, 392-94 (Ariz. Ct. App. 2005).

[16] Section 230 explicitly carves out *federal* criminal prosecutions, but Section 230 immunity applies fully in *state* criminal proceedings. *See, e.g., Backpage.com LLC v. Cooper*, 2013 WL 1558785 (M.D. Tenn. 2013) (Section 230 pre-empts state law criminalizing display of certain advertising); *Backpage.com LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) ("If Congress did not want the CDA to apply to state criminal actions, it would have said so").

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 12

Section 230 immunity applies where (1) the defendant claiming immunity is "a provider . . . of
an interactive computer service," (2) the legal action at issue seeks to "treat[]" the defendant as
the "publisher or speaker" of that information, and (3) the allegedly unlawful information was
"provided by another information content provider." 47 U.S.C. § 230(c)(1); *Ben Ezra, Weinstein
& Co.,* 206 F.2d at 980.

All three elements are met here.

*First*, there is "no doubt that Google qualifies as an 'interactive computer service'" and is
therefore "eligible for immunity under § 230." *Parker v. Google, Inc.,* 422 F. Supp.2d 492, 501
(E.D. Pa. 2006); *see also Langdon v. Google, Inc.,* 474 F. Supp. 2d 622, 631 (D. Del. 2007);
*Jurin v. Google, Inc.,* 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010); *Goddard v. Google, Inc.,*
640 F. Supp. 2d 1193 (N.D. Cal. 2009).

*Second*, any contemplated legal action here depends on treating Google as the "publisher" or
"speaker" of the information in question. That is because any claim that "can be boiled down to
deciding whether to exclude material that third parties seek to post online" is a claim that
depends on treating the service provider as a publisher, and thus falls within the scope of Section
230 immunity. *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 521
F.3d 1157, 1170-71 (9th Cir. 2008) (en banc); *Green,* 318 F.3d at 471 (any claim that a service
provider "promulgat[ed] harmful content" and "fail[ed] to address certain harmful content"
pertains to "decisions relating to the monitoring, screening and deletion of content from its
network—actions quintessentially related to a publisher's role"). The assertion that Google must
legally not display algorithmically generated results linking to certain third-party webpages or
videos not created by Google is a claim that Google must proactively exclude from its services
materials that third parties seek to make available online. This would be the equivalent of
treating Google as if it were the publisher or speaker of third-party information – precisely what
Section 230 forbids.

The same is true for the assertion that Google should not permit autocomplete to display certain
search query predictions. Autocomplete entries simply reflect what an algorithm predicts is the
likely search query the customer is entering, based primarily on analyses of prior queries entered
by other customers (i.e., Google users). The autocomplete function is an "aggregation of user-
generated data," and efforts to preclude Google from displaying such results therefore treat
Google as if it were the publisher or speaker of the third party content, in violation of Section
230. *See Levitt v. YELP! Inc.,* No. C-10-1321 EMC, 2011 WL 5079526, at *6 (N.D. Cal. Oct.
26, 2011) (YELP's publication of aggregated customer ratings covered by Section 230
immunity); *Gentry v. eBay, Inc.,* 99 Cal. App.4th 816, 834 (2002) (eBay's publication of ratings
reflecting its aggregation of ratings supplied by users covered by Section 230 immunity).

WILMERHALE

Hon. Jim Hood
June 26, 2013
Page 13

Google does not manually create the entries displayed in autocomplete; those entries are a reflection of popular search terms on the internet.

*Third*, and finally, all of the information in question here was unquestionably supplied by another information content provider.  Google did not create the web pages about which you complain; it did not shoot or upload the YouTube videos you deem objectionable; and it did not craft the various user search query predictions you find objectionable in autocomplete.  It follows that Section 230 immunity plainly applies to the conduct under scrutiny here.

**Conclusion**

We would be happy to discuss all this in person with you and your staff, at your convenience.

Best regards,

Jamie S. Gorelick
Peter G. Neiman


cc:   The Honorable David M. Louie
      The Honorable Kenneth T. Cuccinelli

# Letter from Google to Attorneys General Bruning and Pruitt from July, 2013

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Main 650 253.0000
Fax 650 253.0001
www.google.com



July 30, 2013

The Honorable Jon Bruning
Attorney General of Nebraska
2115 State Capital
Lincoln, NE 68509

The Honorable Scott Pruitt
Attorney General of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

Dear Attorneys General Bruning and Pruitt:

Thank you for your letter of July 2, 2013. We want to address your concerns and appreciate the opportunity to provide information about illegal or otherwise objectionable videos appearing on YouTube in violation of our express policies.

To provide context for our responses, below is a description of YouTube's multifaceted strategy for identifying, removing, and preventing the monetization of illegal or otherwise objectionable videos. Following this explanation are our answers to the questions posed in your letter.

This response primarily focuses on videos of the kind highlighted in recent media reports (i.e., those removed in recent months). Information about these videos is readily accessible to YouTube, concerns the very types of videos mentioned in your letter, and is included below. We are providing this information now in order to respond in a timely manner. For videos prior to this period, we need to work with you to better understand how you define "objectionable content" videos. For example, many entirely lawful videos that we nonetheless remove for policy violations are likely outside your areas of interest (e.g., spam). Your input will help us to better focus our efforts so that we can provide you with the information you're most interested in. We are available at your convenience to discuss.

## 1.    *Background on YouTube*

The basic function of the YouTube site permits users to "upload" and view video clips free of charge. Before uploading a video to YouTube, a user must register and create an account with the website. The registration process requires the user to accept YouTube's Terms of Service agreement, which incorporate YouTube's Community Guidelines (i.e., content policies). Once uploaded, users can either make their videos available for public viewing, or they can share only with specific users.

As a community forum for user-generated content, users attempt to upload all types of video content onto the site. To help ensure that videos that are harmful to user safety or adversely

1

impact user experience are not available on the site, YouTube designed policies[1] governing the type of content that is permissible on YouTube. These policies prohibit videos containing illegal content, as well as those that are perfectly lawful but nonetheless inconsistent with YouTube's community standards. Users who wish to monetize videos they have uploaded by displaying ads within or alongside their videos must agree to abide by the strict content policies under Google's AdSense program.[2]

## 2.    *How YouTube Identifies Inappropriate Videos*

In order to identify and remove objectionable videos from the site, YouTube relies on: (a) crowdsourcing—leveraging over one billion YouTube users to police for inappropriate content— and (b) sophisticated screening mechanisms and machine learning models to locate videos that potentially violate YouTube's policies, including those involving illegal activity. The enormous scale of YouTube—more than 100 hours of video content is uploaded to the site every minute— means that there will always exist some very small percentage of videos which violate YouTube's policies and manage to evade YouTube's systems.[3] Even at this massive scale, YouTube's two-pronged approach has proven effective in helping it identify bad videos on the site, resulting in tens of millions of removals and helping to keep the YouTube community safe for its users.

Every YouTube user is able to easily report any illegal or otherwise objectionable video they encounter on the site by flagging it as inappropriate. To facilitate user reporting, a prominent flag icon appears below each video. Any user who clicks on the icon is asked to identify the specific reason the video is objectionable – including whether the video contains "violent or repulsive content" or content relating to "harmful dangerous acts" (such as the unlawful use of prescription drugs).

Every day, YouTube users flag or otherwise report over 50,000 specific videos for removal. Once flagged, these videos are immediately routed to YouTube's dedicated fifty-person enforcement team that operates around the clock. The enforcement team, assisted by YouTube's automated systems, reviews and takes action on the removal requests within twenty-four hours (and usually in much less time than that). Any video that violates YouTube's policies is removed immediately. If the video content is particularly egregious, the enforcement team will terminate the YouTube user's account along with any related accounts for other Google services.

Since January 1, 2011, user flagging alone has resulted in the removal of over 10 million videos. And this is just a fraction of the total number of videos that YouTube removes in response to third party requests and input.

---

[1] Please visit http://www.youtube.com/yt/policyandsafety/policy.html for further information on YouTube content policies.

[2] Please visit https://support.google.com/adsense/answer/48182?ctx=checklist for further information on AdSense program policies.

[3] The videos YouTube's internal teams have been able to locate concerning rogue pharmacies, forged documents, and counterfeit merchandise are some examples, and they have been removed for violating YouTube's policies.

2

In order to help combat copyright infringement, YouTube provides rights holders with technological tools to help them identify unauthorized content appearing on the site.  YouTube generally removes somewhere between 40,000 and 50,000 videos per week based on takedown notices from rights holders and through YouTube's automated tools.  In addition, YouTube makes available to copyright owners its Content ID system, a home-grown state of-the-art product that analyzes every video uploaded to YouTube against millions of fingerprints corresponding to copyrighted works.  Once identified, copyright owners using Content ID, which is made available to rights holders free of charge, can opt to block, track the performance of, or monetize any videos identified containing their content, depending on their preference.

As we have explained publicly, YouTube also works collaboratively with law enforcement and takes action in response to legitimate removal requests initiated by law enforcement officials.  Between 2011 and 2012, requests from law enforcement resulted in the removal of approximately 18,000 videos.[4]

To prevent the upload of videos previously removed for policy violations, videos not associated with a valid YouTube account, and child pornography, YouTube has developed and maintains filters to block these videos from reappearing on the site.

YouTube employs ever-evolving computer models to tackle the issue of large-scale abuse (i.e., across many videos, as opposed to an isolated video).   These models result in the removal of millions of videos every month.

YouTube also conducts proactive content reviews when it learns of specific content issues going beyond any particular video (e.g., the pharmacy videos YouTube first learned of as a result of a June 2013 article appearing in *USA Today*).  During these reviews, YouTube's enforcement teams remove any videos they are able to locate that violate YouTube's policies.

As a result of all of these practices, YouTube has removed tens of millions of videos from its site for policy violations, including illegal activity.

### 3.      How YouTube Prevents Advertising From Running On Bad Videos

Any user who uploads a video to YouTube can choose to have ads run against their video (i.e., "monetize" their video).  Given the sheer number of videos on YouTube, YouTube relies on algorithms to identify whether ads should run against a video, and if so, the kind of ad that might be appropriate for that video. YouTube then splits revenue generated by the ad with the owner of the video.

YouTube has developed proactive systems to prevent ads from running against objectionable content.  These systems begin with the classification of video content by "classifiers" that scour the YouTube corpus every day to analyze the metadata associated with each video.  Metadata includes all information associated with video content.  Common examples of metadata for include the video's title, description and publisher name, and the category of video.  Each classifier is created through an intensive process combining machine learning with human review

---

[4] See http://www.google.com/transparencyreport/removals/government/data/.

of thousands of actual videos to test the accuracy and precision of YouTube's automated classifiers. Ads are not triggered by the actual content of the video, but rather are the result of signals found in the video metadata. This is because of the enormous technical challenges involved in automating the assessment of content appearing in videos.

YouTube's content classifier system serves two main purposes. First, it allows advertisers to choose or exclude categories of video content with which to run ads. Second, it enables YouTube to identify video content that, even if in compliance with YouTube's policies, would not be an appropriate for advertising, and any such videos would not be available for monetization (i.e., no ads could run against them).

YouTube also enforces ad blocks targeted at specific types of sensitive content. For example, in the wake of the Boston marathon bombings, YouTube blocked all ads linking to videos it could identify as related to the tragedy, even if the videos themselves were not illegal and did not otherwise violate YouTube's policies.

In addition, once videos flagged by users, copyright owners, law enforcement officials, and other third parties that do not comply with YouTube's policies are removed from the site, ads can no longer run against them.

### 4.      *YouTube's Removal of Inappropriate Videos In The Wake Of A* USA Today *Article*

Upon being alerted through media reports in June 2013 about inappropriate pharma-related videos appearing on YouTube, we took immediate action.

First, YouTube's policy and enforcement teams ran proactive content reviews to identify any videos similar to the ones described in the news reports. These efforts included manual and automated reviews of YouTube videos located as the result of searches conducted across the site by YouTube's enforcement teams.

Since June 6, YouTube has identified and removed a total of 4,357 videos, all which had been uploaded in violation of YouTube's policies. These included videos with content related to rogue pharmacies, forged documents, and counterfeit merchandise, among others. YouTube also "blacklisted" hundreds of URLs associated with those videos, meaning that Google will prevent anyone from running ads or conducting other activity on any Google service that is associated with those URLs. Further, YouTube terminated well over 100 accounts associated with those videos, precluding them from uploading *any* videos (including legitimate videos) to YouTube.

Second, YouTube created and implemented a "blocker" to prohibit ads from running in connection with any video content identified by YouTube's classifiers as relating to Health and Pharmaceuticals. The blocker, which remains in force today, covers not only objectionable content, *but also completely legitimate content* (e.g., videos uploaded by Johnson & Johnson or Walgreens). Exceptions for legitimate publishers are made on a publisher-by-publisher basis, following manual review of the video.

Third, YouTube now scans the entire corpus of videos for thousands of terms associated with prescription drugs. These terms include brand names, generic names, and common misspellings

4

of the same.  Any video content with metadata that uses any of those terms are blocked from receiving ads.

**5.      *Enhancing our Efforts in Partnership with Law Enforcement***

We look forward to working collaboratively to address your concerns going forward.  YouTube grants responsible parties with "Trusted User" status, giving them access to a tool allowing for flagging of videos in bulk.  Once flagged by a Trusted User, YouTube takes action on the flagged videos on an expedited basis.  Given the concerns expressed in your letter, we propose providing your offices with Trusted User status so as to best enable your staff to easily alert YouTube of any illegal videos found on the site for removal under YouTube's policies.

**6.      *Response To Requests For Information***

a.       *Request 1:  Please provide the number of videos that were removed between January 2011 and the end of June for violating YouTube policies that prohibit the posting of illegal and objectionable content.*

In the last year alone, YouTube has removed tens of millions of videos for policy violations. Since YouTube does not categorize removed videos as "illegal and objectionable content," it would be difficult to parse which of this enormous number of videos was removed for being "illegal" or "objectionable," as opposed to any of the other bases for removal (e.g., adult content, spam, etc.).  As mentioned above, we would like to discuss ways to provide you with additional information related to the quantity of removals in particular areas, perhaps by focusing on a smaller time period and/or particular types of policy violations.

b.       *Request 2:  Of the number of videos provided in response to Request #1, please provide (a) the number that had been monetized by Google, as that term is used in this letter, prior to their removal, and (b) the total revenue derived by Google from the advertising associated with those videos.*

YouTube's data is not organized in a way that would make it easy to determine the monetization of removed video content, and it would therefore be burdensome and take a considerable amount of time to provide a complete answer to this question as posed.  As with your first request, we would like to discuss ways to better tailor this request so as to both address your interests and overcome the challenges associated with how we maintain the potentially relevant data.

However, there is good reason to believe there has been limited monetization of videos containing objectionable or illegal content.  For example, the total advertising revenue for all health and pharmaceutical-related video content—the category in which most of the inappropriate videos referenced in the *USA Today* article fell and which also includes perfectly legitimate videos for established pharmacies, doctors, pharmaceutical firms, and the like—is minimal.   The *total* advertising revenue to YouTube and video producers *combined*, for *all* YouTube videos in this category was approximately $123,000 for the period January through June 2013, and approximately $111,000 for all of 2012.  Most of the revenue associated with this content came from perfectly legitimate videos.  For example, the health and pharmaceutical videos generating the most revenue this year included a video about Vicks VapoRub; a music

5

video; a video about a videogame; manufacturer-sponsored videos about anti-depressants; a video about ADHD; and a documentary about Oxycodone abuse.

We have also examined the monetization of the specific 4,357 videos that were removed by YouTube following publication of the *USA Today* article.  Total monetization for *all* of these videos, all-time, was $1,945.12.

   c.   *Request 3.  Please explain what measures, if any, Google has taken to (a) avoid hosting paid advertising on videos containing illegal or objectionable content, (b) remove paid advertising from videos containing illegal or objectionable content once such videos are discovered.*

This question is addressed in section 3 above.

   d.   *Request 4.  Based on search results, it appears that an inordinately large number of videos containing potentially objectionable content were removed in the week following a June 7, 2013 article in the USA Today detailed these issues.  Please describe any and all measures used to remove these videos and explain why the videos were removed.*

This question is addressed in section 4 above.

*****

We look forward to working with you on these important issues and hope that our responses are a first step in resolving your concerns. We would like to set up a call at your earliest convenience to discuss these issues further and to respond to any additional questions that you might have.

Best regards,

Adam Barea
Director, Legal
Google Inc.

"How Google Fights Piracy" report
from September, 2013

More ▾   Next Blog»   Built-On   Built-At   Report Issue   Create Blog   Sign In

# Google Public Policy Blog

Tuesday, September 10, 2013

## Report: How Google fights piracy

Posted by Fred von Lohmann, Legal Director, Copyright

More music, video, text and software is being created on the Internet by more people in more places than ever before. Every kind of creative endeavor, both amateur and professional, is being transformed by the new opportunities and lower costs made possible by digital tools and online distribution. But copyright infringement remains a problem online, and Google is working hard to tackle it.

Today, we are releasing a report, "How Google Fights Piracy," bringing together in one place an overview of the programs, policies, and technologies we have put in place to combat piracy online. Here are few highlights:

- **Better Legal Alternatives**: The best way to fight piracy is with better, convenient, legal alternatives. On YouTube and Play, Google is committed to creating those compelling alternatives for users. Each time a music fan chooses YouTube or Play over an unauthorized source, for example, it's a victory against piracy. And thousands of copyright owners now use Content ID on YouTube to elect to monetize user-generated content on YouTube, rather than take it down, resulting in hundreds of millions of dollars in royalties from Google each year.

- **Follow the Money**: When it comes to rogue sites that specialize in online piracy, other anti-piracy strategies will have limited effect so long as there is money to be made by their operators. As a global leader in online advertising, Google is committed to rooting out and ejecting rogue sites from our advertising services, to ensure that they are not being misused to fund these sites. In 2012, we disabled ad serving to more than 46,000 sites for violating our copyright policies, the vast majority detected through our proactive efforts. We are also working with other leaders in the industry to craft best practices aimed at raising standards across the entire online advertising industry.

- **Removing Infringing Results from Search**: When it comes to Search, Google is a leader in addressing the concerns of copyright owners, responding to more copyright removal notices, and faster, than ever before. During 2012, copyright owners and their agents sent us removal notices for more than 57 million web pages. Our turnaround time on those notices was, on average, less than 6 hours. That's faster than we managed in 2011, despite a 15-fold increase in the volume of requests.

Hundreds of Google employees work on the problem of piracy online, and we will continue to work with copyright owners to focus our energies on combating the problem.

Posted by Google Public Policy Blog at 9:07 AM
Labels: copyright

**Search This Blog**

Search

📶 Site Feed

8558 readers
BY FEEDBURNER

**Archive**

Archive ⇕

**More Blogs from Google**

Visit our directory for more information about Google blogs.

**Get Blog Posts by E-mail**

Subscribe

**Follow us on Twitter**

**What We're Reading**

- 463 Blog: Inside Tech Policy
- CDT - PolicyBeta
- Cisco High Tech Policy Blog
- CNET Politics Blog
- EFF DeepLinks
- Future of Privacy Forum
- GigaOM
- Google European Policy Blog
- Google Public Sector Blog
- Hillicon Valley
- Intel Policy Blog
- John Palfrey's Blog
- Lessig Blog
- Microsoft On the Issues
- Peter Fleischer: Privacy...?
- PFF Blog
- Post I.T.
- Public Knowledge Blog
- Save the Internet
- Search Engine Land
- Susan Crawford Blog
- Tech Daily Dose
- Tech Dirt
- TechCrunch
- Technology Liberation Front
- Verizon Policy Blog
- Yahoo! Policy Blog

# HOW GOOGLE FIGHTS PIRACY



**September 2013**



## Contents

Introduction                                                    2

Better Legitimate Alternatives to Piracy                        4

YouTube                                                         9

Google Web Search                                              13

Advertising                                                    22

# Introduction

In December 2012, a 34-year-old Korean artist made online video history when his viral video "Gangnam Style" smashed records and became the first YouTube video to reach a billion views. PSY was already popular in Korea, but he quickly launched an international career as his music spread from Seoul to North America, South America, and Europe.

In the past, music distribution had been mostly regional, making it difficult to hear great artists from around the world. But with a global platform like YouTube, which is owned and operated by Google, anyone is able to discover and share music from anywhere. This means new revenue opportunities for artists—according to outside estimates "Gangnam Style" generated over $8 million in advertising deals in the first six months alone and has been purchased digitally millions of times.[1]

The Internet has been a boon to creativity. Today, more music, more video, more text, and more software is being created by more people in more places than ever before.[2] Every kind of creative endeavor, both amateur and professional, is being transformed by the new opportunities and lower costs made possible by digital tools and online distribution.

Nevertheless, online piracy remains a challenge, and Google takes that challenge seriously. We develop and deploy anti-piracy solutions with the support of hundreds of Google employees. This report gathers and details those efforts, as well as how Google products and services create opportunity for creators.

### GOOGLE'S ANTI-PIRACY PRINCIPLES

✓ **Create More and Better Legitimate Alternatives.** The best way to battle piracy is with better, more convenient, legitimate alternatives to piracy. By developing licensed products with beautiful user experiences, we help drive revenue for creative industries.

✓ **Follow the Money.** Rogue sites that specialize in online piracy are commercial ventures, which means the most effective way to combat them is to cut off their money supply. Google is a leader in rooting out and ejecting rogue sites from our advertising and payment services, and is raising standards across the industry.

✓ **Be Efficient, Effective, and Scalable.** Google strives to implement anti-piracy solutions that work. For example, beginning in 2010, Google has made substantial investments in streamlining the copyright removal process for search results. As a result these improved procedures allow us to process copyright removal requests for search results at the rate of four million requests per week with an average turnaround time of less than six hours.

Sources:
1. NYMag, "Gangnam-Buster Profits," December 2012 <http://goo.gl/P4J2C>
2. Techdirt, "The Sky is Rising," January 2012 <http://goo.gl/eDN1n>

✓ **Guard Against Abuse.** Unfortunately, fabricated copyright infringement allegations can be used as a pretext for censorship and to hinder competition. Google is committed to ensuring that, even as we battle piracy online, we detect and reject bogus infringement allegations, such as removals for political or competitive reasons.

✓ **Provide Transparency.** We disclose the number of requests we receive from copyright owners and governments to remove information from our services.[3] We hope these steps toward greater transparency will inform ongoing discussions about content regulation online.

These principles guide the actions of Google employees, as well as our investment of tens of millions of dollars in new tools and systems to improve and expand our anti-piracy efforts. Some of the highlights, discussed in more detail in this report, include:

**YOUTUBE PARTNER SUCCESS**

More than one million partner channels are making money from their YouTube videos. More than four thousand rightsholder partners use YouTube's content identification tool, Content ID, to manage their copyrights appearing within user-generated content on the site. These partners include network broadcasters, movie studios, songwriters, and record labels, and they are collectively making hundreds of millions of dollars by using YouTube's Content ID tools to monetize these videos.

**GOOGLE PLAY**

Google Play is a digital storefront where people can buy millions of songs and books, thousands of movies and TV shows, and much more content. All Access, a new monthly subscription service, also gives people another way to access music. For a monthly fee they can listen to millions of songs across their devices.

**GOOGLE SEARCH**

We process more takedown notices, and faster, than any other search engine. We receive notices for far less than 1% of everything we index, which amounts to four million copyright removal requests per week that are processed, on average, in less than six hours.

**ADS**

Our policies restrict infringing sites from using our advertising services. In 2012, Google disabled ad serving to 46,000 sites for violating our policies that prohibit the placement of ads on sites with infringing content, the vast majority being violations Google detected before we were notified.

Sources:
3. Google, "Transparency Report: Removal Requests," January 2013 <http://goo.gl/jrQTj>



## Better Legitimate Alternatives to Piracy

Piracy often arises when consumer demand goes unmet by legitimate supply. As services ranging from Netflix to Spotify to iTunes have demonstrated, the best way to combat piracy is with better and more convenient legitimate services. The right combination of price, convenience, and inventory will do far more to reduce piracy than enforcement can.

The music industry has demonstrated the effectiveness of this approach by licensing a variety of music services including free, advertising-supported streaming services (like Spotify and Pandora), download stores (like iTunes), and on-demand subscription products (like All Access). A survey recently released by the Swedish music industry shows that since 2009 the number of people who download music illegally in Sweden has decreased by more than 25 percent, largely as a result of greater availability of improved legal services such as Spotify.[4] Similar trends were seen in a 2013 survey from NPD Group.[5] And a recent study conducted by Spotify found that overall piracy rates in the Netherlands has declined dramatically thanks to the popularity of legitimate digital music services.[6]

Film and television have had success combating piracy with legitimate alternatives, as well. In a recent interview with Stuff magazine, Netflix's Chief Content Officer Ted Sarandos said that when Netflix launches in a new country, piracy rates in that country drop. In his opinion, the best way to reduce piracy is by "giving good options."[7]

Signs have been positive that the creative industries are growing around the world, thanks in large part to digitization. IFPI reported that the recording industry grew its revenue in 2012 for the first time in over a decade, to $16.5 billion.[8]

Sources:
4. Mediavision, "Music Sweden File Sharing & Downloading," 2011 <http://goo.gl/XTUVH>
5. NPD Group, "Music Filesharing declined Significantly in 2012," Feburary 2012 <http://goo.gl/apJVo>
6. Spotify, "New Spotify study sees encouraging downwards trend in music piracy in the Netherlands," July 2013 <http://goo.gl/ImsYbB>
7. Stuff, "Netflix's Ted Sarandos talks Arrested Development, 4K and reviving old shows," May 2013 <http://goo.gl/O1rJq>
8. IFPI, "IFPI's Recording Industry in Numbers 2013," April 2013 <http://goo.gl/h2jKbS>

Nielson and Billboard reported that, in the same year, music purchases grew by 3.1% from the previous record high set in 2011, which was driven largely by digital purchases.[9] A 2013 study by Booz & Co. in Europe also found that digital media was driving growth in the European creative sector.[10]

Google has been at the forefront of creating new, authorized ways for consumers to obtain digital content. We build platforms where our users can legitimately purchase, consume, and discover entertainment and culture. We also pioneer innovative new approaches to monetizing online media.

## YouTube Partners

YouTube's community includes not only a billion individual users, but also more than a million partner channels from over thirty countries that earn money from their YouTube videos—from independent musicians and creators to some of the world's biggest record labels, movie studios, and news organizations. YouTube has developed a series of tools and programs to help content partners thrive, including partnerships with every major record label, as well as hundreds of collecting societies, independent labels, and music publishers to license recorded music on the site. As a result of partnerships like these, YouTube generates hundreds of millions of dollars each year for the content industry.

From musicians to athletes, teachers to comedians, tens of thousands of video creators are now part of the Partner Program established by YouTube in 2007, many thousands of them earning six-figure incomes from their YouTube channels. To further support this creative community, we have opened facilities like the new collaborative spaces in LA, London, and Tokyo as places for partners to shoot, edit and create their content. These facilities support the creative industry developing and monetizing their work through partner channels on YouTube.

 

Photos of the YouTube Space in Los Angeles. For more information, visit youtubespacela.com.

Sources:
9. Businesswire, "The Nielsen Company & Billboard's 2012 Music Industry Report," January 2013 <http://goo.gl/C4l8j2>
10. Booz & Co., "The Digital Future of Creative Europe: The Economic Impact of Digitization and the Internet on the Creative Sector in Europe," March 2013 < http://goo.gl/35tm0f>

To give YouTube creators more flexibility in monetizing and distributing content, in May 2013 we launched a pilot program for certain partners that will offer paid channels on YouTube with subscription fees starting at $0.99 per month. Our partners are experimenting with different pricing models to attract viewers, including offering 14-day free trials, and many offer discounted yearly rates.

Rentals are another option for content partners. Thanks to our partnerships with content creators, YouTube offers tens of thousands of movies and TV episodes to rent at standard industry pricing.

## CELEBRATING THE NEXT GENERATION OF CREATIVE VIDEO

One of the most inspiring things about YouTube is the way people around the world use it to express their passion and creativity—and to turn it into a career. Thousands of channels are now generating six-figure revenue through the YouTube Partner Program, and there are more than one million channels earning revenue.

To shine a light on the many inspiring things happening on YouTube, we recently published a report sharing the stories of 20 YouTube Partners in the United States who are changing lives, businesses, and in some cases, history.



Read the full report at goo.gl/bMRyj.

Thanks to the popularity of music videos and YouTube's agreements with record labels and music publishers to feature them, YouTube has become an important destination for music. So much so that, as of February 2013, Billboard magazine's Hot 100 chart now incorporates YouTube views when ranking a song's popularity. The 2013 Digital Music Report from IFPI,[11] an international association representing the recording industry, concluded that 90% of Internet users are aware of YouTube, and that the service attracts a large global audience.

Each time a music fan chooses YouTube over an unauthorized source for music, it's a victory against piracy—unlike previous generations of music fans who were raised on unauthorized sources for music, today's young fans have YouTube as a legal, compelling way to experience music online. And because of our licensing agreements with our partners in the music industry, rightsholders are compensated when fans visit YouTube to experience music videos.

## Google Play

More than 900 million Android devices have been activated around the world, presenting a tremendous opportunity to creative industries. Google Play is a global service that helps rightsholders and creators sell their applications or content directly to Google users. It's a digital store where people can find, purchase, and enjoy entertainment for their devices—from computers to tablets to smartphones. We've partnered with all of the major record labels, publishers, and movie studios to offer millions of songs and books, thousands of movies and TV shows, and hundreds of magazines that can be enjoyed across devices. In the last year, Google Play digital content, including music and movies, has launched in 21 new countries, including India, Mexico and Russia.

### MUSIC

Google Play also offers a store where users can purchase new music, a music locker to store existing collections of songs, and a subscription service to access millions of songs from the Google Play collection. Today there are more than 18 million songs available for purchase from Google Play. Google also has "scan-and-match" licenses that enable users to access their personal music collections from any connected device, without the time-consuming process of uploading those files. Our new music subscription service, All Access, lets users listen to millions of songs on-demand for a monthly fee.

These products are driving revenue for the music industry. And thanks to our partnerships with rightsholders around the world, Google Play Music is available to a global audience.

Sources:
11. IFPI, "IFPI Digital Music Report 2013," 2013 <http://goo.gl/DsZ3p>

**MOVIES AND TV SHOWS**

Google Play has partnered with all of the major film studios in the U.S. and many local studios in countries overseas to offer thousands of movies and TV shows that can be rented or purchased. We also offer innovative features that take advantage of a digital format to drive user engagement, such as Info Cards that appear when a movie or TV show is paused and that give more information about the actors and music in a scene.

**BOOKS AND MAGAZINES**

Google Play is home to the world's largest selection of eBooks – with more than 5 million titles available. More than 48,000 publishers have joined the Partner Program to promote their books online, including nearly every major U.S. publisher. We have also partnered with major publishers to offer hundreds of magazines for purchase or subscription in the Google Play store, creating a new market for magazines and newspapers. Users are able to access their books and magazines on any of their devices.

**APPS AND GAMES**

Google Play is an engine of economic opportunity for application and game developers because it gives them a free platform to build on and reach millions of users. More than a million apps and games are available for sale or for free on Google Play, and they've been downloaded over 50 billion times.

Several of the most popular apps are delivering licensed music, movies, and TV shows to users.

- ✓ **Netflix** allows subscribers to stream popular TV and movies to Android devices. Its Android application launched in 2011.

- ✓ **Pandora** creates personalized music stations and streams songs directly to users.

- ✓ **Spotify** is an interactive music service allowing users access to a catalog of licensed music.

Google recently launched Google Play Games, an app that makes it easy to discover new games, track achievements and scores, and play games with friends around the world. Google Play is an opportunity for game developers to showcase their creativity and sell their apps directly to gamers.



More than one billion unique users visit YouTube each month and together watch more than six billion hours of video. And more than 100 hours of video are uploaded to YouTube every minute, spanning every conceivable topic from politics to comedy, from daredevil sports to religion. YouTube has been a transformational force in the world of creative expression, a global video platform at a scale never imagined.

## Content ID: A Win-Win Solution

Beginning in 2007, YouTube developed and launched the most advanced content identification system in the world, called Content ID. With this system, rightsholders are able to identify user-uploaded videos that are entirely or partially their content, and choose, in advance, what they want to happen when those videos are found.

This is how it works: Rightsholders deliver YouTube reference files (audio-only or video) of content they own, metadata describing that content, and policies describing what they want YouTube to do when it finds a match. YouTube compares videos uploaded to the site against those reference files. Our technology automatically identifies the content and applies the rightsholder's preferred policy.

**Rightsholders can choose among three policies when an upload matches their content:**



Thanks to the options that Content ID affords to copyright owners, it's not just an anti-piracy solution, but also a new business model for copyright owners and YouTube alike. The majority of partners using Content ID choose to monetize their claims and many have seen significant increases in their revenue as a result.

Content ID is good for users as well. When copyright owners choose to monetize or track user-submitted videos, it allows users to continue to freely remix and upload a wide variety of new creations using existing works.



**The majority of partners using Content ID choose to monetize their claims, and many have seen significant increases in their revenue as a result.**

## CONTENT ID STATS

Content ID is the premier automated video content identification system in the world. The following statistics provide a sense of the impressive scale and technical sophistication of the system:

More than

# 4,000 partners

**use Content ID, including major U.S. network broadcasters, movie studios and record labels.**

Content ID scans over

# 250 years

**of video every day.**

More than

# 200 million videos

**have been claimed with the help of Content ID.**

We have more than

# 15 million active reference files

**In the Content ID database, that's over 1.5 million hours of material.**

10

## YouTube Copyright Policies

The vast majority of the 100 hours of video uploaded to YouTube every minute will not infringe anyone's copyright. Nevertheless, YouTube takes seriously its role in educating YouTube users about copyright and creating strong incentives to discourage infringing activity. As a result, YouTube has a number of policies in place designed to discourage copyright infringement and terminate repeat offenders.

For example:



When YouTube removes a video in response to a valid copyright removal notice, we notify the user and apply a "strike" to the account of the user who uploaded the video.

Upon receipt of one "strike," the user loses a number of account privileges, including the ability to upload videos longer than 15 minutes and to use our "Hangouts On Air" live-streaming platform.

By completing an online "Copyright School" program and receiving no further strikes during a six-month period, the user can both become educated about copyright and have one strike removed.

Upon receipt of three strikes, the user's account will be suspended and all the videos uploaded to the account will be removed.

11

## The YouTube Copyright Center

In addition to the Content ID system, copyright owners and their representatives can submit copyright removal notices through the YouTube Copyright Center, which offers an easy-to-use web form, as well as extensive information aimed at educating YouTube users about copyright. The Copyright Center also offers YouTube users a web form for "counter-noticing" copyright infringement notices that they believe are misguided or abusive.



Glove and Boots explains copyright in the YouTube Copyright Center: youtube.com/yt/copyright.

## YouTube Content Verification Program

YouTube offers a Content Verification Program for rightsholders who have a regular need to submit high volumes of copyright removal notices and have demonstrated high accuracy in their prior submissions. This program makes it easier for rightsholders to search YouTube for material that they believe to be infringing, quickly identify infringing videos, and provide YouTube with information sufficient to permit us to locate and remove that material, all in a streamlined manner intended to make the process more efficient.



**Google Web Search**

There are more than 60 trillion addresses on the web. Only an infinitesimal portion of those trillions infringe copyright, and those infringing pages cannot be identified by Google without the cooperation of rightsholders. Nearly every paragraph of text, photograph, video, sound recording, or piece of software is potentially protected by copyright law. Moreover, copyright laws generally permit some uses, such as parodies and quotation, even over a copyright owner's objection. So while we don't want to include links to infringing pages in our search results, Google needs the cooperation of copyright owners to separate the authorized or unobjectionable uses from infringing ones.

Google relies on copyright owners to notify us when they discover that a search result infringes their rights and should be removed. These notices are submitted through procedures that are consistent with the Digital Millennium Copyright Act (DMCA) and similar laws that apply to providers of online services.[12]

To help copyright owners submit these notices, Google has developed a streamlined submission process. There is no search engine that processes as many copyright removal notices as Google does, and none that process them more quickly.

For example:

✓ Copyright owners and their agents submitted more than 57 million web pages for removal in 2012

Notes:
12. The DMCA is a U.S. law that provides qualifying online service providers like Google with a safe harbor from monetary liability for copyright infringement claims. One of the requirements of these safe harbor provisions is that the service provider (Google, in this case) remove or disable access to allegedly infringing material upon receiving a request that meets certain requirements. Laws governing other jurisdictions, such as Europe's E-Commerce Directive, have similar requirements for service providers.

✔ Between December 2011 and November 2012, we removed from search 97.5% of all URLs specified in copyright removal requests. For the remaining sites, we either needed additional information, were unable to find the page, or concluded that the material was not infringing

✔ Our average turnaround time for copyright notices is less than 6 hours.

In addition, Google incorporates the number of valid copyright removal notices we receive for any given site as a signal in our ranking algorithm, as described below.

## Submitting Removal Notices

The fastest and most efficient way to submit a copyright removal notice to Google is through our content removal web form, which accepts many different kinds of removal requests, including copyright requests. Our web form is consistent with the DMCA and similar laws, and provides a simple and efficient mechanism for copyright owners from countries around the world. During 2012, approximately 16,000 different entities used our web form to submit copyright removal notices from search results.

In addition to the public content removal web form, for copyright owners who have a proven track record of submitting accurate notices and who have a consistent need to submit thousands of URLs each day, Google created the Trusted Copyright Removal Program for Web Search (TCRP). This program streamlines the submission process, allowing copyright owners or their enforcement agents to submit large volumes of URLs on a consistent basis. At the end of 2012, there were approximately 50 TCRP partners, who together submitted 95% of the URLs submitted during the year.

**At the end of 2012, there were approximately 50 Trusted Copyright Removal Program partners, who together submitted 95% of the URLs submitted during the year.**

## REMOVAL REQUESTS FOR SEARCH SKYROCKET

Since launching new submission tools for copyright owners and their agents in 2011, we have seen remarkable growth in the number of pages that copyright owners have asked us to remove from search results. In fact, today we receive removal requests for more URLs every week than we did in the twelve years from 1998 to 2010 combined. At the same time, Google is processing the notices we receive for Search faster than ever before—currently, on average, in less than six hours.

Google has a strong track record of developing solutions that scale efficiently. The trend line is striking—from more than three million pages for all of 2011 to more than 4 million pages per week today. As the numbers continue to swell, it becomes both more difficult and more important to detect and pick out the abusive and erroneous removal notices.

Google has never charged copyright owners for providing these services, and we will continue to invest substantial resources and engineering effort into improving our procedures for receiving and processing copyright removal notices.



**Top 10 Reporting Organizations in 2012**

| Organization | Value |
|---|---|
| Degban Ltd. | 11M |
| RIAA, Inc. | 8M |
| BPI Ltd. | 7M |
| Takedown Piracy LLC | 5.8M |
| DtecNet | 4M |
| Marketly | 3.5M |
| Fox Group Legal | 2.7M |
| NBC Universal | 2.4M |
| BAF | 1.5M |
| Remove Your Media LLC | 1.4M |



**Top 10 Copyright Owners in 2012**

| Copyright Owner | Value |
|---|---|
| RIAA member companies | 8M |
| Froytal Services Ltd. | 6.6M |
| Microsoft Corporation | 6.2M |
| BPI Ltd. member companies | 3.8M |
| FOX | 2.5M |
| NBCUniversal | 2.4M |
| RK NetMedia Inc. | 1.6M |
| Warner | 1.2M |
| BPI Ltd. | 1.1M |
| FUNimation Entertainment | .8M |

## Transparency

When we remove material from search results, we believe users and the public should be able to see who made the removal request and why. Because copyright infringement allegations are the basis for more than 95% of the legal requests that we receive to remove items from search results, we have taken the following steps to ensure transparency:

- ✓ **Maintaining an ongoing Transparency Report.** In 2012, we added details regarding copyright removal notices to our Transparency Report site.[13] Updated daily, the site shows the aggregate number of URLs that we have been asked to remove, as well as who submitted the notices, on behalf of which copyright owners, and for which websites.

- ✓ **Notifying webmasters of removals.** If a website operator uses Google's Webmaster Tools, notification will be provided to webmasters there when a web page in their domain has received a takedown notice.[14]

- ✓ **Informing users when results have been removed from their results.** When users perform a search where results have been removed due to a copyright complaint, Google displays the following notice:

> *In response to a complaint we received under the US Digital Millennium Copyright Act, we have removed 1 result(s) from this page. If you wish, you may read the DMCA complaint that caused the removal(s) at ChillingEffects.org.*

- ✓ **Providing copies of notices to Chilling Effects.** Since 2002, Google has provided a copy of each copyright removal notice that we receive for search results to the nonprofit organization Chilling Effects. By gathering together copyright removal notices from a number of sources, including Google and Twitter, Chilling Effects fosters research and examination of removal notices submitted by copyright owners.[15]

## Detecting and Preventing Abuse

Google works hard to detect and prevent abuses of the copyright removal process. From time to time, we may receive inaccurate or unjustified copyright removal requests for search results that clearly do not link to infringing content.

Sources:
13. Google, "Transparency Report: Removal Requests," January 2013 < http://goo.gl/jrQTj>
14. Google, "Webmaster Tools" 2013 <http://goo.gl/JxSTF>
15. Chilling Effects, "Legal Scholarship Using Chilling Effects," December 2010 <http://goo.gl/Xez14>

## EXAMPLES OF DMCA ABUSE

Here are a few examples of requests that have been submitted through our copyright removals process that were clearly invalid copyright removal requests. In each case, we did not remove the URL in question from search results.

• A major U.S. motion picture studio requested removal of the Internet Movie Database (IMDb) page for a movie released by its own studio, as well as the official trailer posted on a major authorized online media service.

• A U.S. reporting organization working on behalf of a major movie studio twice requested removal of a movie review on a major newspaper website.

• A driving school in the U.K. requested the removal of a competitor's homepage from Google Search, on the grounds that the competitor had copied an alphabetized list of cities and regions where instruction was offered.

• A content protection organization, acting on behalf of motion picture, record, and sports programming companies, requested the removal of search results. They linked only to copyright removal requests on Chilling Effects that had originally been submitted by one of its clients.

• An individual in the U.S. requested the removal of search results that link to court proceedings referencing her first and last name on the ground that her name was copyrightable.

• Multiple individuals in the U.S. requested the removal of search results linking to blog posts and web forums that associated their names with certain allegations, locations, dates, or negative comments.

• A company in the U.S. requested the removal of search results that link to an employee's blog posts about unjust and unfair treatment.

In 2012, we terminated two partners from the Trusted Copyright Removal Program for Web Search for repeatedly sending inaccurate notices through our high-volume submission mechanisms. Because the TCRP is reserved for partners with a track record of submitting accurate notices, access to the program can be revoked where a partner falls short of these high standards.

As the volume of removal notices continues to rise, detecting inaccurate or abusive notices continues to pose a challenge. Google invests continuously in engineering and machine learning solutions to address this risk. The Transparency Report has also proven useful in detecting abusive notices, as journalists, webmasters, and other interested members of the public have examined the data made available there.

Webmasters may also submit a counter-notice if they determine that a page on their site has been removed from Google Search results due to an erroneous copyright removal notice. Google affords webmasters two ways to be notified if any pages on their sites are targeted by removal notices. If the site operator uses Google's Webmaster Tools, notification will be provided to webmasters there. Alternatively, the search feature on the Transparency Report will show copyright removal notices received for a domain.

## Using Copyright Removal Notices in Ranking

In addition to removing pages from search results when notified by copyright owners, Google also factors in the number of valid copyright removal notices we receive for any given site as one signal among the hundreds that we take into account when ranking search results. As a result, sites with high numbers of removal notices may appear lower in search results. We believe that this ranking change should help users find legitimate, quality sources of content more easily.

While we use the number of valid copyright removal notices as a signal for ranking purposes, we do not remove pages from results unless we receive a specific removal request for the page. As shown on the Transparency Report, we generally receive removal notices for a very small portion of the pages on a site. Even for the websites that have received the highest numbers of notices, the number of noticed pages is typically only a tiny fraction of the total number of pages on the site. It would be inappropriate to remove entire sites under these circumstances.

**Sites with high numbers of removal notices may appear lower in search results.**

## SEARCH AND PIRACY: THE REALITY

In reflecting on the role search engines can play in addressing the problem of piracy, commentators often overlook some important realities:

**1. Search is not a major driver of traffic to pirate sites.**

Google Search is not how music, movie, and TV fans intent on pirating media find pirate sites. All traffic from major search engines (Yahoo, Bing, and Google combined) accounts for less than 16% of traffic to sites like The Pirate Bay.[16] In fact, several notorious sites have said publicly that they don't need search engines, as their users find them through social networks, word of mouth, and other mechanisms.[17] Research that Google co-sponsored with PRS for Music in the UK further confirmed that traffic from search engines is not what keeps these sites in business.[18] These findings were confirmed in a recent research paper published by the Computer & Communications Industry Association.[19]

**2. Search can't eradicate pirate sites.**

Search engines do not control what content is on the Web. There are more than 60 trillion web addresses on the Internet, and there will always be new sites dedicated to making copyrighted works available, as long as there is money to be made doing so. According to recent research, replicating these sites is easy and inexpensive, and attempts to make them disappear should focus on eradicating the business model that supports them.[20]

**3. Volume of allegedly 'piracy-related' queries is dwarfed by broader queries.**

When it comes to building anti-piracy measures, we prioritize efforts where they can make the most difference. Google Search receives more than three billion queries each day. We want to focus our efforts where the users are.

The good news is that the most popular queries relating to movies, music, books, video games, and other copyrighted works return results that do not include links to infringing materials. This is thanks to both our constant improvements to the algorithms that power Google Search, and the efforts of rightsholders to prioritize and target their copyright removal notices.

So when some critics focus on infringing materials appearing in search results for particular queries, it is important to consider how many users actually make those queries. During the first six months of 2013, Google users searched for [21]:

| | |
|---|---|
| "carly rae jepsen call me maybe" **16 TIMES MORE OFTEN THAN** "carly rae jepsen call me maybe mp3" | "flo rida whistle" **30 TIMES MORE OFTEN THAN** "flo rida whistle download" |
| "game of thrones" **200 TIMES MORE OFTEN THAN** "game of thrones download" | "django unchained" **1,000 TIMES MORE OFTEN THAN** "django unchained free download" |
| "30 rock" **5,000 TIMES MORE OFTEN THAN** "30 rock free stream" | "katy perry" **200,000 TIMES MORE OFTEN THAN** "free katy perry mp3" |

## Removing Terms Associated with Piracy from Autocomplete and Related Search

Autocomplete is a convenience feature in Google Search that attempts to "complete" a query as it's typed based on similar queries that other users have typed. Related Search shows queries that other users have typed that may be similar to yours. Google has taken steps to prevent terms closely associated with piracy from appearing in Autocomplete and Related Search. This is similar to the approach we have taken for a narrow class of terms related to pornography, violence, and hate speech.

## The Next Step: Making Legitimate Alternatives More Visible

In addition to removing infringing pages from search results and using valid removal notices as a ranking signal, Google has an ongoing dialogue with content owners about ways to increase the visibility of authorized services in search results.

For example, in 2011, we launched a new open standard for the markup of websites which enables authorized music sites to more prominently feature streaming "preview" music content in our search results ("rich snippets").[22] With this standard, anyone searching for popular music can immediately stream authorized previews right in the search results. A number of music sites (including Amazon and Last.FM) have implemented the new standard, distinguishing their offerings from results from unauthorized sites.



**Lady Gaga |** Free Music, Tour Dates, Photos, Videos
www.myspace.com/**ladygaga** - Cached
**Lady Gaga's** official profile including the latest music, albums, songs, music videos and more updates.

| | | |
|---|---|---|
| Judas | ♫ 4:10 | Judas |
| The Edge Of Glory | ♫ 5:21 | Born This Way |
| Born This Way | ♫ 4:20 | Born This Way |
| You And I | ♫ 5:07 | Born This Way |

Sources:
16. Techdirt, "Data Shows: Removing 'Rogue Sites' From Search Won't Make Much of A Difference," November 2011 <http://goo.gl/XE5oa>
17. TorrentFreak, "Pirate Bay and isoHunt Respond to Google Search Result Punishment," August 2012 <http://goo.gl/DUQ0F>
18. BAE Systems Detica, "The Six Business Models for Copyright Infringement," June 2012 <http://goo.gl/tyIZd>
19. CCIA, "The Search Fixation: Infringement, Search Results, and Online Content," 2013 <http://goo.gl/zIM5LF>
20. Northeastern University, "Clickonomics: Determining the Effect of Anti-Piracy Measures for One-Click Hosting," 2013 <http://goo.gl/Y3wST>
21. These queries were raised by RIAA and MovieLabs in discussions with Google.
22. Google, "Webmaster Tools: Rich snippets - Music," May 2013 <http://goo.gl/7M8Ea>

There is more that authorized music, TV, and movie sites can do to help their sites be more effectively indexed by search engines. The film and television industry has launched wheretowatch.org, and the music industry has launched whymusicmatters.com to help consumers find legitimate channels for buying films, TV shows, and songs. And NARM has recently offered advice to online music retailers on optimizing their sites for better performance in search engine results.[23] But these industries could do even more to build pages specific to albums, movies, and TV shows that could then appear in search engine results (for example, a specific page on "Where to Watch Modern Family online").

Indexing subscription music and video services is also a challenge for search engines. It is difficult for a search engine to return results from licensed services like Spotify or Netflix if it doesn't know what songs and programs are available from those services. With more information, search engines could return better, more relevant legitimate results to users seeking the content. Google looks forward to continuing collaborative efforts with content owners and authorized services, intended to make the offerings of authorized services more visible in search results.

Sources:
23. NARM, "INFOGRAPHIC: Search Engine Optimization for Music Websites," May 2013 <http://goo.gl/UREw6>



**Advertising**

## Following the Money

The most effective way to combat rogue sites that specialize in online piracy is to cut off their money supply. These sites are almost exclusively for-profit enterprises, and so long as there is money to be made by their operators, other anti-piracy strategies will be far less effective. As a global leader in online advertising, Google is committed to rooting out and ejecting rogue sites from our advertising services. We are also working with other leaders in the industry to craft best practices aimed at raising standards across the entire online advertising industry.

## Best Practices

In April 2011, Google was among the first companies to certify compliance in the Interactive Advertising Bureau's (IAB's) Quality Assurance Certification program, through which participating advertising companies will take steps to enhance buyer control over the placement and context of advertising and build brand safety.[24] This program will help ensure that advertisers and their agents are able to control where their ads appear across the web.

In July 2013, Google worked with the White House's Office of the U.S. Intellectual Property Enforcement Coordinator (IPEC) and other leading ad networks to participate in Best Practices and Guidelines for Ad Networks to Address Piracy and Counterfeiting.[25] Under these best practices, ad networks will maintain and post policies prohibiting websites that are principally dedicated to engaging in copyright piracy from participating in the ad network's advertising programs. By working across the industry, these best practices should help reduce the financial incentives for pirate sites by cutting off their revenue supply while maintaining a healthy Internet and promoting innovation.

Sources:
24. IAB, "Quality Assurance Guidelines," November 2011 <http://goo.gl/BfOny>
25. The White House, "Coming Together to Combat Online Piracy and Counterfeiting," July 2013 <http://goo.gl/86x1QE>

# AdSense

More than two million web publishers use AdSense to make money from their content on the web, making it the chief Google advertising product used by online publishers. The overwhelming majority of those publishers are not engaged in any kind of copyright infringement. AdSense has always prohibited publishers from using AdSense to place ads on pages that contain pirated content, and Google proactively monitors the AdSense network to root out bad publishers.

- ✓ In 2012, Google disabled ad serving to 46,000 sites for violating our policies prohibiting the placement of ads on sites with infringing content, the vast majority being violations Google detected before we were notified.

- ✓ Almost all AdSense ad formats include a link that permits a copyright owner to report sites that are violating Google's policies. Copyright owners may also notify us of violations through a web form. In 2012 we took action on several thousand URLs in response to these complaints.

Violating URL: *
Format: http://www.SiteURL.com or http://www.SiteURL.com/page.html

Please select the type of media on which you saw the violation *
○ website
○ mobile website
○ video
○ feed

Description of location on URL: *

- ✓ Each time we receive a valid copyright removal notice for Search, we also blacklist that page from receiving any AdSense advertising in the future.

Google does not want to be in business with rogue sites specializing in piracy. Thanks to our ongoing efforts, we are succeeding in detecting and ejecting these sites from AdSense. While a rogue site might occasionally slip through the cracks, the data suggests that these sites are a vanishingly small part of the AdSense network. For example, we find that AdSense ads appear on far fewer than 1% of the pages that copyright owners identify in copyright removal notices for Search.

# DoubleClick

DoubleClick offers a suite of online advertising platform solutions for both advertisers and web publishers. The principal customers for DoubleClick services are large advertisers, ad agencies, large publishers, and ad networks. It is virtually unheard of for these sorts of "blue chip" commercial entities to be operating rogue sites specializing in copyright infringement.

DoubleClick also offers a free service to smaller web publishers on a self-service basis through the DoubleClick for Publishers (DFP) Small Business program. Although the program has policies in place to prohibit its use in connection with infringing activity, rogue publishers have tried to sneak in through this door. Publishers do not pay Google to use this platform, nor does Google pay them for using it. Nevertheless, Google has recently revised its policies and stepped up enforcement efforts for DoubleClick for Publishers Small Business in an effort to deny rogue sites access to the service as a platform for serving ads sourced from other networks.

# AdWords

AdWords is Google's premier advertising product, responsible for the advertisements that appear next to Google search results, as well the text advertisements on sites across the web. Advertisers pay Google for these placements, generally on a cost-per-impression or cost-per-click basis.

Rogue sites specializing in online piracy generally do not use AdWords. Google receives very few complaints regarding AdWords being used by rogue pirate sites. Nevertheless, we maintain strict policies forbidding the use of AdWords to promote copyright infringement. We take a variety of proactive and reactive steps, through both manual and automated review, to enforce our policies.

## BLOGGER

Blogger is Google's free blog publishing platform, which enables users to create and update blogs. We remain vigilant against use of the Blogger platform by pirates looking to set up a free website. Consistent with other Google products that host user-uploaded content, we will remove infringing blog posts when properly notified by a copyright owner, and will terminate the entire blog where multiple complaints establish it as a repeat infringer.

Blogger has also created an automated bulk submission tool for copyright owners who have a track record of reliable submissions and a regular need to submit large volumes of takedown notices. This tool allows qualified copyright owners to obtain rapid removals of infringing posts appearing on Blogger.

## GOOGLE'S ANTI-PIRACY PRINCIPLES

**Create More and Better Legitimate Alternatives.** The best way to battle piracy is with better, more convenient, legitimate alternatives to piracy. By developing licensed products with beautiful user experiences, we help drive revenue for creative industries.

**Follow the Money.** Rogue sites that specialize in online piracy are commercial ventures, which means the most effective way to combat them is to cut off their money supply. Google is a leader in rooting out and ejecting rogue sites from our advertising and payment services, and are raising standards across the industry.

**Be Efficient, Effective, and Scalable.** Google strives to implement anti-piracy solutions that work. For example, beginning in 2010, Google has made substantial investments in streamlining the copyright removal process for search results. As a result these improved procedures allow us to process copyright removal requests for search results at the rate of four million requests per week with an average turnaround time of less than six hours.

**Guard Against Abuse.** Unfortunately, fabricated copyright infringement allegations can be used as a pretext for censorship and to hinder competition. Google is committed to ensuring that, even as we battle piracy online, we detect and reject bogus infringement allegations, such as removals for political or competitive reasons.

**Provide Transparency.** We disclose the number of requests we receive from copyright owners and governments to remove information from our services. We hope these steps toward greater transparency will inform ongoing discussions about content regulation online.

# White House announcements regarding Best Practices and Guidelines for Ad Networks



the WHITE HOUSE  *PRESIDENT BARACK OBAMA*    ★ ★ ★ ★ ★    📧 Get Email Updates  |  Contact Us

| BLOG | PHOTOS & VIDEO | BRIEFING ROOM | ISSUES | the ADMINISTRATION | the WHITE HOUSE | our GOVERNMENT |

Home • The Administration • Office of Management and Budget

🔍 Search WhiteHouse.gov  **Search**



# Office of Management and Budget

| About | OMBlog | The Budget | Management | Regulation & Information Policy | Legislative Information | Join OMB | Contact OMB |

## Coming Together to Combat Online Piracy and Counterfeiting

📶 Subscribe

Posted by **Victoria Espinel** on July 15, 2013 at 08:33 AM EST

[ ✉ E-Mail ]  [ 🐦 Tweet ]  [ f Share ]  [ + ]

Today, 24/7 Media, Adtegrity, AOL, Condé Nast, Google, Microsoft, SpotXchange, and Yahoo!, with the support of the Interactive Advertising Bureau, committed to a set of best practices to address online infringement by reducing the flow of ad revenue to operators of sites engaged in significant piracy and counterfeiting. The Administration strongly supports voluntary efforts by the private sector to reduce infringement and we welcome the initiative brought forward by the companies to establish industry-wide standards to combat online piracy and counterfeiting by reducing financial incentives associated with infringement. We believe that this is a positive step and that such efforts can have a significant impact on reducing online piracy and counterfeiting.

It is critical that such efforts be undertaken in a manner that is consistent with all applicable laws and with the Administration's broader Internet policy principles emphasizing privacy, free speech, fair process, and competition. We encourage the companies participating to continue to work with all interested stakeholders, including creators, rightholders, and public interest groups, to ensure that their practices are transparent and fully consistent with the democratic values that have helped the Internet to flourish. We also encourage other participants in the online advertising space to consider adopting voluntary initiatives that protect ad networks, publishers, advertisers, creators, rightholders, and above all, consumers.

The Administration is committed to reducing infringement of American intellectual property. We will continue to pursue a comprehensive approach to the problems associated with infringement, including increased law enforcement, educational awareness, and increased cooperation with our trading partners in order to promote innovation, support jobs, increase exports, and maintain our global competitiveness.

Today's news is a good example of how the public and private sector can work to combat piracy and counterfeiting while protecting and, in fact, further encourage the innovation made possible by an open Internet.

Learn more about the Administration's commitment and ongoing efforts to protect intellectual property as a key driver of our economy in my blog post here and in the 2013 Joint Strategic Plan on Intellectual Property Enforcement.

*Victoria Espinel is the U.S. Intellectual Property Enforcement Coordinator*

Statements announcing the new voluntary initiative can be found below:

- AOL
- Google
- Microsoft
- Yahoo

See more about Economy



GIVE FEEDBACK ABOUT THIS PAGE

YOUR FEDERAL TAXPAYER RECEIPT

Launch the Receipt



## WHITE HOUSE BLOGS

The White House Blog
Middle Class Task Force
Council of Economic Advisers
Council on Environmental Quality
Council on Women and Girls
Office of Intergovernmental Affairs
Office of Management and Budget
Office of Public Engagement
Office of Science & Tech Policy
Office of Urban Affairs
Open Government
Faith and Neighborhood Partnerships
Social Innovation and Civic Participation
US Trade Representative
Office National Drug Control Policy

### CATEGORIES

AIDS Policy
Blueprint for an America Built to Last
Equal Pay
White House Internships
Civil Rights
Defense
Disabilities
Economy

More ▾    Next Blog»          Built-On    Built-At    Report Issue    Create Blog    Sign In

# Google Public Policy Blog

Monday, July 15, 2013

## Ad Networks Agree on Industry Best Practices to Combat Piracy and Counterfeiting

Posted by Susan Molinari, Vice President, Public Policy and Government Relations

With more than 30 trillion individual pages on the web, online piracy and counterfeit remains a challenge. Google takes that challenge seriously. Using cutting-edge technology like YouTube's Content ID and innovative copyright removal tools for Web Search, we develop and deploy antipiracy solutions with the support of hundreds of Google employees. In addition to developing legitimate, innovative, and convenient content offerings (such as Google Play and YouTube, through which our partners together generate hundreds of millions of dollars), we continue to develop solutions to help fight piracy and counterfeit online. We think one of the most effective ways to do this is to cut off the money supply to rogue sites that specialize in piracy or counterfeiting. To that end, in 2012 we disabled ad serving to 46,000 sites for violating our policies on copyright infringing content and shut down more than 82,000 accounts for attempting to advertise counterfeit goods. Nearly 99% of our account suspensions were discovered through our own detection efforts and risk models.

There's always more that can be done by the industry to starve these infringing sites of advertising revenues. Today, working with the White House's Office of the U.S. Intellectual Property Enforcement Coordinator (IPEC), the Interactive Advertising Bureau (IAB), and other leading ad networks, we are pleased to participate in a set of voluntary Best Practices and Guidelines for Ad Networks to Address Piracy and Counterfeiting. Under these best practices, Ad Networks will maintain and post policies prohibiting websites that are principally dedicated to selling counterfeit goods or engaging in copyright piracy from participating in the Ad Network's advertising programs. By working across the industry, these best practices should help reduce the financial incentives for pirate sites by cutting off their revenue supply while maintaining a healthy Internet and promoting innovation.

Posted by Google Public Policy Blog at 8:09 AM
Labels: copyright, piracy, ad networks

**Search This Blog**

[                    ] Search

🔊 Site Feed

8558 readers
BY FEEDBURNER

**Archive**

[ Archive                ⬍ ]

**More Blogs from Google**

Visit our directory for more information about Google blogs.

**Get Blog Posts by E-mail**

[                    ]
Subscribe

**Follow us on Twitter**

**What We're Reading**

- 463 Blog: Inside Tech Policy
- CDT - PolicyBeta
- Cisco High Tech Policy Blog
- CNET Politics Blog
- EFF DeepLinks
- Future of Privacy Forum
- GigaOM
- Google European Policy Blog
- Google Public Sector Blog
- Hillicon Valley
- Intel Policy Blog
- John Palfrey's Blog
- Lessig Blog
- Microsoft On the Issues
- Peter Fleischer: Privacy...?
- PFF Blog
- Post I.T.
- Public Knowledge Blog
- Save the Internet
- Search Engine Land
- Susan Crawford Blog
- Tech Daily Dose
- Tech Dirt
- TechCrunch
- Technology Liberation Front
- Verizon Policy Blog
- Yahoo! Policy Blog

# Google blog posts regarding search removals

# Google **Official Blog**

Insights from Googlers into our products, technology, and the Google culture



More ▾   Next Blog»   Built-On   Built-At   Report Issue   Create Blog   Sign In

## Controversial content and free expression on the web: a refresher

Posted: Monday, April 19, 2010



Two and a half years ago, we outlined our approach to removing content from Google products and services. Our process hasn't changed since then, but our recent decision to stop censoring search on Google.cn has raised new questions about when we remove content, and how we respond to censorship demands by governments. So we figured it was time for a refresher.

Censorship of the web is a growing problem. According to the Open Net Initiative, the number of governments that censor has grown from about four in 2002 to over 40 today. In fact, some governments are now blocking content before it even reaches their citizens. Even benign intentions can result in the specter of real censorship. Repressive regimes are building firewalls and cracking down on dissent online -- dealing harshly with anyone who breaks the rules.

Increased government censorship of the web is undoubtedly driven by the fact that record numbers of people now have access to the Internet, and that they are creating more content than ever before. For example, over 24 hours of video are uploaded to YouTube every minute of every day. This creates big challenges for governments used to controlling traditional print and broadcast media. While everyone agrees that there are limits to what information should be available online -- for example child pornography -- many of the new government restrictions we are seeing today not only strike at the heart of an open Internet but also violate Article 19 of the Universal Declaration of Human Rights, which states that: *"Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without*

*interference and to seek, receive and impart information and ideas through any media and regardless of frontiers."*

We see these attempts at control in many ways. China is the most polarizing example, but it is not the only one. Google products -- from search and Blogger to YouTube and Google Docs -- have been blocked in 25 of the 100 countries where we offer our services. In addition, we regularly receive government requests to restrict or remove content from our properties. When we receive those requests, we examine them to closely to ensure they comply with the law, and if we think they're overly broad, we attempt to narrow them down. Where possible, we are also transparent with our users about what content we have been required to block or remove so they understand that they may not be getting the full picture.

On our own services, we deal with controversial content in different ways, depending on the product. As a starting point, we distinguish between search (where we are simply linking to other web pages), the content we host, and ads. In a nutshell, here is our approach:

**Search** is the least restrictive of all our services, because search results are a reflection of the content of the web. We do not remove content from search globally except in narrow circumstances, like child pornography, certain links to copyrighted material, spam, malware, and results that contain sensitive personal information like credit card numbers. Specifically, we don't want to engage in political censorship. This is especially true in countries like China and Vietnam that do not have democratic processes through which citizens can challenge censorship mandates. We carefully evaluate whether or not to establish a physical presence in countries where political censorship is likely to happen.

Some democratically-elected governments in Europe and elsewhere do have national laws that prohibit certain types of content. Our policy is to comply with the laws of these democratic governments -- for example, those that make pro-Nazi material illegal in Germany and France -- and remove search results from only our local search engine (for example, www.google.de in Germany). We also comply with youth protection laws in countries like Germany by removing links to certain material that is deemed inappropriate for children or by enabling Safe Search by default, as we do in Korea. Whenever we do remove content, we display a message for our users that X number of results have been removed to comply with local law and we also report those removals to chillingeffects.org, a project run by the Berkman Center for Internet and Society, which tracks online restrictions on speech.

**Platforms that host content** like Blogger, YouTube, and Picasa Web Albums have content policies that outline what is, and is not, permissible on those sites. A good example of content we do not allow is hate speech. Our enforcement of these policies results in the removal of more content from our hosted content platforms than we remove from Google Search. Blogger, as a pure platform for expression, is among the most open of our services, allowing for example legal pornography, as long as it complies with the Blogger Content Policy. YouTube, as a

community intended to permit sharing, comments, and other user-to-user interactions, has its Community Guidelines that define its own rules of the road. For example, pornography is absolutely not allowed on YouTube.

We try to make it as easy as possible for users to flag content that violates our policies. Here's a video explaining how flagging works on YouTube. We review flagged content across all our products 24 hours a day, seven days a week to remove offending content from our sites. And if there are local laws where we do business that prohibit content that would otherwise be allowed, we restrict access to that content only in the country that prohibits it. For example, in Turkey, videos that insult the founder of modern Turkey, Mustafa Ataturk, are illegal. Two years ago, we were notified of such content on YouTube and blocked those videos in Turkey that violated local law. A Turkish court subsequently demanded that we block them globally, which we refused to do, arguing that Turkish law cannot apply outside Turkey. As a result YouTube has been blocked there.

Finally, our **ads products** have the most restrictive policies, because they are commercial products intended to generate revenue.

These policies are always evolving. Decisions to allow, restrict or remove content from our services and products often require difficult judgment calls. We have spirited debates about the right course of action, whether it's about our own content policies or the extent to which we resist a government request. In the end, we rely on the principles that sit at the heart of everything we do.

We've said them before, but in these particularly challenging times, they bear repeating: We have a bias in favor of people's right to free expression. We are driven by a belief that more information means more choice, more freedom and ultimately more power for the individual.

Posted by Rachel Whetstone, Vice President, Global Communications and Public Affairs



# Official Blog

Insights from Googlers into our products, technology, and the Google culture



More ▾   Next Blog»   Built-On   Built-At   Report Issue   Create Blog   Sign In

# Free expression and controversial content on the web

Posted: Wednesday, November 14, 2007

g+1 ⟨34⟩   Tweet ⟨2⟩   Like ⟨17⟩

Posted by Rachel Whetstone, Director of Global Communications and Public Affairs, EMEA

Our world would be a very boring place if we all agreed all the time. So while people may strongly disagree with what someone says, or think that a particular newspaper article is total nonsense, we recognize that each of us have the right to an opinion.

We also know that letting people express their views freely has real practical benefits. Allowing individuals to voice unpopular, inconvenient or controversial opinions is important. Not only might they be right (think Galileo) but debating difficult issues in the open often helps people come to better decisions.

While most people agree in principle with the right to free expression, the challenge comes in putting theory into practice. And that's certainly the case on the web, where blogs, social networks and video sharing sites allow people to express themselves - to speak and be heard - as never before.

At Google we have a bias in favor of people's right to free expression in everything we do. We are driven by a belief that more information generally means more choice, more freedom and ultimately more power for the individual. But we also recognize that freedom of expression can't be -- and shouldn't be -- without some limits. The difficulty is in deciding where those boundaries are drawn. For a company like Google with services in more than 100 countries - all with different national laws and cultural norms - it's a challenge we face many times every day.

In a few cases it's straightforward. For example, we have a global all-product ban against child pornography, which is illegal in virtually every country. But when it comes to political extremism it's not as simple. Different countries have come to different conclusions about how to deal with this issue. In Germany there's a ban on the promotion of Nazism -- so we remove Nazi content on products on Google.de (our domain for German users) products. Other countries' histories make commentary or criticism on certain topics especially sensitive. And still other countries believe that the best way to discredit extremists is to allow their arguments to be publicly exposed.

All this raises important questions for Internet companies like Google. Our products are, after all, specifically designed to help people create and communicate, to find and share information and opinions across the world. So how do we approach these challenges?

It should come as no surprise to learn people have different views about what should appear on our sites. How and where to draw the boundaries is the subject of lively debate even within Google. We think that's healthy. And partly because of this, we realize that creating a flawless set of policies on which everyone can agree is an impossible task.

Google is not, and should not become, the arbiter of what does and does not appear on the web. That's for the courts and those elected to government to decide. Faced with day-to-day choices, however, we look at our products in three broad categories: search, advertising and services that host other people's content.

Search is the least restricted category. We remove results from our index only when required by law (for example, when linked to content infringing copyright) and in a small number of other instances, such as spam results or results including unauthorized credit card and social security numbers. Where feasible, we tell our users when we remove results.

At the other, most restrictive, end of the spectrum, we have what might be called commerce products –- the text of the advertisements we carry, which are subject to clear ad content policies.

The most challenging areas are where we host other people's content -- offerings like Blogger, Groups, orkut and video. On the one hand, we're not generating the content and we aim to offer a platform for free expression. On the other hand, we host the content on our servers and want to be socially responsible. So we have terms that we ask our users to follow. (See Blogger and orkut for examples.)

So the question becomes: how do we enforce those terms? In general, Google does not want to be a gatekeeper. We don't, and can't, check content before it goes live, any more than your phone company would screen the content of your phone calls or your ISP would edit your

emails. Technology can sometimes help here, but it's rarely a full answer. We also have millions of active users who are vocal when it comes to alerting us to content they find unacceptable or believe may breach our policies. When they do, we review it and remove it where appropriate. These are always subjective judgments and some people will inevitably disagree. But that's because what's acceptable to one person may be offensive to another.

We also face the added complication that laws governing content apply differently in the different parts of the world in which we operate. As we all know, some governments are more liberal about freedom of expression than others. These legal differences create real technical challenges, for example, about how you restrict one type of content in one country but not another. And, in extreme cases, we face questions about whether a country's laws and lack of democratic processes are so antithetical to our principles that we simply can't comply or can't operate there in a way that benefits users.

But it's not only legal considerations that drive our policies. One type of content, while legal everywhere, may be almost universally unacceptable in one region yet viewed as perfectly fine in another. We are passionate about our users so we try to take into account local cultures and needs -- which vary dramatically around the world -- when developing and implementing our global product policies.

Dealing with controversial content is one of the biggest challenges we face as a company. We don't pretend to have all the right answers or necessarily to get every judgment right. But we do try hard to think things through from first principles, to be as transparent as possible about how we make decisions, and to keep reviewing and debating our policies. After all, the right to disagree is a sign of a healthy society.