Google Inc.  
1600 Amphitheatre Parkway  
Mountain View CA 94043



Main Phone 650 253-0000  
Main Fax 650 253-0001  
www.google.com

February 21, 2014

**By E-mail and First Class Mail**

The Honorable Jim Hood  
Attorney General of Mississippi  
P.O. Box 220  
Jackson, Mississippi 39205

The Honorable Jon Bruning  
Attorney General of Nebraska  
2115 State Capitol  
Lincoln, Nebraska 68509

The Honorable George Jepsen  
Attorney General of Connecticut  
55 Elm Street  
Hartford, Connecticut 06106

The Honorable David Louie  
Attorney General of Hawaii  
425 Queen Street  
Honolulu, Hawaii 96813

The Honorable Dustin McDaniel  
Attorney General of Arkansas  
323 Center Street, Suite 200  
Little Rock, Arkansas 72201

The Honorable Sean Reyes  
Attorney General of Utah  
Utah State Capitol Complex  
350 North State Street, Suite 230  
Salt Lake City, Utah 84114

Dear Generals:

Thank you for your letters of February 7 and February 12.  Our team looks forward to our meeting on February 24 and continuing the constructive dialogue we started in Denver.

Our responses to your follow-up requests are below, and also enclosed are slides we prepared for the Denver meeting, providing some additional background information on the massive scale of the issues Google faces and the breadth of our compliance efforts.

Neiman Decl.  
Ex. 23

We appreciate this opportunity to work directly with you on these important user-safety issues.

***1. Will Google agree to substantially increase both automated and human scrutiny of content uploaded to its services? If so, how?***

**Google's Growing Investments in Policy Compliance.** Google will continue to increase its already significant investments in policy enforcement efforts across our platforms, including those relating to ads, Autocomplete, and YouTube, among others.

In 2013, Google spent over **$100 million** on its policy enforcement teams and systems, and over a quarter billion dollars during the last three years. **In 2014, we will increase our spending in these areas by over 10% to $114.5 million.** Among other things, these investments will help improve our ability to identify and remove bad content from our systems, and better identify and terminate any users or advertisers who violate Google's policies relating to dangerous and illegal activity. As part of this effort, we plan to hire over **120 new employees** specializing in policy enforcement, giving us over 1,000 employees working in this area.

As we discussed, given the volume of data that flows over the internet and through our services, simply increasing the number of human reviewers is not generally the best way to identify bad content for removal.  For example, the substantial decrease in counterfeit ads appearing in AdWords was most attributable to enhancements made to our automated systems by a small team of talented engineers who specialize in identifying bad accounts, including those created by counterfeiters.  Although that work was led by a small team, the impact of their efforts in our fight against counterfeiters was substantial.  We will continue focusing our efforts on the most effective ways to combat content policy abuse on Google's hosted platforms, and to devoting the necessary engineering resources for improving our tools in this area.

**Additional Steps.**  Moreover, I am pleased to be able to tell you that Google has already taken steps directly in response to some of the specific concerns you have raised.  Given your feedback in Denver, **we expanded our Autocomplete policies** to cover even more predictions relating to the sale or promotion of dangerous and illegal activities, including drugs (prescription and illegal), slavery and sex trafficking, murder, and terrorism.  We have since removed over 1,200 predictions from Autocomplete, including things like "how to become a drug dealer", "how to get away with robbing a house", and "buy slaves", among many others.

Additionally, in response to your specific concerns about human trafficking, **we have added hundreds of terms to our list** of terms for which we will not return ads on YouTube and AdWords, such as "buy foreign women" or "purchase thai girl," among many others.

***2. Will Google agree to substantially increase the demotion and delisting in its search results of sites whose contents and services violate Google's' own content policies? If so, how?***

**Google's Existing Efforts.**  As we discussed in Denver, Google leads our industry in identifying and removing illegal and dangerous content that violates the content policies governing our hosted platforms and advertising services.  **In 2013**, **we removed over 359 million ads from AdWords, over 78 million videos from YouTube, and over 250,000 web pages from the AdSense network** for violations of our robust content policies.

In contrast to our hosted platforms, our search index reflects existing content on the web, and the sites linked in Google's search results are created and controlled by those sites' webmasters, not Google, meaning they are not subject to the same content policies applicable on our hosted platforms.   Given the First Amendment and free-expression issues at play, search is the least restrictive of our services, but it is important to keep in mind that for the vast majority of search queries run by our users, Google's search results link to legal content drawn from legitimate sources, i.e., not the type of content that has been the focus of our discussions.

It is our firm belief that Google should not be the arbiter of what is and is not legal on the web -- that is for the courts and government to decide.  Google removes results from its index in accordance with the law (e.g., in response to a valid court order or a DMCA notification), and in a small number of other instances, such as results including social security numbers or spam.  **In 2013, we removed over 200 million links from search in response to removal notices from copyright holders, and over 11,000 links in response to court orders.**

**Additional Steps.**  That being said, we agree that it is still important to address content that may pose a risk to user safety.  Regarding sites with potentially dangerous and illegal content, there are some simple steps that, taken in cooperation with Attorneys General and regulators, will make a significant difference in removing illegal web pages from appearing in search results.

In the area of rogue pharmacies for example, Google works closely with Legitscript, the industry leader in identifying rogue pharmacies online.  Google can help the states take advantage of this important resource in order to help identify the most visited unlicensed rogue pharmacy web pages suspected of dispensing prescription drugs.  We also understand that some of your offices may have already identified some of the worst perpetrators in this space.

Once identified, it should be easy enough to obtain orders declaring these web pages illegal and enjoining their continued operation under relevant laws (e.g., 21 U.S.C. § 882 (c), which expressly permits states to obtain injunctions against pharmacies dispensing prescription drugs in violation of state law).  If your offices were to submit a valid court order enjoining specific online pharmacy web pages as illegal, we would promptly remove those pages from search.

Some companies have used a similar approach in the counterfeiting fight to great effect.  By initiating domestic suits against counterfeit websites -- despite the fact that many of those sites are based and hosted overseas -- they have obtained and submitted to Google orders declaring those counterfeit web pages illegal, and in response we have removed the enjoined pages from search.  We hope to further

discuss the viability and potential impact of a similar approach here during our meeting on February 24.

**Sites in Search Results that Include Infringements.** Google has been the leader in the search industry in addressing search results linking to content that infringes copyrights.  For the vast majority of media-related queries, our search results return lawful content.  This is significant considering that we receive more than a billion queries each day, in dozens of languages, and 15% of those queries have never been searched on Google before.

As we noted, search results that include highly ranked links to sites hosting infringing materials are generated for only a small minority of queries.  Following our Denver meeting, in order to confirm that our statements about this were accurate, we ran an analysis of the frequency over the past three months of some of the search queries featured in your presentation.  We learned that in fact a search for "her" is 64 times more likely than "watch her online", a search for "grudge match" is 2736 times more likely than "grudge match solarmovie", and a search for "katy perry roar" is 40 times more frequent than "katy perry roar mp3".

For search results returned in response to queries we see relating to potential violations of copyright (e.g., "grudge match solarmovie"), which constitutes only a very small minority of the overall queries we see, Google relies on copyright owners to send us takedown notices as contemplated under the DMCA.  Over the past three years, Google has dedicated significant resources to make that process work quickly and efficiently.  The regularity with which copyright owners use our DMCA process today is a testament to its usefulness to copyright owners.

**Demotion**.  As we noted, Google is the only search engine that includes a demotion signal in its search algorithms against sites for which we have received a large number of valid DMCA takedown notices.  However, as discussed in Denver, demotion in ranking is not a silver bullet.  We will continue exploring ways that we can improve the demotion signal, including through cooperation with the content industry, who must also do its part to help combat infringing content on the web by making legitimate content available to consumers and helping to identify specific materials that it believes infringes its rights.

It has been suggested that Google should remove entire sites from search results, rather than relying on copyright owners to identify specific infringing pages for removal.  As we explained in Denver, we do not support this approach, which was rejected by Congress in 2012 as part of the controversial Stop Online Piracy Act (SOPA). The DMCA already provides copyright owners with an effective statutory framework for removing any infringing page on a site, whereas removing an entire site would have a chilling effect on free speech by entirely removing lawful pages that no one has identified as infringing.

Whole-site removal also sends the wrong message internationally by favoring over-inclusive private censorship over the rule of law.  If Google embraces such an approach to address domestic law violations (e.g., copyright), it will embolden other countries to seek similar whole-site removal remedies for violations of their laws

(e.g., insults to the king, dissident political speech).  This would jeopardize free speech principles and the free flow of information online globally and in contexts far removed from copyright.

**3. Will Google agree to address its problem monetizing dangerous and/or illegal content through advertising sales and direct revenue-sharing agreements with producers of content which violates Google's own policies? If so, how?**

Google will continue aggressively addressing the issue of dangerous and illegal content being monetized on our hosted platforms in violation of our express prohibitions, and we commit to continuing to improve our methods for preventing bad actors from monetizing such content.

Regarding the content of the ads themselves, we have already taken proactive measures in our fight against ads for counterfeits and illegal pharmacies, among others areas.  Our engineering teams have created automated systems to detect fraudulent activity by advertisers.  Because of our efforts, **in 2013** we saw nearly **an 80% drop in the number of complaints received about counterfeit ads**, and **we removed over 4.5 million ads that violate our pharmacy and health related content policies**.  While no system is perfect, our engineers have also built astonishingly powerful tools calibrated to identify and block a wide range of ads that potentially promote conduct that is illegal or otherwise violates Google's content prohibitions.

YouTube is also committed to continued improvement of the proactive systems it employs for preventing ads from running against videos containing potentially dangerous and illegal content (e.g., ads will not appear in response to queries such as "buy vicodin" or "buy cocaine").  YouTube's automated systems also try to identify and remove spam videos, some of which relate to dangerous and illegal activity such as rogue pharmacies, among other things, and these efforts resulted in the **removal of over 78 million videos in 2013**, which obviously cannot be monetized once removed.

Google expressly prohibits AdSense publishers (i.e., websites that display Google ads), as well as participants in YouTube's Partner Program (i.e., YouTube users who monetize their videos), from including or linking to content in the following areas:
- Pornography, adult or mature content
- Violent content
- Hate speech (including content that incites hatred or promotes violence against individuals or groups based on race or ethnic origin, religion, disability, gender, age, veteran status, or sexual orientation/gender identity), harassment, bullying, or similar content that advocates harm against an individual or group
- Content containing excessive profanity
- Hacking/cracking content
- Illicit drugs and drug paraphernalia content
- Sales of beer or hard alcohol
- Sales of tobacco or tobacco-related products

- Sales of prescription drugs
- Sales of weapons or ammunition (e.g., firearms, fighting knives, stun guns)
- Sales or distribution of coursework or student essays
- Content regarding programs which compensate users for clicking ads or offers, performing searches, surfing websites or reading emails
- Other content that is illegal, promotes illegal activity or infringes on the rights of others

**In 2013, we blocked more than 200,000 publisher pages** from AdSense**, disapproved more than 3,000,000 applications** to join AdSense network, **and terminated more than 250,000 publishers** from AdSense, all for various policy violations.

If we learn that any AdSense publisher or participant in YouTube's Partner Program is violating these express prohibitions, whether in response to complaints or as a result of our own affirmative policy enforcement efforts, ads to their sites or videos will be disabled and their accounts will generally be terminated.

Finally, working with the White House's Office of the U.S. Intellectual Property Enforcement Coordinator (IPEC), the Interactive Advertising Bureau (IAB), and other leading ad networks, Google helped develop and was part of the initial group of companies to agree to the U.S. government's "Best Practices and Guidelines for Ad Networks to Address Piracy and Counterfeiting."  Per these best practices, we promise to always maintain and post policies prohibiting websites that are principally dedicated to selling counterfeit goods or engaging in copyright piracy from participating in Google's advertising programs.

***3. Additionally, what can Google do to encourage a culture worthy of its "Don't be evil" motto by ensuring that preventing the spread of dangerous and/or illegal content is a priority during the product development process? What specific additional steps will Google take to accomplish this?***

Google is working with its product teams to ensure that combating the potential upload of problematic content on Google's hosted platforms continues to be an important part of our product development process.  Before rolling out any product, Google already develops policies governing the type of content allowed on the product, as well the most effective ways to enforce those policies at scale.  This includes policies prohibiting dangerous and illegal content.

However, since our products are never designed for or intended to be used by those wishing to violate our content prohibitions, bad actors are always working to find ways to evade our policies and enforcement systems.  This means that our enforcement strategies and systems must be ever-evolving to keep up with the constantly changing enforcement landscape.

This is why Google invests so heavily in policy development and enforcement, spending **over a quarter of a billion million the last three years and devoting hundreds of engineers and policy specialists** to combat illegal and dangerous

content, as well as other content that violates Google's policies, across Google's hosted platforms and products.

For YouTube, we invested **over $60 million in developing our state-of-the-art Content ID system,** giving copyright owners better control of their content among the millions of hours of videos uploaded to YouTube every year.  Using Content ID, which is offered by YouTube free of charge, copyright owners can identify user-uploaded videos that include their content, and choose in advance what they want to happen when those videos are found.  They can opt to block the video from appearing, or choose instead to monetize the video with advertising, or simply leave the video on the site for promotional value.  There are more than 4,000 Content ID partners, including all the major movie studios and record labels.  We also prevent the upload of any duplicate video on YouTube previously removed in response to a DMCA request.

YouTube's abuse team also works to identify users uploading spam videos, e.g., videos seeking to promote rogue pharmacies, in order to prevent those types of videos from ever going live or being available on the service.  **In 2013**, these efforts resulted in the **removal of over 78 million videos** for actual or suspected content policy violations.

We also voluntarily contract with Legitscript to help us identify rogue pharmacy sites before ads on our systems can ever link to them, and to identify any ads that managed to evade our robust detection systems relating to rogue pharmacies.  Because of these efforts, Google **rejected or disabled over 4.5 million ads believed to violate our pharmacy and health-related content policies**, most of which never generated a single impression on Google's platforms.

**Additional Steps.**  While these measures have proven successful in reducing the prevalence of dangerous and illegal content on Google's platforms, we also take additional steps to help keep our users informed about dangerous and illegal content on the web.

For example, we helped found the Center for Safe Internet Pharmacies ("CSIP"), a cross-industry organization which, among other things, sponsors consumer education campaigns about the dangers associated with rogue online pharmacies. In response to searches relating to prescription drugs, we run CSIP ads, at no cost to CSIP, that link to a pharmacy verification tool enabling users to confirm whether the online pharmacies they are finding are legitimate.



Google also partners with the National Suicide Prevention Lifeline to prominently display information relating to suicide prevention in response to search queries such as "suicide" and "ways to commit suicide."



We believe that abuse of illegal or prescription drugs is a user-safety issue warranting a similar approach.  We are already exploring possible partners to work with this year on returning prominent PSA-style information boxes for searches potentially relating to drug abuse.  This is clearly an important user-safety issue, which is why it is an important issue for Google, and we look forward to discussing this proposal further during our meeting on February 24.

**4. What are Google's specific proposals for creating a mechanism by which Attorneys General and other law enforcement authorities can communicate compliance issues to Google with the expectation of swift responses?**

Given the enormous scale of YouTube -- **more than 100 hours of video content is uploaded to the site every minute** -- we are committed to finding new ways to collaborate directly with law enforcement to further enhance our crowdsourcing and screening mechanisms in order to better identify and remove videos relating to dangerous and illegal activity.

Consistent with this commitment, we have developed the Trusted Flagger program for YouTube. This program will give your offices the ability to prioritize and accelerate reporting of any potentially illegal videos found on YouTube. Videos flagged by the Attorneys General through the Trusted Flagger program will receive expedited review and removal under YouTube's policies.

To facilitate and maximize Attorneys General participation in the Trusted Flagger program, Google will provide training to Attorneys General staff in-person or online. We will work with your offices to arrange the best method for providing this training. Victoria Grand (victoriag@google.com) and Cynthia Pantazis (cpantazis@google.com) will be Google's primary points of contact for this effort.

In addition, I have designated points of contact to make it easier for your offices to raise specific compliance issues for action directly with us.  Aura Navarro-Abreu (auran@google.com) will handle your questions about Autocomplete, YouTube, ads,

and search removals.  Fred von Lohmann (fredvl@google.com) can handle your questions regarding copyright and piracy.  Regarding illegal online pharmacy content appearing on Google's products, Adam Barea (adambarea@google.com) will be in the best position to work with you on those issues.

All of these resources are intended to provide the Attorneys General with options to easily contact us about compliance issues or concerns relating to Google's platforms.

Finally, we will continue to work directly with private rights holders and other entities and organizations interested in collaborating on the best ways to further reduce the availability of objectionable or illegal content on our systems, and remain open to getting your assistance in encouraging and arranging for such collaborations.

*****

We trust that our responses reflect our desire to resolve the issues raised.  Although we do not endorse all of the underlying assumptions and conclusions incorporated into the preambles of your questions, we have answered the questions to the best of our ability in order to continue finding better ways to tackle these important user-safety issues.

Our team looks forward to discussing these issues in greater detail on February 24.

Best regards,

Kent Walker
Senior Vice President & General Counsel

Enclosure