## NON-PROSECUTION AGREEMENT

The United States Attorney's Office for the District of Rhode Island, United States Department of Justice (the "Government"), and Google Inc. ("Google" or the "Company"), a California-based corporation with its principal place of business located in Mountain View, California, hereby agree as follows:

### The Investigation

1.     The Government has conducted an investigation into the Company's acceptance of advertisements placed by online pharmacy advertisers that did not comply with United States law regarding the importation and dispensation of prescription drugs.

### Statement of Relevant Facts

2.     The Government and the Company agree that the following statements are true and accurate:

(a)     Except under very limited circumstances, not relevant here, it is unlawful for pharmacies outside the United States to ship prescription drugs to customers in the United States. Such conduct violates the Federal Food, Drug, and Cosmetic Act, Title 21, United States Code, Section 331(a) and (d) (Introduction into Interstate Commerce of Misbranded or Unapproved Drugs). Where these prescription drugs are controlled substances, such conduct also violates the Controlled Substances Act, Title 21, United States Code, Section 952 (Importation of Controlled Substances).

(b)     The Company is a publicly-traded Internet search and technology corporation.

(c)     The Company offers various advertising services that permit advertisers to have their advertising message, and a hyperlink to their website, appear above and next to search



results in response to search queries relevant to the advertiser, and on various websites that contract with the Company.

(d)    The Company's largest advertising program, AdWords, displays sponsored advertisements in response to queries by the Company's search engine users. Advertisers pay fees to the Company for each ad. Advertisers are able to geo-target their advertising campaigns, selecting the countries where the advertisements will display.

(e)    Online pharmacies advertise through AdWords and other Company advertising platforms. The Company adopted initial policies regarding advertising by online pharmacies, and these policies evolved over time as the Company grew.

(f)    As early as 2003, the Company was aware that in most circumstances it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada. For example, in March 2003 and again in December 2008, the National Association of Boards of Pharmacy advised the Company that the importation of prescription drugs from foreign countries is illegal.

(g)    The Company was aware that importation of prescription drugs to consumers in the United States is almost always unlawful because the United States Food and Drug Administration ("FDA") cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved and because the drugs may not meet FDA's labeling requirements, may not have been manufactured, stored, and distributed under proper conditions, and may not have been dispensed pursuant to a valid prescription. While Canada has its own regulatory regime for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada, which lack adequate pharmacy regulations.

2

(h)     As early as 2003, the Company was on notice that online Canadian pharmacies were advertising prescription drugs to the Company's users in the United States through the Company's AdWords advertising program. Although the Company took steps to block pharmacies in countries other than Canada from advertising in the United States through AdWords, the Company continued to allow Canadian pharmacy advertisers to geo-target the United States in their AdWords advertising campaigns. The Company knew that U.S. consumers were making online purchases of prescription drugs from these Canadian online pharmacies. For example, in a November 18, 2003 email, a Company employee discussed the advertising budgets of several Canadian online pharmacy advertisers and noted that "[a]ll ship from Canada into the US via Express Mail." In an August 23, 2005 email, an employee in the Company's policy group stated, "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and " target the US in their geo-targeting."

(i)     The Company also knew that many of these Canadian online pharmacy advertisers distributed prescription drugs, including controlled prescription drugs, based on an online consultation, rather than a valid prescription from a treating medical practitioner. The Company was also on notice that many pharmacies accepting an online consultation rather than a prescription charged a premium for doing so, because individuals seeking to obtain prescription drugs without a valid prescription were willing to pay higher prices for the drugs.

(j)     From 2004 to 2006, the Company retained a third-party verification service, Square Trade, Inc. ("Square Trade"), to verify whether online pharmacies seeking to advertise through AdWords were licensed in at least one state in the United States or in Canada. Square Trade required pharmacies seeking to advertise through AdWords to self-certify that they would act in accordance with applicable U.S. laws and regulations. During the period that Square



Trade was providing services to the Company, the Company knowingly permitted Canadian online pharmacies that were certified by Square Trade to advertise the sale of prescription drugs through AdWords to U.S. consumers.

(k)     From 2003 through 2009, the Company provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing their AdWords advertisements and in improving the effectiveness of their websites.  For example, on or about April 23, 2004, a Google employee based in Canada reported in an email concerning the advertisements of a large Canadian pharmacy advertiser that "the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind." On or about June 4, 2004, the same employee emailed a member of the Company's policy group and stated, "The Max team and [customer support] are sort of furiously working on creative to appease our new policy before approvals gets to them and disapproves."

(l)     In 2006, the Company's relationship with Square Trade ended, and the Company began using the certification program of a second verification company, PharmacyChecker.com LLC ("PharmacyChecker").  While PharmacyChecker did not certify online pharmacies that shipped controlled prescription drugs, Canadian or otherwise, PharmacyChecker did certify advertisers of non-controlled prescription drugs, including distributors of non-controlled prescription drugs located in Canada.  As a result, the Company knowingly permitted Canadian online pharmacies, certified by PharmacyChecker, to advertise the sale of non-controlled prescription drugs through AdWords to U.S. consumers.

(m)     Some pharmacy advertisers did not qualify for certification by either Square Trade or, later, PharmacyChecker, but nonetheless advertised through the Company's AdWords program.  The Company was on notice that certain online pharmacy advertisers set up their

4



advertising programs so that their AdWords advertisements would not run in the United States. Thus, those advertisements could begin to run without the advertiser being required to obtain a Square Trade or PharmacyChecker certification. Once the advertisements began to run on the Company's search engine, however, some pharmacies changed the geo-targeting of the advertisements so as to cause the advertisements to appear in the United States in response to queries by U.S. users of the Company's search engine. Although the Company was on notice that some online pharmacies changed their geo-targeting in this manner, the Company did not prevent these changes in geo-targeting until after it became aware of the Government's investigation.

(n)     In addition, as early as July 2004, the Company was on notice that online pharmacies were circumventing the Square Trade and PharmacyChecker certification process by intentionally avoiding the use of certain pharmaceutical terms in the text of their AdWords advertisements, while using these same terms as advertising "keyword" terms. A keyword is a specific word or phrase selected by the advertiser that the Company uses to trigger the display of advertisements in response to a user's query. Advertisers bid, in an auction-like format, on keywords in order to have their advertisements appear when the user enters the selected keywords into the Company's search engine. Once the Company began using Square Trade, and continuing throughout the period during which the Company used PharmacyChecker, the Company conducted manual review of non-certified online pharmacy advertisements only if a pharmaceutical term appeared in the text of the advertisement. The Company was on notice, however, that some online pharmacy advertisers, including some from Canada, avoided this review by using the prescription drug terms as keywords only and not in advertising text. For example, in a February 13, 2008 email, a member of the Company's policy group stated, "[t]he



only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady, fraudulent advertisers know not to do this." After it became aware of the Government's investigation, the Company made changes to its systems in order to flag for review all ads that had prescription drug terms as keywords.

(o)  The Government and the Company estimate that the total proceeds to the Company and Canadian online pharmacy advertisers generated from the advertising and sale of controlled prescription drugs by Canadian online pharmacies that advertised through the Company's AdWords program was approximately $500 million.

(p)  The Government's investigation did not relate to the award or performance of any government contract or subcontract.

(q)  In 2009, after the Company became aware of the Government's investigation of its advertising practices in the online pharmacy area, and as a result of that investigation, the Company took a number of significant steps to prevent the unlawful sale of prescription drugs by online pharmacies to U.S. consumers. Among other things, the Company became the first search engine to require online pharmacy advertisers to be certified by the National Association of Boards of Pharmacy's rigorous Verified Internet Pharmacy Practices Sites ("VIPPS") program, which conducts site visits, has a stringent standard against the issuance of prescriptions based on online consultations, and does not certify Canadian online pharmacies. In addition, the Company retained an independent company to enhance its back-end sweeps, which were designed to detect pharmacy advertisers exploiting flaws in the Company's screening systems. The Company has also sued pharmacy advertisers who violated the Company's terms of use, and has reported suspected illegal pharmacies to the FDA.

6



## Acceptance of Responsibility

3.      The Company was on notice that most Canadian online pharmacy advertisers, advertising through the Company's AdWords program, geo-targeted their advertisements to consumers in the United States and imported into the United States both controlled prescription drugs, in violation of Title 21, United States Code, Section 952, and misbranded and unapproved prescription drugs, in violation of Title 21, United States Code, Section 331(a) and (d).  The Company acknowledges that it improperly assisted Canadian online pharmacy advertisers to run these advertisements that geo-targeted the United States through AdWords, and the Company accepts responsibility for the Company's conduct as set forth above in paragraph 2, "Statement of Relevant Facts."

## Forfeiture

4.      As a result of the conduct described in paragraph 2 above, the Company agrees to forfeit $500,000,000 (five hundred million) to the United States as a substitute res for the proceeds of controlled prescription drug sales by Canadian online pharmacies that advertised through the Company's AdWords program.  Payment shall be wire-transferred to the Seized Assets Deposit Account of the United States Marshals Service within three days of the execution of this Agreement.

5.      The Government contends, and the Company agrees not to contest, that the facts contained in this Agreement are sufficient to establish that the $500,000,000 (five hundred million) being paid by the Company to the Government is subject to civil forfeiture to the Government and that this agreement, in lieu of a separate affidavit, may be attached to and incorporated into the Civil Forfeiture Complaint to be filed against said amount.  By this agreement, the Company specifically waives service of said Civil Forfeiture Complaint and



agrees that a Final Forfeiture Order may enter against the $500,000,000 (five hundred million) paid.

6.  Upon payment of said funds as described in paragraph 4 above, the Company shall release any and all claims it may have to such funds and execute such documents as are necessary to accomplish the same, including the release of its claim to said funds in a civil forfeiture proceeding brought against said funds.

## Remediation

7.  The Company represents that it has a comprehensive compliance and ethics program, and policies, procedures and technological tools designed to detect and prevent violations of these laws and to ensure compliance with internal Company policies and procedures.

8.  The Company has enhanced its pre-existing compliance program and has undertaken reforms and remedial actions in response to the conduct that has been the subject of the Government's investigation.

(a)  The Company in March 2010 began requiring VIPPS certification for pharmacy advertisers using AdWords in order to exclude pharmacy advertisers that import or dispense prescription drugs in violation of United States law.

(b)  Because most advertisements the Company accepts are placed electronically and without human interaction, the Company uses electronic screening systems to identify pharmacy ads for which VIPPS approval of the advertiser is required. The Company has continued to improve its electronic systems designed to block ads that violate its policies. To supplement its electronic screening systems, the Company has retained an independent company to enhance its back-end sweeps, that is, searches of advertisements running through AdWords, in order to

identify and allow the Company to block pharmacy advertisers that are not VIPPS-approved and that evaded the Company's electronic screening mechanisms.

(c)     Company policy now forbids accepting advertisements from pharmacies located in Canada, or elsewhere outside the United States, to run in the United States on AdWords.

(d)     The Company shall maintain, and update as necessary, all compliance programs and policies referenced in paragraphs (a), (b) and (c) above.

(e)     The Company has cooperated with the FDA, Office of Criminal Investigations, by making referrals where the Company determines that criminal investigation of a pharmacy advertiser is warranted, and the Company will continue to make such referrals.

(f)     Every three months, beginning three months following the execution of this Agreement, and continuing for two years following the execution of this Agreement, the Company shall furnish a report to the FDA detailing the efforts it has taken to comply with paragraphs (d) and (e) above.

### Government's Agreements

9.     In consideration of the Company's entering into this Agreement and its commitments to: (a) accept corporate responsibility for the conduct described in paragraph 2; (b) forfeit $500,000,000 to the United States; (c) enforce its ethics and compliance programs relating to the advertisement and sale of prescription drugs; and (d) otherwise comply with the terms of this Agreement, the Government agrees not to prosecute the Company for any crimes relating to (i) the conduct described in paragraph 2 or (ii) any other conduct relating to the advertisement or sale of prescription drugs known to the Government or that was the subject matter of the investigation by the Government that led to this Agreement as of the date this Agreement is executed, including but not limited to any alleged violation of Title 21, United States Code.

9



Section 331(a) and (d) (Introduction into Interstate Commerce of Misbranded or Unapproved Drugs), and Title 21, United States Code, Section 952 (Importation of Controlled Substances).

10.   The Government further agrees to release the Company and its successors and assigns (the "Related Parties") from any civil, administrative or equitable claims the Government has or may have against the Company or the Related Parties of which the Government is currently aware that relate to (i) the conduct described in paragraph 2 or (ii) any other conduct relating to the advertisement or sale of prescription drugs known to the Government or that was the subject matter of the investigation by the Government that led to this Agreement as of the date this Agreement is executed.  The Company expressly understands that the protections provided under this Agreement shall not apply to any acquirer or successor entities unless and until such acquirer or successor formally adopts and executes this Agreement.

11.   It is understood that this Agreement is binding on the United States Attorney's Office for the District of Rhode Island, the United States Attorneys' Offices for each of the other ninety-three judicial districts of the United States and the United States Department of Justice, but that this Agreement does not bind any other federal agencies, or any state or local authorities. Any reference in this Agreement to an obligation of the "Government" shall be binding on all of the government entities described in this paragraph.

## Additional Obligations

12.   It is understood that if, in the two years following execution of this Agreement, the Government determines, in its sole discretion, that the Company: (a) has deliberately given false, incomplete, or misleading testimony or information in the investigation that led to this Agreement; (b) has committed any criminal conduct relating to the advertisement or sale of prescription drugs through AdWords and constituting a felony under United States law after the



date of this Agreement; or (c) has otherwise deliberately violated any provision of this Agreement, the Company shall, in the sole discretion of the Government, be subject to prosecution for any Federal criminal violation of which the Government has knowledge, including a prosecution based upon the conduct specified in paragraph 2 herein. Any such prosecutions that are not time-barred by the applicable statute of limitations on the date of the execution of this Agreement may be commenced against the Company. In addition, the Company agrees to toll, and to exclude from any calculation of time, the running of the criminal statute of limitations for any criminal conduct relating to the advertisement or sale of prescription drugs through AdWords and constituting a felony under United States law for two years from the date of execution of this Agreement. By this Agreement, the Company expressly intends to and hereby does waive its rights to make a claim premised upon the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance upon the advice of the Company's counsel. It is further understood that if, within two years following execution of this Agreement, the Government determines, in its sole discretion, that the Company: (i) has deliberately given false, incomplete, or misleading testimony or information in the investigation that led to this Agreement; (ii) has committed any criminal conduct relating to the advertisement or sale of prescription drugs through AdWords and constituting a felony under United States law after the date of this Agreement; or (iii) has otherwise deliberately violated any provision of this Agreement, then: (a) any statements made or testimony given by any then current officer, agent or employee of the Company before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads from such statements or testimony, shall be admissible in evidence in any criminal proceeding hereinafter brought against the Company; (b)

11



the facts set forth in the Statement of Relevant Facts section of this Agreement shall be admissible in evidence in any federal criminal proceeding hereinafter brought against the Company; and (c) the Company shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statements or any leads therefrom should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive all rights in the foregoing respects.

13.    It is understood that for a period of two years following the execution of this Agreement, the Company shall fully cooperate with the Government and any federal law enforcement agency designated by the Government and provide the Government, upon request and appropriate legal process if otherwise required by law, all non-privileged information, documents, records, or other tangible evidence about which the Government or any designated federal law enforcement agency inquires in connection with the Company's conduct relating to the advertisement and sale of prescription drugs through AdWords. Nothing in this Agreement shall be construed as a waiver by the Company of any protections of the attorney-client privilege, the attorney work-product doctrine or any other applicable privilege or protection with respect to any information, documents or records requested by the Government.

## Public Statements

14.    The Company, through its attorneys, agents, officers, directors or employees who have authority to speak, and are speaking on behalf of the Company, shall not make any public statement contradicting any part of paragraph 2. If the Government notifies the Company that it has preliminarily determined, in its sole discretion, that the Company has made any such contradictory statement, the Company may avoid a finding of breach of this Agreement by

12



repudiating such statement, in a manner satisfactory to the Government, both to the recipients of such statement and to the Government within 48 hours after receipt of notice from the Government. The Company consents to the public release by the Government of any such repudiation. Consistent with the above, the Company may avail itself of any legal or factual arguments available to it in defending any litigation brought, or in any investigation or proceeding, by the Company or any party other than the Government, as long as doing so does not otherwise violate any term of this Agreement. This paragraph is not intended to apply to any statement made by any individual in the course of any actual or contemplated criminal, regulatory or administrative proceeding or civil case initiated by any governmental or private party against such individual.

### The Government's Discretion

15.     The Company agrees that it is within the sole discretion of the Government to determine whether there has been a deliberate violation of this Agreement. The Company understands and agrees that the exercise of discretion by the Government under this Agreement is not reviewable by any court. In the event that the Government preliminarily determines that the Company has deliberately violated this Agreement, the Government shall provide written notice to the Company of that preliminary determination and shall provide the Company with thirty calendar days from the date of that written notice in which to make a presentation to the Government to demonstrate that no deliberate breach has occurred, or to the extent applicable, that the breach has been cured. The Government shall thereafter provide written notice to the Company of its final determination regarding whether a deliberate breach has occurred and has not been cured.

### Limits of the Agreement

16.     It is understood that this Agreement does not bind any prosecuting authority other than

13



the Government. However, if requested by the Company or its attorneys, the Government will bring to the attention of any other prosecuting authorities the existence of this Agreement and the status of the Company's compliance with its obligations under this Agreement.

17.    If requested by the Company or its attorneys, the Government agrees to bring to the attention of governmental contracting authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to governmental contracting authorities, the Government is not agreeing to advocate on the Company's behalf, but rather to provide facts to be evaluated independently by the government contracting authorities.

### Public Filing

18.    The Company and the Government agree that this Agreement will be disclosed to the public.

### Integration Clause

19.    This Agreement sets forth all the terms of the agreement between the Company and the Government. This Agreement supersedes all prior, if any, understandings, promises and/or conditions between the Company and the Government. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by all of the parties.



20.     The undersigned represents and warrants to the Government that he/she has the authority
to enter into this Agreement on behalf of the Company.

**On Behalf of the Government**

8/19/11
DATE

PETER F. NERONHA
United States Attorney
District of Rhode Island

5-19-11
DATE                    By:     ANDREW J. REICH
                                Senior Litigation Counsel

8/19/11
DATE                    By:     RICHARD B. MYRUS
                                Assistant United States Attorney

**On Behalf of Google Inc.**

8/17/11
DATE                    By:     KENT WALKER
                                Senior Vice President & General Counsel
                                Google Inc.

8/19/11
DATE                    By:     KAREN F. GREEN
                                Wilmer Cutler Pickering Hale and Dorr LLP
                                Counsel to Google Inc.

8/18/11
DATE                    By:     PATRICK M. COLLINS
                                Perkins Coie LLP
                                Counsel to Google Inc.

15

En Español | Contact Us



UNITED STATES DEPARTMENT of JUSTICE

OFFICES *of* THE
# UNITED STATES ATTORNEYS

SEARCH THE SITE

ABOUT    EOUSA    PRIORITY AREAS    RESOURCES    TRAINING    CAREER CENTER

Home » Priority Areas » Cybercrime » *Major Achievements in the Courtroom:* United States v. Google

## United States v. Google

*by Peter F. Neronha*
*U.S. Attorney for the District of Rhode Island*



On August 19, 2011, Google Inc. entered into a non-prosecution agreement (NPA) with the United States Attorney's Office for the District of Rhode Island. This agreement resolved the government's long-running investigation into Google's advertising practices concerning online pharmacies. Under the terms of the NPA, Google agreed to forfeit $500 million to the United States for allowing Canadian online pharmacies to target U.S. consumers with prescription drug advertisements. The Google NPA is significant not only because of the amount of the financial forfeiture by Google and the extensive remedial steps the NPA obligates Google to take; it also highlights the threat that imported, unregulated prescription drugs pose to U.S. consumers. In addition, the Google NPA marks the first time that a search engine has acknowledged responsibility for facilitating the improper conduct of its advertisers.

Peter F. Neronha, U.S. Attorney for the District of Rhode Island

The Google NPA was the culmination of a multi-year investigation by the Rhode Island Task Force of the Food and Drug Administration's (FDA) Office of Criminal Investigations. The investigation had its origins in a separate, multimillion dollar financial fraud prosecution unrelated to Google in which the main target fled to Mexico. While a fugitive, the target began to advertise the unlawful sale of drugs through Google's AdWords program. After the United States Secret Service apprehended the target in Mexico and returned him to the United States, he cooperated with law enforcement and provided information about his use of the Ad Words program. During the ensuing investigation of Google, the government created a number of undercover websites that advertised the unlawful sale of controlled and non-controlled substances through AdWords.

The subsequent investigation established, and Google acknowledged in the non-prosecution agreement, that beginning in 2003 Google was aware that in almost all instances it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada. Google further acknowledged that it was aware that importation of prescription drugs to consumers in the United States is unlawful, because these drugs are not FDA-approved and therefore may not meet the FDA's labeling requirements; may not have been manufactured, stored, and distributed under proper conditions; and may not have been dispensed pursuant to a valid prescription. In the NPA, Google also conceded that Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada, which lack adequate pharmacy regulations.

In addition to admitting that it was aware of the illegality of importing prescription drugs, Google conceded in the NPA that it was on notice that online pharmacies were in fact advertising prescription drugs to Google users in the United States through Google's AdWords "geo-targeting" feature. Finally, Google acknowledged that it provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing the AdWords advertisements that targeted U.S. consumers.

Prosecuting an internet search engine for aiding and abetting the illegal conduct of its users poses a substantial challenge. Generally speaking, the government must establish that the search engine possessed the requisite combination of knowledge and intent regarding the underlying criminal endeavor and did not act merely as an unwitting, neutral conduit for the principal defendant's illegal activities. The Google NPA signals that, where evidence can be developed that a search engine knowingly and actively assisted advertisers to promote improper conduct, the search engine can be held accountable as an accomplice.

FIND YOUR
UNITED STATES
ATTORNEY

Follow
U.S. Attorneys



DEPARTMENT of JUSTICE
ACTION CENTER

Report a Crime

Job Opportunities

Report Waste, Fraud, Abuse or Misconduct to the Inspector General

Crime Victims' Rights Ombudsman

Request Records Through FOIA

Identify Our Most Wanted Fugitives

Report and Identify Missing Persons

Contact Us



UNITED STATES ATTORNEYS



JUSTICE.GOV/USAO

ATTACHMENT B

## AFFIDAVIT OF LUKE SAMPLE

I, Luke Sample, being duly sworn, attest as follows:

1.    I am a resident of Cape Girardeau, Missouri and above the age of 18. I am a defendant in a lawsuit, filed by a number of motion picture studios and pending in federal court in New York, asserting claims for copyright infringement and unfair competition. I have personal knowledge of the facts set forth in this affidavit.

2.    Around June 2003, my business partner Brandon Drury and I began operating a website business that offered customers assistance in locating and downloading films, television shows, music, and software off of the Internet. We operated this business until 2005, when we shut it down after we were named as defendants in the lawsuit mentioned above. We operated this business through websites located at the following URLs: <www.thedownloadplace.com>, <www.easydownloadcenter.com>, <www.directdownloader.com>, and <www.themp3place.com>. We nominally operated these businesses through two companies Drury and I owned, Internet Billers LLC and LSDB Enterprises.

3.    We operated all of these websites according to the same basic model. The business was one where, for a fee, we would provide customers with one of the popular file-sharing programs through which they could download copies of films, music, software, and photos from the Internet.

4.    We designed our websites and described our services in a way that we believed potential customers would find appealing. For example, we added

cover art from motion pictures and "drop down" menus listing films. We also offered step-by-step instructions on how to use the software, which we called "Download Manager," and how to "burn" onto blank DVDs copies of the films, television shows, and other files these customers had downloaded. The description of our business that appears in the lawsuit is accurate, and the pages from our websites that are attached to the lawsuit are accurate copies of what the websites looked like at that time.

5.    Customers who signed up for the download service we offered had to pay a "membership" fee. They could pay either $29.95 for a one-year membership or $39.95 for a "lifetime" membership. We estimate that we signed up more than 30,000 customers during the period we operated this business.

6.    In addition to offering a "help" page, we also offered our customers on-line support, that is, they would send us email requests for assistance. Either Brandon, myself, or one of our employees would respond. We received requests for assistance in helping our customers find, download, play, or burn copies of films or television programs they had located on the Internet.

7.    Also, for an additional $14.95, our customers could purchase another software package called "Pro Movie Pack." Films or television shows that are widely available over the Internet typically are pirated copies that others have "uploaded" after copying them off of DVDs. Such unauthorized copies quite often are made in different file formats. The purpose of this extra software package we sold was to allow our customers who were looking to download such pirated copies

to view these copies regardless of the file format used by the person who created and uploaded the copy.

      8.    The design of our websites was basically intended to capture two types of customers. First, we wanted to give our site the "look and feel" of a website that was an authorized source of film, television, music, and software downloads. Presumably there are Internet users out there who are not aware, for example, that films that are still playing in movie theaters are not typically available for download from the Internet. The statements on our website to the effect that the service we were offering was legal were intended to reassure such customers. Second, for those other Internet users who are aware that downloading these files is not legal, we wanted to offer (for a fee) a simpler way to find and download those files, along with our assistance if they needed it. The type of file-sharing software that we were supplying was available for free elsewhere, but we believed that we provided additional value that would induce these Internet users to subscribe to our service.

      9.    During the time we were operating this business, there were many, many other websites offering the identical service. In order to be successful, we needed to find ways to get customers to visit our websites and, hopefully, purchase memberships. In the terminology used by Internet businesses, we needed to find a way to "drive traffic" to our downloading websites.

      10.    A common method for getting traffic to your website—perhaps the most common method for this type of Internet business—is to advertise on the

Google search engine using the Google "AdWords" program. With this service, a business owner can have "sponsored link" advertisements for its website appear on the right side of the Google search engine page, in response to particular search terms a Google user might enter. Specifically, from the perspective of an Internet business owner, the AdWords program works this way. You go to the Google website and set up an AdWords account. To do this you must supply certain identifying information, and you also must provide a credit card number. You supply text for the advertisement along with the URL (or website address) that you want to appear on the advertisement, so that if and when the advertisement is "clicked," the Google user is taken to your website. To get the sponsored link to appear, you provide Google with a list of search terms or "keywords" that, when entered by a Google user, will prompt your advertisement to appear. Since you are competing with other Internet businesses for placement of your advertisement, you need to make a bid on how much you are willing to pay Google each time a Google user who searches a particular term clicks on your sponsored link. In effect, Google auctions off search terms or keywords to the highest bidder among Internet businesses who want their "sponsored links" to appear in front of Google users who enter those keywords into the Google search engine.

11.    We started using the Google AdWords program for our downloading business in the summer of 2003. For example, we created a sponsored link advertisement for the <thedownloadplace.com> that read: "Freaky Friday – free. Join now, movies still in theaters, dvd movies, new releases, adult." We then

- 4 -

entered a series keywords that we wanted to bid on, which when typed into Google would prompt our advertisement to appear, including "Freaky Friday free movie," and "Freaky Friday free movie download." As these keywords make clear, we were looking to capture two types of Google users: those who were looking for a legal, authorized source of film downloads, and those who were looking for a good way to find pirated copies of films and television shows

12.    At least initially, all of our dealings with Google regarding our AdWords advertising were through automated software Google uses. Among other things, the Google software suggested keywords for us to use. Beginning in April 2004, however, we began communicating with and receiving assistance from individual Google employees on how to structure our AdWords advertising. I contacted Google at that time to complain that while we were paying Google large amounts for sponsored links—more than $150,000—we were unhappy with the "conversion rate." That is, we were paying Google each time a Google user clicked on one of our sponsored links, but the frequency with which those users purchased a "membership" at one of our websites was low. At that time we communicated with a Google employee named Katie. She suggested that we use more targeted keywords than we had been using. For example, she suggested combining "free music" and "listen" into "listen to free music."

13.    We acted on Google's suggestions and revamped our AdWords advertising in the spring of 2004. To implement Katie's suggestion about targeted keywords, we created a single new campaign to use for all of our sponsored links

geared toward specific movies.  Specifically, in this campaign, we created sponsored links referencing the following films:  Anchorman, Bourne Supremacy, Catwoman, Fahrenheit 911, Hellboy, I Robot, Kill Bill, Shrek II, and Spiderman 2.  The ad text for these links told potential customers that they could get access to "movies still in theaters," "new releases," and "DVD."  The keywords associated with these advertisements combined the title of the film with "download" (*e.g.* "spiderman 2 download").  Later that year, we created another AdWords campaign targeted at television programs and referencing Friends and The Simpsons.

14.    In the summer of that year, our monthly spending for Google advertising was in excess of $20,000.  In the fall, apparently due to the amount we were spending, Google assigned employees to be our personal account representatives.

15.    Julio Herrera was the first Google representative assigned to our account.  In the fall of 2004, I had email communications with him, and also several telephone conversations with him.  He expressed familiarity with our business and the content of our websites, as well as the advertisements and keywords we had been bidding on, including advertisements and keywords utilizing the names of specific films.  Herrera's assistance to us included monitoring our credit card limits; in fact, we supplied him with account information for other credit cards, so that, when one card "maxed out," he could replace it with another so that our AdWords programs could continue.