## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | | |
|---|---|---|
| Google Inc., | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *v.* | ) | No. 3:14cv981 HTW-LRA |
| | ) | |
| | ) | **Supplemental Declaration of Peter G.** |
| | ) | **Neiman in Support of Plaintiff Google** |
| Jim Hood, Attorney General of the State of | ) | **Inc.'s Motion for Temporary Restraining** |
| Mississippi, in his official capacity, | ) | **Order and Preliminary Injunction** |
| *Defendant.* | ) | |
| | ) | |

I, Peter G. Neiman, hereby declare as follows:

1.      I am a partner of Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), 7

World Trade Center, 250 Greenwich Street, New York, NY 10007, and counsel for Plaintiff

Google Inc. ("Google") in this matter.  I submit this supplemental declaration in support of

Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction.

2.      Attached hereto as Exhibit A is a true and accurate copy of a certified transcript of

an audio recording of a December 18, 2014 press conference held by Mississippi Attorney

General Jim Hood.

3.      Attached hereto as Exhibit B is a true and accurate copy of a December 19, 2014

Request for Public Records made by Fred Krutz of Forman, Perry, Watkins, Krutz & Tardey,

LLP, counsel for Google, to the Office of the Attorney General of the State of Mississippi (the

"Office of the Attorney General").

**Exhibit 1**

4.      Attached hereto as Exhibit C is a true and accurate copy of a January 6, 2015 letter from Bridgette W. Wiggins of the Office of the Attorney General to Mr. Krutz regarding the "Google Public Records Request."

5.      Attached hereto as Exhibit D is a true and accurate copy of a January 14, 2015 letter from Mr. Krutz responding to the January 6, 2015 letter from the Office of the Attorney General.

6.      Attached hereto as Exhibit E is a true and accurate copy of a January 20, 2015 letter from Ms. Wiggins of the Office of the Attorney General in response to Mr. Krutz's January 14, 2015 letter.

7.      Attached hereto as Exhibit F is a true and accurate copy of an article in Ars Technica by Joe Mullin, titled "Hollywood v. Goliath: Inside the aggressive studio effort to bring Google to heel," and dated December 19, 2014, available at http://arstechnica.com/tech-policy/2014/12/how-hollywood-spurned-by-congress-pressures-states-to-attack-google/ (last visited January 21, 2015).

8.      Attached hereto as Exhibit G is a true and accurate copy of an article in the Verge by Russell Brandon, titled "Project Goliath: Inside Hollywood's secret war against Google," and dated December 12, 2014, available at http://www.theverge.com/2014/12/12/7382287/project-goliath (last visited January 15, 2015).

9.      Attached hereto as Exhibit H is a true and accurate copy of an article in the Huffington Post by Dana Liebelson, titled "Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda," and dated December 18, 2014, available at http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html (last visited January 21, 2015).

10.   Attached hereto as Exhibit I are true and accurate copies of screenshots capturing two e-mails published in the New York Times on pages 62-63 of an interactive graphic titled "Rhode Island Attorney General Turned Attorney General Lobbyist," and dated October 28, 2014, available at http://www.nytimes.com/interactive/2014/10/28/us/5-Rhode-Island-Attorney-General-Turned-Attorney-General-Lobbyist.html (last visited January 21, 2015).

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

Executed on January 22, 2015, in New York, New York.

_____

Peter G. Neiman

Page 1

1

2

_____

3

ATTORNEY GENERAL JIM HOOD PRESS CONFERENCE
ON GOOGLE

4

5

_____

6

December 18, 2014

7

8

9          T R A N S C R I P T

10

O F

11

12          P R O C E E D I N G S

13

14

15

16

17

18

19

20

21

22

23

24

25

Neiman Supp. Decl.
Ex. A

```
 1     Attorney General Hood Press Conference
 2             MR. HOOD: Thank you for coming.
 3        Sorry I was a little bit late.  Trying
 4        to get some paperwork together here.
 5             I want to talk about a story
 6        that was pushed out by a large
 7        corporation called Google.  I mean,
 8        they pushed this story out.  They
 9        rifled through the e-mails that were
10        stolen from Sony, you know, and I
11        equate it to rifling through someone's
12        stolen property.  If someone goes in
13        your house and steals your filing
14        cabinet and your clothes in the drawer
15        and sits it out on the road, you know,
16        do they have the right to go through
17        it?  Certainly there's case law that
18        says the media has the right to
19        publish this type thing.  But, you
20        know, companies like Google that have
21        pushed this story, putting it out to
22        blogs and it winds up, you know,
23        they're trying to do a story about
24        Sony working with other industries,
25        not just within their industry, to try
```

1    Attorney General Hood Press Conference

2        to do something about intellectual

3        property theft and attorneys general

4        is unfair, to say the least, that

5        they've tried to spin it by feeding

6        the New York Times documents and

7        e-mails and things like to indicate

8        somehow that attorneys general just

9        came to this because the motion

10       picture industry got involved in it.

11           I've got a document right here

12       since November of 2008 where I became

13       the first chair of the intellectual

14       property theft committee of the

15       National Association of Attorneys

16       General; 2008, before any of these

17       e-mails were ever sent.  And I hadn't

18       seen them but I understand it was

19       maybe in the last six months, a year,

20       whatever, when they began this effort.

21           I actually began before 2008.  I

22       was working since I've been an

23       attorney general in 2004.  We had long

24       conversations with the Internet

25       service providers, like Comcast, AT&T,

1    Attorney General Hood Press Conference

2        Verizon, trying to get them to filter

3        out child porn images, those images

4        that had a hash value placed on the

5        photograph.  It was kept by the

6        National Center For Missing and

7        Exploited Children, they knew it when

8        it came through the pipeline, they

9        could identify it, and they ought to

10       pull it down.  They knew it was a

11       child, they knew it was not a

12       computer-generated image; it was a

13       victim.  It took about two or three

14       years to get them to filter that out.

15       We got the banks to stop paying these

16       Web sites that sold these child

17       pornographic images.

18            Then we began sometime around

19       2006 working with the search engines

20       trying to get them to block out terms

21       like child pornography.  It took

22       several years.  We got Google to do

23       that.  If you type in child -- the

24       word "PO porn" it will not

25       automatically lead to child porn and

1     Attorney General Hood Press Conference

2         if you type in the whole word it will

3         not show you anything on-line.

4              So this is not anything new.  I

5         mean, I had media several times on

6         this effort to try to get the search

7         engines.  We got the banks, in fact,

8         to agree and about 2009 -- I mean the

9         banks, I mean the credit card

10        companies.  They agreed if there will

11        be a nonprofit of all the companies

12        like Nike and all these companies, if

13        they would go on-line and find a

14        list -- and there's a nonprofit, it's

15        the international copyright

16        organization that compiles a list that

17        the bank accepts and it is the Web

18        sites that are selling counterfeit

19        products, be it Nike, be it Rolex,

20        those type of lists.  So the banks

21        said well, we won't pay them, which

22        they stepped up and did a good thing;

23        they were good corporate citizens.

24             About 2009 we turned to Google

25        and -- Google's the biggest search

Page 6

1      Attorney General Hood Press Conference
2         engine, but we're talking to Bing,
3         they're really the only two, Google's
4         three times bigger than Bing -- and
5         said why don't you filter out some of
6         these bad sites, those that you've had
7         -- one of them is called MP3 Skull.
8         That's an easy one.  That's on the
9         piracy side.  MP3 Skull has three
10        million notices.  Google's got three
11        million notices.
12             If you go to their Web site,
13        they actually have a report that they
14        do that shows that they have three
15        million notices about this Web site.
16        It's totally illegitimate.  It's all
17        music because I don't think they do
18        any movies.  I don't know.  It is a
19        bogus Web site.  Google knows it.
20        They've got three million actual
21        documented notices of it.  They refuse
22        to take that down, just de-list it.
23             What I'm saying is just don't
24        let them come up in your search
25        results until they go clean up their

1     Attorney General Hood Press Conference
2        act and start selling something
3        legitimate.  Get these lists, work
4        with some nonprofit, and put together
5        these lists, like the banks have done.
6        If the banks can do it, they don't
7        have the immunity protections that the
8        on-line entities do.  You know, your
9        on-line systems have an immunity
10       protections that your print or your
11       stations don't necessarily have on
12       there.  And they refuse.
13              We have been working -- I have,
14       have been working with them since
15       about 2009, 2010.  I've got a file of
16       documents that I've sent them, you
17       know, telling them, you know, take
18       down these Web sites.  And here's an
19       example.
20              Just today my investigators
21       typed in the word "buy drugs."  And if
22       you look right here on this list, you
23       type in buy drugs -- this is Google --
24       and what do you find?  Silkroad.org.
25       That is an illegal drug site that was

Page 8

1    Attorney General Hood Press Conference
2       taken down by the federal government.
3       And here's canadiandrugs.com.  That is
4       the company from which our
5       investigators bought drugs on-line.
6       We got lab reports -- my investigators
7       have them, you can have copies of them
8       -- of drugs that were illegal
9       prescription drugs on-line.  They know
10      about that Web site because I wrote
11      them a letter and said here's where we
12      made these purchases on-line.  But yet
13      even today, you look, some kid in
14      Mississippi types in buy drugs,
15      they're going to find a way to buy
16      something.  Some of these are bogus
17      sites, they're going to rip the kids
18      off, they're going to steal the
19      parents' credit card numbers, those
20      kind of things, but Google knows about
21      it.  There's a Jackson Free Press
22      article right here, I didn't see that
23      one, but anyway.  That's the kind of
24      stuff that we're talking about.  We're
25      talking about prescription drugs.

1     Attorney General Hood Press Conference
2             Now, if they're stealing music
3        and movies and software, you know, the
4        piracy issues, that's bad, that's a
5        crime, and if Google's assisting them
6        they're assisting in a crime.  In
7        fact, Google got caught, they paid a
8        half a billion dollar fine.  Did you
9        all remember that?  Google paid a $500
10       million fine to the federal government
11       to keep from getting prosecuted.  In
12       fact, they entered into a seven-page
13       non-prosecution agreement where they
14       were helping Canadian pharmacies just
15       like that one right there sell
16       prescription drugs on-line without a
17       prescription.
18             I wrote them a letter and I
19       said, look, if you type in the word
20       "prescription," if you're a little
21       lady and you don't want to go to the
22       drugstore anymore and you want to
23       order from Walgreen's on-line and you
24       type in prescription, it autocompletes
25       to buy prescription drugs without a

1       Attorney General Hood Press Conference

2           prescription.  They're leading you to

3           it.  And in May of 2013 I wrote them a

4           letter and they did stop that.  But

5           you can still go on here and find all

6           kinds of drugs, heroin.

7                    So the Internet, as I've been

8           talking about since I've been attorney

9           general for eleven years, is the

10          future of crime and so law enforcement

11          has to get geared up to do that.  And,

12          you know, it's something that Google

13          refuses to be a good corporate

14          citizen.  They got caught while they

15          were on probation now, that's when my

16          investigator made these buys on-line

17          from search results on Google and

18          those search results -- we didn't buy

19          just from search results, we bought

20          from those that were advertising in

21          the margin of Google.  We bought from

22          people they were making money off of

23          advertising.  So that's exactly what

24          they swore to the federal government

25          they would not do.  I've reported to

                                        Page 11

1       Attorney General Hood Press Conference
2          the federal government and I don't
3          know what's happened since.
4              But anyway, Google has not
5          reformed what they've done.  They
6          pushed this whole story out, they
7          rifled through some of these e-mails,
8          I suppose, and they find out that
9          Sony, a little $20 billion company,
10         what the e-mails call Goliath, a five
11         hundred-plus billion dollar
12         capitalized company -- actually, I
13         think it's about three hundred
14         forty-two -- but they're a huge
15         company.
16             You can go do your comparisons
17         with them to ExxonMobil or whatever,
18         but Google is a huge company with a
19         huge reach and our information.  Their
20         motto is do no evil.  Yet all I'm
21         finding when I work with them is
22         they're pushing evil, they're pushing
23         other companies that are -- deserve
24         their respect but more importantly to
25         me they're creating a highway for my

```
 1    Attorney General Hood Press Conference
 2       children, our children in Mississippi
 3       to buy drugs, to have human
 4       trafficking, to buy fake IDs.  I mean,
 5       we've got examples of how you can go
 6       on-line right now and buy fake IDs and
 7       they're aware of these.  You got
 8       YouTube videos of how to buy a fake
 9       ID.
10             I mean, Google's, they say,
11       well, our system, we can't track that.
12       Well, we found that that's not true
13       because they take down this
14       prescription drugs without a
15       prescription autocomplete.  If you
16       type in child porn, you can't find
17       anything.  If you go to Germany and
18       you type in the word "Nazi," you can't
19       find anything.  They can prevent this
20       kind of stuff from coming up, yet they
21       don't because they're making billions
22       at it.
23             And so what aggravates me is
24       that, you know, Google can get one of
25       their blogs to create a story and then
```

Page 13

```
 1    Attorney General Hood Press Conference
 2       that blog headline comes to, you know,
 3       some blog in Mississippi and winds up
 4       in the media as if, you know, the
 5       motion picture industry set up this
 6       system to encourage AGs to enforce the
 7       law.  Well, yes, we worked with them,
 8       we work with a lot of industries.
 9            When we get a counterfeit drug,
10       we call the drug company that
11       manufactures it and they do the
12       testing on it.  They help us
13       understand.  We do training with all
14       the clothing apparel.  We don't know
15       -- our investigators don't necessarily
16       know when something's counterfeit, so
17       we have to work with the victims.
18       They're victims, their property's been
19       stolen.  And Google's making billions
20       off it and they don't care.  And you
21       know -- so that's what this issue is
22       really all about.
23            I mean, you have a victim, Sony,
24       whose e-mails have been hacked.  I
25       mean, in the future hackers are going
```

```
 1    Attorney General Hood Press Conference
 2       to hit our power grids at some point
 3       in our -- an attack on our power grid
 4       and those of you who were here in
 5       Katrina and the power was shut down,
 6       society can turn to chaos in three
 7       days.  I mean, cyber attacks are real,
 8       they're going to be in our future, and
 9       companies like Sony deserve not to
10       have some company like Google rifle
11       through those e-mails.  I mean, they
12       had the information they were
13       providing the New York Times reporter
14       who admitted that even in his own
15       article that he was provided that type
16       thing.  You know, that's just kind of
17       basically, you know, like receiving
18       stolen property if you did it to
19       somebody that was here.  Now, the
20       press has exceptions for those kind of
21       things; I'm not advocating that.
22            Google tried to spin this fight
23       as if it had something to do with SOPA
24       or one of the -- I forgot the acronym
25       of these laws that were attempted to
```

Page 15

Attorney General Hood Press Conference

1    be passed a few years ago.  The AGs
2    wrote letters about that, but that's
3    not really what we're -- that's about
4    music, movies, and software.  We were
5    fighting about drugs and those other
6    dangers on the Internet to our
7    children.
8            And so, you know, for Google to
9    try to spin it and rile up all the
10   people that, you know, don't believe
11   there should be any copyright laws and
12   that somehow the government's trying
13   to filter the Internet, we're not
14   trying to do any of that.  All we're
15   trying to do is get Google to be a
16   responsibile citizen.  Once they do it
17   then Bing will do it and the rest of
18   them will do it.  But to be a
19   responsible citizen and not allow a
20   Web site just doing nothing but
21   selling illegal content, be it, you
22   know -- or drugs or whatever, they
23   feel like they don't have any duty to
24   step in, and that's the battle we've

```
 1    Attorney General Hood Press Conference
 2       got to -- you know, there's several
 3       huge national issues here.  One is is
 4       that Sony's private property; does
 5       people have a right to rifle through
 6       these e-mails, and people know it's
 7       stolen.  The media, yeah, the courts
 8       have said yes, the media does.  But
 9       for these other people to turn it to
10       their own profit for this hacking
11       situation.  We'll find out what
12       companies and who all was involved in
13       it at some point.  There are a lot of
14       federal agencies that are looking at
15       this.  I mean, we worked -- a lot of
16       our documents that we've sent to
17       Google we've worked with the federal
18       government, other entities, to try to
19       make sure that we figure through and
20       ask for the right information.
21            You know, so this has large
22       implications, you know, as to how we
23       handle these type of cyber attacks in
24       the future on companies.  It's going
25       to be a government entity that's going
```

```
 1    Attorney General Hood Press Conference
 2        to get hit.  I feel for these private
 3        companies that get their information
 4        stolen, but when a government agency,
 5        you know, gets hit with all our Social
 6        Security numbers and all those, I
 7        mean, those are real dangers.  And,
 8        you know, it's how we treat the
 9        victims of these type crimes and in
10        the future I think there's a lot of
11        issues yet to be resolved in the
12        courts as well and the public's mind.
13             Have you all got questions, you
14        know, about any of that issue?
15             PRESS CORPS: I do.
16             I don't understand why you're
17        going after Google when you're not
18        going after the individual Web sites
19        because even if Google doesn't carry
20        those Web sites, you can still put in
21        the address in the search engine and
22        it will pop up.
23             MR. HOOD: A lot of them are
24        overseas and we do go after them, but
25        it's the federal government that's got
```

1    Attorney General Hood Press Conference

2        to work with these other countries.

3        And, you know, Google is assisting in

4        promoting, you know, a lot of this

5        advertising on the Web site, making

6        money on advertising.  If you do a

7        YouTube video of how to buy fake IDs,

8        you can click on the button and say I

9        want to monetize this and you make

10       fifty percent of the clicks and Google

11       makes the other.

12            PRESS CORPS: I guess if

13       regulating, you know, access to that

14       information, would that -- I mean,

15       would that not be a stifling of the

16       First Amendment?

17            MR. HOOD: No, because Google is

18       not a government.  I mean, they don't

19       owe a First Amendment.  They should

20       just say we're not going to do

21       business with you, Web site, until you

22       clean up your act, you know, stop

23       selling drugs.  If you don't sell

24       something legitimate --

25            PRESS CORPS: Google is not

Attorney General Hood Press Conference

```
 1          selling drugs, they're just providing
 2          the consumers with access to this
 3          information that there's a Web site
 4          out there that does and it's up to the
 5          individuals, you know, to click on it
 6          or not.
 7                  MR.  HOOD: Well, what we're
 8          saying is if you know that's a
 9          completely illegitimate Web site then
10          you shouldn't have it come up in your
11          search results.
12                  PRESS CORPS: What violation of
13          -- what law violation would that be
14          then?
15                  MR.  HOOD: Well, if you're made
16          aware of it, you could be, you know,
17          an accessory to it.  If you're made
18          aware of something is a hundred
19          percent -- we're not talking about
20          something that's fifty percent
21          legitimate, we're talking about those
22          that they got millions of notices on
23          or these drug sites they're aware of.
24          You know, they shouldn't let that come
```

```
1      Attorney General Hood Press Conference
2         up in their search results, they can
3         block that.  And they should.
4               And so, you know, there's going
5         to be a court battle at some point to
6         determine what their duty is.
7               PRESS CORPS: Were you aware of
8         the e-mails going back and forth
9         between the MPAA and the other studios
10        back in January?
11              MR. HOOD: No, it was almost a
12        surprise to me about those
13        conversations.
14              We have never run away from the
15        fact we work with these industries.  I
16        mean, you're talking about
17        pharmaceutical industries, of course
18        you've got music, movies, and
19        software.  But you also have like
20        human trafficking.
21              I mean, you go on there and
22        search for, you know, Backpage or one
23        of these Web sites and it's just
24        prostitution.  If you did it at the
25        newspaper or at the TV, if one of your
```

1    Attorney General Hood Press Conference

2        stations or radio, if you advertise,

3        you know, a prostitution ad, we'd be

4        down there locking you up today.  But

5        if your Internet site does that then

6        you have the protections under

7        Section 230 of the Communication

8        Decency Act which says if somebody

9        posts something on your board for

10       sale, you're not responsible for it.

11       That was created so we wanted the

12       Internet to flourish.  Companies like

13       Google are using that Section 230

14       protection, that shield as a sword.

15       They're saying you can't come after us

16       because we have immunity even though

17       we're changing the algorithm, we're

18       doing autocomplete, and they're doing

19       all that.  They have some immunity

20       unless they change the information.

21       And when they start using their

22       autocomplete, that's where they've

23       stepped into No Man's Land.  They

24       don't have that Section 230

25       protection.

1    Attorney General Hood Press Conference
2           That's a longer answer than you
3    wanted.
4           PRESS CORPS: Actually, that kind
5    of cleared a lot of things up.
6           PRESS CORPS: Has the attorney
7    general been threatened by Google at
8    all?
9           MR. HOOD: Well, funny, their
10   chief counsel for Google called me
11   Monday morning 8:30 their time.  We
12   had a prearranged call set up and, you
13   know, his suggestion was, well, we
14   could just withdraw our civil
15   investigative demand.  I hadn't made
16   anything public about a civil
17   investigative demand.  I could have, I
18   could have held a press conference,
19   you know, about it.  The only thing --
20   the only restrictions are that the
21   content that I receive on that civil
22   investigative demand, we can't release
23   those documents; they're not public
24   record.  I didn't do it because I
25   wanted to work with them.

```
 1    Attorney General Hood Press Conference
 2            But Google is -- I'm telling
 3       you, I have fought insurance
 4       industries, pharmaceutical industries,
 5       you know, a lot of large corporations.
 6       I have never seen the arrogance of a
 7       company like Google.  They thumb their
 8       nose at the federal government, they
 9       paid a billion dollars to keep from --
10       a half a billion dollars to keep from
11       getting prosecuted.  If you read that
12       seven-page non-prosecution agreement
13       -- I think we have copies of it --
14       your jaw will drop.  That company was
15       telling their marketing people to tell
16       these Canadian pharmacies how to get
17       around the systems that would detect
18       keywords such as prescription drugs
19       and things of that nature.  They were
20       implicit.  And the e-mails that were
21       recovered by the federal government
22       went all the way up, my understanding,
23       to the CEO of the company at the time.
24            The company, you know, is
25       clearly one that should be
```

Page 24

```
 1    Attorney General Hood Press Conference
 2       convicted of a felony.  They had that
 3       non-prosecution agreement.  I made
 4       buys from their advertisers, just like
 5       they said they wouldn't do, during
 6       that probationary period, and then
 7       they refused to work with attorneys
 8       general to try to do something,
 9       low-hanging fruit, do some easy stuff,
10       take these lists, you know, at least
11       de-list some.  They want to go for the
12       demotion signal.  Demotion means you
13       push it down in the search results.
14       And, you know, that has worked to some
15       extent.
16            Our work as attorneys general,
17       what we've done -- they've made a lot
18       of changes.  It wasn't because they
19       wanted to, it was just because they
20       saw it as a possible liability issue.
21       They made huge changes but they've got
22       a long way to go yet.  And, you know,
23       it was the result of a lot of our work
24       but they've still got a long way to
25       go.
```

1      Attorney General Hood Press Conference

2              Does that answer your question?

3              PRESS CORPS: Well, what exactly

4      was the threat that was made?

5              MR. HOOD: They kept saying that,

6      you know, all this stuff about these

7      e-mails, you know, and about this

8      plan, you know, working with us, they

9      tried that like somehow that's

10     inappropriate.  There's nothing

11     inappropriate about a prosecutor

12     working with a victim, and that's what

13     we're talking about, it's that simple.

14     There's companies that have had their

15     products stolen.

16             So, you know, when they are

17     trying to get us to withdraw our civil

18     investigative demand, I said

19     absolutely not, we're going to go

20     forward with this.  I've tried to work

21     with them but, you know, if we have to

22     go to court, that's where we're

23     headed.  And I will take all the help

24     that I can get.

25             I want some insiders to come

```
 1      Attorney General Hood Press Conference
 2         forward that have been done wrong by
 3         Google from the Valley.  I'm putting
 4         out a call to anybody out there that
 5         has information on how Google has done
 6         illegal acts.  I'm trying to reach out
 7         to those people in the Valley or
 8         wherever they are, because it's going
 9         to take an insider to bring this
10         company to the point where it actually
11         follows the law.
12              PRESS CORPS: So this is more or
13         less a covert action essentially?
14              MR. HOOD: Yeah.  Very seldom do
15         we actually look for insiders, but
16         that's what happens at companies like
17         this that get as arrogant as the
18         tobacco companies.  When they start
19         doing these type things, people come
20         forward, you get information, that's
21         the way you make cases.
22              PRESS CORPS: So specifically how
23         is the attorney general association
24         working with Sony to try to track down
25         who was really behind this hacking?
```

1    Attorney General Hood Press Conference

2           MR. HOOD: Well, there is the --

3    I'm president of the National

4    Association of Attorneys General.  I'm

5    not speaking on behalf of our

6    association at all.  I was co-chair or

7    chair of the intellectual property

8    theft committee from 2008, November,

9    2008 until this June, this past June.

10   I've done this for, you know, six

11   years.  And there were twenty-five --

12   about twenty-five attorneys general

13   and one letter that we wrote to Google

14   to have a meeting and try to do

15   something, to work something with us.

16   And we had that meeting.  There were

17   about twenty-five attorneys general

18   there and they said no, we're not

19   doing anything.

20           If anybody makes a slippery

21   slope argument and they try to say,

22   oh, that's government trying to

23   censor, they're fanning the flames of

24   people who don't understand what we're

25   trying to do and what the law actually

1    Attorney General Hood Press Conference
2        is, and that's what Google's trying to
3        say; oh, if we, you know, take this
4        list for this group then we've got to
5        do it for another one.  They take
6        another list that they receive to keep
7        down malware and spyware so if you
8        search Google you don't get those
9        sites and that way you don't get your
10       computer infected and you continue to
11       use Google.  They use lists, you know,
12       and they should do it in other areas,
13       particularly on drugs and things that
14       harm our citizens.
15            PRESS CORPS: I feel like you
16       could ask a majority of people out
17       there and, you know, if they were to
18       search for, you know, how to watch a
19       movie for free on-line or how to buy
20       drugs on-line or how to buy
21       prostitutes or whatever, I feel like
22       if you ask a majority of people out
23       there they'd think that there is some
24       kind of government entity that's
25       watching them, that is -- is that not

Attorney General Hood Press Conference

1    Attorney General Hood Press Conference

2      the case, is that not being monitored

3      at all?

4           MR. HOOD: No.  I mean, there's

5      no federal agency that monitors the

6      Internet and it's fallen to the

7      attorneys general to try to enforce

8      these laws under our state system.  We

9      work with the federal government but,

10     you know, we have to rely on these

11     industries that are losing millions of

12     dollars a year.  They hire people to

13     go out and kind of monitor, they give

14     us the evidence, we verify it, and

15     then -- so when victims are coming to

16     attorneys general, law enforcement

17     officers to do something about

18     something that is a crime then we're

19     going to take some action.  And we

20     tried to negotiate like we did with

21     the Internet service providers, like

22     we've done with the credit card

23     companies.  We've changed the way the

24     Internet operates.  But it's to

25     protect our children.  That's what our

Page 30

```
 1    Attorney General Hood Press Conference
 2       focus is on protecting, you know,
 3       young people.
 4            And, you know, parents don't
 5       realize that their kids can go on-line
 6       and type in something as simple as buy
 7       drugs and then they find this and then
 8       they run into all these dangers of
 9       malware, getting ripped off, actually
10       buying the drugs.  Silk Road, a lot of
11       people never even heard of Silk Road.
12       It was a billion dollar -- that was
13       the illegal drug network that was
14       taken down.  They was using Bitcoins,
15       virtual currency.  There are dangers
16       out there.
17            And like there's a movie that
18       came up at 12:00 last night, it went
19       on, apparently it was shown, Hobbit I
20       think went in the theaters, and there
21       again the movies are not our main
22       focus but they're easy to explain to
23       people.  You know, people get it.  If
24       it's in the movie theaters, pretty
25       much everybody knows that it should be
```

1    Attorney General Hood Press Conference

2       streamed for free on-line.  I mean,

3       that's just kind of a low-hanging

4       fruit.  That's something that, you

5       know, the media or the motion picture

6       people or the music people ought to be

7       able to send a notice to Google to say

8       look, this is what's in our theaters

9       this week.  At least don't stream that

10      on-line or send -- let a search result

11      find that.

12           You know, and you see what the

13      autocomplete did up there.  When you

14      started typing in that line, it

15      autocompleted and download it for

16      free.

17           So Google is leading kids to

18      illegal sites.  That's what's

19      happening.  And kids are actually

20      doing it.  You know, parents don't

21      realize it.  In rural Chickasaw

22      County, maybe they don't have that

23      kind of access but they do it in

24      Rankin and Madison and Hinds and a lot

25      of other counties in our state, and

```
 1    Attorney General Hood Press Conference
 2       that's what scares me about the
 3       Internet and creating those kind of
 4       opportunities for our kids to get
 5       involved in drugs or human trafficking
 6       or a lot of the other dangers.  That's
 7       our main focus.
 8            But for me -- we often use --
 9       there's a separate statute that dealt
10       with some of the Communication Decency
11       Act but there's also the DCMA, I
12       believe it's the -- anyway, it's the
13       federal statute that allows the motion
14       picture, I suppose, and I know for
15       sure the music industry to send these
16       notices to search engines that, hey,
17       these are illegal sites, you know, you
18       should do something about it.  And so
19       it's easy because you have a list of
20       how many times they've been notified
21       about this site and it's just a good
22       example.  So we do use that example,
23       we do work with them.  We're not
24       hiding from that.  But our main focus
25       is on these things like drugs where
```

```
 1     Attorney General Hood Press Conference
 2        you can go on-line and buy drugs just
 3        like my investigators did as any kid
 4        can do that here.
 5             PRESS CORPS: Is there a budget
 6        for legal support right now to --
 7             MR. HOOD: For our office?  I've
 8        got investigators that are doing --
 9        the answer to your question is no.
10        We're going to have to expend some
11        money.  We don't have experts in the
12        area of intellectual property theft.
13        We're going to rely on lawyers that
14        are -- have that type of expertise.
15             And so, you know, the
16        legislature doesn't give me a budget
17        of a million dollars just to go out
18        and do these major investigations so
19        we have to rely and work with the
20        industries, and we're going to work
21        with them and their lawyers.  We're
22        going to go through it though and make
23        sure there's nothing that is
24        incorrect.  But at the same time we're
25        going to work with as many as it takes
```

1

2        to try to change the way these search

3        engines are -- are doing business.

4            (END OF VIDEO CLIP).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 35

1

2                CERTIFICATION BY REPORTER

3

4        I, Wayne Hock, a Notary Public of the

5    State of New York, do hereby certify:

6        That the within transcript is a true

7    record of said proceeding.

8        I further certify that I am not

9    related to any of the parties to this

10   action by blood or marriage, that I am not

11   interested directly or indirectly in the

12   matter in controversy, nor am I in the

13   employ of any of the counsel.

14       IN WITNESS WHEREOF, I have hereunto

15   set my hand this          day of

16   , 2014.

17

18

19

20

21

22

23

24

25

**[12:00 - cleared]**                                                      Page 1

| **1** |
|---|
| **12:00**  30:18 |
| **18**  1:6 |

| **2** |
|---|
| **20**  11:9 |
| **2004**  3:23 |
| **2006**  4:19 |
| **2008**  3:12,16,21  27:8,9 |
| **2009**  5:8,24 7:15 |
| **2010**  7:15 |
| **2013**  10:3 |
| **2014**  1:6 35:16 |
| **230**  21:7,13,24 |

| **5** |
|---|
| **500**  9:9 |

| **8** |
|---|
| **8:30**  22:11 |

| **a** |
|---|
| **able**  31:7 |
| **absolutely**  25:19 |
| **accepts**  5:17 |
| **access**  18:13 19:3  31:23 |
| **accessory**  19:18 |
| **acronym**  14:24 |
| **act**  7:2 18:22 21:8  32:11 |
| **action**  26:13 29:19  35:10 |
| **acts**  26:6 |
| **actual**  6:20 |
| **ad**  21:3 |
| **address**  17:21 |
| **admitted**  14:14 |
| **advertise**  21:2 |
| **advertisers**  24:4 |
| **advertising**  10:20  10:23 18:5,6 |
| **advocating**  14:21 |
| **agencies**  16:14 |
| **agency**  17:4 29:5 |

**aggravates**  12:23
**ago**  15:2
**agree**  5:8
**agreed**  5:10
**agreement**  9:13  23:12 24:3
**ags**  13:6 15:2
**algorithm**  21:17
**allow**  15:20
**allows**  32:13
**amendment**  18:16  18:19
**answer**  22:2 25:2  33:9
**anybody**  26:4 27:20
**anymore**  9:22
**anyway**  8:23 11:4  32:12
**apparel**  13:14
**apparently**  30:19
**area**  33:12
**areas**  28:12
**argument**  27:21
**arrogance**  23:6
**arrogant**  26:17
**article**  8:22 14:15
**assisting**  9:5,6 18:3
**association**  3:15  26:23 27:4,6
**at&t**  3:25
**attack**  14:3
**attacks**  14:7 16:23
**attempted**  14:25
**attorney**  1:3 2:1 3:1  3:23 4:1 5:1 6:1 7:1  8:1 9:1 10:1,8 11:1  12:1 13:1 14:1 15:1  16:1 17:1 18:1 19:1  20:1 21:1 22:1,6  23:1 24:1 25:1 26:1  26:23 27:1 28:1  29:1 30:1 31:1 32:1  33:1
**attorneys**  3:3,8,15  24:7,16 27:4,12,17

29:7,16
**autocomplete**  12:15  21:18,22 31:13
**autocompleted**  31:15
**autocompletes**  9:24
**automatically**  4:25
**aware**  12:7 19:17,19  19:24 20:7

| **b** |
|---|
| **back**  20:8,10 |
| **backpage**  20:22 |
| **bad**  6:6 9:4 |
| **bank**  5:17 |
| **banks**  4:15 5:7,9,20  7:5,6 |
| **basically**  14:17 |
| **battle**  15:25 20:5 |
| **began**  3:20,21 4:18 |
| **behalf**  27:5 |
| **believe**  15:11 32:12 |
| **bigger**  6:4 |
| **biggest**  5:25 |
| **billion**  9:8 11:9,11  23:9,10 30:12 |
| **billions**  12:21 13:19 |
| **bing**  6:2,4 15:18 |
| **bit**  2:3 |
| **bitcoins**  30:14 |
| **block**  4:20 20:3 |
| **blog**  13:2,3 |
| **blogs**  2:22 12:25 |
| **blood**  35:10 |
| **board**  21:9 |
| **bogus**  6:19 8:16 |
| **bought**  8:5 10:19,21 |
| **bring**  26:9 |
| **budget**  33:5,16 |
| **business**  18:21 34:3 |
| **button**  18:8 |
| **buy**  7:21,23 8:14,15  9:25 10:18 12:3,4,6  12:8 18:7 28:19,20  30:6 33:2 |

**buying**  30:10
**buys**  10:16 24:4

| **c** |
|---|
| **c**  1:9,12 |
| **cabinet**  2:14 |
| **call**  11:10 13:10  22:12 26:4 |
| **called**  2:7 6:7 22:10 |
| **canadian**  9:14 23:16 |
| **canadiandrugs.com.**  8:3 |
| **capitalized**  11:12 |
| **card**  5:9 8:19 29:22 |
| **care**  13:20 |
| **carry**  17:19 |
| **case**  2:17 29:2 |
| **cases**  26:21 |
| **caught**  9:7 10:14 |
| **censor**  27:23 |
| **center**  4:6 |
| **ceo**  23:23 |
| **certainly**  2:17 |
| **certification**  35:2 |
| **certify**  35:5,8 |
| **chair**  3:13 27:6,7 |
| **change**  21:20 34:2 |
| **changed**  29:23 |
| **changes**  24:18,21 |
| **changing**  21:17 |
| **chaos**  14:6 |
| **chickasaw**  31:21 |
| **chief**  22:10 |
| **child**  4:3,11,16,21  4:23,25 12:16 |
| **children**  4:7 12:2,2  15:8 29:25 |
| **citizen**  10:14 15:17  15:20 |
| **citizens**  5:23 28:14 |
| **civil**  22:14,16,21  25:17 |
| **clean**  6:25 18:22 |
| **cleared**  22:5 |

**clearly** 23:25
**click** 18:8 19:6
**clicks** 18:10
**clip** 34:4
**clothes** 2:14
**clothing** 13:14
**comcast** 3:25
**come** 6:24 19:11,25
  21:15 25:25 26:19
**comes** 13:2
**coming** 2:2 12:20
  29:15
**committee** 3:14 27:8
**communication**
  21:7 32:10
**companies** 2:20
  5:10,11,12 11:23
  14:9 16:12,24 17:3
  21:12 25:14 26:16
  26:18 29:23
**company** 8:4 11:9
  11:12,15,18 13:10
  14:10 23:7,14,23,24
  26:10
**comparisons** 11:16
**compiles** 5:16
**completely** 19:10
**computer** 4:12
  28:10
**conference** 1:3 2:1
  3:1 4:1 5:1 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1,18
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1 33:1
**consumers** 19:3
**content** 15:22 22:21
**continue** 28:10
**controversy** 35:12
**conversations** 3:24
  20:13

**convicted** 24:2
**copies** 8:7 23:13
**copyright** 5:15
  15:12
**corporate** 5:23
  10:13
**corporation** 2:7
**corporations** 23:5
**corps** 17:15 18:12
  18:25 19:13 20:7
  22:4,6 25:3 26:12
  26:22 28:15 33:5
**counsel** 22:10 35:13
**counterfeit** 5:18
  13:9,16
**counties** 31:25
**countries** 18:2
**county** 31:22
**course** 20:17
**court** 20:5 25:22
**courts** 16:7 17:12
**covert** 26:13
**create** 12:25
**created** 21:11
**creating** 11:25 32:3
**credit** 5:9 8:19
  29:22
**crime** 9:5,6 10:10
  29:18
**crimes** 17:9
**currency** 30:15
**cyber** 14:7 16:23

**d**

**d** 1:12
**dangers** 15:7 17:7
  30:8,15 32:6
**day** 35:15
**days** 14:7
**dcma** 32:11
**de** 6:22 24:11
**dealt** 32:9
**december** 1:6
**decency** 21:8 32:10

**demand** 22:15,17,22
  25:18
**demotion** 24:12,12
**deserve** 11:23 14:9
**detect** 23:17
**determine** 20:6
**directly** 35:11
**document** 3:11
**documented** 6:21
**documents** 3:6 7:16
  16:16 22:23
**doing** 15:21 21:18
  21:18 26:19 27:19
  31:20 33:8 34:3
**dollar** 9:8 11:11
  30:12
**dollars** 23:9,10
  29:12 33:17
**download** 31:15
**drawer** 2:14
**drop** 23:14
**drug** 7:25 13:9,10
  19:24 30:13
**drugs** 7:21,23 8:5,8
  8:9,14,25 9:16,25
  10:6 12:3,14 15:6
  15:23 18:23 19:2
  23:18 28:13,20 30:7
  30:10 32:5,25 33:2
**drugstore** 9:22
**duty** 15:24 20:6

**e**

**e** 1:12,12 2:9 3:7,17
  11:7,10 13:24 14:11
  16:6 20:8 23:20
  25:7
**easy** 6:8 24:9 30:22
  32:19
**effort** 3:20 5:6
**eleven** 10:9
**employ** 35:13
**encourage** 13:6
**enforce** 13:6 29:7

**enforcement** 10:10
  29:16
**engine** 6:2 17:21
**engines** 4:19 5:7
  32:16 34:3
**entered** 9:12
**entities** 7:8 16:18
**entity** 16:25 28:24
**equate** 2:11
**essentially** 26:13
**everybody** 30:25
**evidence** 29:14
**evil** 11:20,22
**exactly** 10:23 25:3
**example** 7:19 32:22
  32:22
**examples** 12:5
**exceptions** 14:20
**expend** 33:10
**expertise** 33:14
**experts** 33:11
**explain** 30:22
**exploited** 4:7
**extent** 24:15
**exxonmobil** 11:17

**f**

**f** 1:10
**fact** 5:7 9:7,12 20:15
**fake** 12:4,6,8 18:7
**fallen** 29:6
**fanning** 27:23
**federal** 8:2 9:10
  10:24 11:2 16:14,17
  17:25 23:8,21 29:5
  29:9 32:13
**feeding** 3:5
**feel** 15:24 17:2
  28:15,21
**felony** 24:2
**fifty** 18:10 19:21
**fight** 14:22
**fighting** 15:6
**figure** 16:19

**[file - international]**                                                Page 3

file  7:15
filing  2:13
filter  4:2,14 6:5
  15:14
find  5:13 7:24 8:15
  10:5 11:8 12:16,19
  16:11 30:7 31:11
finding  11:21
fine  9:8,10
first  3:13 18:16,19
five  11:10 27:11,12
  27:17
flames  27:23
flourish  21:12
focus  30:2,22 32:7
  32:24
follows  26:11
forgot  14:24
forth  20:8
forty  11:14
forward  25:20 26:2
  26:20
fought  23:3
found  12:12
free  8:21 28:19 31:2
  31:16
fruit  24:9 31:4
funny  22:9
further  35:8
future  10:10 13:25
  14:8 16:24 17:10

**g**

g  1:12
geared  10:11
general  1:3 2:1 3:1,3
  3:8,16,23 4:1 5:1
  6:1 7:1 8:1 9:1 10:1
  10:9 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1,7 23:1 24:1,8
  24:16 25:1 26:1,23
  27:1,4,12,17 28:1
  29:1,7,16 30:1 31:1

32:1 33:1
generated  4:12
germany  12:17
getting  9:11 23:11
  30:9
give  29:13 33:16
go  2:16 5:13 6:12,25
  9:21 10:5 11:16
  12:5,17 17:24 20:21
  24:11,22,25 25:19
  25:22 29:13 30:5
  33:2,17,22
goes  2:12
going  8:15,17,18
  13:25 14:8 16:24,25
  17:17,18 18:20 20:4
  20:8 25:19 26:8
  29:19 33:10,13,20
  33:22,25
goliath  11:10
good  5:22,23 10:13
  32:21
google  1:4 2:7,20
  4:22 5:24 6:19 7:23
  8:20 9:7,9 10:12,17
  10:21 11:4,18 12:24
  14:10,22 15:9,16
  16:17 17:17,19 18:3
  18:10,17,25 21:13
  22:7,10 23:2,7 26:3
  26:5 27:13 28:8,11
  31:7,17
google's  5:25 6:3,10
  9:5 12:10 13:19
  28:2
government  8:2
  9:10 10:24 11:2
  16:18,25 17:4,25
  18:18 23:8,21 27:22
  28:24 29:9
government's  15:13
grid  14:3
grids  14:2
group  28:4

guess  18:12

**h**

hacked  13:24
hackers  13:25
hacking  16:10 26:25
half  9:8 23:10
hand  35:15
handle  16:23
hanging  24:9 31:3
happened  11:3
happening  31:19
happens  26:16
harm  28:14
hash  4:4
headed  25:23
headline  13:2
heard  30:11
held  22:18
help  13:12 25:23
helping  9:14
hereunto  35:14
heroin  10:6
hey  32:16
hiding  32:24
highway  11:25
hinds  31:24
hire  29:12
hit  14:2 17:2,5
hobbit  30:19
hock  35:4
hood  1:3 2:1,2 3:1
  4:1 5:1 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1
  17:1,23 18:1,17
  19:1,8,16 20:1,11
  21:1 22:1,9 23:1
  24:1 25:1,5 26:1,14
  27:1,2 28:1 29:1,4
  30:1 31:1 32:1 33:1
  33:7
house  2:13
huge  11:14,18,19
  16:3 24:21

human  12:3 20:20
  32:5
hundred  11:11,13
  19:19

**i**

identify  4:9
ids  12:4,6 18:7
illegal  7:25 8:8
  15:22 26:6 30:13
  31:18 32:17
illegitimate  6:16
  19:10
image  4:12
images  4:3,3,17
immunity  7:7,9
  21:16,19
implications  16:22
implicit  23:20
importantly  11:24
inappropriate  25:10
  25:11
incorrect  33:24
indicate  3:7
indirectly  35:11
individual  17:18
individuals  19:6
industries  2:24 13:8
  20:15,17 23:4,4
  29:11 33:20
industry  2:25 3:10
  13:5 32:15
infected  28:10
information  11:19
  14:12 16:20 17:3
  18:14 19:4 21:20
  26:5,20
insider  26:9
insiders  25:25 26:15
insurance  23:3
intellectual  3:2,13
  27:7 33:12
interested  35:11
international  5:15

**internet**  3:24 10:7
  15:7,14 21:5,12
  29:6,21,24 32:3
**investigations**  33:18
**investigative**  22:15
  22:17,22 25:18
**investigator**  10:16
**investigators**  7:20
  8:5,6 13:15 33:3,8
**involved**  3:10 16:12
  32:5
**issue**  13:21 17:14
  24:20
**issues**  9:4 16:3
  17:11

**j**

**jackson**  8:21
**january**  20:10
**jaw**  23:14
**jim**  1:3
**june**  27:9,9

**k**

**katrina**  14:5
**keep**  9:11 23:9,10
  28:6
**kept**  4:5 25:5
**keywords**  23:18
**kid**  8:13 33:3
**kids**  8:17 30:5 31:17
  31:19 32:4
**kind**  8:20,23 12:20
  14:16,20 22:4 28:24
  29:13 31:3,23 32:3
**kinds**  10:6
**knew**  4:7,10,11
**know**  2:10,15,20,22
  6:18 7:8,17,17 8:9
  9:3 10:12 11:3
  12:24 13:2,4,14,16
  13:21 14:16,17 15:9
  15:11,23 16:2,6,21
  16:22 17:5,8,14
  18:3,4,13,22 19:6,9
  19:17,25 20:4,22

21:3 22:13,19 23:5
  23:24 24:10,14,22
  25:6,7,8,16,21
  27:10 28:3,11,17,18
  29:10 30:2,4,23
  31:5,12,20 32:14,17
  33:15
**knows**  6:19 8:20
  30:25

**l**

**lab**  8:6
**lady**  9:21
**land**  21:23
**large**  2:6 16:21 23:5
**late**  2:3
**law**  2:17 10:10 13:7
  19:14 26:11 27:25
  29:16
**laws**  14:25 15:12
  29:8
**lawyers**  33:13,21
**lead**  4:25
**leading**  10:2 31:17
**legal**  33:6
**legislature**  33:16
**legitimate**  7:3 18:24
  19:22
**letter**  8:11 9:18 10:4
  27:13
**letters**  15:3
**liability**  24:20
**line**  5:3,13 7:8,9 8:5
  8:9,12 9:16,23
  10:16 12:6 28:19,20
  30:5 31:2,10,14
  33:2
**list**  5:14,16 6:22
  7:22 24:11 28:4,6
  32:19
**lists**  5:20 7:3,5 24:10
  28:11
**little**  2:3 9:20 11:9
**locking**  21:4

**long**  3:23 24:22,24
**longer**  22:2
**look**  7:22 8:13 9:19
  26:15 31:8
**looking**  16:14
**losing**  29:11
**lot**  13:8 16:13,15
  17:10,23 18:4 22:5
  23:5 24:17,23 30:10
  31:24 32:6
**low**  24:9 31:3

**m**

**madison**  31:24
**mails**  2:9 3:7,17
  11:7,10 13:24 14:11
  16:6 20:8 23:20
  25:7
**main**  30:21 32:7,24
**major**  33:18
**majority**  28:16,22
**making**  10:22 12:21
  13:19 18:5
**malware**  28:7 30:9
**man's**  21:23
**manufactures**  13:11
**margin**  10:21
**marketing**  23:15
**marriage**  35:10
**matter**  35:12
**mean**  2:7 5:5,8,9
  12:4,10 13:23,25
  14:7,11 16:15 17:7
  18:14,18 20:16,21
  29:4 31:2
**means**  24:12
**media**  2:18 5:5 13:4
  16:7,8 31:5
**meeting**  27:14,16
**million**  6:10,11,15
  6:20 9:10 33:17
**millions**  19:23 29:11
**mind**  17:12
**missing**  4:6

**mississippi**  8:14
  12:2 13:3
**monday**  22:11
**monetize**  18:9
**money**  10:22 18:6
  33:11
**monitor**  29:13
**monitored**  29:2
**monitors**  29:5
**months**  3:19
**morning**  22:11
**motion**  3:9 13:5
  31:5 32:13
**motto**  11:20
**movie**  28:19 30:17
  30:24
**movies**  6:18 9:3 15:5
  20:18 30:21
**mp3**  6:7,9
**mpaa**  20:9
**music**  6:17 9:2 15:5
  20:18 31:6 32:15

**n**

**n**  1:9,12
**national**  3:15 4:6
  16:3 27:3
**nature**  23:19
**nazi**  12:18
**necessarily**  7:11
  13:15
**negotiate**  29:20
**network**  30:13
**never**  20:14 23:6
  30:11
**new**  3:6 5:4 14:13
  35:5
**newspaper**  20:25
**night**  30:18
**nike**  5:12,19
**non**  9:13 23:12 24:3
**nonprofit**  5:11,14
  7:4
**nose**  23:8

| | | | |
|---|---|---|---|
| **notary** 35:4 | **photograph** 4:5 | **profit** 16:10 | **read** 23:11 |
| **notice** 31:7 | **picture** 3:10 13:5 | **promoting** 18:4 | **real** 14:7 17:7 |
| **notices** 6:10,11,15 | 31:5 32:14 | **property** 2:12 3:3 | **realize** 30:5 31:21 |
| 6:21 19:23 32:16 | **pipeline** 4:8 | 3:14 14:18 16:4 | **really** 6:3 13:22 15:4 |
| **notified** 32:20 | **piracy** 6:9 9:4 | 27:7 33:12 | 26:25 |
| **november** 3:12 27:8 | **placed** 4:4 | **property's** 13:18 | **receive** 22:21 28:6 |
| **numbers** 8:19 17:6 | **plan** 25:8 | **prosecuted** 9:11 | **receiving** 14:17 |
| | **plus** 11:11 | 23:11 | **record** 22:24 35:7 |

**o**

| | | | |
|---|---|---|---|
| **o** 1:10,12 | **po** 4:24 | **prosecution** 9:13 | **recovered** 23:21 |
| **office** 33:7 | **point** 14:2 16:13 | 23:12 24:3 | **reformed** 11:5 |
| **officers** 29:17 | 20:5 26:10 | **prosecutor** 25:11 | **refuse** 6:21 7:12 |
| **oh** 27:22 28:3 | **pop** 17:22 | **prostitutes** 28:21 | **refused** 24:7 |
| **once** 15:17 | **porn** 4:3,24,25 | **prostitution** 20:24 | **refuses** 10:13 |
| **operates** 29:24 | 12:16 | 21:3 | **regulating** 18:13 |
| **opportunities** 32:4 | **pornographic** 4:17 | **protect** 29:25 | **related** 35:9 |
| **order** 9:23 | **pornography** 4:21 | **protecting** 30:2 | **release** 22:22 |
| **organization** 5:16 | **possible** 24:20 | **protection** 21:14,25 | **rely** 29:10 33:13,19 |
| **ought** 4:9 31:6 | **posts** 21:9 | **protections** 7:7,10 | **remember** 9:9 |
| **overseas** 17:24 | **power** 14:2,3,5 | 21:6 | **report** 6:13 |
| **owe** 18:19 | **prearranged** 22:12 | **provided** 14:15 | **reported** 10:25 |
| | **prescription** 8:9,25 | **providers** 3:25 | **reporter** 14:13 35:2 |

**p**

| | | | |
|---|---|---|---|
| **p** 1:9,12 | 9:16,17,20,24,25 | 29:21 | **reports** 8:6 |
| **page** 9:12 23:12 | 10:2 12:14,15 23:18 | **providing** 14:13 | **resolved** 17:11 |
| **paid** 9:7,9 23:9 | **president** 27:3 | 19:2 | **respect** 11:24 |
| **paperwork** 2:4 | **press** 1:3 2:1 3:1 4:1 | **public** 22:16,23 35:4 | **responsibile** 15:17 |
| **parents** 8:19 30:4 | 5:1 6:1 7:1 8:1,21 | **public's** 17:12 | **responsible** 15:20 |
| 31:20 | 9:1 10:1 11:1 12:1 | **publish** 2:19 | 21:10 |
| **particularly** 28:13 | 13:1 14:1,20 15:1 | **pull** 4:10 | **rest** 15:18 |
| **parties** 35:9 | 16:1 17:1,15 18:1 | **purchases** 8:12 | **restrictions** 22:20 |
| **passed** 15:2 | 18:12,25 19:1,13 | **push** 24:13 | **result** 24:23 31:10 |
| **pay** 5:21 | 20:1,7 21:1 22:1,4,6 | **pushed** 2:6,8,21 | **results** 6:25 10:17 |
| **paying** 4:15 | 22:18 23:1 24:1 | 11:6 | 10:18,19 19:12 20:2 |
| **people** 10:22 15:11 | 25:1,3 26:1,12,22 | **pushing** 11:22,22 | 24:13 |
| 16:5,6,9 23:15 26:7 | 27:1 28:1,15 29:1 | **put** 7:4 17:20 | **rifle** 14:10 16:5 |
| 26:19 27:24 28:16 | 30:1 31:1 32:1 33:1 | **putting** 2:21 26:3 | **rifled** 2:9 11:7 |
| 28:22 29:12 30:3,11 | 33:5 | | **rifling** 2:11 |
| 30:23,23 31:6,6 | **pretty** 30:24 | **q** | **right** 2:16,18 3:11 |
| **percent** 18:10 19:20 | **prevent** 12:19 | | 7:22 8:22 9:15 12:6 |
| 19:21 | **print** 7:10 | **question** 25:2 33:9 | 16:5,20 33:6 |
| **period** 24:6 | **private** 16:4 17:2 | **questions** 17:13 | **rile** 15:10 |
| **pharmaceutical** | **probation** 10:15 | | **rip** 8:17 |
| 20:17 23:4 | **probationary** 24:6 | **r** | **ripped** 30:9 |
| **pharmacies** 9:14 | **proceeding** 35:7 | **r** 1:9,9,12 | **road** 2:15 30:10,11 |
| 23:16 | **products** 5:19 25:15 | **radio** 21:2 | **rolex** 5:19 |
| | | **rankin** 31:24 | |
| | | **reach** 11:19 26:6 | |

**[run - typing]**

**run**  20:14 30:8
**rural**  31:21

**s**

**s**  1:9,12
**sale**  21:10
**saw**  24:20
**saying**  6:23 19:9
  21:15 25:5
**says**  2:18 21:8
**scares**  32:2
**search**  4:19 5:6,25
  6:24 10:17,18,19
  17:21 19:12 20:2,22
  24:13 28:8,18 31:10
  32:16 34:2
**section**  21:7,13,24
**security**  17:6
**see**  8:22 31:12
**seen**  3:18 23:6
**seldom**  26:14
**sell**  9:15 18:23
**selling**  5:18 7:2
  15:22 18:23 19:2
**send**  31:7,10 32:15
**sent**  3:17 7:16 16:16
**separate**  32:9
**service**  3:25 29:21
**set**  13:5 22:12 35:15
**seven**  9:12 23:12
**shield**  21:14
**show**  5:3
**shown**  30:19
**shows**  6:14
**shut**  14:5
**side**  6:9
**signal**  24:12
**signature**  35:17
**silk**  30:10,11
**silkroad.org.**  7:24
**simple**  25:13 30:6
**site**  6:12,15,19 7:25
  8:10 15:21 18:5,21
  19:4,10 21:5 32:21

**sites**  4:16 5:18 6:6
  7:18 8:17 17:18,20
  19:24 20:23 28:9
  31:18 32:17
**sits**  2:15
**situation**  16:11
**six**  3:19 27:10
**skull**  6:7,9
**slippery**  27:20
**slope**  27:21
**social**  17:5
**society**  14:6
**software**  9:3 15:5
  20:19
**sold**  4:16
**somebody**  14:19
  21:8
**someone's**  2:11
**something's**  13:16
**sony**  2:10,24 11:9
  13:23 14:9 26:24
**sony's**  16:4
**sopa**  14:23
**sorry**  2:3
**speaking**  27:5
**specifically**  26:22
**spin**  3:5 14:22 15:10
**spyware**  28:7
**start**  7:2 21:21
  26:18
**started**  31:14
**state**  29:8 31:25
  35:5
**stations**  7:11 21:2
**statute**  32:9,13
**steal**  8:18
**stealing**  9:2
**steals**  2:13
**step**  15:25
**stepped**  5:22 21:23
**stifling**  18:15
**stolen**  2:10,12 13:19
  14:18 16:7 17:4
  25:15

**stop**  4:15 10:4 18:22
**story**  2:5,8,21,23
  11:6 12:25
**stream**  31:9
**streamed**  31:2
**studios**  20:9
**stuff**  8:24 12:20
  24:9 25:6
**suggestion**  22:13
**support**  33:6
**suppose**  11:8 32:14
**sure**  16:19 32:15
  33:23
**surprise**  20:12
**sword**  21:14
**swore**  10:24
**system**  12:11 13:6
  29:8
**systems**  7:9 23:17

**t**

**t**  1:9,9
**take**  6:22 7:17 12:13
  24:10 25:23 26:9
  28:3,5 29:19
**taken**  8:2 30:14
**takes**  33:25
**talk**  2:5
**talking**  6:2 8:24,25
  10:8 19:20,22 20:16
  25:13
**tell**  23:15
**telling**  7:17 23:2,15
**terms**  4:20
**testing**  13:12
**thank**  2:2
**theaters**  30:20,24
  31:8
**theft**  3:3,14 27:8
  33:12
**thing**  2:19 5:22
  14:16 22:19
**things**  3:7 8:20
  14:21 22:5 23:19
  26:19 28:13 32:25

**think**  6:17 11:13
  17:10 23:13 28:23
  30:20
**threat**  25:4
**threatened**  22:7
**three**  4:13 6:4,9,10
  6:14,20 11:13 14:6
**thumb**  23:7
**time**  22:11 23:23
  33:24
**times**  3:6 5:5 6:4
  14:13 32:20
**tobacco**  26:18
**today**  7:20 8:13 21:4
**totally**  6:16
**track**  12:11 26:24
**trafficking**  12:4
  20:20 32:5
**training**  13:13
**transcript**  35:6
**treat**  17:8
**tried**  3:5 14:22 25:9
  25:20 29:20
**true**  12:12 35:6
**try**  2:25 5:6 15:10
  16:18 24:8 26:24
  27:14,21 29:7 34:2
**trying**  2:3,23 4:2,20
  15:13,15,16 25:17
  26:6 27:22,25 28:2
**turn**  14:6 16:9
**turned**  5:24
**tv**  20:25
**twenty**  27:11,12,17
**two**  4:13 6:3 11:14
**type**  2:19 4:23 5:2
  5:20 7:23 9:19,24
  12:16,18 14:15
  16:23 17:9 26:19
  30:6 33:14
**typed**  7:21
**types**  8:14
**typing**  31:14

**u**

**understand**   3:18
   13:13 17:16 27:24
**understanding**
   23:22
**unfair**   3:4
**use**   28:11,11 32:8,22

**v**

**valley**   26:3,7
**value**   4:4
**verify**   29:14
**verizon**   4:2
**victim**   4:13 13:23
   25:12
**victims**   13:17,18
   17:9 29:15
**video**   18:7 34:4
**videos**   12:8
**violation**   19:13,14
**virtual**   30:15

**w**

**walgreen's**   9:23
**want**   2:5 9:21,22
   18:9 24:11 25:25
**wanted**   21:11 22:3
   22:25 24:19
**watch**   28:18
**watching**   28:25
**way**   8:15 23:22
   24:22,24 26:21 28:9
   29:23 34:2
**wayne**   35:4
**we've**   12:5 15:25
   16:16,17 24:17 28:4
   29:22,23
**web**   4:16 5:17 6:12
   6:15,19 7:18 8:10
   15:21 17:18,20 18:5
   18:21 19:4,10 20:23
**week**   31:9
**went**   23:22 30:18,20
**whereof**   35:14

**winds**   2:22 13:3
**withdraw**   22:14
   25:17
**witness**   35:14
**word**   4:24 5:2 7:21
   9:19 12:18
**work**   7:3 11:21 13:8
   13:17 18:2 20:15
   22:25 24:7,16,23
   25:20 27:15 29:9
   32:23 33:19,20,25
**worked**   13:7 16:15
   16:17 24:14
**working**   2:24 3:22
   4:19 7:13,14 25:8
   25:12 26:24
**wrong**   26:2
**wrote**   8:10 9:18 10:3
   15:3 27:13

**y**

**yeah**   16:7 26:14
**year**   3:19 29:12
**years**   4:14,22 10:9
   15:2 27:11
**york**   3:6 14:13 35:5
**young**   30:3
**youtube**   12:8 18:7

**Section 8.0.1**

## OFFICE OF THE ATTORNEY GENERAL
## REQUEST FOR PUBLIC RECORDS

Person Requesting:        Fred Krutz, Forman Perry Watkins Krutz & Tardy, LLP

Representing:              Google Inc.

Street/Mailing Address:   P.O. Box 22608

City, State, Zip:         Jackson, MS 39225

Telephone:    601-960-8622          Date of Request:   December 19, 2014

Material Requested (Please be as clear and concise as possible.):

(1) During the period from January 1, 2012 through the present, all information and documents
that have been exchanged between Attorney General Jim Hood, the Office of the Attorney
General, and/or any employee of the Office of the Attorney General on the one hand and any of the
following third parties on the other:   the Motion Picture Association of America or any of its
members, Steven Fabrizio, Vans Stevenson, Kate Bedingfield, the Recording Industry Association
of America or any of its members, Digital Citizens Alliance or any of its members, the
Pharmaceutical Research and Manufacturers of America or any of its members, Thomas Galvin,
FairSearch.org or any of its members, Microsoft Corporation, Patrick Lynch Group, Lynch and
Pine Attorneys at Law, Orrick Herrington & Sutcliffe LLP, Jenner & Block LLP, Thomas J.
Perrelli, Elizabeth Bullock, the Mike Moore Law Firm, former Mississippi Attorney General
Michael Moore, 21st Century Fox, News Corp., Comcast Corporation, Viacom Inc., Warner Bros.
Entertainment Inc., The Walt Disney Company, Sony Pictures Entertainment Inc. NBCUniversal,
Inc., and/or any agents, partners, associates, employees, staffers, affiliates, or predecessors of the
foregoing.   For the avoidance of doubt, this request includes all communications of any form,
including email, text messages, and any other form of communication from official or personal
accounts or addresses of Attorney General Jim Hood, the Office of the Attorney General, and or
any employee of the Office of the Attorney General.

(2) During the period from January 1, 2012 through the present, identify with specificity any gifts
or other support, including in kind, accepted by Attorney General Jim Hood in his personal,
official, and candidate capacity from any of the following third parties:   the Motion Picture
Association of America or any of its members, Steven Fabrizio, Vans Stevenson, Kate
Bedingfield, the Recording Industry Association of America or any of its members, Digital
Citizens Alliance or any of its members, the Pharmaceutical Research and Manufacturers of
America or any of its members, Thomas Galvin, FairSearch.org or any of its members, Microsoft
Corporation, the Patrick Lynch Group, Lynch and Pine Attorneys at Law, Orrick Herrington &
Sutcliffe LLP, Jenner & Block LLP, Thomas J. Perrelli, Elizabeth Bullock, the Mike Moore Law
Firm, former Mississippi Attorney General Michael Moore, 21st Century Fox, News Corp.,

Neiman Supp. Decl.
Ex. B

Comcast Corporation, Viacom Inc., Warner Bros. Entertainment Inc., The Walt Disney Company, Sony Pictures Entertainment Inc. NBCUniversal, Inc., and/or any agents, partners, associates, employees, staffers, affiliates, or predecessors of the foregoing.

(3) The total dollar amount of attorney's fees and expenses paid by the Office of the Attorney General and/or Attorney General Jim Hood to any attorney, law firm, and/or agent of an attorney or law firm that is not employed by the Office of the Attorney General, in connection with any inquiry by the Office of the Attorney General and/or Attorney General Jim Hood that relates to any discussion of or matter involving Google Inc., or its alleged conduct.

(4) Any and all agreements between the Office of the Attorney General and/or Attorney General Jim Hood with any attorney, law firm, and/or agent of an attorney or law firm that is not employed by the Office of the Attorney General, in connection with any inquiry by the Office of the Attorney General and/or Attorney General Jim Hood that relates to any discussion of or matter involving Google Inc., or its alleged conduct.

(5) During the period from January 1, 2012 to the present, all information and documents that relate to or concern Google Inc., Project Goliath, and/or Project Keystone, to the extent not covered by the above requests.   For the avoidance of doubt, this request includes all communications of any form, including email, text messages, and any other form of communication from official or personal accounts or addresses of Attorney General Jim Hood, the Office of the Attorney General, and or any employee of the Office of the Attorney General.

(6) Any and all information and documents provided by the Office of the Attorney General in response to the request for public records referenced in the article published on the *New York Times* website on December 16, 2014 as "Google's Detractors Take Their Fight to the States," and in the print version of the *New York Times* on December 17, 2014 as "Google's Critics Enlist States in Their Fights."

Review Requested: _____ Personally Inspect ____X____ Copy of Material

Further Instructions: All copied materials should be provided in their original format, *i.e.* materials maintained in hard copy format should be provided in that format, and materials maintained in electronic format should be provided in their native electronic format (or in a common electronic format if the native format can only be accessed by sensitive or proprietary software) on a CD, DVD, or other appropriate media.

Requestor's Signature: _____

Please submit this request to:

> Opinions Division
> Office of the Attorney General
> P.O. Box 220
> Jackson, Mississippi 39205

**Note**: Actual costs of gathering and reproducing requested materials will be the responsibility of the requesting agent.

STATE OF MISSISSIPPI



**JIM HOOD**
**ATTORNEY GENERAL**

CONSUMER PROTECTION
DIVISION

January 6, 2015

Fred Krutz
Forman Perry Watkins Krutz & Tardy, LLP
City Centre, Suite 100
200 South Lamar Street
Jackson, Mississippi 39201-4099

**RE:    Google Public Records Request**

Dear Mr. Krutz:

The Attorney General's Office is in receipt your request dated December 19, 2014, and received on December 23, 2014. It is the position of this Office that your request violates the "Order On Agreed Stay, Briefing Schedule and Preliminary Injunction Hearing," issued by Judge Wingate on December 23, 2014.  As you know, Judge Wingate's order mandates a stay on proceedings between Google and the Attorney General's office and maintains the status quo until March 6, 2015.

Moreover, all documents responsive to your request either do not exist, do not fall under the definition of "public records" as defined by 25-61-3(b) or constitute investigative reports pursuant to Miss. Code Ann. Section 25-61-3(f), attorney work product pursuant to Miss. Code Ann. Section 25-1-102, and/or attorney-client communications pursuant to  Miss. Code Ann. Section 25-61-11.  Thus, we regret to inform you that said documents are exempt from public inspection.

If you have any questions regarding this matter, I may be contacted at 601-359-4279.

Sincerely,

Bridgette W. Wiggins
Special Assistant Attorney General

550 HIGH STREET - POST OFFICE BOX 22947 - JACKSON, MISSISSIPPI 39225-2947
TELEPHONE (601) 359-4230 - FACSIMILE (601) 359-4231

Neiman Supp. Decl.
Ex. C



**FORMAN PERRY WATKINS KRUTZ & TARDY** LLP
ATTORNEYS AT LAW

City Centre, Suite 100
200 South Lamar Street
Jackson, Mississippi 39201-4099

Post Office Box 22608
Jackson, Mississippi 39225-2608

Telephone: 601.960.8600
Main Facsimile: 601.960.8613
Asbestos Facsimile: 601.960.3241

www.fpwkt.com

FRED KRUTZ
Direct Dial: (601) 960-8622
fred@fpwk.com

January 14, 2015

**VIA EMAIL AND REGULAR MAIL**

Bridgette W. Wiggins
Special Assistant Attorney General
550 High Street
Post Office Box 22947
Jackson. Mississippi 39225-2947

Re:  Google Inc.'s Mississippi Public Records Act Request

Dear Bridgette:

This responds to your January 6, 2015 letter declining to produce any documents in response to Google Inc.'s December 19, 2014 Mississippi Public Records Act request to the Mississippi Attorney General.

You suggest that Judge Wingate's December 23 order – which granted Google the relief sought in its TRO motion – somehow also excused the Attorney General from having to comply with the pending MPRA request, even though you never brought that request to Judge Wingate's attention or sought *any* form of relief from him. Your position is mistaken. The operative paragraph of the Order provides as follows:

> [T]his case is stayed and the status quo shall be maintained until March 6, 2015, during which time the Defendant has agreed not to enforce the Administrative Subpoena and Subpoena Duces Tecum or bring civil or criminal charges against the Plaintiff.

The Order does not purport to address, much less preclude Google from seeking to enforce, its pending MPRA request, an entirely separate exercise. Nor does the Order relieve the Attorney General of its statutory obligation to produce public records under the MPRA.

Judge Wingate's on-the-record description of his Order during the December 22, 2014 hearing (transcript at 32) confirms the narrow scope of relief ordered, and that Judge Wingate's Order does not reach Google's MPRA request:

DALLAS     DENVER     DETROIT     HOUSTON     JACKSON     NEW JERSEY     NEW ORLEANS

Neiman Supp. Decl.
Ex. D

Page 2

> THE COURT: So then there will be a stay of any requirement of Google to answer the subpoena or submit documents any further relative to the subpoena, a stay with regard to any civil or criminal enforcement provision. And, meanwhile, the briefing schedule that I set out will be in effect.
>
> MR. MIRACLE: Yes, Your Honor.
>
> THE COURT: And a sunset provision will be March 6th.
>
> MR. MIRACLE: Yes, Your Honor.
>
> THE COURT: Okay. I'm fine with that. You all fine with that?
>
> MR. KRUTZ: Yes, sir, we are. I think counsel – and we think it's a good idea.

In short, the Attorney General's attempt to turn Judge Wingate's order – squarely addressed to the relief Google sought in its TRO motion – into an order granting the Attorney General relief it did not and could not seek, a general bar on Google pursuing information to which it is entitled under the MPRA, is untenable.

Equally implausible is your alternative basis for withholding documents – that every document covered by the request is protected by either by the attorney client privilege, the work product doctrine, or the investigative reports exemption. Google's MPRA request seeks communications between the Attorney General and third parties or their representatives, who were seeking to influence the Attorney General in his dealings with Google. The Attorney General's communications with third parties seeking to influence his conduct are at the very core of what the MPRA requires be subject to public scrutiny, and cannot possibly be privileged, work product, or investigative reports. Indeed, the Attorney General has already acknowledged that such communications must be made public in response to MPRA requests. For example, the New York Times on October 28, 2014 posted on its website various documents it obtained through public record requests, including a February 20, 2014 email to the Attorney General from the lobbyist Mike Moore, regarding a "pre meeting on Google." *See http://www.nytimes.com/interactive/2014/10/28/us/5-Rhode-Island-Attorney-General-Turned-Attorney-General-Lobbyist.html?_r=1 (last visited December 15, 2014).* Such communications with lobbyists, trade associations, and lawyers seeking to influence the Attorney General are not exempt from disclosure, and must be produced.

Leaving aside the merit of your claims, your letter does not identify the documents which are responsive to Google's MPRA request, or the nature or the basis of the claims of privilege or exemption with respect to each of those documents. Certainly, one-size-fits-all objections are not sufficient.
In sum, your January 6, 2015 letter does not respond to Google's MPRA request in good faith or in compliance with law.

Unless you produce the requested documents, Google will seek appropriate relief.

Page 3

Finally, to avoid the duplicative formality of serving you with a separate request, please treat the following subset of the materials sought in the MPRA request as also having been requested pursuant to Federal Rule of Civil Procedure 34(a) in the matter before Judge Wingate:

1.      Any drafts of possible subpoenas, subpoenas duces tecum, or civil investigative demands ("CIDs") to Google provided directly or indirectly to the Office of the Mississippi AG (the "OMAG") by any of the third parties identified in item 1 of the MPRA request (the "third parties"), as referenced in http://arstechnica.com/tech-policy/2014/12/how-hollywood-spurned-by-congress-pressures-states-to-attack-google/ ("How Hollywood Pressures States") (quoting email from Jenner & Block's Tom Perrelli proposing that "some subset of AGs (3-5, but Hood alone if necessary) should move towards issuing CIDs . . . in terms of outreach and action by us, I think we should (a) Shore up Hood and try to get a small group . . . focused on a clear timetable for CIDs, (b) Draft the CIDs . . . ")

2.      Any research provided directly or indirectly to the OMAG by any of the third parties regarding possible litigation against Google, as referenced in How Hollywood Pressures States (Perrelli: "we should . . . research state law to determine the best state to pursue litigation and communicate that to Hood so that he can try to get the right AGs on board").

3.      The November 13, 2013 email from General Hood to Van Stevenson of the MPAA, referenced in How Hollywood Pressures States, in which General Hood discussed an upcoming meeting with "MPAA/RIAA outside counsel Tom Perrelli and others" to "discuss the next move," and any replies or responses thereto.

4.      The August 28, 2014 letter referenced in How Hollywood Pressures States from the OMAG "to AGs in all 50 states" regarding "setting up a working group" related to the OMAG's planned subpoena or CID to Google, and any communication between the OMAG and the third parties reflecting, relating, or referring to the August 28, 2014 letter.

5.      Any communications from OMAG to any of the third parties providing advance notice of the intent to issue a subpoena, subpoena duces tecum or CID to Google, as referenced in How Hollywood Pressures States (MPAA GC Fabrizio: "Mississippi AG Hood is expected to issue a CID to Google sometime this week (*that information is naturally very confidential*)").

6.      Any communications from any of the individuals or entities identified in the MPRA request attaching or otherwise referencing the word files titled "Google can take action" "Google must change its behavior" "Google illegal conduct" and/or "CDA", as well as the word files themselves, as referenced in How Hollywood Pressures States (Jenner & Block's Perrelli indicating that he will send four "white papers" with these names to Connecticut's Attorney General).

7.      Any drafts of any letters to Google provided directly or indirectly to the OMAG by any of the third parties, and any communications with any of the third parties reflecting, referring, or relating to such draft letters.

Page 4

To insure the availability of these materials in time for use in the briefing and argument on the preliminary injunction hearing, we ask that you agree to produce this specifically identified subset of the requested materials by no later than January 19, 2015. Given the tight schedule, we ask that you stipulate pursuant to Rule 26(d)(1) that these focused requests go forward without awaiting a formal discovery conference pursuant to Rule 26(f).

Sincerely,

Forman Perry Watkins Krutz & Tardy LLP

Fred Krutz

FK/mkm
cc:  Doug Miracle (via Electronic Mail)

STATE OF MISSISSIPPI



**JIM HOOD**
**ATTORNEY GENERAL**

CONSUMER PROTECTION
DIVISION

January 20, 2015

Fred Krutz
Forman Perry Watkins Krutz & Tardy, LLP
City Centre, Suite 100
200 South Lamar Street
Jackson, Mississippi 39201-4099

**RE:    Google Public Records Request**

Dear Fred,

We are in receipt of your letter dated January 14, 2015, regarding the above-referenced matter.  Please note that our office stands by the response that was previously provided to you, dated January 6, 2015.  Said response was provided to you in good faith, as well as in compliance with all applicable laws.

Furthermore, the Attorney General objects to any effort on your part to engage in discovery in the action currently pending in federal court because the matter was stayed by agreement of the parties and pursuant to the Court's order signed on December 23, 2014.  Additionally, we have now filed a motion to dismiss and pursuant to Local Uniform Civil Rule 16(b)(3), the filing of an immunity defense or jurisdictional defense motion stays all discovery.

I hope this addresses all of your concerns.

Sincerely,

Bridgette W. Wiggins
Special Assistant Attorney General

Neiman Supp. Decl.
Ex. E

# LAW & DISORDER / CIVILIZATION & DISCONTENTS

## Hollywood v. Goliath: Inside the aggressive studio effort to bring Google to heel

Leaked Sony e-mails show states' top lawyers and studios are closer than ever.

by **Joe Mullin** - Dec 19 2014, 7:17pm EST

149



Aurich Lawson/Ars Technica

Tensions between Google and Mississippi Attorney General Jim Hood exploded into public view this week, as Google filed court papers seeking to halt a broad subpoena Hood sent to the company.

The Hood subpoena, delivered in late October, didn't come out of nowhere. Hood's investigation got revved up after at least a year of intense lobbying by the Motion Picture Association of America (MPAA). E-mails that hackers acquired from Sony Pictures executives and then dumped publicly now show the inner workings of how that lobbying advanced—and just how extensive it was. Attorneys at Sony were on a short list of top Hollywood lawyers frequently updated about the MPAA's "Attorney General Project," along with those at Disney, Warner Brothers, 21st Century Fox, NBC Universal, and

Neiman Supp. Decl.
Ex. F

1/21/2015 Hollywood's big, secret Hood plan to attack Google: the "expanded Goliath" effort to scrub search results | Ars Technica

Case 3:14-cv-00981-HTW-LRA   Document 52-1   Filed 01/22/15   Page 56 of 73

Paramount.

The e-mails show a staggering level of access to, and influence over, elected officials. The MPAA's single-minded obsession: altering search results and other products (such as "autocompleted" search queries) from Google, a company the movie studios began referring to as "Goliath" in around February 2014. The studios' goal was to quickly get pirated content off the Web; unhappy about the state of Google's voluntary compliance with their demands and frustrated in their efforts at passing new federal law such as SOPA and PIPA, the MPAA has turned instead to state law enforcement.

The most controversial elements of SOPA/PIPA would have let content owners effectively shut down websites they said were infringing their copyrights or trademarks. This already happens—think of various peer-to-peer sites that no longer exist—but it usually involves drawn-out litigation. SOPA promised a faster-moving process that would have essentially made rights holders a website's judge, jury, and executioner.

To get the same results in a post-SOPA world, MPAA has hired some of the nation's most well-connected lawyers. The project is spearheaded by Thomas Perrelli, a Jenner & Block partner and former Obama Administration lawyer. Perrelli has given attorneys general (AGs) across the country their talking points, suggesting realistic "asks" prior to key meetings with Google. Frustrated with a lack of results, Perrelli and top MPAA lawyers then authorized an "expanded Goliath strategy" in which they would push the AGs to move beyond mere letter writing. Instead, they would seek full-bore investigations against Google.

If the AGs felt short on resources—well, Hollywood studios could help with that. Money from Sony and other Big Six studios was available to draft the actual subpoenas, to research legal theories to prosecute Google, to spread negative press about the search giant, and to reach out to other state AGs that might join with Hood.

This is how the project unfolded over the past year.

## Late 2013: Ramping up

One chain of e-mails among the MPAA and studio lawyers bears the subject line "STATE ATTORNEY GENERAL PROJECT" and focuses on how Google could be pressured into altering its search results, demoting or removing so-called "rogue sites" that host high levels of copyrighted context.

Most notes on the project came from Vans Stevenson, the MPAA's VP of state legislative affairs; higher-level updates were written by MPAA general counsel Steven Fabrizio or took the form of memos written by Perrelli. Most information about the AG project was shared with a group of more than 30 lawyers, including several from the MPAA and RIAA, as well as each of the six big studios, but some were kept to just general counsels and their immediate confidantes.

"[Attorney] General Hood told me by e-mail today that his conversation 'with Google's General Counsel did not go well,' and therefore he followed up with the letter that was sent yesterday," Vans Stevenson informed the group in November 2013. "Hood also said he was organizing a meeting during the NAAG [National Association of Attorneys General] meeting next week in New Orleans with

his outside counsel Mike Moore, former MS Attorney General. Also attending that meeting will be MPAA/RIAA outside counsel Tom Perrelli and others, 'so we can discuss the next move,' Hood wrote.... I will keep you advised of further developments."

The e-mail includes a letter from Hood to Google general counsel Kent Walker. It was published earlier this week by *The New York Times*, which reported that most of the letter was actually written by Perrelli's law firm.

Several weeks later, a meeting took place between Google executives and Connecticut Attorney General George Jepsen. The same morning the meeting took place, MPAA's Perrelli was informed about it by two attorneys at the AG's office, who offered to send Google's presentation to Perrelli. Jepsen reached out to the MPAA, seeking demands that he could press against Google. Perelli wrote:

> I talked this morning with the CT AG's office [names redacted] about their meeting with Google. They indicated that it was purely a listening meeting, where Google went through the "standard" presentation of all the things that it does to protect privacy and stop unlawful conduct. They are going to send me the presentation that Google did and asked that we come up and give them a "rebuttal" at some point in the next few weeks (likely the first half of February)...
>
> They told me that AG Jepsen is interested in this area and wants to see if there is something reasonable and practical that he can do to be helpful. They understand the concerns that we have and largely agree with them, but want to be cautious here (consistent with the temperament of their boss). He is not afraid to tangle with Google, as he has on antitrust, but his approach is to look for a small number of reasonable things to demand of them and then to press them hard on it. They asked that we not "shoot the moon" on our asks.
>
> I went through our issues and concerns and emphasized that the asks that we have are really things that Google has demonstrated it can do when it feels like it. I am going to send them the 4 white papers, per their request.

Perelli attached four Microsoft Word files to his update, entitled "Google can take action," "Google must change its behavior," "Google illegal conduct" and "CDA."

## January 2014: Creating Google "asks"

On January 21, 2014, Google's Kent Walker met with 13 state attorneys general who wanted to know more about what Google could do to demote or delete pirated content from its search results. For the MPAA, it was a pivotal moment.

Before the meeting, Mississippi's Hood had already made clear he was going to push his counterparts in other states to take stronger action over movie piracy. He called Stevenson at the MPAA, asking for "fresh examples for his planned live 'search' demonstration of illegal site activity, including the availability of motion pictures only in theatrical release," according to an update Stevenson sent the group.

By the time the AGs meet with Google, they and their staffs had been heavily prepped by Perrelli. In the early morning of January 21, Perrelli shared some of the impressions from those prep meetings:

1) The AGs are going to start the meeting by saying that they are frustrated that Google has not acted; they have had much better success engaging with Facebook and eBay, but feel Google is non-responsive. They want real change at Google that will stick – not just change that lasts for a short time after immense pressure is put on them.

2) The AGs are struggling with their asks. They understand that Google is likely to offer a few morsels, they know it won't be sufficient, but they are unsure how to demand more. Some want to move to CIDs [civil investigative demands, like a subpoena], but I think the majority want to set a short date for some substantial change on a number of fronts (Search, YouTube, Autocomplete). I went over their likely asks again, but encouraged them not to commit to anything with Google in the meeting.

3) I walked away from these meetings thinking that we need to develop a different presentation for the AGs – how Google works. There was a real lack of understanding about Google, its services, its interactions with websites, etc. They don't need more about the bad stuff you can get on the Internet; they need to understand better how Google makes money...

4) I spent more time with Hood after the meeting and, I hope, got him focused on the key issues and the asks. He really does care a great deal about piracy – and he doesn't get sidetracked by some of the things that Microsoft prefers. He wants Google to delist pirate sites and he is going to ask them to do that tomorrow...

6) [Former Washington State AG] Rob McKenna was very helpful– and I talked to some of his clients at Microsoft and my take is that they are not particularly concerned about our advocacy on search. They see the bigger picture.

Later that day, Stevenson sent a report on the meeting. For more than two hours, led by Mississippi AG Hood, the AGs had confronted Google's Walker about the desired issue: "websites devoted to illegal IP activity." They challenged Walker to "delist and block those websites," wrote Stevenson. Google countered that it did not in fact know that every site on the MPAA hitist was in "devoted to illegal IP activity" but that it took action when this was clear. This did not go over well with either the MPAA, which continued to lobby the AGs to take action. As Stevenson put it after the meeting:

Our counsel Tom Perrelli and I spoke this evening. We will organize an outreach to all AGs and deputies that attended the meeting in person, as well as participated by phone, to get a more complete picture of the meeting and their feedback. Perrelli will also follow-up with AG Hood regarding the planned letter to Google and offer assistance.

It would take time, but this continued attention to Hood in particular did pay off.

# February 2014: The "Goliath" Strategy

February 2014 saw a larger meeting at NAAG between Google and AGs from 40 different states. According to MPAA reports on that meeting, Google was even more forceful in rejecting the idea of "de-listing" sites. In Stevenson's telling, that didn't impress the AGs a bit. In a February 26 e-mail, he wrote [link added]:

> All AGs that we talked with following the meeting except Mississippi Attorney General Jim Hood (D), co-chair of the NAAG IP Committee and in-coming NAAG President this summer, were stunned that Google executives took such an absolute stance and were unwilling to negotiate, other than "talk about" demoting certain sites that traffic in illegal products and services, including motion pictures and television programs. Nebraska Attorney General Jon Bruning (R), co-chair of the IP committee, expressed a common reaction among most AGs: "They were arrogant, unwilling to put anything on the table for discussion and in essence told us to pound sand."
>
> This morning at the last NAAG plenary session, both IP-Co Chairs Bruning and Hood issued a verbal public report about the Google meeting, including "Google's lackluster responses" to the AGs questions at the meeting. Both briefly reviewed Google's past and current "bad acts," including facilitating human trafficking, illegal prescription and other illegal drug sites as well as movies and music." Both said "Google came to the meeting basically under orders not to give an inch."
>
> [Attorney] General Bruning addressed options in light of the meeting and mentioned issuing Civil Investigative Demands (CID)s, litigation, and using the press to alert consumers to Google's "bad acts." These options are generally expected to be considered by the AGs as part of a forward plan.   Both Bruning and Hood pointed out that Google paid $500 million in a non-prosecution agreement with the Rhode Island United States Attorney for nurturing and helping to develop illegal prescription drug sites, who were advertising clients.

The following day, word came down from Perrelli that "the time for letter writing is over" and that "it is time to move to actually form an investigation." But it was Perelli and the studio lawyers—not the attorneys general—who intended to form the investigation's strategy, find states to participate, and partly fund it.

Perrelli's next "status report" was forwarded by Fabrizio on February 27 to general counsels at the Big Six movie studios, which begin referring to Google as "Goliath" at about this time. Fabrizio says it's time to discuss an "expanded Goliath strategy."

Google/Goliath "drew a line in the sand," Perrelli explained, and the company "essentially threatened the AGs with the possibility of attacking them as they attacked folks in DC during SOPA. The AGs did not like that. More AGs now think 'something must be done.'"

Still, the AGs were concerned about what an angered "Goliath" might do, as well as how costly an investigation might be. Even as "Goliath" had angered them, they "wouldn't mind a way out"—even Hood.

Google had, at least momentarily, taken a tough line, and the AGs were short on resources. That's where the MPAA could help out. It would be the studios, not public officials, who would initiate "discussions about resources, completion of CIDs, and construction of an investigative plan," proposed Perrelli.

"Some subset of AGs (3-5, but Hood alone if necessary) should move toward issuing CIDs before mid-May," he wrote. "That move should be met with broad expressions of support by AGs, even those not directly involved in the CIDs."

He continued:

> In terms of outreach and action by us, I think we should:
>
> a.     Shore up Hood and try to get a small group (Hood, Bruning, Louie, a couple of others) focused on a clear timetable for CIDs
>
> b.     Draft the CIDs
>
> c.     Research state law to determine the best state to pursue litigation and communicate that to Hood so that he can try to get the right AGs on board

Perrelli's plan met with approval from the MPAA. By the end of April, the question wasn't whether they would move forward with funding an investigation of "Goliath"—it was simply a question of how much to spend.

The e-mails discuss different proposed amounts, but the most definitive budget comes in a missive that Fabrizio sent to the studio GCs on May 8. "Option 1" involved spending $585,000 annually, with $500,000 of that going to Jenner & Block, Perrelli's law firm, and another $85,000 to be spent on "comms." The "comms" spending would go towards keeping the media informed about AG actions against Google, "amplify negative Goliath news" and "seed media stories based on investigation and AG actions."

A larger budget proposed spending more than $1 million. It isn't clear from the e-mails which budget the group ultimately selected.

## Late 2014: Moving to investigate

1/21/2015                                Not With My Rate the progressive study effort to Contain ... And Maybe...

Case 3:14-cv-00981-HTW-LRA   Document 52-1   Filed 01/22/15   Page 61 of 73

By summer's end, Hood was ready to move ahead with the MPAA's desired plan of issuing a civil investigative demand to Google, even though the company had agreed to build out a "trusted flagger" YouTube program to catch infringing videos and began tweaking its search algorithm to more aggressively demote pirate sites.

In an August 28 letter to AGs in all 50 states, Hood tested the waters to see how much support he might get. The letter described how Hood wanted the "trusted flagger" program to go further yet:

> Over the summer, our investigators used and tested the trusted flagger program.
>
> YouTube provides selected "power" users basic information about what YouTube deems improper and then gives them access to the bulk flagger portion of the website for videos that may contain content that would be in violation of YouTube's policies. Trusted flaggers then tag (or flag) the content they feel meets that criteria. Once the suspicious videos are flagged by trusted flaggers, then the YouTube enforcement team reviews the video and assesses whether or not it violates YouTube's terms.
>
> Based on our review, I intend to make the following three suggestions to Google: 1) YouTube should consider temporarily removing the video until it has been reviewed by YouTube staff. Currently, when the trusted user flags a questionable video, it remains up and accessible on YouTube. 2) YouTube should consider giving the trusted user a status report when the video is flagged showing that the video will be reviewed by YouTube and, if the video is removed, the date and time of its removal.  At the time of our test, when videos are flagged, no notice is given to the user if and when the video is removed.

Hood explained that he planned to issue a civil investigative demand to Google in the near future. "I suggest setting up a working group for those interested so our office can share any information we receive with you," Hood told the other AGs.

MPAA knew that Hood was going to issue his CID to Google sometime the week of October 20th. But just days before it was coming, the movie group had an unexpected falling out with Google. Google had released its "How Google Fights Piracy" report, describing how it would be more aggressive about demoting sites linked to piracy in its search results. In response MPAA issued what it viewed as a simple "wait and see" statement—not wanting to sound too positive about Google's new features, lest it jeopardize the investigation it knew was on the way.

"We were... sensitive to the fact that that Mississippi AG Hood is expected to issue a CID to Google sometime this week *(that information is naturally very confidential),*" Fabrizio wrote to the studio lawyers on October 20. "We did not want an unduly favorable statement by us to discourage AG Hood from moving forward."

The MPAA statement issued this statement:

> Everyone shares a responsibility to help curb unlawful conduct online, and we are glad to see Google acknowledging its role in facilitating access to stolen content via search.  We look forward to examining the results of Google's algorithm changes to see if they reduce the

appearance in search results of stolen content and the sites that profit from it.

But Google was furious, and the company allegedly threatened to cut off its communication with MPAA altogether. In a defensively worded e-mail, Fabrizio explained:

> Google's head of policy, Adam Kovacevich, called Laura Nichols, our head of Comms, to say that "at the highest levels [they are] extremely unhappy with our statement."  They conveyed that they feel as if they went above and beyond what the law requires; that they bent over backwards to give us a heads up and in return we put out a "snarky" statement that gave them no credit for the positive direction. Apparently, Google really detests the gatekeeper references ("Google has a role/responsibility online…"). Kovacevich relayed that Google will no longer "speak or do business" with the MPAA. Kovacevich claimed that at least three individual studio GCs conveyed to Google that the studios were very happy about the new features. Accordingly, per Kovacevich, from now on Google will deal with the studios, not MPAA.
>
> We believe Google is overreacting — and dramatically so. Their reaction seems tactical (or childish). Our sense is that this will blow over and that, following the issuance of the CID by AG Hood (which may create yet another uproar by Google), we may be in a position for more serious discussions with Google.

On October 21, Hood issued his CID to Google as the MPAA expected he would. On Wednesday, the *New York Times* published Hood's CID to Google in an article on the MPAA's lobbying of attorneys general. The CID requests a huge volume of information on how Google treats a vast array of illicit material online, from illegal pharmaceuticals to pirated movies.

On October 23, Vans Stevenson wrote to the group alerting them that the CID had issued and saying that Nebraska and "at least three other states" were considering creating their own subpoena. The leaked Sony e-mail cache cuts off at October 29, and there's no further mention of the investigation.

For Google, the MPAA's close involvement with an investigation they view as punitive has been a bridge too far. The company's official statement on the matter came yesterday, in the form of a blog post by company GC Kent Walker entitled "The MPAA's Attempt to Revive SOPA." Walker describes a "coordinated campaign to revive the failed SOPA legislation through other means." The MPAA is "an organization founded in part 'to promote and defend the First Amendment and artists' right to free expression" wrote Walker. "Why, then, is it trying to secretly censor the Internet?"

Asked about the "Attorney General Project," MPAA spokeswoman Kate Bedingfield told Ars the group uses "voluntarily initiatives, policy solutions, and legal actions" to protect members' creative works. "When wrongdoing is taking place online, we work with and support appropriate law enforcement officials, including the Attorneys General, as do many other industries."

As for Google's most recent blog post, Bedingfield said it was an attempt to deflect from Google's own conduct and from investigations that include "illicit drug purchases, human trafficking, and fraudulent documents as well as theft of intellectual property."

Today's lawsuit seeking to have the CID quashed suggests that the Google's pushback against both the MPAA and the state AGs will intensify. The battle between Hollywood and Google has been brewing for years, but in the wake of the Sony hack, relations may have reached a historic new low.

## READER COMMENTS 149

991                    458                    129



**Joe Mullin** / Joe Mullin has covered the intersection of law and technology — including the world's biggest copyright and patent battles — for a number of years, mostly at The American Lawyer.
**@joemullin on Twitter**

# THE VERGE

# Project Goliath: Inside Hollywood's secret war against Google

*SOPA was just the beginning*

By Russell Brandom on December 12, 2014 12:59 pm ✉ Email 🐦 @russellbrandom

*(Spencer Platt/Getty Images)*

What is "Goliath" and why are Hollywood's most powerful lawyers working to kill it?

In dozens of recently leaked emails from the Sony hack, lawyers from the MPAA and six major studios talk about "Goliath" as their most powerful and politically relevant adversary in the fight against online piracy. They speak of "the problems created by Goliath," and worry "what Goliath could do if it went on the attack." Together they mount a multi-year effort to "respond to / rebut Goliath's public advocacy" and "amplify negative Goliath

Neiman Supp. Decl.
Ex. G

Case 3:14-cv-00981-HTW-LRA    Document 52-1    Filed 01/22/15    Page 65 of 73

news." And while it's hard to say for sure, significant evidence suggests that the studio efforts may be directed against Google.

At the beginning of this year, the MPAA and six studios — Universal, Sony, Fox, Paramount, Warner Bros., and Disney — joined together to begin a new campaign against piracy on the web. A January 25th email lays out a series of legally and technically ambitious new tools, including new measures that would block infringing sites from reaching customers of many major ISPs. Documents reviewed by *The Verge* detail the beginning of a new plan to attack piracy after the federal SOPA efforts failed by working with state attorneys general and major ISPs like Comcast to expand court power over the way data is served. If successful, the result would fundamentally alter the open nature of the internet.

THE FOLLOWING **PREVIEW** HAS BEEN APPROVED TO
**BREAK THE INTERNET & STOP PIRACY**
BY THE MOTION PICTURE ASSOCIATION OF AMERICA, INC.
(AND MOST MAJOR STUDIOS)

THE FILM ADVERTISED, **GOLIATH**, HAS BEEN RATED



**G** **GOOGLY** 

UNDER 17 REQUIRES ACCOMPANYING ADULT

STRONG LANGUAGE, GRAPHIC THEFT OF INTELLECTUAL PROPERTY, NUDITY, MILD SWORDPLAY.

"We start from the premise that site blocking is a means to an end," says MPAA general counsel Steven Fabrizio. "There may be other equally effective measures ISPs can take, and that they might be more willing to take voluntarily." According to the email, the group has retained its own technical experts and is working with Comcast (which owns Universal) to develop techniques for blocking or identifying illegally shared files in transit.

That strategy also involves significant political risks. "In the post-SOPA world, we need to consider the extent to which a strategy presents a risk of a public relations backlash," Fabrizio continues, "whether a strategy might invigorate and galvanize the anti-copyright forces we saw in the SOPA debates." SOPA, also known as the Stop Online Piracy Act, proposed ambitious new site-blocking measures in 2011, but was ultimately defeated by coordinated outcry from web companies and their users. The new emails

## Goliath Timeline

*All emphasis below ours*

**October 17, 2013:** Torrent index site Isohunt shuts down after losing a $110 million legal battle with MPAA. The MPAA effort was led by lawyer Steven Fabrizio.

**November 14, 2013:** Chris Dodd announces that Fabrizio has joined MPAA as Senior Executive Vice President and Global General Counsel.

suggest Hollywood hasn't given up on the idea. "We have been exploring theories under the All Writs Acts, which, unlike DMCA 512(j), would allow us to obtain court orders requiring site blocking without first having to sue and prove the target ISPs are liable for copyright infringement," one email reads.

The only thing standing in their way? Goliath.

The MPAA's venture is referred to over and over as "Project Goliath," an effort to take Goliath down, with each studio contributing funds towards a project that will benefit them all. One telling email — titled "Goliath data summary" — comes with an attachment titled "Search Engine Piracy Discussion (MPAA Discussion)," seeming to suggest the codename is a stand-in for Google. A number of Goliath-related emails also point to examples of copyright-infringing search results found on Google; the persistence of file-sharing links in Google search rankings has been a sore point in Hollywood for years.

## *"WE START FROM THE PREMISE THAT SITE BLOCKING IS A MEANS TO AN END."*

The emails reveal a multi-pronged approach to defeating Goliath. One tactic is legal, convincing state prosecutors to take up the fight against Goliath. After a series of meetings at the National Association of Attorneys General in February, MPAA counsel Fabrizio writes, "Goliath has told the AGs to pound sand…they pretty clearly told the AGs that they aren't going to do anything and essentially threatened the AGs with the possibility of attacking them as they attacked folks in DC during SOPA. The AGs did not like that." As a result, the counsels report a growing coalition of attorneys general willing to take action against Goliath, and the group budgeted $500,000 a year towards providing legal support. Much of that budget went towards retaining the prestigious law firm Jenner & Block, specifically Jenner partner and former US Associate Attorney General Thomas J. Perrelli, who has billed the group for as much as $40,000 a month.

In other emails, Google comes up as a specific target. After a dispute over Google's most recent anti-piracy measures in October, Fabrizio suggested further action may be yet to come. "We believe Google is overreacting — and dramatically so. Their reaction seems tactical (or childish)," the email reads. "Following the issuance of the CID [civil investigative demand] by [Mississippi attorney general Jim] Hood (which may create yet another uproar by Google), we may be in a position for more serious discussions with Google." A report from the previous February suggests that the Goliath group drafted civil investigative demands (similar to a subpoena) to be issued by the attorneys general. "Some subset of AGs (3-5, but Hood alone if necessary) should move toward issuing CIDs before mid-May," the email says. (Hood issued a CID against Google in July concerning pharmaceutical counterfeiting, but he does not appear to have issued any actions against the company since Fabrizio's letter in October.)

## *"WE BELIEVE GOOGLE IS OVERREACTING — AND DRAMATICALLY SO."*

**January 25, 2014:** First known mention of Goliath in an email titled "Site Blocking / ISP Measures - INPUT REQUESTED" — from Fabrizio to Rebecca Prentice (Paramount), Leah Weil (Sony), Maren Christensen (NBC Universal), John Rogovin (Warner Bros.), Gary Roberts (Fox), and Alan Braverman (Disney): **"My goal is to use our February meeting to present and discuss a detailed US Goliath strategy."**

**February 24–26, 2014:** The National Association of Attorneys General meet in Washington, DC. In attendance: Mississippi AG (and NAAG President-Elect) Jim Hood. Emails reveal a concerted effort during the event to rally support for Project Goliath.

**February 27, 2014:** In an email titled "Goliath - PRIVILEGED & CONFIDENTIAL," Fabrizio tells the group of six that "we are going to spend the March 12th GC [General Counsel] meeting talking through (and seeking approval for) an expanded Goliath strategy."

Outside counsel Tom Perrelli (a former AG now at Jenner & Block) provides input from the NAAG meeting: "[Goliath] pretty clearly told the AGs that they aren't going to do anything **and essentially threatened the AGs with the possibility of attacking them as they attacked folks in DC during SOPA.**" Perrelli suggests "some subset of AGs (3-5, but Hood alone if necessary) should move toward issuing CIDs before mid-May."

**March 12, 2014:** Leah Weil and Aimee Wolfson (both from Sony) attend a General Counsel meeting. In a March 6th email in advance of the meeting, Fabrizio includes the original six, Wolfson, and presumed +1s, Jeremy Williams (WB), Elizabeth Valentina (Fox), Steve Kang (NBC Universal).

**March 21, 2014:** Fabrizio sends out an approval request for the

The fight against Goliath also has an investigative side. Other emails describe a proposed project called Keystone — budgeted at $70,000 — devoted to gathering enough evidence against Goliath to provoke further action by the state attorneys general. "There is only so far we can get with the AG's unless we develop better evidence and intelligence against Goliath," an email reads, "and that is the budget for Keystone." The planning for the Goliath Project is laid out in dozens of emails after the initial January meeting, although the emails peter out after May for reasons that are still unclear. Still, budget projections suggest that the group was prepared for a long battle. "To take this through and have a reasonable chance of success, we probably would need to continue through year two," one email reads.

In another instance, the group seemed to look to articles on political corruption not as a cautionary tale but as an instruction manual. In one email, the MPAA's Senior VP of State Government Affairs circulated an investigative *New York Times* series on lobbyists wielding increasing influence over state attorneys general. The series details many tactics involved in Project Goliath, including hiring former attorneys general as counsel and targeting officials at the state level where lobbying dollars may stretch farther. The MPAA official offered only the caption "FYI, first in a series of articles." The email was sent to 62 people, including executives at Paramount, Warner Bros., Fox, Comcast, and the RIAA.

# *"THERE IS ONLY SO FAR WE CAN GET WITH THE AG'S UNLESS WE DEVELOP BETTER EVIDENCE AND INTELLIGENCE AGAINST GOLIATH."*

Still, the emails reveal a remarkable hostility towards Goliath, and a persistent desire to stop copyright infringing traffic as it moves across the web, a position that puts it in stark conflict with many of the guiding principles of the web. That, in turn, has created a serious conflict with many of the companies that have grown powerful on the web, a fight that, without an ambitious action like Project Goliath, the industry seems primed to lose. As one counsel noted in March, "There is much to commend an expanded Goliath strategy — the status quo has not exactly been favorable for us and, absent our doing something, it doesn't promise to get better anytime soon."

As of press time, neither the MPAA nor Sony has responded to a request for comment. Google declined to comment.

*Additional reporting from Ross Miller and Bryan Bishop. Illustration by Dylan Lathrop.*

*January 25th email from MPAA Global General Counsel Steven Fabrizio, laying out the group's Goliath strategy:*

Site Blocking/ISP Measures - INPUT REQUESTED - PRIVILEGED

We did not get to have a full discussion of site blocking during our January meeting. However, I believe I have spoken with enough of you individually to have a good read of the room as to our authority to proceed with the

*This is the* Goliath strategy. "In short, this is a strategy based on supporting and strengthening the ongoing State AG effort... [which] is a subset of the larger Goliath strategy."

**April 29, 2014:** Aimee Wolfson sends Leah Weil a blurb from an April GC report: "Search. As of March, MPAA referred 45 search results pointing to infringing content on Google..." Wolfson adds, "FYI re: Goliath end-game — this is from the GC report. Are we looking for more?"

**April 29, 2014:** Maren Christensen (NBC Universal) forwards an email entitled "Goliath data summary." Attached is a PDF, "Search Engine Piracy Discussion (MPAA distribution).pdf"

**May 8, 2014:** Fabrizio to group. "We've had success to date in motivating the AGs; however as they approach the CID phase, the AGs will need greater levels of legal support." He outlines two options, ranging from $585,000 to $1.175 million, which includes legal support for AGs (through Jenner) and optional investigation and analysis of ("ammunition / evidence against") Goliath. Both options include at least $85,000 for communication (e.g. "Respond to / rebut Goliath's public advocacy, amplify negative Goliath news, [and] seed media stories based on investigation and AG actions.").

**October 20, 2014:** Fabrizio emails the team of six with the subject line "Google - Antipiracy Initiatives - Google Reaction to MPAA Statement" (For context: Google was unhappy with the MPAA's reaction to its latest antipiracy report). Fabrizio sees it as an opportunity. "We believe Google is overreacting — and dramatically so. Their reaction seems tactical (or childish). Our sense is that this will blow over and that, following the issuance of the CID by AG Hood (which may create yet another uproar by Google), we

necessary analysis. In this email, I outline the planned scope of analysis. Because the analysis will involve some expense for technical experts, consultants and lawyers (likely totalling in the $200-300k range), I want to make sure we are on the same page. If anyone disagrees with the plan, as described below, please let me know. Otherwise, we will proceed, with the goal of having something to present to you at our March meeting. (My goal is to use our February meeting to present and discuss a detailed US Goliath strategy.)

may be in a position for more serious discussions with Google."

SCOPE We have traditionally thought of site blocking in the US as a DMCA 512(j) issue. In some ways, that is too narrow and we plan to expand our scope of inquiry on two levels. First, DMCA 512(j), by its terms, necessarily creates an adversarial relationship with the target ISP (and more generally with the ISP community). We have been exploring theories under the All Writs Acts, which, unlike DMCA 512(j), would allow us to obtain court orders requiring site blocking without first having to sue and prove the target ISPs are liable for copyright infringement. This may open up avenues for cooperative arrangements with ISPs. Second, we start from the premise that site blocking is a means to an end (the end being effective measures by ISPs to prevent infringement through notorious pirate sites). There may be other equally effective measures ISPs can take, and that they might be more willing to take voluntarily. Our intention is to work with our own retained experts and Comcast (and MPAA's Technology group) to identify and study these other possibilities, as well as US site blocking technical issues.

ANALYSIS The analyses that remain to be done fall into three general categories:

Legal Analyses. The legal analyses that remain to be completed are the smallest part of the project. We need to finalize the All Writs Act research and confirm that developments in the law since the time of previous 512(j) analyses do not materially affect the existing analyses. In the event we recommend or present litigation options, we will also consider tactical issues, including issues related to venue and the interplay of the All Writs Act and 512(j).

Technical Analyses. Very little systematic work has been completed to understand the technical issues related to site blocking in the US and/or alternative measures IPSs might adopt. We will identify and retain a consulting technical expert to work with us to study these issues. In this context, we will explore which options might lead ISPs to cooperate with us.

Political Analyses. Here, we mean political in the broadest sense. There are important Hill issues to consider (e.g., how a strategy might impact the copyright review process). We also need to consider ISP relations issues (e.g., whether a strategy might impact the Copyright Alert program, or any progress we have been making to secure voluntary ISP assistance). Finally, in the post-SOPA world, we need to consider the extent to which a strategy presents a risk of a public relations backlash (e.g., whether a strategy might invigorate and galvanize the anti-copyright forces we saw in the SOPA debates, and what ultimate impact that might have). Each of these issues are like to have considerations that cut in many directions. To get a comprehensive assessment and weigh them in context, we will work closely with the MPAA Policy and Communications teams (and, with them, will solicit input from the appropriate studio policy and communications people).

Hopefully, at the conclusion of this set of analyses, we will be in a position to make a decision that is informed by all considerations of consequence.

If you have any questions, or want to talk through any of this, don't hesitate to call. Best,
SBF

THERE ARE *209* COMMENTS. READ THEM.

SHOW SPEED READING TIPS AND SETTINGS↓

.

**Dana Liebelson** Become a fan dana.liebelson@huffingtonpost.com

# Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda

Posted: 12/18/2014 3:53 pm EST Updated: 12/19/2014 1:59 am EST

Recently leaked emails shed light on how Hollywood is working with state attorneys general to try and push anti-piracy policies that are largely unpopular with the American public. Culture and tech news site The Verge recently reported that the Motion Picture Association of America (MPAA) has made efforts to revive principles from the Stop Online Piracy Act (SOPA), a controversial anti-piracy bill that Congress killed in 2012 following widespread objection. SOPA would have allowed the government to block some website domains, and to delist from search engines sites repeatedly accused of piracy.

MPAA's anti-piracy strategy, based on emails released as part of last month's extensive Sony hack, appeared to involve working with state attorneys general to target "Goliath" -- believed to be a reference to Google, a major opponent of SOPA.

Emails obtained by The Huffington Post show that in January, Mississippi Attorney General Jim Hood (D), president of the National Association of Attorneys General, called a lobbyist for the Motion Picture Association of America (MPAA). Hood was looking for evidence of Google search results leading people to websites with pirated content -- evidence that he hoped to have on hand for an upcoming meeting with the search giant. Besides speaking with the lobbyist, Hood also worked with an outside counsel for the MPAA, a lawyer named Tom Perrelli, who prepped him and other state AGs on what to say during their meeting with Google.

The leaked documents offer a look at how private industries may offer crime-fighting services to resource-strapped AGs, while at the same time pushing policies of their own. For example, Hood said he wan't aware that he was consulting with a lawyer who works with the MPAA on intellectual property issues. He added that he wouldn't find that problematic, if that was indeed the case.

Hood told The Huffington Post that Perrelli has offered to assist his office in its efforts to get search engines to "detect and delist" websites with illegal content and products. He said he did not know that Perrelli is a partner at Jenner & Block, a law firm retained by the MPAA.

"I could not tell you which law firm he works for now," Hood said, adding that he is "not aware" of the relationship between Jenner & Block and the MPAA. He said that he knows

Neiman Supp. Decl.
Ex. H

Perrelli from his time at the U.S. Department of Justice and that he "can attest to [Perrelli's] trustworthiness and expertise in legal matters."

Perrelli did not respond to multiple requests for comment. Kate Bedingfield, a spokesperson for the MPAA, told HuffPost in an email that "when wrongdoing is taking place online, we work with and support appropriate law enforcement officials, including the Attorneys General, as do many other industries."

Documents obtained by The Verge show that Hollywood is looking to revive controversial parts of SOPA to fight piracy, and is concerned that Google may oppose its efforts. The film industry has looked to a variety of politicians and political vehicles to fight that battle. On Tuesday, The New York Times published a letter that Hood sent Google in November 2013, accusing the company of facilitating and profiting "from numerous illegal online activities, ranging from piracy to illegal drug sales."
The letter appeared to be mostly drafted by Jenner & Block, according to the NYT. Hood confirmed to HuffPost that Perrelli was one person who helped draft that letter.

According to other leaked documents, on January 16 of this year, Vans Stevenson, senior vice president for state government affairs at the MPAA, sent an email titled "STATE ATTORNEYS GENERAL PROJECT: Update on AG Denver Meeting With Google Executives" to representatives from the Recording Industry Association of America and others. The email listed 14 AGs and deputy or assistant AGs who were scheduled to attend that meeting.

In that email, Stevenson wrote: "General Hood called me last night and asked that we provide fresh examples for his planned live 'search' demonstration of illegal site activity, including the availability of motion pictures only in theatrical release, which we are working on with our outside counsel Tom Perrelli's team."

On January 21, Stevenson sent around a note from Perrelli, who wrote that he had "multiple meetings tonight with AGs and AG staffs to prepare them for the Google meeting tomorrow," and noted that "the AGs are going to start the meeting by saying that they are frustrated that Google has not acted."

Perrelli also wrote: "I spent more time with Hood after the meeting and, I hope, got him focused on the key issues and the asks. He really does care a great deal about piracy ... He wants Google to delist pirate sites and he is going to ask them to do that tomorrow."

Google declined to comment for this story.

Hood, who told HuffPost he had received assistance from the MPAA but never asked the group any legal questions, noted that Stevenson "is not an attorney, so I would not have sought legal advice from him." He added, "As I said several times, we frequently ask the

companies who report intellectual property theft to assist our office in identifying counterfeit items and evidence of how their property is being stolen."

"We use the expertise that we can," he added. "[We've] got nothing to hide."

Bill Allison, editorial director at the Sunlight Foundation, took a different view, calling Hood's cooperation with the MPAA "hugely problematic."

"You have [industries] that can't get what they want done in Washington going to the state level, where [they] can get away with a lot more," he said.

**UPDATE, 5:45 p.m.** -- Google general counsel Kent Walker published a statement at the company's Public Policy Blog on Thursday, in response to press coverage by The Verge, The New York Times and The Huffington Post. The statement read in part:

We are deeply concerned about recent reports that the Motion Picture Association of America (MPAA) led a secret, coordinated campaign to revive the failed SOPA legislation through other means, and helped manufacture legal arguments in connection with an investigation by Mississippi State Attorney General Jim Hood.

Read the full statement here.

**MORE:**

Attorney GeneralAttorney General HoodHollywoodMoviesMovie PiracyGooglePiracyJim HoodVideo

**Suggest a correction**

p. 62

**From:** Jepsen, George
**Sent:** ~~Friday, October 18, 2013 1:22 AM~~
**To:** Westerberg, Emily
**Subject:** FW: Message on Behalf of Patrick C. Lynch

**From:** Kim Campagna [kim@patricklynchgroup.com]
**Sent:** Friday, October 18, 2013 1:22 PM
**To:** Jepsen, George
**Cc:** Westerberg, Emily; The Honorable George Jepsen
**Subject:** Message on Behalf of Patrick C. Lynch

Dear General,

Sensitive not to inundate you and your office with too much, I felt compelled to forward the attached article from the *Washington Post* as a separate and supplement to the TV news story I had sent you recently. The article serves as a illustration and reminder of how Google has created a direct, commercial relationship with whoever and whatever generates profit--legal or not. Above all else and at any cost, it 's apparent that Google appears to be focused on advertising profits before anything else. Its sales teams helped illegal pharmacies circumvent their systems for preventing the marketing of illegal drugs on AdWorcs.

On YouTube, Google's thirst for profit has seen them remove all constraints from their advertising system. Now, either intentionally or by turning a blind eye, Google is in profit sharing relationships with IP thieves, human traffickers, the illegal sales of steroids, fake pharmacies and more. As is too often the case, but certainly merited here, the voice and authority of Attorneys General, either individually or collectively, are key to changing Google shift behavior - to put them under real pressure via CIDs and depositions.

Naturally, I am available to you or your staff if you would like to discuss this further. Thank you in advance for your consideration.

Peace,

**Patrick C. Lynch**
**Patrick Lynch Group, LLC**
One Park Row, 5tn Flr., Providence, Rhode Island 02903
O: 401.274.3311 | C: 401.871-1148 | F: 401.274.3326
patrick@patricklynchgroup.com | www.patricklynchgroup.com

http://m.washingtonpost.com/business/technology/how-much-should-google-and-others-police-search-results-to-stop-illegal-drug-sales/2013/10/07/1a6e1676-2f68-11e3-bbed-a8a60c601153_story.html

Neiman Supp. Decl.
Ex. I

p. 63

| From: | Kim Campagna <kim@patricklynchgroup.com> |
|---|---|
| To: | Sushak, Karen (ATG) |
| | Marcuss, Mamie (ATG) |
| | Gaul, Judy (ATG) |
| Date: | 10/18/2013 10:14:28 AM |
| Subject: | Message on Behalf of Patrick C. Lynch |

Dear General,

Sensitive not to inundate you and your office with too much, I felt compelled to forward the attached article from the Washington Post *as a separate and supplement to the TV news story I had sent you* recently. The article serves as a illustration and reminder of how Google has created a direct, commercial relationship with whoever and whatever generates profit--legal or not. Above all else and at any cost, it is apparent that Google appears to be focused on advertising profits before anything else. Its sales teams helped illegal pharmacies circumvent their systems for preventing the marketing of illegal drugs on AdWords.

On YouTube, Google's thirst for profit has seen them remove all constraints from their advertising system. Now, either intentionally or by turning a blind eye, Google is in profit sharing relationships with IP thieves, human traffickers, the illegal sales of steroids, fake pharmacies and more. As is too often the case, but certainly merited here, the voice and authority of Attorneys General, either individually or collectively, are key to changing Google shift behavior - to put them under real pressure via CIDs and depositions.

Naturally, I am available to you or your staff if you would like to discuss this further. Thank you in advance for your consideration.

Peace,

Patrick C. Lynch
Patrick Lynch Group, LLC
One Park Row, 5th Flr., Providence, Rhode Island 02903
O: 401.274.3311 | C: 401.871-1148 | F: 401.274.3326
patrick@patricklynchgroup.com | www.patricklynchgroup.com

http://m.washingtonpost.com/business/technology/how-much-should-google-and-others-police-search-results-to-stop-illegal-drug-sales/2013/10/07/1a6e1676-2f68-11e3-bbed-a8a60c601153_story.html