# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

—————————————————————

)
Google, Inc.,                                                )
                                        *Plaintiff*,         )
        v.                                                   )        No. 3:14-cv-981-HTW-LRA
                                                             )
Jim Hood, Attorney General of the                            )
State of Mississippi, in his official capacity,              )
                                                             )
                                        *Defendant*.         )
—————————————————————)

## BRIEF OF *AMICI CURIAE* CONSUMER ELECTRONICS ASSOCIATION, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, AND ENGINE IN SUPPORT OF PLAINTIFF

Margaret Oertling Cupples (MBN 9656)
J. William Manuel (MBN 9891)
Michael J. Bentley (MBN 102631)
BRADLEY ARANT BOULT CUMMINGS
LLP
One Jackson Place
188 East Capitol Street, Suite 400
Jackson, MS 39201
Telephone: (601) 948-8000

Seth D. Greenstein*
Robert S. Schwartz*
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave, N.W., 1300N
Washington, D.C.  20004
Telephone: (202) 204-3500
Facsimile:  (202) 204-3501

Attorneys for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for Consumer Electronics Association (CEA), Computer &

Communications Association (CCIA) and Engine states that neither of these associations has any

parent corporation, and no publicly held corporation owns stock in the associations.

DATE: January 30, 2015                              BRADLEY ARANT BOULT CUMMINGS LLP


By: s/ Michael J. Bentley
      Michael J. Bentley
      Attorney for *Amici Curiae*
      Consumer Electronics Association,
      Computer & Communications Industry
      Association, and Engine

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF CONTENTS................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iiii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 3

ARGUMENT ................................................................................................................. 4

I.     The Actions Targeted by the Attorney General's Subpoena are Governed by Federal Law for Sound Policy Reasons. ................................................................................. 4

II.    Federal Law Insulates Online Services from Liability for the Conduct of Third Parties. ... 5

    A.    The Communications Decency Act confers broad immunity to Internet platforms. ................................................................................................................ 6

    B.    The Digital Millennium Copyright Act contains similar policies favoring immunity for Internet service providers and online service providers. ................. 6

III.   Federal Courts Have Consistently Upheld the Immunity of Web-based Service Providers. ................................................................................................................................. 8

    A.    The immunity from liability is as broad as it is clear. ........................................... 8

    B.    The CDA confers immunity from the threat of litigation as well as from liability. ................................................................................................................ 10

IV.   The Constitution Protects Internet Freedom Under the First Amendment and As a Matter of Federalism. ............................................................................................................ 11

    A.    Failing to enjoin the Attorney General from enforcing the subpoena would effectively vitiate U.S. citizens' and Internet service providers' rights to freedom of speech. ............................................................................................................ 11

    B.    The Attorney General's requests for Google to block or pre-screen all content he finds objectionable or face retribution threatens to chill Google's exercise of free speech.................................................................................................................... 12

CONCLUSION............................................................................................................ 13

CERTIFICATE OF SERVICE .................................................................................. 15

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...................................................................12

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)...........................................6

*Barrett v. Rosenthal*, 146 P.3d 510 (Cal. 2006)......................................................9

*Ben Ezra, Weinstein & Co. v. America Online, Inc.,* 206 F.3d 980 (10th Cir. 2000),
    *cert denied,* 531 U.S. 824 (2000).............................................................9

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) .........................9, 10

*Cooksey v. Futrell*, 721 F. 3d 226 (4th Cir. 2013) ....................................................13

*Doe v. America Online, Inc.*, 783 So. 2d 1010 (Fla. 2001),
    *cert. denied,* 53 U.S. 891 (2001)..............................................................9

*Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ....................................6, 8, 9

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004)..................................................5

*Fair Housing Council of San Fernando Valley v. Roommates.com,*
    521 F.3d 1157 (9th Cir. 2008)...............................................................10

*Green v. America Online (AOL)*, 318 F.3d 465 (3d Cir. 2003),
    *cert. denied,* 540 U.S. 877 (2003).............................................................9

*Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) ...........................12

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014)...........9, 10

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) ...........................................9

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009).................10

*Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007).................................4

*Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006), *aff'd,*
    508 F.3d 1146 (9th Cir. 2007). ...............................................................6

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)................2

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013)..............7

*Universal Commc'n Sys. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)............................9

*Zeran v. America Online, Inc.,* 129 F.3d 327 (4th Cir. 1997)....................................................9, 11

*Zieper v. Metzinger*, 474 F.3d 60 (2nd Cir. 2007) ......................................................................12

## STATUTES

17 U.S.C. § 512.............................................................................................................5, 6, 7, 13

47 U.S.C. § 230(b)(2) .........................................................................................................5, 11

47 U.S.C. § 230(c)(1)............................................................................................... *passim*

47 U.S.C. § 230(e)(3).......................................................................................................6

## OTHER AUTHORITIES

Booz & Co., *The Impact of U.S. Internet Copyright Regulations on Early-Stage
    Investment: A Quantitative Study* (2011),
    http://www.strategyand.pwc.com/media/uploads/Strategyand-Impact-US-
    InternetCopyright-Regulations-Early-Stage-Investment.pdf................................................7

Jonathan Mahler, *YouTube's Chief, Hitting a New 'Play' Button*,
    N.Y. Times, Dec. 20, 2014, *available at*
    http://www.nytimes.com/2014/12/21/business/youtubes-chief-hitting-a-new-play-
    button.html..........................................................................................................4

Jonathan Weisman, *After an Online Firestorm, Congress Shelves Antipiracy Bills*,
    N.Y. TIMES, Jan. 20, 2012, *available at*
    http://www.nytimes.com/2012/01/21/technology/senate-postpones-piracy-vote.html. ......7

McKinsey & Co., *Internet Matters: The Net's sweeping impact
    on growth, jobs and prosperity* (2011),
    http://www.mckinsey.com/insights/high_tech_telecoms_internet/internet_matters. ........13

OECD, The Role of Internet Intermediaries in Advancing Public Policy Objectives (2011),
    http://www.oecd.org/internet/ieconomy/theroleofinternetintermediariesinadvancingpublic
    policyobjectives.htm ......................................................................................11

Raffi Krikorian, *New Tweets per second record, and how!*, The Twitter
    Engineering Blog, Aug. 16, 2013, https://blog.twitter.com/2013/new-tweets-per-second-
    record-and-how...................................................................................................4

Sen. Rep. No. 105-190 (1998) .......................................................................................7

Sriram Sankar, Soren Lassen, & Mike Curtiss, *Under the Hood: Building out the infrastructure
    for Graph Search*, Facebook Engineering Notes, Mar. 6, 2013,
    https://www.facebook.com/notes/facebook-engineering/under-the-hood-building-out-the-
    infrastructure-for-graph-search/10151347573598920.......................................................5

Tony Romm, *SOPA at Republican debate opposed by all four GOP candidates*,
Politico, Jan. 19, 2012, *available at*
http://www.politico.com/news/stories/0112/71697.html.....................................................8

U.S. History, *The Trial of John Peter Zenger,* http://www.ushistory.org/us/7c.asp. ...................11

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Consumer Electronics Association (CEA) is the preeminent technology trade association promoting growth in the $208 billion U.S. consumer electronics industry through market research, education and public policy representation. CEA members lead the consumer electronics industry in the development, manufacturing and distribution of audio, video, mobile electronics, communications, information technology, multimedia, and accessory products, as well as related services sold to consumers.[2]

Computer & Communications Industry Association (CCIA) represents more than twenty large, medium-sized, and small companies in the high technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services –companies that collectively generate nearly a half trillion dollars in annual revenues.[3]

Engine is a technology policy, research, and advocacy organization that bridges the gap between policymakers and startups, working with government and a community of more than 500 high-technology, growth-oriented startups across the nation to support the development of technology entrepreneurship. Engine creates an environment where technological innovation and entrepreneurship thrive by providing knowledge about the start-up economy and constructing smarter public policy. To that end, Engine conducts research, organizes events, and spearheads campaigns to educate elected officials, the entrepreneur community and the general public on

---

[1] No counsel for any party authored this brief in whole or part; no party or counsel made a monetary contribution intended to fund its preparation or submission; and no person other than *amici* made such a contribution.  Plaintiff Google is a member of CEA and CCIA, but took no part in the preparation of this brief. Counsel for both parties consented to the filing of this brief.

[2] A complete list of CEA members is available at http://ce.org/Membership/Membership-Directory.aspx.

[3] A complete list of CCIA members is available at http://www.ccianet.org/members.

issues vital to fostering technological innovation. Engine has worked with the White House, Congress, federal agencies, and state and local governments to discuss policy issues, write legislation, and introduce the tech community to Washington insiders.

Federal law and public policy grant broad and firm immunity to Internet service providers and online intermediaries for third-party content published on websites.  The private sector freedom of action ensured by our Constitution and laws has provided U.S.-based companies like Google with opportunities to innovate that are often denied to overseas competitors by their home countries, and that, increasingly for U.S. companies, are threatened by foreign law.

The members of *amici* CEA, CCIA, and Engine would be impacted, directly and indirectly, by any regime that makes Internet search engines and venues answerable to fifty state attorneys general for failing to impose prior restraint on the speech of others.   For *amicus* CEA, freedom to innovate without prior restraint has been a core issue since the Supreme Court in *Sony Corp. of America v. Universal City Studios, Inc.*[4] protected the right of device innovators to market their products without being held responsible for potential copyright infringement by users.  As a representative of platforms that facilitate communication among billions of users, *amicus* CCIA is directly interested in litigation affecting the immunity provided by Section 230 of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230(c)(1), the applicability of the First Amendment to the Internet, and the safe harbors under the Digital Millennium Copyright Act of 1998, 17 U.S.C. § 512.  The new and young companies represented by Engine rely upon these stable legal platforms as the basis for conceiving, developing, and growing vibrant internet and technology businesses.

---

[4] 464 U.S. 417 (1984).

## INTRODUCTION AND SUMMARY OF ARGUMENT

No public official should have discretion to filter the Internet.  Where the public official is one of fifty state attorneys general, the danger to free speech and to innovation is even more profound.  *Amici* recognize that states may investigate providers of interactive computer services in connection with Internet activity, but such circumstances are very narrowly prescribed.  Because some inquiries may be made does not mean that General Hood's unprecedented inquiry and course of conduct is consistent with federal law, public policy, and good government.  It is not.

Google's business conduct is protected under the Constitution and under explicit federal law.  Section 230 of the CDA[5] confers broad immunity, to intermediaries such as Google, from state action that would punish them for third party conduct.  General Hood's demands, which plainly are or border on harassment, chill free speech.  *Amici* urge the Court to enjoin the Attorney General from enforcing this subpoena pending consideration of Google's federal claims.

---

[5] 47 U.S.C. § 230(c)(1).

## ARGUMENT

**I.   The Actions Targeted by the Attorney General's Subpoena are Governed by Federal Law for Sound Policy Reasons.**

States have a very limited power to determine what their own citizens can read.  They have no power to determine what citizens in other states can read.  If allowed, the conduct of General Hood toward an Internet intermediary would so impair Internet access and innovation that it exceeds his power under our federal system of government, as well as under the First Amendment and explicit federal law.  Our federal system simply cannot endure officials in each state determining, effectively, which portions of the Internet can be available nationally.  For this reason Congress has expressly insulated the development of the Internet from the various state-law regimes.[6]

The Internet is a national and multi-national engine for communication and electronic commerce.  It lives, breathes, and evolves every minute of every day.  Information is uploaded, shared, and consumed at an exponential rate.  Each day, domestic Internet service providers process billions of emails, online service providers enable hundreds of millions of commercial transactions, and users upload hundreds of thousands of hours of personally-generated content.  Online services receive 5,700 tweets per second (Twitter), 300 hours of video per minute (YouTube), and 2.5 billion pieces of content per day (Facebook), on a Web containing tens of billions of search-indexable pages.[7]  Google's search engine alone processes approximately more than 40,000 inquiries per second—some 3.5 billion queries per day.[8]

---

[6] *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007).

[7] *See* Raffi Krikorian, *New Tweets per second record, and how!*, The Twitter Engineering Blog, Aug. 16, 2013, https://blog.twitter.com/2013/new-tweets-per-second-record-and-how; Jonathan Mahler, *YouTube's Chief, Hitting a New 'Play' Button*, N.Y. Times, Dec. 20, 2014, *available at* http://www.nytimes.com/2014/12/21/business/youtubes-chief-hitting-a-new-play-button.html ("Airtime on YouTube is effectively unlimited — 300 hours of new content are uploaded to the

Internet businesses rely not only on the ability to communicate freely with their consumers, but also on the ability to give the public ways to communicate with each other.  Such communications include text, graphics, photographs, audio, video, and more.  This communication, at the speed of the Internet, is impossible to pre-screen.  The restrictions that Attorney General Hood seeks to impose, as a practical matter, would shut down one of the most robust sectors of the economy, destroying investment, and killing jobs.

## II.     Federal Law Insulates Online Services from Liability for the Conduct of Third Parties.

Internet communication, electronic commerce, and information exchange promote innovation as well as free and open discourse.  It is to protect innovation, as well as discourse, that federal law explicitly immunizes search engines, servers, and video sharing platforms from liability for the actions of third-party users.

On two occasions, Congress has adopted statutory regimes guaranteeing Internet platforms protection from liability arising out of content and communications published by third parties.  With Section 230 of the CDA, Congress aimed to foster a vibrant Internet "unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2).  Through Section 512 of the Digital Millennium Copyright Act, 17 U.S.C. § 512, Congress aimed to provide "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities."  *See Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (quoting S. REP. NO. 105-190, at 20 (1998)).

---

site every minute"); Sriram Sankar, Soren Lassen, & Mike Curtiss, *Under the Hood: Building out the infrastructure for Graph Search*, Facebook Engineering Notes, Mar. 6, 2013, https://www.facebook.com/notes/facebook-engineering/under-the-hood-building-out-the-infrastructure-for-graph-search/10151347573598920.

[8] Mem. in Supp. of Pl's. Mot. for TRO and Prelim. Inj. at 5, ECF No. 3.

Both of these sections reflect Congress's sound policy judgment to promote the development of search engines and other online services, which "have become essential sources of vital information for individuals, governments, nonprofits, and businesses who seek to locate information." *Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 848-49 (C.D. Cal. 2006), *aff'd*, 508 F.3d 1146 (9th Cir. 2007).

A.    **The Communications Decency Act confers broad immunity to Internet platforms.**

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  This provision ensures that no provider of an interactive computer service may be treated as the publisher or speaker of third party content. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009) (discussing § 230(c)(1)).

In enacting Section 230, Congress explicitly preempted contrary state law, stating that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  By virtue of Section 230(c)(1), "[no] cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with [Section 230]."  *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  By enacting Section 230, "Congress provided broad immunity under the CDA to Web-based service providers for *all claims* stemming from their publication of information created by third parties," *Doe*, *id.* (quoting § 230(e)(3)) (emphasis added).

B.    **The Digital Millennium Copyright Act contains similar policies favoring immunity for Internet service providers and online service providers.**

Section 512 of the Digital Millennium Copyright Act of 1998, which Google argues preempts some aspects of the Attorney General's actions here, reflects similar policy priorities as

6

Section 230, limiting the exposure of online services for third party content.  In the investment-capital dependent technology industry, even minor changes in intermediary liability risk will deter investors.[9]  Worried that the "specter of liability" would "chill innovation [in] socially beneficial functions," Congress limited the liability of online services in the copyright context as well.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013).  The DMCA thus "ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." S. Rep. No. 105-190, at 8 (1998).

Today, the legal certainty that Sections 230 and 512 provide affords online services space to innovate without fear of liability stemming from the misuse of their services by third parties who publish inappropriate content.  These safeguards have allowed the U.S. Internet industry to become the envy of the world.

Congress recently rejected attempts to narrow intermediary protections.  In 2012, Congress shelved federal legislative proposals that would have resulted in the sort of filtering and pre-screening sought by the Attorney General here.  Those bills, the Stop Online Piracy Act, H.R. 3261, 112th Cong. (2011), and the Preventing Real Online Threats to Economic Creativity and Theft of Intellectual Property Act of 2011 ("PROTECT IP Act"), S. 968, 112th Cong. (2011), prompted an extraordinary public backlash, precipitating a broad Internet protest.[10]  The

---

[9] *See* Booz & Co., *The Impact of U.S. Internet Copyright Regulations on Early-Stage Investment: A Quantitative Study* (2011), at 5-6, http://www.strategyand.pwc.com/media/uploads/Strategyand-Impact-US-InternetCopyright-Regulations-Early-Stage-Investment.pdf.

[10] Jonathan Weisman, *After an Online Firestorm, Congress Shelves Antipiracy Bills*, N.Y. Times, Jan. 20, 2012, *available at* http://www.nytimes.com/2012/01/21/technology/senate-postpones-piracy-vote.html.

backlash was severe enough to become an issue in the then-ongoing Republican primary, where all four candidates opposed the bills in a South Carolina debate.[11]

## III.   Federal Courts Have Consistently Upheld the Immunity of Web-based Service Providers.

In the face of urgings from plaintiffs in a variety of contexts, courts have consistently and emphatically upheld CDA immunity from claims arising from third-party content.  This immunity protects Internet service providers and online intermediaries not only from liability, but also from the sort of harassment that is threatened in this case.

### A.   The immunity from liability is as broad as it is clear.

Prescriptive efforts by plaintiffs to circumvent CDA protections from liability have been unavailing.  In *Doe v. MySpace*, a plaintiff brought suit against a provider of interactive online services for "failing to implement basic safety measures to prevent sexual predators from communicating with minors" and urged the district court to limit CDA immunity to cases involving defamation or related actions.[12]  Plaintiffs contended that the immunity provision of the CDA should not extend to MySpace because the claims had nothing to do with the content of the published information.  The district court expressly rejected these arguments, pointing out that nothing on the face of the statute supported a narrow interpretation of the CDA's immunity provision.  The court said that MySpace was entitled to immunity because plaintiffs' claims were directed at MySpace's "publishing, editorial, and/or screening capacities."[13]  The Fifth Circuit, in affirming noted that Congress enacted the CDA for several policy reasons, and to achieve its

---

[11] *See* Tony Romm, *SOPA at Republican debate opposed by all four GOP candidates*, Politico, Jan. 19, 2012, *available at* http://www.politico.com/news/stories/0112/71697.html.
[12] 474 F. Supp. 2d 843, 848 (W.D. Tex. 2007).
[13] *Id.* at 849.

policy goals "Congress provided broad immunity under the CDA to Web-based service providers for *all* claims stemming from their publication of information created by third parties."[14]

Ten years earlier, the Fourth Circuit in *Zeran v. AOL*[15] held that the immunity granted Web-based service providers is *so broad* that it applies even after the provider is notified of objectionable content published on its site.  AOL was sued for failing to remove a false advertisement that instructed people to place unwelcome telephone calls to the plaintiff.  In dismissing the case, the Fourth Circuit said that "Congress made a policy choice… not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."[16]

The Fifth Circuit and more than a half dozen other U.S. Courts of Appeal and State Supreme Courts have followed suit,[17] as well as numerous district courts and state trial and appellate courts.  Each of these courts has recognized that Congress deliberately chose not to impose liability on intermediaries such as Google, even to deter plainly harmful speech online.[18] It thus has been well-settled for over 15 years that this provision "creates a federal immunity to

---

[14] 528 F. 3d at 418 (emphasis added).

[15] *Zeran v. America Online, Inc.,* 129 F.3d 327, 333 (4th Cir. 1997).

[16] *Id.* at 330-331.

[17] *See Doe v. MySpace, Inc.*, 528 F.3d 413; *see also Universal Commc'n Sys. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007); *Green v. America Online (AOL)*, 318 F.3d 465 (3d Cir. 2003), *cert. denied*, 540 U.S. 877 (2003); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003); *Ben Ezra, Weinstein & Co. v. America Online*, *Inc.,* 206 F.3d 980 (10th Cir. 2000), *cert denied*, 531 U.S. 824 (2000); *Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014); *Barrett v. Rosenthal*, 146 P.3d 510, 515-29 (Cal. 2006); *Doe v. America Online, Inc.*, 783 So. 2d 1010 (Fla. 2001), *cert. denied*, 53 U.S. 891 (2001).

[18] *See, e.g.*, *Universal Commc'n Sys. v. Lycos, Inc.*, 478 F.3d at 418-19; *Carafano*, 339 F.3d at 1123-24 (quoting *Zeran*, 129 F.3d at 330-31).

*any cause of action* that would make service providers liable for information originating with a third-party user of the service."[19]

### B.  The CDA confers immunity from the threat of litigation as well as from liability.

By design, Section 230 is "quite robust," *Carafano*, 339 F.3d at 1123, and plainly precludes the Attorney General's position here.  In *Roommates.com*, upon which the Attorney General relies, the Ninth Circuit emphasized that Section 230 was designed "to protect websites not merely from ultimate liability, but *from having to fight costly and protracted legal battles*."[20]

The Fourth Circuit has consistently concurred:  "Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process.  As we have often explained in the qualified immunity context, immunity is an *immunity from suit* rather than a mere defense to liability."[21]  Similarly, the Sixth Circuit observed in *Jones*, "[g]iven the role that the CDA plays in an open and robust internet by preventing the speech-chilling threat of the heckler's veto, we point out that determinations of immunity under the CDA should be resolved at an earlier stage of litigation."[22]  It is perhaps in recognition of this broad protection from *suit* that some state attorneys general have lobbied, unsuccessfully, against Section 230 as a matter of public policy.[23]  The refusal of legislatures to change federal law further reinforces, strongly, why this Court should enjoin any attempt here to circumvent Section 230 immunity.

---

[19] *Zeran*, 129 F.3d at 330.

[20] *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1175 (9th Cir. 2008) (emphasis added).

[21] *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (internal quotation omitted).

[22] *Jones*, 755 F.3d at 417.  Google's requested relief is thus proper, the Attorney General's protestations regarding ripeness notwithstanding.

[23] *See* Decl. of Peter G. Neiman, Mem. in Supp. of Pl's. Mot. for TRO and Prelim. Inj.,  Exh. 12 at 1, ECF No. 17 (State AGs' 2013 letter demanding exemption of state criminal law from Section 230).

**IV.    The Constitution Protects Internet Freedom Under the First Amendment and As a Matter of Federalism.**

The First Amendment affords a competitive, as well as civic, advantage to U.S. entities. It protects printing presses as well as newspapers.  Since the trial of John Peter Zenger,[24] in 1733 U.S. law has recognized that there is no freedom of speech without the freedom to publish.  From the standpoint of *amici*, U.S. exceptionalism in assiduously protecting the freedom to innovate as essential to the freedom to speak, has been what has secured and protected U.S. global leadership in developing new products and services.

**A.    Failing to enjoin the Attorney General from enforcing the subpoena would effectively vitiate U.S. citizens' and Internet service providers' rights to freedom of speech.**

Just as the actions of Attorney General Hood threaten Internet freedom, there is a growing international consensus that "[i]ntermediaries are increasingly important and empower end-users" and that "[l]imitations on their liability for the actions of users of their platforms have encouraged the growth of the Internet."[25]  This amplifies and confirms the holding in *Zeran* 15 years ago that the risk of imposing liability on intermediaries poses a threat to freedom of speech in the "new and burgeoning Internet medium."[26]  The free exchange of information is the cornerstone of the Internet.  Broad state demands on intermediaries, large or small, run afoul of the federal government's objective to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services."[27]

---

[24] *See* U.S. History, *The Trial of John Peter Zenger,* http://www.ushistory.org/us/7c.asp.

[25] *See* OECD, The Role of Internet Intermediaries in Advancing Public Policy Objectives, at 15 (2011), http://www.oecd.org/internet/ieconomy/theroleofinternetintermediariesinadvancingpublicpolicyobjectives.htm.

[26] *Zeran*, 129 F.3d at 330.

[27] *See* 47 U.S.C. § 230(b)(2).

The Supreme Court has favored user empowerment tools over censorship as "less restrictive alternatives" of achieving the governmental interests.[28]  The Attorney General's proposal for Google to block or pre-screen all content would be a turn in precisely the opposite direction.  It would encourage officers of other states to follow suit in attempts to impose editorial prior restraint on web intermediaries.  Fifty state officers, each with a public policy agenda, could impose on all Internet intermediaries vague and potentially conflicting obligations to pre-screen or block from search engines such as Google, platforms such as YouTube, all advertising, and any third-party content that any of them believes to be objectionable.[29]  Speech and innovation cannot flourish in an environment where the most restrictive state law effectively dictates the content available on the Internet.

> **B.** **The Attorney General's requests for Google to block or pre-screen all content he finds objectionable or face retribution threatens to chill Google's exercise of free speech.**

Federal courts have held that search engines and video sharing platforms are protected by the First Amendment.[30]  In opposition to Google's motion for a temporary restraining order and preliminary injunction, Attorney General Hood argues that "[n]otably absent from Google's complaint is any specific instance in which any constitutionally protected speech has actually been silenced or that Google has been forced to take any steps to remove otherwise protected

---

[28] *See Ashcroft v. ACLU*, 542 U.S. 656, 660-61 (2004).

[29] The Attorney General has even "requested a 24-hour link through which attorneys general can request that links to particular websites be removed from search results 'within hours.'"  Mem. in Supp. of  Pl's. Mot. for TRO and Prelim. Inj. at 1, 9-10, ECF No. 3.

[30] *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) (Search engine rankings are protected speech. The state can no more tell a search engine what results to publish than it can tell a newspaper what editorials to run); *Zieper v. Metzinger*, 474 F.3d 60 (2nd Cir. 2007) (A website hosting third-party video content is protected under the First Amendment and the First Amendment forbids threats of prosecution based upon protected speech).

speech as a result of the Attorney General's investigation."[31]  General Hood incorrectly suggests a requirement for a showing of actual harm.  The question, however, is propensity for harm – it is enough that his proposed conduct has the potential to chill the free exercise of speech.

The question of whether the government action is "sufficiently chilling" turns on whether it would "deter a person of ordinary firmness from the exercise of First Amendment rights."[32] The Attorney General's proposal seeks to force Google to offer only third-party content that the Attorney General finds acceptable.  If Google does not accede, the Attorney General threatens criminal prosecution or civil litigation.  These types of threats can deter a person from the exercise of First Amendment rights; indeed, Google admits that threats have already caused Google to alter its editorial decisions in an effort to assuage the Attorney General of Mississippi.[33]  This our federal system, Constitution, laws, and world leadership in innovation cannot endure.

## CONCLUSION

Together, the First Amendment, CDA Section 230, and DMCA Section 512 comprise the unique legal foundation of the Internet, which enables almost $8 trillion in commerce each year.[34]  The Internet functions effectively due to the free exchange of information and ideas.  The Internet's international landscape makes it unsuitable for state-by-state regulation.  This is a principle Congress recognized early, and federal courts have upheld time and time again.  The

---

[31] Mem. in Opp. to Pl's. Mot. for TRO and Prelim. Inj. at 10, ECF No. 34.

[32] *Cooksey v. Futrell*, 721 F. 3d 226, 236 (4th Cir. 2013) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir.2011)).

[33] Consolidated Mem. Br. in Opp. to Def's Mot. to Dismiss and in Rebuttal to Def.'s Resp. to Pl's. Mot. for a TRO and Prelim. Inj. at 25-29, ECF No. 53.

[34] McKinsey & Co., *Internet Matters: The Net's sweeping impact on growth, jobs and prosperity*, at 9 (2011), http://www.mckinsey.com/insights/high_tech_telecoms_internet/internet_matters.

Internet is a global technology, and its continued growth depends upon uniformity in the legal rules affecting the liability of Internet-based service providers.

For the foregoing reasons, this court should enjoin any attempt by the Attorney General of Mississippi to enforce its subpoena upon Google pending resolution of Google's federal claims.

Respectfully submitted,

*/s/ Michael J. Bentley*
Margaret Oertling Cupples (MBN 9656)
mcupples@babc.com
J. William Manuel (MBN 9891)
wmanuel@babc.com
Michael J. Bentley (MBN 102631)
mbentley@babc.om
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 East Capitol Street, Suite 400
Jackson, MS 39201
Telephone: (601) 948-8000

Seth D. Greenstein*
sgreenstein@constantinecannon.com
Robert S. Schwartz*
rschwartz@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Avenue, NW
Suite 1300 North
Washington, D.C.  20004
Telephone: (202) 204-3500
Facsimile:  (202) 204-3501

**Pro Hac Vice* Motion Pending

Attorneys for *Amici Curiae*
Consumer Electronics Association,
Computer & Communications Industry
Association & Engine

14

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2015, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will deliver copies to all counsel of record.

/s/ *Michael J. Bentley*
Attorney for *Amici Curiae*
Consumer Electronics Association,
Computer & Communications Industry
Association & Engine

15