## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | | |
|---|---|---|
| Google, Inc., | ) | |
| _Plaintiff_, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 3:14-cv-00981-HTW-LRA** |
| | ) | |
| Jim Hood, Attorney General of the | ) | |
| State of Mississippi, in his official | ) | |
| capacity, | ) | |
| _Defendant_. | ) | |
| | ) | |
| | ) | |

---

**[PROPOSED]** _CORRECTED_ **BRIEF OF** _AMICI CURIAE_ **ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY & TECHNOLOGY, NEW AMERICA'S OPEN TECHNOLOGY INSTITUTE, PUBLIC KNOWLEDGE, AND R STREET INSTITUTE IN SUPPORT OF PLAINTIFF GOOGLE, INC.**

---

Corynne McSherry*
Mitchell L. Stoltz
Jamie L. Williams
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:  (415) 436-9333
Facsimile:   (415) 436-9993
corynne@eff.org

*_Pro Hac Vice_ pending

Herbert W. Wilson II (MSB No. 103187)
_Local Counsel_
THE LAW OFFICE OF
HERBERT W. WILSON II, PLLC
P.O. Box 6031
Gulfport, MS 39507
Telephone:  (228) 206-5297
Facsimile:   (800) 916-3763
herb@herbwilson.lawyer

_Counsel for Amici Curiae_
(_Additional Counsel listed on next page_)

*Additional Counsel*:

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N Street NW,
Suite 410
Washington, DC 20036
Tel: (202) 861-0020
Fax: (202) 861-0040
ssiy@publicknowledge.org

Kevin S. Bankston
Laura M. Moy
NEW AMERICA'S OPEN
TECHNOLOGY INSTITUTE
1899 L Street NW, Suite 400
Washington, DC 20036
Tel: (202) 986-2700
Fax: (202) 986-3696
bankston@opentechinstitute.org

Erik Stallman
CENTER FOR
DEMOCRACY &
TECHNOLOGY
1634 I Street NE,
Suite 1100
Washington, DC 20006
Tel: 202.637.9800
Fax: 202.637.0968
estallman@cdt.org

Michael Godwin
R STREET INSTITUTE
1050 17th Street NW, Suite 1150
Washington, DC 20036
Tel: (202) 525-5717

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................................1

INTRODUCTION ...............................................................................................3

ARGUMENT ....................................................................................................4

   I.   SECTION 230 SHIELDS INTERNET SERVICE PROVIDERS FROM LIABILITY BASED ON THIRD-PARTY CONTENT ............................................................4

       A.   Section 230's Statutory Language Is Clear ...............................................4

       B.   Congress Intentionally Crafted Expansive Immunity Under Section 230 to Encourage the Development of Innovative Technologies and Forums For Online Discourse ............................................................................5

       C.   Section 230 Explicitly Preempts Inconsistent State Laws, Including State Consumer Protection Laws and State Intellectual Property Laws ...............................10

   II.   CONGRESS INTENDED TO PROTECT INTERNET SERVICE PROVIDERS NOT ONLY FROM LIABILITY, BUT ALSO FROM THE SORT OF LEGAL BURDEN PLAINTIFF FACES HERE ........................................................................13

   III.   SUBJECTING INTERNET SERVICE PROVIDERS TO OVERBROAD DISCOVERY SUBPOENAS DIRECTED AT THIRD-PARTY CONTENT WOULD STIFLE INNOVATION AND CHILL THE SPEECH OF INTERNET USERS ..........................15

CONCLUSION ...............................................................................................16

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are non-profit public interest organizations seeking to protect speech and innovation—and access to speech and new technologies—on the Internet.

The Electronic Frontier Foundation ("EFF") is a non-profit, member-supported civil liberties organization that works to protect free speech, innovation, and privacy in the online world.  With more than 25,000 dues-paying members, EFF represents the interests of technology users in both court cases and broader policy debates regarding the application of law in the digital age.  EFF actively encourages and challenges industry and government to support free expression, innovation, privacy, and openness in the information society.  EFF frequently participates, either as counsel of record or *amicus curiae*, in cases involving Section 230 of the Communications Decency Act.

The Center for Democracy & Technology ("CDT") is a non-profit public interest and Internet policy organization.  CDT represents the public's interest in an open, innovative, and decentralized Internet, reflecting constitutional and democratic values of free expression, privacy, and individual liberty.  CDT has litigated or otherwise participated in a broad range of Internet free expression and intermediary liability cases.

The Open Technology Institute ("OTI") is a program of New America dedicated to technology policy and technology development in support of digital rights, social justice, and universal access to open communications networks.  OTI, though its unique blend of policy expertise, technical capacity, and field-level engagement, seeks to promote a stronger and more open Internet to support stronger and more open communities.  New America is a non-profit civic enterprise dedicated to the renewal of American politics, prosperity, and purpose in the

---

[1] No one, except for undersigned counsel, has authored this brief in whole or in part or contributed money toward the preparation of this brief.  Plaintiff Google, Inc. consents to the filing of this brief.  Counsel for *Amici Curiae* emailed the attorney of record for Defendant, in addition to the two other attorneys listed on the docket, to request Defendant's consent to file, but received no response.  Accordingly, *Amici* has concurrently filed a motion for leave to file this *amicus* brief.

digital age through big ideas, technological innovation, next generation politics, and creative engagement with broad audiences.

Public Knowledge is a non-profit organization that is dedicated to preserving the openness of the Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully. As part of this mission, Public Knowledge advocates on behalf of the public interest for accessible and open means for public communication, without undue interference of or by intermediaries.

The R Street Institute ("R Street") is a non-profit, non-partisan, public-policy research organization ("think tank"). R Street Institute's mission is to engage in policy research and educational outreach that promotes free markets, as well as limited yet effective government, including properly calibrated legal and regulatory frameworks that support Internet economic growth and individual liberty. R Street's particular focus on Internet law and policy is one of offering research and analysis that show the advantages of a more market-oriented society and of more effective, more efficient laws and regulations that protect freedom of expression and privacy.

## INTRODUCTION

*Amici Curiae* submit this brief because the stakes of this case go well beyond the particular burden the Attorney General's investigation may place on one service provider.  This litigation raises a broader question: whether Section 230 of the Communications Decency Act ("Section 230") precludes a state official from saddling any Internet service provider with burdensome and costly discovery based primarily on the provider's refusal to monitor, take down, or block disfavored third-party content.  Given Section 230's plain language, and its all but universal interpretation by the courts, this Court should find that it does.

A holding to the contrary would contravene Congress's intent in enacting the statute, to the detriment of not only large service providers like the Plaintiff, but also to small service providers and the Internet users who rely on their platforms to communicate, learn, and organize.  One of Congress's primary goals in passing Section 230 was to encourage the development of the Internet as a platform for speech by shielding intermediaries not only from liability, but also from the heavy legal burden of complying with legal process related to third-party content.

Simply put, requiring online service providers either to respond to subpoenas directed primarily at third-party conduct—or to engage in protracted and expensive litigation to challenge their propriety—could result in extraordinary costs for those providers.  Although some large service providers may have the resources to shoulder significant discovery burdens, a small online service provider likely would not.  Smaller providers would therefore likely either adopt the restrictions required to avoid such a burden, or leave the business altogether, depriving users of valuable platforms for speech.  Either outcome would, in turn, chill the online speech of Internet users who communicate via these platforms—exactly the result Congress sought to avoid.

In keeping with both the statutory text and Congress's intent, the kind of burden presented here should only be incurred where the party seeking discovery can show specific, non-speculative allegations of conduct *not* immunized by Section 230.  Accordingly, this Court should find that the interrogatories and document requests in the Attorney General's subpoena

directed at third-party content are barred by Section 230, deny the Attorney General's motion to dismiss, and grant Plaintiff's motion for preliminary injunction.

## ARGUMENT

**I.    SECTION 230 SHIELDS INTERNET SERVICE PROVIDERS FROM LIABILITY BASED ON THIRD-PARTY CONTENT.**

The 79-page subpoena that gave rise to this case appears to be directed primarily at Plaintiff's alleged failure to take down or block certain objectionable third-party content—in other words, to Plaintiff's exercise of editorial control over the third-party content available through its services. *See* Decl. of Peter G. Neiman, ECF No. 17, Ex. 30 (administrative subpoena issued by Defendant to Plaintiff on Oct. 21, 2014). As the statutory language and legislative history makes clear, Section 230 was enacted to immunize interactive computer services from liability for exercising such editorial control, even in cases where the publication of third-party content is actionable under state law.

### A.    Section 230's Statutory Language Is Clear.

Section 230 provides that "[n]o provider or user of an interactive computer service[2] shall be treated as the publisher or speaker of any information provided by another information content provider."   47 U.S.C. § 230(c)(1).   The statutory language is clear: immunity is not conditioned on how an interactive computer service displays, selects, or channels information. As the Fourth Circuit found in the seminal case interpreting Section 230, "[b]y its plain language, [Section] 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).   In other words, Section 230 immunizes

---

[2] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

"any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online[.]"  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc).

As such, under the plain language of the statute, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."  *Zeran,* 129 F.3d at 330; *see also Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) (same).  Section 230 explicitly "precludes courts from entertaining claims that would place a computer service provider in a publisher's role."  *Zeran,* 129 F.3d at 330.

> **B.      Congress Intentionally Crafted Expansive Immunity Under Section 230 to Encourage the Development of Innovative Technologies and Forums For Online Discourse.**

Section 230 of the Communications Decency Act was born from—and intended to dispense with—a broad range of legal uncertainties that Internet service providers faced in the early stages of the Internet.  In the early to mid-1990s, the risk of potentially burdensome regulation and litigation emerged as a concrete threat to the free flow of online speech.  Imposing common law publisher liability, including distributor liability, on Internet service providers was seen as inconsistent with how the Internet works and as a brake on its growth and development.

In enacting Section 230, Congress codified a broad-based anti-regulatory approach to encourage the development of innovative Internet technologies and facilitate robust online discourse.  *Zeran*, 129 F.3d at 330 ("Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.").  To achieve this goal, Congress provided online service providers with "broad immunity" from liability for content originally published by third parties in order to encourage both large and small online intermediaries to open their forums for discussion, free from fear of liability for another speaker's words.  *See Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  Such liability was, "for Congress, simply another form of intrusive government

regulation of speech." *Zeran*, 129 F.3d at 330; *see also Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000) ("Congress enacted § 230 to promote freedom of speech in the 'new and burgeoning Internet medium' by eliminating the 'threat [of] tort-based lawsuits' against interactive services for injury caused by 'the communications of others.'") (citation omitted).

Congress thus recognized in enacting Section 230 what the United States Supreme Court later confirmed in extending the highest level of First Amendment protection to the Internet: "government regulation of content of speech is more likely to interfere with the free exchange of ideas than to encourage it." *Reno v. ACLU*, 521 U.S. 844, 885 (1997). Indeed, Congress explicitly acknowledged in the text of Section 230 that it sought "to promote the continued development of the Internet and other interactive computer services" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal and State regulation[.]" 47 U.S.C. § 230(b)(1)–(2).

The immunity Congress granted to Internet service providers under Section 230 serves three central purposes. First, it keeps to a minimum governmental interference with the "'robust nature of Internet communication.'" *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (quoting *Zeran*, 129 F.3d at 330). As Congress expressly indicated in Section 230(a)'s "Findings," "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity" and "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, *with a minimum of government regulation*." 47 U.S.C. § 230(a)(3)–(4) (emphasis added); *see also Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (Section 230 was intended to encourage "the unfettered and unregulated development of free speech on the Internet[.]").

Second, the immunity provided by Section 230 "protects against the 'heckler's veto' that would chill free speech." *Jones*, 755 F.3d at 407. Without such immunity, those who disliked certain content could pressure Internet service providers into removing the content they found

objectionable simply by threatening litigation—as is apparently occurring in this case.  *See id*.; *see also Zeran*, 129 F.3d at 331 ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect.").

Third, Section 230 immunity encourages service providers to self-regulate—*i.e.*, to police and monitor third-party content posted through their services—by reducing the risk involved in good-faith efforts.  *See Jones*, 755 F.3d at 408; *Batzel*, 333 F.3d at 1028 (noting that one reason "for enacting § 230(c) was to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material"); *see also* 141 Cong. Rec. H8469–70 (Statements of Representatives Cox, Wyden, and Barton).  Without Section 230 immunity, service providers would have strong incentives to *avoid* good-faith efforts to monitor third-party content, for fear of liability if those efforts failed.

This threat was underscored by *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. 1995), a case decided before the enactment of Section 230.  There, the court held that an Internet service provider could be held responsible for the defamatory words of one of its users where the provider had attempted—and failed—to filter objectionable content from its site.  *Id.* at *4.  In other words, according to the court, the service provider could be held liable by virtue of the fact that it had voluntarily engaged in an unsuccessful attempt to police third-party content.  As the Sixth Circuit explained, "Section 230 set out to abrogate [the] precedent" set by *Stratton Oakmont* and to thereby ensure that service providers were encouraged—not discouraged—from self-regulating content disseminated via their services. *Jones*, 755 F.3d at 408.[3]

---

[3] The *amicus* brief of the International AntiCounterfeiting Coalition ("IACC") illustrates how a failure to apply Section 230 as written could discourage good faith editorial efforts.  IACC notes that "Google represents to consumers that it demotes pirated content," but IACC believes that "limited evidence . . . suggests that Google's claims . . . may not be accurate in at least some cases," and that, on that basis, Section 230 immunity should not attach.  Br. of IACC at 11.  IACC suggests that Section 230 does not apply to Google because its efforts to suppress third-party material alleged to infringe copyright has not achieved perfect success as IACC defines it. If this were so, Google would likely avoid attempting to suppress infringement at all.  Smaller

Prior to the enactment of Section 230, Internet service providers were understandably wary of their potential exposure, given their ability to host, and invite the development of, a far greater range and volume of speech than had ever before been possible.  Not only could service providers be held responsible for online content they created, but they "could be held liable for defamation even if [they were] not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement."  *Batzel*, 333 F.3d at 1026–27 (citing *Stratton Oakmont,* 1995 WL 323710).  Congress recognized that the Internet would be a far more limited forum if websites were forced to second-guess their decisions about managing and presenting content they had not authored.  As the Fourth Circuit aptly noted, "It would be impossible for service providers to screen each of their millions of postings for possible problems.  Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted."  *Zeran*, 129 F.3d at 331.

Congress thus chose to protect and foster the Internet as a forum for unrestrained, robust communication rather than to deter potentially harmful online speech through imposing "liability on companies that serve as intermediaries for other parties' potentially injurious messages."  *Id.* at 330–31.  And in enacting Section 230, Congress expressly indicated that it was codifying a federal policy of non-regulation aimed at "preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services[.]"  47 U.S.C. § 230(b)(2).  Congress implemented this policy by granting statutory immunity to providers of "interactive computer services"—such as website operators and search engine providers—for

---

Internet service providers that lack the resources to police their systems for every instance of potentially objectionable third-party content would face an even stronger disincentive. Furthermore, despite IACC's claim that Google is not adequately policing third-party content, neither IACC nor the Attorney General has pointed to any evidence that Google's purported failure is deliberate, or that it in any way encourages or facilitates infringement.

content posted on and through their services by third parties.[4]  *Batzel*, 333 F.3d at 1020; *Green*, 318 F.3d at 471.  Although Section 230 does not affect the liability of users who create actionable material, the statute operates to "protect [online service providers] from taking on liability" and thereby encourages the development of forums to host speech of all types in what is, in the words of one congressman, "the most energetic technological revolution that any of us has ever witnessed."  141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (Rep. Christopher Cox speaking in support of Section 230).

Since the passage of Section 230, courts have routinely—and correctly—recognized the need to construe the statute's terms broadly to carry out Congress's policy choice.  *See Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content.") (collecting cases); *Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1174–75 (9th Cir. 2008); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006).  Courts "have recognized as critical in applying the statute the concern that lawsuits could threaten the 'freedom of speech in the new and burgeoning Internet medium.'"  *Batzel*, 333 F.3d at 1027 (quoting *Zeran*, 129 F.3d at 330).  And as the Sixth Circuit recognized last year, "[t]he protection provided by [Section] 230 has been understood to merit expansion."  *Jones*, 755 F.3d at 408.

Thus, for example, "reviewing courts have adopt[ed] a relatively expansive definition of 'interactive computer service' and a relatively restrictive definition of 'information content provider.'"  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).[5]  Indeed, a

---

[4] As indicated above, Section 230 also immunizes service providers for the removal (as opposed to the hosting) of objectionable material.  47 U.S.C. § 230(c)(2).

[5] Under the statutory scheme, an "interactive computer service" falls outside the protections of Section 230 *only if* it also becomes an "information content provider" in its own right, and only then if it provides the specific content alleged to be actionable.  *Carafano*, 339 F.3d at 1123.  "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  In adopting a restrictive

large number of the potential claims to which the Attorney General alludes as potential outcomes of his investigation in this case are based on conduct that, pursuant to the case law, would not bring Google within the narrow category of "information content provider" that would render it beyond Section 230's protections.

     **C.**     **Section 230 Explicitly Preempts Inconsistent State Laws, Including State Consumer Protection Laws and State Intellectual Property Laws.**

Attorney General Hood (and supporting *amici*) attempt to sidestep the force of Section 230 by pointing to claims that might be under investigation based on laws, such as state

---

definition of "information content provider," courts have found that the creation of "neutral tools" that facilitate the creation of content by third parties does not transform a service provider into a content provider. *See, e.g., Carafano,* 339 F.3d at 1124 (the fact that provider's questionnaire facilitated expression of information by individual users did not make a service provider an "information content provider"); *Roommates.com,* 521 F.3d at 1174 (allowing users to input information into a blank text box did not make service provider an "information content provider"). Nor do any similar actions short of actually creating the actionable content void Section 230 immunity. For instance, an Internet service provider does not lose Section 230 immunity by:

(a) displaying or allowing access to content created by another (even if it encouraged users to provide the content), *see, e.g., Jones,* 755 F.3d at 409–10;

(b) categorizing third party content, *see, e.g., Dart v. Craigslist, Inc.,* 665 F. Supp. 2d 961, 962 (N.D. Ill. 2009) ("Craigslist created the categories, but its users create the content of the ads and select which categories their ads will appear in."); *Gentry v. eBay, Inc.,* 99 Cal. App. 4th 816, 832 (2002);

(c) creating neutral tools, such as generic search engines, that guide users in finding third-party content, *see, e.g., Roommates.com,* 521 F.3d at 1167; *Ascentive, LLC v. Opinion Corp.,* 842 F. Supp. 2d 450, 476 (E.D.N.Y. 2011) ("[Search engine optimization] tactics and its use of plaintiffs' marks to make [defendant's] pages appear higher in search engine results list . . . do not render [defendant] an information content provider"); or

(d) exercising editorial discretion—including the use of an automated filtering tool—to control what third-party content is displayed via its services. *See, e.g., MySpace,* 528 F.3d at 420 (5th Cir. 2008) (holding that pursuant to Section 230, an interactive computer service provider could not be held for "decisions relating to the monitoring, screening, and deletion of content") (internal quotations and citation omitted); *Carafano,* 339 F.3d at 1124 ("[S]o long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process.").

criminal laws, that are not preempted by Section 230.  As Google notes, however, claims that are not preempted are not at issue here, because Google has not claimed immunity from *all* investigation.  Rather, the company seeks "only what Section 230 already offers—protection from the Attorney General bringing a case against Google under the [Mississippi Consumer Protection Act (MCPA)] for making accessible over the Internet content created by third parties, *i.e.*, immunized conduct."  Google's Memorandum Br. in Opp. to Mot. to Dismiss, ECF No. 53, at 21.

Moreover, a large number of the potential claims to which the Attorney General and *amici* allude are in fact foreclosed by Section 230, including a number of claims styled as violations of the MCPA and state intellectual property laws.  *See* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."); *see also Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) ("[W]hen Congress has unmistakably . . . ordained that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall.") (citations and internal quotation marks omitted).

State and federal courts across the country have found claims brought pursuant to state laws—including state consumer protection laws—to be preempted when they conflict with Section 230.  *See, e.g., Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450 (E.D.N.Y. 2011) (holding that Section 230 precluded liability for owner of consumer-review website under state unfair trade practices and consumer protection law, *inter alia*, based on negative postings by customers of mattress manufacturer and computer software developer); *Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *7 (C.D. Cal. May 4, 2011) (holding that the plaintiff's cause of action for unfair business practices under California law was barred on the basis of Section 230 immunity); *Almeida*, 456 F.3d at 1321 (Section 230 "preempts state law that is contrary to this subsection."); *Ben Ezra*, 206 F.3d at 984–85 (Section 230 "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party.").

The Attorney General also indicates that the subpoena at issue seeks information and documents regarding "stolen intellectual property" and the Plaintiff's possible "facilitation of copyright infringement" under state laws.  *See* Attorney General's Memorandum in Opp. to Mot. For Temporary Restraining Order and Preliminary Injunction ("A.G. Opp."), ECF No. 33, at 23. Claims brought under state intellectual property laws, however, are also preempted when they conflict with Section 230.  As the Ninth Circuit has explained, although Section 230 includes an exception for laws pertaining to intellectual property, the exception applies only to federal intellectual property claims.[6]  *Perfect 10, Inc. v. CCBILL, LLC*, 488 F.3d 1102, 1119 (9th Cir. 2007) (en banc) ("[W]e construe the term 'intellectual property' to mean 'federal intellectual property.'"); *see also* 47 U.S.C. § 230(e)(2).

That limit makes perfect sense given the realities of the Internet and the vagaries of state law.  As the Ninth Circuit observed, "[w]hile the scope of federal intellectual property law is relatively well-established, state laws protecting 'intellectual property,' however defined, are by no means uniform."  *Perfect 10*, 488 F.3d. at 1118.  Thus, the court explained, "[b]ecause material on a website may be viewed across the Internet, and thus in more than one state at a time, permitting the reach of any particular state's definition of intellectual property to dictate the contours of this federal immunity would be contrary to Congress's expressed goal of insulating the development of the Internet from the various state-law regimes."  *Id*.  Indeed, "[a]s a

---

[6] In its *amicus* brief, IACC cites several district court cases that have reached the opposite conclusion.  The only circuit court opinions to which IACC points, however, are not instructive. As the Ninth Circuit explained in *Perfect 10, Inc. v. CCBILL, LLC*, 488 F.3d 1102 (9th Cir. 2007) (en banc), *Universal Communication Systems, Inc. v. Lycos, Inc.,* 478 F.3d 413 (1st Cir. 2007), is not in conflict with its decision, as neither party in *Universal Communication Systems* actually raised the question of whether state law counts as "intellectual property" for purposes of Section 230.  The First Circuit simply assumed that it did without actually considering the issue. *See Perfect 10*, 488 F.3d at 1119 n.5.  And the quoted text from *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc*., 519 F.3d 666, 670 (7th Cir. 2008) says nothing about state intellectual property laws.  The case does not even mention 47 U.S.C. § 230(e)(2), Section 230's intellectual property exception.

practical matter, [it] would fatally undermine the broad grant of immunity provided by the [Communications Decency Act]." *Id.* at 1119 n.5.

Even if state intellectual property laws were not preempted by Section 230, attempts to erode Section 230's protection by classifying unrelated state laws as "intellectual property laws" also conflicts with the broad construction of Section 230 immunity. Thus, for example, hypothetical violations of publicity rights statutes or "true name and address" statutes—as suggested by the Attorney General—would likely not, even if substantiated, be exempted from Section 230 immunity.[7] *See* A.G. Opp. at 23.

A narrow and limited exemption is consistent with the speech-protective policy Congress established in enacting Section 230. As the statutory text and legislative history make clear, Section 230 was intended to be a broad shield against liability based on third-party content, even in the face of conflicting state law. This statutory policy has been instrumental to the development of the modern Internet. The Court should not bless the Attorney General's efforts to manufacture theoretical legal claims to sidestep that policy.

## II. CONGRESS INTENDED TO PROTECT INTERNET SERVICE PROVIDERS NOT ONLY FROM LIABILITY, BUT ALSO FROM THE SORT OF LEGAL BURDEN PLAINTIFF FACES HERE.

Congress did not intend Section 230 to be a mere grant of immunity from *liability*. Rather, Congress intended the statute to shield Internet service providers from the legal burden of engaging in legal process arising out of third-party content.

---

[7] Publicity rights claims have been held to be subject to and preempted by Section 230. *Carafano v. Metrosplash.Com, Inc.,* 339 F.3d 1119, 1125 (9th Cir. 2003); *see also Almeida v. Amazon.com, Inc.,* 456 F.3d 1316 (11th Cir. 2006) (discussing the issue but declining to rule). Mississippi's "true name and address" statute, Miss. Code Ann. § 97-23-89, deals with the labeling of physical recording media and does not cover Internet transmissions. The Attorney General has made no substantive, non-speculative accusations of any violation of state trademark law or laws protecting pre-1972 sound recordings.

- 13 -

Congress correctly recognized that a grant of intermediary immunity alone would be insufficient to protect speech carried on the platforms of Internet service providers.  Service providers generally lack sufficient incentive to vindicate their users' interests by challenging undue legal claims or investigation demands—even where they would clearly prevail—when simply removing user content would suffice to extricate them from legal disputes early on.  Thus, immunity that took hold only at the later stages of litigation and, therefore, permitted discovery even in the absence of specific, fact-based allegations of behavior that would bring a service provider outside of Section 230's protections—would not address the chilling effects Congress sought to prevent.  As the Fifth Circuit has recognized, "immunity means more than just immunity from liability; it means immunity from the burdens of defending a suit, *including the burdens of pretrial discovery*."  *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) (emphasis added); *see also Doe v. Bates*, 2006 WL 3813758, at *10 (E.D. Tex 2006) (holding that "delay in ruling on [Section 230 immunity] will defeat one of the fundamental purposes of the immunity, namely to insulate service providers not only from liability, but also from the burdens of litigation, *including those associated with discovery*") (emphasis added).  "[I]mmunity . . . is effectively lost if a case is erroneously permitted to go to trial."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254–55 (4th Cir. 2009).

Congress therefore dictated that "*[n]o cause of action may be brought and* no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3) (emphasis added).  Interpreting this language, numerous courts have found that Section 230 confers on service providers "immunity from suit" in addition to immunity from liability.  *See Carafano*, 339 F.3d at 1125; *Ben Ezra*, 206 F.3d at 983.  But Section 230 must apply not only to the burden of going to trial, but also to the burden of responding to subpoenas directed at third-party content, such as the 79-page subpoena at issue in this case.  Any other reading would gut the statute of the protections intended by Congress.  *See id.*

Neither should Congress's intent be circumvented by a mere conclusory allegation that an Internet service provider is an "information content provider," nor by a party's desire to engage

in discovery to determine whether or not the service provider did anything to fall outside of Section 230's protections.   In the context of motions to dismiss brought by service providers subject to claims arising out of third-party content, courts have held that a plaintiff must allege *specific*, *non-speculative* behavior that a provider authored or developed the content in question, or else the claim must promptly be dismissed.   *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) (allegations that Facebook controlled, allowed, furthered, and failed to remove offending post, or had some contractual obligation to act, were insufficient to defeat Section 230 immunity); *Nemet*, 591 F.3d at 250, 254–56 (granting Section 230 immunity to a consumer complaint website, finding that the complaint failed to "plead sufficient facts to allow a court, drawing on 'judicial experience and common sense,' to infer 'more than the mere possibility of misconduct'") (citation omitted); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) ("Plaintiff has not come close to substantiating the 'labels and conclusions' by which she attempts to evade the reach of [Section 230].").

This rule is consistent with the language of Section 230, furthers Congress's stated policy preference, and should be applied in the context of the discovery subpoena issued here.   Namely, unless a litigant can make plausible and specific factual allegations that would support a showing that the provider directly authored or developed content that would give rise to an alleged violation of state law, an Internet service provider should be granted immunity from burdensome subpoenas directed at third-party content.   Broad, non-specific compelled discovery to determine if a service provider did anything to fall outside the scope of Section 230 immunity contravenes Congress's intent in enacting the statute and should not be tolerated.

**III.    SUBJECTING INTERNET SERVICE PROVIDERS TO OVERBROAD DISCOVERY SUBPOENAS DIRECTED AT THIRD-PARTY CONTENT WOULD STIFLE INNOVATION AND CHILL THE SPEECH OF INTERNET USERS.**

A ruling that subjects Internet service providers to the pressure tactics employed by the Attorney General here would not only conflict with Congress's goals in enacting Section 230, it

would also undermine the economic and democratic benefits of the Internet that we enjoy today. Simply put, *Amici* fear that Internet service providers, faced with a constant threat of burdensome investigation requests for simply facilitating access to third-party content, would be discouraged from investing in or creating important new Internet features.  That, in turn, would inhibit technological innovation and chill online speech.

First, the services of providers that were required to respond to burdensome subpoenas arising out of third-party content hosted through their services—or protracted and expensive litigation in order to protect their ability to host such third-party content—would inevitably become more expensive, more restrictive, and ultimately less available for public speech.  In addition, some smaller providers would likely go bankrupt if forced to undertake the effort. Thus, public and private actors with ample resources would have great power to pressure small Internet service providers to remove content they found objectionable—as the Attorney General has attempted to do here—by simply threatening to serve them with burdensome discovery demands.  *See Jones*, 755 F.3d at 407.

Either effect would result in a chilled and censored Internet, hindering the "robust" Internet communications that Congress explicitly sought to protect.  *See* U.S.C. § 230(a)(3).

### CONCLUSION

The issue before this Court has ramifications far beyond the parties to this case. Congress sought to ensure that all Internet service providers—large and small—would have the benefit of a legal "safe zone" to encourage the development and widespread deployment of low-cost speech-facilitating technologies and services.  Congress's decision to place online service providers, such as search engine providers and website operators, outside the reach of state law claims on the basis of the third-party content available through their services thus protects not only large service providers like the Plaintiff, but also small service providers and the users who rely on those platforms for online speech.  Congress struck a balance that ensured the "robust nature of Internet communication" would continue to flourish without undue government

interference.  *See Zeran*, 129 F.3d at 330 (4th Cir. 1997).  Congress also ensured that Internet service providers could not be strong-armed, under threat of litigation, into taking down or blocking third-party content.  But in this case, it appears that the Attorney General is attempting to do just that.  The Court should therefore deny the Attorney General's motion to dismiss and grant the Plaintiff's motion for preliminary injunction.

Dated:  January 30, 2015                    Respectfully submitted,

                                             /s/ Herbert W. Wilson II
                                            Herbert W. Wilson II
                                            THE LAW OFFICE OF
                                            HERBERT W. WILSON II, PLLC

                                            Corynne McSherry
                                            Mitchell L. Stoltz
                                            Jamie L. Williams
                                            ELECTRONIC FRONTIER FOUNDATION

                                            Erik Stallman
                                            CENTER FOR DEMOCRACY & TECHNOLOGY

                                            Kevin S. Bankston
                                            Laura M. Moy
                                            NEW AMERICA'S OPEN TECHNOLOGY
                                            INSTITUTE

                                            Sherwin Siy
                                            PUBLIC KNOWLEDGE

                                            Michael Godwin
                                            R STREET INSTITUTE

                                            Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which sent notifications of such filing to all counsel of record.

Dated:  February 2, 2015

_/s/ Herbert W. Wilson II_
Herbert W. Wilson II
THE LAW OFFICE OF HERBERT W. WILSON II, PLLC