# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

_____

)
Google, Inc., )
*Plaintiff,* )
v. )          No. 3:14-cv-981-HTW-LRA
)
Jim Hood, Attorney General of the )
State of Mississippi, in his official )
capacity, )
*Defendant.* )
_____)

## BRIEF OF *AMICI CURIAE* STOP CHILD PREDATORS, THE DIGITAL CITIZENS ALLIANCE, TAYLOR HOOTON FOUNDATION, AND RYAN UNITED IN SUPPORT OF DEFENDANT

Paul D. Clement*
Viet D. Dinh*
Jeffrey M. Harris*
BANCROFT PLLC
1919 M St. NW, Suite 470
Washington, D.C. 20036
(202) 234-0090
pclement@bancroftpllc.com

C. Michael Ellingburg
  *Counsel of Record*
DANIEL COKER HORTON & BELL
4400 Old Canton Rd., Suite 400
Jackson, MS 39211
(601) 969-7607
mellingburg@danielcoker.com

Jonathan Massey*
MASSEY & GAIL LLP
1325 G St. NW, Suite 500
Washington, D.C. 20005
(202) 652-4511
jmassey@masseygail.com

**Pro Hac Vice* Motion pending

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

CORPORATE DISCLOSURE STATEMENT .................................... vii

INTEREST OF *AMICI CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

FACTUAL BACKGROUND ...............................................................7

ARGUMENT .........................................................................9

I.   This Court Should Not Enjoin Mississippi's Investigation Because Google Is Unlikely to Succeed on the Merits of Its Claims. .........................9

    A.   Google's CDA Defense Is Premature and Proves Far Too Much. ..............................................................................11

    B.   Google's First Amendment Defense Fails Because the Facts Needed to Adjudicate This Issue Remain to be Investigated. ............17

II.   The Balance of Harms and the Public Interest Strongly Support Denial of the Preliminary Injunction. ...........................................20

    A.   Google Fails to Establish It Will Suffer Irreparable Injury from the Attorney General's Investigation. .......................................21

    B.   Enjoining the Attorney General's Investigation Would Cause Significant Harm to the Public Interest. ...................................25

CONCLUSION ......................................................................31

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*A&M Records v. Napster,*
    239 F.3d 1004 (9th Cir. 2001) ....................................................19

*Am. Radio Ass'n v. Mobile S.S. Ass'n,*
    483 F.2d 1 (1973) ....................................................................22

*Bond Pharmacy, Inc. v. AnazaoHealth Corp.,*
    815 F. Supp. 2d 966 (S.D. Miss. 2011) ........................................24

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984)..................................................................17

*Canal Auth. of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ............................................... 21, 23

*City of Los Angeles v. Preferred Commc'ns, Inc.,*
    476 U.S. 488 (1986)..................................................................17

*Comm. In Solidarity with El Salvador v. Sessions,*
    705 F. Supp. 25 (D.D.C. 1989)....................................................26

*Demetriades v. Yelp,*
    175 Cal. Rptr. 3d 131 (Cal. App. 2014) ........................................16

*DeSpain v. Johnston,*
    731 F.3d 1171 (5th Cir. 1984) ....................................................26

*Doe v. MySpace,*
    528 F.3d 413 (5th Cir. 2008) ......................................................11

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
    762 F.2d 464 (5th Cir. 1985) ......................................................23

*Fair Hous. Council of San Fernando Valley v. Roommates.com,* LLC,
    521 F.3d 1157 (9th Cir. 2008) ......................................... 13, 14, 16

*FTC v. Accusearch Inc.,*
    570 F.3d 1187 (10th Cir. 2009) ....................................... 13, 15, 16

*Hare v. Richie*,
No. ELH-11-3488, 2012 WL 3773116
(D. Md. Aug. 29, 2012) ...................................................................... 14, 15, 16

*Harper & Row v. Nation Enterprises*,
471 U.S. 539 (1985)............................................................................19

*Holland Am. Ins. Co. v. Roy*,
777 F.2d 992 (5th Cir. 1985) .............................................................22

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ...............................................................6

*Jones v. Dirty World Entertainment Recordings LLC*,
755 F.3d 398 (6th Cir. 2014) .............................................................14

*MCW, Inc. v. Badbusinessbureau.com, LLC*,
No. 3:02-cv-2727-g, 2004 WL 833595
(N.D. Tex. Apr. 19, 2004) ..................................................................14

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992).......................................................................... 24, 25

*Morgan v. Fletcher*,
518 F.2d 236 (5th Cir. 1975) .............................................................23

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977).........................................................................26

*New York v. Ferber*,
458 U.S. 747 (1982)......................................................................... 18, 19

*O'Keefe v. Chisholm*,
769 F.3d 936 (7th Cir. 2014) .............................................................26

*Parks v. Dunlop*,
517 F.2d 785 (5th Cir. 1975) .............................................................21

*Pittsburgh Press v. Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973)......................................................................... 18, 19

*Planned Parenthood v. Abbott*,
734 F.3d 406 (5th Cir. 2013) .............................................................25

*Randall v. Sorrell*,
  548 U.S. 230 (2006)..................................................................17

*Trainor v. Hernandez*,
  431 U.S. 434 (1977)..................................................................26

*True the Vote v. Horsemann*, No. 3:14–CV–532–NFA,
  2014 WL 4273332 (S.D. Miss. Aug. 29, 2014) ...........................................25

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994)............................................................... 17, 19

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989) ................................................... 21, 22

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)....................................................................20

*Younger v. Harris*,
  401 U.S. 37 (1971).......................................................... 3, 4, 21, 27

*Zeran v. Am. Online, Inc.*,
  958 F. Supp. 1124 (E.D. Va. 1997) ..............................................16

## Statutes

47 U.S.C. § 230 ................................................................ 5, 11, 12

## Other Authorities

Andy Greenberg, *Where Google Still Censors*,
  Forbes (Jan. 21, 2010), http://onforb.es/1JdZ94o .........................................24

Angela Moscaritolo, *Pirate Bay Apps Yanked from Google Play*,
  PCMag.com (Dec. 8, 2014),
  http://www.pcmag.com/article2/0,2817,2473253,00.asp..............................29

Digital Citizens Alliance, *Better at Any Cost: The Dangerous
  Intersection of Young People, Steroids, and the Internet*
  (Oct. 8, 2013), http://bit.ly/1xEYthb ..............................................8

Digital Citizens Alliance, *Digital Weeds: How Google Continues to
Allow Bad Actors to Flourish on YouTube* ("*Digital Weeds*"),
(Mar. 10, 2014), http://bit.ly/1zA1ULD ....................................................8

Digital Citizens Alliance, *Google & YouTube and Evil Doers: Too Close for
Comfort* ("*Too Close for Comfort*")
(June 10, 2013), http://bit.ly/1yy2cB7 ................................................8

Digital Citizens Alliance, *Google and Content Theft*
(Nov. 12, 2014)........................................................................29

Drew Kerley, *Group Probes Ease and Danger of Buying Steroids Online*,
ABC News (Oct. 3, 2013), http://abcn.ws/1y3Xypk....................................27

Ernesto, *Google Removes Pirate Bay Apps from Play Store*,
TorrentFreak (Dec. 5, 2014), http://bit.ly/1yK8KwL....................................29

Google Transparency Report,
http://www.google.com/transparencyreport/userdatarequests/US ......... 13, 23

International Centre for Missing & Exploited Children,
*Confronting New Challenges in the Fight Against Child
Pornography: Considerations for Protecting Children & Your
Company's Reputation When Engaging with Digital Businesses*
(Nov. 2014), http://bit.ly/1yK8PQZ ............................................30

Jason Mick, *Fourth Straight Federal Court Rules Publicly Shared P2P
Data Has No Privacy Rights*, Daily Tech (Nov. 14, 2013),
http://bit.ly/1unXNv9......................................................................30

Jayne O'Donnell, *Google Cuts Illegal Drug Site Search Ads and Videos*,
USA Today (June 10, 2013), http://usat.ly/1JnHeGK..................................27

Jonathan Zittrain & Benjamin Edelman,
*Localized Google Search Result Exclusions*,
Berkman Center for Internet & Society, Harvard Law School
(Oct. 26, 2002), http://cyber.law.harvard.edu/filtering/google ....................24

Larry Greenemeier, *Software Tracks Child Predators Peddling Porn on Peer-to-Peer Networks*, Scientific American (July 26, 2013), http://www.scientificamerican.com/ article/software-tracks-child-predators-p2p .................................................30

*Man Arrested After Police Find Child Pornography*, WBIW (Aug. 12, 2013), http://bit.ly/1uza5Xe..............................................30

Peter Cohan, *Harvard Professor Sees Google's Illegal Revenue Over $1 Billion*, Forbes (Nov. 8, 2013), http://abcn.ws/1y3Xypk ...............................9

Timothy B. Lee, *Feds Say Senior Google Execs Knew About Illicit Pharma Ads*, arstechnica (Jan. 25, 2012), http://bit.ly/15vSxPY.................10

U.S. Department of Justice, *Press Release: Google Forfeits $500 Million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies* (Aug. 24, 2011), http://www.justice.gov/opa/pr/google-forfeits-500-million-generated-online-ads-prescription-drug-sales-canadian-online .....................7

## CORPORATE DISCLOSURE STATEMENT

Stop Child Predators is a nonprofit organization recognized as tax-exempt under Internal Revenue Code § 501(c)(3).  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

The Digital Citizens Alliance is a nonprofit corporation recognized as tax-exempt under Internal Revenue Code § 501(c)(6).  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

The Taylor Hooton Foundation is a non-profit organization recognized as tax-exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Ryan United is a nonprofit organization recognized as tax-exempt under Internal Revenue Code § 501(c)(3).  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

## INTEREST OF *AMICI CURIAE*

Stop Child Predators is a nonprofit organization dedicated to protecting America's children from sexual predators and preventing the distribution of online content that exploits children.  It has launched federal and state-by-state campaigns to enhance public safety on the ground and on the web.  Stop Child Predators thus has a significant interest in ensuring that the First Amendment and Section 230 of the Communications Decency Act are not construed in a manner that will hinder critical law enforcement functions.

The Digital Citizens Alliance, a nonprofit organization, focuses its efforts on Internet safety issues.  It is a coalition of consumers, businesses, and Internet experts.  It has an important interest in this case because it is focused on educating the public and policy makers on Internet threats.  Digital Citizens Alliance also works to make the Internet a safer place by engaging key Internet stakeholders: individuals, Internet companies, and civic leaders.

The Taylor Hooton Foundation (THF) is widely recognized as the national leader and expert on the subject of Appearance and Performing Enhancing Drug (APED) abuse by the youth of America.  The foundation was formed in memory of Taylor E. Hooton, a 17-year-old high school athlete from Plano, Texas.  Taylor took his own life on July 15, 2003, after using anabolic steroids.  Taylor's parents, family, and friends founded the organization after learning of the growing number of middle

school, high school, and college students illegally using and abusing anabolic steroids, Human Growth Hormone (HGH), unregulated dietary supplements, and other APEDs.  It has a significant interest in this case given its mission to stop the abuse of anabolic steroids, HGH, unregulated dietary supplements, and APEDs.

Ryan United was formed in memory of Ryan VanLuchene, who at 8 years old was kidnapped, sexually assaulted, and murdered by a repeat sex offender.  Ryan United works across the country with key stakeholders to promote better, more sensible laws aimed at making communities safer.  It has an important interest in this case because a key component of its mission is promoting online safety for children and their families.

In sum, *amici* have a strong interest in ensuring that state attorneys general and other law enforcement officials have the tools they need to prevent child predation, illegal sales of steroids and other drugs, and countless other crimes that may be committed using the Internet.  *Amici* have previously cautioned that Google's platforms and services can be used for illegal purposes.[1]  What remains unknown is Google's relationship to these activities.  This is what Attorney General Hood's investigation seeks to uncover.  *Amici* strongly believe that nothing in the

---

[1] *See, e.g.*, *Tell Google to Stop "Forced Friending*," Stop Child Predators (Oct. 23, 2014), http://bit.ly/1Exr6Sf; *see also infra* note 4 (citing reports produced by the Digital Citizens Alliance).

U.S. Constitution or federal law prevents the Attorney General's investigation from proceeding.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Google asks this Court for a sweeping preliminary injunction that would stop in its tracks a state investigation that has barely begun. The Attorney General has not found Google to be in violation of any law, nor has the Attorney General compelled Google to change its business practices in any way. Instead, the Attorney General is investigating whether Google's conduct violates state law. To the extent Google is dissatisfied with that investigation, it has numerous options at its disposal. It can seek to narrow or quash the subpoena. It can meet with the Attorney General to attempt to address any concerns about illegal activity. Or it can refuse to cooperate and defend itself in court if and when it faces an enforcement action.

One option that is not available, however, is a suit in federal court that seeks to preemptively and categorically shut down the Attorney General's investigation. As the Attorney General correctly explains, this suit falls within the heartland of *Younger v. Harris*, 401 U.S. 37 (1971). Courts have held "time and time again" that "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45. The *Younger* doctrine is a critical component of "our federalism." It reflects a "proper respect for state functions," and recognizes that "the National Government will fare best if the States

and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44.

In light of *Younger*, as well as the other legal arguments ably advanced by the Attorney General, Google plainly cannot establish a likelihood of success on the merits, and the preliminary injunction should be denied for that reason alone.  But even if that showing could be made, the balance of the equities and the public interest—which are critical elements in determining whether to grant any equitable relief, especially the extraordinary relief sought here—are not even close.

There are reasons to suspect that Google's services are being used to facilitate distribution of unlawful content and products, and that Google may be profiting from this illegal activity.  For example, Google's YouTube service has been used by those seeking to sell steroids and other illegal drugs online (sometimes accompanied by Google-placed advertisements).  Investigations, like the one Google seeks to halt in its tracks, are designed to determine whether these suspicions regarding Google's involvement in various illegal activities are well-founded.

Thus, on one side of the ledger, the top law enforcement official of the State of Mississippi simply seeks *information* about whether Google's activities are threatening the safety and well-being of consumers.  On the other side of the ledger, any harm to Google from the investigation is *de minimis*, especially given the many options at Google's disposal if it wishes to challenge the scope of the investigation.

Those alternatives are part and parcel of the due process afforded every person.  This extraordinary injunctive action is a departure from both the basic protections needed to ensure due process and the sensible balance between state authorities and federal courts embodied in *Younger*.

Google claims that it is just a middleman that passes along content created by others, and that any investigation should instead focus on the *creators* of illegal or illicit content.  But that argument proves far too much.  Google does not dispute that the First Amendment and Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, would pose no bar to a duly-issued subpoena in connection with a state criminal investigation into a homicide, kidnapping, or robbery.  Indeed, Google has acknowledged that in the first six months of 2014 alone, it complied with more than 10,000 requests for information from law enforcement through subpoenas, search warrants, and other means.  Yet Google's expansive and categorical view of the First Amendment and Section 230 could impair legitimate law enforcement investigations any time the conduct being investigated involved the use of an internet service.  That goes too far.

Moreover, Google's argument that the Attorney General's investigation must focus on the creators of unlawful content begs the question in two respects.  First, Google cannot meet its burden (as part of the extraordinary injunctive relief it seeks) of showing that either the CDA or the First Amendment limits law enforcement's

ability to investigate when leads about third-party wrongdoing suggest that Google possesses critical evidence that would aid the investigation.  Indeed, Google seems to recognize as much with respect to some crimes.  Second, included among the legitimate purposes of the Attorney General's investigation is to determine whether Google itself has facilitated the distribution of illegal content or has made misrepresentations about the actions it has taken regarding such content.  If Google's role is more substantial than it asserts, then Google cannot invoke the protections of either the First Amendment or Section 230 of the CDA.  And if Google's role is protected, it will have ample opportunities to make its case to investigatory authorities and, ultimately, to the courts.

It is thus highly premature and inappropriate at this point for Google to attempt to use the First Amendment and Section 230 of the CDA as swords to shut down the Attorney General's investigation.  There is no question that it is in the public interest for this investigation to proceed, and the extraordinary preliminary injunction sought by Google would far exceed the properly limited role of a federal court.  *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) (preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely").

## FACTUAL BACKGROUND

As one might expect given Google's central role as a profoundly profitable vehicle for numerous activities both licit and illicit, Google has not escaped the attention of federal and state prosecutors.  In 2011, for example, Google agreed to pay $500 million to avoid prosecution after federal authorities and the Rhode Island Attorney General alleged that Google was aiding overseas pharmacies in illegally marketing prescription drugs in the United States.[2]  James Cole, the United States Deputy Attorney General at that time, stated that "[t]he Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," and the settlement ensured that "Google will reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."[3]

While Google's advertising practices unquestionably implicate First Amendment considerations, that did not preclude federal and state authorities from investigating online drug sales by entities that used Google's services, nor did it stop Google from reaching a settlement.  The federal investigation also raised additional

---

[2] U.S. Department of Justice, *Press Release: Google Forfeits $500 Million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies* (Aug. 24, 2011) ("DOJ Google Settlement Press Release"), http://www.justice.gov/opa/pr/google-forfeits-500-million-generated-online-ads-prescription-drug-sales-canadian-online

[3] *Id.*

questions, such as whether Google helped others circumvent the law.  These are precisely the kind of questions that Mississippi Attorney General Hood seeks to investigate here.

Although Google has already paid $500 million to resolve allegations that it facilitated the illegal marketing of prescription drugs, there are reasons to believe that its services are still being used for unlawful activities that pose a risk to both children and adults.  In particular, online drug sellers continue to use YouTube videos to market their illegal products in the United States.  *Amicus* Digital Citizens Alliance, for example, has uncovered significant "hits" when searching on YouTube for "buy drugs without a prescription," and for similar searches referencing specific drugs and steroids.[4]  Some of those videos are accompanied by Google-placed advertisements, in many cases related to the content of the illegal activity, that raise questions about whether Google is facilitating or profiting from these illegal activities.  *See* Part II.B, *infra*.

While there may be explanations and defenses for some of this conduct, at this juncture there is manifestly a legitimate basis for further investigation.  Indeed,

---

[4] Digital Citizens Alliance, *Google & YouTube and Evil Doers: Too Close for Comfort* ("*Too Close for Comfort*"), at 6–9 (June 10, 2013), http://bit.ly/1yy2cB7; *see also* Digital Citizens Alliance, *Digital Weeds: How Google Continues to Allow Bad Actors to Flourish on YouTube* ("*Digital Weeds*"), at 3–5 (Mar. 10, 2014), http://bit.ly/1zA1ULD; Digital Citizens Alliance, *Better at Any Cost: The Dangerous Intersection of Young People, Steroids, and the Internet*, at 7–14 (Oct. 8, 2013), http://bit.ly/1xEYthb.

Harvard Professor Ben Edelman estimated in 2013 that Google's profits from illegal activities may exceed $1 billion annually.[5]  All of these activities and profits raise questions that merit investigation, and the Mississippi Attorney General is reasonably seeking information to determine the nature and extent of Google's involvement with these illegal activities.

## ARGUMENT

**I.**     **This Court Should Not Enjoin Mississippi's Investigation Because Google Is Unlikely to Succeed on the Merits of Its Claims.**

Google should not be permitted to prematurely shut down the investigation of the Mississippi Attorney General.  The investigation is focused on whether Google assisted (and in certain cases continues to assist) those committing serious violations of Mississippi law who endanger or defraud the public—e.g., illegal narcotics and steroids dealers—using Google's platforms to promote and sell their services.  The Attorney General also seeks information about whether Google has made misrepresentations about its own conduct in addressing illegal activity.

The Mississippi Attorney General has ample basis to conduct this investigation.  Google acknowledges that it previously forfeited $500 million from online advertisement revenue related to illegal pharmaceutical sales to avoid prosecution by the U.S. Department of Justice.  (Google Memorandum of Law in

---

[5] Peter Cohan, *Harvard Professor Sees Google's Illegal Revenue Over $1 Billion*, Forbes (Nov. 8, 2013), http://abcn.ws/1y3Xypk.

Support of Temporary Restraining Order and Preliminary Injunction, ECF Doc. 3 ("Google MoL"), at 2 n.2.)  According to the Department of Justice, this wrongdoing occurred "with Google's knowledge and assistance." [6]  Pursuant to the terms of the nonprosecution agreement, Google acknowledged that it "improperly assisted" the foreign marketers of illegal prescription drugs. [7]

In light of Google's past conduct, and evidence suggesting that such conduct continues, Mississippi should be permitted to issue an investigatory subpoena for information and records.  At this time, the Attorney General asks only that Google respond to that subpoena, and Google's argument that it need not do so is based on circular logic:  It contends that federal law, namely Section 230 of the CDA, exempts Google from responsibility if others use its platforms for criminal activities without any involvement from Google.  But the CDA does not purport to exempt Google from cooperating with an investigation or effect a partial repeal of *Younger*, and it is crystal clear that the CDA does not immunize a company from liability if it participated in criminal behavior or civil wrongdoing.  The Mississippi Attorney General's subpoena is designed to determine the precise nature of Google's role and whether its conduct crossed the line.  Quite simply, law enforcement officials cannot

---

[6] DOJ Google Settlement Press Release, *supra* note 2; *see also* Timothy B. Lee, *Feds Say Senior Google Execs Knew About Illicit Pharma Ads*, arstechnica (Jan. 25, 2012), http://bit.ly/15vSxPY.

[7] DOJ Google Settlement Press Release, *supra* note 2.

analyze Google's role or assess its culpability without an investigation to gather the relevant facts—the very investigation that Google now seeks to stop in its tracks.

### A.     Google's CDA Defense Is Premature and Proves Far Too Much.

Section 230 of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."   47 U.S.C. § 230(c)(1).   The Fifth Circuit has explained that this provision bars claims against web-based service providers "*stemming from their publication of information created by third parties.*" *Doe v. MySpace*, 528 F.3d 413, 418 (5th Cir. 2008) (emphasis added).

In arguing that Attorney General Hood's investigation may not proceed because Google has a defense under Section 230 to any claims the Attorney General might bring in the future, Google puts the proverbial cart before the horse.  Nothing in the CDA prohibits a state attorney general from gathering facts to determine whether Section 230 applies.  Indeed, contrary to Google's suggestion, the CDA makes clear that it does not offer web-based service providers *categorical* immunity for all aspects of their business, let alone suspend *Younger* principles in ways that would preclude investigations into whether any non-immune conduct occurred.  In fact, Section 230(e) expressly preserves a number of potential claims, including certain claims brought under state law:

(e) Effect on other laws

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

47 U.S.C. § 230(e).

Based on these express exceptions in the statutory text, courts have properly recognized that the CDA does not offer across-the-board immunity for all conduct by web-based services, let alone an immunity from investigation into whether unprotected conduct occurred.  Indeed, Google itself emphasizes on its website that, in the first six months of 2014, it complied with more than 10,000 requests for information in connection with criminal investigations, including nearly 8,000 subpoenas. *See* Google Transparency Report, Requests for user information, United

States, http://www.google.com/transparencyreport/userdatarequests/US (accessed Jan. 22, 2015). Yet Google's sweeping theory of Section 230 would suggest that it and other internet-based service providers would be under no obligation to comply with those information requests unless they pertained to content actually created by the company. Needless to say, that rule would severely burden law enforcement officials' ability to investigate criminal activity and protect the public.

Unsurprisingly, no court has ever endorsed Google's sweeping view of Section 230. In particular, it is well-established that a web-based service provider lacks immunity under the CDA if it actively conspires or participates in criminal acts. *See, e.g., Fair Hous. Council of San Fernando Valley v. Roommates.com*, LLC, 521 F.3d 1157, 1171-72 (9th Cir. 2008) (website operator was not entitled to immunity with respect to allegedly unlawful content it required users to submit and with respect to the search engine that was built on that content; "even if the data are supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer," so that website that "both elicits the allegedly illegal content and makes aggressive use of it in conducting its business" is not immune); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1200-01 (10th Cir. 2009)

(defendant was "not entitled to immunity under the CDA" because "it contributed mightily to the unlawful conduct").[8]

In *Roommates.com*, for instance, a web-based service provider, as a condition for using an online roommate-finding service, required each user seeking a roommate to create a profile describing the desired roommate including by requiring disclosure of sex and sexual orientation.  521 F.3d at 1161.  Local housing authorities sued, alleging violation of federal and state housing discrimination laws.  *Id.* at 1162.  The court held that a website operator has no CDA immunity with respect to allegedly unlawful content that it required its users to submit, and the search engine built on that content.  *Id.* at 1165-68.  That is, Section 230 does not apply if the service provider "*contributes materially* to the alleged illegality of the conduct."  *Id.* at 1200 (emphasis added)

Another court, applying the same rule, held that a web-based service provider cannot claim protection under the CDA if it was at least in part "responsible for what makes the displayed content allegedly unlawful."  *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014).  Similarly, in

---

[8] *Accord MCW, Inc. v. Badbusinessbureau.com, LLC*, No. 3:02-cv-2727-g, 2004 WL 833595, at *7 (N.D. Tex. Apr. 19, 2004) ("Congress has immunized interactive computer services . . . [but] immunity is not so broad as to extend to an interactive computer service that goes beyond the traditional publisher's role and takes an active role in creating or developing the content at issue."); *see also Hare v. Richie*, No. ELH-11-3488, 2012 WL 3773116 (D. Md. Aug. 29, 2012) (declining to grant motion to dismiss and allowing the case to go to discovery in order to determine whether or not CDA immunity would be appropriate).

*Accusearch Inc.*, the court found that the defendant, rather than a "provider of neutral tools . . . ., solicited requests for confidential information protected by law, paid researchers to find it, knew that the researchers were likely to use improper methods, and charged customers who wished the information to be disclosed."  570 F.3d at 1201.  The defendant was not entitled to CDA immunity because its "actions were not 'neutral' with respect to generating offensive content; on the contrary, its actions were intended to generate such content."  *Id.*

In *Hare*, the court considered in relevant part whether a website publishing gossip material should be afforded CDA immunity in the context of a motion to dismiss.  *Hare v. Richie,* No. ELH–11–3488, 2012 WL 3773116, at *1 (D. Md. Aug. 29, 2012).  The court held that discovery should proceed because it would "allow the creation of a factual record" so that the court could determine whether the website "encourages development" of offensive content "submitted by third parties . . . so as to lose the protection of § 230(c)(1) for user-submitted content by participating in the content's development."  *Id.*, at *19 (citation and internal quotation omitted).  As such, dismissal was inappropriate before discovery that could shine a light on the question of whether CDA immunity would be appropriate. *Id.*

Courts have recognized that CDA immunity is inapplicable in other contexts as well.  For example, where the actionable content is generated by the Internet

service provider itself, rather than by third parties or in response to content created by third parties, the service provider is not immune under the CDA. *See Demetriades v. Yelp*, 175 Cal. Rptr. 3d 131, 145 (Cal. App. 2014) ("Yelp's argument is misplaced. Nowhere does plaintiff seek to enjoin or hold Yelp liable for the statements of third parties (i.e., reviewers) on its website. Rather, plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter."). Finally, it is clear from the language of the CDA that the law does not preempt state-law remedies absent a direct conflict between those remedies and the CDA. *See Zeran v. Am. Online, Inc.*, 958 F. Supp. 1124, 1136 (E.D. Va. 1997), *aff'd*, 129 F.3d 327, *cert. denied*, 524 U.S. 937 (1998).

Here, the Mississippi Attorney General has reasonable grounds to question whether Google aided or profited from content that violates state law. If Google is doing so, then the CDA simply does not immunize Google's acts. *See Roommates.com*, 521 F.3d 1157; *Accusearch Inc.*, 570 F.3d at 1200-01. Google's contention that this Court should shut down Mississippi's inquiry as barred by the CDA is based on flawed, circular logic, because the whole point of the investigation is to uncover facts that can be used to determine whether the CDA's protection apply in the first place. *See Hare*, 2012 WL 3773116, at *19.

The Attorney General's investigation also raises important questions about whether Google lives up to its representations about the standards it applies for use

of its services.  Such claims, just as in *Demetriades*, are at the very least subject to investigation by state law enforcement officials, and the CDA does not go so far as to provide the blanket immunity that Google now seeks.  At this early stage of the proceedings it would be highly premature and inappropriate to allow Google to invoke the CDA to end the Attorney General's inquiry.

### B.    Google's First Amendment Defense Fails Because the Facts Needed to Adjudicate This Issue Remain to be Investigated.

Google also asserts a First Amendment defense and seeks to terminate the Attorney General's investigation on that basis.  But the Supreme Court has repeatedly recognized the importance of a full factual context in assessing the constitutionality of a regulation of speech.  *See, e.g., Turner Broad. Sys. v. FCC*, 512 U.S. 622, 668 (1994) (stressing the importance of a record and remanding First Amendment challenge to "permit the parties to develop a more thorough factual record"); *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 495-96 (1986) (rejecting Government's argument that "a review of historical facts" was unnecessary in challenge to restriction on cable speech).  "[I]n cases raising First Amendment issues," the Court has stressed the need "to make an independent examination of the entire record."  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (internal quotation marks omitted).  *See also Randall v. Sorrell*, 548 U.S. 230, 253 (2006) (opinion of Breyer, J.) ("We consequently must examine the record independently and carefully . . . .").

Yet Google seeks to prevent Mississippi from compiling the factual record that would be necessary to evaluate its First Amendment claim.  Google contends that YouTube's provision of a platform for viewing third-party news and information is protected by the First Amendment (Google MoL, at 22), but even it ultimately concedes that there are limits to this principle.  For example, Google acknowledges that it "will remove links to a website from its search results upon receipt of a valid court order."  (Google MoL, at 23 n.11.)  And, as noted above, Google complies with thousands of subpoenas and search warrants each year, without in any way suggesting that these government-issued information requests impermissibly burden its First Amendment rights.  Google's actions in this regard are not surprising, as the First Amendment does not remotely insulate a web-based service provider from complying with a government investigation into potential illegal activities.

Even a newspaper lacks a First Amendment defense with respect to "Men Only" help-wanted ads that violate employment laws against sex discrimination. *Pittsburgh Press v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973) (upholding injunction against a newspaper's furtherance of illegal sex discrimination by placing of job advertisements in gender-designated columns).  And no form of media has a First Amendment right to distribute child pornography or other kinds of unprotected speech. *New York v. Ferber*, 458 U.S. 747, 762-64 (1982).

Here, Google asserts First Amendment protection, at this preliminary stage, even though the factual record is currently insufficient to determine whether any of the possible exceptions to such protection apply.  Google unquestionably would not be shielded by the First Amendment if it were participating in criminal activities, such as by posting illegal ads, *see, e.g., Pittsburgh Press Co.*, 413 U.S. 376, distributing unprotected speech, *see, e.g., Ferber*, 458 U.S. at 762-64, publishing stolen copyright material, *see, e.g., Harper & Row v. Nation Enterprises*, 471 U.S. 539, 548-49 (1985), or knowingly facilitating theft of intellectual property, *see, e.g., A&M Records v. Napster*, 239 F.3d 1004, 1028 (9th Cir. 2001).

Nor should Google be able to use the possibility of an eventual First Amendment defense (based on a fully-developed factual record) to either force the Attorney General to prematurely disclose his investigatory theories or to preemptively shut down the investigation altogether.  There are significant factual questions regarding Google's First Amendment defense, and the Attorney General's investigation should be allowed to proceed.  Google should not be able to shut down the investigation because a full factual record is needed to determine whether there is any merit to Google's First Amendment argument in the first place.  *See, e.g., Turner Broad. Sys.*, 512 U.S. at 668.

## II.   The Balance of Harms and the Public Interest Strongly Support Denial of the Preliminary Injunction.

Google also fails to establish that it will "suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Google spends exactly two pages of its 36-page brief addressing irreparable injury, the balance of harms, and the public interest, even though these factors are critical elements in determining whether equitable relief is warranted.  (*See* Google MoL at 33-34.)  Much of that discussion merely repurposes Google's merits arguments and contends that a violation of the First Amendment is sufficient by itself to show irreparable injury and a harm to the public interest.

As for the balance of equities, Google's argument boils down to:  "Trust us." Because Google's "existing practices" purportedly "meet or exceed industry standards," Google contends that the Attorney General and the public will not incur any harm if a preliminary injunction is granted.  Those arguments should be rejected out of hand.  Shutting down an investigation designed to determine whether state laws have been violated is an extraordinary step that inevitably risks allowing criminal conduct to go undetected.  On the other side of the balance, ample procedural protections exist to protect the target of investigation should it produce actionable evidence of wrongdoing.

Under these circumstances, and wholly apart from the federalism concerns implicated by a federal court action to enjoin a state criminal investigation, *see Younger*, 401 U.S. at 44-45, the balance of equities is not even close. Indeed, Google's size and dominant market position only underscore the importance of allowing the Attorney General's investigation to proceed. If the investigation unearths actionable misconduct, then Google's size simply magnifies the scale of misconduct that could go unpunished. And no matter what the investigation uncovers, Google will be amply protected by due process protections without the need for premature and preemptive intervention from a federal court.

## A.     Google Fails to Establish It Will Suffer Irreparable Injury from the Attorney General's Investigation.

The "central purpose" of a preliminary injunction "is to prevent irreparable harm." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). "[O]nly those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). Proof of that irreparable injury "must be proven separately and convincingly" from the likelihood that Google will succeed on the merits of its claim. *White v. Carlucci*, 862 F.2d 1209, 1212 (5th Cir. 1989). So even if Google were likely to succeed on the merits, "there is no nexus between the strength and nature of the underlying claim and the element of irreparable harm." *Id.* Google's "burden of proof is not reduced by either the existence of an extremely

strong likelihood of success or the egregiousness of the alleged wrong upon which the underlying claim is based." *Id.*

Google contends that it will suffer irreparable harm absent a preliminary injunction because its constitutional and statutory rights will be violated by the Attorney General "seeking to regulate, through coercion, the content of its protected speech" and "by retaliating for its failure to change its practices." (Google MoL, at 33.)  But Google's irreparable harm argument misses the mark altogether.  At the moment, the Attorney General is not forcing Google to change its primary conduct or business operations in any way.  And the Attorney General's investigation is still in its infancy.  He has asked only for information pursuant to a duly-issued subpoena. That subpoena is not even self-executing, and Google's refusal to answer the subpoena would, at most, result in additional state-court proceedings during which Google could seek to narrow or quash the subpoena on the exact same grounds being advanced in this case. [9]  (See Attorney General Memorandum of Law, ECF Doc. 34, at 32-33.)

Google's asserted harm here is thus a paradigmatic example of "reparable harm."  If there is anything to Google's defenses, it can raise them in state court and attempt to get the subpoena quashed.  *See Holland Am. Ins. Co. v. Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *Am. Radio Ass'n v. Mobile S.S. Ass'n*, 483 F.2d 1, 5 (1973).

---

[9] This fact also shows why Google's suit should be dismissed under *Younger.*

Moreover, even in the universe of efforts to comply with a subpoena, Google has identified little basis to claim harm, let alone irreparable harm, because it already collects and provides much of the information the Attorney General requests. Far from levying an "imminent threat" to "conform[] its constitutionally-protected practices to the [government] preferences," (Google MoL at 33), the Attorney General requests only legally relevant information, much like the information Google already collects and publishes in its "Transparency Report." [10]

At bottom, Google does not want to respond to the subpoena because it purportedly "would have to produce millions of documents, at great expense and disruption to its business" if it had to respond. (Google MoL, at 14.) But that is simply an argument to narrow the subpoena, not an argument to enjoin the investigation altogether. And if that argument does not prevail, the cost of compliance, even if substantial, does not qualify as irreparable harm. "[I]t is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction." *Canal Auth.*, 489 F.2d at 575. The "time and energy necessarily expended" without an injunction "are not enough" because monetary loss alone does not constitute irreparable harm. *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 474 (5th Cir. 1985); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975). But time and energy are the only harms Google can allege with

---

[10] *See* http://www.google.com/transparencyreport.

certainty at this early point in the investigation, and any other injuries are merely "speculative."  *Bond Pharmacy, Inc. v. AnazaoHealth Corp.*, 815 F. Supp. 2d 966, 975 (S.D. Miss. 2011). [11]

Google's alleged harm also pales in comparison to the cases it cites, such as *Morales v. Trans World Airlines, Inc*., 504 U.S. 374 (1992).  In *Morales*, state attorneys general had issued guidelines to the airline industry about unfair advertising practices and sent a letter to carriers making clear that their practices constituted a *violation* of state laws.  *Id.* at 379.  The Supreme Court affirmed an injunction because state enforcement actions were "imminent" and the carriers "lack[ed] the realistic option of violating the law once and raising its federal defenses."  *Id.* at 381.

Unlike *Morales*, the Attorney General has made no official pronouncement that Google has *violated* any state laws; he has instead merely sought the information needed to make that determination.  All he asks is that Google either answer the subpoena or challenge it through the ordinary procedural channels, which do not

---

[11] Even if the Attorney General were requiring Google to modify its search results or advertisements to remove illegal content, that would not constitute irreparable injury.  As far back as 2002, Google has taken steps to ensure that its search results comply with local law in the jurisdictions where it operates.  *See, e.g.*, Jonathan Zittrain & Benjamin Edelman, *Localized Google Search Result Exclusions*, Berkman Center for Internet & Society, Harvard Law School (Oct. 26, 2002), http://cyber.law.harvard.edu/filtering/google; Andy Greenberg, *Where Google Still Censors*, Forbes (Jan. 21, 2010), http://onforb.es/1JdZ94o.  For example, Google has limited neo-Nazi and white supremacist content on its google.de page to *comply with German law restricting such content.  See id.*

include a preemptive suit in federal court. *Compare id.* at 382 ("[T]he prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury").[12]

### B.   Enjoining the Attorney General's Investigation Would Cause Significant Harm to the Public Interest.

Enjoining the Attorney General from investigating Google would cause great harm because it would bar the state's top law enforcement official from pursuing an investigation that unquestionably seeks to protect the public. *See Planned Parenthood v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *True the Vote v. Horsemann*, No. 3:14–CV–532–NFA, 2014 WL 4273332, at *28–29 (S.D. Miss. Aug. 29, 2014) (state "has a significant interest in enforcing its enacted laws").

As a general matter, the balance of the equities in a suit seeking to enjoin an ongoing criminal investigation tips strongly against granting the injunction. On one side of the balance, there is the possibility that criminal conduct could go undetected and unpunished. A state's criminal laws protect against conduct that violates both the public interest and the rights of third parties. Few things tip the balance more strongly against the public interest than the prospect that an injunction would cause

---

[12] Even in *Morales*, the Supreme Court scolded the lower court for "disregard[ing] the limits on the exercise of its injunctive power." *Id.* at 382. Google has asked the court to issue the same sort of "blunderbuss injunction" here. *Id.* It demands that this Court "determine the constitutionality of state laws in hypothetical situations where it is not even clear that the State itself would consider its laws applicable." *Id.*

criminal conduct to go undetected.  See, e.g., *O'Keefe v. Chisholm*, 769 F.3d 936, 940 (7th Cir. 2014) (the "policy against federal interference . . . is especially strong when the state proceedings are criminal in nature"); *Comm. In Solidarity with El Salvador v. Sessions*, 705 F. Supp. 25, 30 (D.D.C. 1989) (alleged constitutional injury was outweighed by the "equally *valid*[] interest in effective police investigation"); *see also New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., as Circuit Justice) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

On the other side of the balance, the multiple procedural protections any defendant enjoys if a criminal investigation bears fruit amply protect the public interest, by ensuring that the innocent are not wrongly punished and that the investigation is no broader than necessary to achieve law enforcement officials' legitimate goals.  *See, e.g., DeSpain v. Johnston*, 731 F.3d 1171, 1176 (5th Cir. 1984) ("the balance tips heavily in favor of the state government and its interest in enforcing its criminal laws" when the target of the prosecution has the opportunity to defend himself in state court); *Trainor v. Hernandez*, 431 U.S. 434, 441-42 (1977) (balance of equities analysis should be "broadened to focus on the remedies available in the pending state proceeding," and "[t]he burden of conducting a defense" in state court is insufficient to warrant federal court intervention).  Thus, wholly apart from

the distinct federalism concerns implicated by a federal court's injunction of a state investigation, *see Younger*, 401 U.S. at 44-45, the balance of equities tips strongly against judicial intervention to enjoin a nascent criminal investigation.

Here, the Attorney General is justifiably concerned about the use of Google's services to facilitate illegal activity.  For example, despite a massive $500 million settlement in 2011, it appears that Google's YouTube service is still being used to facilitate the illegal marketing of drugs, which is obviously harmful to children and adults alike.  A June 2013 investigation by amicus Digital Citizens Alliance found thousands of YouTube videos marketing the illegal sale of narcotics and steroids, including Percocet, Tramadol, and Oxycontin.[13]  In response to the investigation and report, Google made efforts to take some of the videos down, but many remained available for viewing.

The fact that Google allowed, and continues to allow, this content to be posted on its systems raises troubling issues in its own right.  But, even worse, Google may be profiting by placing advertising in and around these videos.  For example, the following screenshot of a YouTube page shows not only a video offering to illegally sell Percocet but also advertising that Google authorized.  Indeed, the advertisement

---

[13] Jayne O'Donnell, *Google Cuts Illegal Drug Site Search Ads and Videos*, USA Today (June 10, 2013), http://usat.ly/1JnHeGK; *see also* Drew Kerley, *Group Probes Ease and Danger of Buying Steroids Online*, ABC News (Oct. 3, 2013), http://abcn.ws/1y3Xypk.

(for "Spinal Cord Stimulation") is closely related to the content of the video, which involves a prescription painkiller.



In another instance, the Digital Citizens Alliance found that drug dealers used YouTube to peddle dangerous steroids and human growth hormone (HGH). Like the above example regarding illegal prescription drugs, dealers were selling steroids and HGH through YouTube, and Google was placing advertisements alongside these videos.



The Attorney General's legitimate grounds for investigation are hardly limited to illegal drug sales.  For example, YouTube is routinely used to distribute other content that is harmful to minors, such as videos regarding "How to Buy Smokes Under-Age" (55,133 views), and "Best Fake ID Service Around" (58,309 views).

Moreover, in December 2014, responding to the crackdown on leading file-sharing website PirateBay, Google removed a file-sharing application from its mobile software store,[14] but reports indicate that Google has continued to allow access to the same and similar sites through its search engine and Chrome browser.[15]

---

[14] *See* Angela Moscaritolo, *Pirate Bay Apps Yanked from Google Play*, PCMag.com (Dec. 8, 2014), http://www.pcmag.com/article2/0,2817,2473253,00.asp.

[15] *See* Ernesto, *Google Removes Pirate Bay Apps from Play Store*, TorrentFreak (Dec. 5, 2014), http://bit.ly/1yK8KwL; *see also* Digital Citizens Alliance, *Google and Content Theft*, at 1-3 (Nov. 12, 2014).

These file-sharing sites are riddled with viruses and other malware that pose a significant threat to consumers.[16]  They can also be used to facilitate the distribution of child pornography and other heinous and unlawful videos.[17]  It is simply not tenable to suggest that the top law enforcement officials of each state are powerless even to *investigate* whether search engines or other intermediaries such as Google are being used—knowingly or unknowingly—to facilitate the distribution of illegal content (or to profit from advertisements that run alongside such content).

*   *   *

Google's previous settlement with the Department of Justice should eliminate any serious argument that Google's business model makes it immune from legitimate investigation.  The Justice Department could not have reached that half a billion dollar settlement if the courts had enjoined the investigation in its infancy out of premature concerns that the investigation would inevitably run afoul of federal law and the Constitution.  In the end, the settlement and the investigation that

---

[16] Digital Citizens Alliance, *Google and Content Theft*, *supra* note 15, at 4-15.

[17] *See* International Centre for Missing & Exploited Children, *Confronting New Challenges in the Fight Against Child Pornography: Considerations for Protecting Children & Your Company's Reputation When Engaging with Digital Businesses* (Nov. 2014), http://bit.ly/1yK8PQZ; Larry Greenemeier, *Software Tracks Child Predators Peddling Porn on Peer-to-Peer Networks*, Scientific American (July 26, 2013), http://www.scientificamerican.com/article/software-tracks-child-predators-p2p; *see also*, *e.g.*, *Man Arrested After Police Find Child Pornography*, WBIW (Aug. 12, 2013), http://bit.ly/1uza5Xe (noting that alleged distributor of child pornography shared files through BitTorrent); Jason Mick, *Fourth Straight Federal Court Rules Publicly Shared P2P Data Has No Privacy Rights*, Daily Tech (Nov. 14, 2013), http://bit.ly/1unXNv9.

produced it vindicated the rule of law and protected the public interest.  Google's extraordinary effort to enjoin the Mississippi Attorney General's investigation raises all the problems an effort to enjoin the Justice Department investigation would have raised and one more:  the profound federalism problems created by an extraordinary request to have a federal court enjoin a state proceeding, in clear violation of the *Younger* doctrine.

In sum, Google's extraordinary effort to obtain an injunction is the wrong remedy in the wrong court at the wrong time.  Google will enjoy ample opportunities to protects its rights if this investigation progresses.  But if this investigation is suppressed in its infancy, there will be no later opportunity to vindicate the public interest in seeing criminal misconduct investigated and stopped.

## CONCLUSION

For the foregoing reasons, Google's motion should be denied.

Respectfully submitted,

/s/C. Michael Ellingburg

C. Michael Ellingburg
  *Counsel of Record*
DANIEL COKER HORTON & BELL
4400 Old Canton Rd., Suite 400
Jackson, MS 39211
(601) 969-7607
mellingburg@danielcoker.com

Paul D. Clement*
Viet D. Dinh*
Jeffrey M. Harris*
BANCROFT PLLC
1919 M St. NW, Suite 470
Washington, D.C. 20036
(202) 234-0090
pclement@bancroftpllc.com

Jonathan Massey*
MASSEY & GAIL LLP
1325 G St. NW, Suite 500
Washington, D.C. 20005
Phone: 202-652-4511
jmassey@masseygail.com

*Pro Hac Vice* Motion pending

*Counsel for Amici Curiae Stop Child Predators, The Digital Citizens Alliance, Taylor Hooton Foundation, and Ryan United*

Dated:  February 2, 2015

## CERTIFICATE OF SERVICE

I, Michael Ellingburg, of the law firm Daniel Coker Horton & Bell, do herby certify that I electronically filed the foregoing Brief of *Amici Curiae* Stop Child Predators, The Digital Citizens Alliance, Taylor Hooton Foundation, Ryan United with the Clerk of the Court using the ECF system, thereby serving all counsel of record registered with the ECF system in this case.

This 2nd day of February, 2015.

/s/C. MICHAEL ELLINGBURG
C. Michael Ellingburg