**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**GOOGLE, INC.**                                                                            **PLAINTIFF**

**VS.**                                                    **CIVIL ACTION NO. 3:14-cv-981-HTW-LRA**

**JIM HOOD, ATTORNEY GENERAL**
**OF THE STATE OF MISSISSIPPI,**
**IN HIS OFFICIAL CAPACITY**                                                           **DEFENDANT**

**MEMORANDUM OF AMICUS CURIAE**
**INTERNATIONAL ANTICOUNTERFEITING COALITION**

**I. INTEREST OF AMICUS CURIAE**

The International AntiCounterfeiting Coalition ("IACC") is a nonprofit corporation recognized as tax-exempt under Internal Revenue Code § 501(c)(6). It has no parent corporation, and no publicly held corporation owns 10% or more of its stock. The IACC was established in 1979 to combat counterfeiting and piracy by promoting laws, regulations, directives, and relationships designed to render the theft of intellectual property undesirable and unprofitable.[1] Counterfeiting and piracy are scourges that threaten consumer health and safety and drain billions of dollars from the U.S. economy. The IACC is the oldest and largest organization in the country devoted exclusively to combating these threats. Today the IACC's members include more than 230 companies in the pharmaceutical, health and beauty, automotive, fashion, food and beverage, computer and electronics, and entertainment industries, among others.

The IACC offers anti-counterfeiting programs designed to increase protection for patents, trademarks, copyrights, service marks, trade dress and trade secrets. Critical to the IACC's

---

[1] IACC states that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person, other than the amicus curiae and its members, contributed money that was intended to fund preparing or submitting this brief.

purpose is its belief that acts of counterfeiting and piracy create severe public health and safety hazards, as well as economic harm. The IACC and its members help coordinate government actions to enforce intellectual property rights and educate the public about how to detect and avoid counterfeit products. The IACC's mission also includes promoting the development of state and federal law to address the threat posed by piracy and related thefts of intellectual property, including through the courts. The IACC's members collectively spend millions of dollars each year on anti-counterfeiting and anti-piracy investigation and enforcement. Despite these efforts, infringement has exploded in recent years, due largely to the advent of electronic commerce and widespread unlawful online activity.

The IACC has a direct interest in the issues raised in this case. The IACC's members face the potential consequences of widespread counterfeiting and piracy on the Internet – and misrepresentations by online companies about their activities – on a daily basis. Among these consequences are the loss of the hard-earned reputation and goodwill embodied by IACC members' trademarks and their exclusive rights to exploit their copyrighted works of authorship, the loss of sales of safe and genuine products, and the financial burden of having to monitor and take action against an ever-growing army of anonymous counterfeiters and pirates who threaten the health and safety of U.S. consumers, while causing serious harm to the U.S. economy. It is critical to the IACC and its members that state Attorneys General retain the ability to investigate such abuses and suspected abuses and to act to stop them when warranted.

## II. INTRODUCTION

There is no reason why the Mississippi Attorney General should not be able to investigate reasonable concerns that unlawful conduct is occurring in connection with Google's (or any other online company's) services, advertisements, and statements. Contrary to Google's assertions in its application for a preliminary injunction, it is sound public policy to allow an

Attorney General to exercise his well-established and necessary powers to engage in fact gathering in order to determine *whether* a company may have engaged in unlawful conduct. It is only *after* the facts are gathered, and there is an evidentiary record – not before – that a proper determination can be made as to whether certain conduct is actionable, or whether it may be protected by the Communications Decency Act ("CDA") or other laws. It would be both improper and illogical to answer the legal question of the applicability of the CDA *first*, and in a factual vacuum.

Thus, the Court should either grant the Attorney General's motion to dismiss, or in the alternative, deny Google's motion for Temporary Restraining Order and Preliminary Injunction. *If* the Court determines there is in fact subject matter jurisdiction and the case remains before this Court, it is simply premature to enjoin the Attorney General from proceeding with his investigation and receiving the information sought by the subpoena based solely on the unsupported and untested assertions advanced by Google. Application of the protections provided by the CDA is a fact specific inquiry. Moreover, it is respectfully submitted that Google's apparent position that the CDA (and other laws) shields its conduct in *all* instances is an extreme and simplistic position unsupported by applicable law, and is contrary to important public policy considerations.

The CDA does not immunize internet service providers from any and all activity they may engage in, and no online company should be allowed to pre-empt *any* state investigation into its alleged wrongdoing by overstating the scope of the immunities afforded by the CDA. Google has not met its burden of establishing that it is entitled to a preliminary injunction and the Court should deny the motion for injunctive relief and allow the Attorney General to proceed with his investigation.

## III. ARGUMENT

### A. The Attorney General has Long-Standing and Well Established Powers to Investigate Possible Violations of State Law.

Title 75, Chapter 24 of the Mississippi Code is titled "Regulation of Business for Consumer Protection." Miss. Code Ann. § 75-24-1, *et seq.*, which is often referred to as the Mississippi Consumer Protection Act ("MCPA"), generally prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce."[2] The MCPA provides that, in construing what constitutes unfair or deceptive trade practices, the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 USCS § 45(a)(1).[3] All of the fifty states have some sort of consumer protection act or deceptive trade practices statutes, and the various states sometimes refer to their respective state consumer protection statutes as "Little FTC Acts."

---

[2] Miss. Code Ann. § 75-24-5(1). "Trade" and "commerce" are defined in Miss. Code Ann. § 75-24-3(2) as:

  the advertising, offering for sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include without limitation, both domestic and foreign persons, irrespective of their having qualified to do business within the state and any trade or commerce directly or indirectly affecting the people of this state.

The MCPA prohibits a variety of actions or practices that constitute unfair methods of competition or unfair or deceptive trade practices, including but not limited to:
  (a) Passing off goods or services as those of another;
  (b) Misrepresentation of the source, sponsorship, approval, or certification of goods or services;
  (c) Misrepresentation of affiliation, connection, or association with, or certification by another;
  (d) Misrepresentation of designations of geographic origin in connection with goods or services;
  (e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;
  (f) Representing that goods are original or new if they are reconditioned, reclaimed, used, or secondhand;
  (g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
  (i) Advertising goods or services with intent not to sell them as advertised; …

[3] Miss. Code Ann. § 75-24-3(c).

4

Over the years, the Mississippi Attorney General has exercised his authority under state law and proceeded with suits under the MCPA against a variety of companies covering many different industries.[4] Indeed, the Attorney General actions are an integral part of a state criminal investigatory proceeding. [*See* Hood Brief at 15-16.][5]

In addition, misrepresentations and false advertising of pirated content as legal and genuine are prohibited by consumer protection laws, as are false or misleading claims about the nature of other goods and services. Such claims are not preempted by federal intellectual property laws. Nor are all statements made or actions taken by online companies themselves protected by the CDA, as Google seems to contend.

**B. An Overview of Section 230 of the Communications Decency Act.**

Section 230 of the CDA was adopted as an amendment to the Communications Decency Act portion of the Telecommunications Act of 1996. Among other things, it was introduced to overrule the decision in *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), where the operator of an online bulletin board was held liable for comments made by a third party. After setting forth findings and a statement of policy, Congress

---

[4] *See, e.g. Mississippi ex rel. Hood v. AU Optronics Corp.,* 134 S.Ct. 736 (2014) (where United States Supreme Court held that there was no federal jurisdiction and removal was improper in suit against manufacturers, marketers, sellers, and distributors of liquid crystal display (LCD) panels, alleging that defendants engaged in price-fixing scheme in violation of Mississippi Consumer Protection Act (MCPA) and Mississippi Antitrust Act (MAA)); *Hood v. AstraZeneca Pharmaceuticals, LP,* 744 F. Supp. 2d 590 (2010) (In suit against pharmaceutical companies, alleging false statements of material fact for use in determining rights to Medicaid benefit in violation of state's Medicaid law, violation of Mississippi Consumer Protection Act (MCPA), and claims for fraud and misrepresentation, unjust enrichment, negligence and gross negligence, federal district court granted motion to remand to state court); *Hood ex rel. Mississippi v. Microsoft Corp.,* 428 F. Supp. 2d 537 (S.D. Miss. 2006) (in suit brought by Mississippi's Attorney General alleging unjust enrichment, violations of MCPA, the Mississippi Antitrust Act, and civil conspiracy, seeking relief for "injuries allegedly suffered by Mississippi in its purchase of software directly and indirectly from Microsoft at unlawfully inflated prices; and … injuries allegedly suffered by Mississippi citizens who purchased Microsoft products at inflated prices", the district court granted the plaintiff's motion to remand to state court); *Hood ex rel. State v. BASF Corp.*, 2006 WL 308378 (Miss. Ch., Jan 17, 2006) (in suit brought by Attorney General, alleging violations of, *inter alia*, Miss. Code §§ 75-24-9 and 75-24-15, Chancery Court denied defendant's motion to dismiss).

[5] All references to "Hood Brief" refer to the Attorney General Jim Hood's Memorandum in Opposition to Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 34].

5

adopted certain statutory protections applicable to online companies. Section 230(c)(1) provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." The law defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including, specifically a service or system that provides access to the Internet." *Id.* § 230(f)(2).

Significantly, however, the Act does not provide immunity for "information content providers," which it defines as anyone who is "responsible, *in whole or in part*, for the creation *or development* of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3) (emphasis added).

In those instances in which it is applicable, the law serves primarily as a bar to potential liability under state law. Section 230 provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." At the same time, nothing prevents a state from enforcing laws that are "consistent with this section." *Id.* § 230(e)(3). The CDA does not affect potential liability under federal criminal law, including laws relating to obscenity or the sexual exploitation of children. *Id.* § 230(e)(1). Additionally, Section 230 does not "limit or expand any law pertaining to intellectual property." *Id.* § 230(e)(2). [6]

---

[6] It is important to understand that the CDA also provides a carve-out from CDA protections for both federal *and state* law intellectual property claims. *See Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F.Supp.2d 690, 704 (S.D.N.Y. 2009); *see also Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 422-23 (1st Cir. 2007) ("Claims based on intellectual property laws are *not subject to Section 230 immunity*.") (emphasis added); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 302 (D.N.H. 2008) (holding that "[c]onsistent with its text, § 230(e)(2) applies simply to '*any* law pertaining to intellectual property,' *not just federal law*.") (emphasis added); *cf. Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670 (7th Cir. 2008) ("To appreciate the limited role of § 230(c)(1), remember that "information content providers" may be liable for contributory infringement if their system is designed to help people steal music or other material in copyright."). Under this carve-out, the Attorney General could pursue MCPA claims predicated on a violation of *state* intellectual property laws including trademark laws, laws protecting individuals' rights of publicity, laws protecting copyrights

6

## C. Section 230's Protections are Not Absolute and Depend on Specific Facts.

Google baldly asserts that it effectively has blanket immunity under Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230(c), (e). In fact, Google significantly simplifies and overstates the protections the CDA provides.

It is true that courts have interpreted Section 230 to protect service providers, including Google, in certain circumstances. *See, e.g., Zeran v. America Online, Inc*., 129 F.3d 327, 330 (4th Cir. 1997). Computer service providers like Google are shielded from certain forms of liability where all they do is publish information provided by another information content provider, *see id*.; 47 U.S.C. § 230(c)(1). But the courts have also been clear that this protection is not unlimited. The CDA "was not meant to create a lawless no-man's-land on the Internet." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc).

Section 230's protections apply only if the interactive computer service is not itself an information content provider. *See Roommates.com*, 521 F.3d at 1162; *Accusearch, Inc.,* 570 F.3d 1187, 1191 (10th Cir. 2009). Even in cases involving search engines, courts have recognized that, "[u]nder the CDA an interactive computer service qualifies for immunity so long as it does not *also* function as an 'information content provider' for the portion of the statement or publication at issue." *Jurin v. Google, Inc*., 695 F. Supp. 2d 1117, 1122 (E.D. Cal. 2010) (emphasis added).

---

in pre-1972 recordings, and true name and address statutes, to the extent they apply to the distribution of electronic files. Moreover, as noted in Attorney General Hood's Memorandum, there are a variety of state intellectual property laws that are or may become ripe as the Attorney General completes his investigation. [*See* Hood Brief at 23.] The scant contrary authority (*viz. Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1119 (9th Cir. 2007)*) has been overwhelmingly criticized and rejected by courts and commentators, and is not the majority rule. *See, e.g.,* cases cited *supra*.

It is important to understand that the terms "interactive computer service provider" and "information content provider" are not mutually exclusive. Courts have recognized that "[i]t is not inconsistent" for a particular entity "to be an interactive service provider *and also* an information content provider." *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) (emphasis added) (quoting *Gentry v. eBay*, Inc., 99 Cal. App. 4th 816, 833 (June 26, 2002)). *See also Fraley v. Facebook, Inc.,* 830 F. Supp. 2d 785, 801-802 (N.D. Cal. 2011); *Mazur v. eBay, Inc.*, 2008 WL 618988, at *9 (N.D. Cal. Mar. 4, 2008).[7] Just as the law's definition of "interactive computer service" is broad, so is the definition of "information content provider."

### D. A Service Provider Responsible in Whole or in Part for the Development – Apart from the Creation – of the Offending Content is Not Protected by the CDA.

As noted, the CDA defines "information content provider" as anyone who is "responsible, *in whole or in part*, for the creation *or development* of" the offending content, 47 U.S.C. § 230(f)(3), and courts have held that the definition covers "even those who are responsible for the development of content only 'in part.'" *Accusearch*, 570 F.3d at 1197. "This is a broad definition, covering even those who are responsible for the development of content only 'in part.'" *Accusearch, Inc.*, 570 F.3d at 1197 (quoting *Fair Housing Council of San Fernando*

---

[7] For instance, in *Fraley v. Facebook*, 830 F. Supp. 2d 785, 801-802 (N.D. Cal. 2011), the court stated:

> Although Facebook meets the definition of an interactive computer service under the CDA, *see* 47 U.S.C. § 230(f)(2) (defining an interactive computer service, in part, as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server"), in the context of Plaintiffs' claims, it also meets the statutory definition of an information content provider, *see id.* § 230(f)(3) (defining an information content provider as "any person or entity that is responsible, in whole *or in part*, for the creation *or development* of information provided through the Internet or any other interactive computer service" (emphasis added)). "A website operator can be both a service provider and a content provider.... [A]s to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider." *Fair Housing Council of San Fernando Valley v. Roommates.com,* LLC, 521 F.3d 1157, 1162 (9th Cir.2008) (en banc). Furthermore, "that [members] are information content providers does not preclude [Facebook] from *also* being an information content provider by helping 'develop' at least 'in part' the information" posted in the form of Sponsored Stories. *Id.* at 1165 (emphasis in original).

8

*Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc)). Thus, there may be multiple information content providers with respect to a single item of information "(each being 'responsible' at least 'in part,' for its 'creation or development.')" *Accusearch*, 570 F.3d at 1197.

Moreover, the term "development" has been held to mean "materially contributing to [the information's] alleged unlawfulness." *Roommates.com*, 521 F.3d at 1167-68. Development includes "the process of researching, writing, gathering, organizing and editing information for publication on web sites." *Id*. at 1168. Accordingly, "develop" means something separate from creating content. It includes "the act of drawing something out, making it 'visible,' 'active,' 'or usable.'" *Accusearch*, 570 F.3d at 1198.

As a result, courts have held that a service provider is not immune from suit where the provider itself creates or helps to develop, rather than merely publishes, the unlawful content. *See, e.g., Roommates.com,* 521 F.3d at 1168-69; *Accusearch*, 570 F.3d at 1198-99; *Anthony v. Yahoo! Inc.,* 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006). Where a search engine is "much more than a passive transmitter of information provided by others," and instead "becomes the developer, at least in part, of that information," Section 230 provides no protection. *Roommates.com*, 531 F.3d at 1166.

Applying these principles, various courts have denied immunity under Section 230 where it was alleged that the service provider either provided content or helped develop online content. *See, e.g., Whitney Info. Network v. XCentric Ventures*, LLC, 199 F. App'x 738 (11th Cir. 2006) (no dismissal where plaintiff alleged that ripoffreport.com modified consumer complaints, added inflammatory headings, and fabricated others); *Doctor's Assocs. v. QIP Holders, LLC*, 2007 WL 1186026 (D. Conn. Apr. 19, 2007) (dismissal not granted where Quiznos posted sample videos for contest against Subway); *Anthony*, 421 F. Supp. 2d 1257 (no immunity where dating site

9

recycled profiles of former members or created fake profiles); *Hy Cite Corp. v. Badbusinessbureau.com, LLC*, 418 F. Supp. 2d 1142 (D. Ariz. 2005) (no dismissal where plaintiff alleged that website modified consumer complaints and added inflammatory headings).

Google sets out the allegations in its Complaint and the assertions in its Memorandum in a manner to suggest that it is "common knowledge" what Google does. Google has unsuccessfully employed this sort of "common knowledge" persuasion tactic before. *See, e.g. Perfect 10 v. Google, Inc.*, 2008 WL 4217837, at *8 (C.D. Cal. Jul. 16, 2008) ("Google merely asserts that it is common knowledge that Google is not a content provider.") As the court noted in the context of the claims in that case, "the very fact that Google owns Blogger indicates that Google is not just in the search engine business." *Id.* at *8. In *Perfect 10,* the district court stated the "question whether any of Google's conduct disqualifies it for immunity under the CDA will undoubtedly be *fact-intensive*." *Id*. (emphasis added). As a consequence, the court held it would be improper to dismiss the claims on Google's 12(b)(6) motion.

**E. False or Misleading Advertisements and Statements are Not Protected by the CDA.**

To the extent that Google may have engaged in false or misleading advertisements or otherwise made false and misleading statements, its conduct would not be shielded by the CDA. For example, in *CYBERsitter, LLC v. Google Inc.,* 905 F. Supp. 2d 1080 (C.D. Cal. 2012), the district court denied Google's motion to dismiss in part. With respect to plaintiff's false advertising claim, the court rejected Google's argument that the claim should be dismissed at the 12(b)(6) stage based on CDA immunity. With respect to plaintiff's state law claim of false advertising, plaintiff alleged that both defendants Google and ContentWatch willfully and intentionally made untrue and misleading statements concerning plaintiff's products and services. Google argued that the advertisements were created by ContentWatch alone and not by Google.

10

The district court held that "[b]ecause Defendant's entitlement to immunity under the CDA depends on whether Defendant 'developed' or materially contributed to the content of these advertisements, it is too early at this juncture to determine whether CDA immunity applies." *Id.* at 1086.

Google's creation and/or development of statements and advertisements is not just some hypothetical supposition. Google represents to consumers that it demotes pirated content and claims that its top search results are "high quality," which Google has represented means sites containing original content, sites to which consumers should feel comfortable providing credit cards, and sites that do not contain malware.[8] But even the limited evidence available without investigation suggests that Google's claims about demotion of pirated content may not be accurate in at least some cases. Moreover, in some cases Google continues to put at the top of its search results sites that it should know are trafficking in unlawful goods and content that may be dangerous to consumers. Hood Brief at 5-6, citing Feb. 13, 2013 letter to Google from

---

[8] *See, e.g.*, http://googleblog.blogspot.com/2011/02/finding-more-high-quality-sites-in.html -"This update is designed to reduce rankings for low-quality sites—sites which are low-value add for users, copy content from other websites or sites that are just not very useful. At the same time, it will provide better rankings for high-quality sites—sites with original content and information such as research, in-depth reports, thoughtful analysis and so on. . . . we do have a responsibility to encourage a healthy web ecosystem. Therefore, it is important for high-quality sites to be rewarded, and that's exactly what this change does."

http://googleonlinesecurity.blogspot.com/2014/08/https-as-ranking-signal_6.html - "Beyond our own stuff, we're also working to make the Internet safer more broadly. A big part of that is making sure that websites people access from Google are secure."

http://insidesearch.blogspot.com/2012/08/an-update-to-our-search-algorithms.html - "Starting next week, we will begin taking into account a new signal in our rankings: the number of valid copyright removal notices we receive for any given site. Sites with high numbers of removal notices may appear lower in our results. This ranking change should help users find legitimate, quality sources of content more easily—whether it's a song previewed on NPR's music website, a TV show on Hulu or new music streamed from Spotify."

http://googlepublicpolicy.blogspot.com/2014/10/continued-progress-on-fighting-piracy.html - "In August 2012 we first announced that we would downrank sites for which we received a large number of valid DMCA notices. We've now refined the signal in ways we expect to visibly affect the rankings of some of the most notorious sites. This update will roll out globally starting next week."

Attorneys General from Hawaii, Mississippi and Virginia; Hood Brief at 7-8, citing December 10, 2013 letter to Google from twenty three Attorneys General.[9]

In addition, Google claims that it vets YouTube videos (YouTube is a Google subsidiary) before agreeing to allow advertising on them, but it allows and profits from advertisements on innumerable illicit YouTube videos. Hood Brief at 6, citing July 2, 2013 letter to Google from Attorneys General Nebraska and Oklahoma; Hood Bref at 7, citing October 7, 2013 letter to Google from Attorneys General Nebraska, Hawaii, and Virginia. To that end, the Attorney General's subpoena seeks, among other things, "documents concerning the use of Google Advertising Services to promote or serve ads on websites or in conjunction with videos on YouTube that are or appear to be promoting, facilitating, offering for sale, disseminating, or engaging in dangerous or Illegal Content/Conduct." Doc. Request No. 16. This and similar requests are intended to help determine whether Google knowingly misrepresents its handling of YouTube videos and the advertisements that run alongside them. Such misrepresentations could render Google subject to liability under the MCPA and would not be precluded by the CDA.

While Google is not a static company and it provides many services and products, it is not above investigation or criticism. As Google itself acknowledges, it entered into a Non-Prosecution Agreement ("NPA") with the United States Department of Justice relating to advertising of prescription drugs.[10] According to the Justice Department Press Release: "Online search engine Google Inc. has agreed to forfeit $500 million for allowing online Canadian

---

[9] *See also* Al Jazeera, "Darknet Thriving after Crackdown", Jan. 20, 2015, available at https://en-maktoob.news.yahoo.com/darknet-thriving-crackdown-054730589--spt.html ("By downloading and installing a free web browser called TOR, anybody can connect to the internet anonymously. Then, with the help of a few site lists which are available through Google, you have immediate access to a wide variety of goods and services. Among them are a host of illegal offerings - drugs, weapons, stolen credit cards, counterfeit money, hackers and hit-men for hire.").

[10] *See* Hood Brief at 5 - 7, discussing the NPA and other investigations and settlements relating to Google.

pharmacies to place advertisements through its AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the United States …"[11] Additionally, as the Attorney General's Memo states, several Attorneys General have expressed concern about Google's "monetization of dangerous and illegal content, particularly on [its] subsidiary, YouTube."[12]

Courts have been quite clear that the CDA offers no protection to service providers that have themselves engaged in unlawful practices. *See, e.g., Anthony*, 421 F. Supp. 2d at 1263 (The CDA "does not absolve Yahoo! from liability for any accompanying misrepresentations" Yahoo! itself made); *See also Mazur v. eBay, Inc.*, 2008 WL 618988 (N.D. Cal. Mar. 4, 2008) ("The CDA does not immunize eBay for its own fraudulent misconduct."); *800-JR Cigar, Inc. v. Goto.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) (holding that the CDA cannot "shield entities from claims of fraud and abuse arising from their own pay-for-priority advertising business, rather than from the actions of third parties"). As a consequence, if Google is "responsible, *in whole or in part*, for the creation *or development* of" the offending content, then it is not entitled to the protections afforded by the CDA. *Accusearch, Inc*., 570 F.3d at 1197 (emphasis added). This Court should permit the Attorney General to conduct his investigation so that he can develop a factual record that will serve as a basis for determining whether Google has violated Mississippi law and what, if any, protections the CDA may provide for its conduct.

## IV. CONCLUSION

The IACC respectfully submits that Google's motion for a preliminary injunction should be denied and/or the Attorney General's motion to dismiss should be granted. Determination of

---

[11] http://www.justice.gov/opa/pr/google-forfeits-500-million-generated-online-ads-prescription-drug-sales-canadian-online

[12] Hood Brief at 7.

CDA immunity is a fact specific inquiry. That is why courts have denied defendants' (including Google's) motions to dismiss based on CDA protection at the pleading stage, holding that a claim had been stated and discovery was needed to resolve the issue. The result should be the same here with respect to a subpoena that is simply the *beginning* of an investigation. The Court should not enjoin the Attorney General from conducting that investigation. Depending on the facts that the Attorney General elicits, he may or may not proceed against Google with claims under the MCPA. If he does, some or all of his claims might be dismissed on CDA or other grounds. However, it is premature to reach the conclusions Google seeks at this very early stage of the investigation without knowledge of the facts that would be developed through the Attorney General's lawful subpoena.

      This, the 3rd day of February, 2015.

Respectfully submitted,

**INTERNATIONAL ANTICOUNTERFEITING COALITION**

By Its Attorneys,

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

    */s/ Jason R. Bush*
  JASON R. BUSH

**OF COUNSEL:**
Jason R. Bush (MB No. 100451)
BAKER, DONELSON, BEARMAN, CALDWELL
 & BERKOWITZ, PC
4268 I-55 North, Meadowbrook Office Park
Post Office Box 14167
Jackson, Mississippi 39236-1467
Telephone: (601) 351-2400
Telecopier: (601) 351-2424
E-mail: jbush@bakerdonelson.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which sent notifications of such filing to all counsel of record.

Dated: February 3rd, 2015.

            */s/ Jason R. Bush*
            JASON R. BUSH