```
            UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                 NORTHERN DIVISION


GOOGLE, INC.                              PLAINTIFF

VS.                      CIVIL NO. 3:14cv00981HTW-LRA

JIM HOOD, ATTORNEY GENERAL
OF THE STATE OF MISSISSIPPI, IN HIS
OFFICIAL CAPACITY                         DEFENDANT




                       HEARING ON
        MOTION FOR TRO, PRELIMINARY INJUNCTION,
              AND THE MOTION TO DISMISS




          BEFORE THE HONORABLE HENRY T. WINGATE
              UNITED STATES DISTRICT JUDGE
                   FEBRUARY 13, 2014
                  JACKSON, MISSISSIPPI


    APPEARANCES:

    FOR THE PLAINTIFF:    MR. FRED KRUTZ III
                          MR. PETER NEIMAN
                          MR. BLAKE ROBERTS
                          MR. DANIEL MULHOLLAND


    FOR THE DEFENDANT:    MR. DOUG MIRACLE
                          MR. BLAKE BEE
                          MS. MARY JO WOODS
                          MS. BRIDGETTE WIGGINS
                          MR. HAROLD PIZZETTA


    REPORTED BY:  CHERIE GALLASPY BOND
                  Registered Merit Reporter
                  Mississippi CSR #1012
_____
            245 E. Capitol Street, Room 120
             Jackson, Mississippi  39201
                  (601) 965-4410
```

1          THE COURT:  Good morning.  This is *Google, Inc., v.*

2  *Jim Hood, Attorney General, State Of Mississippi, in His*

3  *Official Capacity,* cause number 3:14CV981.  The matter before

4  the court is a motion for a temporary restraining order and a

5  motion for preliminary injunction.  There's some other motions

6  that are listed, and all of them concerns -- all of them

7  concern motions for leave to file excess pages and to file

8  amicus briefs.

9          Now, let's have the parties identify themselves,

10  starting first with plaintiff.

11          MR. NEIMAN:  Good Morning, Your Honor.  Peter Neiman

12  from Wilmer Hale for Google.  I'm joined at counsel table by

13  Fred Krutz, Blake Roberts and Danny Mulholland.

14          THE COURT:  Good morning to all of you.  Thank you.

15  Defense.

16          MR. MIRACLE:  Good morning, Your Honor.  I'm Doug

17  Miracle on behalf of the Attorney General from the Attorney

18  General's office.  With me is Bridgette Wiggins, Blake Bee,

19  Mary Joe Woods, and Harold Pizzetta.

20          THE COURT:  All right, then.  Thank you so much.  Now,

21  who will be making the arguments on behalf of the plaintiff?

22          MR. NEIMAN:  I will, Your Honor.

23          THE COURT:  And on behalf of the defense?

24          MR. MIRACLE:  I will, Your Honor.

25          THE COURT:  All right.

1          MR. MIRACLE:  Your Honor, may I make one comment.  I

2     just want to indicate that we do have a motion to dismiss that

3     was also filed on the jurisdictional issue.

4          THE COURT:  That's right.  I saw that motion too.

5     Now, will any of the parties be presenting evidence by way of

6     testimony?

7          MR. NEIMAN:  Not for Google, Your Honor.

8          MR. MIRACLE:  No, Your Honor.

9          THE COURT:  All right.  And with regard to the motions

10    for amicus briefs, do you have a position -- let's start with

11    plaintiff.

12         MR. NEIMAN:  We have consented to a number of the

13    motions.  That was one motion that we took no position on,

14    which Your Honor has already granted, which was the motion by

15    the DCA.  But as to the others, we consent to all of them.

16         THE COURT:  To the briefs?

17         MR. NEIMAN:  To the filing of the amicus briefs, yes.

18         THE COURT:  Okay, thank you.

19         MR. MIRACLE:  Your Honor, we have not taken a position

20    nor opposed, and we have consented to those that requested our

21    consent.

22         THE COURT:  All right.  Then there are several

23    motions.  I'll go down the list that I have.  You can check

24    your list against mine.  First of all -- well, let me talk

25    about the amicus brief first.  There's one filed by Jack

```
 1   Conway.  The court then allows that.

 2            There's one filed by the Center for Democracy and

 3   Technology.  I'll allow that one.  Another one is filed by

 4   Computer and Communications Industry, granted.

 5            Then this might be a second request, but Center for

 6   Democracy and Technology, Electronic Frontier Foundation, Open

 7   Technology Institute, Public Knowledge, R Street Institute,

 8   granted.

 9            And one requested by Internet Commerce Coalition,

10   granted.

11            There's a motion for leave to file excess pages filed

12   by the Attorney General.  That motion is now moot, is it not?

13            MR. MIRACLE:  There it was no opposition to the

14   motion, and we submitted our papers accordingly.

15            THE COURT:  That's why I said it is really moot at

16   this point, isn't it?

17            MR. MIRACLE:  I think so, Your Honor.

18            THE COURT:  So then we have a motion for TRO,

19   preliminary injunction, and the motion to dismiss.  Those are

20   all the motions that I have listed on my motions report.  Are

21   there any others?

22            MR. NEIMAN:  Not that I'm aware of.

23            MR. MIRACLE:  Not that I'm aware of.

24            THE COURT:  All right.  How much time do you want for

25   your argument?
```

1          MR. NEIMAN:  I'd ask for about 45 minutes, Your Honor.

2          THE COURT:  And then for rebuttal?

3          MR. NEIMAN:  20 minutes.

4          THE COURT:  Let me hear from the other side.  Thank

5     you.

6          MR. MIRACLE:  I think similar amounts of time from the

7     state, Your Honor.  I would point out that I think our motion

8     to dismiss is going to be wrapped up somewhat in our response

9     to the motion for preliminary injunction, as far as

10    establishing the four factors.  I don't know how Your Honor

11    wants to proceed in hearing the jurisdictional motion from the

12    state as opposed to our response to the core of the preliminary

13    injunction.  But we'll be arguing both.  I can argue those both

14    at the same time, however Your Honor wants to proceed on that.

15         THE COURT:  All right.

16         MR. NEIMAN:  Just to be clear, that's what I was

17    contemplating in the times that I gave Your Honor to address

18    both sets of issues.

19         THE COURT:  All right.  Then I will hear both at the

20    same time.

21         MR. MIRACLE:  Thank you, Your Honor.

22         THE COURT:  All right.  Now, are you prepared to go?

23         MR. NEIMAN:  I'm prepared to proceed, yes.

24         THE COURT:  Do you have exhibits?

25         MR. NEIMAN:  We have a couple that we're going to put

1    on the screen.  I can also give you hard copies, if you'd like.

2            THE COURT:  No, those on the screen will be

3    sufficient.  And for the record, we'll take the hard copies,

4    though.

5            MR. NEIMAN:  We can bring it up at the end if you

6    like.

7            THE COURT:  Okay.  Now, have those been shown to

8    opposing counsel?

9            MR. NEIMAN:  They are simply excerpts of documents

10   that are already in the record, and I've explained that to

11   Mr. Miracle.

12           MR. MIRACLE:  Same for us, Your Honor.  Everything

13   that we'll be using and as Mr. Neiman has been said, there have

14   been exhibits to the papers that have been filed in our court.

15           THE COURT:  All right.  Then you may begin.

16           MR. NEIMAN:  Thank you, Your Honor.  And good morning.

17   Your Honor, I thought before I got into kind of the details of

18   the arguments, both for Google's motion for preliminary relief

19   and for the Attorney General's motion to dismiss, I'd like to

20   step back first for a minute and just talk about why Google

21   filed this case.  That was not a step that Google took lightly.

22   I understand that outside the world of patents and some

23   collection matters, this is the only lawsuit Google has filed

24   in several years.  Google responds to subpoenas and cooperates

25   with investigations all the time.

1          This inquiry was different.  Mississippi's Attorney

2  General was trying to establish indirectly through threat of

3  prosecution and a very burdensome 79-page subpoena state

4  regulation over the content that Google makes available to the

5  Internet, content created by third parties.  State regulation

6  of that is contrary to core First Amendment principles, and it

7  is contrary to the judgment that Congress reached when it

8  passed the Communications Decency Act in which it granted broad

9  immunity to Internet service providers for their display of

10 third-party content, and it did so with the express goal of

11 promoting the growth of the Internet unfettered by state

12 regulation.

13         Now, over the last 18 months, the Attorney General has

14 repeatedly demanded that Google remove certain content that

15 shows up in search results, remove certain videos that show up

16 on YouTube.  He has threatened to prosecute Google under the

17 Mississippi Consumer Protection Act if it doesn't do what he

18 wants, and he issued a 79-page subpoena when Google refused to

19 do everything that he demanded.

20         He did all of that despite having acknowledged in

21 writing in a letter to Congress that he lacked the authority to

22 bring the very case that he was threatening.  And he did all

23 this following, you know, a covert lobbying campaign from the

24 Motion Picture Association.

25         So with that conduct, those threats and demands, they

1   left Google with a really stark choice.  They could comply with

2   the demands, alter their editorial judgments, stop providing

3   all the information that they provide to users, on the one

4   hand, or they could risk felony prosecution that the Attorney

5   General was threatening quite explicitly as recently as

6   December 18th, the day before Google filed this lawsuit.

7          Now, it's our position that federal law precludes the

8   Attorney General from forcing Google to pick between giving up

9   its federally protected rights or risking state prosecution.

10  Indeed, I think that's precisely the function of federal court

11  to step in when state officials are demanding that people do

12  things in violation of state -- of federal law and they

13  threaten prosecution if there's no compliance with those

14  unlawful demands.

15         And the reason for that, you know, is the federal law

16  recognizes that these kind of threats have real consequences.

17  This is not abstract.  These threats coerce people into giving

18  up their rights.  I mean, it's just -- it's much easier to just

19  go along and say, okay, we'll do some of what you want than it

20  is to stand up for your rights.  In fact, you know, it's not --

21  it wasn't easy for Google here.  The record reflects and this

22  is in the affidavits of Mr. Thomas and Ms. Woo that were

23  submitted in our response papers that there are real concrete

24  things that Google did to change its constitutionally protected

25  and statutorily protected editorial judgments to try and

1    mollify the Attorney General to try to make the choice of well,

2    maybe, we'll give him a little bit of our rights rather than

3    risking a threatened prosecution.

4            Just to give you one example of that, this is laid out

5    in our papers, the Attorney General complained that there were

6    videos on YouTube that other people were putting up, not that

7    Google was putting up, that were, he says, promoting buying

8    pharmaceuticals over the Internet.  And he was very upset that

9    ads were running against those videos.  That's all perfectly

10   protected conduct under the Communications Decency Act, but he

11   was complaining about it quite strongly.

12           And Google had to make a choice.  Do we stand on our

13   rights or do we try to do something to mollify him.  And what

14   Google did was kind of only the practical way to address the

15   problem that he was identifying was it had to come up with a

16   really overbroad solution because, you know, there are 300

17   hours of new video added to YouTube every minute.  There's no

18   way that anybody can review all of them.  You would have to

19   double the size of the company, have people 24 hours a day

20   doing nothing about that.

21           And so what Google does is they have all kinds of

22   systems that he can analyze videos and come to kind of a

23   general sense of what topic the video is on and can classify

24   videos.  Okay.  This is in the classification of health and

25   pharmaceuticals.  That can include the kind of video that the

1  Attorney General complained about, but it could also include,

2  you know, a video promoting Vick's VapoRub, which is, in fact,

3  one of the videos that was up on YouTube that ads were running

4  against.

5          And the only way to make sure that no ads were running

6  against the videos that the Attorney General complained about,

7  the only practical way to do that was to block videos from --

8  ads from running next to any video that was identified as being

9  in this kind of health and pharmaceuticals class.  It was like

10 their very overbroad step was the only practical way to get at

11 the issue that the Attorney General was raising and that was an

12 infringement on Google's editorial judgment and meant there was

13 much less incentive for people to post videos that fit into

14 that category because they couldn't get compensated through ads

15 in doing so.  So it in a very real way chilled both Google's

16 and the public's access to perfectly legitimate information.

17         So that's why we're here.  Those are serious matters.

18 And, you know, Google took all kind of steps to avoid having to

19 come to court.  We voluntarily answered dozens of written

20 questions before the subpoena was ever filed.  You can see

21 those answers in the record.  We produced something like

22 100,000 pages of documents to the Attorney General.  We met

23 with them over and over again.  We provided them evidence

24 before we brought this case that every piece of content that he

25 had objected to was created by third parties, not by Google,

1   which means that it's protected by -- that Google's conduct is

2   protected by the Communications Decency Act.  None of that had

3   any impact.  The threats and demands continued.  And, if

4   anything, they escalated.

5          So that's why we're here.  We're asking the court to

6   issue an injunction that will do two things:  One, preclude the

7   Attorney General from bringing the very prosecution that he's

8   threatened repeatedly; and, second, that would enjoin him from

9   enforcing this 79-page subpoena.

10         Now, what does the Attorney General have to say about

11  all of this?  First, I think importantly there isn't really a

12  fight on the facts here.  We have submitted seven declarations

13  and 74 exhibits that detail all of the threats and demands that

14  the Attorney General has made, all of the ways this has

15  impacted Google, talk about all the things Google does

16  voluntarily to try and limit objectionable content that can be

17  obtained by its services, and the Attorney General doesn't

18  challenge any of that.  And so that means that as you consider

19  motions here, you can accept as true all the facts that are set

20  forth in our affidavits and the exhibits and all the

21  allegations of our complaint because they are not disputed.

22         Mostly what the Attorney General does is raise

23  procedural objections.  He claims this is just not the kind of

24  dispute that's appropriate for a federal court to decide.  And

25  he suggests, you know, maybe we came to court too soon or maybe

1    we're too late.  I think half of his procedural arguments say,

2    oh, you know, this isn't enough of a dispute yet.  You're here

3    too early.  And the rest of his procedural arguments are, well,

4    the court should abstain because we have already issued a

5    subpoena.  You have come to court too late.  We don't think it

6    is either of those things.  We don't think we're too early or

7    too late.  We think we're here at the right time.

8         Let me spend a few minutes telling you why I think

9    that.  Let's start first with this suggestion that we're here

10   too early, that there isn't really a real concrete dispute here

11   or real threat of prosecution that needs to be addressed.  I

12   think that just does not fit the undisputed facts in the

13   record.

14        Let me just walk you through for a couple of minutes

15   and what the Attorney General has actually said, his own words

16   about what he's threatening, what he's demanding, why he issued

17   the subpoena and what's going to happen to Google if it doesn't

18   do what he demands.

19        Let me just walk through that.  And here is where I

20   have some stuff that I'm going to put up on the screen for you,

21   Your Honor.  So let's talk about what the Attorney General is

22   complaining about it.  What is it that he doesn't like?  Here's

23   the first one.  When Google promotes through its search results

24   websites obviously selling unlawful drugs or streaming pirated

25   videos, Google cannot escape liability.  This is from a letter

1   that the Attorney General sent to Kent Walker.  Mr. Walker is

2   the general counsel of Google.  He's here today over here.

3   This is one of the things the Attorney General doesn't like.

4   He doesn't like search results that goes to content he doesn't

5   like.

6          Let's look at the next thing that he's identified.  On

7   YouTube, Google enters into contracts with the producers of

8   YouTube videos to monetize illegal content and fund criminal

9   activity.  Such aiding and abetting of criminal activity falls

10  outside the immunities of Section 230 of the CDA.  That's the

11  second thing he has identified, videos that he doesn't like on

12  YouTube and ads running against those videos that he doesn't

13  like.  All of that is protected by the Communications Decency

14  Act.  That's the second thing he's focused on.

15         Let's look at the next thing.  He says we're aiding

16  and abetting by allowing autocomplete to lead and even

17  encourage users to illegal activity.  Just a reminder of what

18  autocomplete is.  That's when you're typing in your search and

19  Google has an algorithm to predict what I think you're likely

20  typing, based mostly on what other people have been typing when

21  they -- what other people have finished typing when they

22  started typing the same thing you're typing, almost like a

23  spellchecker, but it gives you some suggestions.  You don't

24  have to take them, but they are suggestions.  And they are just

25  an algorithmic prediction based on searches that other people

1    have entered.  That's the primary criteria for generating those

2    predictions, and we said it in our briefs and multiple courts

3    have said that that kind of neutral tool that is making

4    algorithmic predictions based on searches that people have

5    perviously entered in large part and that that's protected

6    under the CDA.  Also we have cited those in our papers.  So

7    those are his complaints.  That's what he doesn't like.

8         Let's look now at what he's demanded that we do.  So

9    here, this is the Attorney General says Google should not index

10   cites substantially dedicated to intellectual property

11   infringement.  He wants to index -- that's the thing that

12   Google's search operates on.  So the way it works is Google

13   kind of sends these robots of sites around the internet and

14   gathers up all this information because it visits 20 million

15   websites a day, I think it is.  All of that goes into this

16   index and then the search runs against that index.

17        What the Attorney General is saying is that, hey, take

18   these websites out of the index so they will never show up in

19   search results.  And it's not sites that have nothing

20   legitimate on them but sites substantially dedicated to

21   intellectual property infringement.  So who knows what that

22   means, but he's saying, *Don't even let people find these*

23   *things.  They have to take them out of your search*.

24        By the way, that is the kind of overbroad remedy that

25   Congress expressly rejected two or three years ago after there

1    was as huge outcry from the public about the notion of that

2    kind of overbroad removal from the Internet of sites simply

3    because they had some infringing content.  Google takes out of

4    search results anything that a copyright holder identifies

5    specifically as infringing on these 200 million web pages a

6    year.  But that's not what the Attorney General is asking for.

7    He's saying take down the whole site, everything on it,

8    infringing or not.

9          What is his next demand?  Announce a 24-hour link

10   through which the Attorney General's deindexing requests are

11   granted or addressed within hours.  This is a pretty

12   extraordinary one.  He is saying, *Give me*, *the Attorney General*

13   *of Mississippi, the right to just tell you*, *Take out this, take*

14   *out that, anything I want.*  No judicial review, no neutral and

15   detached magistrate making this decision, just the Attorney

16   General saying to Google, *Take that out*.  Unprecedented

17   request.

18         So the next one.  Remove poplar copyrighted content

19   from YouTube videos and/or deprioritized videos that contain

20   links to known rogue sites for copyright content.  Again, I

21   don't like the content of some videos on YouTube that third

22   parties are posting, take it down.  It is interesting here.

23   I'll pause on this for a moment.  With regard to YouTube,

24   Google has a system to take complaints, and they have rules

25   with regard to YouTube for community standards, and if people

1   complain about something and it violates the community

2   standards, YouTube takes it down all the time.  We decided to

3   give the Attorney General a tool to tell us after complaints

4   like this specifically what did he want to come down.  And, you

5   know, he identified -- he's had that tool for more than a year.

6         He identified seven videos, one of which was perfectly

7   fine and six of which were taken down.  It is kind of

8   interesting that of the six that were taken down, we didn't get

9   a single request from the Attorney General, *Hey, tell us who*

10  *put that content up.  We'd like to stop the people who are*

11  *doing this bad stuff.*  They never asked.  They are trying to

12  cloak themselves in, *Let's make the Internet safer*, and here we

13  are, they have identified some video that has content that they

14  think is improper.

15        We have taken them down.  We have all kinds of

16  information.  They never asked us.  Google four times a year

17  provides information to the FDA about websites that are showing

18  up and services that seem to be involved in selling

19  prescription drugs improperly.  We're happy to help law

20  enforcement go after the bad guys.  We never get any kind of

21  request like that from the Attorney General.

22        Let's look at the next thing.  He says eliminate

23  autocomplete terms such as, "buy oxycodone online without a

24  prescription."  That was in a letter to Kent Walker back in

25  April of 2013.  Google has done that.  If you type in "buy

1    oxycodone online," you don't see the auto complete prediction

2    that you might be typing in.  "Without a prescription" doesn't

3    show anymore.  We have filtered the autocomplete system so that

4    it doesn't slow up.

5           But again these are complicated big systems, and you

6    can't just take out "oxycodone without a prescription" because

7    if that's all do you, then "Vicodin without a prescription" is

8    going to show up and then "Viagra without a prescription" is

9    going to show up.  And there's so many different ways to

10   describe all these products that there's no way to just focus

11   on stuff that will be problematic.  Instead you have to do the

12   overbroad solution, which is to take out "without of

13   prescription" to filter that so it doesn't appear as an

14   autocomplete prediction for any search inquiry.

15          So what that means is if you type in "buy Claritin

16   without a prescription," Claritin is an allergy medicine that

17   used to be a prescription drug and is not anymore.  If you

18   aren't sure and you want to find out from Google, hey, can I

19   buy Claritin without a prescription, autocomplete no longer

20   helps you finish that because Google, trying to mollify the

21   Attorney General, who is making these demands through things

22   you are perfectly lawful to stop but it is easier to give up a

23   little bit of your rights than to risk prosecution.  Google

24   takes that stuff out, and now its services aren't quite as

25   useful as it used to be.  So those are what the Attorney

 1   General demanded.

 2          Let's talk about the subpoena a little bit.  So we are

 3   going along, and we are giving them documents and talking to

 4   them and answering questions, but we're not agreeing to just

 5   take stuff out of search results like they want.  And the

 6   Attorney General is not pleased with that, and he says -- and

 7   this is in a public speech he made at the National Association

 8   of Attorney Generals.  "I told Google if you don't work with us

 9   to make some of these changes, things I just showed you that we

10   have been suggesting since November, I'm going call my

11   colleagues to issue civil investigative demands or subpoenas."

12   It's clear in his own words he's saying, *If you don't do what I*

13   *want, I've got all of that law stuff about what you have to do.*

14   *If you don't do what I want, I'm going to issue you a subpoena.*

15          Where did that subpoena come from?  Well, in is an

16   interesting note, this is revealed in press accounts emailed

17   from the outside counsel from the MPAA, a man named Tom

18   Perrelli, who is outside counsel for the Motion Picture

19   Association.  He is a partner in a firm called Jenner & Block.

20   That's the firm that we have shown in our papers actually wrote

21   word for word one of the letters that the Attorney General sent

22   to Google.

23          Here's what he's saying a few months after that letter

24   that he wrote -- his firm wrote, I should say, "The time for

25   letter writing is over.  It is time to move to actually form an

1   investigation.  I think we should shore up Hood and try to get

2   a small group focused on a clear timetable for CIDs."  He's

3   pushing for a subpoena to be issued for Google.  What does he

4   offer to do?  Draft the CID.  What do we end up getting?  A

5   79-page subpoena.  He didn't do what he wanted.

6        Let's go now to his threats.  So this is what the

7   Attorney General said when he spoke about this case at the

8   Neshoba County Fair back in 2013.  "Google's revenue were

9   42 billion last year.  And these companies don't move until

10  they see fire and gun smoke.  A lawyer with a badge is not

11  enough to push them a lot of time.  Some of them, some of the

12  time, you had to put somebody in jail."  Jail, for search

13  results.

14        Let's go to a little more recent.  This is the day

15  before we filed this lawsuit.  "The company, you know, is

16  clearly one that should be convicted of a felony."  That's what

17  he said the day before we brought this case.  We're not here

18  too soon.  There is a very concrete threat of prosecution here.

19  We know what it is he doesn't like.  He's made it perfectly

20  clear what he wants, what he's demanding and how he's going to

21  try and coerce us into doing that, and he's threatening jail

22  and felony prosecutions.

23        That's something a federal court can hear?

24  Absolutely.  You know, going back all the way to *Ex Parte*

25  *Young*, it's been clear that when state officials are

1   threatening to bring a case that would be violative of federal

2   law, as this one would be under both the First Amendment and

3   the Communications Decency Act, federal courts absolutely have

4   jurisdiction to step in and say, no, you can't do that.

5           Just to give you two cases that we have cited in our

6   brief that I think are particularly analogous to our situation

7   here, the first case is the *TWA v. Morales* case.  And that's a

8   case in which state Attorney Generals were threatening to bring

9   a lawsuit under their consumer protection laws, the same laws

10  that the Attorney General has invoked if the airlines wouldn't

11  change some of their pricing practices.  The problem was that

12  federal law had deregulated the airlines and had preempted any

13  state effort to regulate how the airlines went about these

14  practices.  And a federal district judge looked at those facts

15  and issued an injunction precluding the state from bringing the

16  cases that they were threatening.  That went all the way up to

17  the Supreme Court, and the Supreme Court affirmed.

18          We have exactly the same thing here.  We have the

19  Attorney General threatening to bring a case.  We have federal

20  law from the CDA that preempts state prosecution and state laws

21  that would punish Google for displaying third-party content,

22  exactly what he's complaining about.  We have even more here

23  because *Morales* was just a statutory case.  Here we have

24  constitution issues because we have got First Amendment Rights

25  here, rights to make our own editorial judgments without the

1   government telling us what we can do and not do.  So this case

2   is just on all fours, and there's clear jurisdiction.

3        As to the subpoena and the court's jurisdiction to

4   address that, we can look at a case like *Cuomo v. Clearing*

5   *House*.  That's a case in which the Attorney General of New York

6   was demanding that some national banks provide him some

7   information, threatening to subpoena them if they didn't do it

8   voluntarily.  And there was a federal law that said that states

9   don't have certain authority over national banks.

10       The banks went to court.  They got an injunction

11  against the demand for information.  It went up to the Supreme

12  Court, and the Supreme Court affirmed the injunction.  Again,

13  it's perfectly clear that when a federal law bars an Attorney

14  General from demanding certain information from certain people

15  in certain contexts, that's enforceable in federal court, and

16  the court has jurisdiction to do it and the Supreme Court has

17  held that.  So we're not here too soon, and this is exactly the

18  kind of case that a federal court has jurisdiction to hear.

19       Let me talk for a minute about the suggestion that

20  maybe if we're not here too soon, it is that we're here too

21  late because they have already issued a subpoena.  And I think

22  they suggest that you ought to abstain.  And I don't think

23  that's right, and let me try and explain why.  So I think cases

24  like -- that we have cited in our briefs like *Sprint* and *NOPSI*

25  make very clear that once the federal court's jurisdiction is

1   properly invoked, as it has been here, the court has what they

2   call an unflagging obligation to hear the case.  There are some

3   exceptional circumstances narrowly defined where the court

4   instead of doing that can abstain, but there are only three

5   circumstances, and none of them apply here.

6        What those circumstances have in common is they all

7   involve situations that -- certainly the first two and the

8   third -- which is the certain kind of special court orders like

9   how much you have to post bond pending appeal are sort of not

10  relevant here, and I don't think anybody has suggested that

11  they are.  But the other two are for a pending criminal case

12  and a pending civil enforcement proceeding.

13       Even if you have those things, there's still lots of

14  reasons why you would not be required to abstain here.  But we

15  don't have either of those things.  Google has not been charged

16  criminally.  There's a threat, but that's it.  Nor has the

17  Attorney General brought a civil enforcement proceeding.  I

18  mean, that is something where the state has made kind of a

19  formal judgment on bringing a case against you, and they charge

20  you either criminally by way of indictment or civilly by filing

21  a complaint somewhere either in court or in an administrative

22  proceeding.

23       The supreme Court has never found that abstention is

24  appropriate just because a civil enforcement proceeding has

25  been threatened or because one subpoena has been issued.  And

1   that subpoena, just to talk about what the Attorney General's

2   own words are, what he says about his subpoena is that it's

3   a -- I want to get the quote right so let's just pause a second

4   and look at my notes.  He says that it is a

5   "nonself-executing," a quote, and a "prelitigation

6   investigative tool."  And that's also a quote.  He maintains

7   successfully in the *Gulf Coast Claims* case that we cited in our

8   brief that it was not even a civil action at all and there had

9   been a subpoena issued and a motion to compel filed in state

10  court to enforce that subpoena.  The subpoena itself, which is

11  all that we have here is just not a civil enforcement

12  proceeding.  It is what the Attorney General said it was, a

13  prelitigation tool to gather evidence.  And so under the

14  Supreme Court's clear command in cases like *Sprint* and *NOPSI*,

15  there's just no basis.  We haven't come to court too late.

16          So that's, you know, what I'd like to say about the

17  procedural arguments that the Attorney General has made.  I'd

18  like to move now to a discussion of the merits.  I'm going to

19  talk first about why Google is likely to succeed on the merits

20  here, and then I'll talk about the balancing of the equities,

21  irreparable harm, whether there is any harm to the Attorney

22  General for maintaining the status quo or where the public

23  interest lies.

24          At the start, I want to say all the court has to

25  decide today is whether to preserve this status quo.  That is

1    to say, whether to continue the situation that we're in now,

2    which is that the Attorney General has agreed not to bring a

3    case and has agreed not to enforce the subpoena for now.  And

4    so all the court has to decide today is whether to continue

5    that.

6         On the likelihood of success on the merits, let me

7    start on the merits of our claim that the threatened

8    prosecution is unconstitutional and in violation of the

9    Communications Decency Act.  I won't take you back through the

10   slides that we looked at, but I think it just couldn't be

11   clearer from those slides that what the prosecution has

12   threatened is one that relates to the display of third-party

13   content, and that's exactly what the Communications Decency Act

14   says "hands off."  The state hasn't any regulatory authority.

15   We want that to be unfettered.  And that's exactly what the

16   First Amendment says too, that before you make editorial

17   judgments, what information do you provide.

18        You know, I think there's some suggestion in the

19   Attorney General's brief that this is really about some other

20   thing, maybe this is about like pre 1972 sound recordings or

21   maybe he could somehow bring a case about whether Google's

22   public statements match precisely what its practice is although

23   he hasn't really identified any disconnect.  But those are just

24   hypotheticals.  They are coming from nowhere but his briefs.

25        The evidence in this case, the affidavits, the

1   undisputed evidence of what the Attorney General has actually

2   said make perfectly clear what he's threatening and what we're

3   trying to get enjoined, and that's a prosecution for displaying

4   third-party content through search results, through YouTube and

5   through autocomplete suggestions.  And that's just exactly what

6   the Communications Decency Act and the First Amendment forbid a

7   state from doing, from getting in the business of deciding what

8   third-party information and Internet service provider can make

9   available.

10      So I think there is ample basis to find that we're

11  likely to succeed on the merits with regard to our challenge to

12  the prosecution that he's threatening and a request for an

13  injunction against him.

14      I think Google's likely to succeed on the subpoena

15  also, and there are multiple independent grounds on which the

16  court could find that we're likely to succeed with regard to

17  the subpoena, and perhaps the simplist one is that the Attorney

18  General's own words show that this subpoena was issued to

19  coerce us to give up our First Amendment rights in retaliation

20  for our refusal to do so.

21      And there's kind of a simple three-part test that the

22  Fifth Circuit lays out in *Wilson* for what to do when you have

23  government action that's alleged to be no retaliation for

24  exercise of protected rights.  And, you know, that requires us

25  to show that we are engaged in protected activity.  I don't

1  think that's really disputed.  Then we have to show that there

2  was a retaliatory purpose, and I think the Attorney General's

3  own words are the only evidence on the purpose of that subpoena

4  and the words are perfectly clear.

5      And then that shifts the burden to the state to

6  present evidence that they would have issued the subpoena

7  anyway, even without that retaliatory purpose, and there's no

8  evidence of that in this record.  The silence on that topic

9  from the government is deafening.

10      Talking about evidence, they say in their brief, of

11  course we would have done it anyway, but there's no affidavit

12  from anybody saying that.  So what you have on one side of the

13  scale is our undisputed evidence that we think creates a more

14  than fair inference of retaliatory purpose to deter us from our

15  protected conduct.

16      And on the other side of the balance you have nothing.

17  And at the stage of evaluating likelihood of success on the

18  merits, that's just not a close question.  For that reason

19  alone, we're likely to succeed.  But we're also likely to

20  succeed, I think, on our argument that the Communications

21  Decency Act bars this subpoena because, as the cases we've

22  cited in our brief show, the Communications Decency Act is not

23  just a defense, not just a bar on liability.  It is also a

24  defense that is being brought and all that that entails -- and

25  there are many cases that say this -- that it's a protection

1    against the burdens of defending against the claims that never

2    should have been brought in the first place.  So I think that

3    extends to the subpoena here as well.

4         If you had any doubt whether this subpoena was really

5    investigating conduct that's protected by the Communications

6    Decency Act instead of investigating the kind of things that

7    the Attorney General identifies in his brief, I don't think you

8    have to look any further than the first definition, and I'll

9    put that up on the screen.

10        This is definition number 1.  And it says right in it,

11   you know, four lines down that aiding and abetting,

12   facilitating, encouraging include any actions whether or not

13   the acts would be protected or immunized under the

14   Communications Decency Act.  It is just right there in black

15   and white.  That definition then gets incorporated into the

16   next two definitions which are about, you know, dangerous

17   conduct and unlawful conduct, which if you read the definitions

18   turns out to mean everything because I think -- and I'll

19   butcher this.  I'll give more tangentials than might really be

20   in there.  But it's like more -- the word "tangential" more

21   times than may be in there, but it's like any action that could

22   be tangentially related to anything that might tangentially

23   influence anybody to do anything that might be dangerous or

24   unlawful.

25        It is incredibly broad and incorporates this aiding

1   and abetting language as well, and that gets carried forth

2   through the whole subpoena so it's intertwined throughout that

3   this is all about immunized conduct.

4           And, you know, it's not like we just left it there and

5   didn't try and work this out.  We had conversations with the

6   Attorney General's office several times, and these are

7   reflected in my affidavit and they are not disputed in this

8   record.  And as we said, hey, we think you're going further

9   than you're allowed.  There has to be some recognition here of

10  the immunity provided by the Communications Decency Act.  There

11  has to be some recognition of the fact that the copyright,

12  which the subpoena focuses on substantially like that is

13  preempted by federal law.  The state doesn't have authority

14  over copyright, and there has to be some recognition in here

15  that had, you know, the portions of the subpoena that focus on

16  importation of pharmaceuticals.  Again that's a topic that's

17  regulated by federal law exclusively.

18          So we said to them, you know, that has to be

19  recognized in here somehow.  You can't just ask for all of this

20  stuff.  And the answer that we got back was, no, the federal

21  law has no impact on what we can ask for.  That's what they

22  said, and that's just wrong.  We have cited multiple cases that

23  made clear that federal law does limit what Attorney Generals

24  can demand:  In *Major League Baseball v. Crist* that we cited,

25  where a state Attorney General was demanding information

1 | relevant to an antitrust investigation that was preempted by

2 | federal law, and the court said, no, you can't do that. *Coumo*

3 | *v. Clearing House* I mentioned before, where the state Attorney

4 | General was demanding certain information from national banks

5 | and the Supreme Court said, no, you can't do that.  Federal law

6 | precludes that.  In the CDA context itself, in a case like

7 | *VoiceNet*, which is cited in our papers, you know, courts have

8 | recognized that the CDA can limit demands for information.  But

9 | their answer was no, no impact.  I think from that kind of

10 | fact, that kind of evidence undisputed in this record, you did

11 | quite fairly infer what was going on here.  This was focused

12 | precisely on our immunized conduct with intent to deter us from

13 | continuing to engage in it so we're likely to succeed on the

14 | merits here.

15 | Let's me turn to the balance of the equities.  I think

16 | Google faces immediate irreparable harm if no injunction is

17 | issued here.  If that happens, it will be right back in the

18 | position that it was in before it brought this case under

19 | threat from the Attorney General doing things that were

20 | limiting.  Information was provided in order to try to put them

21 | off, calm them down.  We would be right back under the very

22 | coercion that the First Amendment precludes, that the

23 | Communication Decency act precludes.

24 | Once again, I have to make that choice.  Do I limit my

25 | constitutional protected and statutorily protected behavior or

1    do I risk that he brings this case?  And that would claim to

2    chill Google's speech rights by itself.  That's not enough to

3    establish irreparable harm and would also deny Google its

4    immunity under -- at least the benefit of the immunity provided

5    by federal law.  And *Elrod v. Burns* says if you are losing

6    constitutional rights, even for a little while, that's

7    irreparable harm and you know we have a documented concrete

8    record of the chilling effect these threats have and will

9    continue to have if no preliminary relief is granted.

10          The same is true, I think, as to the subpoena.  The

11   subpoena, after all, is one of the tools that the Attorney

12   General is using to coerce us to give up our federally

13   protected rights.  Leaving that subpoena in place will subject

14   us to the very coercion that we're trying to avoid by bringing

15   this case.  And leaving that subpoena in place would deny

16   Google the protection of the Communications Decency Act against

17   the burdens of defending against claims that should never have

18   been brought in the first place, the burdens of discovery that

19   many courts have recognized that the CDA protected.

20          So that's what we have on the irreparable harm side of

21   the equation from Google.  Again we have the Attorney General,

22   what's his harm if the court grants preliminary relief.  And

23   the answer is essentially none.  Preliminary relief would

24   simply continue the status quo, and the preliminary injunction

25   we're seeking is no different from the consent order that's

1    already been in place for months.  It would preclude him from

2    bringing a case that's he's threatened based on our display of

3    third-party content on search and YouTube and the like, and it

4    would enjoin him from enforcing his subpoena.  But that's it.

5    He remains free to conduct any investigation he wants that is

6    properly within his jurisdiction.  If he could bring a case,

7    bring it, but all the injunction does is put on hold to bring

8    the case that he's threatened until the court can reach a final

9    judgment as to whether that threatened case is unlawful and is

10   prejudiced at all.

11         We need to talk about the public interest here too.

12   The public has a very strong interest in free access to

13   information on the Internet.  Congress has declared that to be

14   national policy, that he entered -- that Congress has declared

15   a national policy that the Internet be unfettered by state

16   regulation, and there are plenty of cases, and we have cited

17   them, that protection of constitutional interest is always in

18   the public interest.

19         Now, I expect to make here when the Attorney General

20   stands up that, well, you have gotten this amicus brief from

21   the some other Attorneys General who are suggesting there's

22   some more broad threat to the power of Attorneys General to do

23   their jobs.  I don't think that's right here.  You know, first

24   of all, I would note that I think there may be 11 or 12

25   Attorney Generals who signed that brief.  That means that three

1    quarters of the Attorney Generals didn't.  And I think there

2    could be -- if there was a serious threat, the ability of the

3    Attorney General to do their jobs wouldn't have three quarters

4    completely sitting on the sidelines.

5        In that brief -- if what we were asking for was

6    complete immunity from all scrutiny, then that brief would make

7    some sense.  But that's not what we're asking for.  We're

8    objecting to this subpoena and this threatened prosecution.  On

9    this subpoena, the Attorney General stands completely alone.

10   There's nobody else.  We saw in some of those bullets that I

11   put up before that there was an effort to get other people to

12   join in this subpoena.  But he stands alone.

13       I think if you consider that, consider whether the

14   injunction we seek would really impair the ability of attorneys

15   to do their job, is it going to impair the ability of Attorney

16   Generals to do their job to enjoin a subpoena entirely -- that

17   is so heavily focused on immunized conduct?  I think a 79-page

18   subpoena apparently drafted by the Motion Picture Association

19   that's trying to build an investigation into conduct that's

20   immunized, really enjoining an act is going to stop attorneys

21   general from doing their job from all areas when they do it

22   perfectly lawful within their jurisdiction, I just don't think

23   that's credible.

24       I just want to wrap up my remarks by talking about

25   what I think that is at stake here.  The power of Attorneys

 1    General is not at stake at all.  That will continue.  But there

 2    are serious things at stake here.  The Internet is an amazing

 3    thing.  It has put at our fingertips an unbelievable amount of

 4    information.

 5         When I started as a federal prosecutor in 1996, the

 6    notion that you could sit down at your desk and just by typing

 7    in a few words get access to, you know, all of the world's

 8    information essentially in an eighth of a second for free would

 9    have been unimaginable.  But, you know, the Internet revolution

10    has brought that to us.  And, you know, if Internet service

11    providers that have search engines can go to jail, as the

12    Attorney General has threatened, for making third-party content

13    available, that world is going to change because if search

14    engines risk felony convictions for making third-party

15    information available, they have no choice but to screen

16    information before they make it available.

17         And, you know, as I mentioned before, we are talking

18    about 20 billion websites reviewed every day.  There aren't

19    enough people in the world to prescreen that.  So it is

20    inevitable that people go to jail for making third-party

21    content available on the Internet, that search engines are

22    going to have to dramatically reduce the amount of information

23    that they provide because they just can't prescreen everything.

24    So the inevitable result of this would be a dramatic reduction

25    in the amount of information available.

1          I'm not disputing for a second that some of the

2    information that can be found on Google is unpleasant and it is

3    objectionable.  There's no question about that.  But the

4    Supreme Court held in *IMS v. Sorrell* -- and I'm going to give a

5    quote, Judge, "The choice between the dangers of suppressing

6    information and the dangers of its misuse if it is freely

7    available is one that the First Amendment makes for us."  It

8    is what Congress also made for us when it passed the

9    Communications Decency Act so as to make the Internet

10   unfettered from state regulation.  So I think that's what's at

11   stake here.

12          These are serious and important issues, and we

13   respectfully ask that the court deny the Attorney General's

14   motion to dismiss and that the court grant our request of a

15   preliminary injunction to preserve the status quo so the court

16   can decide these very substantial issues.

17          THE COURT:  Thank you.  We'll take a 15-minute recess.

18     (Recess)

19          THE COURT:  During the recess, the IT technician came

20   up and checked the microphone and he discovered that the

21   microphone was really not on.  So you did not transgress.  It

22   was an electronic matter.

23          MR. NEIMAN:  If there's anything I need say again --

24          THE COURT:  I heard you on everything, but she has to

25   hear it through her devices here, and she was having some

1   problems picking it up because she has her headphones on and it

2   comes directly through the microphone.  And so it was not

3   coming through always clearly.  I heard everything you said.  I

4   didn't have any problems whatsoever, but because she has these

5   headphones on then, she is dependent on the faithful operations

6   of the sound system and it was not on.

7          And so our tech came up during the break and just

8   checked it and just finished giving me a report on the sound

9   system so that we'll be sure that we wouldn't have the

10  difficulty again.  But, again, I heard everything that you had

11  to say.

12         MR. KRUTZ:  Your Honor, we don't mind calling it a

13  dress rehearsal, and we can do it again.

14         THE COURT:  Thank you so much.  All right.

15         MR. MIRACLE:  Thank you, Your Honor.  I trust you can

16  hear me now.

17         THE COURT:  Absolutely.

18         MR. MIRACLE:  Your Honor, thank you.  Just as

19  Mr. Nieman started his presentation by saying he wanted to take

20  a step back and talk about some things, I too want to take a

21  step back.  Because while he touched on the jurisdiction of

22  this court and seemed to indicate that it was *fait accompli*

23  that the court has such jurisdiction, I do want to spend a

24  little bit of time because I think if you unpack the theories

25  under which they have come to the federal court, I think it

1    will be clear that there is no federal subject matter

2    jurisdiction here.

3         And so it against that backdrop I want to say that I

4    think what you heard this morning was what we're dealing with

5    here is an ongoing state law investigation by the Attorney

6    General, and the record in the papers lays out that history of

7    when that -- when this really started in earnest some time in

8    2012.

9         But that's what we're dealing with here.  We're

10   dealing with an investigation, an investigation that has not

11   been completed.  And we know it's not been completed because

12   Google has not responded to the subpoena.  And one thing that

13   was suggested this morning was that Google had to chose between

14   one or two paths, either risk being sued or he spent most of

15   his time talking about federal -- about prosecution.  But, you

16   know, there's an entirely different component to this as well

17   and that's a civil action that was not touched upon, which is

18   certainly something that's available under the Mississippi

19   Consumer Protection Act.

20        So I don't -- I think the fact that a lot of what you

21   heard this morning was talking about alleged threats of

22   prosecution.  I think we need to keep in mind that under the

23   Act, civil liability is certainly one of the paramount things

24   that the Attorney General is charged with enforcing the

25   consumer protection laws of this state.

1          And I'll touch on this a little bit more when I talk

2     about the merits and the public interest; but, you know, I'd

3     like to frame this at the outset that while it was suggested

4     that there's no harm to the Attorney General, his duty is to

5     protect the consumers of the state of Mississippi, and that's

6     what he's been doing.  And so I think it's really important

7     that we remember it's the average consumer that the Consumer

8     Protection Act of the state of Mississippi is designed to

9     protect.  So that interest is paramount because that's what

10    started this investigation.

11         So we have an investigation that's not completed.  We

12    have a subpoena that's not been responded to.  And while it was

13    suggested that they had to choose between one of two paths,

14    come to federal court or risk litigation, they left out the

15    obvious one, and that was they could have moved to quash this

16    subpoena in state court.  And the way this statutory mechanism

17    is set up, these civil investigative demands or as the subpoena

18    itself is an administrative subpoena and subpoena duces tecum,

19    that statutory provision requires the Attorney General, if a

20    party -- in this case Google -- doesn't comply with the

21    subpoena, that he has to go enforce that in state court.

22         That means this subpoena is enforceable only in state

23    court.  It was issued pursuant to state law, and it's

24    enforceable only under state law.  They didn't do that.

25    They've said we only -- we had one of two choices, either risk

1   litigation or we've got to come to federal court.  That wasn't

2   their only choice.

3        And the Attorney General worked with them after the

4   subpoena was issued.  We know that the Attorney General

5   voluntarily agreed to extend the subpoena deadline from

6   November 21st to January 5th in an effort to continue to

7   resolve this state matter.  What did Google do?  In the

8   interim, on December 19th, several weeks before the subpoena

9   was even due, they filed this lawsuit.  So I don't think it's

10  accurate to say their only two chooses were to risk litigation

11  or come to federal court.  They had another option.  The option

12  that was most logical for a state court to interpret state law

13  and enforce -- or not enforce this subpoena.

14       Google as to the subpoena essentially is asking Your

15  Honor to file -- they have effectively filed a motion to quash

16  as to the subpoena, and they are asking Your Honor to make a

17  determination at this juncture whether or not that subpoena is

18  enforceable under state law.  And we would submit that is not

19  only not the role of the federal court.  It is premature

20  because the investigation is ongoing, but this whole lawsuit is

21  premised on Google's unilateral interpretation of what they say

22  is in the subpoena and what the Attorney General might do with

23  that information, if it ever received the information.

24       They are saying, no, what we should be able to do is

25  define what we say is in the subpoena, despite the fact that it

covers a number of different issues, which I'll go through

briefly with the court in a little while, and say, *We can tell*

*you, Your Honor, that conclusively everything in this subpoena*

*would somehow be precluded, preempted by federal law.*  None of

those things confer federal subject matter jurisdiction.

So while Google has made at least four different

arguments in support of subject matter jurisdiction, if you

unpack each one of them, there's no jurisdiction.  They first

say that federal courts have jurisdiction over suits to enjoin

state officials from interfering with federal rights.  And in

the abstract, that's true.  And they cite the *Shaw* case, which

cites *Ex Parte Young* for that proposition.  But you have to

look at the specific circumstances when a federal court can

take such action.  Merely alleging does not automatically

confer subject matter jurisdiction.

They next say that Section 1983 creates a federal

cause of action against those who interfere with federal

rights.  We know from a long line of cases that 1983 does not

create any federal rights.  It only provides a procedural

mechanism to enforce other existing rights.

Then they say the First and Fourteenth Amendment

create federal rights which the states may not interfere.

Again, a general abstract proposition may be true, but we have

to look at the specific facts.

And then finally they say federal statutes that

1    preempt state law, like the Communications Decency Act,

2    Copyright Act and the Food & Drug Cosmetics Act preempt any

3    claims that the Attorney General might bring in the future as a

4    result of his investigation.  So just to get here today, we

5    have to string about three "what if"s together.  What if the

6    Attorney General's investigation continues, and what if as a

7    result of that investigation the Attorney General at some point

8    in the future makes a decision that there is a basis under the

9    Mississippi Consumer Protection Act to institute some type of

10   legal action and then does so and then at that point that there

11   might be an actual complaint, then some of these defenses that

12   Google has raised may be just that, defenses.  But they don't

13   give entrance to the federal courthouse.

14          Now, you heard a lot of discussion about the

15   Communication Decency Act, and service providers like to talk

16   about the broad immunity that it provides.  And the cases are

17   clear as to what it does and what it doesn't protect.  And so

18   the Communications Decency Act really fall into two buckets.

19   There's activity that immunizes Internet providers such as

20   Google from suit, and then there's a second bucket, activity

21   that is not immunized.  And we cite the cases in our papers

22   that show where motions to dismiss by Internet service

23   providers, including Google, have been denied, where the issue

24   was whether or not the conduct was for actions that were not

25   immunized.

1          So we know the CDA is not a complete immunity statute.

2     We also know that the CDA is not a complete preemption statute.

3     The reason this is critical for the jurisdictional analysis, as

4     to the CDA, as to the Copyright Act and as to the Food & Drug

5     Act, is that the only way preemption can establish federal

6     subject matter jurisdiction is if it's complete preemption.

7          We cite a line of cases which has long been held,

8     *Caterpillar v. Williams*.  The supreme Court says that complete

9     preemption is the basis for invocation of federal subject

10    matter jurisdiction.  Under the Complete Preemption Doctrine,

11    the court has concluded that the preemptive force of a statute

12    is so extraordinary that it converts an ordinary state common

13    law complaint into one stating a federal claim.

14         Now, there's two problems here with their preemption

15    argument.  Number one, we don't have a state court complaint

16    for jurisdictional purposes to even analyze.  They want you to

17    analyze a subpoena and say, *Based on our interpretation of the*

18    *subpoena we think everything in it is preempted and that*

19    *provides jurisdiction.*

20         Well, the CDA is not a complete preemption statute.

21    In fact, Section 230(e) of the CDA says, "Nothing in this

22    section shall be construed to prevent any state from enforcing

23    any state law that is consistent with this section."  So

24    Congress did not intend the CDA to preempt every consumer

25    protection statute.  It certainly doesn't preempt the

1   Mississippi Consumer Protection Statute, and most importantly,

2   Google does not allege that the Mississippi Consumer Protection

3   Statute or any part of it is preempted.  They don't allege that

4   the Consumer Protection Act is facially or as applied is

5   unconstitutional, which is also significant.

6       They talk about the Attorney General's inquiry.

7   That's the term of art they use repeatedly throughout their

8   papers, the Attorney General's inquiry.  And they couldn't --

9   and they know they couldn't argue that the Consumer Protection

10  Act is unconstitutional, and they don't allege that it's

11  preempted.  They just talk in generalities about the CDA

12  provides broad immunity, and they say that parts of the

13  subpoena may be preempted by the Copyright Act, or parts of it

14  may be preempted by the Food & Drug Act.  For jurisdictional

15  purposes, that is not complete preemption.  So we would submit

16  all of these arguments about the CDA when we're talking about

17  subject matter jurisdiction they have not met that.

18      We cite *Franchise Tax Board* to the court.  *Franchise*

19  *Tax Board* and the *Shaw* decision, which they rely on in their

20  papers they were actually decided on the same day and they were

21  sort of looking at two sides of the same coin.  When in

22  *Franchise Tax Board*, the state -- in that case, the state was

23  seeking to regulate some activity, and the party raised the

24  defense and they said, *Well, you have to look at the character*

25  *of the state complaint, not at the character of the federal*

1    *defense.*

2          As far as subject matter jurisdiction and Google's

3    arguments, I've already touched on the *Shaw* decision.  We

4    addressed these cases in depth in our brief.  They talked about

5    *Morales*.  And I want to address *Morales*.  In *Morales*, the

6    National Association of Attorneys General issued some

7    guidelines following airline deregulation, and those guidelines

8    addressed specific things such as the regulation of fares,

9    routes, advertising.  Well, when it made its way to the Supreme

10   Court, the Supreme Court said, *We have no trouble in saying*

11   *that those written regulations are expressly preempted by the*

12   *Airline Deregulation Act.  The provision in the Airline*

13   *Deregulation Act said that states shall not be a able to*

14   *regulate fares, routes, rates, et cetera.*  That's not this

15   case.

16          Google also relies on the *Cuomo* decision.  That is a

17   case where the Attorney General of New York was enjoined in an

18   investigatory phase.  The Attorney General had made demand on

19   national banks in lieu of a subpoena for documents.  Several of

20   the banks sought an injunction and said, *Under the National*

21   *Banking Act and the regulations interpreting the National*

22   *Banking Act issued by the comptroller of the currency,*

23   *visitorial powers are expressly preempted by the National Bank*

24   *Act.*  And it's also worth noting that the National Bank Act --

25   I believe Section 1985 of the National Bank Act -- the National

1    Bank Act is one of the three statutes that the Supreme Court

2    has held expressly preempts and completely preempts state law.

3    So the Attorney General's action in that case by asking for

4    that information ran squarely into the express preemption of

5    the National Bank Act.  That's not this case.

6           They can't point to any particular statute, not the

7    CDA, not the Copyright Act, not the Food & Drug Act that says

8    that the Attorney General's activity in issuing a subpoena

9    under state law is preempted.

10           They cite to the *Crist* case, *Major League Baseball v.*

11    *Crist*.  In that case, the Attorney General sought to subpoena

12    documents from a major league baseball team concerning the

13    business of baseball.  Major league baseball enjoys federal

14    antitrust exception status.  They are not subject when it comes

15    to the business of baseball from federal antitrust regulation.

16    In that case, the court said, *We can see on the face this*

17    *complaint -- on the face of this subpoena that it is only*

18    *seeking information related to the business of baseball, and*

19    *because that activity is perfectly legal under federal law,*

20    *we're not going to let you investigate under state law.*

21           That was a facial determination as to that subpoena.

22    They can't make a facial -- they cannot make that facial

23    argument.  And while they try to say and suggest to the court

24    that you can look at this 79-page subpoena and find that it is

25    facially preempted, that's simply not the case.

1                  They also cite some cases that the court has

2     jurisdiction under the supremacy clause.  They site *Planned*

3     *Parenthood of Houston v. Sanchez*.  In that case, the court

4     held -- the Fifth Circuit held that there was a private right

5     of action where a state law purportedly conflicts with the

6     federal statute.  We don't have that situation here.  They do

7     not contend that state law conflicts with the federal statute.

8     They talk about the Attorney General's inquiry.

9                  So these cases they cite for the proposition that the

10    court has jurisdiction, all the cases they cite involve a

11    conflict between federal and state law or where a party has

12    moved or challenged directly the constitutionality of a

13    statute.  Specifically, they cite three different cases

14    involving Backpage*:  Backpage.com v. McKenna*, *Backpage v.*

15    *Cooper* and *Backpage v. Hoffman*.

16                 In all of those cases, it dealt with a situation where

17    the plaintiff challenged the constitutionality of the state law

18    as it related to the sale of certain sexually oriented

19    advertisements.  Again unlike Backpage, Google does not

20    challenge the constitutionallity of Mississippi's Consumer

21    Protection Act or any other act.  They simply want to stop the

22    Attorney General's inquiry.  That's not the basis for federal

23    subject matter jurisdiction.

24                 Google also cites *Braniff v. Florida Public Service*

25    *Commission*.  And in *Braniff*, it's the same thing.  It was a

1    challenge to a state statute, challenge that they sought an

2    injunction saying the state statute was unconstitutional under

3    federal law.  They do not do that here.

4           Now, they make an interesting argument in a footnote

5    to their brief, and they say that -- in fact, they say,

6    "Google's complaint alleges that in applying the MCPA," the

7    Mississippi Consumer Protection Act, "to bar Google from making

8    third-party content available to Internet users violates the

9    First Amendment and is preempted by the CDA.  And they cite to

10   several paragraphs of their complaint that they allege stand

11   for that proposition.  They do not allege anything infirm about

12   the Mississippi Consumer Protection Act.  They don't challenge

13   the Attorney General's authority to issue a subpoena under the

14   act.  They object to the scope of the subpoena, and that's why

15   I said earlier, this is essentially a motion to quash, which

16   should be litigated in state court.

17          They concede that the Attorney General has the

18   authority to issue this subpoena.  You heard earlier this

19   morning that they asked that it be scaled back.  There again,

20   that completely undercuts any argument that they can say the

21   subpoena is preempted.  They don't challenge any aspect of

22   state law as being preempted by any of the federal regulatory

23   framework.  As I said, they allege that the First Amendment --

24   1983 gives them a basis, but 1983, as Your Honor well knows, is

25   only a procedural vehicle to support another constitutional

1   claim.

2          You heard a lot about the First Amendment, a lot about

3   threats, and a lot of intimidation and the like.  Google says

4   that the Attorney General's threats of litigation have chilled

5   their speech and the subpoena was issued in retaliation for

6   Google not removing content that the Attorney General claims --

7   that he claimed were deemed unlawful.  First off, general

8   threats by governmental officials to enforce those laws which

9   they are charged to administer do not create the necessary

10  injury in fact for this type of First Amendment challenge.  We

11  have cited the court to those cases in our papers.

12          Furthermore, initiation of criminal investigation in

13  and of itself does not implicate a federal constitutional

14  right.  Further, the constitution does not require evidence of

15  wrongdoing or reasonable suspicion by suspect before the

16  government can begin investigating.  But, here again, they are

17  asking the court to tell the Attorney General that he cannot

18  investigate as it relates to this subpoena that they want to

19  say somehow might be preempted or they might have defenses to

20  later on.

21          Google alleges that these threats constitute chilling

22  and that as a result they took action, as he suggested, to

23  mollify, I think was the term that was used.  And he also said

24  that the absence of evidence from the side of the Attorney

25  General on this point was deafening, that the only evidence in

1    the record is evidence of chilling.

2           Now, the two affidavits that were submitted by Google

3    employees were submitted in response to the Attorney General's

4    motion to dismiss where the Attorney General suggested that

5    there had been no demonstrated showing of any injury as a

6    result of their alleged chilling claim.  But, in fact, it's

7    Google's own correspondence to and from the Attorney General

8    that provides the evidence that the court should look at in

9    terms of exactly how Google viewed its interactions with

10   General Hood as well as other Attorneys General that were

11   taking part in these discussions.  I'm going to have to do this

12   the old fashion way.  I don't have anyone assisting me with my

13   technology.

14           THE COURT:  All right.

15           MR. MIRACLE:  This was a letter that was sent to

16   General Hood on June 26, 2013.  The affidavit that was

17   submitted in response to the motion to dismiss, stated starting

18   in April of 2013 General Hood's actions were having a chilling

19   effect on Google.  But if you look at what Google is telling

20   General Hood, in the second -- third full paragraph, second

21   sentence, "Google has voluntarily and in good faith made

22   considerable strides in addressing the kind of issued raised at

23   your meeting."  This is after the chilling conduct allegedly

24   started.  "Google has voluntarily and in good faith."  I don't

25   think that suggests chilling.

1           Now, it might be argued and it was suggested this
2    morning that these steps were being taken to mollify the
3    Attorney General, but I think the clear language shows that
4    Google knows there was steps that needed to be taken and should
5    have taken and were taken at the prompting of Attorneys
6    General.
7           This is the same letter of June 26, 2013.  Last
8    sentence in the first paragraph, "Google has also voluntarily
9    and without prompting restricted advertising related to health
10   supplements, weight loss drugs, and anabolic steroids."  Again,
11   Google is recognizing in discussions with the Attorney General
12   that there are steps that need to be taken, and what are now in
13   litigation being couched as threats in the correspondence
14   during the earlier phases of this were clearly Google's own
15   words saying, we recognize these things need to be done and
16   we're doing them and we're doing them at our own prompting.
17   We're not doing them because you're threatening us.
18          This is a letter dated February 21, 2014, almost a
19   year after the affidavits indicate or suggest that there was
20   some type of chilling effect.  And this is a letter from
21   Mr. Kent Walker to General Hood and other Attorneys General in
22   response to correspondence from them.
23          On page 2 of this letter under "additional steps,"
24   Google is advising General Hood and the other Attorneys General
25   that "Moreover, I am pleased to be able to tell you that Google

1    has already taken steps directly in response to some of the

2    specific concerns you've raised."  "I am pleased to be able to

3    tell you," does not sound like the type of chilling that's

4    being arguing here.

5         Let's look at exactly what it is that they were glad

6    to tell the Attorneys General.  "Given your feedback in Denver,

7    we expanded our autocomplete policies to cover even more

8    predictions relating to the sale or promotion of dangerous and

9    illegal activities, including drugs, (prescription or illegal)

10   slavery and sex trafficking, murder and terrorism.  We have

11   since removed over 1200 predictions from autocomplete,

12   including things like how to become a drug dealer, how to get

13   away with robbing a house, and buy slaves, among others."

14        Those are things that Google recognized, rightly so,

15   that needed to be done.  No chilling shown in this evidence.

16   This is before suit was filed.  This is the evidence that the

17   Attorneys Generals were working with them.  They were asking

18   that things be done that were pointed out to them, and there

19   are obviously areas that needed to be done.

20        We'd like to back up and just now where this really

21   started.  You didn't hear anything about it this morning but in

22   2011 Google entered into a nonprosecution agreement with the

23   federal government.  That's an exhibit to our brief.  And you

24   heard a lot of discussion about there's nothing that the

25   Attorney General can investigate Google for under Mississippi

1  law that wouldn't be covered by one of their federal defenses.

2  That's just not true.

3        In the nonprosecution agreement, Google admitted that

4  it helped optimize the advertising campaigns for illegal

5  pharmaceutical sales.  From 2013 to 2009 Google provided

6  customer support to some of the Canadian online pharmacy

7  advertisers to assist them in placing and optimizing this

8  ad-word advertisements and improving the effectiveness of their

9  websites.  And the way the federal government uncovered some of

10  this was through e-mails between Google employees and the

11  Canadian pharmacies.

12        While we're not here talking about the specifics of

13  the nonprosecution agreement, what we are here talking about is

14  the kind of conduct sought in the subpoena that make similar

15  kind of conduct that Google is assisting or facilitating or

16  doing something that may be in violation of the Mississippi

17  Consumer Protection Act.  All you've heard is that everything

18  in the subpoena is related to third-party content, which is

19  immune under the CDA.  We don't dispute what the CDA says.  We

20  don't dispute what the cases say about the CDA.  What we do

21  dispute is that the subpoena does not only ask for information

22  that would go to protected content of the CDA.

23        The nonprosecution agreement itself shows that without

24  this kind of information, this kind of conduct would have never

25  come to light.  And it's no secret, and Google attached the

1    nonprosecution agreement to their papers.  It's no secret they

2    paid $500 billion to resolve that litigation.  And while they

3    didn't discuss it this morning, they attached a PowerPoint

4    presentation that General Hood did in 2013 where General Hood

5    made a presentation to the National Association of Attorneys

6    General showing the kind of conduct that he was concerned

7    about.

8            And he showed where investigators from the Mississippi

9    Attorney General's office were able to make illegal drug

10   purchases, drugs without prescriptions, through ads placed on

11   Google platforms.  I don't see that to rehash old issues, but

12   once the Attorney General started to see this kind of

13   information and see the ability to buy counterfeit material, to

14   buy potentially counterfeited drugs, then, yes, he had a duty

15   under state law to start investigating that more vigorously,

16   which is exactly what he did.

17           So this notion that everything in the subpoena somehow

18   magically falls into some preemptive federal statute couldn't

19   be further from the truth.  And we have submitted as part of

20   our papers screenshots that our investigators were able to do.

21   Those were actually done on December 17th of 2014, showing

22   particularly on the YouTube platform monetized ads where an ad

23   appears out in the right-hand column next to a video that may

24   be showing what is illegal content.  And Your Honor will see

25   those when you review our pleadings.

1        How to make crack.  How to buy fake credit cards.  How

2   to hack Facebook accounts.  Those are things our investigators

3   on December 17, 2014, were able to see, just two days before

4   this lawsuit was filed.  If those monetized ads -- if Google is

5   assisting or doing some of the things you they were doing that

6   led to the nonprosecution agreement, that clearly could give

7   rise to potential liability under Mississippi's Consumer

8   Protection Act.  That's what we're seeking here.  That's what

9   we want.

10       The CDA, as I mentioned earlier, does not protect

11   online service providers from everything.  "Service providers

12   such as Google can be held liable for various torts or crimes

13   that they themselves commit, such as fraud and

14   misrepresentation."  That comes from the *CYBERsitter, LLC v.*

15   *Google, Inc.*, cases cited in our papers.  There the court

16   denied Google's motion to dismiss on the CDA immunity holding

17   that although Google was not an information service provider

18   with respect to the ad-words advertisement at issue, the CDA

19   was inapplicable to the extent that Google engaged in tortious

20   conduct separate and apart from the contents of the ads.  And

21   there are others.

22       Now, Google's own YouTube community policy guidelines

23   say we draw the line at content that's intended to incite

24   violence or encourage dangerous illegal activities that have an

25   inherent risk of serious physical harm.  That comes from their

1    own YouTube community guidelines.  If through this

2    investigation the Attorney General finds evidence that

3    contradicts those statements, then clearly under the MPCA there

4    would be potential liability.  The Attorney General has the

5    right, the duty under the Mississippi law to investigate that,

6    and that's what he's doing.

7              So I would like to now turn to why it is Google says

8    they can come to federal court.  We have moved to dismiss this

9    complaint under 12(b)(1) and 12(b)(6) for failure to state

10   subject matter jurisdiction.  Now we know that federal subject

11   matter jurisdiction is not satisfied merely because the dispute

12   in some way is connected to a federal matter.  And we know from

13   the U.S. Supreme Court in *Wycoff* that federal courts will not

14   seize litigation from state court merely because one who is

15   normally the defendant goes to federal court to begin his

16   federal law defense before the state court begins the state law

17   case.  That's exactly what we have here.

18             Now, you're probably going hear in rebuttal about

19   *Wycoff*:  That's dicta, and that's not the holding.  But Your

20   Honor well knows from a number of cases involving declaratory

21   judgment acts that whether it's in the removal context or

22   whether it's in the anticipation of a state law case, a defense

23   to that potential state law case will not confer federal

24   subject matter jurisdiction, and we have cited a number of

25   cases in our papers.

1          Jurisdiction means the kinds of issues which gives the

2     right to entrance into federal court.  In order to confer

3     subject matter jurisdiction, a party's legal interest must

4     relate to the actual claim arising under federal law.  And

5     under *Wycoff* and its progeny *Garr*, a Fifth Circuit case, where

6     the plaintiff in the federal dec action is merely anticipating

7     what the state law plaintiff might do, that is not enough to

8     confer federal subject matter jurisdiction.  It's the

9     character -- under *Franchise Tax Board*, it's the character of

10    the state law claims, not the character of the federal

11    declaratory claims.

12         And so what would be the character of the state law

13    claims here, or the state's claims here?  They would arise

14    under the Consumer Protection Act.  It doesn't matter that

15    those claims may touch on or be related to the CDA or the

16    Copyright Act or the Food & Drug Act.  That does not confer

17    federal subject matter jurisdiction.  If the state had filed

18    its case before Google filed its dec action, the court would at

19    least have a complaint to look at to say whether or not we have

20    tried to fit ourselves into the well-pled complaint rule, and

21    the court would be able to analyze whether or not the state was

22    trying to plead around what were federal claims.  We don't even

23    have that here.  We have a subpoena that Google has interpreted

24    as giving federal subject matter jurisdiction.

25         These claims that Google has brought do not arise

1    under federal law.  They may be federal defenses if and when

2    the Attorney General files suit in state court, but they are

3    not claims arising under federal law.

4            In *Wycoff*, the court said, "The plaintiff's idea seems

5    to be that it can now establish the major premise of an

6    exception not as an incident of any present declaration of any

7    specific right or immunity but to hold in ready for use should

8    the commission at any future time attempt to apply any part of

9    a complicated regulatory statute to it."  That's exactly what

10   Google is asking you to do, Your Honor.  They are asking you to

11   issue an injunction over a subpoena over a suit that has not

12   yet been filed and declare that the Attorney General will be

13   forever foreclosed from further investigating Google as it

14   relates to that subpoena or from filing suit.

15           The court in *Wycoff* said --

16           THE COURT:  Say that again.

17           MR. MIRACLE:  I'm sorry?

18           THE COURT:  Say that again, what you are contending

19   that Google is asking here.  I didn't read their request to go

20   that far.

21           MR. MIRACLE:  They are certainly asking Your Honor to

22   enjoin any further -- as it relates to the application of this

23   subpoena.  They are asking you to declare their rights that the

24   Attorney General cannot enforce that subpoena.

25           THE COURT:  At present.

1          MR. MIRACLE:  At present.  Before it's even been

2     enforced under state law, for that matter.

3          THE COURT:  But I didn't read that request to say that

4     Google is asking this court to forbid any further inquiries or

5     investigation but to hold the matter in stasis until the court

6     can hear some of these matters on the merits.

7          MR. MIRACLE:  Well, certainly the relief they are

8     requesting is that the court declare the subpoena invalid for

9     the various federal defenses that they have raised.  In the

10    short run, yes, they certainly want you to hold it in stasis.

11    But obviously the relief they are seeking is a declaration that

12    the subpoena and the Attorney General's investigation have to

13    be stopped.

14         THE COURT:  So then what is your position as to

15    whether any of the inquiries in the subpoena violate the CDA?

16         MR. MIRACLE:  I think that begs the jurisdictional

17    question, Your Honor.  And I would like to point the court's

18    attention to the *NOPSI* as it's referred to, the *New Orleans*

19    *Public Service Commission* case where the Supreme Court

20    addressed this issue in the context of *Younger* abstention.  And

21    one of the arguments that was raised there was that the court

22    should take a look and see -- at the issue to see whether or

23    not it was preempted.  And the Supreme Court said that which

24    the court has to look at and determine factually, that it can't

25    be complete preemption.

1        So if Your Honor has to get to the point of looking at

2  the subpoena to see whether there are things in it that are or

3  aren't part of CDA or other, they lose.  There's no complete

4  preemption.  If the court has to make a factual determination

5  for jurisdictional purposes, then there is no preemption, and

6  there is no subject matter jurisdiction.  So the answer to the

7  court's question would be my position is there's no subject

8  matter jurisdiction.  The court should not get to the question

9  of what parts of the subpoena are preempted or not preempted.

10  That would beg the entire question, and that's why we're asking

11  the court to dismiss the case in the first instance.

12        A state court -- if they want to raise these issues in

13  state court, the state court should decide -- and they will

14  have the opportunity raise those in state court -- whether or

15  not they have a defense to some of these issues.  So that's

16  why -- what we are really doing here is arguing a motion to

17  quash a subpoena before there's been a determination that

18  subject matter jurisdiction has been conferred.

19        I hope that answers the court's question, but that's

20  my contention is the mere fact that the court would have to

21  look and see whether or not some of these things are preempted

22  or not precludes a complete preemption analysis for subject

23  matter jurisdiction purposes.

24        THE COURT:  Well, let's look at the CDA.  The Attorney

25  General of Mississippi was one of the signatories to a letter

1    dated July 23rd, 2013, that was addressed to Senator

2    Rockefeller, Senator Thorne, Representative Upton and

3    Representative Waxman.  Do you agree with that, that he was

4    among other Attorney Generals who authorized this particular

5    letter or at least signed it?

6              MR. MIRACLE:  Yes, Your Honor.

7              THE COURT:  Does this authorship or signatory by the

8    Attorney General weaken your argument here about the thrust and

9    the breadth of the CDA?

10             MR. MIRACLE:  No, Your Honor, I don't believe it does.

11   And I think the cases are manifestly clear that the CDA -- the

12   activity under the CDA can fall into either protected or not

13   protected conduct.  So I want to make sure I'm clear in my

14   articulation of why at the subject matter jurisdiction

15   preemption phase the CDA doesn't get them into federal court.

16   There's no complete preemption.  The only argument they have

17   made is they have made a determination that the subpoena only

18   asks for things that they say would be preempted, and they try

19   and couch that in terms of everything in the subpoena relates

20   to information posted by third parties.

21             We're still in the investigation stage.  They don't

22   get to make that determination.  The Attorney General has

23   issued a subpoena.  It is enforceable under state law.  If they

24   want to make those claims, then they should litigate that in

25   state court where that should be adjudicated before we get to

1    the -- so if we're arguing over the scope of the subpoena and

2    whether or not certain things are preempted or not preempted or

3    immunized by the CDA, that conversation would be had in state

4    court.

5            THE COURT:  I'm looking at the immunity provided by

6    the CDA and whether any such immunity prohibits the conduct of

7    the Attorney General here.

8            MR. MIRACLE:  No, Your Honor.

9            THE COURT:  So I'm looking at the content of the

10   letter which seems to suggest that the CDA ties the hands of

11   the Attorney Generals in the same regards you're arguing and

12   that instead the Attorney Generals who signed the letter are

13   requesting an amendment to 47SC Section 230(e)(1) and that this

14   amendment, if adopted, would then say that nothing in this

15   section shall be construed to impair the enforcement of

16   Section 223 or 231 of this title, Chapter 71 relating to be

17   obscenity or 110 relating to sexual exploitation of children of

18   Title 18 or any other federal or state criminal statute.

19            Now, does this letter signed by the Attorney General

20   of Mississippi, among others, weaken your position here as to

21   the reach of the CDA?

22            MR. MIRACLE:  No, Your Honor, I don't disagree with

23   what the CDA immunizes.  And I think the cases have been pretty

24   clear about what the CDA does and doesn't immunize.  So I don't

25   think the fact that they are requesting some changes undermines

1   our position, and I think it's important -- I think Your Honor

2   asked about does the CDA limit the ability of the Attorney

3   General's inquiry here.  And one thing I want to point out is

4   nothing in the CDA preempts an investigation by the Attorney

5   General.  So at the stage we are in right now, which is the

6   investigatory stage, nothing in the CDA stops the Attorney

7   General from investigating.

8           And the way this process should work, if Google

9   objected to the subpoena, they could have gone into state

10  court.  Now, if they didn't respond, the Attorney General has

11  the option under the statute to go to the Hinds County Chancery

12  Court and enforce that subpoena.  When I indicated in our

13  papers that this is not a self-executing subpoena, that simply

14  means that if the party in this case, Google, doesn't respond

15  or chooses not to respond, they are not held in contempt.

16  There's no legal consequence.

17          Then the Attorney General has to go to chancery court

18  and enforce that subpoena at which time Google would have an

19  opportunity to raise these very issues.  That's the way this

20  should have worked, not to come to federal court and try to

21  stop an investigation before it has been concluded, before they

22  have had to turn over any documents.  So I don't think the

23  letter, and I don't think the interpretation of the CDA has any

24  impact at the investigatory stage of where we are right now.

25          THE COURT:  Is it the position of Google that the

1   Attorney General here cannot commence such an investigation if

2   Google's activities are protected by the CDA -- and one other

3   thing, and that to intrude at this point then would amount to a

4   diminution or at least a violation of the particular broad

5   immunity that's allowed Google in this context?

6          Now, I was asking you whether this letter that was

7   signed by the Attorney General here weakens your position here

8   with regard to the reach of the CDA.  Does the CDA then

9   immunize in such a fashion that would broadly prohibit the

10  investigation into areas that are already immunized?  And if

11  that is the case, then the inquiry is forbidden.  So with

12  regard to what the Attorney General here signed, did he not

13  sign the letter which says that the CDA has broad proscriptions

14  with regard to prosecutions of Google with regard to the

15  matters here?  So what's your response to that?

16         MR. MIRACLE:  My response to that would be twofold.

17  First I think the case would be different if we were here

18  having filed a lawsuit in state court which then Google

19  presumably would have removed and claimed the same CDA

20  immunity.  In that case, the court would have a specific set of

21  facts to look at.  The court would have a specific set of

22  causes of action to look at.  And the defenses -- but I think

23  the distinction I'm trying to draw is that in the investigation

24  stage for a party to be able to say, We've looked at the

25  subpoena, we've decided that everything you're asking for is

1    immunized and that we're going go to federal court and get an

2    injunction to keep you from any further investigation, I don't

3    think any case or any reading of the CDA has any restrictive

4    effect on the investigation.

5         I mean, Google has already assumed that if they comply

6    with the subpoena and if they turn over documents, they've

7    already then assumed a lawsuit is going to be filed before the

8    Attorney General has had the opportunity to even make that

9    decision.  So my response to the question is, A, I think it

10   would be different if we were looking at an actual complaint

11   and an actual concrete set of facts that the court would be

12   able to look at and say as a matter of law those are -- Google

13   is immunized from that.

14        But how can we say -- we don't have documents.  We

15   don't have anything to look at to say whether or not this

16   particular type of conduct falls in or outside the CDA's

17   immunity.  I don't think Google contends that the CDA immunizes

18   it from every single bit of activity.  Courts have dismissed

19   claims where there is at least the argument that the activity

20   is of their own potential fraud or misrepresentation, not just

21   hosting third-party content.

22        So that's when I started my conversation off earlier

23   about the two buckets.  We have bucket of immunized activity,

24   which I don't dispute, but there is a potential that there is

25   another bucket of activity that's not immunized.  So the

1    impairment of the investigation at this point to say, You can't

2    even look, you can't even ask whether or not there's

3    information that may lead to unimmunized activity I think is

4    completely improper.

5           THE COURT:  So what was the purpose of this letter?

6           MR. PIZZETTA:  I think the purpose of the letter was

7    that obviously the Attorneys Generals collectively wanted to

8    see changes made to the CDA.

9           THE COURT:  Changes made to what?

10          MR. MIRACLE:  Well, even as written, I think -- and I

11   can't speak for the other Attorneys Generals.  But even as

12   written --

13          THE COURT:  Well, just speak to the letter itself

14   that's signed by the other Attorney Generals.

15          MR. MIRACLE:  I think the Attorney Generals are trying

16   to enforce their consumer protection and other laws, criminal

17   laws and otherwise, I'm sure from their perspective feel like

18   it does provide a limitation in some respects.  But that

19   doesn't mean there aren't areas that they can't probe into.  So

20   I don't think the fact that they were asking that there be

21   changes made and whether it was in reaction to court decisions

22   that were coming out and how the CDA was being interpreted.

23   But the point is important to stay -- from our perspective to

24   stay focused on is that at this stage of the proceedings how is

25   the court going to make a determination based on this subpoena

1   that there's not a single piece of information out there that

2   could be responsive to the subpoena that would not fall under

3   the CDA immunity.

4          That's our primary objection here.  We simply want to

5   conduct an investigation.  And if Google objected to the

6   subpoena, we could have had that conversation in state court.

7   But to trump a state investigation by coming to federal court,

8   they have still got to have jurisdiction.  And we contend that

9   based on a subpoena, there's simply not complete preemption

10  under any set of facts or circumstances that they have alleged

11  that would then allow the court to look at this.

12         But then back to the court's earlier question about do

13  we contend there's anything in the subpoena that wouldn't be

14  preempted by the CDA.  Well, that's a two-part answer.  One,

15  yes, we have reason to believe there would be things that would

16  not be preempted.  And the second part of that answer is we

17  certainly believe we have the right to find out.  And we think

18  it's -- you know, when we talked about the public interest,

19  it's inherently dangerous for a company to be able to say or

20  any individual who falls within the Consumer Protection Act's

21  reach to say we've gotten wind of an investigation, we've

22  gotten the subpoena.  We think it's chilling our First

23  Amendment speech or whatnot, avoid state court altogether and

24  run off to federal court and get an injunction.  We just think

25  that's highly improper, Your Honor.

1          THE COURT:  Are you trying to run way from this

2     letter?

3          MR. MIRACLE:  No, Your Honor.

4          THE COURT:  All right, then.  So back to the letter.

5     What was the thrust of this letter?

6          MR. MIRACLE:  Your Honor, other than what the letter

7     says -- and being candid, other than what the letter says, I

8     really can't interpret it any further than what the letter

9     says.

10         THE COURT:  So the letter was written to ask for

11    changes to the CDA so as to allow lawsuits like the ones that

12    Google here fears could take place.  Is that your reading of

13    the letter?

14         MR. MIRACLE:  I certainly think the reading of the

15    letter is such that they are asking that it allow types of

16    suits that had been interpreted as not being permitted under

17    the CDA.

18         THE COURT:  Okay.  And then if those suits were

19    correct, if those interpretations were correct, then service

20    providers such as Google then enjoy certain immunity bestowed

21    by Congress.

22         MR. MIRACLE:  For claims against them arising of

23    hosting of third-party content.

24         THE COURT:  Exactly.  So that immunity then would

25    embrace those service providers, but then if the immunity is

1    bestowed by Congress, does just that, and if there's some

2    attempt then to make inquiries into matters that will fall into

3    these categories, would that not be a violation of Google's

4    rights?

5         MR. MIRACLE:  Well, not for purposes of subject matter

6    jurisdiction.  It may be a defense.

7         THE COURT:  I'm going to come to that.

8         MR. MIRACLE:  It may be a defense.  In fact, we cited

9    in our papers a decision last year, a federal court case

10   involving Facebook where the district -- circuit of the

11   District of Columbia interpreted the CDA as an affirmative

12   defense.  So if the suggestion by Google would be that the CDA

13   immunity is a complete preemption or some type of sword of

14   being an authorization to file suit in federal court to enforce

15   its rights, at least one circuit court has said it's an

16   affirmative defense that may be raised.

17        The only reason that case was in federal court was

18   because it was removed on diversity grounds.  It wasn't even

19   there on federal jurisdiction grounds.  So I think we have an

20   indication of how courts are viewing the CDA, not as a sword

21   but as a shield.  So when you're bringing a dec action under

22   2201, there's got to be some kind of underlying federal subject

23   matter jurisdiction.  The CDA doesn't provide that, even though

24   courts have said in suits against it if you're going to sue a

25   service provider for matters that are simply hosting

1  third-party content, courts have said that is what the immunity

2  covers.

3       It doesn't cover immunity for their own actions, for

4  their own fraudulent actions, and that's why I alluded to the

5  nonprosecution agreement.  It is fine to say we have these

6  immunities and we don't do these things, but I think we're

7  entitled to at least look at the evidence to see, in fact --

8  there's no question that they can't avoid Mississippi's consume

9  protection laws simply by invoking the CDA because --

10       THE COURT:  If Google is clothed with immunity under

11  the CDA, then an attempt to remove those clothes would be a

12  violation, wouldn't it?

13       MR. MIRACLE:  If a suit was brought against them that

14  simply covered matters that were hosting of third-party

15  content, if that's all it was, then courts have said there's

16  immunity.  But as to the cases that I cited earlier, the one

17  where Google's motion to dismissed was denied, the court said

18  they are not immune for their own conduct, own fraud and

19  misrepresentation.

20       THE COURT:  So any inquiry should be directed only at

21  Google's conduct but not that of third parties.  Is that

22  correct?

23       MR. MIRACLE:  As it relates to the bringing of a suit.

24  I don't think there's any authority to say that they can't be

25  investigated and that --

1          THE COURT:  How can you investigate it if they have

2     immunity?

3          MR. MIRACLE:  They can assert it as a defense, if

4     there's a lawsuit -- I guess this goes back to my concern that

5     we're litigating this in the abstract.  Google knows what

6     documents it has and doesn't have.  The Attorney General

7     doesn't.  The Attorney General used a valid lawful state law

8     subpoena power to ask questions to get the information, and the

9     courts in these types --

10          THE COURT:  Let's not talk about the abstract then.

11     Let's talk about something concrete.  What about the comments

12     of the Attorney General about why he wanted this information,

13     and his determination that Google is in violation of various

14     laws?  Did he say that Google itself was doing this or that

15     Google was in violation of the laws because of its placements

16     of ads by third persons?

17          MR. MIRACLE:  I think the evidence that was derived

18     from the nonprosecution agreement, the fact that he was able to

19     make -- his investigators were able to make drug purchases

20     after that nonprosecution agreement was entered into certainly

21     gave him at least reason to believe there was activity that, A,

22     was the type of activity that they were found to have been in

23     violation of when they entered into that nonprosecution

24     agreement.  That all was an ongoing result of information that

25     his investigators had.

1            And that's all in the record, Your Honor.  The

2      PowerPoint presentation with all the types of activities that

3      the Attorney General was concerned about flowing from the

4      nonprosecution agreement, flowing from the fact there were

5      employees who were found to have been engaging in misconduct,

6      found through e-mail communications, things of that nature,

7      that led to that.  And I do want to point out because one of

8      the quotes that was put up on the screen this morning had to do

9      with a press conference that the Attorney General gave, and it

10     was suggested that the company is one that clearly should be

11     convicted of a felony.  That needs to be put in context, and I

12     think it was a little bit unfair to put that in the abstract

13     like that.

14            And this is in the record already so I won't put it

15     back up on the screen.  But the Attorney General was talking

16     specifically about the nonprosecution agreement and the fact

17     that his investigators were able to purchase prescriptions

18     online -- prescription drugs online without a prescription

19     after the nonprosecution agreement had been entered into, and

20     there I was window -- I believe it was a two-year window in

21     that nonprosecution agreement where they could be subject to

22     further liability.  The Attorney General was saying, *If my*

23     *investigators one year later were able to go and buy*

24     *prescription drugs online without a prescription, have them*

25     *delivered,* bath salts, oxycodone, all of those kinds of things,

1    *if my investigators were able to do that, then that might be a*

2    *violation of the nonprosecution agreement.*

3           THE COURT:  Now, did the Attorney General prosecute

4    those people?  I understand that -- I think seven instances or

5    something were identified by the Attorney General and Google

6    removed one from its service and the other six were deemed not

7    to be in violation.  But the Attorney General did not take any

8    steps against the actual purveyors of the advertisement.  Now,

9    that's in the papers, and it was also repeated here during the

10   argument that this occurred.  So in Google's papers, Google

11   made the statement that's made here.  Now, is that correct,

12   that there was no prosecution?

13          MR. MIRACLE:  The answer to the question as to the

14   drug violations, I don't believe there were any prosecutions.

15   Speaking in the broader context, and this is in the record as

16   well, where the Attorney General has indicated that the reason

17   for that in a lot of cases is that they are either

18   international or they are out of the court's jurisdiction --

19   out of the Attorney General's jurisdiction.

20          THE COURT:  Google further makes the comment that the

21   Attorney General didn't even ask for any assistance in moving

22   with the identities of those persons or whereabouts or means by

23   which they could be prosecuted.  So did the Attorney General

24   begin any investigation towards prosecution?

25          MR. MIRACLE:  Not that I'm aware of in those specific

1    instances.  We're not aware of it, Your Honor.

2          THE COURT:  So the Attorney General was aggrieved that

3    Google had placed these ads before the public and specifically

4    identified these specific ones.  So then after the AG

5    identified them, then the AG took no steps whatsoever to

6    prosecute?

7          MR. MIRACLE:  Again, Your Honor, we're not aware of

8    what steps may have been taken on those particular cases.

9          THE COURT:  But it is your office though, isn't it?

10         MR. MIRACLE:  Yes, Your Honor.

11         THE COURT:  All right.  And this is a case you've been

12   working on, and I will presume, then, that if some steps had

13   been taken that you would know it.  So then should I not

14   conclude that the AG then took no steps?

15         MR. MIRACLE:  I cannot say affirmatively one way or

16   the other as to those particular cases, Your Honor.  If I

17   could, I would speak further to it.

18         THE COURT:  Would you have any theory as to why the AG

19   took no steps after this was a huge issue with the AG on

20   Google's alleged misconduct?

21         MR. MIRACLE:  I think the Attorney General's focus and

22   particularly the focus of the consumer investigative division

23   which has been handling this, their focus is to try to as far

24   as the damage or the harm being caused by the consumers in

25   Mississippi to eliminate the prospect of kids or whoever it may

1    be going online and being able to type in, you know, "buy

2    drugs" and it is "buy drugs without a prescription," and what

3    not.  And Google has taken some of those steps to no longer be

4    able to do that.

5          So under the Consumer Protection Act that's been the

6    Attorney General's focus as far as the civil side of things is

7    to say we need this activity to stop to protect our consumers

8    from buying counterfeit goods, from buying counterfeit

9    narcotics or whatever the case may be.  So I know that's been

10   the Attorney General's focus and effort in that regard.

11         THE COURT:  This next question, just for any own

12   edification, it is not necessarily -- and I can't think of why

13   it would be germane to a ruling by the court, but Google

14   constantly has stated in its papers that this action seems to

15   have been pushed by the Hollywood industry and even here made

16   the statement that one of the briefs that was submitted is

17   verbatim from that same industry and that that particular

18   involved party wishes this lawsuit to go forward.

19         Now, when I read the papers, I concluded that

20   seemingly what that third-party is interested in would be

21   pirating or infringement copyrights.  Is that it?

22         MR. MIRACLE:  Those -- there are those elements of

23   concern, copyright infringements, and pirating.  Yes, your

24   Honor, movies.

25         THE COURT:  Were there others, other concerns, because

1    that's what I thought that to be when I read the papers.  But

2    no one discussed it in detail.  Your side didn't discuss it

3    very much at all, whereas Google constantly mentioned that this

4    lawsuit was being fueled by third-party entities such as the

5    one I just mentioned.  So is it -- are there other concerns or

6    other directives that these other third parties in that respect

7    would have other than what I just said?

8         MR. MIRACLE:  As far as the specific instances, I

9    don't believe so, Your Honor.  And I think those arguments --

10   the raising of this issue is a real red herring by Google that

11   someone who the Attorney General has worked with somehow

12   undermines the credibility or whatever the argument is.  The

13   Attorney General has acknowledged in his December 18th press

14   conference -- I believe he was asked about that -- you know,

15   the Consumer Protection Division of the Attorney General's

16   office or the criminal division, they work with victims.  They

17   don't choose who their victims are.  They don't choose who the

18   victims of crime or theft are, but they work with and are

19   assisted by them.

20        So the fact of whether record or recording industry

21   people have concerns about their work being pirated or

22   downloaded for free or whether the Motion Picture Association

23   has those concerns, then certainly they are potential victims

24   of crimes.  The people in Mississippi are able to download

25   things for free or are directed to cites that are taking them

1    to things of that nature.  Those are things that are of concern

2    to him, and he's going to work with and he's on record saying

3    he's going to work with people in the industries that are

4    affected by those problems.  So the notion of raising of this,

5    I simply think is a red herring and somehow designed to cast

6    the investigation in a bad light.  But the Attorney General

7    certainly doesn't pick and chose who are the victims of civil

8    or criminal activity, and I think that's simply the case here.

9          And as to Your Honor's larger point, and the subpoena

10   itself is broken down into 14 different categories, which cover

11   things like human trafficking, credit card theft, other types

12   of counterfeiting.  So the subpoena has gotten a lot of

13   attention on a few specific things; but as has been pointed

14   out, it is a 79-page subpoena that covers a variety of types of

15   conduct that the Attorney General is concerned about.  But

16   counterfeiting and credit card theft and identity theft, all of

17   those things are included in the subpoena and are of paramount

18   concern to the Attorney General in enforcing the consumer

19   protection law.

20         THE COURT:  Thank you.  I just asked the question,

21   this last one, out of curiosity.  That's all.  Go ahead.

22         MR. MIRACLE:  All right.  So, Your Honor, we clearly

23   think that as to the subject matter jurisdiction they have not

24   established subject matter jurisdiction.  They have raised

25   defenses in anticipation of what they think a state lawsuit

1   might look like.  They said they were neither too early or too

2   late.  Well, we clearly think it doesn't matter whether they

3   think they were too early or too late.

4          What we think matters is the predicate for their

5   jurisdiction here was Section 2201 of the Declaratory Judgment

6   Act and Section 1331 and Section 1983.  None of the federal

7   defenses that they have raised give rise to federal subject

8   matter jurisdiction.  In the event that the Attorney General

9   does at some point in the future bring a lawsuit, that may be a

10  question for removal.  I'm sure if a lawsuit is filed, I'm sure

11  the removal will be something that they would look at.

12         But in the absence of any complete preemptive statute

13  here which they cannot point the court to, they simply cannot

14  establish subject matter jurisdiction.  And we would also ask

15  the court to dismiss the retaliation claims for the reasons

16  that we have stated in our brief that the evidence before the

17  court does not show any type of chilling activity.  It shows

18  that Google was concerned, as they should have been, about

19  things that were on their search engine, and they were working

20  with the Attorneys General.

21         The one thing that's absolutely certain to happen here

22  is if an injunction were to issue, the only thing that would be

23  chilled would be the Attorney General's ability to enforce the

24  consumer protection laws on the basis of a company saying, *We*

25  *think the subpoena is too broad and we think it is preempted by*

1  *federal law.*  That's what would be chilled here is the Attorney

2  General's ability to enforce the consumer protection laws.

3          And so on the basis of that, we certainly do not think

4  that they have met their very high burden of proving that

5  there's federal subject matter jurisdiction.  I would like --

6  as Your Honor is probably aware, we have raised *Younger*

7  abstention, assuming the court find there's jurisdiction.  We

8  clearly think that the jurisdiction -- the *Younger* abstention

9  factors here are met.  Google's opposition to *Younger* stems

10  largely from *Sprint* and their interpretation that under the

11  *Sprint* holding, which was, I believe, in 2014, that the cases

12  relied upon by the Attorney General that these types of civil

13  investigative demands constitutes an ongoing proceeding for

14  *Younger* purposes that *Sprint* somehow invalidated those cases.

15          *Sprint*, you know -- my reading of *Sprint* was that it

16  essentially affirmed the court's decision in *NOPSI*, where *NOPSI*

17  said -- the Supreme Court of *NOPSI* looked at an abstention

18  argument and ultimately in *NOPSI* declined *Younger* abstention.

19  But the key holding in *Younger* -- I mean, in *NOPSI* was the

20  Supreme Court's finding that the action at issue was really

21  legislative in nature.  It was not judicial in nature.  And I

22  set this out in our brief that in the *NOPSI* decision, the court

23  looked at what exactly is judicial in nature, what constitutes

24  that ongoing criminal -- ongoing process under the first prong

25  of *Younger*.

1              And they quoted extensively from an earlier Supreme

2    Court decision, I believe it was in 1908, and this is in our

3    papers where they talk about judicial in nature being this type

4    of investigative process, exactly what we have here today.  And

5    I think it is important to look at the investigation of the

6    Attorney General in the context of the statute and the powers

7    that the Attorney General has under the Consumer Protection

8    Act.  He has the authority to issue subpoenas, which he has

9    done.  He can call witnesses.  He can subpoena documents.  He

10   can conduct hearings.  He has the authority to enter into

11   what's called assurances of voluntary compliance.

12             And I want to point out -- these are in our papers --

13   but in the last three years Google has entered into two

14   different voluntary compliance agreements with the State of

15   Mississippi and 37 other states Attorneys Generals over matters

16   of concern to the attorneys generals in the states.  That was

17   the Attorney General exercising his authority under the

18   Consumer Protection Act.

19             So what we're dealing with here is a statute that is

20   very judicial in nature, that is almost akin to a grand jury

21   type proceeding.  And in our papers we point the court to the

22   *Earle* decision, which is where the Fifth Circuit found *Younger*

23   abstention applying in grand jury type proceedings.  So we

24   don't think the *Sprint* decision had any dramatic impact on nor

25   limits the application of *Younger* in this case.

1    There's outstanding –– and one of the arguments that

2    they've either already raised or will raise is this tension on

3    the one hand saying there's no jurisdiction because there's no

4    case filed and there's abstention under *Younger* because there's

5    an ongoing proceeding.  And while it may appear that there's

6    some tension between those two concepts, certainly if the court

7    doesn't have jurisdiction, the case is over.  If the court does

8    decide it has jurisdiction, under *Younger* all the established

9    three–part prong tests of *Younger* are met.

10   So there are really two different inquiries.  In a

11   number of courts, a number of district court have held that

12   these types of CIDs are the type of investigatory devices that

13   constitute ongoing proceedings.  Google has said, *Well, those*

14   *were pre Sprint cases.  And if you read Sprint, then those*

15   *cases are not good law anymore.*

16   We cite a 2414 case in *Empower Texans*, where the

17   district court found these types of CIDs to be the type of

18   ongoing proceedings necessary for an application of *Younger*.

19   Google's critique of that is, *Well, they don't cite to Sprint*.

20   But, again, I think the holding of *Sprint*, I think the holding

21   of *NOPSI* are fully consistent with the type of specific

22   statutory authority that the Attorney General has to conduct

23   these kind of cases.

24   So I think to say in the abstract that an Attorney

25   General might not be deemed to have the type of authority or be

1   conducting the type of investigation that would be consistent

2   with *Younger* principles, I think what's important is to look at

3   the specific application of the Consumer Procedure Act and the

4   authorities that the Attorney General does have.  And if you

5   look at those particular authorities, then it clearly satisfies

6   the *Younger* prong that requires an ongoing proceeding.

7            Certainly there's an important state interest here.  I

8   don't think anyone disputes that the Attorney General's ability

9   to investigate these types things would constitute a matter of

10   important public interest, which is the second *Younger* prong.

11   And then the third *Younger* prong goes back to something that

12   we've already talked about, is Google's ability to litigate

13   this and raise their constitutional challenges.  And the fact

14   that they can raise those in state court is of no moment to

15   whether *Younger* should be applied here.  State courts are fully

16   capable and fully bound to apply and enforce the federal law.

17            So the fact that a state court venue would be the

18   available venue for them under *Younger* is -- should be of no

19   jurisdictional consequence.  They will have that right to raise

20   that in state court at the appropriate time, at the time this

21   becomes ripe.  But to suggest that this court should step in

22   and stop this investigation because there's a chance that some

23   of this activity might ultimately be protected if and when the

24   Attorney General files a lawsuit at some point in the future,

25   we think that's exactly the type of case *Younger* was intended

1    to apply to to allow the state court process to take place.

2         In the absence of that, we'll never know.  If this

3    investigation stopped, we'll never know what information may or

4    may not have been responsive or may or may not have been

5    subject to CDA immunity.  We'll never know.  We think that the

6    Attorney General has the right and the duty and the statutory

7    and constitutional responsibility to conduct this

8    investigation, and we think the argument that the court can

9    somehow look at the subpoena and presume that there may be some

10   things that are later subject to a defense, we submit at this

11   point that would be improper, and we think that's exactly what

12   Google is asking this court to do is to make a facial

13   determination that the subpoena is preempted completely.  If it

14   at not completely preempted, if it is not facially preempted,

15   then there's no complete preemption, there's no subject matter

16   jurisdiction.  So when we talk about the content of the

17   subpoena, I've tried to reiterate the importance of that to our

18   position relative to subject matter jurisdiction.

19        They've pointed you to the definitional section that

20   talks about issues of whether or not it would be immune under

21   the CDA or not.  I think the fact again that the court -- if

22   the court has to examine factually the entire 79-page subpoena

23   and the multitude of requests for production and

24   interrogatories, in order for the court to engage in that fact

25   finding to see exactly what's in the subpoena, is exactly the

1    argument we say takes us out of any kind of complete preemption

2    analysis.

3           And so at the end of the day what we're left with is

4    Google raising defenses to a not yet filed state law claim

5    based on a hypothetical set of facts that they have

6    constructed.  They say, *Well, it's not hypothetical.  We have*

7    *the subpoena, and we know the kind of claims and we know the*

8    *kind of information they are asking for.*  But that doesn't mean

9    that this is the forum to litigate that in.  The forum to

10   litigate that in is in state court, whether they move to quash

11   the subpoena in state court or whether the Attorney General

12   ultimately makes the decision to move to enforce that.  Those

13   questions should be answered in state court, but they should

14   not be answered in the abstract by the federal court.

15           THE COURT:  All right.  Thank you.

16           MR. MIRACLE:  Thank you, Your Honor, for your time.

17           THE COURT:  All right.  Rebuttal.

18           MR. NEIMAN:  If I could have two minutes for a break.

19           THE COURT:  We're in recess for five minute.  Five

20   minutes.

21      (Recess)

22           MR. MIRACLE:  Your Honor, with the court's indulgence,

23   Mr. Neiman has been kind enough to let me just clarify

24   something.  Your Honor was asking me about the letter that

25   General Hood was one of the signatories to about the scope of

1    what the request was.  And my colleagues -- I just want to make

2    sure I was on the same page with my colleagues.

3           But I think our point about this letter is it is very

4    specifically tied to child exploitation and child sex crimes.

5    And where the letter says that, "It is ironic that the CDA,

6    which was intended to protect children from indecent materials

7    is now being used as a shield from those who profit from

8    prostitution and crimes against children."  So it was a very

9    specific issue that the attorneys general were concerned about.

10          And then in the quoted paragraph from

11   Section 230(e)(1), it's specifically talking about the state

12   criminal statutes that nothing will be construed to prevent

13   states from prosecuting those crimes under the CDA.  So I just

14   wanted to clarify if I didn't articulate it as well as I

15   probably could or should have in response to your question that

16   this letter was very specifically limited to one particular

17   area and was in no way any type of concession that the

18   attorneys general were conceding or that General Hood was

19   conceding in any way that the CDA was precluding his ability to

20   enforce the Consumer Protection Act.  Thank you.

21          THE COURT:  Thank you.  Response.

22          MR. NEIMAN:  Thank you, Your Honor.  I just want to

23   start with the letter we just talking about and ask the

24   question.  I think Mr. Miracle was trying to suggest that the

25   CDA perhaps was not -- did not create some kind of immunity

1   from investigation.  We think that's wrong.  And to know that,

2   I don't think you have to look any further than the Attorney

3   General's letter that we have just been talking about.  If we

4   could put the relevant point up on the screen, if you just

5   look -- and I think this is a touchscreen.  Right?  Does that

6   work?  That's what I get for playing with the technology.

7            Anyway, it says right here that, "The undersigned

8   Attorney Generals respectfully request that the U.S. Congress

9   amend the CDA so that it restores the state and local

10  authorities their traditional jurisdiction to investigate and

11  prosecute those who promote prostitution and endanger our

12  children."  I don't think it could be clearer that this is a

13  concession by the Attorney General in a letter he signed that

14  the CDA places limits on investigations.  And we cited multiple

15  cases that say that.  It shouldn't frankly be a controversial

16  point.

17           So then I think you then go to the question of is --

18  if the state breaches an immunity from an investigation, is

19  that enough to get you into federal court, and I think the

20  answer to that is clearly yes.  We've cited four cases that say

21  that if you breach the immunities provided by the CDA, you have

22  a federal cause of action against the state, if they've

23  breached those immunities.  That's the *VoiceNet* case and the

24  three *Backpage* cases.  *Backpage*, by the way, is the very case

25  that's being talked about in this letter.  And those cases are

1    plainly correct.  The standard that governs whether a federal

2    statute creates the kind of right or immunity that can be

3    enforced under Section 1983, it's the *Firestone* case, and it

4    lays out a three-factor test.  And basically you look at is the

5    federal statute designed to benefit the person who's claiming a

6    right and we satisfy that test.  It's clear that the

7    Communications Decency Act, the immunity provisions we're

8    talking about are designed to benefit internet service

9    providers.  So that's met.

10          The second is:  Is it too vague or is it concrete?

11   And again, I think we've clearly met that that Section 230 is

12   very concrete.  It says that no cause of action can be brought

13   and no liability imposed based on treating the Internet service

14   provider as the publisher of third-party information.  It is

15   very concrete.

16          And the third step is:  Is it mandatory or just

17   advisory?  That's the third part of the *Firestone* test, and

18   it's clearly mandatory.  It doesn't say states shouldn't do

19   this.  It says they can't do it.

20          So it's clear that the CDA creates rights that are

21   enforceable under Section 1983.  We have cited four cases that

22   hold that.  And so that by itself would be enough to make clear

23   that there's jurisdiction here, but there's more.  I don't

24   think anybody can dispute that the CDA ultimately provides an

25   immunity.  And Section 1983 doesn't just create a cause of

1    action for federally protected rights.  The statute says

2    rights, privileges, and immunity.  So just on the plain

3    language of the statute itself it's clear that what we have

4    here, whether you want to call it a right under the CDA not to

5    be investigated or an immunity from investigation is sufficient

6    to get you into federal court.  It's exactly what Section 1983

7    is talking about, a right, a privilege, or an immunity.

8         There was some suggestion by Mr. Miracle that somehow

9    to have a preemption claim in federal court you needed to be

10   asserting complete preemption.  That's just an incorrect

11   reading of the cases.  I think we've laid out in our brief, but

12   just to read you what the Supreme Court said in *Shaw*, "It is

13   beyond dispute that federal courts have a jurisdiction over

14   suits to enjoin state officials from interfering with federal

15   rights."  That's the first provision I think I've explained

16   here now why we think that the CDA does create federal rights.

17        But then the next sentence, "A plaintiff who seeks

18   injunctive relief from state regulation on the ground that such

19   regulation is preempted by federal statute, which by virtue of

20   the supremacy clause of the constitution must prevail, thus

21   presents a federal question which the federal courts have

22   jurisdiction under 28SC Section 331 to resolve."

23        It just says preemption.  It doesn't say anything

24   about complete preemption.  There are 50 Supreme Court cases

25   with essentially the same language in them.  None of them say

1    that you have to show complete preemption in order to bring an

2    affirmative cause of action against the state official to

3    enjoin them from doing something that is prohibited by federal

4    law.  There's no case that says that.

5          The cases that they point to about complete preemption

6    are talking about a completely different situation.  Those

7    cases are about disputes between two private parties, and the

8    question is can you get into federal court not when you're

9    seeking to enjoin a state official from violating the

10   constitution but just when you want to assert some kind of

11   federal defense under preemption.  And those cases say, in the

12   private context, that, you know, the plaintiff is the author of

13   their complaint.

14         And so if the plaintiff says he's making a state law

15   claim, if there's complete preemption such that there's no

16   state law claim to make, you can get into federal court.  But

17   if there isn't, then you can't.  And that's the case law that

18   they are picking up on.  But that case law is about private

19   disputes and about the plaintiff being the author of their own

20   complaint.

21         This case is about an effort to enjoin a state

22   official from violating the constitution because what he's

23   trying do is preempted by federal law, and *Shaw* could not be

24   clearer.  And as I said, *Shaw* cites in a string cite like 30

25   more cases immediately after it standing for that proposition

1    and calls it something that is beyond dispute.  I mean, it is

2    frankly a little surprising that the state Attorney General has

3    chosen to stake their argument here by saying that something

4    the Supreme Court has said is beyond dispute, nonetheless

5    there's no jurisdiction.

6           So we think the court has clear jurisdiction here.

7    There was some suggestion that, well, you know, maybe every

8    single item in the subpoena has to be only focused on

9    third-party content before you even have jurisdiction to hear

10   this case.  I don't think they have cited any case that

11   remotely supports that proposition.  We have shown that the

12   subpoena beginning in its very first definition is explicitly

13   focused on immunized conduct, that that definition gets picked

14   up in the definition of aiding and abetting, which then gets

15   in -- excuse me, in definitions of dangerous conduct and

16   unlawful conduct, which then gets repeated in almost every

17   request in the subpoena.  That by itself is enough to show

18   there's a very serious issue here about whether this subpoena

19   intrudes on the federally protected rights that Google has

20   under the Communications Decency Act, and that's enough to get

21   into federal court to be heard on our claim that they are

22   intruding into our federally protected rights.

23          There was a little bit of discussion about whether the

24   nonprosecution agreement that Google reached with the federal

25   government somehow changed the legal landscape here in some way

1   that matters.  A couple of points about that.  First, the

2   notion that someone can draw any inferences about Google's

3   present conduct based on that agreement I think doesn't hold

4   water.  If you look at what that agreement says, most of the

5   facts it's talking about are things that happened ten years

6   ago.  And if you read to the end of the agreement, what you see

7   is that it has an extensive discussion of what Google is doing

8   today in 2011 and how it cleaned up those problems.

9         So the notion that some inference about facts follows,

10   I think, doesn't make any sense.  And there frankly really

11   isn't any legal inference you can draw from the nonprosecution

12   agreement about the scope of the Communications Decency Act

13   immunity for the simple reason that the nonprosecution

14   agreement related to issues of federal criminal law and I think

15   it's common ground that the Communications Decency Act

16   Section 230 doesn't provide immunity for issues of federal

17   criminal law.  So the notion that we settled that case somehow

18   shows something about what we think the scope of CDA immunity

19   is as to a state prosecution that's been threatened doesn't

20   make any sense.

21         The last point that I wanted to make about that

22   nonprosecution agreement is that that concerned a topic,

23   importation of prescription drugs, that is exclusively the

24   province of the federal government.  Of course, that makes

25   sense, importation protecting the borders, that's the federal

1   government's job.  And the Food, Drug and Cosmetic Act, which

2   is the statute that's referenced in the Attorney General's

3   subpoena says right in it that these kind of cases related to

4   importation of prescription drugs must be brought in the name

5   of the United States.  It's not something that's within the

6   proper scope of the Attorney General's jurisdiction.  So I

7   don't think the MPA really affects the court's analysis at all

8   in this case.

9        You know, there was also a suggestion that Google

10  hasn't really been chilled because when it wrote letters to the

11  Attorney General trying to mollify him, it didn't say, *Oh, my*

12  *God, you've forced me at the point of a gun to do this.*  It was

13  polite.  But, you know, there's just no question that the

14  Attorney General's threats and its pressure led Google to make

15  changes.  The Attorney General has bragged about that in his

16  press statements.

17       And, you know, the fact that Google sometimes does

18  things voluntarily has no impact on whether these particular

19  things that we've put in two affidavits about that say this was

20  done in response to the Attorney General's pressure, that fact

21  remains undisputed in the record, and that fact shows concrete

22  chilling.  And, by the way, concrete chilling isn't even a

23  legal requirement.  The standard for whether you've shown

24  sufficient First Amendment injury is whether or not the conduct

25  that's being complained of would chill a person of ordinary

1    firmness.  And I don't know any person of any degree of

2    firmness that wouldn't be extraordinarily chilled by a state

3    Attorney General making the statement that I highlighted for

4    you this morning, including that people should go to jail, and

5    that the company should be convicted of a felony.

6         So I think we've more than met the standard even

7    without the specific facts that we've shown, but the specific

8    facts that we've shown make that even clearer that not only

9    would this chill a person of ordinary firmness, but it has, in

10   fact, chilled Google.  And that's why we have -- the

11   significance of that to the jurisdictional points -- and you've

12   heard a lot from Mr. Miracle about why the CDA isn't enough to

13   get us in federal court.  You didn't hear very much from him

14   about why the First Amendment isn't enough to get us in federal

15   court, and that's because it is.  When a state Attorney General

16   threatens you for First Amendment protected conduct and says,

17   *You should go to jail for it*, that's a serious First Amendment

18   problem, and you get into federal court.

19        And, you know, just to -- Mr. Miracle was suggesting

20   that you can only get into federal court if you're actually

21   sort of making a facial challenge to the state statute.  That

22   is incorrect.  If you look at a case like *Steffel v. Thompson*

23   in the Supreme Court, that's a case in which the plaintiff goes

24   to federal court seeking declaratory relief because he wants to

25   picket at a shopping mall, and he's concerned that he's going

1    to get arrested if he does so.  And he doesn't make -- under

2    Alabama's trespass law, he doesn't make a facial challenge to

3    Alabama's trespass law.  He says, *If they arrest me that would*

4    *be a violation of my First Amendment rights as applied to me*

5    *and my particular conduct.  I'm not saying you could never have*

6    *a trespass law.  I'm saying to apply it to somebody who is*

7    *peacefully picketing at shopping mall as applied to that would*

8    *be unconstitutional.*

9            The Supreme Court doesn't say, *Oh, no, we can't hear*

10   *that case.  Wait until they charge you.  T*he Supreme Court

11   says, *Absolutely that would be unconstitutional.  You've got a*

12   *reasonable fear that's going to happen to you because they have*

13   *done it to other people.  And we'll hear that case, and we'll*

14   *decide for you.*

15           And so to hear, we don't have to say that the

16   Mississippi Consumer Protection Act is unconstitutional in all

17   of its possible iterations, and we don't think that it is.  But

18   if it's applied to Google's making available over the Internet

19   third-party content, then it is unconstitutional both under the

20   First Amendment and under the supremacy clause because of the

21   Communications Decency Act as applied not in the abstract.

22           And, you know, I don't think you heard any argument

23   from the Attorney General that addresses why it is that a court

24   doesn't have jurisdiction for such an as-applied challenge for

25   the First Amendment, because it does.  I think the only thing

1    that they pointed to in their briefs was the case of *Laird v.*

2    *Tatum*, which I think as we've explained has nothing to do with

3    this.  That would be analogous to this case if we were saying

4    the fact that the Attorney General has investigative power,

5    even though he has never directed it at us, is chilling our

6    speech.  That's not what we're saying here.  We've been very

7    clear about what the Attorney General has said to us, what he's

8    threatened us with and the subpoena that he's served.  So we

9    have a firm and clear basis to bring our First Amendment

10   challenge here to his conduct, to the Consumer Protection Act

11   as it is being applied by the Mississippi Attorney General.

12          I'd like to, if I could, just pause for one minute.

13   If I could just circle back, there's some times when

14   Mr. Miracle was suggesting that we were asking for some broad

15   type of immunity, that we were trying to stop him from any

16   investigation.  Our relief is quite specific, and if we could

17   just put it up on the screen.

18          This is what we asked for in our motion.  We asked for

19   an injunction against enforcing the subpoena and from bringing

20   charges against Google for making accessible third-party

21   content to internet users as threatened.  That's all we are

22   seeking, and that's exactly what we're entitled to under the

23   First Amendment and the Communications Decency Act.  That is

24   essentially what's been in place for several months now as the

25   status quo was preserved by the court's prior order, and we

1    think it makes complete sense to continue that in place while

2    the court addresses the serious constitutional and statutory

3    claims that we've made.

4            THE COURT:  All right.  Thank you.  I'll address my

5    first comment to the plaintiff.  Have you looked at the amicus

6    briefs?

7            MR. NEIMAN:  I have, sir.

8            THE COURT:  And are you satisfied that your comments

9    would address any issues raised therein?

10           MR. NEIMAN:  I believe so.  I'm happy to address any

11   questions that Your Honor has, but I believe we've had an

12   opportunity to read them, obviously, prior to coming to court

13   today.  And we've tried to make sure that we have addressed any

14   issue that might be out there.

15           THE COURT:  All right.  Thank you.  And let me ask the

16   defense the same question.  Have you had a chance to review

17   those briefs?

18           MR. MIRACLE:  Yes, Your Honor.

19           THE COURT:  And do you feel like your comments are

20   satisfactory with regard to the issues that might have been

21   raised in those briefs?

22           MR. MIRACLE:  Yes, Your Honor.

23           THE COURT:  All right.  Thank you.  I have not read

24   those briefs yet because I had not made a determination until

25   I -- well, I had not made the determination when they came in

1   as to whether they were something I should study, and I wanted

2   to hear the reaction of the parties before I read them.  So now

3   that I am granting their -- granting them permission to file

4   those briefs, which have been filed, then I will read them.

5          So I will read these briefs -- those briefs, and then

6   I will contact the parties by the 19th and let you know if I

7   see any issues raised by those briefs that have not been

8   addressed thus far.  I will do that by way of a filing, and I

9   will tell you what the question is, if I have a question.  If I

10  do not have a question, then I will file with the clerk's

11  office a short order indicating that I have no questions and

12  I'm satisfied with the argument thus far.  What I hope to do is

13  to be able whether the court has questions and then to set a

14  time period for the response to be able to provide the court's

15  decision by the 24th.  Now, I would like the parties then

16  present for this decision by the court.  Is the 4th all right

17  with the plaintiff?

18          MR. NEIMAN:  May I have one moment?

19          THE COURT:  Meanwhile the defense can check your

20  calendars too.

21          MR. NEIMAN:  Your Honor, it's taking a minute for my

22  phone to pull up there.

23          THE COURT:  Why don't you -- will your phone provide

24  you an answer in the next minute?

25          MR. NEIMAN:  I'll let you know if there's any change

1    to that, but we'll be here.

2         THE COURT:  Okay.  Now, I'd like to do this at

3    1:30 p.m.  Let me talk to the defense.  Is that date and time

4    all right?

5         MR. MIRACLE:  Yes, Your Honor.

6         THE COURT:  All right.  1:30 p.m.  I anticipate in

7    making a bench opinion.  I very may well have the written

8    opinion and if so I will pass it out and discuss it with you.

9    So 1:30 p.m. on the 24th.  I move from next week to this

10   particular date because Monday is a holiday and I start a trial

11   right after that.  I will still be in trial when you come over

12   here, but I will break from that trial to address these

13   particular matters.  So then, again, by the 19th if I see where

14   I need any further briefing on any of the issues raised in the

15   amicus, then I will let you know.  If -- if I don't see any

16   need to change these dates, then we will stay connected to the

17   24th at 1:30.

18        MR. NEIMAN:  Your Honor, I've had a chance to consult

19   my phone, and I am free on the 24th.

20        THE COURT:  Telephone said you're all right?

21        MR. NEIMAN:  Telephone gave me clearance, exactly.

22        THE COURT:  All right.

23        MR. NEIMAN:  I don't do anything without checking with

24   my phone first.

25        THE COURT:  All right.  So your telephone then

1    dictates to you.

2            MR. NEIMAN:  Exactly.

3            MR. KRUTZ:  I think it's his wife, Judge.

4            THE COURT:  You're meddling, now.  So then we will

5    have everybody here at 1:30 p.m. on the 24th.  Is there

6    anything else I need to consider at this point?  From the

7    plaintiff?

8            MR. NEIMAN:  Not from us.

9            THE COURT:  Defense?

10           MR. MIRACLE:  No, sir.

11           THE COURT:  Thank you all for coming.  Then I'll see

12   you then.

13       (Hearing Concluded)

14

15

16

17

18

19

20

21

22

23

24

25

1   CERTIFICATE OF REPORTER

2

3        I, CHERIE GALLASPY BOND, Official Court Reporter, United

4   States District Court, Southern District of Mississippi, do

5   hereby certify that the above and foregoing pages contain a

6   full, true and correct transcript of the proceedings had in the

7   aforenamed case at the time and place indicated, which

8   proceedings were recorded by me to the best of my skill and

9   ability.

10        I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14        This the 12 day of March, 2015.

15

16                        s/ *Cherie G. Bond*
                        Cherie G. Bond
17                        Court Reporter

18

19

20

21

22

23

24

25