IN THE UNITED STATES DISRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

GOOGLE, INC.                                                    PLAINTIFF

V.                              CIVIL ACTION NO. 3:14-CV-981-HTW-LRA

JIM HOOD, in his official capacity
as Attorney General of the State of
Mississippi                                                    DEFENDANT

---

## ATTORNEY GENERAL'S MEMORANDUM IN OPPOSITION TO MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

---

Attorney General Jim Hood, in his official capacity (the "Attorney General" or "General Hood"), files this Response in Opposition to Google, Inc.'s ("Google") Motion to Compel the Production of Documents [Doc. No. 100].  For the reasons set forth below, Google's motion should be denied.[1]

## I.      Introduction

### A.      History and Background Leading to Issuance of Subpoena

Google's lawsuit in general and its motion to compel in particular misapprehends the nature in which this case arose.  Google well knows and the record before this Court clearly reflects, that prior to the issuance of the disputed

---

[1] Google's Motion to Compel does not comply with L. U. Civ. R. 7(b)(4) which provides that "[a]t the time the motion is served, other than motions or applications that may be heard ex parte or those involving necessitous or urgent matters, counsel for the movant *must* file a memorandum brief in support of the motion." *Id.*  The instant motion is not one to be heard ex parte nor does it involve a necessitous or urgent and Google did not file a memorandum nor did it seek relief from the requirements of the Local Rule.  This is notable, in part, because Google throughout its motion argues that the Attorney General's Supplemental Privilege Log does not conform to the requirements of L. U. Civ. R. 26(a)(1)(C), which the Attorney General contests.  However, Google's selective invocation of the Local Rules should be taken with a grain of salt.

Subpoena in this case, a number of Attorneys General were looking into certain of Google's business practices under various state consumer protection laws. For example in February 2013, Attorneys General from Hawaii, Mississippi, and Virginia wrote to search engines, including Google, regarding "concern[ ] about the infringing activities[ ] [i]n addition to the economic impact, the sale of counterfeit products clearly places the consumer's health and safety at risk." [Doc. No. 33-4]. The letter stated that the Director of Immigration and Custom Enforcement "provided chilling examples of the harm that can be inflicted by such products." *Id.*

In March 2013, Google entered into an Assurance of Voluntary Compliance ("Compliance Agreement") as part of a multi-state investigation by State Attorneys General, including General Hood. [Doc. No. 33-5, Ex. 1]. Thirty-seven states, including Mississippi, joined the Compliance Agreement. This Compliance Agreement related to Google's Street View product whereby Google outfitted its Street View cars with antennae to drive down public streets and collect WiFi network identification for use in offering "location aware" or geolocation services. *Id.* As part of the Compliance Agreement, Google agreed to both refrain from certain conduct as well as take affirmative steps. *See, id* p. 5. Google paid $7,000,000 apportioned among the states signing on to the Compliance Agreement. *Id.*

In July 2013, Attorneys General from Nebraska and Oklahoma wrote to Google's Senior Vice President and General Counsel regarding an "alarming trend involving videos on Google's video subsidiary, YouTube." [Doc. No. 33-6]. The July

2

2014 letter further stated that "[a]s we understand the process, video producers are asked prior to posting whether they will allow YouTube to host advertising with the video and, for those who consent, the advertising revenue is shared between the producer and Google.  *Id.* at 1.  While this practice itself is not troubling we were disappointed to learn that many such monetized videos posted to YouTube depict or even promote dangerous or illegal activities."  *Id.*  The letter to Google went on to cite specific examples of these concerns.  *Id.*

In October 2013, Attorneys General from Nebraska, Hawaii, Virginia and General Hood wrote to Google's Senior Vice President for Corporate Development to address the monetization of "dangerous and illegal content."  [Doc. No. 33-7]. Attorney General Bruning of Nebraska, Attorney General Louie of Hawaii and Attorney General Cuccinelli of Virginia, as well as General Hood stated that  "[a]s you are no doubt aware, several state Attorneys General have expressed concerns regarding your company's monetization of dangerous and illegal content, particularly on Google's video subsidiary, YouTube."  *Id.* (emphasis supplied).

The letter further raised concerns "regarding the prevalence of content on Google's platforms which constitute intellectual property violations and within which such content is shared and trafficked over Google's systems.  *Id.*  at p. 1. These Attorneys General raised other concerns to Google in this letter including the "promotion of illegal and prescription-free drugs through Google and the facilitation of payments to and by purveyors of all the aforementioned content through Google's payment services."  *Id.*

In November 2013, Google entered into another Assurance of Voluntary Compliance Agreement with thirty-seven (37) states and the District of Columbia. [Doc. No. 33-5, Ex. 2].  The November Compliance Agreement stemmed from Google's posting of certain information to Apple's Safari Browser.  *Id.*  The November 8 Compliance Agreement provided that "Google shall not employ HTTP Form POST functionality that uses javascript to submit a form without affirmative user action for the purposes of overriding a Brower's Cookie-blocking settings so that it may palace an HTTP Cookie on such Browser, without that user's prior consent."  *Id.* at 2.  Google paid $17,000,000 apportioned among the states and the District of Columbia joining in the Compliance Agreement.  *Id.* at 4.

In December 2013, twenty-three (23) Attorneys General, including General Hood, wrote to Google's general counsel again stating that "[d]uring the past year, a growing number of state Attorneys General have expressed concerns regarding the troubling and harmful problems posed by several of Google's products.  [Doc. No. 33-8].  As expressed by these twenty-three Attorneys General, these issues included: (1) Google's monetization of dangerous and illegal content; (2) the prevalence of content constituting intellectual property violations and ease with which such content is shared and trafficked over Google's systems; (3) the promotion of illegal and prescription-free drugs; and (4) the facilitation of payments to and by purveyors of all of the aforementioned content through Google's payment services."  *Id.*  at p. 1.

In February 2014, Attorneys General from Nebraska, Hawaii, Utah, Arkansas and General Hood again wrote to Google's Senior Vice President and General Counsel.  [Doc. No. 17-22].  The letter noted that [t]hough we believe, as you do, the Denver meeting was a valuable first step in establishing a constructive dialogue on the serious issues before us, much work remains to be done.  *Id.* at 1. The letter from the five (5) Attorneys General posed a series of questions for Google's consideration which included many of the same topics that had been under discussion through 2013 such as the "monetization of dangerous and/or illegal content through advertising sales and direct revenue sharing agreements with producers of content which violates Google's own polices."  *Id.* at 2.

Finally, and even continuing after Google sued the Attorney General to stop an on-going investigation, twelve (12) state Attorneys General filed an *amicus curiae* brief supporting the Attorney General's motion to dismiss in this Court.[2] [Doc. No. 77].  As noted in the brief of the *amici* Attorneys General:

> As the chief law enforcement officers for their states charged with protecting the vital public interest, state Attorneys General are given broad authority to investigate activity that may violate state consumer protection laws.  The amici have a heightened interest in the Court's resolution of this case, and particularly the Court's resolution of General Hood's pending motion to dismiss, in light of the precedential effect of any decision interpreting the Attorney General's authority to investigate potentially unlawful conduct on the Internet.

[Doc. No. 77] at p. 2.

---

[2] States supporting the *amicus* brief included:  Kentucky, Arizona, Connecticut, Illinois, Iowa, Maryland, New Hampshire, New Mexico, Oregon, Rhode Island, Vermont, and Washington.

Thus, this Attorney General's issuance of the disputed Subpoena in October 2014 clearly did not occur in isolation but as demonstrated from the record, evolved over a considerable period of time and involved the joint efforts by multiple state Attorneys General.  And as part of this process described above, the Attorney General enlisted the assistance of various individuals and/or firms with knowledge and expertise concerning the issues at hand as well as those who were victims of potential violations of Mississippi's consumer protection laws.[3]  Thus, Google's instant motion does not present a garden-variety discovery dispute as would be the case involving private litigants and must instead be viewed in the context in which it occurred.

### B.    Procedural History of the Attorney General's April 15, 2015 Production of Documents and Privilege Log.

In accordance with the Court's April 10, 2015 Order ("Order"), the Attorney General produced documents identified in the Order or provided a Privilege Log for documents withheld under privilege.  [Doc. 100-1].  The Attorney General asserted

---

[3] The Attorney General has publically addressed Google's attempt to mischaracterize the fact that he has worked with various industry groups during this investigation:

> "Well, yes, we worked with them [motion picture industry], we worked with a lot of industries.
>
> When we get a counterfeit drug, we call the drug company that manufactures it and they do the testing on it.  We do training with all the clothing apparel.  We don't know – out investigators don't necessarily know when something is counterfeit, so we have to work with the victims.  They're property has been stolen."

[Doc. No. 52-1] p.13.

privilege as to certain of the requested documents on the basis of:  (1) the attorney-client privilege, (2) attorney work-product; and (3) the common-interest doctrine.[4]

## II.    Content of the Supplemental Privilege Log

Google generally argues throughout its motion that the Attorney General's Privilege Log and Supplemental Privilege Log do not meet the technical requirements of L. U. Civ. R. 26(a)(1)(C).  The Attorney General disagrees.  After consultation between counsel for the parties and prior to Google filing its motion to compel, the Attorney General served on Google's counsel the First Supplemental Privilege Log ("Supplemental Privilege Log") [Doc. No. 100-1].

The Supplemental Privilege Log provides the following information:  (1) Privilege Log ("PL") bates numbers of the document withheld (which identifies the length of the withheld document), (2) a description of the document(s) withheld, (3) the date(s) that the Attorney General received the document(s), (4) the author(s) of the document(s), (5) the identity of the individual(s) who provided the document(s) to the Attorney General, (6) the recipient of the document(s) at the Attorney General's Office, and (7) the privilege(s) asserted over the document(s).  [Doc. No. 100-1].

Despite Google's characterization to the contrary, the Attorney General's First Supplemental Privilege Log provides more than sufficient information to allow

---

[4] The common interest doctrine is not a privilege in itself, but is an exception to the waiver of an existing privilege.  "The doctrine 'protects the transmission of data to which the attorney-client privilege or work product protection has attached' when it is shared between parties with a common interest in a legal matter." *Tobaccoville USA v. McMaster*, 387 S.C. 287 (2010) (Common interest doctrine recognized between state attorneys general).

Google "to test the merits of a privilege claim." *United Investors Life Ins. Co. v. Nationwide Life Ins. Co.*, 233 F.R.D. 483, 486 (N.D. Miss. 2006).  Furthermore, any claim by Google that it did not have sufficient information from the Supplemental Privilege Log to challenge the applicability of the asserted privilege is belied by the specificity of the documents Google requested.  Google's first document requested sought the following:

    a.    Any draft subpoenas provided to the Attorney General by the third-parties[5] identified in Google's request of [January 14, 2015].

    b.    Attorney General Hood's November 13, 2013 email to [MPAA lobbyist] Vans Stevenson, and any replies or responses thereto;

    c.    Attorney General Hood's August 28, 2014 letter to the Attorneys General in all 50 states regarding setting up a working group;

    d.    The Word files listed in item (6) of Google's January 14, 2015 request ("Google can take action" "Google must change its behavior" "Google's illegal conduct" (CDA")), and any emails from the third parties attaching those word files;

and

    e.    Any documents already gathered in connection with the Techdirt Mississippi Public Records Act request that are responsive to Google's requests.

---

[5] These third-parties as defined by Google are:  the Motion Pictures Association of America, Steven Fabrizio, Vans Stevenson, Kate Bedingfield, the Recording Industry Association of America, Digital Citizens Alliance, the Pharmaceutical Research and Manufacturers of America, Thomas Galvin, FairSearch.org, Microsoft Corporation, Patrick Lynch Group, Lynch and Pine Attorneys at Law, Orrick Herrington & Sufcliffe, LLP, Jenner & Block, LLP, Thomas J. Perrelli, Elizabeth Bullock, the Mike Moore Law Firm, former Mississippi Attorney General Michael Moore, 21st Century Fox Corp., Comcast Corporation, Viacom Inc., Warner Bros. Entertainment Inc., The Walt Disney Company, Sony Pictures Entertainment Inc., NBCUniversal.

[Doc. No. 100], p. 1.  Based on the specific requests submitted by Google, the information provided by the Attorney General on the Supplemental Privilege Log was more than sufficient to allow Google to test the applicability of the asserted privilege, which it has done in its motion.[6]

## III.   Draft Subpoenas

### A.      The Attorney-Client Privilege

As accurately reflected on the Supplemental Privilege Log, the Attorney General received three (3) of the draft subpoenas from Mike Moore, one of the attorneys retained by the Attorney General in 2012 regarding Google.  *See* [Doc. No. 100-1 – PL000001-PL000067; PL000075-000119, and PL000167-000176].[7]  With regard to the attorney-client privilege, the Fifth Circuit has said:

---

[6] Should the Court determine that the Supplemental Privilege Log does not contain sufficient information to allow the Court and/or Google to test the merits of the asserted privilege, the appropriate remedy is the production of a supplemental Privilege Log.  *See, e.g., Employers Mut. Cas. Co. v. Maison Heidelberg, P.A.*, 2011 WL 1496253, *3 (S.D. Miss., April 20, 2011).

[7] Google also suggests that because the draft subpoena dated April 3, 2012 predates the signed Retention Agreement with Mike Moore it could not possibly be covered by the attorney-client privilege.  First, as is common in the attorney-client relationship, Mike Moore's role as an attorney for the Attorney General commenced prior to the date of the Retention Agreement signed on June 29, 2012.  Mike Moore was acting as an attorney for the Attorney General as early as March 2012.  Because Google did not request communication regarding the production of draft subpoenas, but only the draft subpoenas themselves, the Attorney General did not identify any correspondence with Mike Moore predating the June 29, 2012 Retention Agreement.  However, the Attorney General will supplement the Privilege Log to identify this correspondence and requests that the Court conduct an *in camera* review to evaluate the applicability of the asserted attorney-client privilege.  The Supplemental Privilege Log also identifies Jeff Modisett with the law firm of SNR Denton US LLP, as the author of the draft Subpoena dated April 3, 2012.  *See* [Doc. 100-1] at p.2.  Mr. Modisett had an attorney-client relationship with the Attorney General which began in January 2012.  Because Mr. Modisett was not an identified "third-party" pursuant to Google's document request, the draft Subpoena dated April 3, 2012 was identified only because Google had originally identified Mike Moore as a "third-party" thus making it potentially responsive to the request.  The Attorney General has obviously clarified for Google that Mike Moore is not a "third-party" for purposes of the requests, but one of the Attorney General's attorneys.  The April 3, 2012 draft Subpoena was used by the Attorney General as a starting point in preparing the very limited Subpoena which was served on Google on April 19, 2012.  Google did not object to this Subpoena and produced documents in response thereto.

> The oldest of the privileges for confidential communications, the attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice. The privilege also protects communications from the lawyer to his client, at *least if they would tend to disclose the client's confidential communications.*  Its application is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents.

*Hodges, Grant & Kaufmann v. U.S. of the Treasury,* 768 F.2d 719, 720-21 (5th Cir. 1985) (emphasis supplied).  Thus, with respect to the transmission of the draft subpoenas from Mike Moore to the Attorney General as set forth on the Supplemental Privilege Log, the attorney-client privilege was asserted to avoid any subsequent claim by Google that any confidential communications between the Attorney General and Mike Moore had been waived with respect to these draft subpoenas.  Because these draft Subpoenas were provided by Mike Moore, representing the Attorney General, any confidential communications regarding these subpoenas would be subject to the attorney-client privilege.  Although Google did not request communications with regard to the draft subpoenas, failure to assert the attorney- client privilege regarding the draft subpoenas themselves could be construed as a waiver of any confidential communications related thereto.[8]

Google also attacks the confidential nature of the attorney-client relationship between the Attorney General and Mike Moore, citing as support a New York Times newspaper article.  [Doc. No. 100] p. 7.  Regardless of how Google wishes to

---

[8] Google takes issue with the fact that the Attorney General redacted the scope of the Retention Agreement with the Mike Moore Law Firm. [Doc. No. 100], p. 6. n.2. The Attorney General did produce the Retention letter to Google, with the scope of the representation redacted.  [Doc. No. 100-1], p. 2.  The Attorney General request that the Court conduct an in camera review of the retention letter prior to ruling with respect to the attorney-client privilege.

characterize Mike Moore's role as an attorney for the Attorney General or the nature of his privilege communications with the Attorney General, the attorney-client privilege belongs to the client, in this case the Attorney General and an attorney cannot unilaterally waive the privilege. *See United States v. Juarez*, 573 F.2d 267, 276 (5th Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978). At no time has the Attorney General waived the attorney-client privilege regarding confidential communications with Mike Moore and/or the Mike Moore Law firm regarding his representation of the Attorney General in regard to Google.

### B. Work Product

Google next argues that the Attorney General's claim of work-product as to the draft subpoenas is not well-founded because certain documents for which privilege is claimed were not originally drafted by the Attorney General or anyone representing him. [Doc. No. 100], p. 10. As noted previously, the Attorney General enlisted the assistance of individuals outside of his office to assist with issues related to possible future litigation against Google.

It is well-settled that the work-product doctrine promotes the adversary system by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414 (3rd Cir. 1991). "Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Hickman v. Taylor*, 329

U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947); *United States v. AT & T*, 642 F.2d 1285, 1299 (D.C. Cir.1980).

Rule 26(b)(3) of the Federal Rules of Civil Procedure provides that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial *by or for another* party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). The documents withheld by the Attorney General pursuant to Rule 26(b)(3) were prepared *for* the Attorney General. Furthermore, the work-product doctrine provides qualified protection of documents and tangible things prepared in anticipation of litigation, including "a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements." *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 400, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *United States v. El Paso Co.*, 682 F.2d 530, 543 (5th Cir. 1982)). *Ferko v. Nat. Ass'n for Stock Car Auto Racing*, 219 F.R.D. 396 (E.D. Tex. 2003).

The work product protection is broader in scope and reach than the attorney-client privilege because it extends only to client communications, while the work product protection encompasses much that outside of client communications. *See United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). Further, Rule 26(b)(3) permits disclosure of documents and tangible things constituting attorney work product only upon a showing of substantial need and

inability to obtain the equivalent without undue hardship. Fed. R. Civ. P. 26(b)(3). Google cannot make a showing of "substantial need."

The work product privilege applies to documents "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3). The law in this Circuit is that the work product privilege can apply even where litigation is not imminent "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."[9]  *In re Kaiser Aluminum and Chem. Co.,* 214 F.3d 586 (5th Cir. 2000). "To establish work product protection, a party must show the primary motivating purpose behind the creation of a document was to aid in possible future litigation . . .  whether a document is protected *depends on the motivation behind its preparation, rather than on the person who prepares it*." *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 321 (N.D. Ill. 2008) (emphasis supplied); *see also Boyer v. Gildea*, 257 F.R.D. 488 (N.D. IN 2009) ("[W]hether a document is protected depends on the motivation behind its preparation, rather than on the person who prepares it."). *Id.*

Google seeks to undermine the very nature of the adversary system fostered by the work-product privilege by demanding the production of draft subpoenas prepared for the Attorney General in anticipation of litigation. Allowing Google access to these draft subpoenas would obviously allow it to review earlier drafts of

---

[9] Google does not strenuously contest the fact that the material was prepared in anticipation of litigation, nor could it given the legal arguments advanced in this case. For instance, Google contends that as early as April 2013, it began making changes to its editorial judgments about what Autocomplete predictions would block due to alleged threats. *See* [Doc. No. 54-2]. While the Attorney General vigorously disputes the factual assertions of Google's position, by its own admission, it allegedly deemed possible litigation as a possibility.

the subpoena then compare the drafts against the Subpoena actually served by the Attorney General on October 14, 2014.  This is simply a back-door tactic by Google to gain access to the Attorney General's work product leading up to the issuance of the Subpoena.

Disclosure of work product results in waiver of work-product protection only if work-product is disclosed to adversaries or treated in a manner that substantially increases the likelihood that an adversary will come into possession of the material. *Ferko v. National Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125 (E.D. Tx. 2003).  Here, the draft subpoenas were not disclosed to Google or treated in a manner that substantially increased the likelihood that Google would come into possession of the material.  This is evidenced by the fact that Google now seeks the draft subpoenas.

With respect to whether the "primary motivating purpose" behind the Subpoena was to aid in possible future litigation, the answer to this question is clearly in the affirmative.  Once this matter reached the stage of preparing the Subpoena, litigation was obviously a possibility.  First, had Google not filed this instant lawsuit and failed to comply with the Subpoena, the Attorney General would have been required to file an enforcement action in state court pursuant to Miss. Code Ann. § 75-24-17 to compel the production of the documents sought in the Subpoena.  Thus, litigation of the enforcement of the Subpoena was certainly likely. Second, had the Attorney General's Subpoena provided information or documents evidencing violations of Mississippi's Consumer Protection Act, then information

14

obtained through the Subpoena would certainly have been used to aid in future litigation for any putative claims against Google arising under the Mississippi Consumer Protection Act.

In this case, draft subpoenas were prepared and sent to either the Attorney General directly, or to Mike Moore, the Attorney General's outside attorney for use by the Attorney General as he saw fit. Those draft subpoenas were then used by the Attorney General and his staff to prepare the final Subpoena served on Google on October 14, 2014. To allow Google the benefit of this work and the progression of the drafts leading up to the final Subpoena is simply to allow it the fruits of the Attorney General's work product without having made the requisite showing. Such discovery in this particular case certainly undermines the very nature of the work product doctrine, in that "[p]rotecting [an] attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Hickman*, 329 U.S. at 510–11.

The Supplemental Privilege Log shows that drafts Subpoenas were drafted by Tom Perrelli and/or Brian Moran. While neither Mr. Moran nor Mr. Perrelli represented the Attorney General, both provided assistance to General Hood and prepared draft subpoenas for the benefit of and for Attorney General's use. These draft subpoenas were then used by the Attorney General and his staff. Allowing Google access to draft subpoenas would provide it with information concerning the evolution of the Subpoena, the thought processes of the attorneys in General Hood's

office as well as mental impressions of his staff who prepared the subpoenas.[10]  This is precisely the type of information the work-product privilege is designed to protect.  The only possible reason Google wants draft subpoenas is merely to gain further insight into the Attorney General's investigation.  The Attorney General urges the Court to reject such an expedition.

## IV.  The Word Files Constitute Work Product.

The so-called "Word Files" sought by Google in the first request for production were provided by Tom Perrelli in response to questions posed to Mr. Perrelli by the Attorney General.  Allowing Google access to these documents and communications would reveal the nature of the Attorney General's mental impressions and strategy regarding future litigation against Google.  The Attorney General requests that the Court conduct an *in camera* review of the documents and

---

[10] Google has also issued subpoenas to produce documents to Jenner and Block, LLP , where Mr. Perrelli is employed.  *See* [Doc. No. 85-1].  Even as a third-party, Mr. Perrelli is entitled to assert his own work product with respect to documents he prepared for the Attorney General.  As the Court in *In re: Student Finance Corp.* stated:

> Rule 26(b)(3), however, is not the only means for asserting work product protection in federal courts. The rule is only a partial codification of the work product privilege, [ ] and therefore leaves room for the privilege to be asserted outside its terms in appropriate cases.  Courts have extended the work product privilege beyond the strict terms of Rule 26(b)(3) to protect intangible work product outside the "documents and tangible things" protected by the rule. [ ]. Similarly, the Court believes the privilege may be extended beyond the strict terms of the rule to protect non-parties' work product when doing so accords with the purposes of the privilege set out in *Hickman v. Taylor*.

2006 WL 3484387, at *10 (E.D. Penn. Nov. 29, 2006) (internal citations and quotations omitted).

communication between Mr. Perrelli and the Attorney General's staff which will substantiate the applicability of the work-product privilege.[11]

Furthermore, the same considerations set forth in footnote 7, *supra*, apply with equal force to the work-product of Mr. Perrelli.  The Attorney General should not be required to produce to Google the content of a protected communication for the purpose of substantiating the privilege.  The United States Supreme Court has "long held the view that in camera review is a highly appropriate and useful means of dealing with claims of *governmental privilege*."  *See, e.g., United States v. Nixon*, 418 U.S. 683, 706, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (emphasis supplied); *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).  Thus, the Attorney General requests that the Court conduct an in camera review of the "Word Files" and related correspondence to determine the existence of the work-product privilege.

## V.     The Redacted Letters Authored by the Attorney General and Sent to other State Attorneys General Constitutes Work-Product.

Google argues in its motion that the Attorney General must produce letters he sent to other state Attorneys General without redaction.  [Doc. No. 100], p. 13.  The Attorney General produced a portion of the letters in question owing to the fact that the material did not constitute work product.  The redacted material in the letters, however, do contain the Attorney General's own work product including research, strategy and mental impressions regarding potential claims against

---

[11] The applicable documents with respect to the work-product privilege to the "Word Files" are set forth in the Supplemental Privilege Log and bates numbered PL000223-000245.

Google.  The Attorney General requests that the Court conduct an *in camera* review of the redacted letter so as to assess the assertion of the work-product privilege.

Again, Google cannot demonstrate a "substantial need" for the redacted content of the letter other than its desire to gain as much insight as possible into the nature of the Attorney General's communications with his counter-parts in other states.  Allowing this intrusion into this type of work-product does injury to the public interest by allowing an individual and/or entity to gain access into potential multi-state litigation.  In *camera review* of the letter will demonstrate that the redacted portion of the letter contains the Attorney General's  *See, e.g., United States v. Nixon*, 418 U.S. 683, 706, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974); *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

Google takes exception to the Attorney General's assertion of the common-interest doctrine regarding the letter to other Attorneys General.  While the common interest doctrine is not privilege in and of itself, it is an extension of the attorney-client privilege and of the work-product doctrine.  *See In re LTV Secs. Litig.*, 89 F.R.D. 595, 604 (N.D. Tex. 1981) (noting that the common interest doctrine "extends the attorney-client privilege to communications made in the course of joint defense activities"); *see also Power Mosfet Techs. v. Siemens AG*, 206 F.R.D. 422, 424 (E.D. Tex. 2000) (stating that the common interest doctrine applies to the work-product doctrine).  Generally, when an attorney divulges privileged information to a third party, attorney-client and work-product protection cease to exist.  *See United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir.1976).

The common interest doctrine, however, "extends a recognized privilege, commonly the attorney-client or work product privileges, to cover those communications." *Siemens AG*, 206 F.R.D. at 424.  Consequently, the common interest doctrine is "an exception to the general rule that the attorney-client privilege is waived upon disclosure of privileged information with a third party." *Katz v. AT & T Corp.*, 191 F.R.D. 433, 436 (E.D. Pa. 2000) (citations omitted).  This exception also applies to the work-product doctrine. *Siemens AG*, 206 F.R.D. at 424. The common interest doctrine protects communications between two parties or attorneys that share a common legal interest.

Google cites *In re: Santa Fe Corp.*, 272 F.3d 705, 710 (5th Cir. 2001) arguing that the common interest doctrine only applies for "(1) communications between co-defendants in actual litigation and their counsel; and (2) communications between potential co-defendants and their counsel." *Id.* at 710.  While the Fifth Circuit has not addressed the precise issue before this Court, *i.e.*, the applicability of the common-interest doctrine between state Attorneys General, at least two other Courts have recognized the doctrine regarding the sharing of information between Attorneys General and the National Association of Attorneys General.  *See Tobaccoville USA, Inc., v. McMaster*, 387 S.C. 287 (2010) and *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 2008 WL 1826490, at *3 (Apr. 18, 2008 S.D.N.Y). Because this is not the ordinary dispute between private litigants, but involves an investigation by the chief law enforcement officer of the State of Mississippi, sharing confidential information with other Attorneys General for

19

purposes of possible multi-state litigation must be viewed differently. Therefore, the letters sent by General Hood to other state Attorneys General should be protected as work product.

## VI.  Conclusion

For the reasons set forth, the Attorney General respectfully requests that the Court deny Google's motion to compel.  In the alternative, the Attorney General requests that the Court conduct an *in camera* review of the documents for purposes of testing the privilege asserted prior to ruling on the motion.

THIS the 29th day of April, 2015.

Respectfully Submitted,

JIM HOOD, in his official capacity as Attorney General of the State of Mississippi

By:  JIM HOOD, ATTORNY GENERAL, STATE OF MISSISSIPPI

By:  */s/ Douglas T. Miracle*
DOUGLAS T. MIRACLE (Bar No. 9648)
SPECIAL ASSISTANT ATTORNEY GENERAL

20

STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
BRIDGETTE W. WIGGINS (MSB # 9676)
SPECIAL ASSISTANT ATTORNEY GENERAL
KRISSY CASEY NOBILE (MSB # 103577)
SPECIAL ASSISTANT ATTORNEY GENERAL
Post Office Box 220
Jackson, MS   39205
Telephone No. (601)359-5654
bwill@ago.state.ms.us
knobi@ago.state.ms.us
dmira@ago.state.ms.us


## <u>CERTIFICATE OF SERVICE</u>

I, Douglas T. Miracle, Special Assistant Attorney General for the State

of Mississippi, hereby certify that a true and correct copy of the foregoing

document has been served via electronic mail and United States Mail on the

following:

> Fred Krutz , III
> Daniel J. Mulholland
> FORMAN, PERRY, WATKINS, KRUTZ & TARDY, LLP
> P.O. Box 22608
> 200 S. Lamar Street, Suite 100 (39201-4099)
> Jackson, MS 39225-2608
> Email: mulhollanddj@fpwk.com
> Email: fred@fpwk.com

> David H. Kramer - PHV
> WILSON, SONSINI, GOODRICH & ROSATI, PC
> 650 Page Mill Road
> Palo Alto, CA 94304-1050
> Email: dkramer@wsgr.com

Blake C. Roberts - PHV
WILMER, CUTLER, PICKERING, HALE & DORR, LLP
1801 Pennsylvania Avenue, NW
Washington, DC 20006
Email: blake.roberts@wilmerhale.com

Jamie S. Gorelick - PHV
WILMER, CUTLER, PICKERING, HALE & DORR, LLP
1801 Pennsylvania Avenue, NW
Washington, DC 20006
Email: jamie.gorelock@wilmerhale.com

Patrick J. Carome - PHV
WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Email: patrick.carome@wilmerhale.com

Peter Neiman - PHV
WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Email: peter.neiman@wilmerhale.com

Violetta G. Watson - PHV
WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Email: violetta.watson@wilmerhale.com

THIS the 29th day of April, 2015.

/s/ Douglas T. Miracle
DOUGLAS T. MIRACLE