**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| Google Inc., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| | ) | No. 3:14cv981 HTW-LRA |
| *v.* | ) | |
| | ) | **REPLY MEMORANDUM IN** |
| | ) | **SUPPORT OF MOTION TO COMPEL** |
| Jim Hood, Attorney General of the State | ) | **THE PRODUCTION OF** |
| of Mississippi, in his official capacity, | ) | **DOCUMENTS BY DEFENDANT JIM** |
| | ) | **HOOD, THE ATTORNEY GENERAL** |
| *Defendant.* | ) | **OF THE STATE OF MISSISSIPPI** |
| | ) | |
| | ) | |
| | ) | |

The Attorney General served the 79-page subpoena at the heart of this case after sustained lobbying from the MPAA.  The Court has found that Google is likely to succeed on the merits of its claims, including its claim that the Attorney General conducted his investigation in bad faith.  The Attorney General is now trying to throw a veil of secrecy over his interactions with the MPAA and other lobbyists during his investigation, refusing to produce the draft subpoenas the lobbyists wrote, and the multiple policy memos (with titles like "Google must change its behavior") that the lobbyists sent him.  He asserts, for example, that documents created by the MPAA's lawyers are somehow *his* work product, and thus beyond the scope of discovery absent a showing of substantial need, simply because he read them.  That is flatly wrong.  The work product doctrine exists to shield from discovery an attorney's thoughts and impressions developed in preparation for litigation.  It does not protect a trade association's communications with a government official, aimed at inducing the official to pressure a business rival.  For multiple reasons, this Court should grant Google's motion to compel.

First, the Attorney General has not met his burden to prove that the withheld documents are privileged.  The Supplemental Privilege Log does not describe how the elements of each claimed privilege are met.  The Attorney General submitted no affidavits or other evidence with his opposition brief to meet this burden.  The Attorney General's failure to carry his burden alone requires granting the motion to compel.

The Attorney General's position also fails as a matter of law.  It is undisputed that the central documents at issue were created by private parties for the purpose of lobbying the Attorney General to pressure Google to change its constitutionally-protected practices.  That some of the documents were passed through the Attorney General's lawyer does not make them privileged, as the Attorney General now essentially concedes.  And the work product doctrine

1

does not shield from scrutiny lobbying a public official to take action against a

business adversary.

The Attorney General's position appears to be that the work product protection applies if

(1) talk of litigation was in the air and (2) a document looks litigation-related.  But the basic

requirements of the work product doctrine preclude its application to the lobbying activity at

issue:

- The draft subpoenas, CIDs, and white papers do not constitute the work product *of the Attorney General* because they were not created by his counsel or agent, but instead by private third-parties seeking to influence his official conduct.

- The same documents do not constitute the work product *of private counsel* because their clients (the MPAA, Microsoft, and others) were not anticipating litigation as a party.  And any protection was waived when the documents were provided to the Attorney General to encourage an attack.

- The letter to attorneys general is not work product because the unredacted portion of the document makes clear its primary purpose was to form a working group to induce Google to change its policies, not to prepare for litigation.  And the common interest doctrine does not include unsolicited invitations to join such an effort.

The record also suggests that any privilege was waived by the Mike Moore Law Firm's

parallel representation of the Attorney General and a private lobbying group, as well as Mr.

Moore's repeated disclosures of confidential information to outside interests.  The Attorney

General offers no affidavit explaining the representations or contesting that the disclosures were

made.  Instead, he asserts that "an attorney cannot unilaterally waive the privilege."  Opp'n Br. at

2

11.  But he offers no *evidence* that Moore's disclosures—to the very third parties with whom the Attorney General was in frequent contact, as the privilege log itself reveals—were unauthorized.

The Court should compel the production of the requested documents because the Attorney General has failed to carry his evidentiary burden, because the requested documents are not protected, and because any privilege or protection was waived.

## ARGUMENT

The Attorney General, as the party resisting production, "bears the burden of demonstrating [the] applicability" of the asserted privilege or other claimed protection.  *In re Santa Fe Intl. Corp.*, 272 F. 3d 705, 710 (5th Cir. 2001).  To successfully resist production, the Attorney General must do more than merely assert that a privilege exists.  *See id.* at 710 n.7 ("the privilege claimant's burden extends to proof of preliminary facts showing that the matter is eligible for protection").  The Attorney General has not submitted affidavits or similar evidence that would allow the Court to evaluate the "precise facts [that] exist to support the claim of privilege."  *Varo, Inc. v. Litton Systems*, 129 F.R.D. 139, 142 (N.D. Tex. 1989); *see also Navigant Consulting Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004).

Instead, the Attorney General offers a series of factual assertions lacking any evidentiary support, and repeatedly requests that the Court conduct an *in camera* review of the documents at issue.  *See* Opp'n Br. at 10 n.8, 17, 18.  Google does not oppose such a review, but it is unnecessary here.  Nothing on the face of the documents will remedy the legal or evidentiary deficiencies in the Attorney General's privilege and work product assertions discussed below. *See* PAUL R. RICE, 2 Attorney-Client Privilege in the U.S. § 11:16 (2014) ("It has been held that in camera inspection is not appropriate until prima facie evidence of the validity of the privilege claim has been presented.").

3

I.      THE DRAFT SUBPOENAS AND CIDS PREPARED BY THIRD PARTIES
        SHOULD BE PRODUCED.

The Court should order the production of the draft subpoenas and CIDs because they are

not protected by the attorney-client privilege or work product doctrine.

A.      The Third-Party Draft Subpoenas Are Not Privileged.

The Attorney General's Opposition Brief effectively concedes that two of the three draft

subpoenas that were passed through the Mike Moore Law Firm[1] are not protected by the

attorney-client privilege.  These documents were authored by attorneys that represented third

parties and did not represent the Attorney General.  Opp'n Br. at 15.[2]  For the reasons discussed

in the Motion to Compel, Dkt. No. 100 at 5-11, the mere transmittal of such documents through

the Attorney General's counsel does not transform them into privileged documents.  The

Attorney General's Opposition Brief essentially concedes the point.  It explains that privilege

was claimed over the draft subpoenas and CIDs "to avoid any subsequent claim by Google that

any confidential communications between the Attorney General and Mike Moore had been

waived with respect to these draft subpoenas."  Opp'n Br. at 10.  But the issue here is not

whether confidential communications between a lawyer and client are privileged.  The issue is

---

[1]  The documents, PL000001-67, PL000075-119, PL000068-74, PL000120-166, are responsive
to the first category specified by the Court's April 10 Order, "[a]ny draft subpoenas provided to
the Attorney General by the third parties identified in Google's request."

[2]  With respect to the third document, the draft subpoena identified at PL000167-176, the
Opposition Brief asserts for the first time that the Attorney General had an attorney-client
relationship with Mr. Modisett of the law firm of SNR Denton.  Opp'n Br. at 9 n.7.  The
Attorney General has offered no evidentiary basis for this claim.  If he produces evidence that
demonstrates that the elements of the attorney-client privilege are satisfied with respect to this
document, Google will withdraw its request to compel its production.

whether the subpoenas themselves, created by third parties and transmitted through Mike Moore to the Attorney General, are privileged.  The Attorney General offers no argument that they are.

### B.      The Third-Party Draft Subpoenas and CIDs Are Not Work Product.

The Attorney General repeatedly insists that the draft subpoenas and CIDs are protected work product and that Google has no "substantial need" for the documents.  But Google must show "substantial need" only if the Attorney General first establishes the documents are protected work product, and they are not.[3]

*First*, the draft subpoenas and CIDs do not constitute *the Attorney General's* work product.  It is undisputed that the documents were not prepared by the Attorney General, members of his office, his retained outside counsel, or any agents of those parties.  It follows that the Attorney General may not claim them as his own work product.  *See United States v. Nobles*, 422 U.S. 225, 238-39 (1975) (holding that "[work product] doctrine protect[s] material prepared by agents for the attorney as well as those prepared by the attorney himself"); *Dublin Eye Associates, P.C. v. Massachusetts Mut. Life Ins. Co.*, No. 5:11-CV-128-KSF, 2013 WL 653541, at *7 (E.D. Ky. Feb. 21, 2013) (work product does not protect communications with third party providing "informal assistance" to a party's attorney).

The Attorney General seeks to evade this bar by asserting that he "enlisted" the assistance of outside groups and individuals in his inquiry.  Opp'n. Br. at 6, 11.  The Attorney General offers *absolutely no evidence* to support this claim, or even explain what "enlisted" means for purposes of the motion pending before this Court.  *See In re Refco Securities Litigation*, 280

---

[3]  The relevance of the documents is unquestioned.  Both Google's claims and the Attorney General's argument for abstention put the good faith, objectives, and motivation of the Attorney General directly at issue, and his communications with third parties with business interests adverse to Google's are relevant to those questions.

F.R.D. 102 (S.D.N.Y. 2011) (conclusory allegation not sufficient to support invocation of work

product).  The Attorney General has not explained when he allegedly requested the assistance,

what the scope of his request was, or what the outside parties obtained in return from the

Attorney General for their "enlistment".[4]  But in any event, a mere request for help would not

turn these private lawyers who represent third parties into the Attorney General's own agents.

The authors of these documents, *as attorneys acting for private parties* (*i.e.*, not the State), had

an obligation to act on behalf of their private clients who wished to influence the Attorney

General, not on behalf of the Attorney General himself.  The absence of an attorney-client or

principal-agent relationship between the Attorney General and the authors of the documents

precludes a claim that the documents are the Attorney General's own work product.  *See Nobles*,

422 U.S. at 238-39;  *Dublin Eye Associates*, 2013 WL 653541, at *7.

     Indeed, even the two cases that the Attorney General cites as purportedly on this point do

not support his argument.  In *Boyer v. Gildea*, 257 F.R.D. 488 (N.D. Ind. 2009), the documents

at issue were created by the party's former lawyer in the matter.  *Id.* at 492.  It is unsurprising

---

[4]  The Attorney General's suggestion that he enlisted the MPAA, rather than the other way around, is in tension with the Attorney General's prior public statements.  In December 2014 the Attorney General told the Huffington Post that "he has never asked MPAA a legal question." Liebelson, How State Attorneys General May Help Hollywood Revive SOPA Anti-Piracy Efforts, Huffington Post, December 16, 2014, *available at* http://www.huffingtonpost.com/2014/12/16/attorneys-general-sopa_n_6330298.html ("Liebelson, How State Attorneys General").  He claimed that Mr. Perrelli (the MPAA outside counsel who the privilege log identifies as the author of many of the documents at issue) had simply "offered to assist his office."  *See* Ex. H of Supplemental Declaration of Peter G. Neiman in Support of Plaintiff Google Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction [ECF Dkt. No. 52-1], Liebelson, Emails Show Hollywood Worked With A State Attorney General To Push Its Anti-Piracy Agenda,  Huffington Post, December 19, 2014, *available at* http://www.huffingtonpost.com/2014/12/18/movie-piracy_n_6348256.html.   The Attorney General also claimed at the time not to know which law firm Perrelli worked for, and said he was "not aware" of Perrelli's law firm's relationship with the MPAA.  *Id.*

that materials created by a party's lawyer, even a former one, would fall within the protection

afforded by the work product doctrine, for the lawyer retains fiduciary duties to the client with

respect to his prior representation.  That type of representative relationship seems squarely within

the scope of Federal Rule of Civil Procedure 26.  *See* Fed. R. Civ. P. 26(b)(3)(A) (protecting as

work product materials "prepared in anticipation of litigation or for trial by or for another party

or its *representative*") (emphasis added).  Similarly, in *Grochockinski v. Mayer Brown Rowe &*

*Maw LLP*, 251 F.R.D. 316 (N.D. Ill. 2008), the third party who authored the relevant documents

was a representative of the plaintiff, one that was formally "retained" "[p]ursuant to the parties'

written agreement . . . ."  *Id.* at 322.  Here, however, there is no such relationship as between the

Attorney General and the third-party attorneys who drafted the subpoenas and CIDs to establish

those lawyers as the Attorney General's representatives.

       *Second*, the draft subpoenas and CIDs do not qualify for protection as the work product

of the third-party attorneys who created them.  As an initial matter, it is worth noting the

Attorney General's acknowledgement that the materials "were prepared and sent to either the

Attorney General directly, or to Mike Moore . . . *for use by the Attorney General as he saw fit*."

Opp'n Br. at 15 (emphasis added).  Materials prepared by a third party for any use that the

Attorney General "saw fit" can hardly be seen as having a "primary motivating purpose" to aid

in potential future litigation.  *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir.

2000); *see also United States v. El Paso Co.*, 682 F.2d 530, 544 (5th Cir. 1982) (holding no work

product protection where that the primary motivating purpose of the documents was "not . . . to

prepare a specific case for trial or negotiation").

       As Google explained in the Motion to Compel, the third parties represented by these

private lawyers did not themselves anticipate litigation as a party, but were instead merely urging

7

the Attorney General to do so in his official capacity.  *See* Mot. to Compel at 10.  Therefore, the

"essential element" of the work product doctrine, "that the attorney was preparing for or

anticipating some sort of adversarial proceeding involving his or her client" was missing.  *See In*

*re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 924 (8th Cir. 1997).  The Attorney

General has cited no authority why these materials would be work product absent that essential

element.  *See id.* ("[W]e know of no authority allowing a client … to claim work product

immunity for materials merely because they were prepared while some other person … was

anticipating litigation."); *see also Nobles*, 422 U.S. at 238-39 ("At its core, the work-product

doctrine shelters the mental processes of the attorney, providing a privileged area within which

he can analyze and prepare *his client's* case.") (emphasis added). Nor has the Attorney General

explained how he has standing to assert work product protection which, if it exists at all, would

belong to the third parties and their lawyers, not to him. *See* Mot. to Compel at 10-11 (citing *In*

*re Grand Jury Proceedings*, 43 F.3d 966, 972 (5th Cir. 1994) ("[T]he work product privilege

belongs to both the client and the attorney, either one of whom may assert it.").

> ### C.      Any Work Product Protection Was Waived When the Materials Were Provided to the Attorney General.

Even if the draft subpoenas and CIDs were protected work product when created by the

third-party attorneys, that protection was waived when the third-party attorneys and their clients

elected to give the draft subpoenas and CIDs to the Attorney General.  Opp'n Br. at 15.  Such

conduct waives any claim of work product protection.  *See Baricuatro v. Indus. Pers. & Mgmt.*

*Servs., Inc.*, No. CIV.A. 11-2777, 2013 WL 3367137, at *12-13 (E.D. La. July 5, 2013) (holding

that work product protection was lost where non-party made voluntary submission to

government actor "with the primary purpose of provoking or assisting in the government's

criminal or administrative investigations."). "[D]isclosure in this context increases the probability that the work product will be obtained by the informant's adversary" since if the "lobbying effort is successful and the government initiates a prosecution, then the work product could be disclosed at a public trial." *Id.*

Multiple federal courts have recognized a waiver in similar contexts. For example, in *Information Resources, Inc. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591, 593 (S.D.N.Y. 1998), the court held that "waiver results from the voluntary submission of material to a government agency to incite it to attack the informant's adversary." Waiver is appropriate because it "vindicates the principle of full disclosure, prevents the unfairness of selective revelations, and reflects the common-sense perception that in most such cases the privacy attending the creation of the work-product had either served its purpose of was of little importance in the first place." *Id.*

Similarly, in *Bank of America, N.A. v. Terra Nova Insurance Company*, 212 F.R.D. 166 (S.D.N.Y. 2002) waiver was found for materials voluntarily submitted to the government because "[d]isclosing information to governmental authorities in the hope that they will attack an adversary . . . cannot be said to be done 'in the pursuit of . . . trial preparation.'" *Id.* at 172-73 (citing *U.S. v. AT&T Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) (second ellipses in opinion)). While the work product doctrine "provides qualified protection for materials prepared . . . in anticipation of litigation or for trial . . . [i]t is not intended, however, to obscure what is essentially a lobbying and political effort, even one undertaken by a lawyer." *In re Chevron Corp.*, 749 F. Supp. 2d 141, 165-66 (S.D.N.Y. 2010) (internal quotation omitted), *aff'd*, 409 F. App'x 393 (2d Cir. 2010). Just as in these cases, the attorneys creating the materials at issue here were not preparing to represent their client in litigation—they were instead lobbying for the

Attorney General to threaten litigation to coerce Google to make policy changes and alter its

First Amendment activity.  Such conduct is far removed from the rationale for the work

product doctrine.

## II.  THE ATTORNEY GENERAL HAS FAILED TO MEET HIS BURDEN AND ESTABLISH THAT THE REQUESTED WORD FILES SHOULD NOT BE PRODUCED.

With respect to the four Word files responsive to the fourth category of documents

required to be produced under the Court's April 10 Order [5] the Attorney General fails to

substantively address the arguments made by Google in the Motion to Compel.  *See* Mot. to

Compel at 11-13.  The Attorney General should be required to produce the Word files.

The Attorney General does not cite any authority explaining why these materials,

apparent advocacy pieces crafted by lawyers for the MPAA would constitute *the Attorney*

*General's* work product.  The Word files were not drafted by the Attorney General, his office, or

his retained outside counsel.  Indeed, the Attorney General has conceded that the Word files

were created by a third-party attorney, Mr. Perrelli of Jenner & Block, who did not represent the

Attorney General.  *See* Opp'n Br. at 15.  Nevertheless, the Attorney General asserts that having

to produce these documents would "reveal the nature of the Attorney General's mental

---

[5]  As reflected on the First Supplemental Privilege Log, the Word files were attached to three e-mails, one sent by Mr. McKenna from Orrick (PL000202-222) and two sent by Mr. Perrelli (PL000223-245, PL000177-201).  Both the e-mails and the attached memorandum are responsive to Google's request and should be produced.

impressions and strategy regarding future litigation against Google." *Id.* at 16.[6]  To the contrary,

the documents would at most reveal the strategic thinking and mental impressions of their

author, Mr. Perrelli, who is neither an attorney for, nor an agent of, the Attorney General.[7]  The

Attorney General did not make the documents his work product simply by reading them.[8]

     Even if one were to make the generous assumption that the Word files were Mr. Perrelli's

work product (which would require overlooking the absence of any anticipated litigation

involving Mr. Perrelli's client), the Attorney General fails to explain why turning the documents

---

[6]  In yet another factual assertion made for the first time in his Opposition Brief and unsupported by any evidence, the Attorney General claims that the withheld memoranda were provided "in response to questions posed to Mr. Perrelli by the Attorney General."  Opp'n Br. at 16.  That is contrary to the Attorney General's prior statement that he "never" asked the MPAA (who Mr. Perrelli represents) "a legal question."  *See* note 4 *supra.*  There is no explanation in the Opposition Brief of the nature of the communication between Mr. Perrelli and the Attorney General.  For instance, no such communication appears on the privilege log, and there is no affidavit accompanying the brief attesting to the predicate facts of the communication.  Press accounts reflect that Mr. Perrelli shared the documents with Connecticut's Attorney General at around the same time, casting substantial doubt on the notion that the documents were prepared specifically in response to General Hood's request.  *See* Ex. 5 of Neiman Decl. for Mot. to Compel, Joe Mullin, *Hollywood v. Goliath: Inside the Aggressive Studio Effort to Bring Google to Heel*, Ars Technica, Dec. 19, 2014.  There is also nothing in the Opposition Brief to explain why the Attorney General posing the question in the first instance would change the work product analysis, including whether any waiver occurred.  More generally, the Court cannot credit such bald assertions wholly unsupported by any evidence.

[7]  Outside this litigation, the Attorney General has squarely denied that the MPAA's information influenced his thinking.  *See* Liebelson, How State Attorneys General, note 4 *supra* (the Attorney General "said his views haven't been influenced by the movie industry," that "the MPAA has no major influence on my decision-making").

[8]  Affording work product protection to documents provided to a government official by a lobbyist would also eviscerate Freedom of Information laws, which typically do not extend to protected work product.  Shielding the influence of private parties over public policy in this manner would diminish transparency and disserve the public interest.  "The value of transparency comes from the belief that sunlight is the best disinfectant, and the recognition that we had better do our best, and act in a way that would make the public proud if they saw everything we did.  Transparency is . . . about making government, and making the public who becomes informed by our transparency, the best that we all can be."  Remarks of Associate Attorney General Tom Perrelli at the Justice Department's Sunshine Week Celebration (March 14, 2011).

over to the Attorney General did not waive any protection under the doctrine.  *See supra* at 8-10.

Mr. Perrelli's purpose was plainly to "incite [the Attorney General] to attack [the client's]

adversary," Google.  *Info Res., Inc.*, 999 F. Supp. at 593.  When Mr. Perrelli and his client chose

to share documents with the Attorney General in the hope that he would launch that attack, they

waived whatever protections of the work product doctrine may have applied.

**III.     THE ATTORNEY GENERAL HAS FAILED TO MEET HIS BURDEN AND ESTABLISH THAT THE REDACTED PORTION OF HIS LETTER TO OTHER STATE ATTORNEYS GENERAL SHOULD NOT BE PRODUCED.**

The Attorney General's Opposition Brief fails to establish his claim of work product

protection and common interest privilege for the redacted portion of the 31 copies of a letter

transmitted to state attorneys general around the country (D000004-65).  *See* Opp'n Br. at 17-20.

*First*, with respect to the work product claim, the Attorney General repeats his

misunderstanding of the doctrine, as he does throughout his brief.  Google does not need to

demonstrate a "substantial need" for the redacted portions of the letter (or for any other

discovery sought by the Motion to Compel), as the Attorney General claims, *see* Opp'n Br. at 18,

*see also id.* at 13, because those materials are *not* work product.  The requirement to demonstrate

substantial need is only relevant if the materials sought are work product.  *See* Fed. R. Civ. P.

26(b)(3)(A)(ii).  Because either the materials are not work product or any work product

protection was waived, the documents are subject to the typical requirements of discovery and no

heightened showing of "substantial need" is required.

*Second*, the Attorney General did not address how preparation for litigation was the

"primary motivating purpose" for drafting the letters.  *See* Mot. to Compel at 13-14.  The

Opposition Brief does not explain how a letter that, based on the unredacted portions,

predominantly discusses voluntary monitoring and flagging programs offered by Google to state

12

attorneys general as part of an effort to develop a "working group," is one that was drafted with the "primary motivating purpose" of preparing for litigation.  His bare assertion that the redacted portion of the letter contains "research, strategy and mental impressions regarding potential claims against Google" is inadequate to establish that preparation for litigation was the "primary motivating purpose" for creation of the document.  *See United States v. El Paso Co.*, 682 F.2d 530, 543 (5th Cir. 1982) (declining to extend work product protection to tax pool analysis where "[t]he primary motivating force behind the tax pool analysis . . . is not to ready El Paso for litigation over its tax returns [, but] . . . to anticipate, for financial reporting purposes, what the impact of litigation might be on the company's tax liability.").[9]

*Third*, the Attorney General admits that his invocation of the "Common Interest Doctrine" in this situation is beyond the limits of that doctrine as recognized by the Fifth Circuit. *See* Opp'n Br. at 19 (noting that the Fifth Circuit has not applied the doctrine to communications between the attorneys general of two or more states).  The two cases cited by the Attorney General do not justify expanding the doctrine beyond the narrow scope defined by the Fifth Circuit.  In fact, those cases illustrate why the common interest doctrine does not apply to the redacted portion of the Attorney General's letter.

In *Tobaccoville USA, Inc. v. McMaster*, 692 S.E.2d 526 (S.C. 2010), the Supreme Court of South Carolina recognized the common interest privilege, but only for the "narrow factual scenario" present there.  *Id.* at 531.  As the court explained, the doctrine applies "where several states are parties to a settlement agreement, the state laws that regulate and enforce that

---

[9] Press accounts contain what appears to be a substantial excerpt from the letter, which focuses on proposed changes to YouTube's "trusted flagger" tool. *See* Ex. 5 of Neiman Decl. for Mot. to Compel.

13

settlement all have the same provisions, the attorneys general . . . are involved in coordinating regulation and enforcement, and the settling states have executed a common agreement." *Id*. Those particular facts are nothing like the facts present here.  For instance, there is (i) no settlement agreement, (ii) there are no parallel laws to regulate and enforce a settlement agreement, (iii) there is no formal coordination regarding regulation and enforcement, and (iv) there is no executed common interest agreement.

The other case cited by the Attorney General, *Grand River Enterprise Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068(JFK)(DFE), 2008 WL 1826490 (S.D.N.Y. April 18, 2008) is also inapposite.  The states in *Pryor* had "signed a Common Interest Agreement," in fact, the same common interest agreement implicated in *Tobaccoville*.  *See id.* at *2.  The fact that some of the communications included personnel from the National Associations of Attorneys General ("NAAG") did not change the result.  The state attorneys general had previously agreed that NAAG would "support and coordinate the efforts of the Attorneys General . . . in carrying out their responsibilities" under the settlement agreement, so NAAG's role was accepted by the state attorneys general as part of the common interest.  *Id.*  In other words, the common interest shared by the attorneys general stemmed from a previous litigation and continued on so that the relevant settlement could be effectuated.  That is a very different situation from the one here where the Attorney General is writing a letter to other state attorneys general disconnected to any actual litigation and without a recognized common interest, let alone a common interest agreement.

This scant case law does not justify expanding the very limited scope of the Fifth Circuit's common legal interest doctrine.  Indeed, such an expansion would be contrary to the Fifth Circuit's statement that the doctrine must be construed narrowly" because it is "an obstacle to truthseeking." *In re Santa Fe Int'l Corp.*, 272 at 710.  With no common interest between the

14

Attorney General and the other state attorneys general, any claim of work product was waived

when he voluntarily disclosed the unredacted portions of the letter.

**CONCLUSION**

For the foregoing reasons, Google respectfully requests that the Court compel the

Attorney General to immediately produce the requested documents.

DATED this 7th day of May, 2015.

Respectfully submitted,

OF COUNSEL:
Jamie S. Gorelick
Patrick J. Carome
Blake C. Roberts
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
jamie.gorelick@wilmerhale.com
patrick.carome@wilmerhale.com
blake.roberts@wilmerhale.com

Peter G. Neiman
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone:  (212) 230-8000
Facsimile:  (212) 230-8888
peter.neiman@wilmerhale.com

____s/ Fred Krutz_____
Fred Krutz, MSB No. 4270
Daniel J. Mulholland, MSB No. 3643
FORMAN PERRY WATKINS
   KRUTZ & TARDY LLP
200 South Lamar Street, Suite 100
Jackson, Mississippi 39201
Post Office Box 22608
Jackson, Mississippi 39225-2608
Phone:  (601) 960-8600
Facsimile:  (601) 960-8613
fred@fpwk.com
mulhollanddj@fpwk.com

*Attorneys for Plaintiff Google Inc.*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Mississippi by using the Court's CM/ECF system on May 7, 2015. I further certify that all parties are represented by attorneys who are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 s/Fred Krutz
Fred Krutz, MSB#4270
