**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| Google Inc., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| | ) | |
| *v.* | ) | No. 3:14cv981 HTW-LRA |
| | ) | |
| | ) | **ATTORNEY GENERAL JIM HOOD'S** |
| | ) | **MEMORANDUM BRIEF IN OPPOSITION** |
| Jim Hood, Attorney General of the State | ) | **TO PLAINTIFF GOOGLE INC.'S MOTION** |
| of Mississippi, in his official capacity, | ) | **FOR A PROTECTIVE ORDER WITH** |
| | ) | **RESPECT TO NOTICES OF RULE 30(b)(6)** |
| | ) | **DEPOSITIONS OF GOOGLE INC.** |
| *Defendant.* | ) | |
| | ) | |

## INTRODUCTION

This case is about whether the Attorney General's investigation (and any potential related litigation) is directed at practices for which Google may have immunity or protection, including whether the subject content is truly "third-party content" under the Communications Decency Act ("CDA"), or whether Google's business activities have placed it outside the bounds of the immunity and protection granted by Congress and the Constitution. Google would have this Court enter a broad permanent injunction based solely on its own *ipse dixit* allegations that it does *nothing* to operate outside of its alleged statutory immunity and constitutional protections. However, resolution of these issues is necessary for the permanent injunction sought by Google, and will require the Plaintiff to support its claim of broad immunity with *facts—facts* that are the subject of the discovery sought by the Attorney General.

Despite the fact that Google filed a lawsuit asking this Court to determine whether it is immune from the State's investigation, Google now seeks to block discovery directed at

1

answering that question. "[W]ithout conducting this discovery, the court could not rule on [Google's] immunity claim." *Lion Boulos v. Wilson*, 834 F.2d 504, 508 (5th Cir. 1987) (analyzing scope of discovery regarding party asserting qualified immunity). *See id.* at 507-08 ("However, a second class of discovery … does not encroach upon his qualified immunity claim. Discovery orders entered when the defendant's immunity claim turns at least partially on a factual question; when the district court is unable to rule on the immunity defense without further clarification of the facts; and which are narrowly tailored to uncover only those facts needed to rule on the immunity claim are neither avoidable nor overly broad."). The discovery here is narrowly tailored to "uncover only those facts needed" to decide the question of Google's immunity. *Id.* at 509.[1]

For example, Google complains that offering evidence in this case to support its claims of immunity works to actually undermine its immunity under the CDA. Google relies on *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009), to explain that immunity under § 230 is "an immunity from suit rather than a mere defense to liability" that is "effectively lost if a case is erroneously permitted to go to trial." *Nemet Chevrolet, Ltd.*, 591 F.3d at 254 (citations omitted). The problem, of course, is that Google is not a defendant asserting immunity in this case; Google is a plaintiff who has chosen to seek a judgment in its favor based on its factual allegations. As Plaintiff, Google has pleaded facts that must be tested by discovery and affirmatively proven at trial; this is not an instance where a *defendant's* § 230

---

[1] Google's reliance on decisions where courts had previously entered orders barring the discovery sought by deposition topics is misplaced. *See Frasca v. NCL (Bah.) Ltd.*, 2014 U.S. Dist. LEXIS 32709, *11-12 (S.D. Fla. 2014) ("Frasca is attempting to use the 30(b)(6) deposition as an end-run around his interrogatories seeking this same information because the Court found that he sought this information untimely. This kind of use of a 30(b)(6) deposition is improper."); *Viasat, Inc. v. Space Sys./Loral*, 2013 U.S. Dist. LEXIS 96622, *18 (S.D. Cal. 2013) ("Defendants seek elaboration of the information that Plaintiffs' previously provided, further revealing their true intent to do an end run around the Court's denial of an order to compel supplemental responses to ROG Nos. 22 and 23.").

immunity can be tested on the face of the plaintiff's complaint.  *See Nemet Chevrolet, Ltd.*, 591 F.3d at 254 ("[w]e thus aim to resolve the question of § 230 immunity at the earliest possible stage of the case") (analyzing § 230 immunity to resolve a 12(b)(6) motion) (citations omitted).

Moreover, the authority cited by Google is of little help to Google's position in this case. The cases cited by Google were in a very different posture than the instant matter, because the entity seeking immunity protection was the defendant and relied upon the plaintiff's allegations, taken as true to establish immunity.  That is not the case here—Google cannot assume its allegations to be true in order to fashion its own immunity.

Google's complaint contains seventy-three paragraphs in its "fact" section.  Of those paragraphs, fifty-two focus on Google's complaints that the Attorney General does not like Google.  (Dkt. # 1, ¶¶ 32-81).  Contrary to Google's representations that these fifty-two allegations are the "core allegations of the Complaint," Revised Notice No. 3 focuses on the allegations that are at the core of Google's case—the seventeen paragraphs in the "fact" section which concern Google's allegation that this case involves third-party content.  As this Court recognized, "[Google's] services, particularly its role as publisher of material originating from third parties, are at the epicenter of this litigation."  (Order, Dkt. # 88, p. 3).  Indeed, "the epicenter of this litigation" is the factual basis for the claims brought by Google.  It stands to reason that if Google's services and its role in providing those services are at "the epicenter of this litigation" then the agreements establishing and defining Google's role, what Google actually does when it performs "its role," how Google's systems work, whether the content at issue is Google's content, and what Google does with such content are highly relevant and should in no way be limited or prohibited.

The Attorney General is not seeking Google's "testimony on every facet" of Google's

business, nor does the Attorney General seek discovery "beyond what is necessary to resolve this case." (Dkt. # 129, p. 13). But, Google has not demonstrated what undue burden would be caused by the three noticed 30(b)(6) depositions, nor explained why that burden is so great that the Attorney General should be denied the benefit of testing the factual basis for Google's claimed immunity.

Google mischaracterizes the record, hoping that the Court will buy its position that the Attorney General has somehow agreed to waive discovery of the facts supporting Google's claims to immunity and protection. First, Google urges this Court to forbid discovery because, at the motion to dismiss and preliminary injunction stage, "'the parties agreed upon the relevant facts and … viewed the matter primarily as a dispute of law.'" (Dkt. # 129, p. 6). But, Google has deceptively removed the context of the Court's quote and distorted it's meaning by deleting the following words and phrases: "**Since** the parties agreed upon the relevant facts, and **since they** viewed this matter primarily as a dispute of law, neither party called any live witnesses but, instead, relied upon documentary exhibits.**" (Dkt. # 8, p. 6, emphasis added). Second, Google claims that when Counsel for the Attorney General stated, "I think it would be limited in the terms of the number of deposition at this point," that the Attorney General somehow stipulated to no depositions. But, the Attorney General never made such a stipulation, and the Court's Order following that hearing reflects as much: "the parties are free to utilize all discovery approaches, including depositions, requests for admissions, interrogatories, production of documents, etc., as allowed under the Rules of Federal Civil Procedure … ." (Dkt. # 82, p. 4). The Court's discovery order contained no restrictions on discovery. Even so, the discovery sought—only three depositions—is limited, narrowly tailored, and focused strictly on Google's allegations and its claims of immunity and protection from the Attorney General's investigation.

Ultimately, Google's motion seeks to bar discovery concerning the factual basis for its business activities and its claim that that those activities are immune from investigation by the Attorney General. But, Google's cries of burden ring hollow. The Attorney General is seeking three narrowly tailored 30(b)(6) depositions of Plaintiff Google aimed at Google's core allegations concerning third-party content. General Hood's proposal for *three* corporate representative depositions is less than Google's offer of five depositions of its non-party employees. (Dkt. #. 129, ftn. 7). Indeed, Google appears to believe that it can carry its burden of demonstrating good cause supporting a protective order through naked allegations that the discovery sought is "extraordinarily burdensome." Google has offered no proof of "burden," it has merely typed the words—Google's motion is due to be denied because it has offered no evidence in support of its burden. In doing so, Google overlooks that it has the burden to show good cause "based upon **specific facts rather than stereotyped and conclusory statements**." *Clemons v. Dollar Gen. Corp.*, 2010 U.S. Dist. LEXIS 56376 *3 (N.D. Miss. May 18, 2010) (emphasis added) (citing *U.S. v. Garrett*, 571 F.2d 1323, 1326 (5th Cir. 1978)).

As this Court has recognized, "[t]he burden is on the party who opposes its opponent's request for discovery to show specifically how each request is not relevant or how each request is overly broad, burdensome or oppressive." *Barnhardt v. Meridian Mun. Separate Sch. Dist.*, 2012 U.S. Dist. LEXIS 42460, *10-11 (S.D. Miss. Mar. 2012) (citing *McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir.1990)). *See* Fed. R. Civ. P. 26, Notes of Advisory Committee ("A party claiming undue burden or expense ordinarily has far better information—perhaps the only information—with respect to that part of the determination. A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them. The

court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery."). Aside from the strong rhetoric and overused clichés, Google has not demonstrated any real burden imposed by the three deposition notices. Any belated attempt by Google to offer proof to meet its burden in reply would be improper and should be rejected. Google has failed its burden; its motion is due to be denied.

## I.    GOOGLE'S CLAIMS AND STATEMENT OF LAW

### A.    *Violation of the Communications Decency Act, 42 U.S.C. § 230*

Google claims that the Communications Decency Act ("CDA"), 42 U.S.C. § 230, affords it blanket immunity from the Attorney General's investigation (and any potential related litigation) because it seeks to hold Google legally responsible for alleged third-party content. (Dkt. # 1, ¶¶ 85-92). Google claims that it is merely a "provider" of an "interactive computer service" within the meaning of 47 U.S.C. §230(c)(1). (Dkt. # 1, ¶ 88). "Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content created by third parties: 'No provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.' 47 U.S.C. § 230(c). This grant of immunity applies *only if* the interactive computer service provider is *not also an 'information content provider,'* which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (emphasis added). Despite the "information content provider" exception to immunity, Google begs this Court to forbid the Defendant, General Hood, from challenging Google's claim of immunity on the merits.

Unlike the types of passive interactive service providers envisioned by Congress in enacting the CDA, the Attorney General sought to investigate whether Google's business model, its agreements and terms of service, the actual technical processes underlying its Services, and its use of data gathered within those processes and Services place *any* of Google's actions *outside* immunity under the CDA. For example, the Attorney General sought to investigate deeper into the facts suggesting that Google is responsible, "in whole or in part," for the content displayed using the Google Instant feature in Google Search. Google explains in one of its help pages for Search that "[a]s you start to type your search, Google Instant predicts what you're looking for and starts to show results for your search." (Tapley Dec., Ex. E). This prediction is not the user's actual search, and central to the legal determination of whether Search only "mak[es] accessible third-party content to internet users" is the factual determination of who or whom created the content in the Instant prediction. Google's own help page reveals that the Search user did not create the prediction: "[i]f you don't see the results you want, keep typing and the results will update." *Id*. Instead, Google provided the search term and the search results, through the prediction. Discovery is required to test Google's claims of immunity—it cannot be immune from the Attorney General's investigation, or from discovery in its own lawsuit, to the extent its "actions … go beyond 'a publisher's traditional editorial functions[,] such as deciding whether to publish, withdraw, postpone or alter content[.]" *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 802 (N.D. Cal. 2011). Absent discovery, only Google knows whether the actions it takes to organize, recommend, and monetize the content displayed to users of its Services go beyond "traditional editorial functions."

Google's complaint alleges *fiercely disputed* facts: that Google "did not create or develop any of the content … that is the subject of the Attorney General's inquiry," and that all of the

relevant content is "information" provided by "another information content provider." (*Id.* at ¶ 89). Of course, Google must prove these allegations at trial, supported by admissible evidence, in order to establish its immunity and obtain the permanent injunction it seeks. Instead of just taking Google's word for it, the Attorney General is entitled to obtain the discovery necessary to show the trier of fact that Google is not what it says it is pursuant to § 230, and therefore some of its activities at issue in this case are outside the scope of CDA immunity. This is especially true now that Google has brought the immunity fight to this Court's doorstep. This Court should not allow Google to block discovery of evidence that Google is also an "information content provider"—facts that would strip Google of its claimed immunity.

   **B.**     *Violations of the First and Fourteenth Amendment*

   Google claims that the Attorney General's investigation into conduct that may potentially violate the Mississippi Consumer Protection Act ("MCPA") is retaliation for protected speech that violates Google's Constitutional rights. Google's First Amendment claim is flawed—both legally and factually. Even so, a First Amendment retaliation claim requires Google to prove, *at a minimum*, three elements: (1) that it was engaged in a constitutionally protected activity; (2) that the Attorney General's actions have caused Google to suffer an injury; and, (3) that the adverse actions were substantially motived against Google's exercise of the constitutionally protected conduct. *Singelton v. Darby*, 2015 U.S. App. LEXIS 8382, *4-5 (5th Cir. 2015).

   Google's complaint alleges that the "effect of the Attorney General's Inquiry is to chill the operation of Google's search engine, Autocomplete feature, YouTube video-sharing site, and advertising, thereby threatening to silence vast amounts of speech." (Dkt. # 1, ¶ 97). Google has also offered testimony that the "Attorney General's threats to bring legal action against Google if it did not restrict certain content were an important factor in the decision to algorithmically

prevent advertising from running alongside the aforementioned videos (and many others), which YouTube makes available to the public free-of-charge." (Dkt. # 54-3). Google has also claimed that "[f]ollowing various threats from the Attorney General, Google blocked various Autocomplete predictions. Although Google was not required by law to make changes to its editorial judgment, it blocked Autocomplete predictions, in part, to address concerns raised by the Attorney General." (Dkt. # 54-2). Google must establish its alleged injury with evidence at trial to obtain the permanent injunction it seeks against the Attorney General, and the Attorney General must be permitted to test Google's assertions through discovery.

Despite Google's own evidentiary assertion that it was harmed and as a result made changes to its algorithms, Google now argues "that there is no basis for the Attorney General to probe the technical engineering details of Google's proprietary systems and algorithms." (Dkt. # 129, p. 5). This representation lacks candor—Google created the basis for discovery when it chose to make the allegation of harm and offer evidence in support of this claim. The Attorney General is entitled to probe, through discovery, the nature and extent of the alleged changes Google made to its algorithms in order to defend the First Amendment claims asserted by Google. In doing so, the Attorney General is entitled to take discovery as to whether or not actual changes to source code occurred as Google contends. And, the Attorney General is entitled to test Google's allegations that it made changes to the algorithms, through examination of the source code, in response to threats it asserts were made by the Attorney General.

Further, Google is a party to, obtains and holds proprietary rights in, and has ownership and control over content which is not protected by the First Amendment. In its Terms of Service, Google claims an interest in the content displayed across its Services:

> When you upload, submit, store, send or receive content to or through our
> Services, you give Google (and those we work with) a worldwide license to use,

host, store, reproduce, modify, create derivative works (such as those resulting from translations, adaptations or other changes we make so that your content works better with our Services), communicate, publish, publicly perform, publicly display and distribute such content . . . . This license continues even if you stop using our Services.

(Tapley Dec., Ex. B, p. 2). Google takes this irrevocable license *immediately* when, for example, an individual transmits materials through Google's systems. What Google does with the content in its system, and how or when it then uses that content, may determine whether Google is protected by the First Amendment. Accordingly, the Attorney General is entitled to demonstrate to the trier of fact that Google has not been harmed by this so-called "inquiry."

### C.    *Preemption Under the Copyright Act*

Google claims that the Attorney General's investigation is preempted by the Copyright Act and therefore beyond his authority to investigate. Google's complaint broadly claims preemption under the Copyright Act (Dkt. # 1, ¶ 97), which is governed by Section 512. 17 U.S.C. § 512. Section 512(a) grants certain immunities to a service provider who "transmit[s], rout[es], or provid[es] connections for" the transfer of copyright material through its network, but only if it meets a number of conditions. There is no protection for service providers who maintain a copy of the material for a period longer than is necessary to complete the transmission. *See* 17 U.S.C. § 512(a)(4). The Attorney General is entitled to discover whether Google maintains copies in storage for longer periods than necessary for transmission, and whether Google expressly claims through its agreements an ownership interest in the copies that it keeps. Maintaining copies of content and the taking of an ownership interest in content would remove Google's protection under the Copyright Act—both are evidenced by Google's own Terms of Service. (*See* Tapley Dec., Ex. B, p. 2).

Additionally, there are many more exceptions to the safe harbor protection that Google must navigate in order to sustain its claim of preemption under the Digital Millennium Copyright Act ("DMCA"). "512(a) [protection] applies to service providers who act only as 'conduits' for the transmission of information." *Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1041 (9th Cir. 2013). If Google does more than act as a conduit, then Google is "not [a] 'service provider[]' for purposes of § 512(a), and is not eligible for the § 512(a) safe harbor. *Id.* "§ 512(c) explicitly covers not just the storage of infringing material, but also infringing 'activit[ies]' that 'us[e] the material [stored] on the system or network.' 17 U.S.C. § 512(c)(1)(A)(i)." *Columbia Pictures Indus.*, 710 F.3d at 1042. In other words, what Google does when it *uses* the information stored on its Services may remove Google from safe harbor protection. Also, "[t]he § 512(c) safe harbor is available only if the service provider 'does not have actual knowledge that the material or an activity using the material on the system or network is infringing,' 17 U.S.C. § 512(c)(1)(A)(i), or 'is not aware of facts or circumstances from which infringing activity is apparent[.]'" *Id.* at 1043. Therefore, Google's knowledge of the copyright infringement may remove Google from the protection it seeks.

Further, "[u]nder § 512(c)(1)(B), a service provider loses protection under the safe harbor if two conditions are met: (1) the provider 'receive[s] a financial benefit directly attributable to the infringing activity'; and (2) the 'service provider has the right and ability to control such activity.' 17 U.S.C. § 512(c)(1)(B)." *Id.* at 1044. With all these exceptions to the safe harbor protection, General Hood must be allowed to test the limits of Google's alleged protection through the limited and focused discovery he seeks.

In addition, in footnote 3 of its memorandum, Google appears to allude to a notion of complete preemption of all causes of action involving copyrighted materials. (Dkt. # 129, p. 5).

In order to establish copyright preemption, Google must demonstrate that **any** cause of action brought by the Attorney General against Google would "involve elements that would not establish qualitatively different conduct by [Google] than the elements for an action under the Copyright Act." *Daboub v. Gibbons*, 42 F.3d 285, 289-290 (5th Cir. 1995) (quoting *Quincy Cablesystems Inc. v. Sully's Bar, Inc.*, 650 F. Supp. 838, 850 (D.Mass. 1986)). Highlighting the difficulty of this analysis is the fact that the Attorney General has **not** brought a state law cause of action, and Google has not analyzed any, much less all, of the hypothetical causes of action available against it or evaluated the equivalence of those claims to a copyright claim.

For example, "breach of contract claims are not preempted by the Copyright Act" because "'[an] action for breach of contract involves an element in addition to mere reproduction, distribution or display: the contract promise made by [the parties], therefore, it is not preempted.'" *Real Estate Innovations, Inc. v. Houston Ass'n of Realtors, Inc.*, 422 Fed. Appx. 344, 349 (5th Cir. 2011) (quoting *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir. 1990)). Similarly, when Google makes false statements to its users through its terms of service, its policies, its notices, or through other public statements about how its Services protect the intellectual property of another, then Google's terms, policies, notices, and statements become deceptive. Under these circumstances, a subpoena or claim by the Attorney General for a violation of the Mississippi Consumer Protection Act would not be preempted by the Copyright Act because such a claim under the MCPA would include an "extra element" (truthfulness)—an allegation that Google was "passing off," "misrepresenting," "representing," "disparaging," or "advertising," in relation to prohibited conduct that is "unfair or deceptive." Miss. Code Ann. § 75-24-5 (2014). As such, Google cannot prevent discovery in this case on the basis of complete preemption because Google has not and cannot establish that

there are no "extra-element" claims available to General Hood.  Accordingly, Google's blanket assertion that it is protected from investigation under the terms of the Copyright Act and therefore entitled to a permanent injunction is properly a subject of discovery. The Attorney General is entitled to test the limits of Google's alleged protection, which is precisely the aim of the focused and limited discovery.

## II.     STANDARD

Under Rule 26(b) of the Federal Rules of Civil Procedure, a party is entitled to request and obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense … ." Fed. R. Civ. P. 26(b)(1).  "The aim of these liberal discovery rules is to 'make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'"  *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1346 (5th Cir. 1978) (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S. Ct. 983, 986 (1958)).  Thus, only upon a showing of good cause may a court restrict or prohibit discovery in the limited instances where compliance will cause a party annoyance, embarrassment, oppression, or undue burden or expense.  Fed. R. Civ. P. 26(c)(1).  Furthermore, the party requesting the protective order has the burden to show good cause "based upon **specific facts rather than stereotyped and conclusory statements**." *Clemons*, 2010 U.S. Dist. LEXIS 56376 at *3 (emphasis added) (citing *U.S. v. Garrett*, 571 F.2d at 1326).

## III.    ARGUMENT

### A.      Google has not demonstrated good cause to prohibit the discovery sought by Revised Notice No. 1.

If Google has any hope of prevailing on the merits of this case, it must demonstrate that this case is ***only about*** third-party content.  Under the CDA, Google only has immunity if it is truly a mere publisher of third-party content.  *See, e.g.*, *Fair Hous. Council of San Fernando*

*Valley v. Roommates.com, LLC*, 489 F.3d 921, 925 (9th Cir. 2007) (If the service "is responsible, in whole or in part, for creating or developing the information, it becomes a content provider and is not entitled to CDA immunity."). While Google has taken contradictory positions, it has made the broad-sweeping assertion that the entirety of the Attorney General's investigation involves *only* third-party content. However, Google now squarely resists discovery which may lead to a wholly different conclusion than that proffered by Google. The Attorney General's Revised Deposition Notice No. 1[2] seeks the facts that will establish that some of the content at issue in this case is Google's content, not third-party content. This deposition will establish how Google, through its agreements with users and third parties, obtains ownership and other property interests in all content displayed through its Services—this fact alone transforms Google into more than a mere publisher.

In its complaint, Google alleges that it does no more than "mak[e] accessible third-party content to internet users … ." (Dkt. # 1, ¶ 78). Google's own Terms of Service confirms that Google mostly displays *its own content*, along with *some* third–party content: "[o]ur Services display *some* content that is not Google's." (Tapley Dec., Ex. B). This fact largely destroys Google's immunity defense. It individualizes, on a content-by-content basis, the analysis necessary to determine the reach of Google's claimed immunity for any given content, and prevents the issuance of a broad injunction such as the one sought in this case. Further, through Google's Terms—the agreements with its users, which "control the relationship between Google and you"—Google obtains an interest in all of the content displayed on its Services:

> ***When you upload, submit, store, send or receive content to or through our Services, you give Google (and those we work with) a worldwide license to use, host, store, reproduce, modify, create derivative works (such as those resulting***

[2] Google's reference to withdrawn discovery is irrelevant to Google's motion; the withdrawn discovery illustrates that General Hood is willing to respond to information obtained during the meet and confer process, to compromise, and to focus his discovery on central issues.

*from translations, adaptations or other changes we make so that your content works better with our Services), communicate, publish, publicly perform, publicly display and distribute such content.* The rights you grant in this license are for the limited purpose of operating, promoting, and improving our Services, and to develop new ones. *This license continues even if you stop using our Services* (for example, for a business listing you have added to Google Maps). Some Services may offer you ways to access and remove content that has been provided to that Service. Also, in some of our Services, there are terms or settings that narrow the scope of our use of the content submitted in those Services. Make sure you have the necessary rights to grant us this license for any content that you submit to our Services.

(Tapley Dec., Ex. B, p. 2).

While Google uses the term "license" to characterize the interest that Google acquires in all of the content accessible on Google's Services, the facts concerning what Google actually does with the content when users "upload, submit, store, send or receive content to or through our Services" will be critical to the jury's determination of whether Google actually obtains a license, or whether Google obtains a broader *ownership* interest that could change its status under the CDA. If Google ultimately succeeds on the merits of this case, and the Court issues a permanent "injunction against enforcing the subpoena and from bringing charges against Google for making accessible third-party content to internet users as threatened," that injunction will be impossibly vague and overbroad, among other things, absent a determination of what content, available on Google's Services, is merely third-party content versus what content is Google's.

Another example of why the discovery sought under Notice No. 1 is crucial to General Hood's defense is exemplified through YouTube's Terms of Service. Google has offered evidence that "YouTube is a web-based platform owned by Google that allows users to upload, search for, view, and share videos." (Dkt. # 16, ¶ 2). In determining whether the content displayed on YouTube is Google content versus third-party content, YouTube's Terms of Service defines content to include: "the text, software, scripts, graphics, photos, sounds, music,

videos, audiovisual combinations, interactive features and other materials you may view on, access through, or contribute to the Service." (Tapley Dec., Ex. C, ¶ 2A). Content is everything a user uploads to YouTube. And, "[t]hese Terms of Service apply to all users of the Service, including users who are also contributors of Content on the Service." (*Id.*).

Google argues that this content is merely third-party content, but YouTube's Terms of Service tell a different story: "[t]he Content on the Service, and the trademarks, service marks and logos ('Marks') on the Service, are ***owned by*** or licensed to ***YouTube***, subject to copyright and other intellectual property rights under the law." (Tapley Dec., Ex. C, ¶ 5A, emphasis added). Google's Terms of Service and YouTube's Terms of Service are but two examples of many that demonstrate why binding corporate representative testimony is necessary to explain Google's agreements with its users for the Services at issue in Google's complaint.

In an attempt to avoid critical discovery aimed at the issue of deciphering between Google content versus third-party content, Google's motion mischaracterizes that "the Attorney General claimed that he is entitled to seek deposition testimony to probe whether Google may be in violation of Mississippi state law by not complying with its own terms of service." That is not true. General Hood's position during the meet and confer process was clear:

> We agree that Google is required to establish that Google merely displays third party content. ***Google's agreements with its users are central to the analysis of whether the content is truly third party content. All of the user agreements are relevant to the foundational element at issue in Google's complaint, is the content displayed by Google third party content?*** Either withdraw the contention, or support it and subject it to discovery. This is a simple inquiry that lies at the heart of Google's case; the Attorney General does not understand why Google is so resistant to having the factual basis for this legal conclusion explored through discovery. (emphasis added).

(Tapley Dec., Ex. F). Google cannot avoid discovery on this issue and has not demonstrated good cause for why the targeted discovery should be prohibited.

**B.      Google has not demonstrated good cause to prohibit discovery sought by Revised Notice No. 3.**

In paragraphs 11-16, 19-24, 26-29, and 31, Google alleges how its Services use what Google claims to be third-party content.  Revised Notice No. 3 seeks 30(b)(6) testimony on Google's use and monetization of that content within the following Services at issue in this case: (1) Google Search, (2) Autocomplete, (3) Instant Search, (4) YouTube, (5) AdSense, and (6) AdWords.  The notice also seeks testimony concerning Google's "content and data collection, storage, and retention policies and practices."  In response, Google has offered a witness to testify generally as to Google's allegations in paragraphs 19-24, 26-29, and 31.  Google has peculiarly refused to offer testimony concerning Google's allegations in paragraphs 11-16: (11) allegations concerning the Google Services at issue in this lawsuit; (12) allegations concerning how Search works; (13) allegations concerning how the Autocomplete feature in Search works; (14) allegations concerning how YouTube works; (15) allegations concerning how AdWords works and how Google profits from AdWords; and (16) allegations concerning how advertising works in YouTube and how Google profits from it.  Paragraphs 19-24, 26-29, and 31 contain additional allegations on how these Services work.  All of these paragraphs in Google's complaint, and the factual bases for these allegations, are critical to the determination of whether Google is entitled to safe harbor protection under the DMCA—a *contested* issue on which Google bears the burden of proof.  Whether an entity qualifies for the safe harbor protection is a fact intensive inquiry; Google cannot therefore rest on its bare pleadings alone.  General Hood must be allowed to test Google's allegations and develop a factual record.

Google claims that neither Google's "uses and monetization of user and advertiser content or data," nor its "content and data collection, storage, and retention policies and practice" have any "bearing on this case."  But, these issues are directly relevant to Google's cause of

action under the DMCA and whether the safe harbor protections apply under either 17 U.S.C. § 512(a) or (c).  For Google to rely on the protections of Section 512(a), Google must establish that, when it transmits copyrighted materials, "***no copy*** of the material … ***is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients***, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients ***for a longer period than is reasonably necessary for the transmission, routing, or provision of connections.***"  *See* 17 U.S.C. § 512(a)(4) (emphasis added).[3]  Indeed, "512(a) [protection] applies to service providers who act only as 'conduits' for the transmission of information."  *Columbia Pictures Indus.*, 710 F.3d at 1041.  If Google does more than act as a mere conduit for the transmission of information, then Google is "not [a] 'service provider[]' for purposes of § 512(a), and is not eligible for the § 512(a) safe harbor."  *Id*.  If Google does more than act as a mere conduit, "then it does not matter whether they are automatic or humanly controlled."  *Id*. at 1042.  *See also In re Charter Commc'ns, Inc., Subpoena Enforcement Matter*, 393 F.3d 771, 775 (8th Cir. 2005) (noting that § 512(a) "limits the liability of [service providers] when they do nothing more than transmit, route, or provide connections for copyrighted material—that is, when the [provider] is a mere conduit for the transmission").  Here, Google's own allegations reveal that Google is more than a mere conduit—paragraph 21 of its complaint alleges that YouTube videos are *stored* "on Google servers."  Google's "content and data collection, **storage, and retention** policies and practice" may take Google outside the scope of protection.

    The Attorney General is also entitled to discovery concerning Google's *use of* copyrighted materials, because "§ 512(c) explicitly covers not just the storage of infringing

---

[3] To the extent Google relies upon other provisions of § 512, each of the enumerated elements Google must show to obtain a ruling of preemption would similarly require an examination of Google's agreements, processes, and uses of data.

material, but also infringing 'activit[ies]' that 'us[e]' the material [stored] on the system or network.' 17 U.S.C. § 512(c)(1)(A)(i)." *Columbia Pictures Indus.*, 710 F.3d at 1042. In other words, what Google does when it *uses* the information stored on its Services may remove Google from safe harbor protection.

Additionally, "[t]he § 512(c) safe harbor is available only if the service provider 'does not have actual knowledge that the material or an activity using the material on the system or network is infringing,' 17 U.S.C. § 512(c)(1)(A)(i), or 'is not aware of facts or circumstances from which infringing activity is apparent.'" *Id*. at 1043. Both the Second and Ninth Circuits have held that "the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Id*. at 1043 (citing *Viacom Int'l, Inc*., 676 F.3d at 31). This discovery is particularly useful in determining the capabilities of the "sophisticated algorithms that [Google employs to] review the metadata associated with YouTube videos [in order to] classi[fy] the videos … to determine whether advertising should run against the video." (Wu Decl., Dkt. # 54-3). Discovery concerning Google's use and monetization of content are critical to a determination of whether or not Google has safe harbor immunity, because it evidences what Google *learns* about the content using its "sophisticated algorithms," which review the contents of videos when determining which advertisements to run.

"Under § 512(c)(1)(B), a service provider loses protection under the safe harbor if two conditions are met: (1) the provider 'receive[s] a financial benefit directly attributable to the infringing activity'; and (2) the 'service provider has the right and ability to control such activity.' 17 U.S.C. § 512(c)(1)(B)." *Columbia Pictures Indus.*, 710 F.3d at 1044. Google's

monetization of copyrighted material is directly relevant to the first condition because Google receives a financial benefit from the advertisement that Google "run[s] against the [YouTube] video[s]." (Dkt. # 1, ¶ 22). Google also meets the second condition in that it has offered testimony that Google employees "staffed in multiple offices around the world, review[] videos 24 hours a day, seven days a week," and decide which videos to allow for or block from public viewing. (Grand Decl., Dkt. # 16). And, there is no dispute that Google receives revenue from advertisements that run alongside copyrighted materials. The Ninth Circuit has held, "the connection between the infringing activity and [the infringer's] income stream derived from advertising is sufficiently direct to meet the direct 'financial benefit' prong of § 512(c)(1)(B)." *Columbia Pictures Indus.*, 710 F.3d at 1045. Indeed, evidence of Google's "uses and monetization of user and advertiser content or data" and Google's content and data collection, storage, and retention policies and practices" have everything to do with what this case is about—the limits of Google's alleged safe harbor protection.

Ultimately, Google seeks protection based on untested allegations and legal conclusions pleaded in its complaint. Such conclusory proof was not sufficient to establish protection as a matter of law in *Columbia Pictures*, where the defendant seeking immunity "respond[ed] only with the generalized assertion that he 'ha[s] a robust copyright compliance system.' But 'conclusory allegations, standing alone, are insufficient to prevent summary judgment.'" *Id*. at 1043 (citing *Newman v. County of Orange*, 457 F.3d 991, 995 (9th Cir. 2006) (internal quotation marks and citation omitted). This case is no different—examination of Google's claim of safe harbor protection requires an examination of the alleged facts supporting those claims, including the discovery of evidence sought by revised notice No. 3—evidence that may remove Google from safe harbor protection.

**C.**     **Google has not demonstrated good cause to prohibit discovery sought by Revised Notice No. 2**

1.     Areas of Examination 1-6, 11 and 12.

Revised Notice No. 2, specifically Areas of Examination numbers 1-6, seeks discovery asking Google to "describe and explain" how the Google Services and features (that Google alleges are the subject to this lawsuit) work. In response, Google has offered a witness to testify only generally, with a self-limited "reasonable level of detail." Google now moves for a protective order that would expressly exempt testimony from a technical or engineering perspective concerning Google's Search algorithms, because Google claims "Google's search algorithms … ha[ve] nothing to do with the lawsuit pending before this Court … ." Google's attempt to exclude technical or engineering level testimony concerning its search algorithms should be rejected because Google's own allegations about search make the algorithms relevant to the determination of Google's claim of CDA immunity.

Google's objection to the discovery sought centers on Google's erroneous but persistent position that Google's search algorithms have nothing to do with this case. That position is contrary to Google's allegations and is wrong. Paragraph thirteen of Google's complaint references Autocomplete.[4]     In that paragraph, Google alleges that "Search includes an Autocomplete feature that uses algorithms to statistically predict a user's query before the user finishes typing that query." Central to the legal determination of whether Search only "mak[es] accessible third-party content to internet users" is the factual determination of who or whom created the content in the prediction. Google's own allegations reveal that the Search user did not create the prediction. Instead, Google provided the search term, through the prediction, "before the user finishe[d] typing that query." If Google honestly believes that this case has

---

[4] Autocomplete is but one example of the factual difficulty Google will face in establishing what is "third-party content" for the basis of determining Google's legal claims.

nothing to do with its algorithms, then Google should notify the Court that the preliminary injunction is overly broad and promptly respond to the CID's Interrogatories 61 and 62 and Document Requests 132-141, because these requests concern the operation of Autocomplete algorithms.

Area of Examination number 11 seeks discovery on how Google complies with the legal requirements and internal policies that Google alleges apply to Google in paragraphs 19-31 of the complaint. (Dkt. # 1). First, Google makes no specific argument as to why Area 11 is improper for discovery, and a reply is not the proper place to make an initial argument. Second, Google alleges in paragraph 25 that it uses "information location tools" that comply with the legal requirements of the DMCA and thus Google is entitled to safe harbor protection. But, Google has refused to offer any testimony as to this legal conclusion in paragraph 25 of its complaint. Likewise, Google has refused to offer testimony as to paragraph 30 of the complaint, which contains allegations concerning Google's profiting from advertisements from foreign pharmacies who sought to illegally import prescription drugs into the United States. Paragraph 31 reveals that Google has displayed ads to users that violate its own healthcare and medicine policies. Nonetheless, Google has sought to avoid discovery on this issue and has sought an injunction against the Attorney General that would immunize Google from suit or prosecution.

Area of Examination number 12 seeks discovery on Google's policies for accepting advertisements. Google has not explained why—especially given Google's prior conduct that resulted in non-prosecution agreement with the U.S. Department of Justice—it is entitled to an injunction without an analysis informed by discovery. Evidence of Google profiting from illegal online conduct is probative of Google's entitlement to immunity because the CDA does not grant immunity for Google's participatory violation of criminal law.

2. Area of Examination 8.

During meet and confer process, Counsel for General Hood understood "Google's final response to be a take it or leave it offer and [was] unable to agree to Google's unilateral restriction of discovery in this litigation." (Tapley Dec., Ex. F). Google's Counsel confirmed "your summary is accurate, as far as it went." *Id*. Except for Google's all or nothing offer, there is no serious dispute as to Area of Examination 8. General Hood is willing to compromise and accept Google's proposal to provide a 30(b)(6) witness to "describe and explain the factual basis for the assertion that 'Google [does] not create or develop any content accessible via Google *that is the subject of the Attorney General's Inquiry*.'" This issue is therefore moot.

3. Areas of Examination 7.

The Attorney General seeks Google's testimony on the "factual basis for the assertion that [it] is **merely** a 'provider' of an 'interactive computer service.'" (Tapley Dec., Ex. A, emphasis added). Google's assertion that it merely provides an "interactive computer service"— and is therefore not **also** an "information content provider"—is the factual basis for Google's claim of immunity under the CDA, and is a hotly disputed issue at the epicenter of this lawsuit. Google cannot obtain the broad permanent injunction it seeks without proving on the merits that **every** inquiry of the Attorney General's investigation is directed at activities for which Google is "merely a 'provider' of an 'interactive computer service.'" Fed. R. Civ. Pro 65 (d)(1) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."). Google has the burden of proving these facts at trial, and Area of Examination 7 is directed squarely at this dispute.

First, Google protests against this critical discovery because "[t]he Attorney General ... has never challenged Google's status as a provider of an interactive computer service, including in his opposition to the preliminary relief ordered in this case." (Dkt. # 129, p. 15). Google provides no caselaw to support this unfounded argument that General Hood is somehow estopped from challenging the substance of Google's pleadings once discovery commences. The Attorney General is now defending a permanent injunction on the merits, and must fully test the underlying facts of Google's case; he is no longer bound to accept the factual allegations and legal conclusions in Google's pleadings. *See, e.g.*, *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 847 (5th Cir. Tex. 2004) (permanent injunction requires "actual success on the merits"). To the extent Google seeks to limit discovery to the Attorney General's arguments on the motion to dismiss or opposition to the preliminary injunction, Google implies that decisions in this case have already been made *on the merits*. Not so—the Court's Order is clear: "this Court is not forecasting any ultimate ruling on the merits." (Dkt. # 82, p. 3). Therefore, arguments and statements by the Attorney General about Google's Services within the procedural context of the preliminary injunction or motion to dismiss were, in that limited context, focused on the issues at hand, and without the benefit of discovery.

Second, Google brazenly misrepresents the purpose and scope of the discovery sought in Area of Examination No. 7. The Attorney General seeks targeted discovery on whether Google "***merely***" provides an "interactive computer service," not whether Google "***is, in general,***" an interactive computer service under the statute. Although Google may meet the statutory definition of an "interactive service provider," General Hood is entitled to investigate and discover whether Google is ***also*** an "information content provider." Discovery of particular facts is necessary to determine whether Google is a content owner or contributes to content creation in

a way that takes it outside the CDA's immunity for mere publishers. The fundamental question of whether Google's activities are subject to immunity requires discovery into *what* those activities actually are. The Attorney General's position has remained clear throughout the meet and confer process:

> Google should either support its allegation with evidence, subject to discovery through deposition, or withdraw it. Google's *ipse dixit* is not proof. Whether or not Google may have litigated this issue before in a foreign court with some party other than the Attorney General is meaningless for the purposes of Google's case in the S.D. Miss. Moreover, []it is true that Google will have to establish, not merely plead, this legal conclusion in order to prevail in this case. Furthermore, the Attorney General's request does not concern the bare legal conclusion pleaded by Google. The Attorney General seeks "the factual basis for the assertion that Google is merely a "provider" of an "interactive computer service." It is well established in the record that this legal conclusion, pleaded by Google, but which Google resists having tested in discovery, is the foundation for Google's theory. Further, Google resists depositions as to topics 1 & 4 on the basis of the legal conclusion that "Google is merely a 'provider' of an 'interactive computer service.'" The Attorney General's position is simple, and well supported in American jurisprudence—prove it.

(Tapley Dec., Ex. F). In an effort to avoid the Attorney General's discovery request, Google insists that it can prove its case, on the merits, by relying on bare legal conclusions in its complaint. Google now seeks a protective order because it wrongfully believes that it is not required to support its legal conclusions with facts, or have the factual basis of its alleged immunity explored through discovery.

Google's immunity under the CDA is conditioned on the particulars of the actions Google takes with respect to content displayed on its Services—a determination that is the very aim of the Attorney General's discovery. Google argues that it is immune from any relevant investigation by the Attorney General because it is an "interactive computer service" that makes available third-party content. "But if it is responsible, in whole or in part, for creating or developing the information, it becomes a content provider and is not entitled to CDA immunity."

*Fair Hous. Council of San Fernando Valley*, 489 F.3d at 925. To the extent Google contributes to the content available on its Services, it lacks immunity under the CDA. *See, e.g.*, *id.* at 926 (website "responsible" for some content on its website "because it 'creat[ed] or develop[ed]' the forms and answer choices" that lead to publication of tortious content); *Fraley*, 830 F. Supp. 2d at 801 (Facebook's actions were not immunized by the CDA because "Plaintiffs allege that Facebook contributes, at least in part, to the creation or development of the" tortious online content; *Carafano v. Metrosplash, Inc.*, 207 F. Supp. 2d 1055, 1067 (C.D. Cal. 2002) (Website was not immune under the CDA because it "does not just provide a site for people to post whatever information they choose. … This Court's determination would be different if [the website] simply acts as a conduit of the information, but it does not.")

The cases cited by Google also demonstrate that computer service providers are **not** always immunized for their content. "Section 230(c)(1)'s grant of immunity is not without limits, however. It applies only to the extent that an interactive computer service provider is not also the **information content provider** of the content at issue." *Am. Income Life Ins. Co. v. Google, Inc.*, 2014 U.S. Dist. LEXIS 124870 at *18 (emphasis added) (quoting *Jones v. Dirty World Entertainment Recordings*, 755 F.3d 398, 408-09 (6th Cir. 2014)). *See, e.g.*, *Nemet Chevrolet, Ltd.*, 591 F.3d at 254 ("Assuming a person meets the statutory definition of an 'interactive computer service provider,' the scope of § 230 immunity turns on whether that person's actions also make it an 'information content provider.'"); *Goddard v. Google, Inc.*, 2008 U.S. Dist. LEXIS 101890, *2-3 (N.D. Cal. 2008) ("[T]he claims, as pled, are barred by § 230 of the CDA. Accordingly, Google's motion to dismiss will be granted. However, **because the Court is not convinced that Plaintiff could not legitimately plead around § 230, leave to amend also will be granted**.") (emphasis added). "An unprotected service provider is defined

as any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1122 (E.D. Cal. 2010).

In this case, the Attorney General's discovery is targeted at activities that are believed to place Google outside its alleged immunity under the CDA—activities where Google is *also* responsible, in whole or in part, for the creation or development of available content. Google must establish on the merits—through admissible evidence—that it is not ***also*** an "information content provider" regarding its activities responsive to the Attorney General's investigation. As a defendant, the Attorney General must be able to explore the "factual basis for the assertion that Google is ***merely*** a 'provider' of an 'interactive computer service.'" (Tapley Dec., Ex. A, emphasis added). Discovery is required to test Google's claims of immunity—it cannot be immune from investigation to the extent its "actions … go beyond 'a publisher's traditional editorial functions[,] such as deciding whether to publish, withdraw, postpone or alter content[.]" *Fraley*, 830 F. Supp. 2d at 802.

Third, Google resists discovery on the premise that Google is, as a matter of law, an interactive service provider entitled to immunity. Not so. Whether Google was held to be an interactive computer service as to some subset of its sprawling business activities in other, unrelated cases irrelevant.[5] Google relies on cases in which it was a *defendant* to a lawsuit where plaintiffs failed to plead facts that demonstrated Google was acting outside the scope of CDA immunity. Here, however, Google has the burden of proof as a plaintiff seeking a permanent

---

[5] Google cannot rely on a theory of "issue preclusion" or other principle of *res judicata* as a substitute for evidence in support of its claims. Issue preclusion requires that "(1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a part of the judgment in that earlier action. Relitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 (5th Cir. 1999) (citations omitted).

injunction that would prohibit any investigation of its broad business activities. Whether litigants suing Google have previously failed to allege facts sufficient to plead that a particular business activity fell outside of CDA immunity has no bearing on the application of the law to the facts in this case. *See, e.g.*, *Parker v. Google, Inc*., 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006) ("**In this case**, there is no doubt that Google qualifies as an 'interactive computer service' and not an 'information content provider.' Thus, it is eligible for immunity under § 230.") (emphasis added); *Novak v. Overture Servs.*, 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004) ("No interpretation of the **complaint**, even when applying the generous interpretations appropriate in connection with **Plaintiff's pro se status**, could suggest that Google was the 'information content provider' for the relevant statements.") (emphasis added); *Am. Income Life Ins. Co.*, 2014 U.S. Dist. LEXIS 124870 at *21-22 ("After careful review of the **Complaint**, the court finds that **plaintiffs** clearly allege that Google is an interactive computer service, but not an information content provider because there are no allegations that Google originated, developed, or modified the disputed content.") (emphasis added); *O'Kroley v. Fastcase, Inc.*, 2014 U.S. Dist. LEXIS 86343, *3-4 (M.D. Tenn. 2014) (**Plaintiff's** defamation claim failed because "the automated editorial acts of Google in publishing the information which was the search result did not make Google an information content provider and did not take away Google's statutory immunity from Plaintiff's claims") (emphasis added); *Gavra v. Google Inc.*, 2013 U.S. Dist. LEXIS 100127, *9 (N.D. Cal. 2013)("Google's conduct *here* falls well within the bounds of publication activity") (emphasis added); *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 633 (E.D. Va. 2010) (**plaintiff's** "claim here relate[d] to the content of the Sponsored Links appearing on Google's search results page," not other Google services) (emphasis added); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 630-31 (D. Del. 2007) (**pro se plaintiff** attempted to hold Google liable for removal of

offensive content from search results) (emphasis added). The Attorney General seeks to test the facts in *this* case in which Google is the *plaintiff*: Google's *allegations* that *all* of its activities responsive to the Attorney General's investigation are immune from suit under the CDA.

## CONCLUSION

Google failed to carry its burden of establishing good cause by failing to offer *any evidence* that compliance with the discovery will cause annoyance, embarrassment, or undue burden or expense. Instead, Google made "stereotyped and conclusory statements." The discovery sought by the Attorney General is relevant to the issues at the "epicenter" of this lawsuit. Google thinks that supporting its allegations through *binding* corporate representative testimony is burdensome and somehow novel for corporate parties. If Google's allegations are too much trouble for Google to support, Google's remedy is to withdraw them. The Attorney General is unwilling to and cannot be compelled to play blind man's bluff. Google's motion is due to be denied.

THIS the 16th day of June, 2015.

Respectfully Submitted,

JIM HOOD, in his official capacity as Attorney General of the State of Mississippi

By: */s/ F. Jerome Tapley*

F. Jerome Tapley, PHV
Hirlye R. "Ryan" Lutz III, PHV
**Cory Watson, P.C.**
2131 Magnolia Avenue South
Birmingham, AL 35205
Telephone: (205) 328-2200
jtapley@corywatson.com
rlutz@corywatson.com

John W. Kitchens, (MSB # 101137)
**Kitchens Law Firm, P.A.**
Post Office Box 799
Crystal Springs, MS 39059-0799
Telephone: 601-892-3067
Facsimile: 601-892-3057
jkitchens@kitchenslaw.net

DOUGLAS T. MIRACLE (MSB # 9648)
SPECIAL ASSISTANT ATTORNEY GENERAL
BRIDGETTE W. WIGGINS (MSB # 9676)
SPECIAL ASSISTANT ATTORNEY GENERAL
KRISSY CASEY NOBILE (MSB # 103577)
SPECIAL ASSISTANT ATTORNEY GENERAL
**Office of the Attorney General**
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-5654
Facsimile: (601) 359-2003
dmira@ago.state.ms.us
bwill@ago.state.ms.us
knobi@ago.state.ms.us

Sean Rommel, PHV
Jim Wyly, PHV
**Wyly-Rommel, PLLC**
4004 Texas Boulevard
Texarkana, Texas  75503
Telephone: (903) 334-8646
Facsimile: (903) 334-8645
srommel@wylyrommel.com
jwyly@wylyrommel.com

Carolyn G. Anderson, PHV
Patricia A. Bloodgood, PHV
**Zimmerman Reed, PLLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone:  612.341.0400
carolyn.anderson@zimmreed.com
patricia.bloodgood@zimmreed.com

## CERTIFICATE OF SERVICE

I, F. Jerome Tapley, one of the attorneys for Defendant Jim Hood, hereby certify that I have this date electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Mississippi through the Court's CM/ECF system. I further certify that all parties are represented by attorneys who are registered users of the CM/ECF system and that service will be accomplished through the CM/ECF system.

*/s/ F. Jerome Tapley*

F. Jerome Tapley, PHV
Hirlye R. "Ryan" Lutz III, PHV
**Cory Watson, P.C.**
2131 Magnolia Avenue South
Birmingham, AL 35205
Telephone: (205) 328-2200
jtapley@corywatson.com
rlutz@corywatson.com