**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| GOOGLE INC.           )<br>       *Plaintiff*,   )<br>             )<br>             )<br>v.           )<br>             )<br>             )<br>JIM HOOD, ATTORNEY GENERAL OF   )<br>THE STATE OF MISSISSIPPI, IN HIS   )<br>OFFICIAL CAPACITY,   )<br>       *Defendant*.   )<br>             )<br>             )<br>_____ ) | No. 3:14-cv-981-HTW-LRA<br><br>**DECLARATION OF MICHAEL H.<br>RUBIN IN SUPPORT OF GOOGLE<br>INC.'S OPPOSITION TO THE MOTION<br>PICTURE ASSOCIATION OF<br>AMERICA, INC.'S MOTION TO<br>QUASH RULE 45 DEPOSITION<br>SUBPOENA** |

I, MICHAEL H. RUBIN, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am a partner with the law firm Wilson Sonsini Goodrich & Rosati, attorneys for Plaintiff Google Inc. ("Google"). I submit this declaration in support of Google's Opposition to the Motion Picture Association of America, Inc. ("MPAA")'s Motion to Quash Rule 45 Deposition Subpoena. The following facts are true of my personal knowledge and if called and sworn as a witness I could competently testify to them.

2.     On January 14, 2016, I emailed Brian Hauck, counsel for the MPAA, to inform him that Google intended to notice the deposition of Steven B. Fabrizio. I told him that fact discovery was set to close on March 18, 2016 and asked if he could provide me with available dates prior to then. I also asked him if he would accept service on Mr. Fabrizio's behalf, explaining that if so I would send a deposition notice that set the deposition for a mutually agreeable date before the close of discovery.

3.      Mr. Hauck responded to me via email on January 19, 2016. He agreed to accept service on behalf of Mr. Fabrizio, but he reserved the right to challenge the notice on non-jurisdictional grounds. I asked him on what grounds the MPAA would challenge the deposition notice, and Mr. Hauck responded that the MPAA was "just reserving our rights at this point, not asserting a challenge."

4.      On January 22, 2016, Mr. Hauck emailed me to discuss dates for the Fabrizio deposition. In his email, he noted that the MPAA "may object to or file a motion to quash a sub-poena for the deposition of Mr. Fabrizio." In response I told him that Google assumed the MPAA would make any motion to quash the deposition in time for the motion to be resolved prior to the noticed deposition date. Mr. Hauck's only reply was to say that whether the MPAA would file a motion to quash "seem[ed] like bridges we can cross when we get to them" and that "[p]resumably it would depend on the anticipated scope of the deposition, which we can discuss."

5.      Between January 23, 2016 and February 8, 2016, Mr. Hauck and I continued to work on finding a mutually agreeable date for the Fabrizio deposition.

6.      Following these discussions, on February 8, 2016 Google and the MPAA mutual-ly agreed that Mr. Fabrizio would be deposed on March 17, 2016 (the day before fact discovery was set to close). The next day, February 9, I sent Mr. Hauck a subpoena, which set the deposi-tion of Steven Fabrizio for March 17, 2016 in Washington, D.C.

7.      The following day, February 10, 2016, Mr. Hauck emailed me to ask for a meet-and-confer regarding the scope of the Fabrizio deposition.

8.      We met and conferred by phone on February 17, 2016, the first mutually available date. When we spoke, I explained that Google was interested in questioning Mr. Fabrizio about the same general topics covered in its prior document subpoena served on the MPAA: the

MPAA's role in directly and indirectly influencing AG Hood to take action against Google. I also reiterated that Google was not interested in legitimately privileged information. Mr. Hauck nevertheless indicated the MPAA was likely to move for a Protective Order in an effort to block the deposition.

9.      I did not hear further from Mr. Hauck until February 23, 2016, when he sent me a letter stating that the MPAA declined to make Mr. Fabrizio available for the March 17 deposition and it planned to file a motion to quash. The letter gave Google until February 25, 2016, to indicate whether it wished to have an additional meet-and-confer.

10.      I emailed Mr. Hauck on February 25, 2016 to say that Google took issue with the MPAA's decision not to make Mr. Fabrizio available for the deposition, and that, absent an order from the court, the MPAA's obligations were clear.

11.      I heard nothing from Mr. Hauck for eight days. Then, on March 4, 2016 (a Friday), Mr. Hauck emailed me to ask if Google would sign the Certificate of Good Faith required by this Court's local rules.

12.      I was travelling that Friday, but I responded to Mr. Hauck the following Monday, March 7, 2016. I told Mr. Hauck that the MPAA's motion to quash was untimely and violated the local rules, but that if the MPAA wished to proceed Google would provide a Certificate of Good Faith that reserved its rights with regard to the rule violations.

13.      Mr. Hauck responded via email, indicating that the MPAA would proceed with its motion, that Mr. Fabrizio would not appear on March 17, and that Google should provide the Certificate of Good Faith. Later that day, I provided Mr. Hauck with a signed Certificate of Good Faith, which was filed in conjunction with the MPAA's Motion to Quash.

**Authentication of Other Exhibits**

14.     Attached hereto as Exhibit A is a true and correct copy of pages 1-2, 32-38, 50-55, 78-81, 100-102, 123-131, and 179-185 of the certified transcript of the deposition of Brian Cohen, the MPAA's former Director of External State Government Relations, held on October 8, 2015, at the offices of Wilson Sonsini Goodrich & Rosati in Washington, D.C.

15.     Attached hereto as Exhibit B is a true and correct copy of the transcript of the July 29, 2015 hearing before Judge Schofield of the Southern District of New York on motions to compel and motions to transfer filed by Google against several of the MPAA's member studios.

\*   \*   \*

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.  Executed on March 22, 2016.

Michael H. Rubin

# EXHIBIT A

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

3            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

4                       NORTHERN DIVISION

5        _____

6        GOOGLE, INC.                  )No.

         Plaintiff                     )3:14-cv-981-HTW-LRA

7        vs.                           )

         JIM HOOD, ATTORNEY            )

8        GENERAL OF THE STATE OF       )

         MISSISSIPPI, IN HIS           )

9        OFFICIAL CAPACITY             )

         Defendant                     )

10       _____

11

12

13

14           Videotaped Deposition of Brian Cohen

15                   Washington, D.C.

16                   October 8, 2015

17                      9:06 a.m.

18

19

20

21

22

23

24       Reported by:  Bonnie L. Russo

25       Job No. 2146100

Page 2

1        Videotaped Deposition of Brian Cohen held at:

2

3

4

5                    Wilson Sonsini Goodrich & Rosati

6                    1700 K Street, N.W.

7                    Washington, D.C.

8

9

10

11

12

13

14

15

16

17

18

19

20        Pursuant to Notice, when were present on behalf

21        of the respective parties:

22

23

24

25

1          A.    Who else that was not part of the

2      studios.

3          Q.    No.

4                I asked you to list anyone on that

5      call.  So I would like to be real clear.

6          A.    Got it.

7          Q.    Who was on that call?

8          A.    I apologize.  I thought you had

9      asked me who from the studios was on that call.

10         Q.    Talked about them.  Who was on the

11     call?

12         A.    Vans Stevenson, Melissa Patack,

13     Angela Miele, Sara Walsh.  Those in the MPAA

14     State Government Affairs team.  In the studios,

15     State Government Affairs' representatives, the

16     people that I had listed and other people whose

17     names I forget.

18         Q.    Okay.  And the -- the people that

19     you -- the names that you forget are the

20     individuals from paramount and NBCU?

21         A.    Correct.

22         Q.    Is the NBCU individual Rick Smotkin?

23         A.    He was occasionally on those calls.

24         Q.    And he worked for NBCU?

25         A.    He worked for Comcast.

Page 33

1          Q.    But he was on those calls for NBCU?

2          A.    Yes.

3          Q.    Do you know who else would have been

4    on those calls?  Does that jog your memory, at

5    all, for -- for NBCU?

6          A.    For the weekly State Government

7    Affairs calls?

8          Q.    Sure.

9          A.    No.

10         Q.    Were there any other weekly calls

11   set up on State Government Affairs or with

12   he -- with this group of people?

13         A.    Weekly calls with State Government

14   Affairs or this group of people?

15         Q.    Yes.

16               Did you have any other standing

17   calls with this group of people?

18         A.    No.

19         Q.    With any subset of this group of

20   people?

21         A.    Yes.

22         Q.    What were those calls?

23         A.    Well, Rick was part of an AG working

24   group call.

25         Q.    Okay.  Who was -- who else was part

1    of that group, the AG working group?

2         A.   Bill Guidera, so Vans, David Green

3    from NBC; Troy Dow from Disney.  I'm trying to

4    remember.  Tom Galvin, Digital Citizens

5    Alliance.  Patrick Lynch, Mike Moore.  Those

6    are the names that come to mind.

7         Q.   Okay.  Did you communicate in

8    writing to the AG working group?

9         A.   Yes.

10        Q.   Did you communicate in writing over

11   e-mail to the AG working group?

12        A.   Let me rephrase.  We as MPAA did.

13        Q.   Did you personally, on behalf of the

14   MPAA, send e-mails to the AG working group?

15        A.   I occasionally, on behalf of the

16   MPAA, yes.

17        Q.   What is the difference between the

18   AG working group and the state -- I'm -- I'm

19   forgetting the name.  The other call?

20        A.   State Government Affairs was focused

21   on legislative issues in the states.  The AG

22   working group was focused on the general issue

23   of piracy and intellectual property theft.

24        Q.   Was Google a main focus of the AG

25   working group?

Page 35

1        A.    Define "main focus"?

2        Q.    Was Google a focus of the AG working

3    group?

4        A.    Yes.

5        Q.    What other companies were a focus of

6    the AG working group?

7        A.    Any companies in the search engine

8    universe.

9        Q.    Any company in the search engine

10   universe.  Please list them, that you focused

11   on in those calls.

12       A.    Define "focus."  I mean...

13       Q.    I'm not trying to play a game.  I

14   mean, I'm trying --

15       A.    Yeah.

16       Q.    -- to figure out what you talked

17   about on those calls.  You tell me.

18       A.    We talked about strategies to combat

19   intellectual property theft that related to

20   search engines, including Google.

21       Q.    The name of the call was the AG

22   working group, right?

23       A.    Yes.

24       Q.    So you weren't talking about

25   strategies at large, you were talking about

1      some sort of strategy that involved Attorneys'

2      General, right?

3                  MR. ROMMEL:  Objection.  Misstates

4      evidence.

5                  THE WITNESS:  Can you repeat the

6      question?

7                  BY MR. RUBIN:

8          Q.    Sure.

9                  You weren't talking about strategies

10     written large to combat issues.  You were

11     talking about strategies involving Attorneys

12     General; isn't that right?

13                 MR. ROMMEL:  Objection.

14                 THE WITNESS:  No.  No, that's not

15     right.

16                 BY MR. RUBIN:

17         Q.    Then, please describe to me the

18     strategies that were discussed on those calls.

19                 MR. HANDZO:  And let me just

20     interject because this has a potential to get

21     into legal strategies and legal advice, so I

22     don't have any problem with your answering with

23     respect to general business strategies.  To the

24     extent that there was legal advice on the

25     phone -- on these calls, I would object if that

1      invades the MPAA provision.

2                  MR. RUBIN:  There -- as described to

3      me, there is no attorney-client privileged

4      relationship listed on that call, as that would

5      be help by the MPAA.

6                  MR. HANDZO:  Well, I don't agree

7      with your characterization, but my point to the

8      witness is if there are legal strategies

9      involved, whether they were coming from lawyers

10     directly or whether they were being repeated by

11     people on the call to talk to the lawyers, I

12     would object to any discussion of legal

13     strategy as opposed to business strategy.

14                 THE WITNESS:  And you -- you did jog

15     my memory.  Ben Sheffner was also on those

16     calls.

17                 BY MR. RUBIN:

18     Q.    Okay.  What strategies were

19     discussed on those calls?

20                 MR. HANDZO:  And same objection.

21                 THE WITNESS:  There were different

22     strategies discussed generally to compel

23     companies, such as Google, to change behavior,

24     to prevent the theft of intellectual property.

25     Some of those strategies entailed legislative,

1      some of them were legal, as you heard, some of

2      them were simply ways to compel stakeholders to

3      come to the table to have discussions about

4      voluntary actions.

5          Q.    Did all of the strategies discussed

6      on those calls involve, in some way, attorneys

7      general?

8          A.    No.

9          Q.    So the AG working group meandered

10     from its title?

11         A.    Yes.

12         Q.    What else -- what, beyond the use of

13     attorneys general, were considered as

14     strategies to compel search engines to change

15     their behavior?

16         A.    Can you repeat the question?

17         Q.    What else, beyond the use of

18     attorneys general, were considered as

19     strategies to compel search engines to change

20     their behavior?

21         A.    Legislative.

22         Q.    What sort of legislative strategies?

23         A.    Strategies not too dissimilar from

24     the strategies that were tried previously.

25         Q.    What strategies were tried

1          Q.    So, again, your title there was

2     director, External State Government Relations;

3     is that right?

4          A.    Yes.

5          Q.    You were a lobbyist; isn't that

6     right?

7          A.    No.

8          Q.    No, you weren't lobbying?

9          A.    No.

10          Q.    I would like to introduce

11     Plaintiff's Exhibit --

12              MR. RUBIN:  Can we go off the record

13     for one second?

14              THE VIDEOGRAPHER:  Off the record at

15     9:48.

16              (Pause.)

17              THE VIDEOGRAPHER:  On the record at

18     9:49.

19              MR. DAVIS:  As a housekeeping

20     matter, this is Mike Davis, Mr. Cohen's

21     attorney.  I am e-mailing to Google's counsel

22     the common interest agreement between Mr. Cohen

23     and the MPAA.

24              MR. ROMMEL:  Can you copy me on

25     that, as well?

Page 51

1           MR. DAVIS:  Sure.

2           MR. RUBIN:  I would like to

3      introduce Plaintiff's Exhibit 1.

4           (Deposition Exhibit No. 1 was marked

5      for identification.)

6           BY MR. RUBIN:

7      Q.    Mr. Cohen, what I just handed you is

8      a copy of Mississippi Code, Title 5, Chapter 8,

9      titled "Lobbying Reform Act of 1994.

10          Do you see that?

11     A.    Yes.

12     Q.    If I could call your attention to --

13     on the printout, it's Page 5 of 8, definition

14     K, lobbying.

15     A.    Okay.

16     Q.    Could you read K, the first sentence

17     under K?

18     A.    KI?

19     Q.    Yes, lobbying -- it says, "Lobbying

20     means."

21     A.    "Lobbying means influencing or

22     attempting to influence legislative or

23     executive action through oral or written

24     communication."

25     Q.    Does that not describe what -- part

Page 52

1      of what you did in your job at the MPAA?

2                   MR. ROMMEL:  Objection.

3      Argumentative.

4                   MR. DAVIS:  Objection.  Form.

5                   MR. ROMMEL:  Calls for a legal

6      conclusion, as well.

7                   BY MR. RUBIN:

8          Q.    You can answer the question.

9                   Mr. Cohen?

10         A.    I'm sorry.  Was I waiting?

11         Q.    You can answer the question.

12                No.  You -- your -- today, I --

13     I'm -- I suspect you're going to hear quite a

14     number of objections.  As we talked about at

15     the beginning, you can answer the question.

16     Only if one of your lawyers instruct you not to

17     answer should you not answer the question.  So,

18     here, you should answer the question.

19         A.    Got you.

20         Q.    And I'll restate the question now --

21         A.    Okay.

22         Q.    -- because there's been a little

23     passage of time.

24         A.    Okay.

25         Q.    K says, "Lobbying means influencing

Page 53

```
 1        or attempting to influence legislative or
 2        executive action through oral or written
 3        communication."  It goes on -- it describes
 4        some other things.
 5                  But that first definition, that
 6        describes, at least in part, what you did as a
 7        part of your job at the MPAA; isn't that right?
 8                  MR. DAVIS:  Objection.  Form and
 9        foundation.
10                  MR. ROMMEL:  Argumentative.  Calls
11        for legal conclusion.
12                  THE WITNESS:  Part of my job.  I
13        think part -- part of the MPAA's job was to
14        service the studios and believed that they were
15        victims of crime, and so part of that job was
16        to work with law enforcement and others to
17        educate and train and hope that they would take
18        action.  So if you equate that with that
19        definition, that was part of what MPAA did, but
20        it was under the auspices of being a victim of
21        crime.
22                  BY MR. RUBIN:
23        Q.    I'm asking for a "yes" or "no"
24        question [sic], Mr. Cohen.  Rather, I'm asking
25        a yes-or-no question that calls for a yes-or-no
```

```
 1      answer.

 2              MR. ROMMEL:  Objection.

 3      Argumentative.

 4              MR. DAVIS:  Same objection.  Form.

 5      Foundation.

 6              MR. RUBIN:  Counsel, I'm not asking

 7      an argumentative question.  If you could keep

 8      your objections to a flat objection, I'd

 9      appreciate it.

10              MR. ROMMEL:  I'm allowed to make any

11      evidentiary objection I -- I'm entitled to

12      make, so I'm going to make them.

13              BY MR. RUBIN:

14          Q.   Mr. Cohen, I'm simply asking for you

15      to read those words and -- and -- and tell me

16      if that was within the compass of what you did.

17          A.   When you say --

18              MR. DAVIS:  Objection.  Form.

19      Foundation.

20              THE WITNESS:  Would executive action

21      mean calling a meeting to discuss issues of

22      concern?

23              BY MR. RUBIN:

24          Q.   Sure, if that's what you understand

25      it to mean.
```

1          A.    Then, yes.   That was something the

2     MPAA did.

3          Q.    Were you -- are you a registered

4     lobbyist, or were you a registered lobbyist in

5     Mississippi?

6          A.    No.

7          Q.    Did anyone else at the MPAA

8     register -- register as a lobbyist in

9     Mississippi?

10               MR. ROMMEL:   Objection.

11               THE WITNESS:   I don't know.

12               BY MR. RUBIN:

13          Q.   Have you ever registered as a

14     lobbyist anywhere?

15          A.    No.

16          Q.    Were there any discussions at the

17     MPAA about registering as a lobbyist?

18               MR. HANDZO:   Again, objection to the

19     extent that it might reveal discussions with

20     attorneys on that issue.   If there are

21     non-legal discussions, you can talk about it.

22     If those were legal discussions, then don't.

23               THE WITNESS:   I don't remember any

24     discussions.

25               BY MR. RUBIN:

Page 78

1          A.    General overarching strategy with
2      regards to Google.
3          Q.    Whose strategy?
4          A.    The MPAA's.
5          Q.    Who developed the strategy?
6          A.    I don't know.
7          Q.    Who coined the term "Project
8      Goliath"?
9          A.    I don't know.
10         Q.    Who would know?
11         A.    I don't know.
12         Q.    Who is the expert in Project
13     Goliath?
14         A.    I don't know.
15         Q.    Whose baby was Project Goliath?
16             MR. ROMMEL:  Objection.
17             MR. DAVIS:  Objection to form.
18             THE WITNESS:  I don't know.
19             BY MR. RUBIN:
20         Q.    Who would know?
21         A.    I don't know.
22             MR. ROMMEL:  Objection.  Calls for
23     speculation.
24             BY MR. RUBIN:
25         Q.    Who's in charge of the MPAA?

1          A.    Chris Dodd.

2          Q.    And all decisions of consequence are

3     run by Chris Dodd?

4               MR. DAVIS:  Objection.

5               MR. ROMMEL:  Objection.  Lacks

6     foundation.

7               THE WITNESS:  I don't know.

8               BY MR. RUBIN:

9          Q.    When did you first hear the term

10    "Project Goliath"?

11         A.    It was towards the end of my tenure

12    there.  I don't recall exactly.  You know, I --

13    I finished around April 2014.  So it was

14    towards the end, but I can't tell you the

15    specific date.

16         Q.    Was the term "Project Goliath" ever

17    used on the AG working group calls?

18         A.    I don't know.

19         Q.    Did you ever hear anyone else use

20    the term?

21         A.    Yes.

22         Q.    Who did you hear it from?

23         A.    General counsel at MPAA, Steve

24    Fabrizio.

25         Q.    In what context?

1          A.    Again, this overarching theme of --
2     with regards to Google.
3          Q.    What did he tell you?
4              MR. HANDZO:  Objection.  Mr.
5     Fabrizio, obviously, is a lawyer, so to the
6     extent that Mr. Fabrizio is giving -- dealing
7     legal strategy or legal advice, I would object
8     to the witness answering that question.
9              THE WITNESS:  I don't remember.
10              BY MR. RUBIN:
11          Q.    You don't remember what he said?
12          A.    No.
13              MR. RUBIN:  I want to be clear with
14     respect to the objection just made by the MPAA
15     that it's not clear, at all, that the --
16     anything with respect to Project Goliath is
17     privileged.  We don't believe that it is.  It's
18     a business strategy.  We don't believe that
19     there's any legal advice involved, whatsoever.
20              MR. HANDZO:  You're entitled to your
21     opinion.  Obviously, I have a different one.
22              MR. RUBIN:  That seems to be the
23     case.
24              BY MR. RUBIN:
25          Q.    Who else did you hear use the term

Page 81

1       "Project Goliath"?

2              A.    Vans, Michael O'Leary.

3              Q.    Did Project Goliath involve others

4       outside the MPAA?

5              A.    I don't know.

6              Q.    Did it involve the member studios?

7              A.    I don't know.

8              Q.    Did it involve efforts to influence

9       State's attorneys general?

10             A.    It did involve efforts to educate

11      State's attorneys general.

12             Q.    And push them to take action?

13             A.    Yes.

14             Q.    So not just to educate State's

15      attorneys general?

16                   MR. DAVIS:  Objection.  Form.

17      Foundation.

18                   THE WITNESS:  To educate them to

19      take action.

20                   BY MR. RUBIN:

21             Q.    What sort of action?

22             A.    To compel Google to come to the

23      table to have discussions about changing its

24      practices.

25             Q.    Changing what practices,

Page 100

1          A.      No.

2          Q.      Who drafted the presentation that

3     you gave?

4          A.      It was sort of a group effort from

5     all those involved in this meeting.

6          Q.      Was that done electronically?

7          A.      I don't remember.

8          Q.      You don't remember if you

9     collectively drafted a presentation

10    electronically or not?

11         A.      It may have been verbally, in -- in

12    person.  It may have been electronically.  I

13    can't say with certainty.  I don't recall.

14         Q.      What was the purpose of the meeting

15    from the MPAA's perspective?

16         A.      I was not part of leadership or

17    policy discussions from the MPAA.  I was

18    implementing, so I don't know.

19         Q.      What did you understand it to be?

20         A.      I understood the purpose to be

21    continuing education to work with law

22    enforcement as victims of crime to demonstrate

23    the dangerous behavior to our industry but to

24    many industries.

25         Q.      Did you seek to incentivize Attorney

1       General Hood to take action against Google?

2                    MR. ROMMEL:  Objection.

3                    MR. DAVIS:  Objection.  Form.

4       Foundation.

5                    MR. ROMMEL:  Argumentative.

6       Speculation.  Calls for a legal conclusion.

7                    THE WITNESS:  No.

8                    BY MR. RUBIN:

9            Q.    The MPAA did not have as a goal of

10      that meeting to seek to have Attorney General

11      Hood take any action with respect to Google,

12      whatsoever?

13           A.    Well, it's a separate question.

14      Just --

15           Q.    I'm asking you a yes-or-no question.

16           A.    Can you repeat the question?

17           Q.    Did the MPAA have as a goal of that

18      meeting to have Attorney General Hood take any

19      action with respect to Google, whatsoever?

20           A.    Yes, MPAA would have wanted Google

21      to come to the table to change its behavior.

22      We encouraged General Hood and others to

23      continue these important conversations with

24      Google.

25           Q.    What means did you seek to have

1      Attorney General Hood employ to have Google

2      come to the table?

3          A.    I think a variety of different means

4      were discussed.  I think the core goal was

5      simply through the course of these

6      conversations and platforms, such as the NAAG

7      IP Committee, that they would come to the table

8      and have a good dialogue.  I think it was

9      evident if that was not going to work other

10     means would -- would be necessary.  Some of

11     those are legal, which I can't talk about

12     because of the privilege.  Some of them were to

13     continue to have this conversation through

14     other platforms, including the public purview.

15         Q.    Which means did you discuss at the

16     meeting with Attorney General Hood to have

17     Google come to the table?

18         A.    I think all means were discussed.

19         Q.    Which specific means were discussed?

20         A.    Continued conversations through AGs

21     and the NAAG IP Committee, written letters to

22     follow up to Google regarding these questions,

23     continued elevation of the issue in the public

24     purview to hope that they would come to the

25     table, and then if none of those worked, legal

                                            Page 123

1       too.

2              A.    Okay.

3              Q.    You sent the document.  Can you tell

4       me --

5              A.    Right.

6              Q.    -- what it refers to?

7              A.    I don't -- again, I don't recall the

8       actual instance when I was sending the

9       document.  I'm sure that I did send the e-mail.

10      It's right here.

11             Q.    Uh-huh.

12             A.    I -- it looks like I did attach

13      this.  That would appear to be a date; but,

14      again, I can't say with certainty that that

15      refers to a date.

16             Q.    Okay.  I'm going to ask you -- ask

17      you a specific question.  On what day did you

18      send this e-mail?

19             A.    It looks like Thursday, January

20      17th, 2013.

21             Q.    What's the date format in the

22      subject of the attachment?

23             A.    Day of the week, month of the year,

24      the actual day, the year and the time.

25             Q.    In the subject of the attachment,

Page 124

1          what's the format?  What's the number?

2                A.    In the subject -- it's 1-17-13.

3                Q.    And what do you understand that to

4          mean?

5                A.    Again, I would presume that that's

6          referring to the date.

7                Q.    Okay.  Would you -- do you

8          understand this to mean that this was the final

9          version of this document as of this date that

10         you sent this e-mail?

11               A.    Yes.

12               Q.    Were there draft versions of this

13         document that existed prior to this version?

14               A.    I don't remember.  I don't remember

15         if there were drafts.

16               Q.    Do you have a habit of labeling

17         documents "final" when there aren't drafts

18         preceding them?

19               A.    No.

20               Q.    You were sending this document for

21         what purpose?

22               A.    This was follow up on behalf of the

23         MPAA.  So, again, I was a contact, a messenger,

24         a liaison for the MPAA, and it appears the RIAA

25         and IACC to thank and provide recommendations

Page 125

1      to the NAAG IP Committee chaired by General

2      Hood for suggestive follow-up actions that

3      would help propel and continue the conversation

4      from the Florida meeting.

5          Q.   You were suggesting actions that

6      Attorney General Hood could take as chair of

7      the NAAG IP Committee at the next NAAG meeting;

8      is that right?

9               MR. ROMMEL:  Objection.

10              THE WITNESS:  Yes.

11              Actions that the committee could

12     take.

13              BY MR. RUBIN:

14         Q.   Actions that the MPAA, the RIAA, and

15     IACC were interested in having Attorney General

16     Hood pursue; is that right?

17              MR. ROMMEL:  Objection.  Misstates

18     testimony.

19              THE WITNESS:  The MPAA and it

20     appears the RIAA and IACC were interested in

21     only speaking, from what I would surmise from

22     the MPAA, as a victim of crime with the

23     committee taking actions that would help propel

24     and continue the conversation.

25              BY MR. RUBIN:

1          Q.    You were interested in having

2     Attorney General Hood as the chair of the IP

3     Committee pursue the action items you attached

4     to this e-mail; isn't that right?

5               MR. ROMMEL:  Objection.  Misstates

6     testimony.

7               THE WITNESS:  I was not personally

8     interested.  The MPAA provided recommendations

9     for General Hood who chaired the committee for

10    follow-up actions regarding that NAAG IP

11    Committee.

12              BY MR. RUBIN:

13         Q.    And it hoped that -- and the MPAA

14    hoped that Attorney General Hood would follow

15    those recommendations, didn't it?

16              MR. ROMMEL:  Objection.  Lacks

17    foundation.  Speculation.

18              THE WITNESS:  Yeah.  Yes.

19              BY MR. RUBIN:

20         Q.    In the -- in the e-mail that you

21    sent to Meredith Aldridge of Attorney General

22    Hood's office --

23         A.    Uh-huh.

24         Q.    -- you start by saying, "We look

25    forward to seeing you at DAGA in California."

Page 127

```
1              Do you see that?
2         A.    I do.
3         Q.    What is DAGA?
4         A.    Democratic attorneys general
5    Association.
6         Q.    Could you explain to me what "DAGA
7    in California" is a reference to?
8         A.    There is a conference in California
9    for the Democratic attorneys general
10   Association.
11        Q.    When did that take place?
12        A.    It looks as though from the e-mail
13   around February 1, 2013.
14        Q.    Did you attend that?
15        A.    Yes.
16        Q.    Do you recall meeting with Attorney
17   General Hood or anyone from his office at the
18   DAGA meeting in California?
19        A.    I don't remember or recall.
20        Q.    Do you recall working with Senator
21   Dodd about what he was going to be addressing?
22        A.    I recall -- I was not very -- I was
23   not really a part of the prep for his -- his
24   address at that conference.
25        Q.    Who was part of Senator Dodd's
```

Page 128

1       preparations for his address at the DAGA

2       meeting on February 1 in California?

3              A.    Vans.

4              Q.    Did you have any communications at

5       all with Vans about his prep with Sen -- with

6       Senator Dodd for that presentation?

7              A.    Yes.

8              Q.    What were the -- what were the

9       substance of those preparations?

10             A.    I think Vans and I, potentially

11      others, discussed that this was another good

12      opportunity for Senator Dodd to bring up these

13      important issues of piracy and intellectual

14      property theft before an audience of attorneys

15      general and to recognize some of the leaders in

16      the room, General Hood being one of them.

17      There were potentially others, as well.  So

18      those AGs that had -- have been good leaders on

19      the issue.

20             Q.    Did you discuss Google, in

21      particular, with Vans as something that Senator

22      Dodd should raise at that meeting?

23             A.    I don't remember.

24             Q.    You don't recall one way or the

25      other?

Page 129

1          A.    I don't recall if I specifically
2     discussed Google with Vans as part of that
3     speech.
4          Q.    Do you recall if Vans told you that
5     Senator Dodd was considering raising Google in
6     that speech?
7          A.    I don't remember.
8          Q.    But you did suggest to Vans that it
9     would be productive to thank Attorney General
10    Hood -- rather, productive for Senator Dodd to
11    thank and commend Attorney General Hood at
12    that -- in that speech, didn't you?
13         A.    I think we discussed it.  I don't
14    recall if I suggested it or if Vans suggested
15    it.
16         Q.    Who came up with the action item
17    recommendations reflected in the attachment?
18         A.    I don't know.
19         Q.    Did you help develop them?
20         A.    I helped develop them.  I don't
21    think I came up with them.  I did not come up
22    with them.
23         Q.    Where did they originate?
24         A.    I don't know.
25         Q.    You have no idea where they came

1      from?

2         A.    I could guess and have some idea.

3         Q.    Okay.  Please explain your

4      understanding of where they came from.

5         A.    Probably collaboration amongst Vans,

6      some of the studios who were interested in

7      this, other stakeholders such as the RIAA who

8      had an interest in these issues.  There was

9      generally a group collaboration when it came to

10     this.

11        Q.    Did you -- what input did you

12    provide into the creation of the NAAG action

13    item -- pardon me -- the NAAG action item

14    recommendations?

15        A.    I think that I thought sending

16    follow-up letters to the different sectors of

17    the committee, the search, the advertising, the

18    payment processing content was a good way to

19    ensure that the questions were continued --

20    that the conversation was continued.

21        Q.    And who do you think should draft

22    those letters?

23        A.    I don't recall having an opinion who

24    should draft.  I don't recall drafting.

25        Q.    Do you recall having meetings about

Page 131

1     the creation of the action item recommendations
2     reflected in the attachment to Exhibit 4?
3          A.    Yes.
4          Q.    How many meetings do you recall?
5          A.    I don't know.
6          Q.    Do you recall having e-mail
7     exchanges with respect to the attachments
8     reflected in Exhibit 4?
9          A.    Yes.
10         Q.    Did you have communications with
11    Attorney General Hood's office in advance of
12    the DAGA meeting other than the e-mail that
13    we're looking at embodied in Exhibit 4?
14         A.    Yes.
15         Q.    Could you describe those
16    communications?
17         A.    I think there were various e-mails
18    between me as a messenger for the MPAA and
19    General Hood's office, I think particularly
20    Meredith, regarding follow up to that meeting
21    in Florida.
22         Q.    What particular -- what, in
23    particular, were you discussing in those
24    e-mails?
25         A.    Follow-up items.

1       AG voice and that the concerns stem across all

2       industries, movies, music, pharmaceuticals,

3       other products that affect consumer safety."

4                So, again, here --

5       Q.    You can go on.  Please read the next

6       paragraph.

7       A.    "Just trying to ensure not

8       taking" -- "not taken as an MPAA letter, avoid

9       the SOPA/PIPA perception, et cetera.  Does that

10      make sense?  That was the only concern.  Thanks

11      again."

12      Q.    Okay.

13      A.    So, again --

14      Q.    So please --

15      A.    Well, i would like to clarify the

16      question, and I'm still answering your

17      question.

18      Q.    You're not still answering the

19      question.

20      A.    Okay.

21      Q.    You indicated before that -- that --

22               MR. ROMMEL:  Please let the witness

23      answer the question.

24               MR. RUBIN:  The question has been

25      answered.

1          MR. ROMMEL:  You can restate it.

2     Let the witness answer the question.

3          MR. RUBIN:  The question has been

4     answered.

5          MR. ROMMEL:  Objection.  Let the

6     witness answer the question.

7          MR. RUBIN:  We're not going to have

8     speeches being made.

9          THE WITNESS:  I'm not making a

10    speech.  I just want to clarify when I say,

11    "my" --

12          BY MR. RUBIN:

13    Q.    Okay.

14    A.    -- you asked me if -- you said,

15    "your personal."  My personal concern -- that

16    was not my personal concern.

17    Q.    Whose concern was it?

18    A.    So...

19          I think it was a concern of the MPAA

20    leadership.

21    Q.    Okay.  Which -- who -- who -- who in

22    the MPAA leadership?

23    A.    I don't know.

24    Q.    How did you come to understand that

25    it was a concern of the MPAA leadership?

Page 181

1          A.    Through my supervisor.

2          Q.    Who is your supervisor?

3          A.    Vans.

4          Q.    He communicated to you that it was

5     the concern of the MPAA leadership that this

6     letter not bear the fingerprint of the MPAA; is

7     that right?

8                MR. ROMMEL:  Objection.  Misstates

9     testimony.

10               MR. DAVIS:  Objection.  Form and

11    foundation.

12               THE WITNESS:  He conveyed to me --

13    well, there is -- I think there is general

14    consensus from the AG working group that it was

15    important that as these issues played out

16    through this letter that the MPAA concern was

17    not of intellectual property theft.  It was not

18    the only concern regarding this dangerous

19    behavior on the Internet.  There was other --

20    there are other dangerous behaviors;

21    pharmaceuticals and whatnot.

22               So it was conveyed to me through

23    Vans that the MPAA leadership, and I imagine

24    all folks that -- all stakeholders that were

25    interested in these issues did not want this to

1    become just about intellectual property theft.

2    It was about the greater good of preventing

3    this dangerous behavior from being accessed

4    Google.

5          So what I was doing was clarifying

6    when I say, "my," I was speaking through the

7    input that I received from Vans that reflects

8    those other stakeholders.

9         Q.    That reflects MPAA leadership.

10   That's what you testified to earlier?

11        A.    Right.

12          Among other stakeholders, as well;

13   but, certainly, yes, MPAA leadership.

14        Q.    But -- your e-mail says you want to

15   be sure that -- and I'm going to quote here,

16   "You guys" -- "anything you guys added didn't

17   make the letter seem like it was MPAA driven,"

18   close quote.

19          Do you see that?

20        A.    Yes.

21        Q.    That's because the letter emanated

22   from the MPAA and was sent to Attorney General

23   Hood's office; isn't that right?

24          MR. DAVIS:  Objection.  Form and

25   foundation.

```
 1              MR. ROMMEL:  Objection.  Calls for
 2       speculation.  Misstates testimony.  Lack of
 3       foundation.
 4              THE WITNESS:  I know the letter -- I
 5       know the letter had input from various people;
 6       the MPAA, General Hood's office, and
 7       potentially others that I'm not aware of.
 8              BY MR. RUBIN:
 9          Q.    It was a collective effort?
10              MR. ROMMEL:  Objection.  Misstates
11       testimony.
12              BY MR. RUBIN:
13          Q.    Is that right?
14              MR. DAVIS:  Same objection.
15              THE WITNESS:  I don't know the final
16       draft of the letter.  I don't know who penned
17       the final draft of the letter.  I know that
18       MPAA provided input to the letter.
19              BY MR. RUBIN:
20          Q.    Would it be correct to say that you
21       worked with Attorney General Hood's office on
22       this letter?
23          A.    Yes.
24          Q.    Why do you think the MPAA wanted to
25       make sure that it didn't seem MPAA driven?
```

Page 184

1          A.    I don't know.

2          Q.    You were just told that that was a

3    concern of -- of MPAA leadership?

4          A.    I didn't develop policy or strategy.

5    I implemented, and those were the sentiments

6    that were conveyed to me.

7          Q.    Policy and strategy were developed

8    by Vans Stevenson and those above him at the

9    MPAA; is that right?

10         A.    I don't know who developed them, but

11   it wasn't me.

12         Q.    Who do you understand developed

13   them?

14         A.    I understand that Vans is part of

15   the leadership team.

16         Q.    Who else is on the leadership team?

17         A.    I don't know how you define

18   leadership team.  It's certainly the CEO.

19         Q.    Who is the CEO?

20         A.    Chris Dodd.

21         Q.    Who else?

22         A.    I would imagine heads of

23   departments.

24         Q.    Did Chris Dodd see the -- see a

25   draft of that letter?

1          MR. ROMMEL:  Objection.  Calls for

2     speculation.

3          THE WITNESS:  I don't know.

4          BY MR. RUBIN:

5     Q.    Would you expect him to have seen a

6     draft of that letter?

7          MR. ROMMEL:  Same objection.

8          MR. DAVIS:  Objection.  Form and

9     foundation.

10          THE WITNESS:  I don't know.

11          BY MR. RUBIN:

12     Q.    Did you have input into other

13     letters or give the MPAA signoff on other

14     letters sent by the Attorney General's Office?

15          MR. ROMMEL:  Objection.  Vague.

16          THE WITNESS:  I don't know that

17     there was ever an MPAA signoff.  Did MPAA have

18     input into other letters sent by General Hood,

19     yes.

20          BY MR. RUBIN:

21     Q.    I would like to introduce

22     Plaintiff's Exhibit 7.

23          (Deposition Exhibit No. 7 was marked

24     for identification.)

25          MR. DAVIS:  What are you thinking

# EXHIBIT B

```
                                                1
     F7t6gooc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    GOOGLE, INC.,

4                  Defendant,

5           v.                         15 MC 150(LGS)

6    TWENTY-FIRST CENTURY FOX, INC.
     et al.,
7
                   Defendants.
8    ------------------------------x
9                                 New York, N.Y.
                                  July 29, 2015
10                                10:30 a.m.

11   Before:

12                  HON. LORNA G. SCHOFIELD,

13                                    District Judge

14                      APPEARANCES

15   WILSON SONSINI GOODRICH & ROSATI
          Attorneys for Plaintiff
16   BY:  DAVID H. KRAMER
          MICHAEL H. RUBIN
17
     JENNER & BLOCK, LLP
18        Attorneys for Defendants
     BY:  SCOTT BLOCK WILKENS
19        DAVID A. HANDZO

20

21

22

23

24

25
```

F7t6gooc

1           (Case called; in open court)

2           THE DEPUTY CLERK:  Counsel, please state your name for

3      the record.

4           MR. RUBIN:  Michael Rubin of Wilson Sonsini for

5      petitioner Google.

6           MR. KRAMER:  David Kramer from Wilson Sonsini also for

7      Google, your Honor.

8           THE COURT:  Good morning.

9           MR. HANDZO:  Good morning, your Honor.  David Handzo

10     on behalf of respondents Twenty-First Century Fox and NBC

11     Universal and Viacom.

12          THE COURT:  Good morning.

13          MR. WILKENS:  Scott Wilkens from Jenner & Block also

14     on behalf of the respondent.

15          THE COURT:  Good morning.  First of all my apologies

16     that we're starting late.  I didn't know the last matter was

17     going to take as long as it took.

18          We are here in connection with Google, the

19     petitioner's petition to transfer the motion to compel

20     compliance from third-party subpoena under Rule 45(f).  I have

21     this matter as you know as the Part I judge.  I think that

22     Judge Ramos had it before me.  Judge Abrams briefly had it

23     after that.  It is mine now for the moment.  As I hoped was

24     clear in the order that I issued on July 23rd, I wanted to

25     revisit Judge Ramos's decision whether or not transfer is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

F7t6gooc

1    appropriate.  So Google, which is the petitioner, has the

2    burden of proof.  I have read -- I will not promise that I have

3    read all five inches of the material but I think I have read

4    the material parts, but I would like to hear a summary of your

5    argument as to why it should be transferred and then I will

6    hear the other side and then we can go from there.

7              So I am not sure who is speaking on behalf of

8    petitioner, Mr. Rubin or Mr. Kramer.

9              MR. RUBIN:  It will be me, your Honor, Mr. Rubin.

10             I had understood your order to indicate that we should

11   be presenting new considerations, new arguments and new facts

12   not presented in prior briefing.

13             THE COURT:  You can do both.

14             MR. RUBIN:  I would be happy to summarize our previous

15   argument.  That is rather straightforward.  The basic issue

16   here is that the standard under Rule 45 is that where there are

17   exceptional circumstances, and the advisory committee rules

18   speak to that, that is where there are circumstances that are

19   likely to lead to interference with the management of the

20   underlying litigation.  The advisory rules give two examples of

21   that where issues are pending in multiple districts or where

22   there are prior orders issued by the district courts that bear

23   on the issues in whatever is before the district court.  Where

24   that occurs, exceptional circumstances exist.  Unless there are

25   countervailing undue burdens, transfer is appropriate.  We

4

F7t6gooc

1    believe we showed that exceptional circumstances exist.

2              THE COURT:  Can you update me at all on the facts or

3    are they still basically the same?  The last I heard you had

4    filed a motion to compel in both Mississippi and in D.C. and

5    both were pending.  Is that still the case?

6              MR. RUBIN:  It is essentially the case, but let me

7    give you a brief update.

8              THE COURT:  Okay.

9              MR. RUBIN:  It is correct that in Mississippi the

10   motion to compel is still under submission with Judge Wingate

11   in the Southern District of Mississippi.  He is the judge in

12   the underlying case against Attorney General Hood.

13             In the District of D.C. there are pending two motions.

14   They are consolidated motions against three different parties.

15   That is a motion to compel raising similar issues to the one

16   before your Honor from the time being anyway and a motion to

17   transfer those subpoenas to the Southern District of

18   Mississippi.  Both of those are pending.  We expect a ruling on

19   the transfer motion imminently.

20             We had also indicated last time we were before the

21   Court that we believed there was a possibility we might be

22   moving to compel against a third party.  That is now happening.

23   We'll be filing that motion within a few days.

24             THE COURT:  Where?

25             MR. RUBIN:  Northern District of California.  That

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7t6gooc

1    motion will raise similar issues.  Although I will be frank

2    that they have gone even further in withholding materials.

3    They have withheld everything, even their communications with

4    Attorney General Hood.  They are another party that worked

5    alongside all the other parties here and the parties in D.C. in

6    the anti Google campaign.

7            THE COURT:  There is some suggestion by the

8    respondents that your decision to file these various motions to

9    compel in different jurisdictions is strategic so that you can

10   get them all back to Mississippi.  So tell me a little bit

11   about that.

12           MR. RUBIN:  I can just flatly say it is not.  We have

13   no choice.  We're going where we have to go to find the

14   evidence.  There was some questions, and I believe your Honor

15   said you had read the transcript from the last hearing, where

16   Judge Ramos asked me some questions about could we have served

17   the subpoenas elsewhere?  We served the subpoenas where the

18   entities are located.  That brought us to where we are.  We

19   have the three in D.C, we have the three here, and we will now

20   have one more in the Northern District of California.

21           THE COURT:  Tell me about the relationship of these

22   various entities to the lawsuit.

23           MR. RUBIN:  We're learning more.  I think it is

24   actually interesting.  If you read our opening motion to

25   compel, our reply, the fact that I have had to put in an

F7t6gooc

1    opening declaration, a supplemental and a second supplemental

2    and even yet a supplemental evidentiary submission because we

3    keep learning more.  I can tell you what I know today.  I can

4    tell you today that there are three parties in D.C. and to my

5    surprise counsel for all of them are here.  Counsel for the DCA

6    is sitting in the back.  That is the Digital Citizens Alliance.

7    Counsel for Jenner & Block and the MPAA, both in D.C., are here

8    because they represent the studios as well.

9         I don't want to retread old ground but a little bit.

10   Throughout the meet and confer process we have interacted with

11   quite a number of parties, but what has become clear is that

12   all of these parties worked together in some way to animate

13   Attorney General Hood's anti-Google efforts and to inspire

14   them.  There are the three studios here that are at issue here

15   working in the litigation effectively as a single voice.  Their

16   lobbyist at the Motion Picture Association of America, the

17   MPAA, and an affiliated organization called the Digital

18   Citizens Alliance have worked together to provide information

19   to Attorney General Hood to draft to CIE that was at issue that

20   prompted the underlying lawsuit, to fundraise for him, to hire

21   a PR agency for him, to ghost write press release for him and

22   to do all the other things that we have yet to learn about.

23   The document we submitted as supplemental evidence -- I think

24   it is docket entry 40 -- is quite instructive.  It lays out a

25   plan.

7

F7t6gooc

1           THE COURT:  I am curious and it has no bearing on my

2    decision, but is there liability on their part?

3           MR. RUBIN:  It's an interesting party.  There is no

4    claim against them.

5           THE COURT:  I understand that.  They are all

6    third-party witnesses.

7           MR. RUBIN:  I don't know.  The documents that we

8    submitted on the 23rd, docket entry 40, talks about some rather

9    surprising things -- stock manipulation efforts, efforts to

10   submit material to the SEC.  That is not something we're

11   pursuing in the Southern District of Mississippi or at this

12   time.  It does raise one's eyebrows I agree.

13          THE COURT:  Tell me a little bit about discovery with

14   petitioner's here.  As I understand it there has been some

15   limited exchange of documents; is that right?

16          MR. RUBIN:  Yes.  Let me explain that.  I was going to

17   get into that anyway.  The discovery with the petitioners here

18   has been in a word frustrating.  I am not going to get into the

19   materials that they have agreed -- not agreed to produce.  They

20   have agreed to produce a certain set of documents.

21          THE COURT:  There has been no actual production yet?

22          MR. RUBIN:  There has been an actual production.

23          THE COURT:  What form did it take?

24          MR. RUBIN:  It took the form of a PDF.

25          THE COURT:  They were e-mailed?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

F7t6gooc

1              MR. RUBIN:  I don't know how they were sent to us.

2     They were e-mailed completely to avoid custodial information.

3     As we get from supplemental productions from Attorney General

4     Hood, it became clear to us that the representation to us--

5              THE COURT:  I just want to go back to something much

6     more basic.  You're in California.  They are producing

7     documents to you.  Lawyers are not running around to

8     Mississippi to make production to you.  They are sending them

9     electronically somehow; is that right?

10             MR. RUBIN:  Absolutely.

11             THE COURT:  There is no burden because whether this

12    production of discovery itself is in Mississippi or California

13    or whatever it is; is that right?

14             MR. RUBIN:  100 percent.  The only time I have seen

15    them face-to-face has been in court.

16             THE COURT:  But if I were to transfer this, the motion

17    to compel would require someone to show up in Mississippi?

18             MR. RUBIN:  Absolutely not.

19             THE COURT:  Why is that?

20             MR. RUBIN:  Rule 45 actually speaks to this.

21             THE COURT:  I know that if the judge is amenable, they

22    get can appear by phone.

23             MR. RUBIN:  Judge Wingate is amenable.  In fact more

24    than one of his hearings have been held by phone in the main

25    case.  There is every reason to believe that he would be open

F7t6gooc

1    to it.  They indicated they are not interested in that.

2            THE COURT:  I understand.  That is a strategic

3    decision people make.

4            MR. RUBIN:  Agreed.

5            THE COURT:  If you don't mind I am going to ask you to

6    sit down and I will hear from the petitioners.

7            So tell me why it is hardship for this to be in

8    Mississippi?

9            MR. HANDZO:  Your Honor, it is a burden because as you

10   point out we're going to be making lots of trips to Mississippi

11   if this case gets transferred.  It is -- we've had multiple

12   hearings already of course in this case and there will be more

13   to come if the case stays here.

14           THE COURT:  I notice you're from Washington so you are

15   traveling to come here.  It is not as though you are down the

16   street.

17           MR. HANDZO:  Trust me, your Honor, there is a world of

18   different between getting on the Acela to come to New York and

19   I do my best work on the Acela.  Going to Mississippi is a

20   different ballgame.  It is going to be multiple trips.  I think

21   you probably already have a sense of the litigiousness of this

22   matter.

23           THE COURT:  What I have also heard is that Judge

24   Wingate will accommodate counsel by having conferences on the

25   phone if counsel wish to appear that way.  I know sometimes

F7t6gooc

1   lawyers are not interested in that and they think there is

2   value to being in court.  That is a strategic decision.

3           MR. HANDZO:  Your Honor, I don't know whether Judge

4   Wingate would have accommodate it.  Maybe he would.  This is

5   way too important to my clients to be phoning it in.  I am one

6   of those old-school lawyer who likes to be in front of a judge

7   and see facial expressions.  I don't think my clients would be

8   willing to do this by telephone.

9           If I, may, I want to address the Courts questions but

10  I want to go back to the question you asked in your order

11  initially which is what has changed since Judge Ramos's ruling

12  and the answer is not a lot but some.  One of the things that

13  has changed is we have filings from Google in the District of

14  Columbia that confirm a lot of the things that I said when I

15  was last here arguing the motion to transfer and underlining

16  some of the things that Google was saying at that time.  For

17  example -- by the way, I have a set of those filings if the

18  Court would like them.

19          THE COURT:  No.  Go ahead and tell me about them.

20          MR. HANDZO:  One of the things -- let me back up.  The

21  filings arose because after Judge Romas ruled that the case

22  would not be transferred, we of course sent a short document to

23  the magistrate judge in D.C. with the transcript of that

24  hearing and Google then filed a response to that and they were

25  a couple more back and forths after that.

F7t6gooc

1              When we were here Google argued that the New York

2    subpoenaed parties played "staring roles" in this whole

3    underlying manner that is playing out in Mississippi and that

4    was part of their argument, that because of the staring role

5    they could be transferred to Mississippi because they were so

6    engaged with it.  Well, after Judge Ramos's ruling what they

7    wrote to the judge in D.C. was something quite different.  It

8    turns out the New York subpoenaed parties were not terribly

9    important or involved at all.  Google said, "While the movie

10   studies in New York were involved in lobbying AG Hood, it was

11   primarily their lobbyist of the MPAA and Jenner who directed AG

12   Hood pursue Google."  So suddenly these parties have become

13   much less important apparently.

14              Also, one of the things that came out in those filings

15   was one of the arguments that Google made in this case was that

16   there is -- we should transfer both the D.C. and the New York

17   cases to Mississippi in part to avoid inconsistent rulings

18   between the D.C. and the New York courts.  What Google said in

19   its filing with this Court was "Google's motion to compel here

20   is nearly identical to Google's consolidated motions already

21   filed in the District Court for the District of Columbia

22   against the subpoenaed parties."  That is what they are arguing

23   here.  We pointed out that is not correct.  There is some

24   overlap but there are significant differences between subpoenas

25   in New York and subpoenas in D.C.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7t6gooc

1          So when Google then filed its response in D.C. after

2     Judge Ramos's ruling, it now says that the subpoenas served in

3     New York "were considerably more limited than those at issue

4     here," meaning in D.C.  So now all of a sudden Google is

5     agreeing to Judge Ramos that these subpoenas are not the same.

6     They are different and they are more limited here.

7          So there are those changes.  The other thing is maybe

8     not technically a change but something I think worth bringing

9     to the Court's attention.  There are some number -- there is

10    two, that I know of, discovery motions pending before Judge

11    Wingate neither of them having anything to do with the issues

12    here.

13         THE COURT:  Can I interrupt for a second?  Are they

14    still on an expedited deadline down there to end on August?

15         MR. HANDZO:  I believe it is August 10th, your Honor.

16    Whether it holds is a different matter.  That is the point I

17    wanted to get to.

18         THE COURT:  Okay.

19         MR. HANDZO:  It is this:  One of the motions filed in

20    Mississippi was filed by Google.  What happened was the

21    Attorney General Hood produced a number of documents but then

22    he withheld some based on privilege.  Google filed a motion to

23    compel arguing that the privilege was not valid and those

24    documents should be produced.  Back on May 21st Judge Wingate

25    heard argument on that and asked to see the documents that were

13

F7t6gooc

1    maybe 20 so he could look at them in camera.  He still has not

2    ruled on that.  So it has been May 21st to today.  Still no

3    ruling on that.

4         THE COURT:  How does that help you?  It seems to me

5    that to the extent he is still trying to decide on issues that

6    impact the scope of discovery that that suggests he should be

7    able to do that and he should be able to do it broadly.

8         MR. HANDZO:  No.  I think what it means, Judge, is

9    that Google's point was, gee, we need to get it transferred

10   because we need a quick ruling.  I think the reality is a quick

11   ruling is going to come here, not in Mississippi.  Judge

12   Wingate -- I don't know anything about Judge Wingate's docket,

13   but I have heard it is pretty busy.  We've had these fairly

14   straightforward motions pending down there that have been

15   pending for a long time.  It is unconceivable to me that if

16   there is a quicker ruling down there by the time we refile

17   briefs, get a hearing date, get down there, it is going to

18   happen much quicker here.  I think the time going on since we

19   were last here just confirms that fact.  If Google is sincere

20   in saying that they want a quick ruling, this is where it

21   should be.  It will not be in Mississippi.

22        So having said all that, your Honor, I, like

23   Mr. Rubin, I read the Court's order and doesn't want to

24   transgress by making all of my arguments again and I hope I

25   made them appropriately in the transcript, but no lawyer can

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F7t6gooc

1    resist a second bite at the apple if there is even a little bit

2    of opening.  Let me repeat a couple things.

3           THE COURT:  Okay.

4           MR. HANDZO:  I think Google's really principal point

5    on the motion to transfer was that there was a risk of

6    inconsistent rulings as between Mississippi, D.C., and New

7    York.  I think I have already covered the D.C. versus New York

8    because in fact the subpoenas are different and Google now

9    admits --

10          THE COURT:  I think you said the New York subpoena is

11   more limited.

12          MR. HANDZO:  Yes, the subpoena is more limited.  There

13   are some things that are asked for in New York that we oppose

14   that are not in the D.C.s subpoena.  For example, they have

15   asked for all communications of all attorney generals other

16   than Attorney General Hood.  More critically I think Google has

17   argued that any ruling here could be inconsistent with rulings

18   that Judge Wingate may be making in Mississippi.  That simply

19   is not correct.  There is nothing happening in the discovery

20   front in Mississippi that is in any way related to what is

21   happening here.  The reason for that is, you asked Judge, what

22   has been produced.  What has been produced is all of the

23   communications exchanged between these subpoenaed parties and

24   Attorney General Hood.  That has been given to them.  Also

25   documents showing any financial -- political contributions to

F7t6gooc

1    Attorney General Hood or to the Democratic attorney general.

2    What is in question are documents that Attorney General Hood

3    never received.

4         THE COURT:  I understand that.  Perhaps just to make

5    it a little more interesting for you on that particular issue

6    knowing almost nothing about your case, it seems to me that

7    there are all sorts of documents that Attorney General Hood

8    never saw that are conceivably relevant.  Certain kinds of

9    e-mail communications internally of your client that might

10   relate to the subject for example.  Those could be highly

11   relevant.  Part of what I am saying sort of as a footnote is be

12   careful what you wish for because you may find yourself in a

13   worse position if you were before a judge who actually

14   understood the case.

15         MR. HANDZO:  I understand there is a risk in

16   litigation no matter what position you take.  Perhaps we'll

17   have a further conversation on that point at some other time.

18   The fundamental point to the motion to transfer is that the

19   issues that Judge Wingate is considering relate to documents

20   that Attorney General Hood has.  The issues here relate to

21   documents that he does not have.  There is not really any

22   overlap in that.  There is just nothing that Judge Wingate has

23   under consideration that would resolve the issues that are

24   being raised in the motion to compel here.

25         Where I think in the end that leaves Google is there

F7t6gooc

```
 1    is kind of a general argument, that, well, the Court in the
 2    underlying action is going to know the relevance better than
 3    this Court perhaps or there is some judicial efficiency in
 4    transfer this all to one place.  The problem for that argument
 5    is that that simply is not what the drafters of the rules said.
 6    The drafters of the rules could have gone in that direction,
 7    but they didn't.  They required extraordinary circumstances
 8    which the advisory committee said is only likely to arise in
 9    rare occasions.
10            THE COURT:  I will interrupt you here.  I actually
11    heard a lot of the dialogue around the passage of this rule and
12    they were afraid that judges would reflect the case back to the
13    original district and they didn't want that to happen.
14            If you don't mind, I am going to stop you right there
15    unless there is any last burning point you need to make.
16            MR. HANDZO:  There is not a burning point unless
17    Mr. Wilkens tells me there is and he tells me there isn't.
18            THE COURT:  I am prepared to rule then.
19            I am going to grant the motion for transfer.
20    Petitioner's Rule 45(f) motion to transfer is granted.
21    Petitioner's motion to compel compliance with subpoenas at
22    Docket No. 1 is hereby transferred to the Honorable Henry
23    Wingate in the United States District Court for the Southern
24    District of Mississippi.  I will give you some explanation of
25    my finding.
```

F7t6gooc

1           As we all know Judge Ramos -- then acting as Part I

2    Judge -- heard oral argument on this motion on July 10, 2015.

3    He denied the motion to transfer, but he also said explicitly

4    it was a very close call.  The Order I issued on July 23, 2015,

5    states, "a district court possesses the inherent authority to

6    sua sponte reconsider its own interlocutory orders before they

7    become final."  Chartis Seguros Mexico, S.A. de C.V. v. HLI

8    Rail Rigging, LLC, No. 11 Civ. 3238, 2015 WL 545565, at *2

9    (S.D.N.Y. Feb. 9, 2015).  In other words, "application of the

10   law of the case doctrine is discretionary and does not limit a

11   court's power to reconsider its own decisions prior to final

12   judgment."  Aramony v. United Way of Am., 254 F.3d 403, 410 (2d

13   Cir. 2001).

14          That is all a short way of saying I have the power to

15   essentially change the mind of the court and make a different

16   decision from the decision that Judge Ramos made and that is

17   what I am doing.  I did want to hear the parties on what more

18   developed and I appreciate the parties making those arguments.

19          I am well aware of what the commit notes to Rule 45(f)

20   provide.  They state, "The court may transfer in exceptional

21   circumstances, and the proponent of transfer bears the burden

22   of showing that such circumstances are present.  The prime

23   concern should be avoiding burdens on local nonparties subject

24   to subpoenas, and it should not be assumed that the issuing

25   court is in a superior position to resolve subpoena-related

F7t6gooc

 1   motions.  In some circumstances, however, transfer may be

 2   warranted in order to avoid disrupting the issuing court's

 3   management of the underlying litigation, as when that court has

 4   already ruled on issues presented by the motion or the same

 5   issues are likely to arise in discovery in many districts.

 6   Transfer is appropriate only if such interests outweigh the

 7   interests of the nonparty served with the subpoena in obtaining

 8   local resolution of the motion.

 9          For the sake of expediency, I will not reiterate the

10   remainder of the factual background and applicable law that

11   Judge Ramos thoroughly laid out at the July 10 Hearing.  As

12   Judge Ramos said, this is an "extremely close case" where

13   "reasonable minds can disagree."  Although I disagree as to the

14   ultimate resolution of this motion, I agree with Judge Ramos'

15   summary of the history of this case as well as his assessment

16   of the applicable law.  I will add, however, that -- since Rule

17   45(f) became effective on December 1, 2013 -- there have been

18   just over 40 written opinions citing Rule 45(f) to date.  Of

19   those that adjudicate Rule 45(f) motions, and not all of them

20   do, the majority grant the motion to transfer.

21          I find that, here, exceptional circumstances --

22   including Judge Wingate's management of the underlying

23   litigation -- outweigh the interests of the subpoenaed parties

24   in obtaining local resolution of the motion.  It is for that

25   reason I am granting Google's motion to transfer.

F7t6gooc

1           First, I agree with Judge Ramos that "Google has the
2    better of the undue burden argument."  "Other courts have
3    indicated that concerns regarding the burdens of transfer are
4    lessened when the disputed subpoena is directed to a large
5    corporation, rather than an individual person."  I am quoting
6    Agincourt Gaming, LLC v. Zynga, Inc., No. 14 Civ. 0708, 2014 WL
7    4079555, at *8 (D. Nev. Aug. 15, 2014) The fact that the
8    subpoenaed party is "a large corporation represented by
9    sophisticated counsel is by no means a dispositive
10   consideration, but it is relevant as the Court evaluates any
11   burden imposed."  Id.
12           Here, the subpoenaed parties argue that they would be
13   subject to undue burden, as they have no offices in Mississippi
14   and would therefore be required to travel more than 1,000 miles
15   for litigation in which they are not a party.  "Almost any
16   subpoenaed party could make the same undue burden arguments" --
17   that litigating its discovery dispute in a foreign district
18   would cause the party undue burden.  Chem-Aqua, Inc. v. Nalco
19   Co., No. 14 Misc. 71, 2014 WL 2645999, at *3 (N.D. Tex. June
20   13, 2014).  Furthermore, the subpoenaed parties may be
21   permitted to make telephonic appearances at any hearing in
22   Mississippi.  I am told by counsel for Google that in fact is
23   the case.  See id at *3-4.; see also Judicial Watch, Inc. v.
24   Valle Del Sol, Inc., No. 14 Misc. 0538, 2014 WL 4954368, at
25   *3-5 (D.D.C. Oct. 3, 2014) and Moon Mountain Farms, LLC v.

20

F7t6gooc

1    Rural Cmty. Ins. Co., 301 F.R.D. 426, 430 (N.D. Cal. 2014).

2             Accordingly, I find the subpoenaed parties have failed

3    to show they would be subject to undue burden should the

4    subpoena-related motions be transferred to Judge Wingate.

5             Turning to exceptional circumstances, I find that

6    Google has demonstrated circumstances that warrant transfer of

7    the subpoena-related motions, as contemplated by Rule 45(f).

8             First -- although questions of relevance come up in

9    any case -- the questions of relevance here implicate the scope

10   of discovery in the underlying litigation before Judge Wingate.

11   Citing considerations of judicial efficiency and comity, courts

12   have granted Rule 45(f) motions where the subpoena-related

13   motions go to the scope of discovery in the underlying

14   litigation.  In F.D.I.C. v. Everest Reinsurance Holdings, Inc.,

15   for example, Judge Failla of this court transferred a motion to

16   compel and noted that, as the judge in the underlying

17   litigation had yet to rule on the relevance of the subpoenaed

18   information, and I gather it is similar here.  She wrote,

19   "wishes not to hamstring his ability to control and delineate

20   the parameters of discovery in the" underlying action.  No. 13

21   Misc. 381, 2014 WL 260589, at *2 (S.D.N.Y. Jan. 23, 2014).

22   Likewise, in Wultz v. Bank of China, Ltd., the court granted a

23   Rule 45(f) motion to transfer to Judge Scheindlin of this court

24   who was presiding over the underlying litigation -- "due to her

25   familiarity with the full scope of issues involved as well as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7t6gooc

1    any implications the resolution of the motion will have on the

2    underlying litigation."  304 F.R.D. 38, 47 (D.D.C. 2014).

3    Courts have likewise rejected arguments by subpoenaed parties

4    that the subpoenas at issue are irrelevant to the underlying

5    dispute and held instead that such relevance arguments

6    "emphasize the need for the court where the underlying matter

7    lies to decide" the subpoena-related motions.  See XY, LLC v.

8    Trans Ova Genetics, L.C., No. 14 Misc. 00778, 2014 WL 4437728,

9    at *2 (D.D.C. Sept. 10, 2014).  In Federal Home Loan Mortgage

10   Corp. v. Deloitte & Touche LLP, the court rejected the very

11   argument that respondents present here -- "that nearly all

12   motions to compel would be subject to transfer if the rule were

13   so broad as to encompass any motion where another court has to

14   make a relevancy determination."  15 Misc. 568, 2015 WL

15   3413540, at *2 (D.D.C. May 2015).  There, the court held that

16   "resolution of the motion to compel requires delving into

17   substantive issues in the highly complex underlying action" --

18   which I find to be the case here as well.  I likewise reject

19   the subpoenaed parties' argument that these subpoenas present

20   only a "run-of-the-mill relevance dispute" -- the questions of

21   relevance here run much deeper than garden-variety relevance

22   objections.

23        Second, the main Mississippi litigation in the present

24   case is subject to an expedited discovery schedule, currently

25   set to conclude on August 10.  The parties expected to move

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7t6gooc

1    rapidly into summary judgment after the close of discovery.

2    Courts have considered unusual discovery timetables in granting

3    Rule 45(f) motions.  See, e.g., Federal Home Loan Mortgage

4    Corporation, 2015 WL 3413540, at *3 and In re Subpoena to Kia

5    Motos America, Inc., No. 14 Civ. 315, 2014 WL 2118897 at *1

6    (C.D. Cal. Mar. 6, 2014).  Courts have also considered the

7    history of discovery in the underlying litigation,

8    particularly, how contentious discovery has been to date.

9    Seems to be the case here.  See Elliot v. Mission Trust Servs.,

10   LLC, No. 14 Civ. 972, 2014 WL 7157156, at *3 (W.D. Tex. Dec.

11   12, 2014).  Accordingly, I find that the transfer may help

12   avoid unnecessary disruption with Judge Wingate's management of

13   his case particularly in light of the looming discovery cutoff

14   date.

15         Third, I note separately that the allegations that

16   Google presents here resemble those in the underlying

17   litigation addressed in Valle Del Sol, Inc. v. Kobach, No. 14

18   Misc. 219, 2014 WL 3818490 (D. Kan. Aug. 4, 2014), and Judicial

19   Watch, Inc., v. Valle Del Sol, Inc., No. 14 Misc. 0538, 2014 WL

20   4954368 (D.D.C. Oct. 3, 2014).  The underlying litigation in

21   those cases involved allegations that state officials in

22   Arizona worked in concert with private organizations to commit

23   constitutional violations.  In both cases, the courts agreed to

24   transfer the subpoena-related motions to the District of

25   Arizona.

F7t6gooc

1          By contrast, I am not persuaded by any of the

2    subpoenaed parties' remaining arguments in opposition.  First,

3    as they admit in their opposition, "the subpoenaed parties

4    declined to search for, review or produce documents that AG

5    Hood never saw, including internal communications about

6    contributions to AG Hood."  They contend that "such documents

7    are completely irrelevant to the underlying litigation."  As I

8    mentioned I am not persuaded at this juncture that this is

9    necessarily true, and Judge Wingate is best positioned to

10   evaluate the merits of the subpoenaed parties' arguments.

11   Second, the subpoenaed parties contend that Google's need to

12   issue multiple subpoenas in multiple jurisdictions was

13   "dubious" and that Google's subpoenas were simply a "tactical

14   ploy to create arguments for transfer, rather than any real

15   need for discovery."  At this stage I am hesitant to conclude

16   this is the case particularly when Google has subpoenaed third

17   parties necessary where third parties are located.

18          So in closing I find that the exceptional

19   circumstances here outweigh any interest that the subpoenaed

20   parties have in obtaining local resolution of the motions.

21   Google's Rule 45(f) motion to transfer is therefore granted.  I

22   will issue a short written order to that effect later today.

23          Thank you.

24                              oOo

25